## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BCB HOLDINGS LIMITED and THE BELIZE BANK LIMITED, | )<br>)<br>)<br>) |
| Petitioners/Plaintiffs, | ) Case No. |
| v. | )<br>)<br>) |
| THE GOVERNMENT OF BELIZE, | )<br>) |
| Respondent/Defendant. | )<br>)<br>) |

## <u>DECLARATION OF EAMON H. COURTENAY</u>

EAMON H. COURTENAY declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a Senior Counsel duly admitted to practice law in Belize. I am also a partner in the law firm of Courtenay Coye LLP, which acts as counsel for BCB Holdings Limited ("BCB Holdings") and The Belize Bank Limited ("BBL") (collectively, "Petitioners") in Belize.

2.      I submit this declaration in support of Petitioners' Petition to confirm a foreign arbitration award pursuant to Section 207 of the Federal Arbitration Act and Article III of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958.

3.      The purpose of my declaration is to provide certain factual information regarding legal proceedings in Belize as to which I have direct knowledge because of my role as counsel in those proceedings.

4.      I am fully familiar with the facts set forth herein.

A.    **The 2008 Election in Belize**

5.       BCB Holdings is a company incorporated in Belize that operates the largest full service commercial and retail banking operation in Belize.  BBL is one of BCB Holdings' principal subsidiaries.  The ultimate majority shareholder of BCB Holdings is Lord Michael Ashcroft, a British businessman.

6.       On February 8, 2008, a national election took place in Belize that resulted in a change in the political party that was in control of the Government of Belize (the "GOB"). As a consequence, the Honorable Dean Barrow was appointed the new Prime Minister and Minister of Finance (the "Prime Minister").

7.       The new government administration quickly became involved in a number of legal disputes.  Several disputes related to the GOB's refusal to honor contracts entered into by the prior government, especially an agreement between the GOB and the main provider of telecommunications in Belize, Belize Telemedia Limited ("Telemedia"). In August 2009, the GOB nationalized Telemedia, which gave rise to further claims and litigation.

8.       In response to these various claims, the GOB commenced litigation in Belize to enjoin these proceedings from going forward in any forum other than the Belize courts.  In addition, the GOB enacted new criminal legislation to impose mandatory criminal sanctions on parties who violated Belize court injunctions.  The ease with which the GOB obtained injunctive relief in the Belize courts, coupled with this new criminal legislation, had a chilling effect upon companies in Belize attempting to pursue legal claims against the GOB outside of Belize (like BCB Holdings and BBL) as well as on attorneys serving as counsel for companies adverse to the GOB (such as myself).

9.      Much of the GOB's rhetoric to justify the nationalization of Telemedia and the refusal to honor certain contracts was directed at Lord Ashcroft and his various businesses in Belize.

10.     I summarize below some of the actions taken by the GOB that have prevented or discouraged parties from enforcing their claims against the GOB outside of Belize.

**B.      The Telemedia Arbitration**

11.     On September 19, 2005, the GOB and the predecessor of Telemedia entered into an agreement called the Government Telecommunications Accommodation Agreement, which was subsequently amended (the "Accommodation Agreement").  A true and correct copy of the Accommodation Agreement is attached hereto as Exhibit A.

12.     Under the Accommodation Agreement, Telemedia agreed to acquire certain properties from the GOB (and in fact did so).  In return, the GOB agreed, inter alia, to afford Telemedia a minimum rate of return and certain tax treatment with respect to the Belize business tax, and to exempt Telemedia from import duties on goods and equipment imported for Telemedia's own use.

13.     The GOB agreed to arbitrate all disputes arising out of or in connection with the Accommodation Agreement in London pursuant to the arbitration rules of the London Court of International Arbitration (the "LCIA").

14.     In early 2008, after the election in Belize, the GOB refused to comply with the terms of the Accommodation Agreement.  As a result, Telemedia initiated arbitration proceedings against the GOB in London, and an arbitral tribunal was constituted in accordance with the LCIA rules.

15.     The GOB refused to participate in these arbitration proceedings.

16.     On March 18, 2009, the arbitral tribunal rendered a unanimous final award against the GOB and in favor of Telemedia.  The tribunal found that the Accommodation Agreement was legal and binding as a matter of Belize law and that the GOB had violated numerous provisions of the Accommodation Agreement.  The tribunal granted both declaratory relief and damages of approximately US $22 million against the GOB (the "Telemedia Award").  A true and correct copy of the Telemedia Award is attached hereto as Exhibit B.

17.     On March 20, 2009 Telemedia assigned the monetary portion of the Telemedia Award to Belize Social Development Limited ("BSDL"), a British Virgin Islands company that is not present in Belize.

18.     Also on March 20, 2009, the GOB issued a press release announcing its intention not to be bound by the Telemedia Award:

> "1. It has been and continues to be the government's position that the Accommodation Agreement is illegal and invalid. In that connection government notes that our local courts have already rejected the Agreement to the extent that the Agreement purports to authorize Telemedia not to pay its taxes.
>
> 2. The government of Belize will not be bound by any ruling of a foreign arbitral tribunal where that ruling conflicts with a position taken by Belize's superior courts.
>
> 3. Any damages award made under the umbrella of the London Court of International Arbitration must be brought to Belize for enforcement by our Supreme Court before it can have any practical effect. Government is completely confident that it can successfully resist any attempt at local enforcement. Indeed, that is one of the reasons government chose not to spend millions of dollars on representation before a foreign tribunal. We will defend the national position on national soil."

A true and correct copy of the GOB press release dated March 20, 2009 is attached hereto as Exhibit C.

19.     In April 2009, the GOB sought and obtained an ex parte injunction in Belize against Telemedia and BSDL to prevent enforcement of the Telemedia Award.  The injunction was granted and stated that Telemedia and BSDL:

> "their successors, assigns and subsidiaries, whether by themselves, their officers, servants, affiliates, agents or howsoever, shall be and are hereby restrained until further order from enforcing or causing to be enforced the 'Final Award' issued on the 18th March 2009… whether in Belize or any other jurisdiction outside Belize, or from commencing or continuing any other legal or arbitral proceedings in any country or jurisdiction whether in or outside of Belize, relating to or arising out of the said Final Award."

A true and correct copy of the ex parte injunction is attached hereto as Exhibit D.

20.     On July 20, 2009, after a hearing attended by Telemedia, but not BSDL, the Belize Supreme Court granted an interim injunction against Telemedia and BSDL that prohibited enforcement of the Telemedia Award in any jurisdiction other than Belize.  A true and correct copy of the interim injunction dated July 20, 2009 is attached hereto as Exhibit E  The court ordered that:

> "Belize Telemedia Limited and Belize Social Development Limited or their successors, assigns or subsidiaries, are hereby restrained by themselves, agent representative or howsoever, from enforcing or commencing or continuing in the United Kingdom or any other jurisdiction, proceedings for enforcing the award of the London Court of International Arbitration (LCIA), made on 18.3.2009, or from commencing or continuing in the United Kingdom or in any other jurisdiction, any proceedings relating to the enforcement of the award."

Exhibit E ¶ 31.3.

### C.     The Nationalization of Telemedia

21.     The Accommodation Agreement and Lord Ashcroft were used as the justification for the GOB's next step, the nationalization of Telemedia.  On August 25, 2009, the GOB enacted the Belize Telecommunications (Amendment) Act (the "Telecommunications

Act") and issued Statutory Instrument No. 104 of 2009, which resulted in the GOB's acquisition of 94% of the shares of Telemedia.  A true and correct copy of the Telecommunications Act and Statutory Instrument No. 104 of 2009 are attached hereto as Exhibit F.  The GOB acquired shares of Telemedia that the GOB believed were controlled by the companies owned or controlled by Lord Ashcroft.  The magnitude of this action was described by the Belize press on August 24, 2009 as follows:

> "There was a Special Sitting of the House of Representatives today but the term 'special' doesn't do it justice – it was historic, epochal, seismic. The Prime Minister introduced and the House passed the Belize Telecommunications Act of 2009 which allows government to acquire Belize Telemedia Limited. It is the most dramatic, consequential and bold piece of legislations ever taken to the legislature – and it changes everything. Government did it to resolve what had become an intractable and costly series of legal battles with Ashcroft affiliated interests which own BTL. The central basis for those battles was the Accommodation Agreement secretly signed by the Musa Administration in 2006."

A true and correct copy of Belize press article is attached hereto as Exhibit G.

22.     The Prime Minister set forth the rationale for the nationalization in a speech to House of Representatives on August 24, 2009:

> "As soon as we discovered this Accommodation Agreement and the fact that it had been secretly signed and secretly implemented by the PUP [People's United Party], we came to the Belizean public and denounced it.  Lord Michael Ashcroft is an extremely powerful man.  His net worth may well be equal to Belize's entire GDP. He is nobody to cross and the new government could well have chosen the path of least resistance; to cower in the face of the certain wrath of this potentate; to continue in the PUP style with business as usual; to betray, in other words, all that we had campaigned for, all that we had promised, and all that is basic and decent and straight forward if there is to be any ounce of trust left in public office.  But betrayal of the people is not in my nature, and not, I am surpassingly proud to say, in the nature of the United Democratic Party.
>
> And so we took counsel among ourselves and to a man the UDP cabinet voted, in the name of the Belizean people, to resist this

treasonous Accommodation Agreement at all costs.  Belizean Law and Belizean dignity would be upheld; Belizean pride and Belizean patriotism and Belizean patrimony vindicated.

And, of course, resisted we have.  Now no one can doubt the justice of our stand.  But, as we always knew, it has been costly.  Michael Ashcroft had Telemedia invoke arbitration in London to enforce the Accommodation Agreement.   And he obtained a judgment of 38.5 million dollars and a court–mandated requirement that government now begin to honor the Accommodation agreement.

Well, I have said that as God is my witness I will never pay that award.  But it doesn't stop there.  In April of 2009 Telemedia informed the government of further claims they will make to the London Court of International Arbitration, and that the size of a new award 'could pale the current award of 38 million into insignificance.'

Mr. Speaker, Members, fellow Belizeans:  this is intolerable.  I, and the United Democratic Party Government, in the name of the people will put up with it no longer.  That an agreement so patently illegal, so patently immoral, so patently anti-Belize, should continue to torture us, to bleed us, to subject us to this death by a thousand cuts, cannot for one second more be countenanced.  This is our House, this is our country.  Here we are masters, here we are sovereign.  And with the full weight of that sovereignty we must now put an end to this disrespect, to this chance taking, to this new age slavery.  There will thus be no more Telemedia awards against us; no more Telemedia court battles; no more debilitating waste of government's energies and resources; and there will be no more suffering of this one man's campaign to subjugate an entire nation to his will.  After long and sufficient consideration, therefore, and in the exercise of that national power that is ours by Constitution and inalienable right, this government will now acquire Telemedia."

A true and correct copy of the text of the Prime Minister's speech is attached hereto as

Exhibit H.

23.     This legislation led to several constitutional and other legal challenges

being filed by parties based on the GOB's taking of their interests in Telemedia.

### (i)      The Dunkeld Injunction

24.      One such party was Dunkeld International Investment Limited ("Dunkeld"), which held the majority of the shares of Telemedia that were nationalized by the GOB.

25.      Dunkeld commenced an arbitration proceeding against the GOB in December 2009 under the bilateral investment treaty between the United Kingdom and Belize (the "Bilateral Investment Treaty") based on the taking of its Telemedia shares.

26.      The GOB responded by commencing an action (the "GOB Lawsuit") against Dunkeld and others (together the "Dunkeld defendants") in the Belize Supreme Court for a declaration that the Belize Supreme Court was the proper forum for resolving matters arising out of the nationalization of Telemedia and that the commencement of the Dunkeld arbitration was oppressive, unconscionable and an abuse of the arbitral process.

27.      On December 30, 2009, the GOB obtained an ex parte injunction from the Belize Supreme Court against the Dunkeld defendants (the "Dunkeld Injunction") restraining them:

> "whether by themselves or by their officers, servants, agents, subsidiaries, assignees, or other persons and bodies under their control… from taking any or any further steps in the continuation or prosecution of the arbitration proceedings commenced…"

A true and correct copy of the GOB ex parte injunction against the Dunkeld defendants dated December 30, 2009 is attached hereto as Exhibit I.

28.      On January 8, 2010, several of the Dunkeld defendants applied to the Belize Supreme Court for an order discharging the injunction.  The GOB responded with an application requesting that the injunction be continued until the trial of the GOB Lawsuit.

29.     On February 10, 2010, in lieu of continuing the Dunkeld Injunction, the Belize Supreme Court entered a new injunction prohibiting any of the Dunkeld defendants or "their officers, servants, agents, subsidiaries, assignees, or other persons and bodies under their control… from taking any or any further steps in the continuation or prosecution of the arbitration proceedings commenced" until the GOB Lawsuit was decided by the Belize courts. A true and correct copy of the injunction dated February 10, 2010 is attached hereto as Exhibit J.

### (ii)     The British Caribbean Bank Injunction

30.     In August 2009, British Caribbean Bank ("BCB Bank"), which was at that time a subsidiary of BCB Holdings (but is no longer), had loan facilities in place to Telemedia and had taken security in Telemedia assets.

31.     Pursuant to the Telecommunications Act, the GOB acquired all of BCB Bank's security interests in Telemedia assets.

32.     On May 4, 2010, BCB Bank filed an arbitration (the "BCB Bank Arbitration") against the GOB under the Bilateral Investment Treaty for the taking of its interests without compensation.  At this same time, BCB Bank obtained an anti-suit injunction from the English High Court (the "BCB Bank Anti-Suit Relief") to restrain the GOB from seeking an order in the Belize courts to stop the arbitration.  A true and correct copy of the BCB Bank Anti-Suit Relief dated May 4, 2010 is attached hereto as Exhibit K.  The BCB Bank Anti-Suit Relief restrained the GOB from "commencing, pursuing, progressing or taking any steps before the Courts of Belize or elsewhere to enjoin or restrain [BCB Bank] and/or the Tribunal [in the BCB Bank Arbitration]."  *Id*.

33.     On August 16, 2010, in violation of the BCB Bank Anti-Suit Relief, the GOB filed a claim in the Belize Supreme Court.  A true and correct copy of the GOB claim is attached hereto as Exhibit L.  The GOB sought, *inter alia*, a declaration that the Belize Supreme Court is the proper forum to hear any complaint that BCB Bank had arising from the nationalization of its assets and that the BCB Bank arbitration was "oppressive, vexatious, inequitable and an abuse of the arbitral process."  Exhibit L ¶ 5.  The GOB further requested an anti-arbitration injunction.  *Id.*

34.     On December 7, 2010, the Belize Supreme Court granted the GOB an anti-arbitration injunction against BCB Bank.  A true and correct copy of the GOB anti-arbitration injunction against BCB Bank dated December 7, 2010 is attached hereto as Exhibit M .  The GOB anti-arbitration injunction restrained BCB Bank:

> "whether by itself or by its officers, servants, or agents, subsidiaries, assignees or other persons or bodies under its control, from taking any or any further steps in the continuation or prosecution of the arbitration proceedings [BCB Bank Arbitration] … until the hearing and determination of the local claims for compensation… and until any subsequent proceedings in the local courts in relation to the said local claims are heard and determined."

Exhibit M ¶ 92 (1).

### D.     The Belize 2010 Criminal Statute

35.     On March 31, 2010, the GOB enacted a new criminal law as an amendment to the Supreme Court of Judicature Act, Chapter 91 of the Laws of Belize "to strengthen the provisions relating to contempt of court; and to provide for matters connected therewith or incidental thereto."  This new law is entitled the Supreme Court of Judicature (Amendment) Act, 2010, Act. No. 18 of 2010 (the "2010 Criminal Statute").  A true and correct

copy of the 2010 Criminal Statute as enacted on March 31, 2010 (with the amendment of October 22, 2010) is attached hereto as Exhibit N.

36.     The 2010 Criminal Statute makes it a criminal offense, punishable by fines and/or imprisonment, to "disobey[] or fail[] to comply with an injunction, or an order in the nature of an injunction issued by the [Supreme Court of Belize]."  2010 Criminal Statute, Section 106A(1).

37.     ***Mandatory Penalties***. The 2010 Criminal Statute imposed mandatory penalties for violations.  It made such offenses punishable (against a natural person) by imprisonment "for a term which shall not be less than five years but which may extend to ten years" and/or by a fine "which shall not be less than fifty thousand dollars but which may extend to two hundred fifty thousand dollars."  2010 Criminal Statute, Section 106A(3)(i).  The law applied regardless of whether such injunction was issued "before or after" the 2010 Criminal Statute became effective, and applied "whether the offenses occurred in Belize or in any other territorial jurisdiction, or whether or not the offender was present in Belize or elsewhere."  2010 Criminal Statute, Sections 106A(7) and (6).

38.     ***Aiding or Facilitating***. The 2010 Criminal Statute made it a criminal offense if any person, "directly or indirectly, instigates, commands, counsels, procures, solicits, advises or in any manner whatsoever aids, facilitates, or encourages" violation of an injunction or similar order issued by the Supreme Court of Belize.  2010 Criminal Statute, Section 106A(4)(a).  The penalties for "abetting the said offense… shall be punished in like manner" (fines and/or imprisonment) as if the abettor "had committed that offense."  2010 Criminal Statute, Section 106A(4).  In other words, anyone who directly or indirectly "counsels, advises

or in any manner whatsoever aids, facilitates or encourages" a violation shall be subject to punishment as if he "had committed that offense."

39.     ***Individuals and Groups/Body of Persons***.  The 2010 Criminal Statute imposed criminal liability on individuals as well as a body of persons.  The statute provided that "[w]here an offense . . . is committed by a body of persons, whether corporate or unincorporated, every person who, at the time of the commission of the offence, acted in an official capacity for or on behalf of such body of persons, whether as shareholder, partner, director, manager, advisor, secretary or other similar officer . . . shall be guilty of that offense and punished accordingly unless he adduces evidence to show that the offence was committed without his knowledge, consent or connivance."  2010 Criminal Statute, Section 106A(5).  In other words, the 2010 Criminal Statute placed the evidentiary burden on each member of a body of persons to prove his or her innocence.

40.     ***Jurisdiction***. The 2010 Criminal Statute gave the Belize Supreme Court jurisdiction "to issue an injunction against a party or arbitrators (or both) restraining them from commencing or continuing any arbitral proceedings (whether sited in Belize or abroad), or an injunction against a party restraining it from commencing or continuing any proceedings for enforcement of an arbitral award (whether in Belize or abroad), where it is shown (in either case) that such proceedings are or could be oppressive, vexatious, inequitable or would constitute an abuse of the legal or arbitral process."  2010 Criminal Statute, Section 106A(8)(i).

41.     ***Adjudication and Punishment***.  Offenses set forth in the 2010 Criminal Statute "shall be investigated, tried, judged and punished by the [Belize] Court," regardless of whether they occurred in Belize or in any other territorial jurisdiction, or whether or not the alleged offender was present in Belize or elsewhere.  2010 Criminal Statute, Section 106A(6).

Additionally, alleged violations could be tried in the absence of the accused.  2010 Criminal

Statute, Section 106A(11).

42.     Soon after the 2010 Criminal Statute was enacted, I was asked by counsel

for BSDL in the United States to submit a declaration in connection with a proceeding by BSDL

to enforce the monetary portion of the Telemedia Award rendered in London against the GOB.

43.     By letter dated April 27, 2010, Allen & Overy LLP, who were counsel

for BSDL, sought my assistance in responding to issues raised by Belize Senior Counsel for the

GOB in that case.  A true and correct copy of the letter dated April 27, 2010 is attached hereto

as Exhibit O.

44.     As noted in paragraph 20 above, in July 2009 the GOB had obtained an

interim injunction against Telemedia and BSDL to prevent enforcement of the Telemedia

Award outside of Belize.

45.     As a result of the 2010 Criminal Statute and based on independent legal

advice that I had received, I concluded that I was unable to provide the requested assistance to

counsel for BSDL in the United States because my legal work could result in criminal sanctions

against me in Belize.

46.     On May 14, 2010, I replied to Allen & Overy stating:  "Unfortunately,

based on legal advice that I have received from counsel in Belize regarding Act No. 18 of 2010,

Supreme Court of Judicature (Amendment) Act, 2010, I am not in a position to provide a

witness declaration in the above-referenced proceeding."  A true and correct copy of this letter

is attached hereto as Exhibit P.[1]

---

[1] BSDL filed an application in the Belize Supreme Court challenging the lawsuit filed by the GOB in April 2009 and the injunction granted in that proceeding on the ground that proper service of process had never been made on BSDL outside of Belize and the court lacked jurisdiction.  The GOB chose not to contest this application.  As a

E.     **Legal Challenge to 2010 Criminal Statute**

47.     The 2010 Criminal Statute applied on its face both to parties who had been enjoined by the Belize Supreme Court as well as to counsel who advised these parties. Furthermore, the 2010 Criminal Statute threatened both parties and their legal advisors with mandatory criminal penalties.  As a result of the breadth and impact of the new criminal law, legal challenges to its constitutionality soon followed.

48.     On April 16, 2010, a group of individuals led by Philip Zuniga, and including Lord Ashcroft (the "Zuniga Group"), commenced proceedings in Belize challenging the constitutionality of the 2010 Criminal Statute.  A group of legal entities and individuals led by BCB Holdings and including BBL (the "BCB Holdings Group") joined the challenge on April 23, 2010.

49.     On December 22, 2010, the Belize Supreme Court concluded that the 2010 Criminal Statute was largely constitutional (although three sections were held to be invalid).  Importantly, the mandatory criminal penalty provision of the new law was upheld. The individuals and entities who filed this litigation, as well as the GOB, appealed the decision of the Belize Supreme Court to the Belize Court of Appeal.

50.     On August 8, 2012, the Belize Court of Appeal partially reversed the Supreme Court's decision. The Court of Appeal specifically struck down as unconstitutional three provisions of the statute: Section 106(A)(1), which created criminal offenses, Section 106(A)(3), which imposed mandatory penalties, and Section 106(A)(5), which reversed the presumption of innocence.  As a result, the Court of Appeal found that several other provisions of the 2010 Criminal Statute were rendered unenforceable.

---

result, on April 19, 2012, the Belize Supreme Court discontinued the 2009 claim against BSDL and also discharged the injunction against BSDL.

51.     The GOB appealed this decision to the Caribbean Court of Justice (the "CCJ"), which is the highest court to which parties in Belize could appeal.

52.     On January 24, 2014, the CCJ issued a final judgment regarding the constitutionality of the 2010 Criminal Statute in *The Attorney General of Belize v. Philip Zuniga, et al.,* [2014] CCJ 2 (AJ).  The CCJ, by majority, struck down substantial parts of the Criminal Statute on the ground that those parts were unconstitutional, but upheld the remaining parts (the dissenting judges would have struck down the entire statute).  Importantly, the CCJ confirmed that the mandatory criminal sanctions of the new law were unconstitutional.  A true and correct copy of the CCJ Judgment dated January 24, 2014 is attached hereto as Exhibit Q.

**F.      The January 2014 CCJ Judgment**

53.     The CCJ judgment explained the procedural context of the case, the factual background of the dispute between the parties, and the legal analysis of the statute.

54.     With regard to the procedural history, the Court noted the serious concerns created by the 2010 Criminal Statute:

> "At the time their challenge was mounted members of these groups feared that the legislation posed considerable, serious and immediate risks to their respective interests and accordingly, they instituted these proceedings . . . ."

Exhibit Q ¶ [3].  Although the CCJ believed that its decision in *British Caribbean Bank Ltd. v. The Attorney General of Belize*, [2013] CCJ 4 (AJ), reduced the fears of the litigants, it recognized that "[t]he legal issues raised by the appeal are still, however, of significant constitutional importance and the challengers retain their anxieties about the constitutional validity of the [2010 Criminal Statute]."  *Id.*[2]

---

[2] The *British Caribbean Bank* case concerned an anti-arbitration injunction obtained by the GOB and is discussed in paragraphs 60-61 of this declaration.

55.     The CCJ recounted the factual background that gave rise to the 2010

Criminal Statute and the resulting constitutional challenges:

> "[6]     The present Government of Belize has had a series of
> continuing disputes with members of both the Zuniga and the BCB
> Holdings groups.     These disputes relate back to an
> 'Accommodation Agreement' entered into in 2005 between Belize
> Telemedia Limited ('Telemedia') and the former Government.  It
> is unnecessary for the purpose of this appeal to enter into the
> details of this Accommodation Agreement.  It suffices merely to
> note that under the agreement the then Government granted certain
> financial concessions, assurances and inducements to Telemedia.
>
> [7]     Upon assuming office in 2008, the present Prime Minister
> disavowed the Accommodation Agreement.  He flatly stated that
> his Government would not be bound by its terms.  His conception
> of, and vigorous opposition to, the Agreement is well captured in
> his resolve, uttered in parliament.  'That an agreement so patently
> illegal, so patently immoral, so patently anti-Belize, should
> continue to torture us, to bleed us, to subject us to death by a
> thousand cuts cannot for one second more be countenanced'.
>
> . . .
>
> [9]     Throughout the series of events relating to the fall-out from
> the Accommodation Agreement, the Prime Minister consistently
> cast matters in terms of a battle between his government and Lord
> Michael Ashcroft, a member of the Zuniga group.   There is
> evidence to suggest that, at one time, the Prime Minister believed
> that Lord Ashcroft owned the bulk of the shares in Telemedia.  The
> Government's next move was to pass legislation acquiring 94% of
> the shares in Telemedia.  In fact, although Mr. Zuniga and other
> members of the Zuniga group, including Lord Ashcroft, were
> indeed at the time directors or officers of Telemedia or persons
> with some interest in Telemedia, 71% of the shares were owned by
> Dunkeld International Investment Limited ('Dunkeld'), a Turks &
> Caicos Island company wholly owned by Hayward Charitable
> Belize Trust ('the Hayward Trust').
>
> . . .
>
> [11]    There exists a bilateral investment treaty between the
> Government of the United Kingdom and the Government of Belize
> prohibiting the nationalization or expropriation of investments
> except for specified purposes and upon payment of just and
> equitable compensation.  Dunkeld responded to the acquisition of

its shares by invoking the arbitration clause contained in this bilateral investment treaty.  [British Caribbean Bank Limited] also notified the Government of its intention to commence arbitration proceedings.

[12]    The Prime Minister made further public statements indicating that 'he [the reference was to Lord Ashcroft] must realize I don't care how much money he has, I don't care how powerful he thinks he is, he cannot and will not defeat the sovereign united nation...'  Taking the view that the members of the Zuniga group were Trustees of the Hayward Trust (although in fact, they were mere advisors to the Trust); that the Belize courts were the proper forum for determining all matters in relation to the acquisition of Telemedia and compensation for expropriated shareholders; and the arbitral proceedings related to the acquisition, commenced contemporaneously with the earlier mentioned domestic proceedings, were oppressive and unconscionable, the Government filed a suit against Dunkeld and the Zuniga group claiming a permanent injunction to prevent them from taking further steps in the arbitration processes they had instituted.  The Government also applied for and obtained in December 2009 an interim injunction preventing these parties from proceeding further with arbitration.  In February 2010 the Belize trial court continued this interim injunction until the hearing and determination of the suit filed by the Government.

. . .

[14]    In the wake of the passage of the [2010 Criminal Statute] the members of the Zuniga group resigned as advisors of the Hayward Trust with effect from 29th March 2010.  They apparently feared that they could be charged under the Act and resigned in light of the injunction that had been granted against Dunkeld, their lack of control over the actions of Dunkeld and bearing in mind the stiff sanctions introduced by the [2010 Criminal Statute] against even advisors to a party disobeying a court injunction.  The Zuniga group launched their challenge to the constitutionality of the [2010 Criminal Statute] in April 2010 and, within a few weeks, the BCB Holdings group applied to be joined to the suit as Interested Parties."

*Id*.  ¶¶ [6]-[14].

56.    The CCJ then reviewed the 2010 Criminal Statute and addressed the constitutional challenges.

57.     The CCJ struck down the mandatory criminal penalties in Section

106(A)(3) of the 2010 Criminal Statute.  In doing so the CCJ explained:

> "[62]   . . . In this case the mandatory minimum fines of $50,000
> plus a daily rate of $100,000 are well beyond the ability of the
> average Belizean to pay and so are grossly disproportionate.
> Equally, the imposition of a mandatory minimum fine of
> $50,000.00 or a sentence of imprisonment for at least a stretch of
> five years on anyone convicted of any of the offences in question
> (save those whose sentences fall within mitigating criteria
> fashioned not by the court but by Parliament)[3] is grossly
> disproportionate.  It bears no reasonable relation to the scale of
> penalties imposed by the Belize Criminal Code for far more
> serious offences and for that reason it is also arbitrary.  In our
> view, the mandatory minimum sentences here should indeed be
> characterized as being grossly disproportionate, inhumane and
> therefore unconstitutional for contravening section 7 of the
> Constitution."

*Id.*  ¶ [62].

58.     The CCJ also found that Section 106(A)(5), which was alleged to have

reversed the burden of proof requiring defendants to prove their innocence, was inconsistent

with the Constitution of Belize and was thereby invalid in its entirety because the it

"contravene[d] the principle of the presumption of innocence"  *Id.* ¶ [71].

59.     A majority of the CCJ struck down the unconstitutional provisions of the

2010 Criminal Statute and left the other portions of the law in force.

60.     The CCJ referred to one of its recent decisions -- *British Caribbean Bank*

*Ltd. v. The Attorney General of Belize*, [2013] CCJ 4 (AJ), (2013) 82 WIR 63 -- the appeal from

the case described in paragraph 34, above, relating to an anti-arbitration injunction obtained by

---

[3] The GOB had amended the 2010 Criminal Statute to provide criteria by which the mandatory penalties could be mitigated for individuals.  (*See* Exhibit N at pages 533-534.)  However, the CCJ concluded that these provisions must be severed from the 2010 Criminal Statute because they would not have been enacted without "the unconstitutional mandatory penalties."  CCJ Judgment ¶ [99].

the GOB against BCB Bank.  A true and correct copy of the CCJ Judgment dated June 25, 2013

is attached hereto as Exhibit R.

      61.    In the *British Caribbean Bank* decision, the CCJ addressed the standard

that applied to the issuance of an injunction under Section 106A(8)(i) of the 2010 Criminal

Statute.  The CCJ discharged the injunction that had been issued by the Belize Supreme Court

(and upheld on appeal to the Court of Appeal) enjoining the arbitration proceedings filed by

BCB Bank.  In doing so, the CCJ identified the limited circumstances under which injunctions

may be granted to interfere with arbitration proceedings:

> "[41]  In particular, the jurisdiction to grant an anti-arbitration injunction must be exercised with caution and only granted if the arbitral proceedings are vexatious or oppressive.  Proceedings could be vexatious where they are absurd or the litigant seeks some fanciful advantage by suing in two courts at the same time but they would not be so held where there are substantial reasons of benefit to the plaintiff to bring the two sets of proceedings.  There is no presumption that a multiplicity of proceedings or that merely bringing the proceeding in an inconvenient place is vexatious. . . . The equitable basis of the jurisdiction makes it a remedy based on the wrongful conduct of the person to be restrained.  In cases of restraining international arbitration proceedings, the court must re-double the caution it normally exercises in restraining foreign proceedings because of the importance of recognizing and enforcing the agreement of parties to the mechanism for dispute resolution and the accepted principle of international law that the arbitral tribunal should not be subjected to the control of the domestic courts before it makes an award."

Exhibit R ¶ [41].

      62.    As a result of these two recent CCJ decisions, it should now be more

difficult for Belize courts to issue injunctions to prevent arbitration proceedings or to prevent

proceedings to enforce arbitration awards.  The mandatory sanctions in the 2010 Criminal

Statute have been struck down as unconstitutional, but much of that statute remains in force.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on 26th June 2014 in Belize City, Belize.

_____
Eamon H. Courtenay

# Courtenay Declaration Exhibit A

# GOVERNMENT TELECOMMUNICATIONS ACCOMMODATION AGREEMENT

## SECTION 1

THE PARTIES

This is an agreement made on this 19th day of September, 2005 by and between the **Government of Belize** (including its ministries, departments, and political subdivisions) acting through its authorized representative the Honorable Said Musa, Prime Minister and Minister of Finance (hereinafter referred to as the "Government") and **Belize Telecommunications Limited,** a public company duly incorporated under the laws of Belize with its principal offices situated at the Esquivel Telecom Center, St. Thomas Street, Belize City, Belize (hereinafter referred to as "BTL").

## SECTION 2

DESCRIPTION

In order to better accommodate the Government's telecommunications needs and other requirements, BTL has agreed to acquire certain properties from the Government, and in consideration for the acquisition of these properties and this accommodation, the Government has agreed to afford BTL the benefits, covenants and undertakings contained in this Agreement.

## SECTION 3

DEFINITIONS

As used in this Agreement, the following definitions shall apply to the capitalized words as follows:

3.1    $ shall mean the lawful money of Belize.

# GOVERNMENT TELECOMMUNICATIONS ACCOMMODATION AGREEMENT

## SECTION 1

THE PARTIES

This is an agreement made on this 19th day of September, 2005 by and between the **Government of Belize** (including its ministries, departments, and political subdivisions) acting through its authorized representative the Honorable Said Musa, Prime Minister and Minister of Finance (hereinafter referred to as the "Government") and **Belize Telecommunications Limited,** a public company duly incorporated under the laws of Belize with its principal offices situated at the Esquivel Telecom Center, St. Thomas Street, Belize City, Belize (hereinafter referred to as "BTL").

## SECTION 2

DESCRIPTION

In order to better accommodate the Government's telecommunications needs and other requirements, BTL has agreed to acquire certain properties from the Government, and in consideration for the acquisition of these properties and this accommodation, the Government has agreed to afford BTL the benefits, covenants and undertakings contained in this Agreement.

## SECTION 3

DEFINITIONS

As used in this Agreement, the following definitions shall apply to the capitalized words as follows:

3.1    $ shall mean the lawful money of Belize.

3.2     Force Majeure shall mean, with respect to any party, any event or condition that is beyond its reasonable control, or which it could not reasonably have foreseen or otherwise prevented and shall include, subject to the foregoing, without limitation, insurrection, war or other armed conflict, floods, earthquakes, hurricanes and other natural disasters, acts of God or other public enemy, fire, strikes, walkouts, and other labour difficulties, whether or not the affected party is in a position to accede to the demands arising in connection therewith, embargos, acts of civil or military authorities and failures of suppliers to deliver, except, that the acts of the Government of Belize taken in its sovereign capacity shall not be an act of force majeure excusing the performance of the Government.

3.3     Government shall mean the sovereign and duly constituted Government of Belize, including its ministries, departments, political subdivisions, and appointees of Her Majesty.

There are one or more terms defined within this Agreement in Sections other than this Section 3.

## SECTION 4
### AGREEMENT

BTL hereby agrees to acquire from the Government certain properties more fully described in Schedule 1. hereto (the "Properties") and in the manner provided for in Section 5 of this Agreement, in order to better accommodate the Government's telecommunications needs and other requirements (the "Accommodation"), and in consideration for the acquisition by BTL of the Properties and the Accommodation, the Government hereby grants and affords to BTL the benefits, covenants and undertakings provided for herein, the receipt and sufficiency of which are acknowledged by both parties.

obligations, any material indenture, mortgage, trust deed, bond or other instrument or agreement to which it is bound, or any award, order, judgment, regulation, injunction, resolution, determination or other ruling of any court or governmental authority, agency or instrumentality which is binding on it; (d) do not constitute or result in (even if notice is given, time elapses or both) a default, event of default or event of acceleration under any contract which is binding on or affecting it;

(ii)     it has taken all action required by law, regulation, or policy required to authorize the execution, delivery and performance of this Agreement, and this Agreement is a valid and binding agreement of the Government in accordance with its terms.

(iii)    the undersigned party executing this Agreement on behalf of the Government has been duly authorized to execute this Agreement.

(iv)     it is not in violation or breach of, or in default under, any law, rule or regulation, any duty or obligation, or any indenture, mortgage, trust deed or other instrument or agreement to which it is bound, so as to materially and adversely affect in any of the foregoing instances, its ability to perform its obligations hereunder; and, as of the date of this Agreement, there is no pending or, to its knowledge, threatened action or proceeding affecting it before any court, governmental agency or arbitrator which may materially and adversely affect its assets, financial condition, affairs or its ability to either execute, deliver or perform (or the ability of the BTL to enforce) this Agreement;

(v)      its obligations hereunder are direct, unconditional and general obligations;

## SECTION 5
## SALE AND PURCHASE OF PROPERTIES

5.1     The Government wishes to sell the Properties to BTL and BTL wishes to
        purchase the Properties from the Government for a total consideration of
        $19,200,000 (the "Property Consideration") and the Government hereby
        warrants and guarantees to BTL that on completion of the sale and
        purchase of the Properties to BTL ("Completion"), BTL will obtain good
        and clear title in fee simple to the Properties free and clear of all liens,
        charges and encumbrances.

5.2     The Government shall deliver to BTL no later than two weeks prior to
        Completion proof of good and clear title to the Properties in a form and
        manner acceptable to BTL.

5.3     The Government shall on Completion deliver to BTL duly completed
        conveyances or instruments of transfer to the Properties in a form
        acceptable to BTL together with the deeds, land certificates or other title
        documents relating to the Properties and such further documents and other
        assurances sufficient to enable BTL to its satisfaction to be registered and
        recorded with absolute title to the Properties free and clear of all liens,
        charges and encumbrances.

5.4     On Completion, BTL shall satisfy the payment of the Property
        Consideration to the Government by the execution and delivery by BTL to
        the Government of a loan note in the form set out in Schedule 3. (Form of
        Loan Note) hereto,  for the full amount of the Property Consideration.

5.5     Completion shall take place at the Central Bank in Belize City on a date to
        be agreed by the parties but no later than December 31, 2005.

5.6 All stamp duty and registration, recording and filing fees payable on the conveyance or transfer of the Properties to BTL shall be for the account of the Government.

## SECTION 6

GOVERNMENT COVENANTS AND UNDERTAKINGS

6.1 In consideration for the acquisition of the Properties by BTL and the Accommodation, the Government covenants and undertakes as follows:

(i) Authority, Permits and Licenses – to take all necessary steps to procure to the satisfaction of BTL that: (a) within 90 days of the date of the execution of this Agreement no persons other than BTL and Speednet Communications Limited ("Speednet") will hold an Individual License (within the meaning of the Telecommunications (Licensing Classification, Authorization and Fee Structure) Regulations 2002 (the "Regulations")) granted pursuant to the Belize Telecommunications Act, 2002; (b) no persons other than BTL, Speednet, and those persons who hold Class Licenses issued pursuant to the Regulations, have or will have or be granted any authority, permit or license in Belize to legally carry on, conduct or participate in the telecommunication business, or provide any telecommunication services; (c) no person other than BTL and Speednet have or will have or be granted any authority, permit or license in Belize to legally carry on, conduct, or provide telecommunication services involving or allowing the provision or transport of voice services, and (d) no holder of any Class License has or will have or be granted any authority, permit or license in Belize to legally carry on, conduct, or provide telecommunications services involving or allowing the provision or transport of voice services.

(ii)     Return on Capital Investment – to take all necessary steps to procure to the satisfaction of BTL that with effect from June 30, 2005 and going forward, BTL is able to charge to its subscribers and customers rates and charges which enable BTL to fully achieve the Minimum Rate of Return ("MROR") as provided for and calculated in accordance with Schedule 2. (Rate of Return: Determination).

(iii)    Management Services – in the event that BTL engages any company to render any management services, to take all necessary steps to procure that BTL is able to pay to them fees and foreign currency in such amounts as the Board of Directors of BTL shall approve and to procure that the repatriation of such fees and foreign currency and the receipt of such fees and foreign currency by any manager are not subject to currency restrictions, withholding taxes or other similar taxation by the Government, but subject to any applicable business tax.

(iv)    Foreign Exchange Controls - to permit BTL without restriction, to make payments in foreign currency to international correspondents; creditors of BTL of debt denominated in foreign currency; suppliers of imported supplies of equipment, materials and services used and needed by BTL's operations, and to any Belizean or foreign entity or person by way of dividends declared on BTL shareholdings or other sums due from BTL.

(v)     Tax. – to procure that the payment and repatriation of BTL dividends to any person, and the payment of interest on debt denominated in foreign currency by BTL, is not subject to withholding tax or any other tax of any other kind or character.

(vi)    Offshore Accounts – to permit and not restrict BTL's ability to
        maintain financial accounts offshore (including in countries other
        than Belize).

(vii)   Disposition of the Interconnectivity and Infrastructure Sharing
        Issues – to take all necessary steps to procure that in the event BTL
        is required to provide interconnection services to, or to share
        infrastructure with, any person other than Speednet, any
        interconnectivity and/or infrastructure sharing between BTL and
        such person is achieved in such a manner that charges for BTL's
        interconnection services and/or infrastructure facilities reflect
        BTL's costs based upon a total system costs allocation (including
        indirect and common costs) and will include a return on capital
        employed after tax of 15% per annum.

(viii)  Shareholder and Employee Suits – to procure that the Belize Social
        Security Board withdraws Case No. 557/2002 against BTL.

(ix)    Foreign Nationals – in the event that BTL is of the opinion that it is
        not able to find the appropriate personnel in Belize, to procure the
        grant of all necessary visas and work permits to enable BTL to
        employ foreign nationals in Belize (including the grant of visas to
        their family members) to carry on BTL activities and to enable
        foreign nationals to serve as directors of BTL. This paragraph
        shall apply whether such visas and work permits are permanent or
        temporary in nature.

(x)     Non-Renewal of Individual License – in the event that the
        Government and the Public Utilities Commission do not renew
        BTL's Individual License upon the expiration of its term, to

acquire all the assets and rights of BTL for their fair market value using a valuation as if the license had been renewed (on the same terms and conditions) and BTL remained as a going concern. If the Government and BTL can not agree upon the valuation, then they agree to enter into binding arbitration pursuant to the provisions of this Agreement. Notwithstanding anything herein to the contrary, if the prospective renewal of the license is not upon terms and conditions acceptable to BTL, then BTL shall be entitled to the same treatment as if the license had not been renewed.

(xi)   No changes to terms of Individual License – to take all necessary steps to procure that no changes are made to the terms of BTL's Individual License without the prior written agreement of BTL.

(xii)   No undermining of material guarantee– to take all necessary steps to procure that the Public Utilities Commission does not undermine any guarantee, undertaking, covenant or assurance given by the Government to BTL in this Agreement.

## SECTION 7
### GOVERNMENT REPRESENTATIONS AND WARRANTIES

7.1   The Government represents and warrants that:

(i)   the execution, delivery and performance of this Agreement: (a) are its legal, valid and binding obligation, enforceable against it by BTL in accordance with its terms, and that it has all powers, authorities, consents and approvals necessary to enter into this Agreement; (b) have been duly ratified by all necessary constitutional and legal action; (c) do not contravene the constitution of Belize or any law, rule, regulation, treaty, regulated practice, procedure or internal policy or any of its duties or

(vi)     it will cooperate in all respects to the end that all matters and transactions contemplated by this Agreement will be consummated; and

(vii)    to the best of the Government's knowledge, all of the representations of the Government contained in Section 7 of this Agreement are true and correct.

## SECTION 8
## BTL REPRESENTATIONS AND WARRANTIES

8.1     BTL represents and warrants:

(i)      it is a public limited company duly established and incorporated, validly existing and in good standing under the laws in operation in Belize;

(ii)     it has taken all action required by law required to authorize the execution and delivery of this Agreement, and this Agreement is a valid and binding Agreement of BTL in accordance with its articles of incorporation and governing instruments;

(iii)    the undersigned party executing this Agreement on behalf of BTL has been duly authorized by the Board of Directors of BTL to execute this Agreement;

(iv)     it has the requisite human resources and capital and ability to raise financing to perform all of its obligations and undertakings required by this Agreement, and

(v)     it is not bankrupt, has not been and is not subject to any
        insolvency proceedings, nor has it filed for nor is it in any other
        way involved in any proceedings for re-organization of the
        company or in any similar proceedings which would affect BTL's
        capacity to assume the obligations under this Agreement or its
        ability to perform its obligations hereunder.

## SECTION 9
CONDITIONS PRECEDENT TO OBLIGATION OF BTL

The obligations of BTL under this Agreement are subject to the satisfaction at or
before Completion of all of the following conditions:

9.1     Accuracy of Representations and Warranties – The representations and
        warranties of the Government contained in this Agreement shall be true in
        every material respect on and as of the Completion, with the same effect
        as though such representations and warranties had been made on and as of
        such date.

9.2     Performance of Agreements – The Government shall have performed all
        obligations and agreements required to be performed by it and complied
        with all terms and conditions required to be complied with by it,
        hereunder, on or prior to the Completion except to the extent attributable
        to obligations, agreements and actions imposed on the Government
        hereunder post Completion.

9.3     Cancellation of Individual License – The receipt by BTL of written
        confirmation from the Government in a form acceptable to BTL that the
        Public      Utilities     Commission      has      written      to      International
        Telecommunications        Limited        ("Intelco")        cancelling        all
        telecommunications licenses held by Intelco including the Individual

License dated December 30, 2002, with all such cancellations to take effect within 90 days of the date of the execution of this Agreement.

## SECTION 10
CONDITIONS PRECEDENT TO OBLIGATION OF THE GOVERNMENT

The obligations of the Government under this Agreement are subject to the satisfaction at or before Completion of all of the following conditions:

10.1 Accuracy of Representations and Warranties - The representations and warranties of BTL contained in this Agreement shall be true in every material respect on and as of Completion with the same effect as though such representations and warranties had been made on and as of such date.

10.2 Performance of Agreements – BTL shall have performed all obligations and agreements required to be performed by it and complied with all terms and conditions required to be complied with by it, hereunder, on or prior to Completion except to the extent attributable to obligations, agreements and actions imposed on the Government hereunder post Completion.

## SECTION 11
POST COMPLETION OBLIGATIONS AND OTHER OBLIGATIONS

11.1 The Government shall procure that the post Completion obligations set out in Section 11.3 (the "GOB Post Closing Obligations") are fully met to the satisfaction of BTL.

11.2 BTL shall be entitled to waive the GOB Post Closing Obligations (or any part of the same) or to extend any time line for their satisfaction, by notice in writing to the Government.

11.3    The GOB Post Closing Obligations are as follows:

(i)    the Government undertakes to procure that for the duration of
BTL's Individual License or for a minimum term of 15 years,
which ever is the longer period:

(a)    Voice Over Internet – (a) no Class License holder is able
to use or permit the use of "voice over internet" for any
telecommunications traffic originating or terminating
within Belize; (b) no user or customer of a Class License
holder is able to make use of "voice over internet"
services, and (c) any user or customer of an Individual
License holder is only able to make use of "voice over
internet" services with the written approval of the
Individual License holder concerned.

(b)    No Competing Individual License Holder Other than
Speednet – Other than the Individual License held by
Speednet, BTL shall be the sole Individual Licensee for the
the duration of its license or for a minimum term of 15
years,  which ever is the longer period.

(c)    Rate Setting – For the purpose of agreeing to rates or
setting rates: (i) a cost based approach shall be adopted by
BTL and the Public Utilities Commission which fully
utilizes all charges (including all taxes) incurred by BTL,
projected on a forward looking basis plus a profit mark-up,
and (ii) no rate setting proceeding shall be permitted that
has the effect of suspending BTL requested rates for more
than six (6) months.

(d)     No Duty to Share Facilities or Infrastructures Other than with Speednet – BTL shall have no duty or obligation to share facilities or infrastructure other than with Speednet.

(e)     Rate of Return: Methodology – the methodology to determine BTL's rate of return shall be in accordance with Schedule 2 (Rate of Return: Determination).

(f)     Business Tax – the tax treatment of BTL shall be no less favorable than that afforded to other telecommunication licensees in Belize. To enable telecommunications service providers to lower the rates to their subscribers the Government undertakes by no later than April 1, 2008 to adjust the rate of the Business Tax applicable to telecommunications services so that the amount of the Business Tax payable does not exceed the amount of income tax otherwise payable by them.

(g)     Import Duties – BTL and its subsidiaries shall be exempt from any tax, duty, levy or impost upon goods, materials, equipment and machinery of every type or description imported for their own use. No exemption shall be granted for goods imported for immediate (within 6 months) resale as new goods in the normal course of business to third parties.

(h)     Resale Of Services – BTL is able to restrict the resale of its services in accordance with Section 25 of the Belize Telecommunications Act 2002 (including any obligation to

provide indirect access to BTL's telecommunications network) but shall be obligated to provide interconnection services to Speednet.

(i) Service Provision – BTL shall not be under any obligation to provide any service within any defined timescale, other than as is commercially agreed between BTL and its customers.

(ii) Recognition of Properties – the Government undertakes to procure the receipt by BTL within 2 weeks of the date of Completion of written confirmation in a form acceptable to BTL that all Properties acquired by BTL hereunder will be recognized by the Government and the Public Utilities Commission as constituting part of the "Rate Base" for the purposes of the rate of return determinations set out in Schedule 2 hereto.

11.4 In the event that BTL fails to achieve, in any given financial year during the duration of BTL's Individual License, an Achieved Rate of Return (as defined Schedule 2. hereto) greater than or equal to the Minimum Rate of Return (as defined in Schedule 2. hereto), then the Government hereby irrevocably undertakes to monetarily compensate BTL to the full extent of any shortfall in Earnings (as defined in Schedule 2 hereto), so that the Achieved Rate of Return is equal to the Minimum Rate of Return in the financial year under consideration. Any shortfall shall be demonstrated by reference to BTL's group audited accounts for the relevant financial year and a capital rate of return statement to be prepared by BTL in accordance with its normal accounting procedures and the terms of this Agreement (the "Capital Rate of Return Statement"). The Government shall be informed by BTL of the amount of any such shortfall (the "Shortfall Amount") and provided by BTL with a copy of the group audited accounts

together with the Capital Rate of Return Statement for the relevant financial year no later than 6 months following the end of BTL's financial year (the "Delivery Date"). The Government agrees to pay BTL the Shortfall Amount in full no later than 3 months following the Delivery Date (the "Deadline Date"). The Government further agrees that should the Shortfall Amount not have been paid to BTL in full by the Deadline Date then any unpaid amount shall bear interest at the base rate as quoted by The Belize Bank Limited from time to time plus 1½ % per annum which shall accrue from the Deadline Date up to and including the date of payment in full to BTL of such unpaid amount and all such outstanding interest. In the event that payment to BTL of a Shortfall Amount (including all accrued interest) has not been made in full by the third anniversary of the Deadline Date then such unpaid amount may be set-off by BTL against the amount of any taxes (including Business Tax, Sales Tax or other similar taxes) payable by BTL to the Government.

11.5 Subject to the recommendation of the Board of Directors of BTL (the "Board") and the approval of the majority of the "B" and "C" ordinary shareholders of BTL (together the "Majority Shareholders"), and within three months of a written request being made by BTL to the Government, the Government shall take all necessary steps to enact legislation in Belize (in a form and by a manner and means acceptable to BTL) transferring and vesting the undertakings of BTL including, the assets, liabilities, rights, obligations, property, files and documentation of BTL, in a new company (incorporated under the Companies Act, Chapter 250 of the Laws of Belize) on such terms and conditions as are approved by the Board and the Majority Shareholders.

## SECTION 12
### FORCE MAJEURE

12.1   Liability in the event of Force Majeure  -  No party shall be held liable or deemed to be in default under this Agreement for any failure to perform obligations and duties hereunder if such failure has resulted directly or indirectly from Force Majeure, provided that the party had taken all precautions to minimize the consequences of the Force Majeure. Acts of the Government taken in its Sovereign capacity are not acts of Force Majeure excusing the obligation or performance by the Government.

12.2   Notice of Force Majeure – In the event of Force Majeure, the party so claiming shall notify the other party in writing of the circumstances and the parties shall meet forthwith to determine the action to be taken.

12.3   Extension of Time for Force Majeure – Any period during which the event of Force Majeure continues shall be added to the time allowed to any party to perform the obligation presented by the event of Force Majeure.

## SECTION 13
### INDEMNITY

13.1   Indemnity by Government – The Government agrees to hold BTL and its directors, officers, employees and agents, harmless from and against all judgments, damages, losses, claims, liens, penalties, obligations, liabilities, settlements and expenses, including reasonable attorney's fees, arising out of –

(a)     any breach of any contractual provisions or covenant or any inaccurate or erroneous representations of the Government

contained herein, in any schedule attached hereto or in any agreement or other instrument duly executed and delivered by the Government pursuant to this Agreement;

(b)     any failure of the Government to perform or comply with any provision, obligation or duty contained in this Agreement and required to be performed or complied with by the Government;

(c)     any contractual arrangement or agreement which in any way, direct or indirect, increases the operating costs, capital costs or other costs of property, plant and equipment by and between BTL, on one hand, and on the other, Belize Telecom Limited, Innovative Communications Corporation, Innovative Communication Company, LLC ("ICC"), an ICC subsidiary or affiliate (interpreted in the broadest terms) or any person or entity including relatives affiliated in any way with any person in the management or in the ownership of ICC or any affiliated entity of Belize Telecom Limited or ICC in its management and ownership;

13.2    Indemnity by BTL – BTL agrees to hold Government and its officers, employees and agents harmless from and against all judgments, damages, losses, claims, liens, penalties, obligations, liabilities, settlements and expenses, including reasonable attorney's fees, arising out of –

(a)     any breach of any contractual provisions or covenant or any inaccurate or erroneous representations of BTL contained herein, and in any schedule attached hereto or in any agreement or other instrument duly executed and delivered by BTL pursuant to this agreement; and

(b) any failure of BTL to perform or comply with any provision obligation or duty contained in this agreement and required to be performed or complied with by BTL.

13.3 Making of Claims – All claims under this Agreement shall be made in writing within the time specified in Section 14 hereof.

## SECTION 14
### SURVIVIAL OF AGREEMENT TERMS

14.1 Representations and Warranties – The representations and warranties which are included herein or in any schedule attached hereto, agreement or other instrument duly executed and delivered pursuant to this Agreement, and the remedies which are provided for herein to the extent that they relate to the said representations and warranties, shall survive Completion.

14.2 Covenants and Certain Other Provisions – Any covenant or other provision of this Agreement which by its nature and content is applicable to the operation of BTL, including legislative and regulatory matters shall be effective and survive Completion, and shall be binding on the parties for a period equal to the term of the Individual License granted to BTL by the Public Utilities Commission dated December 23, 2002, or any renewals thereof, granted in respect of such operations plus two (2) years.

14.3 Other Provisions – Any provision of this Agreement not included in Subsections 14.1 and 14.2 of this Section shall survive Completion, and shall be binding on the parties, for a three (3) year period after Completion.

**SECTION 15**

GOVERNING LAW; ARBITRATION, WAIVER OF SOVEREIGN IMMUNITY

15.1 This agreement is governed by and shall be construed in accordance with Belize law.

15.2 Any dispute arising out of or in connection with this Agreement including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this Section. There shall be 3 arbitrators.

15.3 The arbitral proceedings shall be conducted in the English language.

15.4 The seat or legal place of the arbitral proceedings shall be London, England.

15.5 The Government irrevocably and unconditionally:

(i) agrees that if BTL brings proceedings against it or its assets in relation to this Agreement no immunity from such legal proceedings (which will be deemed to include without limitation, suit, attachment prior to judgment, other attachment, the obtaining of judgment, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

(ii) waives any such right of immunity which it or its assets now has or may in the future acquire;

(iii)     consents generally in respect of any such proceedings to the giving
of any relief or the issue of any process in connection with such
proceedings including, without limitation, the making,
enforcement or execution against any property whatsoever
(irrespective of its use or intended use) of any award, order or
judgment which may be made or given in arbitration proceedings
or related enforcement proceedings.

## SECTION 16
WAIVERS

16.1     Extension of Time and Waivers — Any party to whom any obligation is
due under this Agreement may by written notice to the party from whom
performance of the obligation is due —

(a)     extend the time for the performance of any of the obligations or the
taking of other action under this Agreement;

(b)     waive inaccuracies in the representations and warranties of the
other contained in this agreement or in any schedule hereto;

(c)     waive compliance with any of the covenants or conditions
contained in this Agreement; or

(d)     waive or modify performance of any of the obligations under this
Agreement.

Except as provided in the preceding sentence, no action taken pursuant to
this Agreement, including, but without any limitation, any investigation by
or on behalf of any party, shall be deemed to constitute a waiver, by the
party taking such action, or compliance with, or performance of, any

representations, warranties, covenants, conditions or obligations contained in or under this Agreement.

16.2   Waiver of Breach Not to Extend to Subsequent Breach – Any waiver by a party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

**SECTION 17**
EFFECT OF HEADINGS

The headings of the various Sections and paragraphs herein are inserted merely as a matter of convenience and for reference and any such heading shall not be construed as in any manner defining, limiting, or describing the scope or intent of the particular Section or paragraph to which it refers, or as affecting the meaning or construction of the language in the body thereof.

**SECTION 18**
NOTICES

All notices which are required or may be given pursuant to this agreement shall be in writing and shall be sufficient in all respects if delivering in person or mailed by registered, certified or express mail, postage prepaid, as follows:

To the Government:

> Honorable Francis Fonseca
> Attorney General
> Attorney General's Ministry
> New Administration Building
> Belmopan,
> Belize

To BTL:

> Mr. Keith Arnold

Chairman
Belize Telecommunications Limited
Esquivel Telecoms Center
St. Thomas Street
Belize City
Belize

or at such other address as either of the above parties shall have designated by notice in writing to the other party.

## SECTION 19
### ASSIGNMENT AND SUCCESSION

BTL shall have the right by notice to the Government, to assign all of BTL's rights and delegate all of BTL's duties under this Agreement. In the event of such assignment, all references to BTL in the Agreement thereafter shall mean such assignee, and upon assumption by the assignee, the assignor BTL shall have no further liability under this Agreement; provided, the assignee may only be a new subsidiary of BTL, or some other company within BTL's corporate group or under the control of BTL.

## SECTION 20
### GENERAL PROVISIONS

20.1 Severability, Construction. The invalidity of any provision of this Agreement as determined at the time of arbitration, or by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof, so long as the original purpose of the Agreement is not substantially frustrated by reason of this severance of such provision. This Agreement shall be construed in accordance with the general tenor of the language in order to give it business effect and to achieve an equitable result. The reference to any schedule in this Agreement, unless the context clearly indicates otherwise, shall be deemed to be a reference to the corresponding schedule attached to this Agreement, if any, which shall

be deemed to be incorporated by reference into this Agreement as if set out in its entirety.

20.2 Entire Agreement. The parties confirm that this is the entire agreement between them with respect to the subject matter hereof. No party shall be bound by any terms, conditions, statements, or representations, oral or written, not contained herein. It is mutually understood and specifically agreed that this Agreement is binding upon the parties, their respective successors, and assigns.

20.3 Changes. No modification of this Agreement shall be valid or binding unless such modification is in writing, duly dated and signed by both parties to this Agreement.

## SECTION 21

## GENERAL DUTY OF CONFIDENTIALITY

The parties hereby agree that the terms of this Agreement and all information gathered to comply with the terms and conditions of this agreement, shall be and remain confidential to the parties, their financiers, and any other persons agreed by the parties in writing. Neither party shall disclose this Agreement or its contents to any unauthorized third party without the written consent of the other. The parties further state that the information gathered during the compliance process shall be considered proprietary information, except to the extent that such information has been disclosed by public or semi public documents of the parties.

All confidential matters or matters comprising of proprietary information may only be disclosed by the parties to their agents and representatives, including financiers; and it shall be the express duty of each party to obtain such secrecy or confidentiality agreements as may be necessary to preserve the confidences, secrets, and proprietary information of BTL, the Government or their respective successors and assigns.

Executed on behalf of the Government of Belize this ⟨19⟩ day of ⟨September⟩, 2005 at ⟨Belmopan⟩, Belize:

For the Government of Belize

By: _____

Honorable Said Musa, Prime Minister and
Minister of Finance

Executed on behalf of Belize Telecommunications Limited, a Belize Company, this 19th day of September, 2005 at Belize City, Belize.

Belize Telecommunications Limited,

A Belize Company

By: _____

Keith Arnold, Chairman

## SCHEDULE 1.

### PROPERTIES

1.  **First Boom Junction Property:** All that piece or parcel of land situate at the junction of the Boom Road and the Northern Highway, Belize District, comprising 14.47 acres and being more particularly delineated by the Minister's Fiat Plan No. 90 of 1981 held by Transfer Certificate of Title recorded in the Land Titles Register in Volume 34 at Folio 85.

2.  **Santa Cruz Property:** All that piece or parcel of land containing 22.872 acres situate near Mile 14.5 opposite the Boom Cut Off Road, Belize District, the said land being the subject of Minister's Fiat (Grant) No 360 of 1996 and bounded and described as shown by Plan No:360 of 1996 held by Deed of Conveyance dated 28th July 2000, recorded in Deeds Book Volume 45 of 2000 at folios 927 to 936.

3.  **Second Boom Junction Property:** All that piece or parcel of land situate near the junction of the Northern Highway and Boom Road, Belize District, comprising 4186.29 s.y. and being a portion of the land described in T.C.T. Volume 26 Folio 125 and which said lot is numbered 9B on a Sub-division Plan made by H.D. Flowers, Licenced Land Surveyor and dated 15th August 1995, and is lodged at the Lands and Survey Department in Belmopan in Register No.2 Entry No. 2444 held by Transfer Certificate of Title dated 10th August 2000 recorded in volume 37 at folio 49.

4.  **San Ignacio Property:** All those lots pieces or parcels of land upon which telecommunications towers and other telecommunications equipment is situate as of the date of this Agreement together with all perimeter land surrounding such telecommunications equipment (including that contained within all existing security fencing) (together the "Compound") and all land comprised in all access roads to the Compound, located in San Ignacio Town, Cayo District in Lots Numbered 76 and 77, as shown on a Plan dated 12th August, 1991 by Rolando A Rosada, Licensed Land Surveyor and registered at the Lands and Surveys Department in Belmopan in Register 12 Entry No. 1275. Together with all buildings and erections standing and being thereon held by Deed of Conveyance dated 11th May 2001 recorded in Deeds Book Volume 20 of 2001 at folios 719-728.

## SCHEDULE 2.

## RATE OF RETURN: DETERMINATION

For the purposes of this Agreement between the Government of Belize and BTL, the parties agree that this Schedule 2 and the Agreement records their mutual understanding and agreement as to the formula, methodology, definitions and prescribed meanings to be used in relation to the calculation of the Achieved Rate of Return and the Minimum Rate of Return.

### Achieved Rate of Return

The Achieved Rate of Return ("AROR") for each financial year of BTL shall be calculated according to the method set out below:

AROR shall mean the percentage achieved by dividing earnings after tax and interest received ("Numerator") by book equity plus long term debt ("Denominator") (as recorded in the consolidated audited group accounts of BTL for the financial year under consideration) and then expressing the product in hundredths.

The Numerator (also referred to in this Schedule and the Agreement as "Earnings") shall be calculated by adding together:

        a. Operating Income after deducting all taxes, plus

        b. interest income,

as drawn from the consolidated audited group accounts of BTL for the year under consideration.

The Denominator (also referred to in this Schedule and the Agreement as the "Rate Base"), shall be calculated by adding together:

        a. total shareholders' equity (including capital and revenue reserves), plus

        b. long term debt, plus

        c. current portion of long-term debt,

as drawn from the closing balances of the consolidated audited group accounts of BTL for the financial year under consideration.

"Operating Income" means all revenue earned by BTL net of all charges levied against revenue by BTL, including, but not limited to, all operational and other charges such as staff costs; travel costs; distribution costs; corporate management costs; professional fees (including legal, accounting and technical fees); sales and marketing expenses; depreciation and amortization charges; licence and frequency fees; bad debt charges, provisions and write-offs; asset write-offs; currency exchange charges; bank charges; interest charges on short term debt; cost of sales, and interconnection fees.

### Minimum Rate of Return

The Minimum Rate of Return (MROR) per annum is 15%. This is the agreed minimum rate of return that BTL must achieve in each financial year. The consequential value to be obtained by BTL in applying the MROR in each financial year under consideration is the sum achieved by multiplying the MROR against the Rate Base in the given financial year.

## Acquired Assets and Payments Incurred

For the avoidance of doubt, any assets acquired and payments incurred by BTL in the performance of this Agreement, or in subsequent financial years through the normal course of business, shall be included as part of the "Rate Base", for the purposes of calculating the monetary value of the AROR and MROR.

## SCHEDULE 3.

## FORM OF LOAN NOTE

## LOAN NOTE

### BELIZE TELECOMMUNICATIONS LIMITED

(Incorporated in Belize under the Companies Act)

**BELIZE TELECOMMUNICATIONS LIMITED** (the "Company"), for value received, hereby promises to pay the registered holder of this Note for the time being (the "Holder"), being at the date of this Note, **THE GOVERNMENT OF BELIZE**, in accordance with the terms and conditions attached to this Note (the "Conditions"), the principal amount of:

BZ$19,200,000 (Nineteen Million and Two Hundred Thousand Belize Dollars)

together with interest thereon, payable in the manner set out in the Conditions.

This Note is subject to the Conditions.

This Note is transferable in the circumstances more fully set out in the Conditions.

IN WITNESS of which this Note has been duly executed and delivered as a deed by BELIZE TELECOMMUNICATIONS LIMITED whose registered office is at the Esquivel Telecom Center, St. Thomas Street, Belize City, Belize, on the date and year first written below.

Dated: this          day of                              , 2005.


EXECUTED AS A DEED by                      )
BELIZE TELECOMMUNICATIONS     )
LIMITED                                           )
acting by [INSERT DIRECTOR'S NAME]   )
and [INSERT COMPANY SECRETARY'S )
NAME]                                              )


_____

DIRECTOR


_____

COMPANY SECRETARY

## TERMS AND CONDITIONS

This Note is issued by the Company in registered form pursuant to a resolution passed by the Board of Directors of the Company.

### 1.    INTEREST

(a)    The principal sum of the Note will bear interest from and including the date of issue of this Note (as set out on page 1 above). Interest shall accrue daily on the principal sum and will be payable quarterly in arrears on the last business day of each quarter (each an "interest payment date"), the first interest payment date being [date] in respect of interest for the period from and including [date] to and including that date.

The period beginning on [date]and ending on the first interest payment date and each successive period beginning on an interest payment date and ending on the next succeeding interest payment date is hereafter called an "interest period".

(b)    Interest due on or before repayment of the Note will be paid in accordance with the provisions of Condition 6 below to the Holder on the relevant interest payment date.

(c)    Interest will cease to accrue on the Note (or, in the case of partial repayment, on the amount to be repaid) on the due date for repayment thereof unless, upon such due date, payment of the principal amount due to be repaid by the Company is withheld or refused. In such event, interest will continue to accrue (after as well as before any judgment) up to but excluding the date on which payment in full of the principal amount due to be repaid by the Company is made.

(d)    The rate of interest payable in respect of the Note will be 6.188 per cent. per annum.

(e)    Calculation of the interest amount will be done on the basis of a 365-day year and the number of days elapsed in the relevant interest period.

### 2.    REPAYMENT

(a)    The payment of principal in respect of the Note will be made against presentation of the Note at the Company's registered office located at the Esquivel Telecom Center, Belize City, Belize. This Note will be repaid quarterly in arrears and no later than [date], 2013 (unless previously repaid under the provisions set out below) by the Company to the Holder in accordance with Condition 6 below.

(b)    The Company may at any time in its absolute discretion by notice in writing to the Holder repay all or any part of the principal sum of the Note (together with accrued interest). Upon receipt of such notice the Holder shall deliver the Note to the Company.

(c)     On any repayment whereby the whole of the principal amount of the Note or the then outstanding balance thereof shall be repaid the Company shall cancel the Note. On any partial repayment hereunder (other than a partial repayment whereby the then outstanding balance of the principal amount of the Note is repaid) the Company shall make an entry in the Register to record the part of the principal sum then repaid and shall endorse the Note with a note of such entry.

## 3.     EVENTS OF DEFAULT

(a)     If any of the events set out in paragraph (b) below (an "Event of Default") occurs, all principal of this Note and all interest then accrued shall be immediately due and payable (without service of any Notice). The overdue sum shall bear interest at the base rate as quoted by The Belize Bank Limited from time to time plus [number ] percentage points per annum, which shall accrue from the date of such default up to and including the date of payment in full of such overdue sum and all such outstanding interest.

(b)     The events referred to in paragraph (a) above are as follows:

> (i)  payment of any amount due from the Company under this Note is not made on or within 14 days of its due date; or

> (ii)  an order is made or an effective resolution of the Company is passed for the winding up or dissolution of the Company or the Company goes into liquidation; or

> (iii) proceedings are initiated against the Company under any bankruptcy or insolvency law of any competent jurisdiction and the proceedings have not been discharged or stayed within a period of 30 days after the Company first becomes aware of them and they are not contested by the Company in good faith.

## 4.     TRANSFER

The Company may not transfer any of its obligations under this Note. The Holder may transfer its rights evidenced by this Note free from any claims or defenses, which the Company may have against such Holder. In the event of any transfer by the Holder, the Holder shall surrender to the Company at its registered office this Note together with a transfer (in the form set out in this Note) duly executed by the transferor and the confirmation of the transferee endorsed on the transfer duly executed by the transferee and the Company shall register the transfer and shall deliver this Note to the transferee.

5.      REGISTER

So long as this Note is outstanding, the Company will at all times keep at its registered office a register (the "Register") specifying the amount and date of issue of this Note and the name and address of the Holder and all transfers and changes of ownership of this Note.

6.      PAYMENTS

All payments under this Note shall be made in full quarterly installments of BZ$[INSERT AMOUNT] without regard to any equities between the Company and the Holder or to any right of set-off, or counterclaim in any suit or action for the collection of any sum due to the Holder under this Note. All payments will be made in Belize dollars without deduction or withholding for or on account of any present or future taxes, duties or other charges levied or imposed on this Note or the proceeds or the Holder by the Government of the Belize or any taxing authority.

7.      NOTICES

Any notice or other communication to or upon either the Company or the Holder of this Note must be in writing and may be delivered or sent by prepaid mail and shall be addressed in the case of the Company to it at Esquivel Telecoms Center, St. Thomas Street, Belize City, Belize marked for the attention of [INSERT NAME AND POST OF COMPANY OFFICER], and in the case of the Holder to it at its address appearing in the Register.

8.      GOVERNING LAW

This Note shall be governed by and construed in accordance with the laws of Belize.

## FORM OF TRANSFER

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers to


(PLEASE PRINT OR TYPEWRITE THE NAME AND ADDRESSES OF THE TRANSFEREE)

this Note, and all rights under this Note

[to be executed as a deed by the Transferor]

Dated:


In consideration of the Transferor transferring this Note to the Transferee THE TRANSFEREE confirms to the Company and the Holder that it will be bound by the terms and conditions of this Note.

[To be executed as a deed by the Transferee]

Dated:



THIS DOCUMENT IS EXECUTED AS A DEED and is made on November 21, 2005.

BETWEEN:

(1) GOVERNMENT OF BELIZE (including its ministries, departments, and political subdivisions) acting through its authorized representative, the Honourable Said Musa, Prime Minister and Minister of Finance (hereinafter referred to as the "Government"); and

(2) BELIZE TELECOMMUNICATIONS LIMITED, a public company duly incorporated under the laws of Belize with its principal offices situated at the Esquivel Telecom Center, St. Thomas Street, Belize City, Belize (hereinafter referred to as "BTL").

BACKGROUND:

(A) The Government and BTL entered into the Government Telecommunications Accommodations Agreement on September 19, 2005 (the "Original Agreement"), whereby in order to better accommodate the Government's telecommunications needs and other requirements, BTL agreed to acquire certain properties from the Government, and in consideration for the acquisition of these properties and this accommodation, the Government agreed to afford BTL the benefits, covenants and undertakings contained in the Original Agreement.

(B) The Government and BTL wish to set out herein certain provisions in relation to completion of the Original Agreement and certain amendments to the Original Agreement as set out herein.

IT IS AGREED as follows:

1. INTERPRETATION

1.1 Capitalised terms used in this deed and not defined herein shall bear the same meaning as in the Original Agreement.

1.2 The headings in this deed do not affect its interpretation.

2. COMPLETION

2.1 Completion of the Original Agreement shall take place at the location specified in Section 5.5 of the Original Agreement on November 21, 2005, immediately following the execution of this deed.

2.2 On Completion, save with respect to the San Ignacio Property and the Replacement Property (as described in Section 4.2 herein), the Government shall comply with the provisions of Section 5.3 of the Original Agreement and deliver

to BTL duly executed conveyances or instruments of transfer to the Properties which shall enable BTL to its satisfaction to be registered and recorded with absolute title to the Properties free and clear of all liens, charges and encumbrances at the land registry in Belmopan, Belize no later than December 31, 2005.

2.3 On Completion, BTL shall comply with the provisions of Section 5.4 of the Original Agreement and deliver to the Government the duly executed loan note in the form set out in Schedule 3.to the Original Agreement save that the loan note shall be amended to take effect from the date upon which all executed conveyances, instruments of transfer, leases and easements to the Properties to be delivered to BTL pursuant to this deed and the Original Agreement, are registered and recorded to the satisfaction of BTL at the land registry in Belmopan, Belize.

2.4 The Government shall deliver to BTL no later than March 31, 2006 a duly executed lease and easements to the San Ignacio Property and duly executed conveyances or instruments of transfer to the Replacement Property, in a form acceptable to BTL, and in accordance with this deed and the Original Agreement, together with the deeds, and certificates or other title documents relating to the Replacement Property and such further documents and other assurances sufficient to enable BTL to its satisfaction to be registered and recorded with absolute title to the Replacement Property and leasehold title and easements to the San Ignacio Property in accordance with section 4.2 herein, free and clear of all liens, charges and encumbrances.

## 3. UNDERTAKINGS OF THE GOVERNMENT

From the date of this deed until the date of the registration and recording of the Properties in the name of BTL at the land registry in Belmopan, Belize, in accordance with this deed and the Original Agreement, the Government undertakes: (i) not to transfer, charge, pledge, or exercise any rights attaching to the Properties; (ii) not to grant any option over the Properties; (iii) not to dispose of any of the Properties; (iv) save for the San Ignacio Property, not to take any action which undermines, affects or interferes with the right of BTL to enjoy absolute title to the Properties free and clear of all liens, charges and encumbrances, and (v) not to take any action which undermines, affects of interferes with the right of BTL to enjoy good and clear leasehold title to the San Ignacio Property free and clear of all liens, charges and encumbrances and to enjoy good and valid easements to the San Ignacio Property.

## 4. SURVIVAL OF THE ORIGINAL AGREEMENT

4.1 Section 20.2 of the Original Agreement shall be amended such that the Original Agreement, the documents referred to in the Original Agreement, this deed and the documents referred to herein shall constitute the whole agreement between the parties.

4.2 Paragraph 4. ("San Ignacio Property") of Schedule 1 of the Original Agreement shall be deleted in its entirety and replaced by the following paragraphs:

"4.    San Ignacio Property: A 99 year lease at a rent of BZ$1.00 per annum, over all that parcel of land upon which a telecommunications tower is situate as of the date of this deed together with all perimeter land surrounding such telecommunications tower within all existing security fencing (the "Compound") together with an easement over all land comprised in all access roads to the Compound, located in San Ignacio Town, Cayo District in Lots Numbered 76 and 77, as shown on a Plan dated 12th August, 1991 by Rolando A. Rosado, Licensed Land Surveyor and registered at the Lands and Surveys Department in Belmopan in Register 12 Entry No.1275, together with all buildings and erections thereon and being held by Deed of Conveyance dated 11th May 2001 recorded in Deeds Book Volume 20 of 2001 at folios 719-728.

"5.    Replacement Property: All those lots pieces or parcels of land comprised in land to be identified by BTL and agreed between BTL and the Minister of Natural Resources as a replacement for the land described in the original Paragraph 4 of Schedule 1.of the Original Agreement, such land to be of a similar market value in Belize to that described in the original Paragraph 4."

4.3 Section 5.1 of the Original Agreement is amended as follows:

The wording therein:

"and the Government hereby warrants and guarantees to BTL that on completion of the sale and purchase of the Properties to BTL ("Completion"), BTL will obtain good and clear title in fee simple to the Properties free and clear of all liens, charges and encumbrances."

is deleted in its entirety and replaced by the following words:

"and the Government hereby warrants and guarantees to BTL: (i) that save for the San Ignacio Property (as described in Section 4.2 in this deed), upon the registration and recording of the duly executed conveyances or instruments of transfer to the Properties in the name of BTL at the land registry in Belmopan, Belize, in accordance with this deed and the Original Agreement, BTL will obtain good and clear title in fee simple to the Properties free and clear of all liens, charges and encumbrances, and (ii) that upon registration and recording of the duly executed lease and easements to the San Ignacio Property in accordance with this deed and the Original Agreement, BTL will obtain good and clear leasehold title to the San Ignacio Property free and clear of all liens, charges and encumbrances, and good and valid easements to the San Ignacio Property."

4.4   Section 5.2 of the Original Agreement is deleted in its entirety.

4.5   Section 5.6 of the Original Agreement is hereby extended to cover all duties and fees payable on the registration, recording and filing of the lease and easements to the San Ignacio Property.

4.6   For the avoidance of doubt, save as amended by this deed, all provisions of the Original Agreement and the Schedules thereto shall remain in full force and effect.

IN WITNESS whereof this amendment deed has been executed on the date first above written.

Executed as a deed on behalf of the Government of Belize this 21st day of November, 2005 at Belize City, Belize:

   For the Government of Belize

By:_____
   Honourable Said Musa, Prime Minister and
   Minister of Finance.

Executed as a deed on behalf of Belize Telecommunications Limited this 21st day of November, 2005 at Belize City, Belize:

   Belize Telecommunications Limited

By:_____
   Keith Arnold, Chairman



SETTLEMENT IN RELATION TO GOVERNMENT
TELECOMMUNICATIONS ACCOMMODATION AGREEMENT
DATED 19 SEPTEMBER 2005 (AS AMENDED ON 21 NOVEMBER
2005)


GOVERNMENT OF BELIZE

AND

BELIZE TELECOMMUNICATIONS LIMITED


15 December 2006

THIS SETTLEMENT DEED IS DATED 15 DECEMBER 2006

AND MADE BETWEEN:

(1)     THE GOVERNMENT OF BELIZE (including its ministries, departments, and political
        subdivisions) acting through its authorized representative, the Honourable Said Musa, Prime
        Minister and Minister of Finance (hereinafter referred to as the "Government") whose office is at
        New Administration Building, Belmopan, Cayo, Belize, Central America; and

(2)     BELIZE TELECOMMMUNICATIONS LIMITED, a public company duly incorporated under
        the laws of Belize with its principal offices situated at the Esquivel Telecom Center, St Thomas,
        Belize City, Belize (herein referred to as "BTL").

WHEREAS:

(A)     On 19 September 2005 the Government and BTL entered into the Government Telecommunications
        Accommodation Agreement (the "Original Agreement").

(B)     On 21 November 2005 the Government and BTL entered into a deed which set out certain
        provisions in relation to completion of the Original Agreement and certain amendments to the
        Original Agreement (the "First Amendment Deed").

(C)     A dispute has arisen between the Government and BTL in relation to the interpretation of certain
        provisions of the Original Agreement and the breach by the Government of certain obligations
        under the Original Agreement.

IN SETTLEMENT OF THIS DISPUTE IT IS AGREED:

1.      CONSTRUCTION

1.1     Unless expressly defined in this deed or the contrary intention appears, capitalised terms defined in
        the Original Agreement and the First Amendment Deed shall have the same meanings in this deed.
        References to the Original Agreement are to that agreement as amended by the First Amendment
        Deed.

2.      RETURN ON CAPITAL INVESTMENT

2.1     BTL achieved less than the Minimum Rate of Return in the financial year ended 31 March 2006 and
        pursuant to clause 11.4 of the Original Agreement, BTL formally notified the Government of the
        Shortfall Amount of BZ$7,075,000 and provided the Government with a Capital Rate of Return
        Statement setting out the basis for calculation of the Shortfall Amount. Full payment of the Shortfall
        Amount is due and payable on 18 December 2006.

2.2     Notwithstanding clause 2.1 herein, the Government hereby agrees to pay BTL the Shortfall Amount
        no later than October 31, 2007. The Government further agrees that in the event that payment of the
        Shortfall Amount has not been made by the Government to BTL in full by this date in accordance
        with the Original Agreement then such unpaid amount may be set-off by BTL against the amount of
        any taxes or any other payments or obligations due and payable by BTL to the Government.

2.3     The Government agrees that the methodology, bases and principles adopted in preparation of the
        Capital Rate of Return Statement dated 18 September 2006, appended to this deed at Appendix A,
        shall constitute the agreed methodology bases and principles for the preparation of any future
        Shortfall Amount under clause 11.4 of the Original Agreement.

3.    TAXATION ISSUES

3.1   The Government agrees that it will confirm to the Income and Business Tax Department BTL's exemption in relation to withholding tax (as provided for in clause 6.1 (v) of the Original Agreement) and provide BTL with a copy of this confirmation within 90 days of the date of this deed.

3.2   The Government agrees that it will confirm to the relevant fiscal departments that all goods, material, equipment and machinery imported for BTL's own use (whether before or after the date of this deed) are free from import duties and General Sales Tax and provide BTL with a copy of this confirmation within 90 days of the date of this deed.

3.3   The Government agrees to reimburse BTL the sum of BZ$1,169,373.70 within 90 days of the date of this deed for taxation paid on goods, material, equipment and machinery imported for BTL's own use since 19 September 2005. The Government further agrees that in the event that it fails to reimburse BTL for this sum in full by this date then such unpaid amount may be set-off by BTL against the amount of any taxes or any other payments or obligations due and payable by BTL to the Government.

3.4   The Government hereby confirms for clarity and for the avoidance of doubt that the tax treatment of BTL shall be no less favourable than that afforded to other telecommunication licencees in Belize. The Government acknowledges that internet services provided by Class Licensees are currently taxed at 1.75%, whereas BTL is obligated to pay 19% in tax on its internet services, and agrees to procure to BTL's satisfaction that the disparity between the tax treatment of Class Licencees and BTL is rectified by 31 March, 2007 so that BTL is taxed on its internet services at the same rate as that at which the Class Licensees are currently taxed and, on such rectification, BTL shall waive its entitlement to be reimbursed for the difference in the amount paid in tax pursuant to the unequal terms of its licence between 19 September 2005 (the date of the Original Agreement) and 31 March 2007.

3.5   The parties hereby agree that clause 11.3(f) of the Original Agreement shall be amended as follows:

      "Business Tax – the tax treatment of BTL shall be no less favourable than that afforded to other telecommunication licensees in Belize. To enable telecommunications services providers to lower the rates to their subscribers the Government undertakes by no later than April 1, 2008 to adjust with immediate legal effect and force the rate of Business Tax applicable to telecommunications services so that the amount of Business Tax payable by BTL does not exceed the amount of Income Tax that would be paid by BTL if it was assessed for Income Tax by applying an Income Tax rate for companies at 25% (companies being persons other than employed persons for the purposes of the Income and Business Tax Act)."

4.    PUBLIC UTILITIES COMMISSION

4.1   The Government hereby irrevocably confirms that it has procured the Public Utilities Commission (the PUC) to give effect to its obligations under the Original Agreement and in this regard has issued a directive to the PUC to comply with the Government's obligations under the Original Agreement as a matter of Government policy (including in respect of any proposals for future legislation).

4.2   The Government hereby agrees to procure that the PUC do not give effect to the VOIP Regulatory Policy and Framework Guidelines issued by the PUC on 23 June 2006 (the VOIP Guidelines).

4.3   The Government agrees to procu e within 90 days of this deed, evidence of the formal amendment to BTL's Individual Licence permitting it to restrict the resale of its service in accordance with clause 11.3(i)(h) of the Original Agreen ent.

5.   OTHER ISSUES

5.1   The Government agrees within 9 ) days of this deed, to procure that the Belize Social Security Board withdraws Case No: 557/2002 against BTL and shall provide evidence of such withdrawal to BTL as soon as practicable thereafter.

5.2   BTL hereby waives its right under clause 13.1 (c) of the Original Agreement to an indemnity from the Government in respect of:

(a)   a default judgment against Belize Telecom for the sum of BZ$ 14,325,004 (with interest at 6% per annum from 20 July 2006 until p ayment with costs taxed and allowed at $105,487.50); and

(b)   the amount of BZ$1,668,093.18 )wed to BTL for operating the assets of International Telecommunications Limited for the period from September 2004 to December 2005.

5.3   The Government undertakes to procure to the satisfaction of BTL, that in the interest of consumers and competition, no utility service provider in the water or electricity industries (or any associated, affiliated or related company or entity thereof), provides telecommunications services including voice, data and internet services which compete against BTL in respect of the telecommunications activities carried out by BTL.

5.4   The Government hereby irrevocably confirms that for the duration of BTL's Individual License or for a minimum term of 15 years from the date of the Original Agreement, which ever is the longer period, BTL is not obliged to prc vide interconnection for voice services from its network with any VOIP service provider licensed in Belize or otherwise.

5.5   The Master Agreement between BTL and the Government dated 6 July 2005 is hereby amended in accordance with the terms of a letter agreement dated 5 December 2006 from BTL to the Government, which was executed by the Government on the date of this deed (attached hereto at Appendix B).

6.   EFFECT OF AMENDMENTS

6.1   This deed is supplemental to the Original Agreement and the First Amendment Deed and from the date of this deed, the Original Agreement and the First Amendment Deed shall be read and construed as amended by this deed and references in the Original Agreement and the First Amendment Deed to "this deed" shall be construed as references to the Original Agreement and the First Amendment Deed as amended by this deed.

6.2   The parties agree that the obligations and liabilities under the Original Agreement and the First Amendment Deed that are not specifically amended by this deed continue in full force and effect.

7.   GENERAL

7.1   The parties agree that clauses 12 to 21 of the Original Agreement shall be deemed to be incorporated into this deed as though they were expressly set out herein.

7.2   Each party shall bear its own cos s in connection with the negotiation, execution and implementation of this deed.

7.3 This deed shall be binding on the parties, their successors and assigns and the name of a party appearing herein shall be deemed to include the names of any such successor or assign.

7.4 This deed may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same agreement and any parties may enter into this deed by executing a counterpart.

**IN WITNESS** whereof this deed has been executed on the date first above written.

SIGNATORIES

Signed as a deed by THE       )
GOVERNMENT OF BELIZE     )

Prime Minister and Minister of Finance
(On behalf of the Government of Belize)

In the presence of:

Justice of Peace

GLENN F. LONGSWORTH
Justice Of the Peace
6 St. Joseph St.
Belize City, Belize

Attorney-General of Belize
(On behalf of the Government of Belize)

In the presence of:

GLENN F. LONGSWORTH Peace
Justice Of the Peace
6 St. Joseph St.
Belize City, Belize

Signed, sealed and delivered by BELIZE )
TELECOMMUNCIATIONS LIMITED this )
15th day of December 2006 in the presence of )

Director

For and on behalf of
Share Holdings Limited

Secretary/Director

For and on behalf of
Rocky Reef Ventures Limited

5

# APPENDIX A

## Belize Telecommunications Limited
## Capital Rate of Return Statement
## Financial Year Ending 31st March 2006

### COMPUTATION OF THE ACHIEVED RATE OF RETURN ("AROR")

The AROR shall mean the percentage achieved by dividing earnings after tax and interest received ("Numerator") by book equity plus long term debt ("Denominator") (as recorded in the consolidated audited group accounts for BTL for the financial year under consideration) and then expressing the product in hundredths. [see Schedule 2 of Government Telecommunications Accommodation Agreement ("The Agreement")]

The Numerator (also referred to in Schedule 2 and the Agreement as "Earnings") shall be calculated by adding together a) Operating Income and b) interest income:

| Numerator | BZ$000's Excluding Shortfall Amount | BZ$000's Shortfall Amount | BZ$000's Including Shortfall Amount | Comments |
|---|---|---|---|---|
| Results taken from the BTL consolidated group accounts | | | | |
| Income before interest and extraordinary items | 31,764 | | | Operating revenues, net of operating costs and taxation, and before interest and extraordinary items |
| short term interest | (721) | | | Interest on short-term debt (part of the $1.881m in the audited accounts) |
| extraordinary items | 3,466 | | | Operational items of a non-recurring nature. |
| a. Operating Income | 24,509 | 7,075 | 31,584 | After deduction of all operational charges, including interest on short-term debt and taxation. (See definition below, per Schedule 2 of the Agreement) |
| b. interest income | 2,738 | | 2,738 | Interest income on all deposits and notes as recorded in the annual audited and published group accounts. |
| 'Earnings' | 27,247 | 7,075 | 34,322 | = The "Numerator"as used for calculating the AROR. ('Net Earnings' per the audited accounts ($26,088m), is net of interest charges on long term debts) |

Definition: "Operating Income" means all revenue earned by BTL, net of all charges levied against revenue by BTL, including, but not limited to, all operational and other charges such as staff costs; travel costs; distribution costs; corporate management costs; professional fees (including legal, accounting and technical fees); sales and marketing expenses; depreciation and amortization charges; licence and frequency fees; bad debt charges; provisions and write-offs; asset write-offs; currency exchange charges; bank charges; interest charges on short term debt; cost of sales, and interconnection fees.

The Denominator (also referred to in Schedule 2 and the Agreement as the "Rate Base") shall be calculated by adding together the following, as drawn from the closing balances of the consolidated audited group accounts of BTL for the financial year under consideration:

| Denominator | BZ$000's Excluding Shortfall Amount | BZ$000's Shortfall Amount | BZ$000's Including Shortfall Amount | Comments |
|---|---|---|---|---|
| Total Shareholders Equity | 209,760 | 7,075 | 216,835 | Including capital and revenue reserves |
| Long Term Debt | 4,830 | | 4,830 | |
| Current Portion of Long Term Debt | 7,145 | | 7,145 | |
| 'Rate Base" | 221,735 | 7,075 | 228,810 | = The "Denominator" (Total funding at 31st March 2006) |
| Achieved Rate of Return | 12.3% | | 15.0% | = Numerator divided by Denominator |

## COMPUTATION OF THE MINIMUM RATE OF RETURN ("MROR")

The Minimum Rate of Return (MROR) per annum is 15%. This is the agreed rate of return that BTL must achieve in each financial year. The consequential value to be obtained by BTL in applying the MROR in each financial year under consideration is the sum achieved by multiplying the MROR against the Rate Base in the given financial year. [see Schedule 2 of the Agreement]

|  | Excluding Shortfall Amount | Including Shortfall Amount |  |
|---|---|---|---|
| MROR | 15% | 15% | Percentage set per the Agreement |
| Rate Base in BZ$000's | 221,735 | 228,810 | Calculation above |
| Consequential MROR in BZ$000's | 33,260 | 34,322 | MROR multiplied against the Rate Base |

## COMPUTATION OF ANY SHORTFALL AMOUNT

In the event that BTL fails to achieve, in any given financial year during the duration of BTL's Individual Licence, an Achieved Rate of Return (as defined above, per Schedule 2 of the Agreement) greater than or equal to the Minimum Rate of Return (as defined above, per Schedule 2 of the Agreement), then the Government shall monetarily compensate BTL to the full extent of any Shortfall Amount in Earnings (as defined above, per Schedule 2 of the Agreement), so that the Achieved Rate of Return is equal to the Minimum Rate of Return in the financial year under consideration. Any Shortfall Amount shall be demonstrated by reference to BTL's group audited accounts for the relevant year and a Capital Rate of Return Statement to be prepared by BTL in accordance with this Pro Forma, its normal accounting procedures and the terms of the Agreement. [Section 11.4 of the Agreement]

| Shortfall Amount Calculation | BZ$000's | Comments |
|---|---|---|
| Actual Earnings | 27,247 | Monetary equivalent of the AROR (before Shortfall Amount) |
| MROR Earnings | 34,322 | Consequential value of MROR (including Shortfall Amount) |
| **Shortfall Amount** | **7,075** | To be paid by GOB to BTL per section 11.4 of the Agreement |

Submission Date: 18 / 9 / 06

Submitted By (BTL Representative): _____

_____
Chairman, Executive Committee

Attached: BTL Group Audited Accounts for the financial year ending 31st March, 2006



# BELIZE TELECOMMUNICATIONS LIMITED

Esquivel Telecom Center · St. Thomas Street · P.O. Box 603 · Belize City · Belize · Central America
Telephone #01-223-2858 · Fax 601-227-7650 · http://www.btl.net

Hon. Said Musa
Prime Minister and Minister of Finance
Government of Belize
New Administration Building
Belmopan, Cayo District
Belize

Hon. Francis Fonseca
Attorney-General
Government of Belize
East Block Building
Belmopan, Cayo District
Belize

December 5, 2006

Dear Sirs,

RE: Amendment to Master Agreement between Belize Telecommunications Limited ("BTL") and the Government of Belize (the "Customer") dated July 6, 2005 (the "Original Agreement")

BTL and the Customer wish to record in this letter agreement certain amendments to the Original Agreement, as set out herein.

Capitalised terms used in this letter agreement and not defined herein shall bear the same meaning as in the Original Agreement.

In consideration of the mutual covenants and undertakings set forth in this letter agreement, and for valuable consideration, the Parties hereby agree that the Original Agreement is amended as follows:

(1) Sections 1.2.1 and 26 of the Original Agreement shall be amended such that the Original Agreement, the documents referred to in the Original Agreement, this letter agreement and the documents referred to herein shall constitute the entire agreement between the Parties.

(2) The definition of the word "Attachment" in Section 1.1 of the Original Agreement is deleted in its entirety and replaced by the following definition:

"'Attachment' means any attachment included in this Agreement from time to time by BTL containing the terms and conditions governing each Service and which may be amended from time to time by BTL in writing and in accordance with BTL's standard practice, and

pursuant to which BTL shall provide and the Customer shall purchase each Service."

(3) The definition of the word "Customer" in the recital and Section 1.1 of the Original Agreement is deleted in its entirety and replaced by the following definition:

"'Customer' means the Government of Belize and all ministries, departments, groups, entities, organizations, bodies and associations of the Government of Belize from time to time, the current list of which is contained in Schedule D, and their successors."

(4) The definition of the word "Schedule" in Section 1.1 of the Original Agreement is deleted in its entirety and replaced by the following definition:

"'Schedule' means any schedule included in this Agreement from time to time by BTL and which may be amended by BTL in writing from time to time".

(5) The definition of the word "Services" in Section 1.1 of the Original Agreement is deleted in its entirety and replaced by the following definition:

"'Services' means all 'telecommunications services' (as such term is defined in the Belize Telecommunications Act 2002 as amended or re-enacted from time to time) and all other services ancillary and related thereto."

(6) Section 2 of the Original Agreement is deleted in its entirety and replaced by the wording in the following new Section 2:

"2. Services

The Customer desires to obtain all Services used by the Customer from time to time, from BTL, on an exclusive basis, and for the duration of this Agreement, including but not limited to all those Services listed in Schedule A attached hereto. BTL agrees to be the exclusive provider of all such Services to the Customer for the duration of this Agreement and to provide all Services to the Customer in accordance with the terms and conditions of this Agreement and on such other terms and conditions relating to individual Services as may be published by BTL from time to time."

(7) Section 3 of the Original Agreement is deleted in its entirety and replaced by the wording in the following new Section 3:

## "3. Term and Termination

3.1 This Agreement shall come into force on the Agreement Date and subject to the terms of Section 10, shall remain in force for a period of ten (10) years (the Initial Term") until July 6, 2015 (the "Renewal Date") and thereafter for consecutive periods of three (3) years (each an "Extension"), unless terminated by either Party serving upon the other six months' written notice (indicating an intention to terminate this Agreement) expiring upon the Renewal Date or the last day of any Extension, as applicable.

3.2 If the Customer uses an alternative Service not provided by BTL in breach of Section 2 herein, prior to the Renewal Date or the last day of any Extension, then the Customer must pay to BTL a monetary charge equivalent to thirty per cent (30%) of the gross revenue lost by BTL for the remainder of the Initial Term or any Extension, as applicable, by reason of the Service not being provided by BTL, based on the average of the last six monthly invoices previously billed to the Customer for the Service concerned or BTL's price for the equivalent Service, plus any applicable taxes payable to the Government of Belize or any taxing authority, on such revenue.

3.3 The Customer acknowledges and agrees that the charge prescribed in Section 3.2 above is a genuine pre-estimate of the loss to BTL in the given circumstances and is not intended to be a penalty. The Customer further agrees that all such charges shall be due and payable to BTL by the Customer within thirty (30) days from the date the payment of such charges is first demanded by BTL in writing."

(8) Section 4.1 of the Original Agreement is deleted in its entirety and replaced by the wording in the following new Section 4.1:

"4.1. All charges for Services shall be payable by the Customer to BTL in accordance with the prices published by BTL from time to time and the invoice for such Services issued to the Customer on or before the date on which any such charges are due (the "Due Date"), and the Customer shall pay to BTL all such charges together with any applicable taxes without any reduction or deduction whatsoever, on or before the Due Date."

(9) Section 4.6 of the Original Agreement is deleted in its entirety

(10) Section 8 of the Original Agreement is deleted in its entirety and replaced by the wording in the following new Section 8:

"8. Application of Discounts

8.1 Commencing on the Agreement Date and continuing throughout the duration of this Agreement, BTL shall: (i) add-up the charges for all Services (net of all applicable taxes) provided to the Customer during the course of any calendar month, and (ii) deduct from the total amount of such charges the sum levied by BTL over such calendar month for National Fixed Line Calls carried across the BTL network (as determined in accordance with Section 8.3 below) between the Customer's premises in Belize (net of all applicable taxes), and the resulting sum shall constitute the Customer's monthly base cost charge (the "Monthly Base Cost Charge").

8.2 BTL shall then apply the Customer's Monthly Base Cost Charge in accordance with the following tables in order to determine the level of discount to be applied to the Customer's Monthly Base Cost Charge for the calendar month concerned:

Table One

Year 1, (Commencing 1st July 2005)

| Insert Monthly Base Cost Charge into the relevant range set-out below in order to determine the applicable discount | Discount to be applied to the Monthly Base Cost Charge for each calendar month |
|---|---|
| Up to $650,000 | 0% |
| $650,001 to $700,000 | 13% |
| $700,001 to $750,000 | 14% |
| $750,001 to $800,000 | 17% |
| $800,001 to $850,000 | 17% |
| $850,001 to $900,000 | 17% |
| $900,001 to $950,000 | 17% |
| $950,001 to $1,000,000 | 19% |
| $1,000,001 to $1,050,000 | 20% |
| $1,050,001 to $1,100,000 | 21% |
| $1,100,001 to $1,150,000 | 22% |
| $1,150,001 to $1,200,000 | 23% |
| $1,200,001 to $1,250,000 | 24% |
| $1,250,001 and above | 25% |

Table Two

Year 2. (Commencing 1st July 2006)

| Insert Monthly Base Cost Charge into the relevant range set-out below in order to determine the applicable discount. | Discount to be applied to the Monthly Base Cost Charge for each calendar month |
|---|---|
| Up to $682,500 | 0% |
| $682,501 to $735,000 | 13% |
| $735,001 to $787,500 | 14% |
| $787,501 to $840,000 | 17% |
| $840,001 to $892,500 | 17% |
| $892,501 to $945,000 | 17% |
| $945,001 to $997,500 | 17% |
| $997,501 to $1,050,000 | 19% |
| $1,050,001 to $1,102,500 | 20% |
| $1,102,501 to $1,155,000 | 21% |
| $1,155,001 to $1,207,500 | 22% |
| $1,207,501 to $1,260,000 | 23% |
| $1,260,001 to $1,312,500 | 24% |
| $1,312,501 and above | 25% |

Year 3 and each subsequent year thereafter for the duration of this Agreement

The following formula and mechanism shall be applied:

(i) the ranges set out in column one of Table Two shall be increased on an annual basis throughout the remaining duration of this Agreement, by either 5% per annum or by a sum per annum equivalent to the annual percentage rate of inflation for Belize (as published by the Central Bank), whichever is the greater amount (the "Annual Adjusted Ranges");

(ii) the level of discounts as set out in column two of Table Two shall remain unchanged throughout the remaining duration of this Agreement; and

(iii) the Monthly Base Cost Charge shall be inserted into the Annual Adjusted Ranges in order to determine the discount to be applied to the Monthly Base Cost Charge for each calendar month..

8.3   All National Fixed Line Calls carried across the BTL network between the Customer's premises in Belize shall be charged by BTL at a flat rate of $49,000 per calendar month during the first year following the Agreement Date (the "Flat Rate"). Thereafter and in each subsequent calendar year throughout the remaining duration of this Agreement, the Flat Rate shall be increased on an annual basis by either 5% per annum or by a sum per annum equivalent to the annual percentage rate of inflation for Belize (as published by the Central Bank), whichever is the greater amount.

8.4   The Customer shall pay BTL the charge for all National Fixed Line Calls as calculated in accordance with Section 8.3, and the Monthly Base Cost Charge net of the discount calculated in accordance with Section 8.2, on a calendar month basis and in the manner provided for in Section 4.

(11)   Schedules B and C of the Original Agreement and all references to Schedules B and C in the Original Agreement are deleted.

(12)   Insert new Schedule D into the Agreement (a copy of which is attached to this letter agreement) er titled: "All ministries, departments, groups, entities, organizations, bodies and associations of the Government of Belize constituting the "Customer" in this Agreement."

For the avoidance of doubt, save as amended by this letter agreement, all provisions of the Original Agreement including the Attachments and Schedules thereto shall remain in full force and effect.

Please indicate your acceptance and agreement to the terms contained in this letter agreement by executing the copy enclosed for this purpose and returning the same to BTL, marked for my attention.

Yours sincerely

Dean C. Boyce
Executive Committee Chairman


CC: Hon. Ralph Fonseca, Minister of Public Utilities

Executed as a deed on behalf of the Government of Belize this *15th*. day of ~~November~~ *December*
2006 by:

_Said Musa_

Hon. Said Musa, Prime Minister and
Minister of Finance

In the presence of:

Hon. Francis Fonseca, Attorney General
of Belize

# SCHEDULE D

All ministries, departments, groups, entities, organizations, bodies and associations of the Government of Belize constituting the "Customer" in this Agreement.

Account Number.

| | | | |
|---|---|---|---|
| 00000077437-001 | Ministry of Finance | 00000077437-002 | Accountant General |
| 00000077437-003 | Attorney General Ministry | 00000077437-004 | Ministry of Home Affairs |
| 00000077437-005 | Auditor General | 00000077437-006 | Archives Department |
| 00000077437-007 | Belize Defense Force | 00000077437-008 | Ministry of Defense |
| 00000077437-009 | BELIPO/Company Registry | 00000077437-010 | N E M O |
| 00000077437-011 | Bio-safety Framework Project | 00000077437-012 | Bureau of Standards |
| 00000077437-013 | Immigration Department | 00000077437-014 | Center for Employment Training |
| 00000077437-015 | Conscious Youth Development | 00000077437-016 | Customs Department |
| 00000077437-017 | Climate Change Center | 00000077437-018 | Director of Public Prosecution |
| 00000077437-019 | Ministry of Education | 00000077437-020 | Election & Boundaries |
| 00000077437-021 | Governor General | 00000077437-022 | Press Office |
| 00000077437-023 | General Registry | 00000077437-024 | General Post Office |
| 00000077437-025 | Legislature | 00000077437-026 | Magistrate Court |
| 00000077437-027 | Meteorological Dept | 00000077437-028 | Min Of Agriculture Fisheries Coop |
| 00000077437-029 | Ministry Of National Development | 00000077437-030 | Rural Development |
| 00000077437-031 | Ministry of Human Development | 00000077437-032 | Ministry of Industry & Commerce |
| 00000077437-033 | Karl Heusner Memorial Hospital | 00000077437-034 | Labour Department |
| 00000077437-035 | Min of Natural Resources & Envi'on | 00000077437-036 | Office of The Snc Commission |
| 00000077437-037 | Ministry of Local Government | 00000077437-038 | Min of Tourism & Broadcasting |
| 00000077437-039 | Ministry of Foreign Affairs | 00000077437-040 | Ministry of Health |
| 00000077437-041 | Ministry of Works | 00000077437-042 | National Library Service |
| 00000077437-043 | National Security & Immigration | 00000077437-044 | Office of P/Minister & Cabinet |
| 00000077437-045 | Primary Education Dev Project | 00000077437-046 | Prime Minister's Office |
| 00000077437-047 | Public Utilities Transport Com | 00000077437-048 | Civil Aviation Department |
| 00000077437-049 | Income Tax Department | 00000077437-050 | Ministry of Housing |
| 00000077437-051 | Ministry of Investment & Trade | 00000077437-052 | Prime Minister |
| 00000077437-053 | Youth For The Future | 00000077437-054 | Ministry of Public Utilities |
| 00000077437-055 | Police Department | 00000077437-056 | Ministry of Energy & Comm |
| 00000077437-057 | Minister of State | 00000077437-058 | Foreign Trade |
| 00000077437-059 | Department Of Transport | 00000077437-060 | National Fire Service |
| 00000077437-062 | Central Statistical Office | 00000077437-063 | Office of Governance |
| 00000077437-064 | Belize Defence Force (Card) | 00000077437-065 | Sales Tax Department |
| 00000077437-066 | National Drug Abuse Control C.) | | |



# SETTLEMENT IN RELATION TO GOVERNMENT TELECOMMUNICATIONS ACCOMMODATION AGREEMENT DATED 19 SEPTEMBER 2005 (AS AMENDED ON 21 NOVEMBER 2005 AND ON 15 DECEMBER 2006)

THE GOVERNMENT OF BELIZE

AND

BELIZE TELEMEDIA LIMITED

January 7, 2008

**THIS SETTLEMENT DEED IS DATED JANUARY 7, 2008**

**AND MADE BETWEEN:**

(1)     **THE GOVERNMENT OF BELIZE** (including its ministries, departments, and political subdivisions acting through its authorized representative, the Honourable Said Musa, Prime Minister and Minister of Finance, National Development and the Public Service (hereinafter referred to as the "**Government**") whose office is at New Administration Building, Belmopan, Cayo, Belize, Central America; and

(2)     **BELIZE TELEMEDIA LIMITED**, a public company duly incorporated under the laws of Belize with its principal offices situated at the Esquivel Telecom Center, St Thomas, Belize City, Belize, Central America (herein referred to as "**Telemedia**").

**WHEREAS:**

(A)     On 19 September 2005 the Government and Belize Telecommunications Limited (herein referred to as "BTL") entered into the government telecommunications accommodation agreement (the "**Original Agreement**").

(B)     On 21 November 2005 the Government and BTL entered into a deed which set out certain provisions in relation to completion of the Original Agreement and certain amendments to the Original Agreement (the "**First Amendment Deed**").

(C)     On 15 December 2006 the Government and BTL entered into a settlement deed in relation to certain matters of dispute under the Original Agreement (as amended) (the "**First Settlement Deed**").

(D)     On 15 September 2006 BTL and Telemedia entered into a business transfer agreement pursuant to which BTL agreed to transfer its business to Telemedia (the "**Business Transfer Agreement**"). On 29 May 2007 the Belize Telecommunications Undertaking (Belize Telecommunications Limited Operations) Vesting Act, 2007 (the "**Vesting Act**") was assented to by the Governor General of Belize and was made law. Pursuant to the provisions of the Vesting Act, all of the assets, liabilities, rights, obligations, property, files and documentation of BTL (including any rights and obligations arising under the Original Agreement as amended) which had been agreed to be transferred pursuant to the Business Transfer Agreement were vested in Telemedia.

(E)     The Government and Telemedia (as successor to BTL pursuant to the Business Transfer Agreement and the Vesting Act) wish to settle a number of outstanding issues in relation to the Original Agreement (as amended).

**IN SETTLEMENT OF THESE OUTSTANDING ISSUES IT IS AGREED:**

1.     **CONSTRUCTION**

1.1     Unless expressly defined in this deed (including the recitals) or the contrary intention appears, capitalised terms defined in the Original Agreement, the First Amendment Deed and the First Settlement Deed shall have the same meanings in this deed. References to the Original Agreement are to that agreement as amended by the First Amendment Deed and the First Settlement Deed.

2.     **RETURN ON CAPITAL INVESTMENT**

2.1     In accordance with clause 2 of the First Settlement Deed, if full payment of the Shortfall Amount of BZ$7,075,000 (the **2006 Shortfall Amount**) was not paid by the Government to BTL (or its

successor, Telemedia) by 31 October 2007, the further provisions of clause 2.2 of the First Settlement Deed are to apply. The Government has not yet paid the 2006 Shortfall Amount.

2.2    In addition, BTL achieved less than the Minimum Rate of Return in the financial year ended 31 March 2007 and pursuant to section 11.4 of the Original Agreement, Telemedia formally notified the Government of the Shortfall Amount of BZ$11,628,000 (the "**2007 Shortfall Amount**") on 23 August 2007 and provided the Government with a Capital Rate of Return Statement setting out the basis for calculation of the 2007 Shortfall Amount. Full payment of the 2007 Shortfall Amount was due and payable by no later than 23 November 2007.

2.3    Certain additional and final assessments to taxation have been made by taxation authorities in Belize against BTL for the period ending 31 March 2005, including, but not limited to, assessments concerning general intercompany cross charges; intercompany charges for pre-paid cards; management fees; receipts by board members of BTL and of BTL associated companies and affiliates; international settlements; internet and data revenues, and assessments concerning all other BTL business activities, and including all accrued penalties, arrears interest or other interest thereon (together, the **Assessments**) amounting to BZ$4,000,000. As successor to BTL, Telemedia has, subject to the provisions of clause 2.7 assumed this liability.

2.4    In accordance with clause 2.2 of the First Settlement Deed, the unpaid taxes due and owing as set out in clause 2.3 above shall be set-off against the 2006 Shortfall Amount and the Government hereby acknowledges and agrees that:

(a)    in respects of all financial periods of BTL (and/or Telemedia as the case may be) up to and including the period ending on 31 March 2007, all taxation assessments made on BTL (and/or Telemedia as the case may be) have been made and that no further tax assessments for these periods will be made by any taxation authority in Belize on BTL (and/or Telemedia as the case may be); and

(b)    this set-off constitutes full and final settlement of all liabilities to taxation assessed by any taxation authority in Belize owed by BTL and/or Telemedia in respects of all financial periods of BTL (and/or Telemedia as the case may be) up to and including the period ending on 31 March 2007, and no further tax shall be due or payable by BTL (or Telemedia as the case may be) for such financial periods and that there are no other payments or obligations due and payable by BTL (and/or Telemedia as the case may be) to the Government.

2.5    Following the set-off described in clause 2.4 above, the balance of BZ$3,075,000 plus the 2007 Shortfall Amount will be due and owing to Telemedia by the Government together totalling BZ$14,703,000 (the "**Balance Amount**") and the Government agrees that Telemedia shall be entitled with effect from 1 February, 2008, and at its sole discretion, to set off the Balance Amount against monthly-based tax liabilities including, but not limited to, business tax as they fall due and owing until the Balance Amount has been extinguished.

2.6    The Government hereby acknowledges and agrees that, in the event the Government fails to pay to Telemedia, in accordance with section 11.4 of the Original Agreement, any Shortfall Amount arising in respect of Telemedia's financial year ending on 31 March 2008 or any subsequent financial years of Telemedia, on or by the relevant Deadline Date for each such financial year, Telemedia shall be entitled to set-off any such future Shortfall Amounts against the amount of any taxes or other payments or obligations due and payable by Telemedia to the Government.

2.7    The Government hereby acknowledges and agrees that any set-off made by Telemedia in accordance with any of clauses 2.4 to 2.6 above shall be made without prejudice to Telemedia's right to challenge the validity, basis of calculation or amount of:

3

(a) any of the Assessments (to the extent that Telemedia is unable to set-off the 2006 Shortfall Amount in accordance with this clause 2); or

(b) any future assessments made in relation to financial periods subsequent to the financial period ending on 31 March 2007.

2.8 Telemedia hereby confirms that the business tax payable by the company for the months of October 2007 (BZ$1,460,338.71) and November 2007 (BZ$1,540,228.29) together totalling BZ$3,000,568 have been fully paid to the Income Tax Department.

## 3. RATE OF BUSINESS TAXATION

3.1 In relation to the Government's undertaking in section 11.3 (f) of the Original Agreement (as amended by clause 3.5 of the First Settlement Deed), to the extent that the Government does not comply in full with or implement such undertaking by 1 April 2008, Telemedia shall be entitled at its sole discretion from 1 April 2008 to calculate the amount of business tax it pays as set out in clause 3.5 of the First Settlement Deed and the Government hereby agrees that the payment by Telemedia of such amounts so calculated by Telemedia shall be in full and final settlement of Telemedia's liability to pay business tax in respect of any period.

## 4. VESTING ACT FURTHER ASSURANCES

4.1 Within 21 days of a written request being made by Telemedia to the Government, the Government shall, at its own cost and expense, take all necessary steps (or procure to the satisfaction of Telemedia that all such steps are taken by any other necessary party) to vest the undertaking of Telemedia (or BTL as the case may be) in:

(a) a new company to which Telemedia has transferred its undertaking on terms similar to the Vesting Act; or

(b) such entity as Telemedia or any of its successors or predecessors in title may require.

## 5. ADDITIONAL GOVERNMENT CONFIRMATIONS AND UNDERTAKINGS

5.1 The Government hereby confirms on behalf of the Income and Business Tax Department that, BTL, and therefore Telemedia, is exempt from withholding tax as set out in clause 3.1 of the First Settlement Deed..

5.2 The Government hereby confirms on behalf of the relevant fiscal departments that all goods, material, equipment and machinery imported for Telemedia's own use are free from import duties and General Sales Tax as set out in clause 3.2 of the First Settlement Deed and that all such fiscal departments will give full effect to the benefit of this status promptly and in any event within three business days of a request being made by Telemedia (or BTL as the case may be), and without any need for further recourse or authorisation from any other department or person.

5.3 The Government agrees to procure within 21 days of this deed, evidence to the satisfaction of Telemedia:

(a) of the formal amendment to Telemedia's Individual Licence (or BTL's as the case may be) permitting it to restrict the resale of its services in accordance with Section 25 of the Belize Telecommunications Act 2002 (including an obligation to provide indirect access to BTL's telecommunications network) but shall be obliged to provide interconnection services to Speednet, and

(b)     that the Belize Social Security Board has withdrawn Case No: 557/2002 against BTL in accordance with clause 5.1 of the First Settlement Deed.

5.4     The Government further agrees to procure within 21 days of this deed evidence to the satisfaction of Telemedia that the disparity between the business tax treatment of all Class Licensees and Telemedia (or BTL as the case may be) is rectified effective from 31 March 2007, so that Telemedia is taxed on its internet services and all other services provided, facilitated, permitted or covered by Class Licensees, at the same rate at which the Class Licensees are taxed, and in the event that the Government fails to procure such evidence within 21 days of this deed, Telemedia shall be entitled to pay business tax on its internet services and all other services provided, facilitated, permitted or covered by Class Licensees at the same rate at which Class Licensees are taxed until such disparity no longer exists.

## 6.     LICENCE

6.1     The Government hereby undertakes to procure the grant by the Public Utilities Commission of any unconditional telecommunications licence, including, but not limited to, an Individual Licence granted under section 15 of the Belize Telecommunications Act, 2002 to Telemedia or to such other entity as Telemedia may nominate in substitution for any licence granted by the Public Utilities Commission and vested in Telemedia pursuant to the Vesting Act.

## 7.     ASSIGNMENT

7.1     Notwithstanding the provisions of section 19 of the Original Agreement, the Government acknowledges and agrees that all rights of BTL under the Original Agreement are transferred to Telemedia effective from 29 May 2007 and that BTL has no further liabilities under the Original Agreement.

7.2     Without prejudice to the provisions of the clause 7.1 above, section 19 of the Original Agreement shall be deleted in its entirety.

7.3     Telemedia may at any time assign or transfer (including by way of novation) any rights or obligations under this deed, the Original Agreement, the First Amendment Deed and the Settlement Deed to:

(a)     any other member of Telemedia's corporate group;

(b)     any company under the control of Telemedia; or

(c)     any company under common control with Telemedia;

(d)     any purchaser or transferee of the business and assets of Telemedia or its successor which may enforce them as if it had been named in this deed as Telemedia.

7.4     For the purposes of this clause 7, 'control' means in relation to a company ownership of 50 per cent. or more of the voting rights in such company.

## 8.     OTHER ISSUES

8.1     The Government agrees within 21 days of this deed to:

(a)     assign to Telemedia the frequency spectrum from 2.496 Ghz to 2.69 Ghz for Telemedia's sole use for the purposes of the deployment of its Wimax system throughout Belize;

5

(b) assign to Telemedia the frequency spectrums: B band: 835 – 845 Mhz (Up link) and 880 – 890 (downlink) and Ext B band: 846.5 – 849 MHz (uplink) and 891.5 – 894 MHz (downlink) for Telemedia's sole use for the purposes of the deployment of its GSM system throughout Belize, and

(c) procure the Public Utilities Commission to clear the 450 MHz sub-band A in order to eliminate potential or actual interference with Telemedia's use of this frequency band.

8.2 The Government undertakes to give and to procure that the Public Utilities Commission give, full legal effect to the "Guidelines for the Regulation of Voice Over Internet Protocol ("**VOIP**") Operators" published by the Caribbean Association of National Telecommunication Organisations ("**CANTO**") in June 2007 (a copy of which is annexed to this deed) (the "**CANTO Guidelines**"), by the issuance within 14 days of the date of this deed, and by their implementation no later than February 29, 2008, of regulations governing the regulation of VOIP in a form acceptable to Telemedia and in full compliance with the CANTO Guidelines.

8.2 The Government undertakes to take, and to procure that the Public Utilities Commission take, all necessary steps to ensure that all Class Licencees fully comply with the CANTO Guidelines.

8.3 The Government undertakes not to, and to ensure that the Public Utilities Commission does not: (i) take any steps or any other act on which would undermine Telemedia's position as the sole landing party for the Arcos submarine fiber optic cable, and (ii) allow any person or give any person permission or approval to access the Arcos submarine fiber optic cable either directly or indirectly, other than through Telemedia and by means of the purchase of capacity and services from Telemedia.

8.4 The Government undertakes to issue or to procure that the Public Utilities Commission issue, no later than February 29, 2008, all authorisations, consents or approvals necessary for Telemedia to fully implement with effect from a date to be determined by Telemedia, the tariff changes detailed in Telemedia's communication to the Public Utilities Commission dated August 10, 2007, a copy of which is annexed hereto.

8.5 The Government undertakes within 21 days of the date of this deed to remove or to procure the removal of, all duplicated business tax charges levied on revenue receipts arising from the provision and resale of services by Individual Licensees and Class Licensees.

## 9. EFFECT OF AMENDMENTS

9.1 This deed is supplemental to the Original Agreement, the First Amendment Deed and the First Settlement Deed and from the date of this deed, the Original Agreement, the First Amendment Deed and First Settlement Deed shall be read and construed as amended by this deed and references in the Original Agreement, the First Amendment Deed and the First Settlement Deed to "this deed" shall be construed as references to the Original Agreement, the First Amendment Deed and the First Settlement Deed as amended by this deed.

9.2 The parties agree that the obligations and liabilities under the Original Agreement, the First Amendment Deed and the First Settlement Deed that are not specifically amended by this deed continue in full force and effect.

## 10. ENFORCEMENT

10.1 Telemedia may enforce any provision of this deed for itself and as trustee on behalf of any predecessor or successor in title to the former business and assets of BTL transferred to Telemedia pursuant to the Business Transfer Agreement and the Vesting Act.

## 11. GENERAL

11.1 The parties agree that sections 17 to 18, 20 and 21 of the Original Agreement shall be deemed to be incorporated into this deed as though they were expressly set out herein.

11.2 Each party shall bear its own costs in connection with the negotiation, execution and implementation of this deed.

11.3 This deed shall be binding on the parties, their successors and assigns and the name of a party appearing herein shall be deemed to include the names of any such successor or assign.

11.4 This deed may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same agreement and any parties may enter into this deed by executing a counterpart.

IN WITNESS whereof this deed has been executed and delivered on the date first above written.

**SIGNATORIES**

Signed as a deed by )
**THE GOVERNMENT OF BELIZE** )

_____
Prime Minister and Minister of Finance
(On behalf of The Government of Belize)

In the presence of:

_____
Justice of Peace

CLENN F. LONGSWORTH
JUSTICE OF THE PEACE
6 SAINT JOSEPH ST.
BELIZE CITY, BELIZE

_____
Attorney-General of Belize
(On behalf of The Government of Belize)

In the presence of:

_____
Justice of Peace

CLENN F. LONGSWORTH
JUSTICE OF THE PEACE
6 SAINT JOSEPH ST.
BELIZE CITY, BELIZE

Signed, sealed and delivered by )
**BELIZE TELEMEDIA LIMITED** )
this 7th day of January 2008 in the presence of: )

_____
Director

_____
Secretary/Director

8



*DRAFT*
*GUIDELINES FOR THE REGULATION OF*
*VOICE OVER INTERNET PROTOCOL (VOIP) OPERATORS*

The Caribbean Association of National Telecommunication Organizations (CANTO) has prepared the following guidelines to assist the Governments of CANTO Members in establishing the legal and regulatory framework for Voice over Internet Protocol ("VoIP"). These guidelines are considered necessary in light of the increased activity of VoIP operators in the Caribbean markets. These guidelines seek to ensure that the interests of the local economies, the licensed operators, and consumers are taken into consideration.

## DESCRIPTION

1. Voice over Internet Protocol (VoIP) is an emerging technology. The term refers to transmission of voice over packet based networks. The IP suffix signifies the packet based protocol – Internet Protocol – used. The term VoIP also refers to all types of Internet Protocol-based one-way or two-way voice services, including both interconnected and non-interconnected services, provided in whole or in part over a broadband connection via data transmissions, including without limitation the public Internet, a corporate intranet, a managed network, or other actual or virtual dedicated circuits or capacity such as an international private line. The term VoIP also includes Voice over Frame Relay, Voice over ATM, packet voice, packetized voice, and all equivalent or similar services and applications.

## EXISTING FRAMEWORKS

2. A Government which currently directly or indirectly restricts some or all VoIP services and applications should not relax or remove such restrictions without first ensuring that the current legal and contractual rights of all parties are fully recognized and satisfied.

## LICENSING AND TAXATION

3. The Government shall adopt laws requiring all providers of VoIP services and applications, (either wholesale or retail), to one or more customers in the country to apply for and obtain an appropriate license before commencing VoIP service. Each provider should be required to provide certain minimum information regarding the company, its location and offices, its capital structure and financial qualifications, its ownership, its operations, its services, service quality, network, and 24/7 contact information.

4. The licensing and taxation regimes applicable to VoIP providers should be non-discriminatory when compared to the legal and regulatory regime governing non-VoIP providers of similar or equivalent services or applications.

5. At a minimum, the Government should adopt laws requiring each licensed VoIP provider to have a bona fide local business presence and to accept service of process at such location or through another designated and accessible local entity.

6. The Government should adopt laws stating that a person or entity directly or indirectly providing VoIP services in the jurisdiction without fully complying with all licensing and related requirements is thereby deemed to consent to accept service of process within the jurisdiction and to be subject to the judicial system within the jurisdiction.

7. A licensed operator providing a broadband connection to a customer shall be entitled to shut down such broadband connection, either by port blocking or otherwise, in the event the customer takes service from a VoIP provider which does not comply with all licensing and related requirements in the jurisdiction. This ensures that the licensed operator is not disadvantaged by its network being used for no charge.

8. The providers of local telephone services whose networks are being used to convey VoIP traffic should not be restricted from undertaking network management activities to promote efficient bandwidth usage by customers while removing incentives for users to engage in bandwidth usage which was not reasonably contemplated by the local operator's rate plans and applicable cost recovery mechanisms in the jurisdiction.

9. A person providing only VoIP services may also be required to make a contribution to universal service within the jurisdiction in a non-discriminatory manner when compared to other providers of similar or equivalent service. It is expected that fixed and mobile providers would already be required to make contributions to the USO fund.

10. The Government should adopt laws making it a misdemeanor criminal offence to provide VoIP services or applications in the jurisdiction without complying with all licensing and related requirements.

11. Each VoIP provider should be required to coordinate with national law enforcement authorities to ensure that such authorities are able to enforce the laws of the jurisdiction.

## NUMBERS

12. The Government should establish a unique block of telephone numbers for assignment to VoIP users so that all parties can easily distinguish VoIP calls from all other types of traffic, and VoIP providers should port numbers to competing carriers consistent with the porting requirements of the country.

## CONSUMER ISSUES

13. Each VoIP provider shall be required to offer an emergency voice calling service capability for all customers in the jurisdiction that is reasonably equivalent in quality and reliability to the emergency voice calling capability offered by the incumbent local telephone operator.

14. Each VoIP provider should be required to comply with all local consumer protection laws, including provisions in the local operator's license, and to provide appropriate disclosures to customers regarding the potential effect of power loss on the availability of VoIP services.

15. Each VoIP provider should be required to offer its customers termination on all licensed networks in the jurisdiction.

16. The Government should adopt laws granting to licensed operators a private right of action against any VoIP operator which does not comply with all licensing and related requirements in the jurisdiction. Such licensed operators shall be entitled to enhanced damages for the harm caused by such a VoIP provider, including without limitation lost revenues, stranded investment, bandwidth usage and congestion, network management costs, or other increased costs. Licensed operators should be permitted to rely upon any reasonable methodology for estimating damages.

17. Each VoIP provider should be required to post a bond with the National Licensing Agency in an amount sufficient to cover reasonably expected claims by customers for refunds, overcharges, or inferior service should the VoIP provider refuse to grant appropriate remedies or cease providing service without satisfying such claims.

18. In any case where a VoIP provider is reselling or rebilling VoIP services provided by another entity, or providing VoIP services in partnership with another entity, all such VoIP providers shall be independently subject to these requirements.

 **Belize Telemedia Limited**

August 10, 2007

Roberto Young
Chairman
Public Utilities Commission
P.O. Box 300
41 Gabourel Lane
Belize City
Belize

Dear Mr. Young,

<u>Revision of Service / Tariff Strategy</u>

Operators in the telecommunications industry have consistently looked towards new and innovative ways of improving customer service and increasing value for customers, whilst at the same time developing a financially stable and forward-looking business, that is able to fully support its various stakeholders over the longer term. One such service improvement is tariff bundling, tailored to meet the particular requirements of individual customer segments.

The Company's existing customer service tariffs have been developed over a period of time, with international service tariffs being used to provide the necessary cross subsidies for domestic services that have been provided to a very substantial number of customers. The rapidly changing industry environment, and the changes in customer profiles, has completely undermined this traditional pricing model and everything that it supported.

To address the various financial issues and problems that exist, to leverage the benefits from the new billing platforms that are now being installed, and to more closely meet the current and projected demands of our customers, Telemedia plans to introduce the attached changes to its tariff and service structure.

The new pricing strategy is based on the segmentation of the market through packages designed to cater to the needs of the different customer groups, and it will work towards a more equitable tariff structure that is more reflective of the underlying service costs. The new bundled packages are built on simplicity, and will include both voice and high speed data services, and these packages will provide a base for future enhancements. .

The Vesting Act in May 2007 vested all the assets and liabilities of Belize Telecommunications Limited into Belize Telemedia Limited. Given that the underlying assets are common to both companies, the current plans for Telemedia use the results and performance achieved under Belize Telecommunications Limited, as a base. Any

references to either BTL or Telemedia will therefore, for the purposes of this document, be considered the same.

The new pricing strategy takes into account:

- The Line Access and Maintenance ("LAM) charge has not been increased since December 2001 (almost 6 years ago);

- The Company has over the past years been forced to cope with inflationary charges across most of its cost categories, including staff salary increases (4-5% p.a.), BEL rate increases (33% increase since July 2005), insurance rates, maintenance and support charges (as older systems are upgraded), and depreciation (as the Company has expanded and improved the network);

- Despite these varying cost increases, the Company has made substantial tariff reductions for telecommunication services over the past years, including cellular, international and internet, benefiting both post and pre-paid service users, and **no** service tariffs have been increased since December 2001;

- As an example of the effect of those tariff reductions, the annualized revenue earned from post-paid fixed line customers five years ago, for outbound international call services, compared with the current annualized revenues, reflect an annualized revenue reduction $12m p.a. (i.e. 70%), and in turn this has reduced the Company's ability to maintain the same level of cross subsidies for the LAM service;

- The Company is faced with an increasing array of competition, and rapidly changing industry environment, including the effect of the foreign based VoIP providers, that parasitically utilize the local Belize network without contributing to the cost of that network, pay Belize taxes, etc., forcing down international tariffs in particular, but over time this will certainly extend to all domestic call rates (fixed and cellular);

- LAM services across the country make a substantial loss for the Company. Gross revenue would need to increase by $18m per annum in order to cover the related operating and capital cost, for that particular service. The Company has provided around $100m in cross subsidies (i.e. has forgone the related profits) over the past five years for this LAM service (with additional cross subsidies for certain other services such as internet and line installation);

- LAM services account for only 8% of the Company's total revenue (i.e. 8% of the total customers' bills), and with Internet making up 6.5%. The net effect of the introduction of the service changes included in this document, will be to increase the overall value received by residential customers. The effect of the change in services for business customers will be to increase Telemedia's overall revenue by less than 3%. Given the very small overall revenue impact on this occasion, and the much larger revenue and value benefits received by all customers over the past five years, there is no reason why this current change should create any difficulties.



**2005/6 Revenue Analysis**

- Installs 0%
- Other (e.g. equip rent, mntce, sales) 7%
- LAM (Business + Residential) 8%
- Data 3%
- Internet 7%
- Calls 75%

- As long as it is financially able to do so, the Company will try to continue to provide some subsidies. In particular, in order to protect the genuine low income customer, the afford-a-phone program will continue to be subsidized as at present, with no increase in tariffs. The Company is however unable to maintain the same level of cross subsidies that it has for the past few years, before the inflationary cost increases, reduced international revenues and reduced tariffs for other services, and the impact of competition.

- The implementation of the new services are detailed in Appendix A, and are planned for implementation on 1st September, 2007.

The Company believes it would be beneficial if we could arrange a meeting discuss the contents of this document, and any matters arising, at your earliest convenience.

Yours Sincerely
**BELIZE TELEMEDIA LIMITED**

Dean Molina
Manager – Legal & Regulatory Affairs

c: Executive Committee

## APPENDIX A

## HomeFone & BizFone Services

Telemedia's HomeFone Service is a fixed telephone line offered only to residential customers and provides access to local, national and international calls. This service provides a Standard Package to all residential customers with options to purchase additional calling plans and internet upgrades. It also includes a package catered to the low-income users.

Telemedia's BizFone Service is a fixed telephone line offered only to Business customers including Small, Medium and Large Businesses, Government, Diplomatic and all lines currently classified as Business, which provides access to local, national and international calls, and with more advanced support standards. This service provides a Standard / Base Package to all Business customers and in the near future, Telemedia will offer options to purchase additional calling plans and upgrades for data services.

### 1. HomeFone Package

HomeFone Service provides a Standard Package to all postpaid and prepaid residential customers that include a fixed telephone line, a number of weekend minutes and free value added features as specified below. This package also offers a free directory listing, a telephone directory, 24 hours access to operator assistance and access to online services.

| | Monthly Charge | Package Includes | | |
|---|---|---|---|---|
| **HomeFone Standard Package** | $35 | Fixed Line Telephone Number, and maintained line and network access | First 60 minutes every Saturday, and First 60 minutes every Sunday, to any fixed line countrywide | Value Added features<br>• Caller ID<br>• Voice-Mail |

**Notes:**
- Excess minutes are billed at standard off peak rates
- Operator assisted calls, Cellular calls and International calls are not included
- Above stated Monthly Charge is exclusive of GST
- Includes calls to any Speednet fixed line number (non discrimination).

**Benefits:**

The 480 (60 x 8 days) additional FREE minutes have a value of $62 (using an average weighted rate per minute, taking into account the normal traffic patterns). Therefore, the

total charge at $35, compared with the previous tariff arrangement (i.e. $20 LAM + $62 charge for 480 Minutes = $82), provides an overall NET GAIN to the customer of $47, that is a 57% overall saving.

The break-even point, where the free minutes exactly offset in the original LAM + minutes charge, is only 120 minutes during the month (out of the 480 minutes).

## 2. HomeFone Plans

HomeFone Service also offers residential customers the option to purchase additional bundles of minutes at discounted rates by selecting one of the following three plans. All three plans already include the cost and benefits of the Standard HomeFone Package above.

| | Monthly Charges | Plans Include | | |
|---|---|---|---|---|
| **HomeFone Lite** | $59 | Standard Package (which includes at least 480 Free Minutes along with Value Added Services) PLUS | 150 local minutes, at anytime, during the month | 75 national minutes, at anytime during the month |
| **HomeFone Premium** | $99 | | 600 minutes (10 hours) at any time, to any fixed line in the country, during the month | |
| **HomeFone Family** | $149 | | 1200 minutes (20 hours) at any time, to any fixed line in the country, during the month | |

**Notes:**
- Operator assisted calls, Cellular calls and International calls are not included
- Excess minutes are billed at standard peak and off-peak rates
- Above stated monthly charges are exclusive of GST
- Includes calls to any Speedne fixed line number (non discrimination).

**Benefits:**

In addition to the overall 57% saving on the previous LAM charge and free weekend minutes, the savings on the additional bundled plan minutes amount to approximately 20% for Lite, 30% for Premium, and 40% for Family.

These are indicative numbers at this stage, and may be adjusted slightly prior to implementation, but still with the objective of providing the discount percentages shown.

In addition, it is expected that over time, additional features and benefits will be added to each plan.

Strictly Private & Confidential: Other than to relevant persons within the PUC, the contents of this document must not be disclosed to any third party without Telemedia's permission.

## 3. HomeFone Internet Upgrade

Residential customers on any HomeFone Plan will receive up to 30% additional discount on Telemedia's High Speed Internet Service when upgrading their internet plans, or when buying an internet connection for the first time with one of the Plans.

| Plans | Speed | Actual Price | Savings | Discounted Price |
|---|---|---|---|---|
| HomeFone Lite | 256k | $179 | 10% | $161 |
| | 512k | $300 | 15% | $255 |
| | 1MB | $500 | 20% | $400 |
| HomeFone Premium | 256k | $179 | 15% | $152 |
| | 512k | $300 | 20% | $240 |
| | 1MB | $500 | 25% | $375 |
| HomeFone Family | 256k | $179 | 20% | $143 |
| | 512k | $300 | 25% | $225 |
| | 1MB | $500 | 30% | $350 |

**Notes:**
- Above stated monthly charges are exclusive of GST
- The discounted prices are applicable to 'UPGRADES' only, or for customers buying a connection for the first time on a phone line with one of these Plans.
- The internet dial-up facilities will be available with each plan internet service.

## 4. HomeFone (Afford-A-Phone) Package

HomeFone Service also provides an affordable package to all Telemedia's Afford –A-Phone customers who are low-income prepaid residential customers. This package includes a fixed telephone line, and free value added features as specified below at a very low monthly charge. This package also offers a free directory listing, a telephone directory, 24 hours access to operator assistance and access to online services.

| | Monthly Charge | Package Includes | | |
|---|---|---|---|---|
| HomeFone (Afford-A-Phone) Package | $5 | Fixed Line Telephone Number, and maintained line and network access | | Value Added features<br>• Caller ID<br>• Voice-Mail |

Strictly Private & Confidential: Other than to relevant persons within the PUC, the contents of this document must not be disclosed to any third party without Telemedia's permission.

**Notes:**
- Package includes access to making national and international calls using prepaid pins only.
- Above stated Monthly Charge is exclusive of GST

## 5. BizFone Package

BizFone Service provides a Standard Package to all postpaid and prepaid business customers that include a fixed telephone line, a block of local minutes and free value added features as specified below. This package also offers a free directory listing, a telephone directory, 24 hours access to operator assistance and access to online services.

| | Monthly Charge | Package Includes | | |
|---|---|---|---|---|
| BizFone Standard Package | $99 | Monthly charge for Fixed Line Telephone Number, and maintained line and network access | First 250 local minutes anytime during the month | Value Added features<br>• Caller ID<br>• Voice-Mail |

**Notes:**
- Excess minutes are billed at standard rates
- Operator assisted calls, National calls, Cellular calls and International calls are not included
- Above stated Monthly Charge is exclusive of GST
- Includes calls to any local Speednet fixed line number (non discrimination).

**Benefits:**

The 250 local anytime additional FREE minutes have a value of $20 (using an average weighted rate per minute, taking into account the normal traffic patterns). The service profitability / cost analysis shows that the Line Access should be charged at $132. Together with the $20 calls, the $99 bundle gives that customer an overall subsidy benefit of $43, that is a 28% overall subsidy / saving.

## 6. Future BizFone Plans

BizFone Service will soon offer Business customers the option to purchase additional bundles of minutes at discounted rates when selecting optional plans.

Strictly Private & Confidential:

Other than to relevant persons within the PUC, the contents of this document must not be disclosed to any third party without Telemedia's express permission.

## APPENDIX B

### HISTORICAL RATE TABLE
All rates exclusive of tax

| EXISTING SERVICES | Period | Yr 2001 (Pre Dect) | Yr 2001 (December 1, Tar Rebal) | Yr 2002 | Yr 2003 | Yr 2004 (June 1, Rate Change) | Yr 2005 (December1, Rate Change) | Yr 2006 (August 1, Rate Change) | Yr 2007 (March 1, Rate Change) | Yr 2007 (Sept 1, Rate Change) | % Change Dec 01 to Sept 07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INTERNATIONAL** | | | | | | | | | | | |
| **Direct Dialled** | | | | | | | | | | | |
| Zone 1A-USA | Peak | $2.75 | $1.75 | | | $1.60 | $1.39 | $1.16 | | | (34)% |
| | Off-Peak | $2.00 | $1.50 | | | $1.40 | $0.97 | $0.92 | | | (39)% |
| Zone 1B-Mexico | Peak | $1.50 | $1.40 | | | | $1.19 | $1.36 | | | (3)% |
| | Off-Peak | $1.00 | $0.90 | | | | $0.83 | $1.12 | | | 24 % |
| Zone 1C-Canada | Peak | $2.75 | $2.50 | | | | $2.19 | $0.96 | | | (62)% |
| | Off-Peak | $2.00 | $1.90 | | | | $1.53 | $0.76 | | | (60)% |
| Zone 2 - UK | Peak | $4.50/$5.75 | $4.00 | | | | $2.99 | $1.20 | | | (70)% |
| | Off-Peak | $4.00/$5.00 | $3.50 | | | | $2.09 | $0.99 | | | (73)% |
| **10-10-199** (launched 2004) | | | | | | | | | | | |
| Zone 1A-USA | Peak | | | | | $.25 | $1.11 | $0.92 | | | (47)% |
| | Off-Peak | | | | | $0.99 | $0.78 | $0.76 | | | (49)% |
| Zone 1B-Mexico | Peak | | | | | $.75 | $0.95 | $1.12 | | | (20)% |
| | Off-Peak | | | | | $1.25 | $0.67 | $1.00 | | | 11 % |
| Zone 1C-Canada | Peak | | | | | $1.00 | $1.75 | $0.76 | | | (70)% |
| | Off-Peak | | | | | $0.75 | $1.23 | $0.64 | | | (68)% |
| Zone 2 - UK | Peak | | | | | $3.00 | $2.39 | $1.00 | | | (75)% |
| | Off-Peak | | | | | $2.50 | $1.67 | $0.88 | | | (75)% |

Zones removed at August 1, 2006, therefore the 4 countries are used as examples.
Further rate reductions above 5 minute call durations, plus corporate and volume discounts provided, plus rates now billed in 15 second increments and not rounded to nearest minute.
The overall effect on revenue per minute from international services reduced by 70%+ between December 2001 to December 2005
Off Peak hours extended in April 2003 to start at 8pm instead of 10pm and further extended at December 1st 2005, starting at 6pm
Connect cards that offer even lower rates were launched in 2005

Strictly Private & Confidential;

Other than to relevant persons within the PUC, the contents of this document must not be disclosed to any third party without Telemedia's express permission.

| EXISTING SERVICES | Period | Yr 2001 (Pre Dec1) | Yr 2001 (December 1, Yr Rate) | Yr 2002 | Yr 2003 | Yr 2004 (June 1, Rate Change) | Yr 2005 (December1, Rate Change) | Yr 2006 (August 1, Rate Change) | Yr 2007 (March 1, Rate Change) | Yr 2007 (Sept 1, Rate Change) | % Change Dec 01 to Sept 07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REGULAR TELEPHONE SERVICE** | | | | | | | | | | | |
| Installation | | | | | | | | | | | |
| Business or Residence | | $90.00 | $100.00 | | | $100.00 | | | | | (100)% |
| Afford A Phone | | | | | | $0.00 | $0.00 | | | | |
| | | | | | | | | | | | |
| **LAM** | | | | | | | | | | | |
| Business PostPaid & PrePaid | | $20.00 | $50.00 | | | | $50.00 | | | $5.00 | |
| Residence PostPaid & PrePaid | | $8.00 | $20.00 | | | | $20.00 | | | discontinued | |
| Res-Eco Pkg (contract $2 per mth) | | | $10.00 | | | | | | | discontinued | |
| Afford A Phone | | | | | | | | | | | |
| | | | | | | | | | | | |
| **HomeFone Service** | | | | | | | | | | | |
| HomeFone (Afford A Phone) | | | | $10.00 | $10.00 | discontinued | $5.00 | | | $5.00 | implement Oct 1 |
| HomeFone Standard Package (PrePaid) | | | | | | | | | | $35.00 | |
| HomeFone Standard Package (PostPaid) | | | | | | | | | | $35.00 | |
| | | | | | | | | | | | |
| HomeFone Plans (PostPaid) | | | | | | | | | | | |
| HomeFone Lite | | | | | | | | | | $59.00 | |
| HomeFone Premium | | | | | | | | | | $99.00 | |
| HomeFone Family | | | | | | | | | | $149.00 | |
| | | | | | | | | | | | |
| **BizFone Service** | | | | | | | | | | | |
| BizFone Standard Package PrePaid | | | | | | | | | | $99.00 | implement Oct 1 |
| BizFone Standard Package PostPaid | | | | | | | | | | $99.00 | |
| BizFone Plans (PostPaid) | | | | | | | | | | | |
| BizFone Plan 1 | | | | | | | | | | Coming Soon | |
| BizFone Plan 2 | | | | | | | | | | Coming Soon | |
| BizFone Plan 3 | | | | | | | | | | Coming Soon | |
| | | | | | | | | | | | |
| **Set Rental** | | | | | | | | | | | |
| Business | | $2.00 | $5.00 | | | discontinued | | | | | |
| Residence | | $2.00 | $5.00 | | | $2.00 | $2.00 | | | | |
| Res-Economy Package (contract) | | $2.00 | $2.00 | | | | | | | | |
| Afford A Phone | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Local/National Calls** | | | | | | | | | | | |
| Local (Belize City) Peak | Peak | $0.05 | $0.10 | | | discontinued | | | | | |
| | Off-Peak | | $0.05 | | | discontinued | | | | | |
| Local (Districts) | Peak | $0.15/call | $0.10 | | | discontinued | | | | | |
| | Off-Peak | | $0.05 | | | discontinued | | | | | |
| Local (ALL) | Peak | | | | | $0.10 | | | | | |
| | Off-Peak | | | | | $0.05 | | | | | |
| Zone 1 (Intra-Dist) | Peak | $0.25 | $0.20 | | | $0.10 | | | | | |
| | Off-Peak | $0.15 | $0.15 | | | | | | | | |
| Zone 2 (Inter-Dist) | Peak | $0.55 | $0.40 | | | | | | | | |
| | Off-Peak | $0.15 | $0.15 | | | | | | | | |

Strictly Private & Confidential:

Other than to relevant persons within the PUC, the contents of this document must not be disclosed to any third party without Telemedia's express permission.

| EXISTING SERVICES | Period | Yr 2001 (Pre Dec1) | Yr 2001 (December 1, Tar Retail) | Yr 2002 | Yr 2003 | Yr 2004 (June 1, Rate Change) | Yr 2005 (December 1, Rate Change) | Yr 2006 (August 1, Rate Change) | Yr 2007 (March 1, Rate Change) | Yr 2007 (Sept 1, Rate Change) | % Change Dec 01 to Sept 07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CELLULLAR SERVICE** | | | | | | | | | | | |
| **Cellular AMPS** | | | | | | | | | | | |
| Standard | | | | | | | | | | | |
| Activation | | $49.00 | $40.00 | | | | | | | | (49)% |
| Access | | $35.00 | $25.00 | | | | | | | | (58)% |
| Mobile Rate | Peak | $0.70 | $0.55 | | | | | | | | (33)% |
| | Off-Peak | $0.40 | $0.30 | | | | | | | | (45)% |
| PrePaid | | | | | | | | | | | |
| Activation | | $49.00 | $40.00 | | | | | | | | |
| Access | | $0.00 | $0.00 | | | | | | | | |
| Mobile Rate | Peak | $0.99 | $0.90 | | | | | | | | (9)% |
| | Off-Peak | $0.00 | $0.70 | | | | | | | | (17)% |
| **DigiCell  (launched Dec 2002)** | | | | | | | | | | | |
| Premier (Access Inclusive of Nat'l mins) | | | | Dec-02 | | | Apr-05<br>25% more Mins on all Plans for same price | | | | |
| Standard | | | | $50.00<br>50PK, 100 OPK,30 SMS | | | 65 PK, 125 OPK, 20 SMS | | | | |
| Leisure | | | | $50.00<br>250 OPK, 20 SMS | | | 315 Opk, 20 SMS | | | | |
| Gold | | | | $100.00<br>200 Anytime, 30 SMS | | | 250 Anytime, 30 SMS | | | | |
| Platinum | | | | $150.00<br>400 Anytime, 30 SMS | | | 500 Anytime, 30 SMS | | | | |
| | Excess PK | | | $0.50 | | | $0.50 | | | | |
| | Excess OPK | | | $0.25 | | | $0.25 | | | | |
| PrePaid | | | | | | | Up to 30% More value on all GSM PrePaid Cards | | | | |
| | Peak | | | $0.85 | | | | | $0.60 | | (33)% |
| | Off-Peak | | | $0.50 | | | | | $0.60 | | (14)% |
| | | | | | | | | | $0.25 | | (22)% |

After 10 Mins in one day  $0.25 (rest of day)  > 5 Min Call

Step Pricing (rate reduced after five minutes) for DigiCell Prepaid introduced in October 2006 with the launch of the IN

Telemedia: Revised Services / Tariffs:  August 2007

Strictly Private & Confidential:

Other than to relevant persons within the PUC, the contents of this document must not be disclosed to any third party without Telemedia's express permission

| EXISTING SERVICES | Period | Yr 2001 (per each) | Yr 2001 (Document 1, Tar Retail) | Yr 2002 | Yr 2003 | Yr 2004 (June 1, Rate Change) | Yr 2004 (December, Rate Change) | Yr 2006 (August 1, Rate Change) | Yr 2007 (March 1, Rate Change) | Yr 2007 (Sept 1, Rate Change) | % Change Dec 01 to Sept 07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| INTERNET |  |  |  |  |  |  |  |  |  |  |  |
| Dialup |  |  |  |  |  |  |  |  |  |  |  |
| 1st visitor | per each | $30.00 | $30.00 |  |  |  |  |  |  |  |  |
| Monthly Access |  | $40.00 | $24.00 |  |  |  |  |  |  |  |  |
| First 8 Hrs |  | Free | rate change |  |  |  |  |  |  |  |  |
| Additional Hours |  | $4.00 | rate change |  |  |  |  |  |  |  |  |
| Excess Usage 0-12 Hrs | per min |  | $0.10 |  |  |  |  |  |  |  |  |
| Excess when exceed 12 Hrs | per min |  | $0.25 |  |  |  |  |  |  |  |  |
| DSL/WHS Access |  |  |  |  |  | May-04 |  |  |  |  |  |
|  |  |  |  |  | 1-Aug-03 | d same rate |  |  |  |  |  |
| 64K |  |  | . . | $100.00 | $100.00 | $100.00 | $100.00 |  |  |  | (44)% |
| 128K |  |  | . . | $175.00 | $175.00 | $179.00 | $179.00 |  | $161.00 |  | (40)% |
| 256K |  |  | . . | $300.00 | $300.00 | $300.00 | $300.00 |  | $266.00 |  | (40)% |
| 512K |  |  | . . | $500.00 | $500.00 | $500.00 | $500.00 |  | $286.00 |  |  |
| 1MB |  |  | . . |  |  |  |  |  |  |  |  |
| With HomeZone Plans |  |  |  |  |  |  |  |  | $153.00 |  | (15)% |
| HomeZone Lite |  |  |  |  |  |  |  |  | $240.00 |  | (20)% |
| 256K |  |  |  |  |  |  |  |  | $315.00 |  | (25)% |
| 1MB |  |  |  |  |  |  |  |  |  |  |  |
| HomeZone Premium |  |  |  |  |  |  |  |  | $143.00 |  | (20)% |
| 512K |  |  |  |  |  |  |  |  | $225.00 |  | (20)% |
| 1MB |  |  |  |  |  |  |  |  | $335.00 |  | (20)% |
| HomeZone Funny |  |  |  |  |  |  |  |  |  |  |  |
| 256K |  |  |  |  |  |  |  |  |  |  |  |
| 1MB |  |  |  |  |  |  |  |  |  |  |  |
| DEDICATED INTERNET |  |  |  | 24/2007 | 8-17-03 |  |  |  |  |  |  |
| 28 K - 1Y |  |  |  | $600.00 | discontinued |  |  |  |  |  |  |
| 28 K - 2Yrs |  |  |  | $600.00 | discontinued |  |  |  |  |  |  |
| 28 K - 3Yrs |  |  |  | $600.00 | discontinued |  |  |  |  |  |  |
| 28 K - 5Yrs |  |  |  | $600.00 | discontinued |  |  |  |  |  |  |
| 64 K - 1Y |  |  |  | $1,285.00 | discontinued |  |  |  |  |  |  |
| 64 K - 2Yrs |  |  |  | $1,175.00 | discontinued |  |  |  |  |  |  |
| 64 K - 3Yrs |  |  |  | $1,085.00 | discontinued |  |  |  |  |  |  |
| 64 K - 5Yrs |  |  |  | $1,030.00 | discontinued |  |  |  |  |  |  |
| 128 K - 1Y |  |  |  | $2,600.00 | $900.00 | $900.00 |  |  |  |  | (80)% |
| 128 K - 2Yrs |  |  |  | $2,285.00 | $720.00 | $720.00 |  |  |  |  | (89)% |
| 128 K - 3Yrs |  |  |  | $2,115.00 | $660.00 | $660.00 |  |  |  |  | (90)% |
| 128 K - 5Yrs |  |  |  | $2,005.00 | discontinued |  |  |  |  |  |  |
| 256 K - 1Y |  |  |  | $4,805.00 | $1,295.00 | $1,295.00 |  |  |  |  | (73)% |
| 256 K - 2Yrs |  |  |  | $4,340.00 | $1,175.00 | $1,175.00 |  |  |  |  | (73)% |
| 256 K - 3Yrs |  |  |  | $4,020.00 | $1,085.00 | $1,085.00 |  |  |  |  | (73)% |
| 256 K - 5Yrs |  |  |  | $3,815.00 | discontinued |  |  |  |  |  |  |
| 512 K - 1Y |  |  |  | $7,945.00 | $2,535.00 | $2,500.00 |  |  |  |  | (67)% |
| 512 K - 2Yrs |  |  |  | $6,660.00 | $2,285.00 | $2,285.00 |  |  |  |  | (65)% |
| 512 K - 3Yrs |  |  |  | $6,195.00 | $2,115.00 | $2,115.00 |  |  |  |  | (66)% |
| 512 K - 5Yrs |  |  |  | $5,835.00 | discontinued |  |  |  |  |  |  |
| 1 MB - 1Y |  |  |  | $11,630.00 | $4,805.00 | $4,805.00 |  |  |  |  | (59)% |
| 1 MB - 2Yrs |  |  |  | $10,380.00 | $4,340.00 | $4,340.00 |  |  |  |  | (58)% |
| 1 MB - 3Yrs |  |  |  | $9,680.00 | $4,020.00 | $4,020.00 |  |  |  |  | (59)% |
| 1 MB - 5Yrs |  |  |  | $9,060.00 | discontinued |  |  |  |  |  |  |
| 2 MB - 1Y |  |  |  | $19,350.00 | $7,985.00 | $7,985.00 |  |  |  |  | (60)% |
| 2 MB - 2Yrs |  |  |  | $17,835.00 | $6,685.00 | $6,685.00 |  |  |  |  | (63)% |
| 2 MB - 3Yrs |  |  |  | $16,705.00 | $6,195.00 | $6,195.00 |  |  |  |  | (63)% |
| 2 MB - 5Yrs |  |  |  |  | discontinued |  |  |  |  |  |  |

# Courtenay Declaration
# Exhibit B

AN ARBITRATION

BEFORE THE LONDON COURT OF INTERNATIONAL ARBITRATION

B E T W E E N :

BELIZE TELEMEDIA LIMITED

Claimant

- and -

THE ATTORNEY GENERAL OF BELIZE
(On behalf of the Government of Belize)

Respondent

LCIA Arbitration No. 81079

---

FINAL AWARD

---

LONDON COURT OF INTERNATIONAL ARBITRATION
Certified true copy of original

*James Clanchy* LCIA Registrar

Date 18 March 2009

Tribunal

Mr. Mark Kantor
Ms Paula Hodges
Mr. Alan Redfern (Chairman)

1

CONTENTS

| I. | INTRODUCTION | 3 |
|---|---|---|
| A. | The Parties | 3 |
| B. | Constitution of the Tribunal | 3 |
| C. | Summary of the Dispute | 4 |
| D. | The Agreement to Arbitrate and Governing Law | 6 |
| E. | Background to the Accommodation Agreement | 7 |
| F. | The Accommodation Agreement | 9 |
| G. | The Vesting Act | 9 |
| H. | Change of Government, 8 February 2008 | 10 |
| I. | The Principal Terms of the Accommodation Agreement | 11 |
| J. | Belizean and English Injunctive Relief | 24 |
| II. | TRIBUNAL'S PROCEDURAL DIRECTIONS | 25 |
| A. | The Request for Arbitration | 25 |
| B. | Appointment of the Arbitral Tribunal | 26 |
| C. | The Procedural Meeting of 17 September 2008 | 31 |
| D. | The First Procedural Order | 32 |
| III. | THE PARTIES' RESPECTIVE CLAIMS | 34 |
| A. | Telemedia's case | 34 |
| B. | The Government's case | 42 |
| IV. | WITNESSES AND HEARINGS | 43 |
| A. | Witnesses | 43 |
| B. | The November Hearing | 45 |
| C. | The January Hearing | 46 |
| V. | THE ISSUES | 46 |
| A. | Introduction | 46 |
| B. | The General Issue | 47 |
| C. | The Specific Issues | 62 |
| D. | Relief Sought | 66 |
| VI. | VALUATION | 69 |
| A. | Damages | 69 |
| B. | Interest | 97 |
| VII. | COSTS | 97 |
| A. | Costs under the Indemnity | 97 |
| B. | Costs of the Arbitration | 100 |
| VIII. | THE TRIBUNAL'S AWARD | 105 |

# I.   INTRODUCTION

## A.   The Parties

1.   The Claimant, Belize Telemedia Ltd ("the Claimant" or "Telemedia"), is a company incorporated and existing under the laws of Belize. Telemedia's address is Esquivel Telecom Centre, St Thomas Street, P.O. Box 603, Belize City, Belize, Central America.

2.   Telemedia is represented in these proceedings by Ms. Judith Gill and Mr. Matthew Gearing of Allen & Overy LLP, One Bishops Square, London EC1 6AD, United Kingdom (Tel: 0044 20 3088 3000, Fax: 0044 20 3088 0088).

3.   The Respondent is The Attorney General of Belize on behalf of the Government of Belize ("the Government" or "the Belize Government"). Pursuant to section 42(5) of the Belize Constitution, civil proceedings against the Government are taken in the name of the Attorney General. The Government's address is The Attorney General, Attorney General's Ministry, New Administration Building, Belmopan Cayo, Belize, Central America (Fax: 00501 822 3390).

4.   The Government has been given notice of these proceedings, but is not represented and has failed or refused to take part in them.

## B.   Constitution of the Tribunal

5.   Telemedia filed a Request for Arbitration ("the Request") in respect of this dispute with the London Court of International Arbitration ("LCIA") on 9 May 2008. In the Request, Telemedia invited the Government to agree to the nomination of arbitrators by the parties. The Government failed to do this. Nor did the Government file a Response to the Request as it was entitled to do.

6.    Accordingly, by letter dated 13 June 2008, the LCIA Court appointed the following arbitrators ("the Tribunal") pursuant to Articles 5.4 and 5.5. of the LCIA Rules:

      (1)    Mr Mark Kantor, Suite 311B, 110 Maryland Avenue NE, Washington DC 20002, USA.

      (2)    Mr Rory Brady SC, St Dominic's, 5 Temple Gardens, Dublin 6, Ireland.

      (3)    Mr Alan Redfern, One Essex Court, Temple, London, EC4Y 9AR, UK

      to be the Tribunal in this arbitration, with Mr Redfern presiding.

7.    Unfortunately, Mr Brady was forced to withdraw due to illness. On 15 October 2008, the Registrar of the LCIA wrote to the parties informing them of this.

8.    Ms Paula Hodges of Herbert Smith LLP, Exchange House, Primrose Street, London EC2A 2HS, UK was therefore appointed by the LCIA on 24 October 2008 to replace Mr Brady.

## C.    Summary of the Dispute

9.    On 19 September 2005, the Government entered into a so-called "Accommodation Agreement" ("the Original Accommodation Agreement") with a company known as Belize Telecommunications Limited ("BTL"). Subsequently two amendments were made to this Original Accommodation Agreement, in November 2005 and December 2006.

10.   BTL owned and operated telecommunications services in Belize from 1987 until its dissolution in 2007. Until December 2002, BTL was the monopoly telecommunications service provider in Belize. By the time of its dissolution in May 2007, BTL remained the largest operator in this industry in Belize, the second largest operator being Speednet Communications Limited ("Speednet").

11. Under a business transfer agreement dated 15 September 2006, BTL agreed to transfer its business to Telemedia. On 29 May 2007 the Belize Telecommunications Undertaking (Belize Telecommunications Limited Operators) Vesting Act, 2007 ("the Vesting Act") was assented to by the Governor General of Belize and was made law. Under the provisions of the Vesting Act, all of the assets, liabilities, rights and obligations, property, files and documentation of BTL which had been agreed to be transferred pursuant to a business transfer agreement (including any rights and obligations arising under the Original Accommodation Agreement, as subsequently amended) were vested in Telemedia. Accordingly, any and all of BTL's rights and obligations pursuant to the Accommodation Agreement as amended vested in Telemedia.

12. Further to the provisions of the Vesting Act, BTL was declared dissolved and references to its name in the register of companies maintained by the Registrar of Companies in Belize were deemed struck off.

13. The third and final amendment to the Original Accommodation Agreement was made between the Government and Telemedia in January 2008. Clause 7.1 of this Amendment Deed makes it clear that Telemedia has assumed all of BTL's rights and obligations under the Accommodation Agreement as amended. Under this clause, the Government acknowledged and agreed that all rights of BTL under the Original Accommodation Agreement were transferred to Telemedia with effect from 29 May 2007 and that BTL has no further liabilities under the Original Accommodation Agreement.

14. The Tribunal is told that Telemedia is Belize's largest telecoms provider and that it enjoys the most subscribers to telephone, cellular, internet and other such services in the country, supporting approximately 180,000 customer services nationwide[1].

---

[1]    Boyce, First Witness Statement, paras. 2.2 and 2.6

15.     In this Award, the Original Accommodation Agreement, as subsequently amended, is referred to as "the Accommodation Agreement".

16.     On 8 February 2008, there was a change of Government in Belize. Telemedia wrote to the incoming administration to bring the Accommodation Agreement to its attention, but was told that the Government knew nothing of any such agreement. Disputes arose, as to whether or not the Claimant was entitled to the concessions set out in the Accommodation Agreement, and it is these disputes that have been referred to arbitration.

## D.     The Agreement to Arbitrate and Governing Law

17.     In the Original Accommodation Agreement, the parties agreed that any disputes between them were to be referred to and finally resolved by arbitration in London under the LCIA Rules. Section 15 of the Original Accommodation Agreement stated:

> *"15.1   This agreement is governed by and shall be construed in accordance with Belize law.*
>
> *15.2    Any dispute arising out of or in connection with this Agreement including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this Section.   There shall be 3 arbitrators.*
>
> *15.3    The arbitral proceedings shall be conducted in the English language.*
>
> *15.4    The seat or legal place of the arbitral proceedings shall be London, England."*

18.     As already stated, the Original Accommodation Agreement was amended three times.

19. Clause 4.6 of the First Amendment Deed, Clause 6.2 of the Second Amendment Deed and Clause 9.2 of the Third Amendment Deed state that, save as amended by them, the provisions of the Original Accommodation Agreement remain in full force and effect.

20. The agreement to arbitrate which is set out above (at paragraph 17) has not been amended and is expressly incorporated into the Accommodation Agreement. Accordingly, the arbitration agreement applies to any dispute arising out of or in connection with the Accommodation Agreement, with London as the seat of the arbitration and the law of Belize as the governing law of the Accommodation Agreement.

## E. Background to the Accommodation Agreement

21. Mr. Dean Boyce, Chairman of the Board of Directors of Telemedia, has submitted five witness statements in the course of this arbitration. In the first of these statements, he described the background to the Accommodation Agreement. Put briefly, it is said that:

    (1) In 2005, the year in which the Original Accommodation Agreement was made, the telecommunications industry in Belize was "*in a dreadful mess*"[2].

    (2) From about 2001, the Government had sought to liberalise the telecommunications industry. A company called International Telecommunications Ltd ("Intelco") was brought in to improve matters, but lacked experience and technical expertise in the industry and ran into financial difficulties. The Government then increased its shareholding in BTL and sought to sell a majority stake to Innovative Communication Corporation LLC ("ICC"), a company run by an US entrepreneur called

---

[2] Boyce, First Witness Statement, paras. 3.3 to 3.16

Jeffrey Prosser. However, ICC was unable to pay for the shares it had agreed to purchase and the Government retook control of BTL.

(3)     In 2005, the Government sought to enlist the assistance of the former BTL management and to sell 52% of BTL's share capital to private buyers in place of ICC.

(4)     In March 2005, approximately 15% of the issued share capital of BTL was sold to Ecom Limited ("Ecom"). During this period, Shire Holdings Limited ("Shire") became a director of BTL. (Mr Boyce was the corporate representative of Shire on the board of BTL.)

(5)     From March 2005 to September 2005, the Government and BTL entered into negotiations over a skeleton contract between them intended to support the local telecommunications industry. That intention was recorded in Mr Boyce's note of a meeting on 15 June 2006[3]. A number of general Government objectives for any agreement between the parties are set out in the First Witness Statement of Mr Boyce[4].

(6)     Mr Boyce initially attended meetings with the Government in his capacity as corporate representative of Shire, and subsequently, from 29 August 2005, as Chairman of the Executive Committee of the Board of BTL. In attendance for the Government at those meetings were, variously, the Hon. Said Musa (the then Prime Minister and Minister of Finance), the Hon. Ralph Fonseca (the then Attorney General) and the Hon. Francis Fonseca (the then Minister of Public Utilities).

---

[3]     Exhibit C-26
[4]     Boyce, First Witness Statement, para. 4.6

## F.     The Accommodation Agreement

22.     On 19 September 2005, the Original Accommodation Agreement was signed by
        Prime Minister Musa on behalf of the Government and by Mr Keith Arnold,
        Chairman of BTL, on behalf of BTL.

23.     On 21 November 2005, the same signatories executed a deed of amendment to the
        Original Accommodation Agreement ("the First Amendment Deed").

24.     On 15 December 2006, a second deed of amendment was executed by the parties.
        Prime Minister Musa and Attorney General Francis Fonseca signed on behalf of
        the Government.  The deed was signed by Mr Boyce and Jose Alpuche, Secretary
        of BTL.  The deed was witnessed by a Justice of the Peace ("the Second
        Amendment Deed")

25.     On 7 January 2008, the signatories to the Second Amendment Deed signed the
        third deed of amendment ("the Third Amendment Deed").  This deed too was
        witnessed by a Justice of the Peace.  By this stage the Vesting Act had been made
        law, and BTL was than known as Telemedia.

26.     These executed documents together comprise the agreement between the parties
        which, as already stated, is referred to in this Award as "the Accommodation
        Agreement".

## G.     The Vesting Act

27.     On 29 May 2007 the Vesting Act was assented to by the Governor General of
        Belize, and was made law.  Under the Vesting Act, all the assets, liabilities, rights
        and obligations, property, files and documentation of BTL were transferred to and
        vested in Telemedia.  On 30 May 2008, BTL was dissolved and struck off the
        Belize company register.

28.     Section 7 of the Third Amendment Deed provided:

> *"7.1 Notwithstanding the provisions of section 19 of the Original Agreement, the Government acknowledges and agrees that all rights of BTL under the Original Agreement are transferred to Telemedia effective from 29 May 2007 and that BTL has no further liabilities under the Original Agreement.*
>
> *7.2 Without prejudice to the provisions of the clause 7.1 above, section 19 of the Original Agreement shall be deleted in its entirety."*

29.  Therefore under the Vesting Act, as confirmed in the Third Amendment Deed, Telemedia assumed all the rights and liabilities that had accrued to BTL under the Accommodation Agreement.

## H.  Change of Government, 8 February 2008

30.  On 8 February 2008, as previously stated, the Government administration in Belize changed, following a general election. The Hon. Dean Barrow was appointed the new Prime Minister and Minister of Finance.

31.  On 8 February 2008, Telemedia wrote to the new administration bringing the Accommodation Agreement to its attention[5]. On 22 February 2008 the Government replied, stating that it knew nothing of any such agreement[6]. Following further correspondence, the Government was provided with copies of all Accommodation Agreement documents on 12 March 2008.

32.  Telemedia contends that the new administration does not intend to honour the Accommodation Agreement. In Section 7.A of his First Witness Statement, Mr Boyce sets out the basis for that contention:

---

5   Exhibit C-9
6   Exhibit C-45

(1)    In an interview with 'Love FM' radio station on 11 April 2008[7], Prime
       Minister Barrow stated that

> *"What's happening with BTL is that we were confronted*
> *immediately with a position taken by the local management*
> *of BTL that there was this secret agreement that had been*
> *signed by the last government that committed us to all sorts*
> *of extraordinary, in my view, concessions to be given to BTL.*
> *I indicated that I don't care, I am not going to abide by such*
> *agreement..."*

(2)    On 25 April 2008, Prime Minister Barrow, in the Belize
       House of Representatives, referred to the Accommodation
       Agreement as[8]:

> *"...[a] secret agreement as it were handcuffing the*
> *government, shackling the government, making it impossible*
> *legally, contractually for the government to do anything*
> *about rates because that agreement guaranteed BTL a rate*
> *of return of 15% and said that if BTL didn't make that rate of*
> *return they could withhold their payment of their Business*
> *Tax, which they have done for the past three months."*

(3)    Prime Minister Barrow has variously stated that the
       Government has *"...taken the formal position, we do not*
       *accept the validity of that agreement"*; that he believes *"...as*
       *a lawyer, that those agreements are invalid..."*; and that the
       Government was *"continuing to maintain that the*
       *accommodation and other agreements are illegal, null and*
       *void"*[9].

## I.    The Principal Terms of the Accommodation Agreement

33.    Telemedia alleges that the Government has failed to honour its undertakings and
       obligations under the Accommodation Agreement.  The principal undertakings
       and relevant facts are set out below.

---

[7]    Exhibit C-10
[8]    Exhibit C-11
[9]    Exhibits C-48 to C-50

*Purchase of properties by BTL*

34.     This is provided for in Section 5 of the Original Accommodation Agreement, as amended by Section 4 of the First Amendment Deed. BTL was to purchase several properties from the Government for BZ$19,200,000.

35.     BTL did in fact pay BZ$19,200,000 to the Government by way of a Loan Note[10]. The last payment made under the Loan Note was in March 2008[11].

*Minimum Rate of Return*

36.     The Government irrevocably undertook that, in any given financial year during the duration of BTL's Individual License, if the Achieved Rate of Return ("AROR") was below the Minimum Rate of Return ("MROR") of 15%, the Government would monetarily compensate BTL to the full extent of any shortfall ("the Shortfall Amount").

37.     Clause 11.4 of the Original Accommodation Agreement provided:

>       *"11.4 In the event that BTL fails to achieve, in any given financial year during the duration of BTL's Individual License, an Achieved Rate of Return (as defined in Schedule 2 hereto) greater than or equal to the Minimum Rate of Return (as defined in Schedule 2 hereto), then the Government hereby irrevocably undertakes to monetarily compensate BTL to the full extent of any shortfall in Earnings (as defined in Schedule 2 hereto), so that the Achieved Rate of Return is equal to the Minimum Rate of Return in the financial year under consideration. Any shortfall shall be demonstrated by reference to BTL's group audited accounts for the relevant financial year and a capital rate of return statement to be prepared by BTL in accordance with its normal accounting procedures and the terms of this Agreement (the "Capital Rate of Return Statement"). The Government shall be informed by BTL of the amount of any such shortfall (the "Shortfall Account" and provided by BTL with a copy of the group audited*

---

10      Exhibit C-111
11      Boyce, First Witness Statement, para. 6.2

*accounts together with the Capital Rate of Return Statement for the relevant financial year no later than 6 months following the end of BTL's financial year (the "Delivery Date"). The Government agrees to pay BTL the Shortfall Amount in full no later than 3 months following the Delivery Date (the "Deadline Date"). The Government further agrees that should the Shortfall Amount not have been paid to BTL in full by the Deadline Date then any unpaid amount shall bear interest at the base rate as quoted by The Belize Bank Limited from time to time plus 1½ % per annum which shall accrue from the Deadline Date up to and including the date of payment in full to BTL of such unpaid amount and all such outstanding interest. In the event that payment to BTL of a Shortfall Amount (including all accrued interest) has not been made in full by the third anniversary of the Deadline Date then such unpaid amount may be set-off by BTL against the amount of any taxes (including Business Tax, Sales Tax or other similar taxes) payable by BTL to the Government."*

38. Schedule 2 to the Original Accommodation Agreement prescribed the method of calculation to be used for the AROR and MROR.

39. Pursuant to Section 6.1 (ii) of the Original Accommodation Agreement, the Government also covenanted and undertook:

> *"6.1(ii)Return on Capital Investment – to take all necessary steps to procure to the satisfaction of BTL that with effect from June 30, 2005 and going forward, BTL is able to charge to its subscribers and customers rates and charges which enable BTL to fully achieve the Minimum Rate of Return ("MROR") as provided for and calculated in accordance with Schedule 2 (Rate of Return: Determination)."*

*Business Tax*

40. Section 11.3 (i)(f) of the Original Accommodation Agreement, as amended by Clause 3.5 of the Second Amendment Deed, provided as follows:

> *"11.3 (i)(f)   Business Tax – the tax treatment of BTL shall be no less favourable than that afforded to other*

*telecommunications licensees in Belize. To enable
telecommunications services providers to lower the rates to
their subscribers the Government undertakes by no later
than April 1, 2008 to adjust with immediate legal effect and
force the rate of Business Tax applicable to
telecommunications services so that the amount of Business
Tax payable by BTL does not exceed the amount of Income
Tax that would be paid by BTL if it was assessed for Income
Tax by applying an Income Tax rate for companies at 25%
(companies being persons other than employed persons for
the purposes of the Income and Business Tax Act)."*

41.    Clause 3.1 of the Third Amendment Deed provided:

> *"3.1    In relation to the Government's undertaking in
> section 11.3 (f) of the Original Agreement (as
> amended by clause 3.5 of the First Settlement Deed),
> to the extent that the Government does not comply in
> full with or implement such undertaking by 1 April
> 2008, Telemedia shall be entitled at its sole discretion
> from 1 April 2008 to calculate the amount of Business
> Tax it pays as set out in clause 3.5 of the First
> Settlement Deed and the Government hereby agrees
> that payment by Telemedia of such amounts so
> calculated by Telemedia shall be in full and final
> settlement of Telemedia's liability to pay Business
> Tax in respect of any period."*

42.    Therefore the Government undertook that by 1 April 2008, the Business Tax
levied on BTL was to be no more than the equivalent of paying Income Tax at a
rate of 25%. In addition, BTL's tax treatment was to be no less favourable than
that of other telecommunications licensees in Belize ("the Agreed Rate").

43.    Since 1 April 2008, Telemedia has therefore been filing Business Tax returns on
the basis of the Agreed Rate. However, Assessment Notices for Business Tax

have been filed by the Commissioner for Income Tax which do not correspond with the Agreed Rate[12].

44.     Furthermore, in his Third Witness Statement, Mr Boyce notes that, on 31 October 2008, it was reported in the Belize news that the Government planned to raise the rate of Business Tax payable by telecommunications companies[13]. The rate was in fact raised from 19% to 24.5% of gross revenue as of 1 January 2009[14].

*Business Tax Set-Off*

45.     As set out above, the Government undertook to compensate BTL annually for any difference between the AROR and the MROR. Section 11.4 of the Original Accommodation Agreement provided that if the Government failed to make payment, BTL would be entitled to set off any amount owed to it against taxes payable by BTL to the Government:

> *"11.4. [...] In the event that payment to BTL of a Shortfall Amount (including all accrued interest) has not been made in full by the third anniversary of the Deadline Date then such unpaid amount may be set off by BTL against the amount of any taxes (including Business Tax, Sales Tax or other similar taxes) payable by BTL to the Government."*

46.     The Government had been unable to pay by the end of December 2006. The parties therefore agreed that the Government would have more time to pay. That agreement is set out in Clause 2.2 of the Second Amendment Deed:

> *"2.2    Notwithstanding clause 2.1 herein, the Government hereby agrees to pay BTL the Shortfall Amount no later than October 31, 2007. The Government further agrees that in the event that payment of the Shortfall Amount has not been made by the Government to BTL in full by this date in accordance with the Original*

---

12      Boyce, First Witness Statement, paras. 7.54-7.55
13      Boyce, Fourth Witness Statement, para. 2.16
14      Boyce, Third Witness Statement, para. 2.16 and Exhibits C-171 to C-174

> *Agreement then such unpaid amount may be set off by BTL against the amount of any taxes or any other payments or obligations due and payable by BTL to the Government."*

47.    The 'set-off' was then re-visited in January 2008 in the Third Amendment Deed. Clauses 2.4-2.6 are particularly important in the context of these proceedings and are accordingly set out in full below:

> *"2.4.    In accordance with clause 2.2 of the First Settlement Deed, the unpaid taxes due and owing as set out in clause 2.3 above shall be set off against the Shortfall Amount and the Government hereby acknowledges and agrees that:*
>
>> *(a)    in respects of all financial periods of BTL (and/or Telemedia as the case may be) up to and including the period ending on 31 March 2007, all taxation assessments made on BTL (and/or Telemedia as the case may be) have been made and that no further tax assessments for these periods will be made by any taxation authority in Belize on BTL (and/or Telemedia as the case may be); and*
>>
>> *(b)    this set-off constitutes full and final settlement of all liabilities to taxation assessed by any taxation authority in Belize owed by BTL and/or Telemedia in respects of all financial periods of BTL (and/or Telemedia as the case may be) up to and including the period ending on 31 March 2007, and no further tax shall be due or payable by BTL (and/or Telemedia as the case may be) for such financial periods and that there are no other payments of obligations due and payable by BTL (and/or Telemedia as the case may be) to the Government.*
>
> *2.5    Following the set-off described in clause 2.4 above, the balance of BZ$3,075,000 plus the 2007 Shortfall Amount will be due and owing to Telemedia by the Government together totalling BZ$14,703,000 ('the "Balance Amount") and the Government agrees that Telemedia shall be entitled with effect from 1*

> *February 2008, and at its sole discretion, to set off the Balance Amount against monthly-based tax liabilities including, but not limited to, Business Tax as they fall due and owing until the Balance Amount has been extinguished.*
>
> 2.6 *The Government hereby acknowledges and agrees that, in the event the Government fails to pay to Telemedia, in accordance with section 11.4 of the Original Agreement, any Shortfall Amount arising in respect of Telemedia's financial year ending on 31 March 2008 or any subsequent financial years of Telemedia, on or by the relevant Deadline Date for each such financial year, Telemedia shall be entitled to set off any such future Shortfall Amounts against the amount of any taxes or other payments or obligations due and payable by Telemedia to the Government."*

48.  Pursuant to the Accommodation Agreement, the Government agreed (in a letter dated 4 October 2007 from the Financial Secretary, on behalf of the Ministry of Finance, to Telemedia[15]) to set off the amount of BZ$1,109,655.69 against Business Taxes due to be paid by Telemedia in October 2007 *"in accordance with [the] Settlement Deed dated 15 December, 2006"*. The letter continued:

> *"I write to advise you that we have since completed the reconciliation of the figures provided, and hereby authorize a set-off of the amount claimed (i.e. $1,109,655.69) against Business Taxes due to be to paid by BTL in October 2007.*
>
> *By a copy of this letter, the Commissioner of Income Tax is advised of this approval."*

49.  From 1 February 2008, Telemedia began to set off the payment of Business Tax against the new Shortfall Amount. Telemedia has included the set-off in each monthly Business Tax return since 1 February 2008.

---

15      Exhibit C-8

50. The Government has not accepted those tax returns. Instead, the Government (through the Commissioner of the Ministry of Finance) has issued monthly Assessment Notices including penalties and interest for the full sum of Business Tax owed, without any set-off. Those Assessment Notices have been issued against Telemedia and two of its subsidiaries: Business Enterprise Systems Limited ("BESL") and BTL Digicell Limited ("Digicell").

51. Telemedia also contends that those Assessment Notices are, in any event, calculated using different revenue figures and tax rates to those used by Telemedia[16].

52. Telemedia refused to accept those Assessment Notices. In response, the Government issued judgment summonses[17] for Telemedia at the Magistrate's Court to pay the tax as set out in the Assessment Notices. At a hearing in the Magistrate's Court on 24 June 2008, Telemedia was ordered to pay amounts in settlement of the judgment summonses issued.

53. Telemedia appealed that decision of the Magistrate's Court on 27 June 2008. Telemedia contended that the decision was made under an error of domestic law[18]. Telemedia further contended that by virtue of Section 112 of the Belize Supreme Court of Judicature Act, Cap 91 ("Section 112") it was not required to make payment pending the outcome of the appeal.

54. On 4 July 2008 the Government issued a warrant for the arrest of Mr Boyce. To avoid Mr Boyce's arrest, Telemedia made payment of Business Tax on 4 July 2008. To avoid another warrant being issued, Telemedia sought emergency declaratory relief from the Belize Supreme Court on 8 July 2008. This application was rejected. Telemedia therefore made payment of outstanding sums to avoid another warrant.

---

16  Statement of Case, para. 100
17  Exhibit C-57
18  Exhibit C-61

55.   To avoid the risk that Section 112 might prevent the Government from enforcing judgment against Telemedia, the National Assembly passed an amendment to Section 112. The amendment stated that section 112 did not apply to payment of tax judgments by lower courts.

56.   In his Second, Third and Fourth Witness Statements, Mr Boyce sets out the current position with regard to set-off. It appears from those statements that the Assessment Notices, summonses and Magistrate Court hearings instituted by the Government have been continuing.

57.   Telemedia filed a public law action against the Government in Belize on 10 July 2008[19] seeking declaratory relief that the Assessment Notices and judgment summonses are unlawful. In relation to that action, Conteh CJ found for the Government on 28 October 2008[20]. Telemedia plans to appeal.

*Import duties*

58.   Section 11.3 (i)(g) of the Original Accommodation Agreement provided:

*"11.3(i)(g)    Import Duties − BTL and its subsidiaries shall be exempt from any tax, duty, levy or impost upon goods, materials, equipment and machinery of every type or description imported for their own use. No exemption shall be granted for goods imported for immediate (within 6 months) resale as new goods in the normal course of business to third parties."*

59.   In the Original Accommodation Agreement the Government therefore undertook to procure the exemption of BTL and its subsidiaries from paying duty on goods and equipment imported for BTL's own use.

60.   Prior to the change of government administration in February 2008, Telemedia had *"been submitting lists of imported goods for exemption without any difficulties...the Ministry of Finance would provide us with a letter of exemption in*

---

19    Exhibit C-75
20    Boyce, Third Witness Statement, para. 2.14

*respect of the goods that we could take to customs. On sight of the letter, Belize Customs would release the goods, without requiring payment of any import duty"[21].*

61. However, on 14 April 2008, when Telemedia submitted a list of imported goods[22] for exemption from import duty, the Ministry of Finance wrote back on 18 April 2008[23] and stated:

> *"We are informed by the Commission of Income Tax that Belize Telemedia Ltd is substantially in arrears in their payment of Business Tax due to the Government of Belize. In the circumstances we are unable to consider your request for waiver of duties.*
>
> *Whenever Belize Telemedia Ltd becomes current in its payment of Business Tax your application will be reconsidered."*

62. Further lists of imported goods eligible for exemption from income tax were provided to the Ministry of Finance on 13 and 30 June 2008. No response was received. It appears that the Ministry of Finance was not prepared to release those goods unless either import duties were paid, or outstanding Business Tax was paid. In order to release the goods, Telemedia has recently started paying the necessary import duties[24].

*Voice Over Internet Protocol*

63. Section 6.1 of the Original Accommodation Agreement provided as follows:

> *"6.1   In consideration for the acquisition of the Properties by BTL and the Accommodation, the Government covenants and undertakes as follows:*

---

21   Boyce, First Witness Statement, para. 7.57
22   Exhibit C-20
23   Exhibit C-21
24   Boyce, Second Witness Statement, section 3; Boyce, Third Witness Statement, section 3 and Exhibits C-143 to C-152; C-175 to C-179

> (i)    *Authority, Permits and Licenses – to take all necessary steps to procure to the satisfaction of BTL that: ...(c) no person other than BTL and Speednet have or will have or be granted any authority, permit or license in Belize to legally carry on, conduct, or provide telecommunications services involving or allowing the provision or transport of voice services, and (d) no holder of any Class License has or will have or be granted any authority, permit or license in Belize to legally carry on, conduct, or provide telecommunications services involving or allowing the provision or transport of voice services."*

64.    Section 11.3 provided:

> *"11.3   The GOB [Government] Post Closing obligations are as follows:*
>
> (i)    *The Government undertakes to procure that for the duration of BTL's Individual License or for a minimum term of 15 years, whichever is the longer period:*
>
>> (a)    *Voice Over Internet – (a) no Class License holder is able to use or permit the use of "voice over internet" for any telecommunications traffic originating or terminating within Belize; (b) no user or customer of a Class License holder is able to make use of "voice over internet" services, and (c) any user or customer of an Individual License holder is only able to make use of "voice over internet" services with the written approval of the Individual License holder concerned."*

65.    Hence, the Government undertook to *"procure to the satisfaction of BTL"* that BTL and its competitor Speednet were to be the only parties allowed to provide telecommunications services which involved the provision or transport of voice services. The Government further undertook to procure that Voice over Internet Protocol ("VoIP") services could only be used by an individual with the written

approval of the Individual Licence holder concerned. Class Licence holders and their customers were not to be permitted to use VoIP services.

66. The Accommodation Agreement also considered the Caribbean Association of National Telecommunications Organisations ("CANTO") Guidelines. Clause 8.2 of the Third Amendment Deed provided:

> *"8.2. The Government undertakes to give and to procure that the Public Utilities Commission give, full legal effect to the "Guidelines for the Regulation of Voice over Internet Protocol ("VOIP") Operators" published by the Caribbean Association of National Telecommunications Organisations ("CANTO") in June 2007 (a copy of which is annexed to this deed) (the "CANTO Guidelines") by the issuance within 14 days of the date of this deed, and by their implementation no later than February 29, 2008, of regulations governing the regulation of VOIP in a form acceptable to Telemedia and in full compliance with the CANTO Guidelines.*
>
> *The Government undertakes to take and to procure that the Public Utilities Commission take, all necessary steps to ensure that all Class Licensees fully comply with the CANTO Guidelines"*

67. The Government therefore undertook to procure that the Belize Public Utilities Commission ("PUC") enacted Regulations governing the use of VoIP in a form acceptable to BTL and in full compliance with the CANTO Guidelines. Such Regulations were to be implemented no later than 29 February 2008.

68. Despite the 29 February 2008 deadline having passed, the Government has yet to enact Regulations implementing the CANTO Guidelines. It also appears that class licensees are offering access to VoIP service providers. MirrorNet Limited is a class licence holder offering voice plans to Belize-based customers for calling international telephones by VoIP, as well as for calling domestic telephones within

the MirrorNet network[25]. Telemedia wrote to the Government informing them of these contraventions on 13 March 2008[26].

*Frequencies*

69.  In the Third Amendment Deed, the Government agreed that within 21 days of the deed it would:

> *"8.1    (a) assign to Telemedia the frequency spectrum from 2.496 Ghz to 2.69 Ghz for Telemedia's sole use for the purposes of the deployment of its Wimax system throughout Belize"*

70.  Therefore, prima facie, the Government was to assign to Telemedia the frequency 2.496 – 2.69 Ghz by 28 January 2008. Telemedia had applied to the PUC for those frequency authorisations on 7 November 2007.

71.  By 28 January none of the specific frequency spectrums had been assigned to Telemedia. On 9 March 2008, a notice was published in the Guardian newspaper that Southern Cable Network Ltd ("Southern Cable") had applied to the PUC for frequency bandwith 2.524 Ghz and 2.588 Ghz[27]. Telemedia therefore wrote to the Government on 13 March 2008 stating that Southern Cable's application should be refused[28].

72.  On 14 April 2008, the PUC informed Telemedia that it assigned it the use of bandwidths 2.630 – 2.69 Ghz[29]. Telemedia has not been granted the use of bandwidths 2.496 – 2.629 Ghz. The letter from the PUC stated that *"the PUC acknowledges that the 2.5 Ghz band provides superior coverage and in-building penetration"*.

---

25    Boyce, First Witness Statement, para. 7.89
26    Exhibit C-22
27    Exhibit C-79
28    Exhibit C-22
29    Exhibit C-23

73.     When Telemedia contested this assignation, and asked for the use of frequency
        range 2.496 – 2.69 Ghz, the PUC wrote to Telemedia again on 18 April 2008. In
        that letter the PUC's chairman, Mr Kingsley Smith, claimed that the PUC had no
        knowledge of the Accommodation Agreement.    Mr Smith stated "*that the
        frequency range 2.496 GHz to 2.58 GHz is not available for Belize Telemedia Ltd
        to use at this time*"[30].

## J.      Belizean and English Injunctive Relief

74.     On 9 May 2008, Telemedia filed an urgent "without notice" application for an
        injunction from the High Court of England and Wales, Commercial Division in
        order to preserve Telemedia's right to set off Business Tax and import duty
        exemptions. That application was heard by Mr Justice David Steel on 12 May
        2008[31].

75.     Steel J granted an interim injunction restraining the Government and the
        Commissioner of Income Tax from obtaining any orders on the judgment
        summonses and issuing any further judgment summonses, until such time as the
        Government has given Telemedia full credit for any Shortfall Amounts. The
        Government was also ordered to take such steps as necessary to exempt Telemedia
        from relevant import duties.

76.     The application notice for an extension of the interim injunction and note of
        proceedings were served on the Government by fax on 13 May 2008[32]. The
        Government appears to have complied to a degree with that Order[33] but Telemedia
        remained concerned that the Government would continue to issue summonses.

30      Exhibit C-24
31      Relevant supporting documents are at Exhibits C-84 to C-86
32      Exhibit C-87
33      Boyce, First Witness Statement, para. 8.12

77.     A return hearing was held on 16 May 2008. Steel J heard the application and extended the injunction until trial or further Order[34].

78.     It appears that the Government has not abided by that Order.

79.     Telemedia also attempted to obtain a similar injunction to that obtained in the English High Court, in Belize. Those attempts are set out in section 8.C of the First Witness Statement of Mr Boyce. The injunction application was heard by Chief Justice Conteh on 21 June 2008. Conteh CJ refused to grant the injunction, on the basis that the dispute related to Belizean tax matters, and an English Court did not have jurisdiction to interfere in such matters. If he was wrong about that, Conteh CJ held, in any event, that there would be no irreparable damage or loss because, if this Tribunal finds for Telemedia, it will make an Award for repayment of tax erroneously paid.

80.     Telemedia filed a notice of appeal of the decision of Conteh CJ on 15 July 2008.

## II.    TRIBUNAL'S PROCEDURAL DIRECTIONS

### A.    The Request for Arbitration

81.     By a Request dated 9 May 2008 Allen & Overy, acting on behalf of Telemedia invoked Section 15 of the Accommodation Agreement and requested arbitration under the LCIA Rules. The Request for Arbitration ("Request") outlined the background to the Accommodation Agreement and the operation of that agreement for a period of two and a half years, following its inception, which was described as being reasonably successful. The Request then went on to say that, on 8 February 2008, the Government in Belize changed and the new administration had failed or refused to honour the Accommodation Agreement.

---

34      Exhibits C-88 to C-91

82.     The Request gave details of the Government's alleged breaches of the
        Accommodation Agreement in relation to, *inter alia,* Business Tax, import duties
        and requested frequencies and sought declaratory relief, damages and costs.

**B.      Appointment of the Arbitral Tribunal**

83.     In the Request, the Claimant pointed out that the Accommodation Agreement did
        not provide for party nomination of arbitrators, as envisaged by the LCIA Rules
        and went on to say:

> *"Telemedia invites the Government to indicate within 14
> days of the date of this Request whether or not it agrees to
> party nominations, in which case Telemedia proposes that it
> would then nominate an arbitrator within seven days of such
> agreement, and the Government would nominate an
> arbitrator within a further seven days of Telemedia's
> appointment. If the Government does not agree to party
> nomination of arbitrators, or fails to respond within 14 days
> of the date of this Request, Telemedia requests that the LCIA
> Court constitute the Tribunal under Article 5.4 of the LCIA
> Rules."*

84.     The Government failed or refused to respond to this invitation; and accordingly
        the LCIA Court appointed all three members of the arbitral tribunal (those
        arbitrators are set out in the Introduction of this Award). The LCIA notified the
        parties of this by a letter of 13 June 2008 and by a formal Notice of the same date
        in which it stated inter alia:

> *"1.     The LCIA has been informed that a dispute has arisen
> between the above-named parties out of an agreement
> entitled "Government Telecommunications Accommodation
> Agreement", dated 19 September 2005 (the Agreement);*
>
> *2.     By a Request for Arbitration dated 9 May 2008 (the
> Request), the Claimant requested arbitration of the dispute,
> invoking the provisions of Section 15 of the Agreement,
> which provides, in part, as follows:*

*"15.1   This agreement is governed by and shall be construed in accordance with Belize law.*

*15.2   Any dispute arising out of or in connection with this Agreement including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this Section.   There shall be 3 arbitrators.*

*15.3   The arbitral proceedings shall be conducted in the English language.*

*15.4   The seat or legal place of the arbitral proceedings shall be London, England."*

*3.      In the Request, the Claimant invited the Respondent to agree to the nomination of arbitrators by the parties;*

*4.      No Response has been filed by the Respondent for the purposes of Article 2 of the LCIA Rules within the timeframe or at all, nor any reply to the Claimant's proposal in relation to the nomination of arbitrators."*

85.   On 17 June 2008, the Chairman of the Tribunal ("the Chairman") wrote to the parties' lawyers referring to the appointment of the Tribunal and stating in material part:

> *"Under Article 15 of the LCIA Rules, as Miss Shek[35] has pointed out in her fax to you of 13 June 2008, the Claimant should file a Statement of Case within 30 days of 13 June 2008, unless the Claimant elects to treat the Request for Arbitration as a Statement of Case.  This Statement of Case should set out the facts and any contentions of law on which the Claimant relies, together with the relief claimed.*
>
> *Within 30 days of receipt of the Statement of Case, or of notice from the Claimant that it elects to treat the Request for Arbitration as its Statement of Case, the Respondent is required to submit a Statement of Defence, setting out which of the facts and contentions of law it admits or denies and on*

---

[35]   On behalf of the Registrar

> *what grounds and on what other facts and contentions of law it relies.*
>
> *These Statements should be accompanied by copies of the documents on which the party concerned relies. "*

86.    The letter asked the Claimant to inform the Tribunal if it intended to lodge a Statement of Case; and by letter of 19 June, 2008 the Claimant stated that it did propose to do so, by 14 July 2008. (In the event, the Claimant was obliged to ask for two short extensions of time, which the Tribunal granted.) The Statement of Case, with exhibits, authorities and the First Witness Statement of Mr. Dean Boyce was submitted on 25 July 2008.

87.    On 28 July 2008, the Chairman wrote to the Attorney General of Belize. The Chairman referred to his previous letter of 17 June 2008 and stated:

> *"The Claimant's lawyers, Allen and Overy LLP, have now submitted their Statement of Case dated 25 July 2008. Under the LCIA Rules of Arbitration, the Respondent is required to submit its Defence (and Counterclaim, if any) within 30 days of receipt of this Statement of Case.*
>
> *Since we are now close to the August vacation, it may be that you will require more time in which to submit your Statement of Defence (and Counterclaim, if any). If this should be the case, I should be grateful if you would let the members of the Tribunal know, so that we can draw up a time-table for these proceedings.*
>
> *By letter of 10 July, I suggested that we should hold a procedural meeting in mid-September between the members of the Tribunal and the parties' lawyers and I should be glad to hear from you in response to this proposal. The dates proposed are dates at which Mr. Kantor will be in London and so it would be helpful if we could meet on one of the proposed dates. "*

88.    This letter, which was copied to the Claimant, the co-arbitrators and the LCIA was sent by fax to the Attorney General. No reply was received.

89.   On 15 August, 2008, the Director-General of the LCIA wrote to the parties'
      lawyers, with a copy to the Tribunal, stating that the Respondent had failed to
      lodge its initial share of the advance on costs, as requested. The Director-General
      directed the Claimant to make a substitute payment, pursuant to Article 24.3 of the
      LCIA Rules. In the meantime, at the Chairman's request, his clerk was trying to
      arrange a procedural meeting between the Tribunal and the parties' lawyers, to
      take place in London in September 2008.

90.   On 25 August 2008, the Government's Statement of Defence was due but was not
      filed.

91.   On 27 August 2008, Allen & Overy wrote to the Tribunal stating:

          *"We refer to the letter from the LCIA dated 28 July 2008 and
          to the letter from Mr. Redfern of the same date informing the
          Respondent that its Statement of Defence should be filed on
          25 August 2008 although extensions would be considered
          where necessary.*

          *The Respondent failed to file its Statement of Defence on 25
          August 2008 or, that being a national holiday in the United
          Kingdom (although not in Belize), on the next working day
          thereafter. We are unaware of any requests for an extension
          having been made or granted.*

          *We note that the Respondent has yet to participate in these
          proceedings and that certain statements have been made in
          the Belize media that indicate that it will not do so. It was,
          for example, reported in Amandala, a Belize newspaper, on
          27 June 2008 in the context of this dispute that:*

              *"Prime Minister Dean Barrow has told Amandala
              that the Government would not expend resources in
              fighting a foreign arbitration..."*

          *We attach a copy of that report for your information."*

92.   The letter went on to say:

*"The Claimant has served a Statement of Case that sets out in detail the facts and legal arguments upon which it relies, which is supported by witness evidence and copies of documents relied upon by the Claimant. As it appears that the Respondent has chosen not to take part in these proceedings (thus far), we suggest that the 17/18 September 2008 hearing is used to consider the substantive merits of the case and, in particular, to deal with any questions or concerns that the Tribunal may have arising from the Claimant's Statement of Case so that an Award may be made on these issues.*

*As noted in paragraphs 7 and 82 of the Statement of Case, the Claimant intends to provide a report from an independent expert to quantify its claim for damages. The expert will not be available for the proposed hearing on 17/18 September 2008, but is estimated to be completed by or around 15 October 2008. The Claimant will provide that report to the Respondent and to the Tribunal as soon as it is available."*

93. The letter concluded by suggesting that the Tribunal should, in effect, bifurcate the proceedings, giving first an Award on liability and, if this were favourable to the Claimant, going on to assess quantum later.

94. After consulting with his co-arbitrators, the Chairman replied to the parties' representatives, stating in material part:

> *"The Tribunal has received a letter from the Claimant's lawyers, dated 27 August, 2008, in which the Tribunal is asked the purpose of the meeting with yourselves, envisaged for 17/18 September 2008: the Claimant's lawyers suggest that this meeting should in fact deal with the merits of the Claimant's case, on the basis that it appears that the Respondent may fail or refuse to take part in this arbitration.*
>
> *The Tribunal considered that once the Respondent had submitted its Statement of Defence (and Counterclaim if any), it would be appropriate to hold a meeting with you in order to discuss the future conduct of these proceedings. One of the members of the Tribunal who is not based in London will be in London on other business on 17/18 September 2008 and it was envisaged that the procedural*

> *meeting, which would not take more than half a day, could conveniently be held at that time, subject to the availability of the parties.*
>
> *The Tribunal has not heard from the representatives of the Respondent in reply to its questions as to their availability for this proposed meeting; and it has not received the Statement of Defence from the Respondent that was due on 25 August 2008, in accordance with the LCIA Rules of Arbitration. In these circumstances, the Tribunal will go ahead with the proposed meeting, at 2.30 p.m. on Wednesday 17 September 2008, at these Chambers.*
>
> *The purpose of this meeting will be to consider how to proceed with the conduct of this arbitration, and will take account of the possibility that it may have to proceed in accordance with Article 15.8 of the LCIA Rules, should the Respondent fail to refuse to take part."*

95.    This letter was sent to the Attorney General of Belize by Transworld, a firm of international couriers, who provided a copy of the signed delivery receipt.

## C.    The Procedural Meeting of 17 September 2008.

96.    A few days before the date fixed for this meeting, Mr. Rory Brady informed his co-arbitrators that he would be unable to attend. (He was due to enter hospital in Ireland for an operation, on the day following the meeting). The Chairman decided that, as this was simply a procedural meeting, it should go ahead with himself and Mr. Kantor alone, on the basis that any decisions would be discussed with Mr. Brady, before being communicated to the parties.

97.    At the Procedural Meeting, the Claimant was represented by Ms. Judith Gill and Mr. Matthew Gearing of Allen & Overy. The Respondent was not represented and did not appear.

98.    There were discussions between the Claimant's lawyers and the two members of the Tribunal as to the procedure to be followed, with the Tribunal emphasising that it would be for the Claimant to prove its case, by evidence and argument, even if

the Respondent did not appear and was not represented at the Hearing. There would be no question of the Tribunal simply "rubber-stamping" the Claimant's case.

99. Following the Procedural Meeting, the Chairman and Mr. Kantor prepared a draft Procedural Order, which was sent to Mr. Brady for approval.

100. Once this approval had been obtained, the Chairman sent the First Procedural Order to the parties' representatives, the Respondent's copy being sent by courier as before.

## D. The First Procedural Order

101. The First Procedural Order was sent to the parties on 30 September 2008. The Order included, *inter alia*, the following terms:

> *"10.    The procedural meeting was held at the IDRC in London, as planned, on Wednesday 17 September, with Mr Kantor and Mr Redfern present as members of the Tribunal and with Messrs Allen & Overy representing the Claimant. The Respondent did not attend this meeting and was not represented.*
>
> *11.    At the beginning of the procedural meeting, the Chairman stated that the Respondent would be given a final opportunity to submit its Statement of Defence; and that whether or not this was done, the Tribunal would proceed with the arbitration and make an award, pursuant to Article 15.8 of the LCIA Rules.*
>
> *12.    The Tribunal added that, if the arbitration did proceed in default of any participation by the Respondent, the Claimant would need to prove its case: it would not be approved by the Tribunal without question.*
>
> *13.    After consultation with Mr Brady, the Tribunal now makes the Order that follows.*

## II. THE TRIBUNAL'S ORDER

*14. The Claimant is ordered to file evidence as to the quantum of its claim by Friday 17 October 2008.*

*15. The Respondent is ORDERED to file its Statement of Defence, in conformity with Articles 15.3 and 15.6 of the LCIA Rules, by Friday 31 October 2008.*

*16. In view of the Respondent's failure so far to file any Statement of Defence, as previously directed by the Tribunal, this Order is now made as a peremptory Order, pursuant to section 41(5) of the English Arbitration Act, 1996. If the Respondent fails to comply with this peremptory Order, the Tribunal will proceed to an Award on the basis of the evidence presented to it, in accordance with Article 15.8 of the LCIA Rules and Section 41(7)(c) of the English Arbitration Act, 1996."*

102. Despite the Tribunal's Order, the Government did not file a Statement of Defence by 31 October 2008 or at all.

103. That omission appears consistent with Prime Minister Barrow's reported comments to a Belize newspaper on 27 June 2008 that:

> *"[The] Government would not expend resources in fighting a foreign arbitration, but would wait until steps are taken to enforce any possible rulings here in the Belize Supreme Court, to defend itself against BTL's claims[36]."*

104. In another interview on 18 July 2008, Prime Minister Barrow is reported as having stated:

> *"The [arbitration] in the UK, we take the view that's illegal, if you will, since it stems from a contract that we absolutely renounce and reject, and we will use that to resist any award that they get in the UK, which must be enforced in the courts of this country[37]."*

---

[36]    Exhibit C-81
[37]    Exhibit C-83

## III.   THE PARTIES' RESPECTIVE CLAIMS

### A.   Telemedia's case

105.   Telemedia set out its claims in its Statement of Case. Telemedia alleges that the Government is in breach of the Accommodation Agreement in the following respects:

(1)   The Government's failure to allow Telemedia to set off the Shortfall Amounts owed by the Government to Telemedia and, specifically, a failure to uphold Telemedia's right to set off such amounts against its Business Tax liability and amounts due under the Loan Note;

(2)   The Government's failure to apply the correct Business Tax rate to Telemedia;

(3)   The Government's failure to exempt Telemedia from import duties;

(4)   The Government's failure to grant the requested and stipulated frequencies to Telemedia;

(5)   The Government's failure to enact regulations governing VoIP services and the CANTO guidelines.

106.   Telemedia sought relief from the Tribunal, as set out in its Statement of Case[38]. At the hearings in London in November 2008 and January 2009, to which reference is made later in this Award, the Claimant sought leave to amend its Statement of Relief.

107.   During the course of the January hearing, the Claimant was given leave to amend certain claims and indicated that it would not pursue others. In order to be clear as

---

38      Section F

to the precise position, the Chairman of the Tribunal wrote to the Claimant's lawyers, with a copy to the Respondent, asking them to set out their client's requests for relief as they stood at the close of the January hearing.

108. The Claimant's lawyers replied on 17 February 2009 with a "Summary of Relief Sought", which was expressed to be supplemental to that previously requested. The Chairman then wrote again, to make it clear that what the Tribunal was looking for was a "stand-alone" document, which could be read as a complete statement of what was sought and what was no longer being sought. The Claimant's lawyers confirmed on 24 February, 2009 that the "Summary of Relief Sought" dated 17 February, 2009 was intended to be a "stand-alone" document including all relief now claimed and the relief no longer pursued. Subsequently, this document was updated to 27 February, 2009 as requested by the Tribunal.

109. As set out in this updated document, the Claimant's amended claim for relief is as follows:

*Orders to the Respondent to take or refrain from taking a particular course of action*

*Business Tax*

110. An order directing the Government to procure the withdrawal of the Assessment Notices and any Magistrate Court proceedings for the enforcement of the May judgment summonses and any further judgment summonses issued in breach of the Telemedia companies' right of set-off; and

*Import Duty Tax Exemption*

111. An order requiring the Government to issue and procure the issuance of such documents and to take such other steps as are necessary to exempt Telemedia from any tax, duty, levy or other impost upon goods, materials, equipment and machinery of every type of description imported for the use of the Claimant's

business in accordance with Section 11.3 (i)(g) of the Accommodation Agreement, including those items listed in Telemedia's letter dated 30 June 2008; and

*Frequencies*

112. An order requiring the Government to procure the unconditional assignment to Telemedia of the frequencies 2.496 Ghz to 2.69 Ghz inclusive; and

*VoIP*

113. An order that the Government must procure that:

    (1)    no person including any holder of a Class Licence other than the current Individual Licence Holders, Telemedia and SpeedNet, has been or will be granted any authority, permit or license in Belize to legally carry on, conduct, or provide telecommunications services in Belize involving of allowing the provision of or transport of voice over internet services;

    (2)    no user or customer of a holder of a Class Licence is able to make use of voice over internet services; and

    (3)    a user or customer of an Individual Licence Holder is only able to make use of voice over internet services with the written permission of the relevant Individual Licence Holder; and

114. An order that the Government must procure that the CANTO Guidelines are implemented in full compliance with their provisions; and

*New Tariffs*

115. An order requiring the Government to issue or procure that the Public Utilities Commission issues all authorisations, consents or approvals necessary for Telemedia to fully implement with effect from a date to be determined by

Telemedia, the tariff changes detailed in Telemedia's communication to the Public Utilities Commission dated 10 August 2007.

*Declaratory Relief*

*General*

116. A declaration that the Accommodation Agreement is binding on the Government; and

117. A declaration that Telemedia is entitled to set off payments due under the Loan Note; and

*Business Tax*

118. A declaration that Telemedia and its subsidiaries, BTL Digicell Limited and Business Enterprises Systems Limited, are entitled pursuant to the terms of the Accommodation Agreement to elect to set off the Shortfall Amounts and the contractual interest accruing thereon as they fell due against Business Tax and/or such other payments or obligations due and payable by Telemedia to the Government; and

119. A declaration that Telemedia is entitled to apply the Agreed Rate to its business tax liabilities pursuant to the terms of the Accommodation Agreement; and

*Import Duty Tax Exemption*

120. A declaration that Telemedia is entitled to an exemption from import duty on the terms set out in Section 11.3 (i)(g) of the Original Accommodation Agreement; and

*Frequencies*

121. A declaration that Telemedia is entitled, pursuant to the terms of the Accommodation Agreement, to the use of the frequencies 2.496 Ghz to 2.69 Ghz inclusive; and

*VoIP*

122. A declaration that the Government has agreed to procure the following in respect of voice over internet services:

    (1) no person including any holder of a Class Licence other than the current Individual Licence Holders, Telemedia and SpeedNet, has been or will be granted any authority, permit or license in Belize to legally carry on, conduct, or provide telecommunications services in Belize involving or allowing the provision of or transport of voice over internet services;

    (2) no user or customer of a holder of a Class Licence is able to make use of voice over internet services; and

    (3) a user or customer of an Individual Licence Holder is only able to make use of voice over internet services with the written permission of the relevant Individual Licence Holder; and

*New Tariffs*

123. A declaration that Telemedia is entitled to implement the tariff changes detailed in Telemedia's communication to the Public Utilities Commission dated 10 August 2007, a copy of which is annexed to the Third Amendment Deed.

*Monetary Relief*

*General*

124.  An order for the payment of any outstanding Shortfall Amount, together with interest at the contractual rate as set out in Section 11.4 of the Original Accommodation Agreement, currently BZ$15,973,621; and

*Business Tax*

125.  An order for damages to compensate Telemedia and its subsidiaries in respect of payments made in connection with Business Tax, namely:

(1)  The interest and penalties levied on Business Tax on the basis of late payment in the sum of BZ$1,738,777; and

(2)  The loss of the use of the sums wrongly paid to the Government by way of Business Tax, interest and penalties (which had the Government not denied Telemedia and its subsidiaries their right of set-off they would have had the benefit of BZ$1,184,173); and

126.  An order for damages in the sum of BZ$9,797,879 in respect of the difference in the Business Tax levied from 1 April 2008 and that ought properly to have been due if the Agreed Rate had been applied as per the Accommodation Agreement; and

*Import Duty Tax Exemption*

127.  An order for damages for:

(1)  The payments Telemedia has made by way of import duty in order to have its goods released and a reasonable rate of interest on those payments; and

(2)     The loss of the use of the sums paid to the Government by way of import duty; together, BZ$912,781; and

*VoIP*

128.    An order for damages in the sum of BZ$3,346,931 (if calculated by Method 1, including interest) or in the sum of BZ$4,696,686 (if calculated by Method 2, including interest) in respect of the Government's breach in relation to the VoIP provisions of the Accommodation Agreement; and

*Indemnity*

129.    Pursuant to Section 13.1 of the Original Accommodation Agreement, Telemedia claims any and all costs and expenses incurred in connection with these arbitration proceedings, including but not limited to:

(1)     Reasonable legal fees (and related disbursements) incurred by Telemedia to Allen & Overy LLP and Courtenay Coye & Co incurred in respect of these arbitration proceedings in the sum of BZ$2,840,085.79; and

(2)     Reasonable legal fees incurred by Telemedia to Allen & Overy LLP and Courtenay Coye & Co incurred in respect of Claim No 2008-458 before the English High Court, Commercial Division and Claim No 317 of 2008 before the Belize Supreme Court and any subsequent appeal in the sum of BZ$1,833,937 (not including interest); and

(3)     Fees paid to the LCIA and the Arbitral Tribunal in connection with these arbitration proceedings in the sum of BZ$404,298.03 (including interest); and

130.    Telemedia also seeks:

(1) The costs of the arbitration in the sum of BZ$3,244,383.82 (including interest and as an alternative to the claim made at paragraph 128(1) and (3)); and

(2) Such other or further relief as this Arbitral Tribunal thinks just and/or appropriate; and

(3) Interest on the bases specified above, alternatively interest compounded at monthly rests on sums owing both pre and post-Award pursuant to Section 49 of the Arbitration Act 1996 and/or Article 26.6 of the LCIA Rules.

*Claims for Relief no longer pursued by the Claimant*

131. During the hearing, Telemedia made clear that it was no longer seeking the following claims for relief:

(1) An order for damages for disruption to Telemedia's business. This is in the context of the import duty exemption claim; and

(2) An order for damages for the failure to assign the sole use of the frequency spectrum 2.496 Ghz to 2.69 Ghz by 28 January 2008 inclusive; and

(3) An order for damages in respect of the Government's breach in relation to the frequency provisions of the Accommodation Agreement; and

(4) An indemnity for any and all damages, losses and expenses which can be attributed to the management time which officers and employees of Telemedia have incurred in connection with the breaches by the Government of the Accommodation Agreement and these arbitration proceedings.

## B. The Government's case

132. The Government has not submitted any arguments or evidence in these proceedings. However, Prime Minister Barrow has variously described the Accommodation Agreement as *"invalid"*, *"illegal"*, *"null"* and *"void"*. The Accommodation Agreement has also been referred to by Prime Minister Barrow as a *"secret agreement"* entered into by the previous administration.

133. This appears to be a contention that the Accommodation Agreement as entered into between the Government of Prime Minister Musa and BTL/Telemedia is invalid and/or does not bind the Government of Prime Minister Barrow.

134. The Accommodation Agreement contained an agreement to arbitrate, by which the Government agreed that it would take part in arbitral proceedings in London under the LCIA Rules, if called upon to do so. It is well established in the law and practice of international arbitration that such an "agreement to arbitrate" is independent of the main contract in which it is contained and gives an arbitral tribunal the authority to rule on its own jurisdiction, *"including any objection to the initial or continuing existence, validity or effectiveness of the Arbitration Agreement"*[39].

135. This is the principle of *competens/competens* to which the Honourable Chief Justice Abdulai Conteh referred in his judgment of 21 June 2008[40]. Therefore, it was open to the Government to take part in these proceedings and to argue, if it so wished, that the Accommodation Agreement was – as Prime Minister Barrow asserts – *"illegal, null and void"*[41].

136. The Government did not avail itself of the opportunity. It chose to boycott these proceedings. This does not prevent the Tribunal from carrying out its task.

---

39    Article 23.1 of the LCIA Rules
40    At paragraph 9, fifth point. The Chief Justice went on to say that he did not consider that the remit of an arbitral tribunal comprehended "the payment of taxes or customs duties ..." and this issue is considered later in this Award.
41    Exhibits C-48 to C-50; and C-234

Article 15.8 of the LCIA Rules makes it clear that if any party *"fails to avail itself of the opportunity to present its case"*, the Tribunal *"may nevertheless proceed with the arbitration and make an award"*[42].

137. This is what the Tribunal decided to do; and in doing so, the Tribunal made it clear that, despite the absence of the Respondent, the Claimant could not take anything for granted: it would have to prove its case to the satisfaction of the Tribunal.

## IV. WITNESSES AND HEARINGS

### A. Witnesses

138. Written witness statements for the first and second hearings of this case were submitted by the following witnesses on behalf of the Claimant:

(1) Mr. Dean Boyce. As already stated, Mr. Boyce is Chairman of the Executive Committee of the Board of Directors of Telemedia. His First Witness Statement, a document of some 54 pages, describes the background to the dispute and the Government's alleged breaches of the Accommodation Agreement. His Second, Third, Fourth and Fifth Witness Statements deal with further and continuing alleged breaches by the Government of the Accommodation Agreement and outline investments made by Telemedia in pursuance of that agreement.

(2) Mr. Alastair Macpherson, a partner in the London office of the United Kingdom firm of PricewaterhouseCoopers LLP. Mr Macpherson is a partner in the London office of Pricewaterhouse Coopers LLP. He has worked in the telecommunications industry for over 19 years, acting for operators, regulators and governments in over 30 countries. Mr. Macpherson submitted a voluminous expert report on behalf of the Claimant, in which he assessed the losses allegedly sustained by the Claimant as a result of the Government's alleged breaches of the

---

42    This reflects Section 41 of the English Arbitration Act, 1996.

Accommodation Agreement. This Report was updated by Addenda of 11 November 2008, 18 November 2008, 9 January 2009 and 26 February 2009 and a letter dated 4 March 2009.

(3)     Mr. Macpherson made a declaration in his Expert Report, and again before the Tribunal, in which he recognised that his duty to the Tribunal overrides his obligation to the party who engaged him. Mr. Macpherson also disclosed to the Tribunal at the hearing on 19 November 2008 that, in May 2005, he had been engaged by Lord Ashcroft, the chairman of BB Holdings Limited (a shareholder in Telemedia) to provide advice on the definition of the rate of return and other financial measures. That work was, according to Mr. Macpherson, ultimately incorporated into the Original Accommodation Agreement. In the Second Addendum to his Expert Report dated 18 November 2008, Mr. Macpherson had already explained that, in his view, *"this background knowledge had not been of any relevance to the instruction to carry out the production of [his] expert report and subsequent addenda and that the work has not prevented [him] in any way from forming an independent view on the matters set forth"* in that Report and addenda. The Tribunal concludes that Mr. Macpherson's independence has not been impaired by virtue of that connection.

(4)     A written witness statement for the Second Hearing of this case was submitted by Mr. Philip Osborne, a member of the Executive Committee of the Board of Directors of Telemedia. Mr. Osborne gave evidence as to the negotiation of the Accommodation Agreement (and of the previous agreements) and of the steps taken to implement it. This brought Mr. Osborne into regular contact with members and officials of the Belize Government.

(5)     Mr. Boyce gave evidence in person at the first hearing of the arbitration and by video-link from New York at the second hearing.

(6)     Mr. Osborne gave evidence in person at the second hearing.     Mr.
Macpherson gave evidence in person at both hearings.

## B.     The November Hearing

139.    As arranged, the Hearing of this arbitration opened at the International Dispute
Resolution Centre in London ("the IDRC") on Wednesday, 18 November 2008.
The Claimant was represented by Ms. Judith Gill and Mr. Mathew Gearing of
Allen & Overy.

140.    Ms. Gill made an opening statement on behalf of the Claimant and evidence was
then given orally by Mr. Dean Boyce and Mr. Alastair Macpherson, both of whom
were questioned in detail by the members of the Tribunal.  At the end of the day,
the hearing was adjourned for further evidence and legal submissions, to a date to
be fixed.

141.    A transcript of the proceedings was made, by Court reporters, and a copy of this
transcript was sent by the Chairman of the Tribunal to the Attorney-General of the
Government of Belize by letter of 25 November 2008.

142.    On 5 December 2008, the Clerk to the Chairman of the Tribunal notified the
parties as follows:

> *"I am directed by the Chairman of the Tribunal to confirm
> that the adjourned hearing of this arbitration will take place
> at the IDRC, 70 Fleet Street, London on 14 and 15 January
> 2009 at 10.30am.*
>
> *1.      The procedure prior to this hearing will be as
> follows:*
>
> *(a)     a Witness Statement of Philip Osborne; and*
>
> *(b)     a letter from Alastair Macpherson responding to
> queries put to him by the Tribunal at the hearing on
> 19 November 2008;*

2.  By 6.00pm (London time) on Friday 19 December 2008, the Claimant shall file a written skeleton outlining its oral submissions; and

3.  By 6.00pm (London time) on Friday 9 January 2009, the Respondent shall file any skeleton submissions in reply."

## C.    The January Hearing

143.   The hearing took place on 14 and 15 January 2009. Much of the time was taken up with legal argument by Ms. Gill and Mr. Gearing on behalf of the Claimant, but the Tribunal also heard additional evidence from Mr. Boyce (by video link from New York), Mr. Osborne and Mr. Macpherson.

144.   As before, a transcript of the proceedings was made and a copy sent to the Government by the Claimant under by letter dated 20 January 2009.

## V.    THE ISSUES

### A.    Introduction

145.   Although the Government chose not to take part in these proceedings, there is a general issue that the Tribunal must consider of its own initiative as to the legality of the Accommodation Agreement. This has been said, by the present Prime Minister of Belize, to be an invalid and, indeed, illegal agreement. The Tribunal raised the issue of alleged illegality with Counsel for the Claimant and proposes to deal with it first. If the Tribunal finds the Accommodation Agreement to be valid and enforceable, the Tribunal will then go on to consider the specific issues raised by the Claimant in these proceedings.

## B.    The General Issue

### *A secret agreement?*

146.   As set out in Section I.H of this Award, the current Government (on taking office)
maintained that it had no knowledge of the Accommodation Agreement. In its
letter to Telemedia of 22 February 2008[43], the Government stated that:

> *"No one currently in the Ministry of Finance, or the Attorney General's
> Ministry, has copies of, or has ever seen, the Accommodation Agreement
> (or any other related agreement) to which you refer."*

147.   Moreover, Prime Minister Barrow has described the Accommodation Agreement
on a number of occasions as *"secret"[44]*.

148.   The Tribunal has therefore investigated the extent to which the existence of the
Accommodation Agreement was in the public domain and was known to the
representatives of the previous administration.

149.   According to Mr. Boyce[45] and Mr. Osborne[46], no press release was issued when
the Accommodation Agreement was signed in September 2005. However, Mr.
Osborne gave evidence that the negotiations between the previous Government
and BTL were widely covered by the press over the summer of 2005[47] and that the
existence of the Accommodation Agreement was known to numerous
representatives of the previous administration[48]. Mr. Osborne identified a number
of individuals involved in the negotiation and implementation of the
Accommodation Agreement, including Prime Minister Musa (the then Prime
Minister and Minister of Finance), Minister Ralph Fonseca (the then Minister of
Public Utilities), Minister Francis Fonseca (the then Attorney General), Godfrey
Smith (the then Minister of Foreign Affairs and Minister of Information), Dr.

---

| | |
|---|---|
| 43 | Exhibit C-45 |
| 44 | Exhibits C-10 and C-11 |
| 45 | Transcript 19 November 2008, p.86, line 14 |
| 46 | Transcript 14 January 2009, p.36, line 1 |
| 47 | Osborne, Witness Statement, section 3 |
| 48 | Osborne, Witness Statement, section 2 |

Elson Kaseke (former Solicitor General), Gian Gandhi (Government legal counsel), Arsenio Burgos (the then Chairman of the Development Finance Corporation), Dr. Carla Bennett (Ministry of Finance), John Briceno (the then Minister of Natural Resources), Mrs. Betty-Ann Jones (Ministry of Finance), Dr. Gilbert Canton (the then Chairman of the PUC), Joseph Waight (Ministry of Finance), and Edwin Flowers (former Solicitor General). Similar evidence was provided by Mr. Boyce in his First Witness Statement[49]. Both Mr. Boyce and Mr. Osborne also gave oral evidence to the same effect[50]. Furthermore, Mr. Boyce confirmed that the previous Government had not issued any direction to keep the Accommodation Agreement secret[51].

150. The Tribunal found the following evidence to be particularly compelling in assessing the Government's knowledge of the Accommodation Agreement:

(1) the transfer to BTL of the properties identified in the Accommodation Agreement and the involvement of both Elson Kaseke, the then Solicitor General, and Gian Gandhi, a legal adviser within the Ministry of Finance, in this process[52];

(2) the routine processing of import duty exemptions by Mrs Betty-Ann Jones at the Ministry of Finance between April 2006 and January 2008[53];

(3) the steps taken by the Government to enforce the Loan Note issued by BTL in order to pay for the properties it had received, including a letter from Joseph Waight at the Ministry of Finance dated 19 May 2006[54];

(4) the response of 30 November 2006 from Edwin Flowers (the then Solicitor General) to Allen & Overy's letter of 9 November 2006 alleging various breaches of the Accommodation Agreement by the Government, which

49 Boyce, First Witness Statement, Sections 4-6
50 Transcript 19 November 2008, pp.46-48, 52-84, 86-88 and Transcript 14 January 2009, pp.23-29, 38
51 Transcript 14 January 2009, p.87, line 9
52 Exhibits C-183-200
53 Exhibits C210
54 Exhibits C203-206

acknowledged the existence of the Accommodation Agreement and the obligations it imposes on the Government[55]; and

(5)     the letter from Joseph Waight to BTL of 4 October 2007 in which he authorises a set-off of BZ$1,109,655,69 against "Business Taxes" due to be paid by BTL in October 2007, pursuant to the Second Amendment Deed[56].

151.    It is important to note that a number of the individuals listed above have retained roles at the Ministry of Finance within the new Government[57].  Joseph Waight, Betty-Ann Jones and Gian Gandhi are particularly worthy of mention.  Mr Osborne also identified Eric Eusey, the Commissioner of Income Tax, as falling into the same category, and possibly Beverley Castillo (Commissioner of General Sales Tax)[58].

152.    Given all of this evidence, the Tribunal is satisfied that the Accommodation Agreement was not a *"secret"* agreement.  Nor has any allegation of corruption been made[59].

*Is the Accommodation Agreement binding on the new Government?*

153.    In order for the Accommodation Agreement to be binding on the new Government, it is necessary for the Claimant to prove that the previous administration had authority to enter into the Agreement and that its contents are lawful.  The Tribunal deals with each of these issues in turn.

154.    The Original Accommodation Agreement and each of the three Amendment Deeds were signed (expressly) on behalf of the Government of Belize by Prime Minister Musa in his capacity as Prime Minister and Minister of Finance.  The Second and Third Amendment Deeds were also signed by the Honourable Francis

---

55      Exhibits C-34 and 35
56      Exhibit C-8
57      Exhibit C-58
58      Transcript 14 January 2009, p.30, line 11. See also Exhibits C-14, C-17 and C-103
59      Transcript 19 November 2008, p. 76, lines 1-17

Fonseca in his capacity as the Attorney General of Belize, and witnessed by a Justice of the Peace.

155. Belize gained its independence in 1981, but it remains part of the Commonwealth. Under the Belize Constitution, the executive authority of Belize is vested in Her Majesty The Queen, but it may be exercised on behalf of Her Majesty by the Governor-General directly or through other officers of the Government of Belize. The Governor-General appoints both the Prime Minister and other Government Ministers to whom he may assign responsibility for *"any business of the Government, including the administration of any department of government"*. This permits the Minister responsible to *"exercise general direction and control over that department of government"*. In addition, the Attorney General is identified under the Constitution as *"the principal legal advisor to the Government ...with responsibility for the administration of legal affairs in Belize[60]."*

156. The Belize Gazette of 23 August 2004 announced that, as of 19 August 2004, the Governor-General had assigned to Prime Minister Musa responsibility for the business of Government relating to the Office of the Prime Minister and Ministry of Finance, Defence and the Public Service. The Public Utilities Commission was identified as falling within the Office of the Prime Minister and the remit of the Ministry of Finance was stated to cover customs and excise, the Development Finance Corporation, income tax, the Inland Revenue, sales tax and taxation. The same edition of the Belize Gazette also announced the responsibilities assigned to the Honourable Ralph Fonseca as Minister of Home Affairs and Investment and the Honourable Francis Fonseca as Attorney General (including responsibility for the administration of justice, contracts and legal affairs)[61]. The Tribunal has seen no evidence to suggest that the assignment of these responsibilities was altered prior to the change of administration in February 2008.

---

60   Authority A-1: The Constitution of Belize, Sections 36-42
61   Authority A-8: The Belize Extraordinary of 23 August 2008. Also see references to the Honourable John Briceno and the Honourable Godfrey Smith.

157. At the time when the Original Accommodation Agreement and the three Amendment Deeds were executed in September 2005, November 2005, December 2006 and January 2008, the Tribunal therefore finds that Prime Minister Musa had authority to contract on behalf of the Government of Belize. The participation of the Attorney General, as the Government's principal legal advisor (including responsibility for government contracts), in the negotiation of the Accommodation Agreement and the execution of the Second and Third Amendment Deeds by the Attorney General in the presence of a Justice of the Peace further corroborates the Government's authority to enter into the Accommodation Agreement.

158. The next issue to consider is whether the authority of the Prime Minster and other Government Officials extended to the matters covered by the Accommodation Agreement. From the evidence before the Tribunal, it appears that the Government of Belize entered into the Accommodation Agreement in a bid to resolve the difficulties stemming from inter alia the failed takeover of BTL by ICC and to develop modern, sustainable telecommunications services for the people of Belize. For example, the Government's objectives are described in a note prepared by Mr Boyce in June 2005 at the outset of negotiations with BTL[62].

159. In return for the obligations accepted on the part of BTL to purchase certain properties *"[in] order to better accommodate the Government's telecommunications needs and other requirements"* and in the expectation that BTL would be the principal telecommunications provider in Belize for a number of years, the Government agreed to afford BTL a number of benefits in the Original Accommodation Agreement and subsequent Amendment Deeds including:

(1) an MROR of 15% triggering a potential payment by the Government of the Shortfall Amount;

---

[62] Exhibit C-26

(2)     the right to set off any unpaid Shortfall Amount against *"the amount of any taxes or other payments or obligations due and payable by Telemedia to the Government"[63]*;

(3)     Business Tax payable at the Agreed Rate (no more than 25% of taxable income as opposed to gross revenue);

(4)     exemption from import duties;

(5)     assignment of the 2.496 – 2.69 Ghz frequency range for Telemedia's sole use; and

(6)     restrictions on VoIP services offered by third parties and implementation of the CANTO Guidelines.

160.   The question for the Tribunal to decide is whether it was lawful for Prime Minister Musa and the other Government officers involved to afford these benefits to BTL and subsequently Telemedia.

161.   As recorded in Section I.D of this Award, the governing law of the Accommodation Agreement is the law of Belize.  Pursuant to the Belize Constitution and the Imperial Laws (Extension) Act[64], the Tribunal accepts that the law of Belize is based to a significant degree on English law.  This approach was affirmed by the Supreme Court of Belize in *The Attorney General v The Belize Bank Limited (2008)*[65].

162.   The Crown's common law prerogative to enter into contracts in relation to public services is extensive as can be seen from the judgments in *Bankers Case (1700)*[66] and *New South Wales v Bardolph (1934)*[67].  The latter case also recognises that

63     Exhibit C-4, Section 2.6
64     Authorities A-1 and A-2
65     Authority A-4: Claim No. 228 of 2008
66     Authority A-6: [1700] 90 E.R. 270
67     Authority A-7: [1934] 52 C.L.R. 455

this prerogative can be exercised on behalf of the Crown by the Government of the day in the absence of any constitutional or statutory restriction and provided that:

(1)     the contract is entered into in the ordinary or necessary course of Government administration;

(2)     it is authorised by the responsible Minister; and

(3)     any payments to be made by the Government are covered by or referable to an appropriate parliamentary grant (although this limb was held not to affect the validity of the contract *per se*).

163   As noted in paragraph 155 above, the Belize Constitution provides duly appointed Government Ministers with a significant degree of latitude to pursue the business of Government relevant to the departments over which they have been assigned responsibility. In the absence of any specific statutory limitation to the contrary, therefore, the Tribunal finds that Prime Minister Musa (as the most senior Government Minister dealing with public services and taxation, acting on the advice of the Attorney General) had the authority to enter into the Accommodation Agreement and to grant the benefits afforded to BTL/Telemedia in circumstances where it was necessary to stabilise the telecommunications industry in Belize and to develop it for future generations, thereby dealing with the first two *Bardolph* provisos. For the avoidance of doubt, the Tribunal considers (following the judgment in the *Bardolph* case) that the third proviso dealing with payments by the Government goes to the enforceability of the Agreement rather than its validity. Given that Telemedia is seeking payment of the Shortfall Amount by way of set-off (rather than a direct payment) on the basis of the Second and Third Amendment Deeds and that the Accommodation Agreement does not stipulate the direct payment of any other sum by the Government, this issue does not require further consideration.

164.    In order to determine whether there is any specific statutory restriction on the Government's authority to execute the Accommodation Agreement, the Tribunal considers in turn each of the claims raised by Telemedia.

165.    MROR/Shortfall Amount – A press report of 3 August 2005 records Prime Minister Barrow (as the then Leader of the Opposition) objecting to the suggestion that BTL be afforded a MROR as a matter of principle, but the Tribunal has seen no evidence that it was unlawful for the Government to make such a contractual commitment. Moreover, as the press reports of the time mention, the Government had previously agreed a 15% MROR with ICC (the company run by Jeffrey Prosser, which would have taken over BTL but for its inability to source the purchase funds)[68] and the Tribunal is not aware of any challenge being made to the validity of that arrangement. To the contrary, the Government of the day sought to rescind the agreement when ICC failed to pay for the shares that they had agreed to buy, implying that the original validity of the agreement was not in doubt[69].

166.    Right of set-off – It appears from the evidence that the Income and Business Tax Act ("IBTA")[70] does not contain any provision dealing expressly with a tax payer's right of set-off. It neither authorises a tax payer to set off any debts due from the Government against its tax liabilities nor does it prohibit such a practice[71]. Prime Minister Barrow has suggested in press reports that National Assembly approval would be required in respect of any "withholding" of tax, but the Tribunal is satisfied that this would not arise in a case where tax debts are being set off against sums due from the Government as opposed to being withheld in the sense of not being paid at all. The Tribunal draws support for this view from both the legal authorities cited and the evidence served in this case. First, a number of English law cases recognise that the Crown may choose to set off debts that it owes to tax

---

68     Exhibit C-246, Section 7.8.1 and 7.16.1 of the Share Purchase Agreement
69     Exhibit C-248
70     Authority A-51
71     Exhibits C-103 and C-107

payers against their outstanding tax liabilities[72]. Secondly, there are a number of examples of the Government of Belize granting a set-off against outstanding tax liabilities[73]. Exhibits C-8, C-13 and C-36 relate to the previous administration, but it is worthy of note that Exhibit C-135 records the current Government setting off general sales tax ("GST") against Telemedia's Business Tax liabilities. By way of completeness, the Tribunal has not identified any statutory limitation on the Government's right to agree a broad set-off provision such as that contained in Clause 2.2 of the Second Amendment Deed to the extent that it applies to payments due under the Loan Note (which is dealt with in further detail below) as well as Business Tax liabilities.

167. Business tax – The Government undertook in the Accommodation Agreement that from 1 April 2008 the Agreed Rate of Business Tax would apply to BTL/Telemedia. The standard rate of Business Tax is charged at 19% of gross revenue, but Prime Minister Barrow's administration has recently introduced a new rate for telecommunications companies of 24.5% of gross revenue as of 1 January 2009[74]. According to Mr. Boyce, the previous Government agreed to a lower rate of Business Tax for BTL/Telemedia in order to level the playing field with other industries in Belize, who were perceived as paying less tax, and to encourage BTL/Telemedia to reduce customer tariffs[75]. The Agreed Rate of tax was never introduced formally, but the Government agreed in the Third Amendment Deed that Telemedia should from 1 April 2008 self-assess its Business Tax liability at the Agreed Rate, which it has done. Telemedia relies on Section 95 of IBTA[76], which permits the Minister of Finance to remit income tax payable (in whole or part) if he is satisfied that it would be *"just and equitable"* to do so, as the statutory basis for the Government's contractual agreement to charge Telemedia a lower rate of tax. This provision has remained unchanged following

---

72    Authorities A-12-15: *De Lancey v The Queen* [1871] L.R. 6 Ex 415; *Re: DH Curtis (Builders) Limited* [1978] 2 W.L.R. 28; *Re: Cushla Limited* [1979] 3 All ER 415; *Secretary of State for Trade and Industry v Frid* [2004] 2 All ER 1042

73    Exhibits C-8, C-13, C-36 and C-135

74    Authority A-57: Income and Business Tax (Amendment) (No.2) Act 2008

75    Boyce, First Witness Statement, para.4.14

76    Authority A-51

the introduction of the new 24.5% charge for telecommunications companies and Telemedia argues that the contractual rate agreed by the Government therefore still applies. Ms Gill also pointed to the fact that governments often agree tax concessions to encourage investment in a particular business sector and cited the *Alcoa Minerals of Jamaica Inc (USA) v Government of Jamaica* case[77] as an example. In addition, Telemedia argues that there is no restriction on the Government agreeing to a self-assessment mechanism in the form contained in the Third Amendment Deed. At the hearing in January, the Tribunal probed the extent to which the Government can tie its hands in relation to the rate of Business Tax imposed on Telemedia. On balance, however, the Tribunal considers that the power to remit tax under IBTA does provide a statutory basis for the lower rate agreed and has identified no limitation on the Government allowing Telemedia to undertake a self-assessment in respect of its Business Tax liability.

168. Exemption from import duties – In the context of Telemedia's application for ancillary injunctive relief before the Belize courts in June 2008[78], the Government argued that an injunction should not be granted in respect of the import duty exemption afforded to Telemedia under the Accommodation Agreement on account of the limited circumstances in which the Minister of Finance is expressly permitted to remit duties under Section 17 of the Customs and Excise Duties Act 2002[79]. Section 17 provides that:

> *"17.(1)The Minister may after consultation with the Comptroller remit, wholly or partially, the duties set forth in the First Schedule in the case of goods imported by charitable and religious organisations, or registered non-governmental organisations with emphasis on poverty reduction and not engaged in commercial activities, or for educational or*

77    Authority A-24: Unpublished Decision on Jurisdiction and Competence of Arbitral Tribunal, International Centre for Settlement of Investment Disputes (ICSID) ARB 74/2 (1975), mentioned in *Arbitration Under the Auspices of the Internatioinal Centre for Settlement of Investment Disputes (ICSID): Implications of the Decision on Jurisdiction in Alcoa Minerals of Jamaica Inc. v Government of Jamaica* by John T. Schmidt in Harvard International Law Journal, 1976, Vol.17, page 92
78    Exhibit C-110, p.8
79    Authority A-28

> *charitable objects, if he is satisfied that it would be in the public interest to do so,*
>
> *(2) In exercising his discretion under sub-section (1) above, the Minister shall have due regard to the kind and quantity of the goods imported and to whether such goods are reasonably necessary for the purpose of such organisation or for the achievement of such object as aforesaid.*
>
> *(3) The limitation to the discretion of the Minister to remit customs duties imposed by this section shall not affect the application of any contract or other agreement in force at the date of the commencement of this section between the Government and any person providing for the remission of customs duties in terms of the contract or the agreement"*

169. Telemedia disputes that Section 17 includes an exhaustive list of the circumstances when the Minister may exercise his discretion to remit duties and argues that it does not invalidate the exemption granted to Telemedia, not least because of the broad power of the Prime Minister/Minister of Finance to execute contracts in relation to the departments over which he has responsibility and the involvement of the Attorney General in negotiation and execution of the Accommodation Agreement. The Belize court was not required to reach a decision on this issue and, in the Tribunal's opinion, the interpretation of Section 17 is not straightforward. The stated circumstances in which duties may be remitted are not expressed to be exhaustive, but they are all non-commercial in nature and Section 17(3) refers to the *"limitation"* to the Minister's discretion to remit customs duties *"imposed by this section"* in the context of carving out contracts which the Government may have executed prior to the Customs and Excise Duties Act 2002 coming into force. It could be argued that commercial agreements executed by the Government after 2002 would be subject to the *"limitation"* imposed by Section 17, potentially throwing into doubt the import duty exemption granted to Telemedia under the Accommodation Agreement in 2005. On balance, however, the Tribunal considers that any fetter on the broad power of the Prime Minister/Minister of Finance to contract on behalf of the

Government should have been stipulated expressly in Section 17 if that was in fact the intention of the legislators. The Tribunal draws support for its view from the actions taken by the Government under the administrations of both Prime Minister Musa and Prime Minister Barrow in respect of Telemedia's exemption described in paragraphs 60-62 above.

170. Frequency range/VoIP services – On the basis of the evidence before it, the Tribunal is not aware of the current Government raising any objection in principle (whether statutory or otherwise) to the power of the previous administration to agree the provisions in the Accommodation Agreement in relation to (1) the assignment of the 2.496 – 2.69 Ghz frequency range to Telemedia for its sole use, and (2) the restrictions on VoIP services offered by third parties and implementation of the CANTO Guidelines. Mr Gearing did bring to the Tribunal's attention Section 42(4) of the Telecommunications Act 2002[80], but the Tribunal is satisfied that this does not fetter the Government's power to enter into the relevant provisions of the Accommodation Agreement. The Tribunal considers the Government's authority over the PUC in paragraph 175 below.

171. In conclusion, the Tribunal finds that the Government had actual authority to enter into the Accommodation Agreement and that it was lawful for the Government to agree to the provisions that are now in dispute. In any event, the Tribunal shall also deal briefly with the submissions made by Telemedia in respect of the Government's apparent or ostensible authority to execute the Agreement.

172. As highlighted by Telemedia's Counsel, the principles of English law as to apparent authority (and the Tribunal is not aware of any divergence under Belize law) were summarised in recent years by Mr Justice Cresswell in *Marubeni Hong Kong and South China ltd. V Government of Mongolia*[81]. Apparent authority arises in circumstances where:

---

80    Authority A-38
81    Authority A-45: [2004] 2 Lloyd's Rep. 198

Government should have been stipulated expressly in Section 17 if that was in fact the intention of the legislators. The Tribunal draws support for its view from the actions taken by the Government under the administrations of both Prime Minister Musa and Prime Minister Barrow in respect of Telemedia's exemption described in paragraphs 60-62 above.

170. Frequency range/VoIP services – On the basis of the evidence before it, the Tribunal is not aware of the current Government raising any objection in principle (whether statutory or otherwise) to the power of the previous administration to agree the provisions in the Accommodation Agreement in relation to (1) the assignment of the 2.496 – 2.69 Ghz frequency range to Telemedia for its sole use, and (2) the restrictions on VoIP services offered by third parties and implementation of the CANTO Guidelines. Mr Gearing did bring to the Tribunal's attention Section 42(4) of the Telecommunications Act 2002[80], but the Tribunal is satisfied that this does not fetter the Government's power to enter into the relevant provisions of the Accommodation Agreement. The Tribunal considers the Government's authority over the PUC in paragraph 175 below.

171. In conclusion, the Tribunal finds that the Government had actual authority to enter into the Accommodation Agreement and that it was lawful for the Government to agree to the provisions that are now in dispute. In any event, the Tribunal shall also deal briefly with the submissions made by Telemedia in respect of the Government's apparent or ostensible authority to execute the Agreement.

172. As highlighted by Telemedia's Counsel, the principles of English law as to apparent authority (and the Tribunal is not aware of any divergence under Belize law) were summarised in recent years by Mr Justice Cresswell in *Marubeni Hong Kong and South China ltd. V Government of Mongolia*[81]. Apparent authority arises in circumstances where:

---

80    Authority A-38
81    Authority A-45: [2004] 2 Lloyd's Rep. 198

-58-

(1) a person by words or conduct represents or permits to be represented that a person has authority to act on his behalf;

(2) the representation may be express or implied; and

(3) it is either a genuine representation or a representation of a very general nature.

173. In the same case, Mr Justice Cresswell pointed out that certain special considerations arise when a public official purports to contract on behalf of the Crown and he considered in particular the case of the *Attorney General for Ceylon v Silva*[82]. However, he concluded that those special considerations do not apply where the authority of the public official is not borne out of and therefore limited by specific legislation, and where the act in question is not seen to fetter the Crown's freedom of action to do its public duty generally. In the *Marubeni* case, therefore, the Minister of Finance was held to have apparent authority to issue a guarantee on behalf of the Mongolian Government on the basis of affirmative letters issued by the Ministry of Justice.

174. Returning to the current case, the Accommodation Agreement was negotiated by the then Prime Minister/Minister of Finance and other senior Government ministers, including the Attorney General and Minister of Public Utilities, all of whom were assigned responsibility for conducting business in relation to the government departments under their control as described in paragraph 156 above. Moreover, Section 7 of the Accommodation Agreement contains extensive representations and warranties on the part of the Government as regards the legality and enforceability of the Agreement and the authority of the Prime Minister to act on its behalf. This provision is incorporated by reference into the three Amendment Deeds. In addition, the Accommodation Agreement and three Amendments Deeds were signed by the Prime Minister and (in the case of the Second and Third Amendments Deeds) the Attorney General expressly on behalf of the Government of Belize. The Tribunal therefore finds that the criteria for

---

82 Authority A-50: [1953] AC 461

apparent authority have been established and that the special considerations that arise when contracting with the Crown have been met. This conclusion is further supported by the implementation of the Accommodation Agreement by the Government. For example, the transfer of properties to BTL, the vesting of BTL's assets etc in Telemedia (which in itself required the enactment of the Vesting Act 2007 and the assent of the Governor General), the agreement to pay the Shortfall Amount in the Second and Third Amendment Deeds and the granting of import duty exemptions until May 2008[83].

175. The remaining issue for the Tribunal to consider in relation to the validity of the Accommodation Agreement is the authority of the Government to procure that its departments and future administrations abide by its terms.

(1) For the purposes of implementing the Accommodation Agreement, the Ministry of Finance and PUC are the key bodies involved. Given the responsibility assigned to Prime Minister Musa in respect of both of these bodies in his roles as Prime Minister and Minister of Finance, the Tribunal accepts that he had authority to direct the Ministry of Finance and PUC to implement the provisions of the Accommodation Agreement. In the case of the Ministry of Finance, there are numerous examples in the evidence of both Prime Minister Musa and Prime Minister Barrow directing the Ministry's representatives to take certain actions and of their directions being followed[84]. For example, Joseph Waight approving the Business Tax set-off in October 2007 under the Musa administration, but subsequently withholding import duty exemptions pursuant to instructions from Prime Minister Barrow in April 2008. Turning to the PUC, it was involved to an extent in the transfer of the properties to BTL[85], but has not fulfilled the Government's promises to BTL/Telemedia in relation to VoIP services and assignment of the 2.496 – 2.69 Ghz frequency range for

---

83 Exhibit C-210
84 For example, Exhibits C-8, C-59 and C-103
85 For example, Exhibit C-41

Telemedia's sole use. The PUC is a statutory body established by the Public Utilities Commission Act[86]. Section 3.2 describes the PUC as *"an autonomous institution"* but states that it should exercise its powers in accordance with the legislation that governs its functions. For instance, the Belize Telecommunications Act[87] requires the PUC to regulate the telecommunications sector and to implement Government policy. As noted in paragraph 156 above, the PUC falls within the purview of the Office of the Prime Minister and has been described by the Belize Supreme Court as *"a functionary of the Government"*[88]. The Tribunal therefore concludes that the Government is able to procure that the PUC implements the terms of the Accommodation Agreement.

(2)    Similarly, the Tribunal finds that the Accommodation Agreement is binding on the Government notwithstanding any change in the political administration given its conclusion that the Agreement is valid in all other respects. The *Bardolph* case is persuasive authority in this regard[89]. Indeed, it is worthy of note that the current Government has not consistently attacked the validity of the Accommodation Agreement. The press reports in evidence record Prime Minister Barrow as acknowledging the binding nature of the Accommodation Agreement at times[90]. Moreover, in a speech to the House of Representatives on 11 December 2008, Prime Minister Barrow is reported as having said that if Telemedia is transparent about its operations and is prepared to enter talks with the Government, *"we don't have a problem with the accommodation agreement...we may have to retune it, retweak it, but in essence we don't have a problem with it"*[91]. The Government has also taken steps to

---

86    Authority A-39
87    Authority A-38, Section 6
88    Authority A-9: *Attorney General of Belize v Belize Water Services*, claim No. 376 of 2004, para. 13
89    Authority A-7: *New South Wales v Bardolph* (1934) 52 C.L.R. 455
90    Exhibits C-11
91    Exhibit C-234

enforce the Loan Note by which Telemedia agreed to pay for the properties transferred pursuant to the Accommodation Agreement[92].

176. To conclude on the General Issue, the Tribunal finds that the Accommodation Agreement is valid and enforceable against the present Government of Belize.

## C. The Specific Issues

177. The Tribunal now turns to the Specific Issues raised by Telemedia in this arbitration. Its claims are set out in paragraph 105 above.

178. First, however, there is a threshold issue which the Tribunal must resolve in connection with its jurisdiction to deal with certain of the claims.

### *Arbitrability of claims?*

179. There are two issues for the Tribunal to determine as regards the arbitrability of the claims, namely:

   (1)    whether the Tribunal has jurisdiction to determine the claims relating to tax issues under the Accommodation Agreement; and

   (2)    whether the claim relating to set off of payments due under the Loan Note falls within the arbitration clause contained in the Accommodation Agreement.

180. First, the Tribunal will deal with the tax issues. The Tribunal accepts that the enforcement of tax laws should be undertaken by the national courts of the jurisdiction in question[93]. However, in upholding this general rule, the House of Lords in *Government of India v Taylor*[94] acknowledged that *"there may be cases in which our courts, although they do not enforce foreign revenue law, are bound to recognise some of the consequences of that law"*. Moreover, the authorities

---

92      Exhibit C-139-142
93      Authority A-16: Dicey & Morris, *The Conflict of Laws* (14th Ed) pages 100-121
94      Authority A-17: [1955] A.C. 491, p.505

reviewed by the Tribunal do not restrict the ability of the courts to determine contractual arrangements relating to the application of foreign revenue laws as opposed to the enforcement of the laws themselves. Similarly, the Tribunal's attention has been drawn to a number of cases in which arbitral tribunals have dealt with tax disputes in a contractual context[95]. In the present case, the Tribunal is being asked to determine the disputes that have arisen as regards the application of the bespoke tax arrangements included in the Accommodation Agreement relating to the rate of Business Tax to be paid by Telemedia, its right to set off the Shortfall Amount against its tax liabilities and its entitlement to be exempted from import duties. The Tribunal concludes that these claims fall within its jurisdiction. The Tribunal notes that the Belize Supreme Court anticipated that the Tribunal would deal with the set-off claim (at least) when dealing with Telemedia's application for ancillary injunctive relief in that regard in June 2008[96].

181. Secondly, the Tribunal acknowledges that the Loan Note constitutes a separate contract which does not contain an arbitration agreement. Nevertheless, the issue in dispute relates to the ability of Telemedia to set off part of the Shortfall Amount against outstanding payments due under the Loan Note pursuant to the set-off provision contained in Clause 2.2 of the Second Amendment Deed. The Deed incorporates by reference the arbitration agreement contained in Section 15 of the Accommodation Agreement[97]. The Tribunal therefore finds that it has jurisdiction to determine this claim too.

---

95  Authorities A-18-24: *Engineering Company (Italy) v Engineering Company (Greece) and Greece* –
Final award in cases nos. 6515 and 6516 of 1994; *Amco Asia Corporation v Republic of Indonesia*
(1988) 27 ILM, pages 1283-1313; *T.C.S.B. Inc v Iran* (Case No. 140), 1984, Award No. 144-140-2;
*Pan American Energy LLC (United States) and Ors v The Argentine Republic (Argentina)* ICSID Case
No. ARB/03/13; *Owner of Company registered in Lebanon v Defendant African State* (not specified),
Unpublished (Original in French), mentioned in Yearbook Commercial Arbitration, 1995, Vol.XX,
pages 58-61; *Questech hc v The Ministry of National Defence of the Islamic Republic of Iran* Award in
Case No.59 (191-59-1) of 1985, mentioned in Yearbook Commercial Arbitration, 1986, Vol. XI, pages
283-287; *Alcoa Minerals of Jamaica Inc (USA) v Government of Jamaica*, *supra* note 77
96  Exhibit C-245
97  Exhibit C-3, Clause 7.1

182. As described in paragraphs 36 and 37 above, Telemedia is entitled to receive the Shortfall Amount from the Government of Belize as compensation for the difference between AROR and MROR in the first two years of operation following the execution of the Accommodation Agreement (financial years 2006 and 2007). As an alternative to paying Telemedia direct, the Government agreed that Telemedia could set off the Shortfall Amount against its tax liabilities and any other amount owed by Telemedia to the Government. Telemedia has therefore taken steps to set off the Shortfall Amount against its Business Tax liabilities and sums outstanding under the Loan Note. The Government under the administration of Prime Minister Musa approved the set-off of BZ$1,109,655.69 against Business Taxes due to be paid by Telemedia in October 2007, but the current Government has refused to recognise the set-offs included in Telemedia's monthly Business Tax returns since February 2008. The current Government has also disputed Telemedia's entitlement to set off part of the Shortfall Amount against sums outstanding under the Loan Note[98].

183. Telemedia's right of set-off was first established in Section 11.4 of the Original Accommodation Agreement, but this was expanded in the Second and Third Amendment Deeds. Clause 2.2 of the Second Amendment Deed is drafted in broad terms and affords Telemedia a right of set-off against *"any taxes or any other payments or obligations due and payable by [Telemedia] to the Government"*. This provision combined with the specific Business Tax set-off permitted under Clause 2.5 of the Third Amendment Deed entitles Telemedia to exercise its rights of set-off in the manner described in the previous paragraph. The Tribunal therefore finds that the government of Belize is in breach of its obligations under Section 11.4 of the Original Accommodation Agreement as amended.

---

98    Exhibits C-139-142

184. As described in paragraphs 42 and 43 above, Telemedia has been entitled since 1 April 2008 to submit Business Tax returns applying the Agreed Rate. However, the Commissioner for Income Tax has issued Assessment Notices against Telemedia that do not correspond to the Agreed Rate. In addition, the current Government has raised the standard rate of Business Tax applicable to telecommunications companies from 19% to 24.5% of gross revenue as of 1 January 2009.

185. To the extent that the Government of Belize has not applied the Agreed Rate to Telemedia in respect of its Business Tax liabilities, the Tribunal finds that the Government is in breach of Section 11.3 (i)(f) of the Original Accommodation Agreement as amended by Clause 3.5 of the Second Amendment Deed and Clause 3.1 of the Third Amendment Deed.

## *Import Duty Exemption*

186. As described in paragraphs 58 and 59 above, Section 11.3 (i)(g) of the Original Accommodation Agreement entitles Telemedia to an exemption from import duties in respect of goods imported for its own use. Exemptions were duly granted to Telemedia until May 2008, but the current Government has refused to exempt Telemedia from paying import duties purportedly because its Business Tax payments are in arrears. The Government has also raised an objection on the basis of the Customs and Excise Duties Act 2002, but that point has already been dealt with in paragraph 169 above. Therefore, given the finding that the Government's position in respect of Telemedia's Business Tax liabilities is unsustainable, the Tribunal concludes that the Government is in breach of Section 11.3 (i)(g) of the Original Accommodation Agreement.

*Frequencies*

187. As described in paragraphs 71 to 73 above, Telemedia has not been assigned the 2.496 – 2.69 Ghz frequency range for its sole use in accordance with Clause 8.1 of the Third Amendment Deed and has been told by the PUC that the frequency range is not available for it to use *"at this time"*. It is not clear from the evidence whether the frequency range has been assigned to a third party. In any event, the Tribunal finds that the government of Belize is in breach of its obligations under the Third Amendment Deed.

*VoIP*

188. As described in paragraph 68, the Government has not taken steps to restrict the extent to which VoIP services can be offered by third parties or to implement the CANTO guidelines in accordance with its obligations under Sections 6.1 and 11.3 (i)(a) of the Original Accommodation Agreement, Clause 4 of the Second Amendment Deed and Clause 8.2 of the Third Amendment Deed. The Tribunal therefore finds that the Government is in breach of its obligations under these provisions of the Accommodation Agreement.

**D.    Relief Sought**

189. As set out in Section III.A above, Telemedia has sought relief in the form of declarations, orders and damages. No point of principle arises in respect of the declarations sought by Telemedia and the Tribunal considers Telemedia's claims to damages in the valuation section to follow. However, the Tribunal is concerned as to its power to grant certain of the orders sought by Telemedia to the extent that Telemedia is seeking specific performance against the Government of Belize, and the Tribunal deals with this issue below.

190. In Section 15.5 (iii) of the Accommodation Agreement, the Government consents to *"the giving of any relief"* in the context inter alia of these arbitration proceedings. Therefore, it is open to Telemedia to seek an order for specific

performance on the face of the Agreement alone. Nevertheless, given that this arbitration is taking place in London, the Arbitration Act 1996 (the "1996 Act") applies and the Tribunal's powers should be interpreted in line with its provisions.

191. Section 48 of the 1996 Act[99] deals with the Tribunal's power to order remedies as follows:

> *"48 Remedies*
>
>> *(1) The parties are free to agree on the powers exercisable by the arbitral tribunal as regards remedies.*
>>
>> *(2) Unless otherwise agreed by the parties, the tribunal has the following powers.*
>>
>> *(3) The tribunal may make a declaration as to any matter to be determined in the proceedings.*
>>
>> *(4) The tribunal may order the payment of a sum of money, in any currency.*
>>
>> *(5) The tribunal has the same powers as the court—*
>>
>>> *(a) to order a party to do or refrain from doing anything;*
>>>
>>> *(b) to order specific performance of a contract (other than a contract relating to land);*
>>>
>>> *(c) to order the rectification, setting aside or cancellation of a deed or other document."*

192. As Mr Gearing pointed out, Section 48 affords the parties freedom to agree the Tribunal's powers in respect of remedies. Section 48 also describes certain of the remedies that a Tribunal may award in the absence of any agreement between the parties to the contrary. As regards injunctive relief and orders for specific performance, Section 48(5) stipulates that the Tribunal has the same powers as the English court. Mr Gearing sought to argue that a broad agreement between the parties on remedies of the sort contained in Section 15.5 (iii) of the Original

99    Authority A-43

Accommodation Agreement overrides any limitation on the Tribunal's power to order specific performance under Section 48(5) on account of the words *"Unless otherwise agreed by the parties...."* in Section 48(2). The Tribunal does not accept that submission. The Tribunal interprets the phrase in Section 48(2) as meaning that the Tribunal will have the powers specified in Section 48(3)-(5) unless the parties agree that it should not. The Tribunal therefore finds that the parties cannot agree to extend its power to order specific performance beyond the power exercisable by the English court.

193. The Belize Crown Proceedings Act[100] prohibits orders for specific performance being made against the Crown in civil proceedings and directs that declaratory relief should be ordered instead. Telemedia argues that this provision does not apply to arbitral tribunals as its remit is limited to civil proceedings in the Belize courts and that the Supreme Court of Belize in *Attorney General of Belize v Carlisle Holdings Limited*[101] has curtailed the application of the provision in any event. Taking each argument in turn, the Tribunal finds it hard to accept that an arbitral tribunal sitting in London should have greater latitude than the courts in Belize to order specific performance against the Government of Belize. In addition, the *Carlisle Holdings* case concerned an application to restrain the Government of Belize from dealing with the (BTL) shares in dispute between the parties pending the outcome of LCIA arbitration proceedings in London. Therefore, although Conteh CJ in that case sought to limit the scope of the Belize Crown Proceedings Act, his comments should be read in the context of the interim relief being sought by Carlisle Holdings and his desire to hold the Government of Belize to the terms of the arbitration agreement reached between the parties. The case should not, in the Tribunal's view, be interpreted as undermining the overall thrust of Section 19 of the Belize Crown Proceedings Act that declaratory relief should be ordered against the Crown in preference to specific performance.

100   Authority A-41, Section 19(1)(a)
101   Authority A-44: Claim No 15 of 2005

194. The same approach was endorsed by the Privy Council in *Gairy v Attorney General of Grenada*[102]. That case concerned the constitutional right of the applicant not to have his property compulsorily acquired without compensation and the Privy Council decided that the Constitution of Grenada gave the court *"a broad power to give effective relief for any contravention of protected constitutional rights, where necessary by a new remedy"*. Nevertheless, Lord Bingham drew a distinction between *"coercive"* orders against a government minister in support of constitutional rights and *"mandatory orders to which there attaches a sanction....for non-compliance"*. He continued:

> *"Such orders, regularly made against private individuals, are not made against ministers and public officials. There is no need. Experience shows that if such orders are made there is compliance, at any rate in the absence of most compelling reasons for non-compliance."*

195. In short, Lord Bingham was advocating the use of declaratory relief in place of injunctions and orders of specific performance against government ministers, a point echoed (expressly) by Conteh CJ in the *Carlisle Holdings* case, who concluded that declarations have a similar mandatory effect in any event. The Tribunal therefore holds that it is more appropriate for it to order the declaratory relief sought by Telemedia against the Government of Belize in place of orders for specific performance, which is a discretionary remedy in any event.

## VI. VALUATION

### A. Damages

196. The claims for relief made by Telemedia are set out in Section III.A above.

---

102    Authority A35: [2001] UKPC 30

197. In connection with these requests for relief, Telemedia has submitted in evidence the Witness Statements and testimony from Mr. Boyce and the Expert Reports, as supplemented, of Mr. Macpherson discussed above.

198. Mr. Macpherson also testified as an expert witness before the Tribunal on 18 November 2008 and 14 January 2009. The Tribunal questioned him closely on the evidence relating to damages and found him to be a reliable witness.

199. In his Expert Report, as supplemented, and in his testimony before the Tribunal, Mr. Macpherson provided evidence as to (i) Shortfall Amounts, (ii) the right to set off Business Tax and Loan Note repayments payable by Telemedia against Shortfall Amounts owed to it, (iii) losses arising in respect of the difference in Business Tax levied from 1 April 2008, (iv) sums paid to the Government by way of Business Tax which allegedly should not have been paid, (v) loss of the use of sums paid to the Government by way of import duty, (vi) loss of profits as a result of the Government's alleged failure to ensure that no user or customer of a Class Licence holder is able to make use of VoIP services, (vii) loss of profits as an alleged consequence of Telemedia being unable to exploit the use of the frequencies that the Government allegedly failed to assign to Telemedia and (viii) all costs and expenses arising from legal proceedings.

200. In the Fourth (and final) Addendum to his Expert Report, Mr. Macpherson set out as follows his conclusion in respect of the position as at 27 February 2009.

| Area of Claim | Para | Principal Amount BZ$ | Interest BZ$ | Total BZ$ | Total GB£ |
|---|---|---|---|---|---|
| Shortfall Amounts | 3.2 | 18,703,000 | 4,842,208 | 23,545,208 | 8,439,143 |
| Less: Tax set-off applied | 4.7 | (24,884,456) | (2,569,186) | (27,453,642) | (9,840,015) |
| Less: Loan Note repayment set-off applied | 4.7 | (2,664,443) | (175,966) | (2,840,409) | (1,018,068) |
| Adjustments resulting from the change of Business Tax rate | 5.3 | 9,242,441 | 555,438 | 9,797,879 | 3,511,785 |
| Sums paid to the Government by way of Business Tax which should not have been paid | 6.4 | 15,669,954 | 1,184,173 | 16,854,127 | 6,040,906 |
| Loss of the use of the sums paid to the Government by way of import duty | 7.4 | 866,499 | 46,282 | 912,781 | 327,162 |
| Loss of profits as a result of the Government's failure to ensure that no user or customer of a Class License holder is able to make use of VoIP services | 8.7 | 4,108,395 | 588,291 | 4,696,686 | 1,683,400 |
| Loss of profits as a consequence of Telemedia being unable to exploit the use of the frequencies that the government failed to assign to it | | - | - | - | - |
| Costs and expenses arising from legal proceedings | 10.2 | 1,833,937 | - | 1,833,937 | 657,325 |
| **Total loss** | | **22,875,327** | **4,471,240** | **27,346,567** | **9,801,637** |

201. The Tribunal also questioned Mr. Macpherson closely as to whether any double-counting may have occurred in his calculations. The Tribunal is satisfied that no double-counting has occurred.

202. All computations the Tribunal will refer to in the remainder of this Award will be based upon the final figures Mr. Macpherson presented as at 27 February 2009.

203. In assessing damages, the Tribunal has generally employed the standard of *"the balance of probabilities"* in weighing the evidence presented. The Tribunal understood, however, that a different standard might apply to questions of proof of lost profits. The Tribunal sought information from the Claimant regarding the proper standard for proof of lost profits under Belize law.

204. Telemedia noted that, by virtue of the LCIA Rules Article 22.1(f), the Tribunal is not constrained to apply strict rules of evidence to proof of lost profits.

> *"Article 22*
>
> *Additional Powers of the Tribunal*
>
> *22.1 Unless the parties at any time agree otherwise in writing, the Tribunal shall have the power, on the application of any party or of its own motion, but in either case only after giving the parties a reasonable opportunity to state their views:*
>
> *\*\*\*\**
>
> *(f)      to decide whether or not to apply any strict rules of evidence (or any other rules) as to the admissibility, relevance or weight of any material tendered by a party on any matter of fact or expert opinion; and to determine the time, manner and form in which such material should be exchanged between the parties and presented to the Tribunal;"*

205. The Tribunal considers, that the question before it is the standard for the burden of proof for the existence of lost profits, not the admissibility, relevance or weight of the evidence to which that burden will apply. In that regard, Telemedia asserts that the proper standard of proof is *"the balance of the probabilities[103]"*.

206. The Tribunal questioned counsel at the oral hearings about whether English law, and, therefore, Belize law, imposed a higher burden of proof ("reasonable certainty") for lost profits in respect of damages than for breach of contract damages generally[104].

207. In response, counsel noted that English law traditionally draws a distinction between remoteness and heads of damages, as substantive law, and the measure or quantification of damages, which are procedural questions[105].

---

103     Authority A-52: Redfern & Hunter, *Law and Practice of International Commercial Arbitration*, (4th Ed.) at paragraph 6-67

104     Transcript 15 January 2009, pp. 133 to 140

105     Authority A-53: *See* Dicey, Morris and Collins on The Conflict of Laws, Vol. 1, para. 7-035 et seq. (14th ed. 2006) referring to *Boys v. Chaplin*, [1971] A.C. 356, 379.

208. *"Heads of damages"* includes the question as to what items of loss may be recovered. English substantive law would call for proof of *"heads of damages"* with as much certainty and particularity *"... as is reasonable, having regard to the circumstances and to the nature of the acts themselves by which the damage is done[106]."*

209. Quantification, on the other hand, as a procedural issue, would fall within the authority of the Tribunal under the LCIA Rules.

210. As Vaughan Williams, LJ, stated in *Chaplin v. Hicks*[107], *"[the] fact that damages cannot be assessed with certainty does not relieve the wrongdoer of the necessity of paying damages."*

211. If, however, the Tribunal was minded to apply the English (and therefore Belize) substantive legal principle of *"reasonable certainty"* to quantification of lost profits, then the Claimant stressed that the evidence presented by Mr Boyce and Mr Macpherson satisfied that test in any event.

212. In *Biggin & Co. Ltd. v. Permanite Ltd.*[108], Devlin J. said, *"Even if it can be said that the damage must be proved with reasonable certainty, the word 'reasonable' is really the controlling one, and the standard of proof only demands evidence from which the existence of damage can be reasonably inferred and which provides adequate data for calculating its amount."*

213. The Tribunal concludes that, whether or not a *"balance of probabilities"* test or a *"reasonable certainty"* test is applied, Telemedia has demonstrated that it is losing profits as a consequence of the Government's breach of its obligations under the Accommodation Agreement with respect to VoIP. Therefore, the Tribunal is satisfied that Telemedia has established heads of damages with the requisite degree of certainty.

---

[106]  *Ratcliffe v. Evans*, [1892], 2 Q.B. 524 CA, at 533 (Bowen, L.J.). *See, generally,* Authority A-54: McGregor on Damages, para. 8-001 et seq. (17th ed. 2003).
[107]  [1911] 2 K.B. 786
[108]  [1951] 2 KB 314

214. Moreover, Telemedia cannot be held to an unusually high standard of proof for quantification. It is the Government's conduct in breach of its freely-accepted contractual obligations, not Telemedia's conduct, that makes it difficult to calculate these lost profits with precision. It would be inequitable to hold Telemedia, the non-breaching party, responsible for the consequences created by the Government's breach.

*Shortfall Amounts*

215. Telemedia seeks damages for breach of contract for the 2006 and 2007 Shortfall Amounts, together with contractual interest thereon.

*2006 Shortfall Amount*

216. As explained in Mr. Boyce's Witness Statements and in Mr. Macpherson's Expert Report (as supplemented), the Government guaranteed under Section 11.4 of the Accommodation Agreement a MROR on capital invested in BTL of 15%. If the AROR was less than the 15% MROR, the Original Accommodation Agreement required the Government to make up the shortfall through the payment of Shortfall Amounts. The formula set out in Schedule 2 to the Original Accommodation Agreement is principally as follows:

$$\text{AROR (\%)} = \frac{\text{Earnings after tax and interest received (but before deducting interest paid)}}{\text{Total shareholders' equity + long term debt}}$$

217. Based on BTL's audited consolidated financial statements, for the fiscal year ended 31 March 2006[109], Mr. Macpherson calculated that the AROR for 2006 was 12.3%, resulting in a 2006 Shortfall Amount of BZ $7,075,000. PKF Accountants

---

[109]   Exhibit C-42

and Business Advisers audited those statements. That amount was confirmed by the Government in Clause 2.1 of the Second Amendment Deed.

218. Section 11.4 of the Accommodation Agreement defines the *"Deadline Date"* for payment in full of the Shortfall Amount as *"no later than 3 months following the Delivery Date [the date of submission of that year's calculation by means of a Capital Rate of Return Statement]."* For 2006, the Delivery Date was 18 September 2006. The Deadline Date for full payment of the 2006 Shortfall Amount was thus 18 December 2006.

219. Section 11.4 further provides that interest will accrue on the unpaid portion of any Shortfall Amount at the base rate quoted by The Belize Bank Limited plus 1½ % per annum.

220. The base rate of The Belize Bank Limited has remained unchanged at 14½% per annum from the 2006 Deadline Date (18 December 2006) to the date of this Award. Accordingly, the interest rate set by Section 11.4 is 16% per annum simple interest. According to Mr. Macpherson's calculations, accrued and unpaid interest on the 2006 Shortfall Amount from 18 December 2006 until 27 February 2009 was BZ$2,487,299.

221. Excluding any set-off for Business Tax and for amounts due under the Loan Note, which are discussed below, the total owing by the Government on account of the 2006 Shortfall Amount plus interest to 27 February 2009 was, according to Mr. Macpherson, BZ $9,562,299.

222. The Government has not paid any portion of the 2006 Shortfall Amount or interest thereon.

223. Subject to the set-offs for Business Tax and amounts due under the Loan Note the Tribunal is satisfied that Telemedia has shown damages for failure by the Government to pay the 2006 Shortfall Amount in the amount of BZ $9,562,299,

comprising a Shortfall Amount of BZ $7,075,000 plus interest to 27 February 2009 of BZ $2,487,299.

*2007 Shortfall Amount*

224. Mr. Macpherson again calculated the Shortfall Amount for 2007 based upon BTL's audited consolidated financial statements. PKF Accountants and Business Advisers again served as auditors for those financial statements[110]. The 2007 fiscal year ended on 31 March 2007. The AROR for 2007 was 11.2%, resulting in a Shortfall Amount from the 15% MROR of BZ $11,628,000. BTL submitted its Capital Rate of Return Statement on 23 August 2007, and thus the Deadline Date for payment by the Government of the 2007 Shortfall Amount was 23 November 2007.

225. Based on Section 11.4 of the Accommodation Agreement, Mr. Macpherson calculated 16% per annum simple interest on the unpaid 2007 Shortfall Amount, again to 27 February 2009, at BZ $2,354,909.

226. Excluding any set-off for Business Tax and for amounts due under the Loan Note, which are discussed below, the total owing by the Government on account of the 2007 Shortfall Amount plus interest to 27 February 2009 was thus BZ $13,982,909, according to Mr. Macpherson.

227. The Government has not paid any portion of the 2007 Shortfall Amount or interest thereon. Subject to the set-offs for Business Tax and amounts due under the Loan Note the Tribunal is satisfied Telemedia has shown damages for failure by the Government to pay the 2007 Shortfall Amount under the Accommodation Agreement in the amount of BZ $13,982,909, comprising a Shortfall Amount of BZ $11,628,000 plus interest to 27 February 2009 of BZ $2,354,909.

---

[110] Exhibit C-43

228.    Telemedia calculated the Shortfall Amount for 2008, based upon Telemedia's consolidated financial statements, again audited by PKF Accountants and Business Advisers. Telemedia, as noted above, succeeded to BTL's position under the Accommodation Agreement on 29 May 2007. Telemedia's 2008 fiscal year ended 31 March 2008.

229.    By letter dated 30 September 2008[111], Telemedia advised the Government that it was not claiming a Shortfall Amount for 2008, subject to a reservation *"to the extent that any retrospective charges are levied in connection with matters relating to the financial year ended 31 March 2008, thereby subsequently necessitating a claim for a Shortfall Amount in respect of that period."*

230.    Telemedia has not sought recovery of a 2008 Shortfall Amount in these proceedings.

*Shortfall Amount Conclusion*

231.    Therefore, subject to Business Tax and Loan Note set-offs applied to these Shortfall Amounts, Telemedia is entitled to an aggregate Shortfall Amount of BZ $18,703,000 plus interest as at February 27, 2009 of BZ $4,842,208 totalling BZ $23,545,208.

*Set-Off of Business Tax and Loan Note Repayments*

232.    Mr. Macpherson then turned in his Expert Report to Clause 2.2 of the Second Amendment Deed. That clause provides *"in the event that payment of the Shortfall Amount has not been made in accordance with the Original [Accommodation] Agreement then such unpaid amount may be set off by BTL against the amount of any taxes or any other payments or obligations due and payable by BTL to the Government."*

---

[111]    Exhibit C-112

233. As explained previously, Telemedia succeeded to the rights and obligations of BTL under the Accommodation Agreement by operation of the Vesting Act and the Third Amendment Deed.

234. The Third Amendment Deed specifically referenced set-off of a BZ $4,000,000 tax liability against unpaid Shortfall Amounts, calculated from a final tax assessment for the period ended 31 March 2005.

235. In Clause 2.5 of the Third Amendment Deed, the parties specified a "Balance Amount" of BZ $14,703,000, representing the unpaid 2006 and 2007 Shortfall Amounts after giving effect to the set-off of that BZ $4,000,000 tax liability.

236. Therefore, the sum of BZ$4,731,178, comprising the BZ$4,000,000 tax set-off from the Third Amendment Deed plus interest accruing thereon to cancel out the comparable interest accruing on the Shortfall Amounts, must be deducted from the Shortfall Amounts in calculating the sum due to Telemedia under this Final Award.

*The Loan Note*

237. As discussed above, the Government transferred to BTL a number of properties pursuant to Schedule 1 of the Original Accommodation Agreement. One of those properties (the San Ignacio property) became the object of a substitution contemplated in the First Amendment Deed. BTL paid for those properties by means of a Loan Note of BZ $19,200,000, as provided for in Section 5.4 of the Original Accommodation Agreement.

238. As noted previously, the Tribunal has found that Telemedia is entitled to set off sums due under the Loan Note against Business Tax owed by Telemedia.

239. For the purposes of his Expert Report as supplemented, Mr. Macpherson has calculated set-off sums on the basis of Telemedia's position before this Tribunal.

240. The Loan Note provides for principal to be paid in 28 quarterly instalments from 30 June 2006 to 31 March 2013, plus interest at 6.188% per annum. Telemedia sought to exercise set-off rights for quarterly payments due on 30 June 2008, 30 September 2008 and 30 December 2008.

241. Mr. Macpherson calculated the value of Loan Note payments against which Telemedia has, as at 27 February 2009, sought to exercise a set-off as follows.

| Quarter ended | Outstanding Principal | Repayment | | |
|---|---|---|---|---|
| | Amount BZ$ | Principal BZ$ | Interest BZ$ | Total BZ$ |
| 30 June 2008 | 13,714,288 | 685,714 | 211,579 | 897,293 |
| 30 September 2008 | 13,028,574 | 685,714 | 203,209 | 888,923 |
| 31 December 2008 | 12,342,860 | 685,714 | 192,513 | 878,227 |
| | | **2,057,142** | **607,301** | **2,664,443** |

242. The Tribunal has concluded that Telemedia is entitled to set off unpaid Shortfall Amounts and unpaid interest thereon under the Accommodation Agreement against Business Tax and Loan Note Repayments provided that such set-off rights are not exercised in a manner to produce double recovery on account of unpaid Shortfall Amounts and interest accruing thereon through enforcement of this Award and the set-off of sums for which compensation is also hereby awarded. The Tribunal is also satisfied that the set-off rights on account of Business Tax extend to Telemedia's consolidated subsidiaries, including BESL and Digicell.

243. Telemedia seeks to set off the sum of BZ $2,664,443, comprising the three principal instalments due under the Loan Note referred to above plus interest of BZ $607,301 accrued thereon under the Loan Note, against unpaid Shortfall Amounts. Therefore, in light of the Tribunal's conclusion that Telemedia is entitled to effect that set-off, the specified sum, plus interest accruing thereon to cancel out the comparable interest accruing on the Shortfall Amounts, must be deducted from the Shortfall Amounts in calculating the sum due to Telemedia under their Final Award.

*Net Shortfall Amounts owing to Telemedia*

244. In view of the foregoing, the Tribunal holds that a net Shortfall Amount of BZ $15,973,621, including interest and after giving effect to set-offs for Business Tax and Loan Note payments, is due to Telemedia pursuant to the Accommodation Agreement. That sum is calculated on the following basis:

|  | Principal Amount | Interest | Total | Total |
|---|---|---|---|---|
|  | BZ$ | BZ$ | BZ$ | GB£ |
| Shortfall Amounts | 18,703,000 | 4,842,208 | 23,545,208 | 8,439,143 |
| Less: Tax set-off specifically referred to in the Third Amendment Deed | (4,000,000) | (731,178) | (4,731,178) | (1,695,763) |
| Less: Loan Note repayment set-off | (2,664,443) | (175,966) | (2,840,409) | (1,018,068) |
|  |  |  |  |  |
| **Total** | **12,038,557** | **3,935,064** | **15,973,621** | **5,725,312** |

*Right to Future Business Tax Set-offs*

245. Clause 2.5 of the Third Amendment Deed provides as well that *"Telemedia shall be entitled with effect from 1 February 2008, and at its sole discretion, to set off the Balance Amount against monthly-based tax liabilities including, but not limited to, Business Tax as they fall due and owing until the Balance Amount has been extinguished."*

246. In light of these provisions, Mr. Macpherson calculated in his Expert Report, as supplemented to 27 February 2009, the balance of unpaid Shortfall Amounts if the monthly Business Tax were set off against the Balance Amount (i.e., the 2006 and 2007 Shortfall Amounts). His calculations excluded any reduction in the rate of Business Tax by operation of Clause 11.3(i)(f) of the Original Accommodation Agreement as amended by Clause 3.5 of the Second Amendment Deed, which he dealt with separately (and which the Tribunal discusses below).

247.  In Belize, a Business Tax Return must be submitted by the 15th day of each month (or, if not a business day, the next succeeding day that is a business day). The Return covers the previous calendar month and sets out the Business Tax due for that month based on a percentage of the taxpayer's revenue. The calculated Business Tax is due and payable on the same day the Business Tax Return is required to be submitted[112].

248.  Between 1 February 2008 and 27 February 2009, Telemedia and its subsidiaries submitted thirteen monthly Business Tax Returns. In each of those Returns, Telemedia has sought to exercise its set-off rights under the Second and Third Amendment Deeds against unpaid Shortfall Amounts.

249.  The Government has, however, rejected any application of Telemedia's set-offs. Telemedia has therefore paid the Business Tax subject to protest on the basis of its set-off claim. Telemedia does not seek double recovery for full Shortfall Amounts plus set-offs. Instead, Telemedia seeks damages based on the Shortfall Amounts and a declaration that its set-off rights are properly exercised.

250.  Mr. Macpherson calculated the following Business Tax sums and due dates, in each case after cross-checking amounts in each of the thirteen Business Tax Returns[113] against supporting tax calculation schedules.

---

112    Macpherson, Expert Report para. 4.4
113    Exhibits C-12-14, C-17, C-54, C-63, C-69, C-73, C-122, C-131, C-134, C-230, C-233. These returns are appended to Mr MacPherson's Expert Report and supplements thereto

| Date | Calendar Month | Telemedia | BESL | Digicell | Total |
|------|---------------|-----------|------|----------|-------|
| | | BZ$ | BZ$ | BZ$ | BZ$ |
| 15/02/2008 | January 2008 | 919,738 | 911,583 | 431,314 | 1,442,635 |
| 17/03/2008 | February 2008 | 1,008,047 | 115,777 | 674,568 | 1,798,392 |
| 15/04/2008 | March 2008 | 994,311 | 93,890 | 601,596 | 1,689,797 |
| 15/05/2008 | April 2008 | 981,499 | 85,768 | 615,280 | 1,682,547 |
| 16/06/2008 | May 2008 | 872,139 | 94,727 | 575,420 | 1,542,286 |
| 15/07/2008 | June 2008 | 923,497 | 92,509 | 597,440 | 1,613,446 |
| 15/08/2008 | July 2008 | 857,700 | 96,269 | 587,153 | 1,541,122 |
| 15/09/2008 | August 2008 | 827,486 | 88,160 | 536,166 | 1,451,812 |
| 15/10/2008 | September 2008 | 826,967 | 93,708 | 527,092 | 1,447,767 |
| 15/11/2008 | October 2008 | 920,099 | 76,351 | 433,501 | 1,429,951 |
| 15/12/2008 | November 2008 | 840,899 | 79,766 | 480,373 | 1,401,048 |
| 15/01/2009 | December 2008 (estimate) | 759,626 | 89,907 | 547,243 | 1,396,776 |
| 15/01/2009 | December 2009 | 820,489 | 100,082 | 547,743 | 1,468,314 |
| 16/02/2009 | January 2009 | 983,266 | 83,328 | 726,657 | 1,793,251 |
| | **Total due** | **11,776,137** | **1,191,928** | **7,334,303** | **20,302,368** |

251.  Mr. Macpherson then adjusted underpayment of Business Tax in the amount of BZ $582,088 for the period 1 April to 31 December 2007, as per a 9 May 2008 letter from Telemedia to the Government[114].

252.  The Tribunal concludes that Telemedia is entitled to a declaration that it and its subsidiaries, Digicell and BESL are entitled pursuant to the Accommodation Agreement to set off Shortfall Amounts and contractual interest accruing thereon as they fall due against Business Tax and/or such other payments or obligations

---

[114]  Exhibit C-55

due and payable by Telemedia to the Government (including sums under the Loan Note).

*Difference in Business Tax Rate*

253. Telemedia further seeks damages in respect of the difference in the Business Tax levied from 1 April 2008 on Telemedia and its consolidated subsidiaries and the Business Tax that would have been due from 1 April 2008 if the Agreed Rate specified in Section 11.3 (i)(f) of the Original Accommodation Agreement, as amended by Clause 3.5 of the Second Amendment Deed, had instead been applied.

254. The effect of this Agreed Rate is to set a ceiling on Telemedia's Business Tax, from and after 1 April 2008, equal to the amount that would be assessed for Income Tax at a 25% rate.

255. The Business Tax in Belize is payable monthly on a company's receipts without deduction. According to Telemedia, the rate applicable to BTL's telecommunications revenues, comprising more than 50% of BTL's total receipts, was 19%. Other revenue streams were taxed at lower rates, including property rental income at 3% and income from the sale of telecommunication equipment at 1.75%.

256. Under Belize tax law, Business Tax is treated as an advance payment of Corporate Income Tax for that year, which is charged at 25% of chargeable profits. Chargeable profits are, of course, calculated as receipts minus expenses, with a variety of adjustments. Business Tax is deducted from the final Corporate Income Tax payable for the applicable year.

257. Historically, the Business Tax amount for BTL and Telemedia has been higher than the Corporate Income Tax. In Section 11.3 (i)(f) of the Accommodation Agreement, BTL sought a reduction in Business Tax so that the Business Tax amount payable would not exceed the Corporate Income Tax amount payable.

258. The Tribunal has held that the ceiling set by Section 11.3 (i)(f) is binding and enforceable in accordance with its terms.

259. Mr. Macpherson reviewed adjusted Business Tax Returns submitted by Telemedia and its subsidiaries for the ten months following the effective date of 1 April 2008 established by Section 11.3 (i)(f). His adjustments seek to implement the Agreed Rate by reducing the amount of Business Tax payable to be equivalent to 25% of the chargeable profits of Telemedia and its subsidiaries in the respective months.

260. Mr. Macpherson then calculated the adjustments resulting from the change in Business Tax at the Agreed Rate, as follows:

| Date | Description | Principal Amount | No of Days | Interest at 16% | Total |
|------|-------------|------------------|------------|-----------------|-------|
|      |             | BZ$              |            | BZ$             | BZ$   |
| 15/05/2008 | April 2008 | 760,904 | 288 | 96,062 | 856,966 |
| 16/06/2008 | May 2008 | 759,357 | 256 | 85,214 | 844,571 |
| 15/07/2008 | June 2008 | 782,409 | 227 | 77,855 | 860,264 |
| 15/08/2008 | July 2008 | 993,746 | 196 | 85,381 | 1,079,127 |
| 15/09/2008 | August 2008 | 891,988 | 165 | 64,516 | 956,504 |
| 15/10/2008 | September 2008 | 888,993 | 135 | 52,609 | 941,602 |
| 17/11/2008 | October 2008 | 804,603 | 102 | 35,976 | 840,579 |
| 15/12/2008 | November 2008 | 966,338 | 74 | 31,346 | 997,684 |
| 15/01/2009 | December 2008 | 1,064,684 | 43 | 20,069 | 1,084,753 |
| 16/02/2009 | January 2009 | 1,329,419 | 11 | 6,410 | 1,335,829 |
| Total tax adjustments | | 9,242,441 | | 555,438 | 9,797,879 |

261. As the Tribunal has already noted, the Government has failed to recognize Telemedia's alleged right to set off Business Tax against unpaid Shortfall Amounts. Accordingly, Telemedia has been required to make Business Tax payments without regard to the asserted set-offs, together with amounts for penalties and interest resulting from late payment.

262. Accordingly Telemedia is entitled pursuant to the Accommodation Agreement to apply the Agreed Rate to its Business Tax liabilities.

263. The Tribunal therefore finds that Telemedia is entitled to damages of BZ $9,797,879, being the difference in Business Tax actually paid by Telemedia to the Government from and after 1 April 2008 and the amount of Business Tax that should have been payable to the Government on account of Business Tax if tax had been charged at the Agreed Rate, plus simple interest on such sums at the rate of 15% per annum discussed below.

264. The Government further assessed penalties and interest for Telemedia's efforts to assert its set-off rights, in the amount of BZ $1,737,777 to 27 February 2009.

265. In addition, Telemedia is entitled to be compensated for the use by the Government of the sums wrongly paid to the Government on account of Business Tax improperly assessed and interest, penalties and fees related thereto. That sum is BZ$1,119,600, calculated on the basis of 15% simple interest from the date of the payment to 27 February 2009, as follows:

| Date | Description of Tax-Related Payment | Principal Amount | No of Days | Interest at 15% |
|------|-----------------------------------|------------------|------------|-----------------|
|      |                                   | BZ$              |            | BZ$             |
| 13/05/2008 | Without prejudice payment on account | 1,500,000 | 290 | 178,767 |
| 04/07/2008 | Payment of first instalment in relation to February and March 2008 tax assessment | 2,360,559 | 238 | 230,882 |
| 09/07/2008 | Payment of second instalment in relation to February and March 2008 tax assessment | 2,303,692 | 233 | 220,586 |
| 05/08/2008 | Payment in relation to May 2008 tax assessment | 2,200,027 | 206 | 186,249 |
| 24/10/2008 | Tax payment in relation to June and July 2008<br><br>Business Tax assessments referred to in my first addendum report | 4,152,107 | 126 | 215,000 |
| 12/11/2008 | Further tax payment in relation to August 2008<br><br>Business Tax assessment | 2,042,059 | 105 | 88,116 |
| **Total Interest** | | | | **1,119,600** |

266.    For the purposes of a reasonable rate of interest, Mr. Macpherson has employed for these and other heads of damages a rate of 15% per annum simple interest. That rate represents in Mr. Macpherson's view compliance with the provision in the Accommodation Agreement guaranteeing that all capital reinvested in Telemedia's business is entitled to a 15% MROR.

267.    Pursuant to Sections 49(3) and (4) of the 1996 Act and Article 26.6 of the LCIA Arbitration Rules, the Tribunal is entitled to set interest at such rate as it considers appropriate. The Tribunal concludes that, in light of the 15% MROR established by the Accommodation Agreement, simple interest of 15% per annum is a

reasonable interest rate in the circumstances. That 15% rate is, of course, lower than the 16% current rate for interest on Shortfall Amounts called for by the Accommodation Agreement.

268. For the avoidance of doubt, the Tribunal notes that awarding damages on account of these breaches of the obligation in the Accommodation Agreement, to permit set-off of Business Tax and other obligations and to charge Business Tax at the Agreed Rate, does not result in double recovery. The amounts awarded by the Tribunal as damages for the Government's failure to pay Shortfall Amounts do not (just like the Government's conduct) take account of Telemedia's asserted Business Tax set-off.

*Overpayment of General Sale Taxes*

269. In addition, Telemedia claimed a General Sales Tax (GST) refund of BZ $1,308,304 on account of April 2008. The Government has asserted that the correct refund amount due is instead BZ $838,326. The Government has further stated that this amount is being offset against Business Tax obligations of Telemedia that the Government considers to still be due, owing and unpaid notwithstanding the terms of the Accommodation Agreement.

270. The Government has asserted an off-set of this refund amount against sums it claims Telemedia owes (which Telemedia denies). Telemedia has therefore been denied the benefit of that refund. Telemedia seeks the benefit of this refund of General Sales Tax plus a reasonable rate of interest on the refund amount (which Telemedia again considers to be 15% simple interest).

271. For purposes of calculating this aspect of Telemedia's damages claim, Mr. Macpherson has without prejudice employed the lower refund amount of BZ $838,326 claimed by the Government, rather than the higher sum of BZ $1,308,304 claimed by Telemedia.

272. On this basis, Mr. Macpherson calculated Telemedia's loss on account of the failure of the Government to refund General Sales Tax to 27 February 2009, including again 15% simple interest per annum, as BZ $1,176,083, as follows:

| Date | Description | Principal Amount | No. of days | Interest at 15% | Total |
|------|-------------|-----------------|-------------|-----------------|-------|
|      |             | BZ$             |             | BZ$             | BZ$   |
| 02/10/2008 | General Sales Tax refund due | 838,326 | 148 | 50,989 | 889,315 |
| 29/10/2008 | Further General Sales Tax refund due | 273,184 | 121 | 13,584 | 286,768 |
|      | Total due | 1,111,510 |  | 64,573 | 1,176,083 |

*Loss of Use of Sums Paid by Way of Import Duty*

273. Telemedia seeks damages for payments the Government has required it to make by way of import duty in order to have its imported goods released, again with 15% simple interest thereon.

274. Section 11.3 (i)(g) of the Accommodation Agreement provides that *"BTL and its subsidiaries shall be exempt from any tax, duty, levy or import upon goods, materials, equipment and machinery of every type or description imported for their own use...,"* with an exclusion for goods imported with a view towards prompt resale in the normal course of business.

275. The Government has, however, failed to grant Telemedia's requests for import duty exemptions on goods since 27 May 2008. Telemedia has, accordingly, made payments under protest in respect of import duty. Those payments total BZ $866,499 to 27 February 2009, as verified by Mr. Macpherson.

276. To that sum, Mr. Macpherson has again applied a 15% interest rate, from the date of protested payment until 27 February 2009 as a measure of the loss of the use of such funds. He therefore calculated an interest sum of BZ $46,282.

277. The resulting total loss calculated by Mr. Macpherson for the sums allegedly improperly paid to the Government by way of import tax, together with interest to 27 February 2009 is BZ $912,781.

278. The Tribunal concludes that Telemedia has demonstrated that it incurred damages on account of the Government's breach of its obligation under the Accommodation Agreement to exempt imports from import duty, including simple interest at 15% per annum to 27 February 2009 of BZ $912,781.

*Loss of Profits from Governments' Failure to Fulfil VoIP Commitments under Accommodation Agreement*

279. VoIP calls are substantially less expensive calls compared to Public Switched Telephone Network (PSTN) calls over a network of the type operated by Telemedia and most major telecommunications carriers. Although VoIP has a lower quality of service than PSTN calls, nevertheless according to Mr. Boyce and Mr. Macpherson the availability of VoIP in contravention of the Government's commitments under the Accommodation Agreement has diverted users from Telemedia to VoIP providers, resulting in lost revenues for Telemedia. Telemedia therefore seeks lost profits damages on account of this breach.

280. As discussed above, the Tribunal has concluded that the Government did in fact breach its obligations with respect to VoIP under the Accommodation Agreement.

281. To determine the impact of VoIP availability on Telemedia, Mr. Macpherson has presented the Tribunal with what he refers to as a "*top down*" analysis of the VoIP lost profits (Method 2) and, by way of a check, with a "*bottom up*" analysis (Method 1) also.

282. The "*top down*" estimate of lost cash flow assumed that subscribers with broadband lines will substitute their PTSN international calls with VoIP calls to a specified extent.

283. The "*bottom up*" assessment compared Telemedia' PSTN international traffic against the trend line growth rate before VoIP traffic was present. Telemedia had noticeable success in blocking VoIP during 2006 and 2007. By reviewing Telemedia's international traffic, adjusted for subscriber growth, Mr. Macpherson estimated a shortfall against trend line growth thereafter in this international traffic. In the absence of other explanations, he attributed that shortfall after 2007 against the trend line to VoIP competition.

284. Mr. Macpherson relied upon the "*top down*" method because, among other matters, (i) it takes account of both inbound and outbound international minutes not accounted for in the "*bottom up*" method and (ii) it can account for traffic utilizing Skype and similar systems. The "*bottom up*" method estimates losses in outgoing international calls only, not any loss in incoming international connections.

285. The "*top down*" method, though, potentially understates lost VoIP profits, as it does not account for multiple VoIP users of a single broadband line – for example, workplace and internet café computers.

286. According to Mr. Boyce and Mr. Macpherson, losses attributable to VoIP competition prior to 1 April 2007 have resulted in reductions in AROR for fiscal years ended in 2006 and 2007. Consequently, the Shortfall Amounts for those years, up to the MROR of 15%, will compensate for VoIP-attributable losses with respect to that period.

287. However, Telemedia has not claimed a Shortfall Amount for the fiscal year ended 31 March 2008 or thereafter. In each case, therefore, Mr. Macpherson made his calculations of lost profits for the period from 1 April 2007 to 30 September 2008.

288. He further assumed that losses attributable to improper VoIP competition for each month subsequent to September 2008 would continue to accrue at the same even rate.

289. Both methods estimate only lost international traffic, not any lost domestic traffic. Mr. Macpherson considered lost domestic traffic to be *"small relative to the potential loss of international traffic, due to the low penetration of broadband users in Belize"* and the lower cost of domestic calls over the Telemedia network compared with international calls.

290. In addition, both the *"bottom up"* and the *"top down"* methods measure historical losses up to 27 February 2009 and do not predict future losses after that date.

291. It is plain that neither analysis can claim to provide an exact assessment of the loss suffered and likely to be suffered; no analysis of non-existent profits can do this nor could it be expected to do so.

292. All that can be expected is that damage is proved to have been suffered – which the Tribunal accepts – and that the expert who has attempted to assess the extent of that damage has done so honestly and with the appropriate professional skill and care. The Tribunal is satisfied that Mr. Macpherson has carried out his task in this way and has done his best to assist the Tribunal in assessing the amount of damages to be awarded by way of compensation for the loss which has undoubtedly been suffered by the Claimant.

293. The Tribunal notes that the Government has chosen not to participate in this arbitration. Accordingly, the Tribunal has not been presented with any evidence in rebuttal to Mr Macpherson's evidence.

294. After careful consideration the Tribunal has decided to adopt the *"top down"* approach (Method 2), which is the approach favoured by Mr. Macpherson.

295. For the purposes of the *"top down"* calculation, Mr. Macpherson employed the following assumptions, to calculate the average revenue for each customer making international PSTN calls.

| Broadband customer type | Number of lines (Sept 2008) | Eligible customer For VoIP – overlap Between broadband Customers and those Making int'l calls | Effective VoIP lines (75% of Eligible) | Comment |
|---|---|---|---|---|
| Telemedia DSL lines | 7,601 | 100% | 75% | All DSL customers will have Telemedia fixed line. High cost of Int'l calls and high cost of broadband indicates common customer segment. |
| Fixed-Wireless providers | 4,864 | 50% | 37.5% | Customers do not necessarily have a Telemedia fixed line and have a choice of mobile from Speednet and Telemedia. |
| Others – e.g. CaTV | 3,139 | 50% | 37.5% | |
| Speednet | 1,081 | 50% | 37.5% | Customers do not necessarily have a Telemedia fixed line and are more likely to select Speednet for mobile. |
| Direct Satellite broadband links | 1,000 | 50% | 37.5% | Customers do not necessarily have a Telemedia fixed line and have a choice of mobile from Speednet and Telemedia. |

296. Mr. Macpherson then calculated average revenue per user ("ARPU") for all Telemedia customers making and receiving international calls between August 2006 and March 2007, the period for which Telemedia's VoIP blocking was most effective. He estimated Outgoing International ARPU per customer as BZ $19.31.

297. For Incoming International ARPU, Mr. Macpherson assumed that 50% of incoming international calls to effective VoIP lines are actually terminated on that VoIP service, with the remaining 50% terminating on the regular PSTN service. All incoming international calls are routed onto Telemedia's network, and thus

Telemedia collects termination rates for those connections from other originating international carriers.

298. Mr. Macpherson therefore then divided Telemedia's incoming international revenues, BZ $1,340,000 per month, by the population of telephony subscribers in Belize.

299. On this basis, the lost revenue to Telemedia would be BZ $22.96 per month per customer.

300. Turning to broadband lines, Mr. Macpherson then estimated average broadband lines per customer type, extrapolating growth rates for other carriers using Telemedia growth rates.

| Broadband Customer type | Number of lines (March 2007) | Number of lines (March 2008) | Number of lines (Sept 2008) extrapolatioin | Average March 07 to September 08 |
|---|---|---|---|---|
| Telemedia DSL | 6,484 | 7,534 | 7,601 | 7,043(e) |
| Fixed-Wireless providers | 3,874(e) | 4,500 | 4,864(e) | 4,369(e) |
| Others – e.g. CaTV | 2,722(e) | 3,000 | 3,139(e) | 2,930(e) |
| Speednet | 861(e) | 1,000 | 1,081(e) | 971(e) |
| Direct Satellite Broadband | 1,000(e) | 1,000 | 1,000(e) | 1,000(e) |

301. The lost revenue resulting for VoIP would, under this computation, be the lost revenue for each broadband line.

302. Finally, Mr. Macpherson reduced revenues to reflect international carriers carrying outgoing Telemedia international calls to the end user. Mr. Macpherson calculated the deduction based on an average termination fee of BZ $0.108 for each minute of lost calls.

303. He applied this termination rate to a share of the total outbound international traffic based on the proportionate share of total outbound international revenue attributable to his calculated incremental outbound revenue, resulting in 34,372,331 incremental minutes between April 2007 and September 2008.

304. The Tribunal questioned Mr. Macpherson as to whether any other additional expenses should be deducted in this calculation. Mr. Macpherson testified that, apart from the termination rate payable to the international carrier connecting the call to the end user, there are no other variable (marginal) reductions in costs associated with Telemedia losing an international call to VoIP[115].

305. Mr. Macpherson explained that, because the calculation related to additional minutes for an existing subscriber, "*they already have those subscribers in their network, so the additional costs associated with the subscriber making 110 calls as opposed to 100 calls, for example, there are really only those that can be associated directly with that additional ten calls. The only costs that are directly variable with those continue (sic) calls that I could identify are the costs that are paid to the other operators, overseas operators, for terminating those calls....*"

306. The Tribunal concludes that this explanation is correct. The only expenses that are properly deducted from the additional lost revenues are the expenses that would actually have been incurred to support the additional service, not expenses that would be incurred regardless of new calls. Therefore, it would not be proper to deduct average operating expenses from revenues to arrive at a lost profits amount.

---

[115]    Transcript 19 November 2008, pp. 146 to 149

307.    The results of Mr. Macpherson's "*top down*" calculations are as follows:

| | |
|---|---|
| Average number of broadband lines between March 07 and September 08 | 75% * 7,043<br>37.5% * 4,369<br>37.5% * 2,930<br>37.5% * 971<br>37.5% * 1,000<br>8,757 effective VoIP broadband lines |
| Monthly ARPU for PSTN international calls (inbound and outbound) | Outbound: BZ$19.31<br>Inbound: BZ$3.65<br>**Total: BZ$22.96** |
| PSTN international outbound revenues lost to VoIP between 1 April 07 and 30 September 08 | 18 months * BZ$19.31 * 8,757<br>**BZ$3,043,758** |
| Outpayments for incremental international Outbound PSTN revenues | Termination rate * outgoing international<br>Minutes<br>BZ$0.108 * 3,739.135 minutes<br>**BZ$403,826** |
| Net PSTN international outbound cash flow<br>Lost to VoIP between 1 April 07 and 30 September 08 | BZ$3,043,758 – BZ$403,826<br>**BZ$2,639,931** |
| PSTN international inbound cash flow lost<br>To VoIP between 1 April 07 and 30 September 08 | 18 months * BZ$3.65 * 8,757<br>**BZ$575,335** |
| **CASH FLOW IMPACT OF LOST PSTN REVENUES** | **BZ$3,215,266** |

308.    As that chart shows, lost net cash flow calculated on the basis of the "*top down*" method would be BZ$3,215,266, accruing evenly over the 18-month period from 1 April 2007 to 30 September 2008.

309.    On the basis that losses would continue to accrue after 30 September 2008 at the same even rate, Mr. Macpherson calculated that the losses would be BZ$178,626 for each subsequent month.

310.    To 27 February 2009, therefore, Mr. Macpherson calculated total "*top down*" losses in respect of the impact of VoIP as BZ $4,108,395, plus interest of BZ $588,291 at 15% per annum, for total VoIP-related lost profits of BZ $4,696,686.

311. Mr. Macpherson was asked generally if he was reasonably certain as to the numbers for his methods. He replied, *"I have taken different methods using the best empirical data I could find and tried to get the most reasonable estimates I can using the two methods, so I wouldn't describe that as a certainty. I think just given the informational difficulties with it, I think this is as good an estimate as I could produce[116]."*

312. Accordingly, the Tribunal is also satisfied that Telemedia has demonstrated the amount of lost profits damages with the requisite degree of certainty required by English and Belize law.

313. The Tribunal therefore concludes that Telemedia is entitled to lost profits damages on account of breach by the Government of its VoIP obligations under the Accommodation Agreement in the amount of BZ $4,696,686 including interest at 15% per annum of BZ $588,291, to 27 February 2009.

*Loss of Profits from Being Unable to Exploit Frequencies*

314. Telemedia originally sought damages in its Statement of Case for Telemedia being unable to exploit the use of frequencies the Government had allegedly failed to assign to Telemedia in accordance with the Accommodation Agreement. Under the Accommodation Agreement, the Government was obligated to assign to Telemedia the sole use of the frenquency spectrum 2.496 GhZ to 2.68 GhZ by 28 January 2008.

315. However, Telemedia is no longer pursuing damages for the failure to assign these frequencies to Telemedia by 28 January 2008.

*Damages for Management Time*

316. Telemedia sought in its Statement of Claim damages, losses and expenses attributable to the management time which officers and employees of Telemedia

---

116    Transcript 19 November 2008, p. 165, lines 13 to 19

have incurred in connection with the alleged breaches by the Government of the Accommodation Agreement and these arbitration proceedings.

317. However, Telemedia is no longer pursuing damages for disruption of its business.

## B.   Interest

318. The Tribunal has already addressed the accrual of interest on sums due to Telemedia from the date(s) of breach to 27 February 2009. For the period thereafter until the sums awarded to Telemedia in this Final Award are paid in full, the Tribunal holds that the Government is to pay interest on the unpaid amount of such sum at the rate of 15% or 16%, as the case may be, simple interest per annum as is applied to such sum in this Final Award for the period to 27 February 2009.

## VII.  COSTS

319. Telemedia has claimed legal costs and expenses on two bases: first, under the indemnity expressed in Section 13.1 of the Original Accommodation Agreement and secondly, as "*the costs of the arbitration*" under the LCIA Rules.[117]

320. The Tribunal will consider each of these bases of claim in turn.

## A.   Costs under the Indemnity

321. The claim for costs under the indemnity is for three sets of costs: first, the costs of proceedings before the English High Court; secondly, the costs of proceedings before the Belize Supreme Court and any subsequent appeal; and thirdly, the costs of the present arbitral proceedings.

322. Under Section 13.1 of the Original Accommodation Agreement, the Government agreed:

---

[117]   Updated Summary of Relief at para. 186.1

> *"to hold BTL ... harmless from and against all judgments, damages, losses, claims, liens, penalties, obligations, liabilities, settlements and expenses, including reasonable attorney's fees, arising out of –*
>
> *(a)  any breach of any contractual provisions or covenant or any inaccurate or erroneous representations of the Government contained herein ...;*
>
> *(b)  any failure of the Government to perform or comply with any provision, obligation or duty contained in this Agreement and required to be performed or complied with by the Government; "*

323.   The Tribunal has concluded that the Government breached a number of its obligations under the Accommodation Agreement, potentially triggering application of the contractual indemnity in Section 13.1 for *"reasonable attorney's fees"*.

324.   However, unlike the English High Court or the Belize Supreme Court, before whom the Claimant appeared, this Tribunal is not well placed to determine whether the attorney's fees incurred by Telemedia in the judicial proceedings were reasonable in all the circumstances.

325.   Under English law it is clear that a court has discretion in awarding costs, notwithstanding the terms of a contractual indemnity.

326.   Civil Procedure Rules Part 44.3 provides in the relevant part:

> *"44.3*
>
> *(1)  The court has discretion as to –*
>
> *(a)  whether costs are payable by one party to another;*
>
> *(b)  the amount of those costs; and*
>
> *(c)  when they are to be paid.*
>
> *(2)  If the court decides to make an order about costs –*

> (a)　the general rule is that the unsuccessful party
> will be ordered to pay the costs of the
> successful party; but
>
> (b)　the court may make a different order.
>
> ...
>
> (4)　In deciding what order (if any) to make about costs,
> the court must have regard to all the circumstances,
> including –
>
> (a)　the conduct of all the parties;
>
> (b)　whether a party has succeeded on part of his
> case, even if he has not been wholly
> successful; and
>
> (c)　any payment into court or admissible offer to
> settle made by a party which is drawn to the
> court's attention, and which is not an offer to
> which costs consequences under Part 36
> apply.
>
> (5)　The conduct of the parties includes –
>
> (a)　conduct before, as well as during, the
> proceedings and in particular the extent to
> which the parties followed any relevant pre-
> action protocol;
>
> (b)　whether it was reasonable for a party to raise,
> pursue or contest a particular allegation or
> issue;
>
> (c)　the manner in which a party has pursued or
> defended his case or a particular allegation or
> issue; and
>
> (d)　whether a claimant who has succeeded in his
> claim, in whole or in part, exaggerated his
> claim. "

327.　It is clear from this that decisions about costs in judicial proceedings do not
involve only the exercise of the court's discretion; they also require the court to
review the particular circumstances of the judicial proceedings and the conduct of

the parties in those proceedings. This is not something this Tribunal can do, since it has no direct knowledge or experience of those proceedings.

328. Consequently, the Tribunal considers that requests for reimbursement of the claim before the English High Court, the claim before the Belize Supreme Court and any subsequent appeal and appearances, correspondence, objections and appeals in connection with Business Tax assessments are more properly addressed to the courts or other tribunals supervising those proceedings.

329. The Tribunal therefore declines to assess the reasonableness or otherwise of the legal costs incurred by the Claimant in those proceedings and makes no order in respect of them.

## B. Costs of the Arbitration

330. By way of an alternative to the claim made under the indemnity, the Claimant seeks the *"costs of the arbitration in the sum of BZ$ 3,244,383.82 (including interest ...* [118]*"*.

### *The Claimant's Submissions*

331. In its "Schedule of Costs in the Arbitration to 27 February 2009" ("the Costs Schedule"), the Claimant submits that it is entitled to recover the costs incurred in this arbitration, under the LCIA Rules and under Section 61(1) of the English Arbitration Act, 1996. The Claimant states, in material part[119]:

> *"The costs incurred by Telemedia in relation to these proceedings are a foreseeable consequence of the Government's unlawful action. The Accommodation Agreement as amended operated between the parties for around two and a half years prior to a change in Government administration in February 2008. The new administration has made it clear that it does not intend to*

---

118    Ibid.
119    See the Costs Schedule, at paras. 3.2 *et seq*.

*comply with the Accommodation Agreement as amended. On a Belizean radio station in April 2008 the Prime Minister said of the agreement "I don't care, I am not going to abide by such agreement".* [120]

*Prior to commencing these arbitration proceedings, Telemedia sought a resolution of this issues in the dispute with the Government. On 25 April 2008 Allen & Overy LLP wrote to the Government outlining the breaches of the Accommodation Agreement as amended seeking the remedy of those breaches. No response was received to that letter.*

*The Government then expended great efforts to circumvent the terms of the Accommodation Agreement as amended; namely breaching the terms of an English Court Injunction, issuing an arrest warrant for the Chairman of the Chief Executive of Telemedia and passing legislation in order to collect business tax from Telemedia when such tax had already been satisfied by way of Telemedia's contractual right of set-off.*

*Telemedia had no option in the circumstances but to commence these proceedings in order to preserve its contractual rights. These proceedings and the costs in relation thereto were a foreseeable consequence of the Government's conduct, and efforts on the part of the Claimant to seek resolution of the dispute without recourse to arbitration were unsuccessful. The Claimant submits that an award of costs in relation to its legal costs and the costs of the arbitration are necessary and appropriate to make Telemedia whole.*

*The Government has also failed to participate in these proceedings and narrow the issues in dispute, despite having numerous opportunities to do so. Additional costs have also been incurred by the Claimant in trying to anticipate and present to the Tribunal arguments which the Government of Belize might have made had they participated in the proceedings. As noted by Mr. Redfern on the second day of the hearing held on 14 and 15 January 2009 "it has not been easy absent the Government and you [counsel for the Claimant's] have tried very hard indeed to anticipate what the Government might have said if they had been here to*

---

[120]     See First Witness Statement of Dean Boyce, paragraph 7.5

-101-

*deal with it[121]". For this reason the legal costs incurred by
Telemedia are also proportionate and reasonably incurred.*

*Finally the Arbitral Tribunal has the power to award simple
or compound interest on sums owing both pre- and post-
Award pursuant to Section 49 of the Arbitration Act 1996
and/or Article 26.6 of the LCIA Rules. It is submitted that an
award of compound interest is more appropriate in the
circumstances and will more accurately reflect the loss
caused to Telemedia by not having had the funds paid in
costs at its disposal. An award of compound interest more
accurately reflects the loss caused to Telemedia.[122]*

*At Annex 3 Telemedia has calculated interest at 8%
compounded monthly from the date that it paid its legal costs
and the date on which it paid deposits to the LCIA in relation
to the arbitration costs. The rate of interest is within the
discretion of the Arbitral Tribunal. 8% is the rate applied to
judgment debts in the High Court of England and Wales
pursuant to section 17(1) of the Judgments Act, 1838 and
the Judgment Debts (Rate of Interest) Order 1993 (CI
1993/564).*

*For the avoidance of doubt, post award interest is also
claimed up until the date on which the Award is complied
with in respect of the total sums awarded thereunder."*

### Discussion

332. This arbitration is being conducted under the LCIA Rules of Arbitration. These
Rules contain the following provisions in respect of Costs:

*"Article 28 – Arbitration and Legal Costs*

28.1 *The costs of the arbitration (other than the legal or
other costs incurred by the parties themselves) shall
be determined by the LCIA Court in accordance with
the Schedule of Costs. The parties shall be jointly and
severally liable to the Arbitral Tribunal and the LCIA
for such arbitration costs.*

28.2 *The Arbitral Tribunal shall specify in the award the
total amount of the costs of the arbitration as
determined by the LCIA Court. Unless the parties*

---

121 Transcript 15 January 2009, p. 156, lines 14 to 22
122 *Sempra Metals Ltd v. Inland Revenue Commissioners* [2007] UKHL 34

> *agree otherwise in writing, the Arbitral Tribunal shall determine the proportions in which the parties shall bear all or part of such arbitration costs. If the Arbitral Tribunal has determined that all or any part of the arbitration costs shall be borne by a party other than a party which has already paid them to the LCIA, the latter party shall have the right to recover the appropriate amount from the former party.*
>
> *28.3 The Arbitral Tribunal shall also have the power to order in its award that all or part of the legal or other costs incurred by a party be paid by another party, unless the parties agree otherwise in writing. The Arbitral Tribunal shall determine and fix the amount of each item comprising such costs on such reasonable basis as it thinks fit.*
>
> *28.4 Unless the parties otherwise agree in writing, the Arbitral Tribunal shall make its orders on both arbitration and legal costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration, except where it appears to the Arbitral Tribunal than in the particular circumstances this general approach is inappropriate. Any order for costs shall be made with reasons in the award containing such order. "*

333.   The LCIA Rules distinguish between (i) the fees and expenses of the arbitrators and of the LCIA itself (which are called "*the costs of the arbitration*") and (ii) "*the legal or other costs*" incurred by the parties.

334.   The "*costs of the arbitration*" are determined by the LCIA Court in accordance with its published Schedule of Costs. In this arbitration, the LCIA Court has fixed the total costs of the arbitration, pursuant to Article 28.1 of the LCIA Rules to be as follows:

| | |
|---|---|
| Registration fee: | £1,500.00 |
| Administrative charges: | £11,414.61 |
| Tribunal's fees and expenses: | £144,994.93 |
| **Total costs of the arbitration:** | **£157,909.54** |

335. The "*legal and other costs*" of the Claimant (hereinafter "the legal costs") are considerable, as might be expected of such a complex dispute, with problems of constitutional law, arbitrability, enforceability and other matters to be considered, as well as issues of proof and of valuation. The legal costs, which include the fees and expenses of PriceWaterhouseCoopers LLP for forensic accounting services, amount to BZ $ 2,785,937.99[123].

336. The justification for these costs has been given by the Claimant's lawyers in Annex 1 to their Costs Schedule. This gives a comprehensive description both of the work done and of the time spent by the legal and accountancy teams respectively.

### Decision

337. In view of the importance and complexity of the issues involved in these proceedings, to which the Tribunal has already referred, the Tribunal has decided to award the Claimant the whole of the legal costs claimed, in the sum of BZ $2,785,937.99.

338. The Tribunal has decided, however, that it would not be appropriate to award interest on these costs up to the date of this Award, as claimed by the Claimant. It is true, of course, that legal costs accumulate as an arbitration progresses; but the costs do not become due and payable by the adverse party until the arbitral tribunal so decides. In the present arbitration, the Tribunal's decision on costs forms part of this Award. In the Tribunal's judgment, it would be right that interest on the legal costs should only run from the date of the Award, when they will bear simple interest at the rate of 8% per annum until payment.

339. So far as the costs of the arbitration are concerned, these (as already stated) have been fixed by the LCIA Court in the sum of £157,909.54. The LCIA Court has

---

[123]  Costs Schedule at page 5

accounted for these costs in pounds sterling and so the Tribunal's award in this respect is in pounds sterling.

340. The Claimant also paid for room hire and transcription services for the Hearings on 19 December 2008 and 14/15 January 2009 and these costs, again in sterling, which amount to £4,949.90[124], are added to the costs of the arbitration, making a total of £162,859.44. Once again, interest on this sum will only run from the date of this Award, when it will bear simple interest at the rate of 8% per annum until payment.

## VIII. THE TRIBUNAL'S AWARD

341. For the reasons already set out in this Award, the Tribunal is not prepared to issue Orders for Injunctive Relief against the Respondent Government. However, the Tribunal now HEREBY GRANTS the following Declaratory Relief to the Claimant:

    (1)    The Accommodation Agreement is binding on the Government and accordingly:

        (i)    The Assessment Notices, any Magistrate Court proceedings for the enforcement of the May judgment summonses and any further judgment summons should not have been issued.

    (2)    Telemedia is entitled to set off payments due under the Loan Note against amounts due in Business Tax;

    (3)    Telemedia and its subsidiaries, BTL Digicell Limited and Business Enterprises Systems Limited, are entitled pursuant to the terms of the Accommodation Agreement to elect to set off the Shortfall Amounts and the contractual interest accruing thereon as they fall due against Business

---

[124]     Costs Schedule, Annex 2

Tax and/or such other payments or obligations due and payable by Telemedia to the Government;

(4)     Telemedia is entitled to apply the Agreed Rate to its Business Tax liabilities pursuant to the terms of the Accommodation Agreement;

(5)     Telemedia is entitled to an exemption from import duty on the terms set out at Section 11.3 (1)(g) of the Original Accommodation Agreement;

(6)     Telemedia is entitled, pursuant to the terms of the Accommodation Agreement, to the use of the frequencies 2.496 Ghz to 2.69 Ghz inclusive;

(7)     The Government has agreed to procure the following in respect of VOIP services:

    (i)     that no person including any holder of a Class Licence other than the current Individual Licence Holders, Telemedia and SpeedNet, has been or will be granted any authority, permit or licence in Belize to legally carry on, conduct, or provide telecommunications services in Belize involving or allowing the provision of or transport of VOIP services;

    (ii)    that no user or customer of a holder of a Class Licence is able to make use of VOIP services;

    (iii)   that a user or customer of an Individual Licence Holder is only able to make use of VOIP services with the written permission of the relevant Individual Licence Holder; and

    (iv)    that the CANTO guidelines are implemented in Belize.

(8)    Telemedia is entitled to implement the tariff changes detailed in Telemedia's communication to the Public Utilities Commission dated 10 August 2007, a copy of which is annexed to the Third Amendment Deed.

342.    The Tribunal also HEREBY ORDERS the Government to pay Telemedia damages as follows:

(1)    BZ $15,973,621 as the amount of the outstanding net Shortfall Amount due to Telemedia including interest at 16% per annum to 27 February 2009 and after giving effect to set-offs for Business Tax and Loan Note payments;

(2)    BZ $9,797,879 in respect of the Government's failure to apply the Agreed Rate of Business Tax including interest at 15% per annum to 27 February 2009;

(3)    BZ $1,738,777 as compensation for penalties and interest wrongly applied by the Government to 27 February 2009 following Telemedia's efforts to assert its set-off rights;

(4)    BZ $1,119,600 as compensation for loss of the use by Telemedia of the sums wrongly paid to the Government on account of Business tax, improperly assessed and interest, penalties and fees related thereto including interest at 15% per annum to 27 February 2009;

(5)    BZ $1,176,083 in respect of the Government's failure to refund General Sales Tax including interest at 15% per annum to 27 February 2009;

(6)    BZ $912,781 as compensation for sums wrongly paid to the Government by way of import duty including interest at 15% per annum to 27 February 2009;

(7)    BZ $4,696,686 as compensation for lost profits caused by the Government's breach of its VoIP obligations including interest at 15% per annum to 27 February 2009; and

(8)    Simple interest on each of the above amounts from 27 February 2009 until payment in full, at the rate applied to such amount up to 27 February 2009.

343.    The Tribunal also HEREBY ORDERS the Government to pay the following sums to Telemedia:

(1)    BZ $2,785,937.99 in respect of Telemedia's legal costs with simple interest on such amount accruing at the rate of 8% from the date of this Award until payment; and

(2)    £157,909.54 in respect of the costs of the arbitration plus £4,949.90 of additional hearing expenses, with simple interest on the total amount of £162,859.44 accruing at the rate of 8% from the date of this Award until payment.

344.    All other claims are dismissed.

**Signed**


P. Hodges　　　　　　MK

Ms Paula Hodges　　　　　　　　　Mr Mark Kantor


Alan Redfern

Mr Alan Redfern
(Chairman)


London, England the place of Arbitration, this .18th. day of ......March...... 2009.

# Courtenay Declaration Exhibit C



*Government of Belize*

| Home | About Belize | The Prime Minister of Belize | Office of Governance | Press Office |

Friday, April 17, 2009

**:: Press Office**

Press Release Archives | Cabinet Briefings | Audiovisual Library | About the Press Office | Contact Press Office

**PRESS OFFICE**
**GOVERNMENT OF BELIZE**

TEL: 08-2009 2/4        FAX: 08-22671/20093

Ministry of Finance

Expand All | Collapse All

+ Our Governance
+ Resource Centre
Electronic Forms
+ Opportunities
+ Social Services
+ Weather and Travel Tips

## GOB Statement on Ruling by International Arbitration Court On Telemedia Secret Accommodation Agreement

Belmopan - 20 March, 2009

The Government of Belize has learnt, through reports in the local media, that a ruling has been made by a London Arbitration Panel awarding Belize Telemedia Limited $38.5 Million in damages to be paid by the Government for failing to honour the secret Accommodation Agreement signed by former Prime Minister Said Musa.

That Agreement, among other things, prevented the introduction of telecommunications competition in Belize; outlawed voice over Internet Protocol as a way of bringing down rates; and exempted Telemedia from paying taxes under Belize law whenever it claimed not to have made the minimum 15% rate of return that the Accommodation Agreement, without any reference to the PUC as the only legal rate setting authority in the country, gave Telemedia.

The government has not received a copy of the reported ruling, but can state the following:

1. It has been and continues to be government's position that the Accomodation Agreement is illegal and invalid. In that connection government notes that our local courts have already rejected the Agreement to the extent that the Agreement purports to authorize Telemedia not to pay its taxes.

2. The government of Belize will not be bound by any ruling of a foreign arbitral tribunal where that ruling conflicts with a position taken by Belize's superior courts.

3. Any damages award made under the umbrella of the London Court of International Arbitration must be brought to Belize for enforcement by our Supreme Court before it can have any practical effect. Government is completely confident that it can successfully resist any attempt at local enforcement. Indeed, that is one of the reasons government chose not to spend millions of dollars on representation before a foreign tribunal. We will defend the national position on national soil.

Finally, government reiterates its commitment to the continued protection always of the interests of Belize. Arrangements that are immoral, made in secret and that defy our very democracy, will continue to be resisted at all costs.

Back to Press Releases Index

▲ Top

Copyright © 2006 Government of Belize- Powered by Netkom Internet Solutions

# Courtenay Declaration Exhibit D

LOIS YOUNG BARROW   @001

IN THE SUPREME COURT OF BELIZE, A.D. 2009

CLAIM NO. 317 OF 2009

BETWEEN

THE ATTORNEY GENERAL OF BELIZE          CLAIMANT          (APPLICANT)

And

BELIZE TELEMEDIA LIMITED          FIRST  DEFENDANT  )
                                                          )(RESPONDENT
BELIZE SOCIAL DEVELOPMENT LIMITED   SECOND DEFENDANT)

ORDER

Before the Honourable Mr. Justice Samuel Lungole Awich

On Tuesday, the 7th day of April, 2009.

UPON HEARING Counsel for the Claimant (Applicant);

AND UPON READING the affidavit of Gian Ghandi dated the 6th April 2009 filed in support of the application;

. AND UPON THE Claimant (Applicant), through his Counsel, undertaking to pay any damages, which the Defendants (Respondents) may sustain which the Court considers the Claimant should pay,

1



IT IS ORDERED THAT:

1.  The First Defendant, BELIZE TELEMEDIA LIMITED, and the Second Defendant, BELIZE SOCIAL DEVELOPMENT LIMITED [Collectively "the Respondents"], their successors, assigns and subsidiaries, whether by themselves, their officers, servants, affiliates, agents or howsoever, shall be and are hereby restrained until further order from enforcing or causing to be enforced the 'Final Award' issued on the 18th March 2009 by the Arbitration Tribunal constituted by the London Court of International Arbitration (LCIA) to hear claims in Arbitration number 81079 (or 81709) between Belize Telemedia Limited (the First Defendant herein) and the Attorney General of Belize (the Claimant herein), whether in Belize or any other jurisdiction outside Belize, or from commencing or continuing any other legal or arbitral proceedings in any country or jurisdiction whether in or outside of Belize, relating to or arising out of the said Final Award.

2.  The costs of the application be cost in the cause are reserved to hearing on notice on the return date.

3.  The Defendants (Respondents), shall have liberty to apply on at least 7 days' written notice to the Claimant's attorneys for a variation or discharge of this Order.

4.  Further affidavit regarding receipt of Final Award today, may be filed.

5.  This Order is returnable on Tuesday 5th May 2009 for inter partes hearing.

Dated the ___8___ day of _____, 2009

BY ORDER

REGISTRAR

# Courtenay Declaration Exhibit E

IN THE SUPREME COURT OF BELIZE A.D.2009

CLAIM NO: 317 OF 2009

BETWEEN:    THE ATTORNEY GENERAL    CLAIMANT-
                OF BELIZE                     APPLICANT

                AND

                1.BELIZE TELEMEDIA LTD    1ST DEFENDANT-
                                                     RESPONDENT
                2.BELIZE SOCIAL DEVELOPMENT   2ND DEFENDANT-
                LTD.                             RESPONDENT

Mr. Michael Young S. C. for the claimant-applicant, Attorney General.
Mr. Nigel Plemming Q.C. and
Mr. Aamon Courtenay S.C., for the first defendant-respondent.
No appearance by the second defendant-respondent.

17.7.2009             D E C I S I O N

1.    Notes:    *Interim restraining order in a claim challenging enforcement of a foreign arbitration award – Arbitration Act Cap 125, ss:13, 19, 20, 28 and 30; whether the claim in domestic court disclosed serious questions of illegality on the grounds that the three agreements were contrary to the Constitution and other statutory laws, and to public policy so that it cannot be enforced in Belize. Procedure; discharge of an order made without notice; requirement that applicant must reapply in writing for an order continuing the interim restraining order made ex parte. R. 17.3, 17.4 (4) and 17.4(7).*

1

2.  On 7.4.2009, this court made an interim restraining order on the application of the Attorney General, the claimant-applicant.  The application was made without notice to the defendants-respondents, Belize Telemedia Limited and Belize Social Development Limited. The order restrained the respondents until further order, from: "enforcing or causing to be enforced the final award issued on the 18th March 2009, by the London Court of International Arbitration Tribunal (LCIA)…", in Arbitration Award No. 21079 (or 81709). It further, restrained the respondents from causing the LCIA to further hear any related arbitration claims; and from, "commencing or continuing any other legal or arbitral proceedings relating to or arising out of the award made by LCIA."

3.  The award made by the LCIA made several declarations in favour of BTL, against the Government of Belize, regarding a certain "accommodation agreement," dated 19.9.2005, and three amended agreements dated, 21.11.2005, 15.12.2006 and 7.12.2008.  In addition the LCIA ordered the Government to pay to BTL, damages in the sum of $35,415,427 and costs in the sum of $2,948,797.33.  Both sums to bear interests.

2

4.    The restraining order was worldwide, it applied to enforcement proceedings and further related arbitration claims in Belize, the UK and any other jurisdiction.  It was to last until 5.5.2009, which was 27 days, that is, within 28 days of the making of the order *ex parte,* as required by *R 17.4 (4) of the Supreme Court (Civil Procedures) Rules 2005.*  The respondents were given permission to apply earlier on seven days notice, for an order discharging the order of 7.4.2009, made on an application without notice to the respondents.

5.    On the return date of the order, 5.5. 2009, the date intended for *inter partes* hearing of the application of the Attorney General, learned counsel Mr. Aamon Courtenay S.C., appeared for the first respondent. He applied for adjournment of the hearing until July, 2009.  Learned counsel Mr. Michael Young S.C., representing the Attorney General, and learned counsel Ms. Lois Young Barrow S.C., representing parties intended to be joined, did not oppose the application.  The court adjourned the hearing to last Thursday 9.7.2009.

6.    Rather surprising, Mr. Courtenay in a letter dated 30th June 2009, to the Registrar, requesting that the respondents' own application for, a

3

declaratory order recognizing the arbitral award, and an order for a stay of this claim, be heard with the application for the restraining order, complained that, "Telemedia will have been subjected to this serious and exceptional form of relief... for three months." Two of the three months were at the request of counsel himself.

7.    The direction of the court regarding the request of the first respondent that the court hear its own application with the application for interim restraining order, was to refuse it and limit the hearing last Thursday to the hearing on notice, of the application of the Attorney General, and the cross-application of BTL for an order discharging the interim restraining order made on 7.4.2009, without notice.

8.    Belize Social development Limited was not represented and has not filed any papers in answer to the original application without notice. The case papers did not even identify it, except by bare name. The terms of the arbitration award the subject of this claim, do not really concern Belize Social Development Limited. It was intimated at the hearing of this application that, BTL intended to assign the benefit of the arbitration award to Belize Social Development Limited. That is

4

not in issue at this stage.   However, my view is that eventhough Belize Social Development has not bothered to oppose the application of the Attorney General, the court will not issue a restraining order against it unless the court has determined that it is appropriate to do so.

9.     *Determination:*

As a reaction to the restraining order made on 7.4.2009, BTL filed an application asking for among others, an order discharging the restraining order.   So, instead of these proceedings being conducted only as a renewed application of the Attorney General on notice, the proceedings were conducted as the hearing of the application for an order to discharge the order made on 7.4.2009 as well.   It is a matter of mere detailed technicality, but it is worth mentioning that the interim restraining order would have expired on the adjourned date, last Thursday anyway, but for the fact that the applicant attend court to repeat on notice, his earlier application.

10.    Naturally, I start my determination by enquiring whether there is any premise on which to base the application for an interim restraining

order.  The premise is always a serious question that may go to trial, disclosed by the case papers, in particular by the affidavit that supports the application.  In this application, the grounds stated in the substantive claim of the Attorney General, and the affidavit of Mr. Gian Ghandi, must disclose a serious question appropriate to go to trial, in order for the court to proceed to consider discretion to grant a restraining order.

11.  The substantive claim of the Attorney General is for a number of declaratory reliefs to the effect that enforcement of the award made by the London Court of International Arbitration (LCIA) on 18.3.2009, in an arbitration Proceedings No. 81079 between the Government of Belize and Belize Telemedia Limited, would be contrary to the Constitution of Belize and several statutory laws of Belize.  To effect the declaratory reliefs, if granted, the Attorney General asked for a permanent restraining order, restraining BTL and Belize Social Development Limited from taking steps to enforce the award and from commencing any related proceedings in Belize, the UK and in any other jurisdiction.

6

12.   In his oral submission in court in support of the application of the
      Attorney General, Mr. Young relied largely on "public policy", stated
      in s: 20 (1) of the Arbitration Act Cap. 125, as a ground that will bar
      enforcement of an arbitration award. But in his written submission he
      relied largely on illegality, namely, that the original, "accommodation
      agreement", and the two subsequent, "amended accommodation
      agreements," were contrary to: the Constitution of Belize; the Income
      and Business Tax Act, Cap 55; the Finance and Audit (Reform) Act,
      No. 12 of 2005, Customs and Excise Duties Act, Cap 48; the
      Telecommunications Act; Cap. 229; and the Public Utilities Act, Cap.
      223.  Mr. Young did not go into much detail about the meaning of
      public policy in the context of the Arbitration Act; neither did learned
      counsel Mr. Nigel Plemming Q.C., for the first respondent.   Some
      case law would have been useful.

13.   It was apparent to me that so far without the benefit of respondents'
      defence, illegality or legality of the three agreements, and whether the
      decision of the arbitrators must be regarded as final even on questions
      of law, would be the issues to be joined.  It was also expected that the

question of jurisdiction of this court was likely to be added by the defendants to the issues.

14.   Mr. Nigel Plemming did not concern himself much with the question of illegality of the agreements.  He was content to say that the LCIA considered and decided all the questions raised regarding illegality. He, however, conceded that the Attorney General raised serious questions in his claim, but contended that the Attorney General raised the claim, "the wrong way; he should have raised it at the supervising court in England."  Counsel further contended that by bringing this claim in the Supreme Court in Belize, the Government was trying to open the case already decided by the LCIA.

15.   The agreements the subject of the claim were made and performed in Belize until the Government changed, and the new Government challenged the agreements and refused to perform duties under them. The agreements stipulated that the law of Belize would apply to them, but that the seat of arbitration would be London, the UK.

8

16.   The arbitrators decided on all the questions of law that, the law of Belize was the same as the law of England.   Opinion of an expert in the law of Belize was not sought.   Secondly, the arbitrators seemed to rely on past actions of the Prime Minister Hon. Said Musa, who signed the agreements in issue on behalf of the Government of Belize, as a practice and the basis of the lawfulness of these agreements.   On the face of it, and logically, that seems erroneous.   Thirdly, the arbitrators decided that, "the agreements were entered into in the ordinary or necessary course of Government administration," regardless of the requirement of the law that such agreements had to be approved by Parliament.   About secrecy, it appears that Mr. Gandhi's evidence about it would be a direct and first hand one, despite aspersion cast on him by Mr. Dean Boyce in his affidavit. Several persons who were said to have participated in negotiation were named.   Many more detailed affidavits might have been expected.

17.   From the above, it is obvious that serious questions arise in the several contentions of illegality of the agreement, raised by the Attorney General.   That in turn raises a serious question as to whether

9

enforcement of the award will not be contrary to the Constitution, the other statutory laws and public policy. ***Section 20 of Arbitration Act,*** requires that for an award to be enforced, *"the arbitration agreement must be valid under the law by which it was governed",* and the enforcement, *"must not be contrary to public policy or the law of Belize".*

18.   It was suggested that the Attorney General needed to wait until the respondent had filed an application in the Supreme Court of Belize or in courts in England, the seat of arbitration, before taking up the challenge to the arbitration award.  That may be the convenient thing to do; it does not mean that the person against whom an award has been made cannot initiate his own claim.  Arbitration Act does not require so.  The letter dated 30.3.2009, of Allen & Overy Solicitors, for BTL, had made certain demands to the Attorney General, based on the arbitration award, and threatened taking steps.  Attorney General considered, whether correctly or erroneously, that certain rights of the Government were threatened.  He was entitled to take the matter to court for determination.  In any case, there is now an application dated and filed on 20.5.2009, asking for a declaration that the award made

10

on 18.3.2009, by the LCIA, "is valid and binding".  That is already an indirect way to seek enforcement of the award.

19.   Mr. Plemming devoted most of his submission to arguing that the order made on 7.4.2009, should not have been made on an application without notice to the respondents.  The arugument, no doubt, stated correctly the principle in *r:17.3 and 4 of the Supreme Court (Civil Procedure) Rules 2005,* however, it was of no use in deciding this application which was already at the stage of an application on notice. The hearing last week on 9.7.2009, was not an occasion for demonstrating that the order made on the application without notice on 7.4.2009, was wrong and should be discharged.  The order expired when the application came up for hearing on notice last week.

20.   Before 9.7.2009, the respondents had ample opportunity to apply for the discharge of the order made on the application without notice. That would be the opportunity to challenge the order.  A clause was specifically included in the order that, the respondents were given permission to apply on seven days notice to have the order discharged. Obviously the respondents preferred not to apply; BTL waited for the

11

*inter partes* hearing.   The order of 7.4.2009, simply expired by effluxion of time.

21.   The argument that the provision of the Arbitration Act, regarding enforcement of an arbitration award might have not been "disclosed" to the court on 7.4.2009, and so there was "non-disclosure", a ground for setting aside the order made on the application without notice is, with much respect, misleading.   Non-disclosure as a ground for setting aside an order made on an application without notice is still primarily about non-disclosure of material fact, not of, the point of law in the claim.   The quotation from the judgment in the case of ***Memory Corporate Plc and Another v Sidhu[2000] 1WLR 14 43,*** cited by counsel, is misleading if taken out of context.   In that case, the judge had not been shown the supporting affidavit and a draft order which was not in the usual from, and further, the statements about a bank account was untrue.   Notwithstanding, the Court of Appeal (UK) stated that, *"the judge made rule that a without notice order would be discharged if it was obtained without full disclosure could not be permitted to become an instrument of injustice…"* The injunction order was allowed to continue, despite the non-disclosure and error.

12

22.   The application, the subject of this decision, is for an order to preserve the *status quo* until trial of the claim of the Attorney General, in which he claims relief against enforcement of the foreign arbitration award made on 18.3.2009, by the LCIA. The *status quo* at the moment is that no enforcement proceedings have been commenced in courts in Belize or in courts in England or elsewhere, although an application has been filed for an order of this court for a declaration that the "award is valid and binding..."

23.   I have decided that serious issues of illegality and of public policy, have been raised in the claim to resist enforcement. I must proceed to consider whether in the circumstances of the claim, including the fact that the restraining order is sought in respect of proceedings outside Belize as well, it is appropriate to exercise discretion in favour of granting an interim restraining order.

24.   It is my view that, in the interest of justice, the *status quo* should obtain until the determination of the claim of the Attorney General. However, in considering whether to exercise the discretion to grant an interim restraining order, I have to pose the same question posed by

13

Mr. Plemming in his submission. Is a court restraining order necessary to ensure that the *status quo* is preserved while the claim proceeds to determination?

25.   I accept the submission by Mr. Plemming, to the extent that it applies to Belize that, the law regulating enforcement of a foreign arbitration award in Belize renders an interim injunction order restraining BTL and Belize Social Development from enforcing the award unnecessary. Section 20 of the Arbitration Act provides as follows:

> "20 (1) In order that a foreign award may be enforceable under the said sections it must have-
>
>> (a) been made in pursuance of an agreement for arbitration which was valid under the law by which it was governed;
>>
>> (b) been made by the tribunal provided for in the agreement or constituted in a manner agreed upon by the parties;

14

> (c) been made in conformity with the law
> governing the arbitration procedure;
>
> (d) become final in the country in which it was
> made;
>
> (e) been in respect of a matter which may lawfully
> be referred to arbitration under the law of
> Belize;
>
> and the enforcement thereof must not be contrary to public
> policy or the law of Belize."

26.   Should BTL choose to enforce the award of the LCIA in Belize, it will
have to bring a claim by a fixed date claim I suppose; and it will be
required to serve the claim on Attorney General, thereby giving him
notice and opportunity to oppose the claim for enforcement.   The
grounds of opposition would obviously be illegality and public policy
already raised.   BTL or Belize Social Development Limited will only
proceed to enforce the award in Belize after obtaining an order in their
favour from court in Belize.   It follows that any attempt to set off
sums in the foreign award against sums payable as taxes, fees and

15

others will be illegal in Belize unless there has been a court order authorizing enforcement of the award.

27. The procedure regarding enforcement of the award in the UK or in any other jurisdiction may not be the same as that in Belize. In the first place, I have not been assured that the laws about enforcement in the UK and in any other jurisdiction are exactly the same as in Belize. Secondly, from paragraph 74 to 80 of the proceedings of the LCIA, the arbitrators recounted that BTL had obtained, without notice to the Attorney General, a restraining order from court in the UK, in aid of the arbitration, and that BTL unsuccessfully sought to register the order in Belize. The possibility may still exist of attempts to set off sums of the award against receipts of income by the Government of Belize in the UK and elsewhere, making it necessary to obtain an interim restraining order in regard to enforcement in the UK and any other jurisdiction.

28. There is a further reason in favour of granting an order restraining both respondents from enforcing the award or commencing or continuing claims related to the award in the UK and in any other

16

jurisdiction.  According to an application dated 28.4.2009, filed the same day by BTL, there are already three claims: No. 317 of 2009, No. 275 of 2009 and No. 279 of 2009, in the Supreme Court of Belize, in which both the Attorney General and BTL are parties with others. BTL has asked that the claims be consolidated with this claim.  It said that the same ground of illegality concerning the same and similar agreements are in issue.

29.    In my view, it would be oppressive and vexatious to have enforcement of an award in which the same ground was considered proceed with outside Belize, while the proceedings in Belize were still pending. The Attorney General would have to contest enforcement proceedings in the UK as well as contest the other three claims in Belize on the same ground.  It appears wasteful in regard to costs.  I considered the case of *Societe Nationale Industriale Aerospatiale (SINA) v Lee Kui Jak and Another [1987] 3 W.L.R.59 or [1987] 3 All ER 510.*  I am persuaded completely about the point made there by the House of Lords (UK), about injustice in circumstances similar to the circumstances in this application.  I am inclined to say, adopting the reason in the case that, *"as a matter of injustice",* if BTL was allowed

17

to pursue the enforcement of the foreign award when the same questions of law are still pending in the courts of Belize, the injustice to the Attorney General, "would *outweigh the injustice to BTL*".

30.   In considering whether to restrain the respondent from taking any enforcement steps and commencing or continuing proceedings related to the award outside Belize, I have not overlooked the need to exercise great caution because of the danger of interfering with the jurisdiction of a foreign court.  I took into consideration the judgments in: *Aggeliki Charis Compania Maritima SA v Pagnan Spa (the Angelic Grace) [1995] 1 Lloyd's Rep. 87* and *National Westminster Bank v Utrecht American Finance Company [2001] 3 All E.R. 733*

31.   The application of the Attorney General for an interim restraining order in this claim No. 317 of 2009, succeeds in part.  Similarly, the application of BTL, or its opposition to the application of the Attorney General succeeds in part.  The order that the Court makes, upon the Attorney General providing undertaking as to damages that may be occasioned are the following:

18

31.1   The request of the Attorney General for a restraining order restraining Belize Telemedia Limited and Belize Social Development Limited in Belize from commencing in Belize proceedings for enforcement of the award of the London Court of International Arbitration (LCIA) made on 18.3.2009 is denied.

31.2   The request of the Attorney General for a restraining order restraining Belize Telemedia Limited and Belize Social Development Limited from commencing or continuing in the UK and in any other jurisdiction, proceedings for enforcement of the award of LCIA made on 18.3.2009, is granted; and

31.3   It is ordered that Belize Telemedia Limited and Belize Social Development Limited or their successors, assigns or subsidiaries, are hereby restrained by themselves, agent, representative or

19

howsoever, from enforcing or commencing or continuing in the United Kingdom or any other jurisdiction, proceedings for enforcing the award of the London Court of International Arbitration (LCIA), made on 18.3.2009, or from commencing or continuing in the United Kingdom or in any other jurisdiction, any proceedings relating to the enforcement of the award.

31.4   These orders will continue until the conclusion of this claim No. 317 of 2009, or until further order.

31.5   Costs of the applications shall be in the cause.

32. Delivered this Monday 20th day of July 2009 at 3.00 pm.
At the Supreme Court,
Belize City

Sam L. Awich
Judge
Supreme Court

20

## POST- DECISION RULING

1.   Immediately after the above decision was delivered, learned counsel Mr. Aamon Courtenay SC., requested to be heard.   It was an important point he raised that, at the hearing on 9.7.2009, the Attorney General did not file and make a written application for the injunction order granted on 7.4.2009, to continue, and that on the other hand, BTL made a written application for the discharge of the order; so the only application before court was that of BTL for a discharge order. Mr. Courtenay asked the court to vacate any order made restraining BTL.   Learned counsel Mr. Michael Young SC., opposed the request on the ground that parties made their submissions on the basis that the Attorney General had made an application to continue the restraining order.

2.   Although the point was not raised on 9.7.2009, I averted my mind to it, as reflected in my decision above.   I accept the submission that *R 17.4(7) of the Supreme Court (Civil Procedures) Rules, 2005,* requires that an application on notice be made by an applicant who had obtained an order on an application without notice, to extend the

21

order.   That means the application must be made in writing as a general rule – see *R 11.6*.

3.   I concluded that the manner in which parties presented their submissions did not cause me to worry that the failure of the Attorney General to file a written application under *R17.4 (7)* caused any prejudice to BTL or Belize Social Development Limited.   Counsel for BTL, did not complain about the omission or any prejudice arising, at the hearing.   I am still of that view after hearing Mr. Courtenay a short moment ago.

4.   There is no direct rule under *Part 17* that provides for cure or waiver of non compliance with the rules in that Part of the Rules.   There are general provisions in *R 26.9*, concerning general management of cases in court.   I apply the provisions, in view of the fact that I saw no prejudice that resulted from the non-compliance with *R 17.4(7)*.

5.   I decline to vacate any of the orders I have just made above.

6.   Read this Monday 20th day of July 2009 at 3:45pm
At the Supreme Court
Belize City

Sam L. Awich
Judge
Supreme Court

22

1/348

# Courtenay Declaration
# Exhibit F



No. 9 of 2009

I assent,

(SIR COLVILLE N. YOUNG)
*Governor-General*

25th August, 2009

**AN ACT to amend the Belize Telecommunications Act (No. 16 of 2002), to provide for assumption of control over telecommunications by the Government in the public interest; and to provide for matters connected therewith or incidental thereto.**

*(Gazetted 25th August, 2009.)*

*BE IT ENACTED, by and with the advice and consent of the House of Representatives and the Senate of Belize and by the authority of the same, as follows:-*

1. This Act may be cited as the

Short title.

BELIZE TELECOMMUNICATIONS
(AMENDMENT) ACT, 2009.

*Belize Telecommunications*

Act No. 16/02.
29/05.

and shall be read and construed as one with the Belize Telecommunications Act which, as amended, is hereinafter referred to as the principal Act.

Repeal of
section 57A,
No. 29/05.

2. Section 57A of the principal Act [added by Act No. 29 of 2005] is hereby repealed.

Addition of
new Part XII
and sections
63 to 74.

3. The principal Act is hereby amended by the addition of the following as new Part XII (containing sections 63 to 74) immediately after section 62:-

## " PART XII
## ASSUMPTION OF CONTROL OVER TELECOMMUNICATIONS BY THE GOVERNMENT

Assumption of
control by
Government
on revocation
of licence or
for a public
purpose.

63. (1) Where the licence granted to a public utility provider is revoked by the Public Utilities Commission, or where a licensee ceases operations or loses control of operations, or where the Minister considers that control over telecommunications should be acquired for a public purpose, the Minister may, with the approval of the Minister of Finance, by Order published in the *Gazette*, acquire for and on behalf of the Government, all such property as he may, from time to time, consider necessary to take possession of and to assume control over telecommunications, and every such order shall be *prima facie* evidence that the property to which it relates is required for a public purpose.

(2) Upon publication in the *Gazette* of the Order made pursuant to subsection (1) above, the property to which it relates shall vest absolutely in the Government free of

all encumbrances without any further assurance, and the Registrar General, the Registrar of Lands, the Registrar of Companies and all other relevant authorities shall take due notice thereof and shall make such annotations on the records as may be necessary and issue all such certificates or documents as may be required to perfect the title of the Government to all such property.

(3)  In every case where the Minister makes an Order under subsection (1) above, there shall be paid to the owner of the property that has been acquired by virtue of the said Order, reasonable compensation within a reasonable time in accordance with the provisions of this Act.

(4)  Any person claiming an interest in or right over the acquired property shall have a right of access to the courts for the purpose of determining whether the acquisition was duly carried out for a public purpose in accordance with this Act.

(5)  Where a licence has been revoked by the Public Utilities Commission, the power vested in the Minister under subsection (1) above may be exercised notwithstanding that such revocation is the subject of any appeal or review proceedings.

(6)  An Order made under subsection (1) above may contain such ancillary and consequential directions as may be necessary to give full effect to the Order, including the appointment of an interim Board of Directors of a public utility provider and of its subsidiaries.

(7) Notwithstanding anything contained in the Interpretation Act, an Order made under subsection (1) above may provide that any contravention or breach thereof shall be punishable on summary conviction by a fine not exceeding five thousand dollars for each day the offence continues, or by a term of imprisonment not exceeding two years, or by both such fine and term of imprisonment.

CAP. 1.

(8) Every Order made by the Minister under this section shall be subject to negative resolution.

(9) In this section -

"**property**" includes shares, stock, interests of all kinds, including a mortgagee's or chargee's interest in property, telecommunications equipment, installations, service, apparatus or station, assets, cash and cash equivalents, rights, files, documentation, customer database, and all other property of whatever description, tangible or intangible, corporeal or incorporeal, including property held by the subsidiaries, affiliates or associates of a licensee;

"**licensee**" includes, where a licence has been revoked by the Public Utilities Commission, a person or entity, corporate or unincorporate, who held a licence immediately before such revocation.

(10) The power of the Minister to make an Order under this section shall be exercised by statutory instrument with legislative effect.

(11) The Minister may make successive Orders under this section as he may consider necessary and the foregoing provisions of this section shall apply to every such Order.

64. (1) As soon as may be after the acquisition of property by virtue of section 63, the Financial Secretary shall publish in the *Gazette* and in at least one newspaper of general circulation in Belize, a notice of acquisition containing particulars of the property that has been acquired and requiring all interested persons to submit their claims within such time as may be specified, being not less than one month after the date of publication of the notice in the *Gazette*.

Notice of acquisition.

(2) The Financial Secretary shall cause a copy of the notice of acquisition to be served, either personally on, or by registered post addressed to the last known place of abode or business of, every person who is known or believed by the Financial Secretary to be entitled to compensation in respect of the acquisition, and whose whereabouts are known to the Financial Secretary.

(3) Any person who is required to make a claim under this section wilfully makes a claim which is false in any material particular commits an offence and shall be liable on summary conviction to a fine not exceeding one thousand dollars or to imprisonment for a term not exceeding one year.

Financial Secretary to treat with claimants.

65. (1)  On receipt and verification of the claims, the Financial Secretary shall, without delay, and with the prior approval of the Minister of Finance, enter into negotiations with the claimants for the payment of reasonable compensation within a reasonable time.

(2)  In default of determination by agreement, the compensation payable under this Act shall be determined by the Supreme Court (hereinafter referred to as "the Court") as hereinafter provided.

Proceedings in respect of claims to compensation.

66. (1)  Proceedings in respect of any claim to compensation under this Act (other than claims determined by agreement) may be taken either by the claimant or by the Financial Secretary and shall, unless otherwise provided by rules made under section 72, be commenced by a fixed date claim form and the procedure set out in the Supreme Court (Civil procedure) Rules, 2005, shall accordingly apply.

S.I. 75/05.

(2)  In any proceedings for assessment of compensation instituted by the Financial Secretary, every person by whom or on whose behalf any such compensation is claimed or who has an interest in the property in respect of which compensation is payable under this Act and whose whereabouts are known to the Financial Secretary shall be named as a party to the proceedings.

(3)  Where in any such proceedings or otherwise, the Court is of the opinion that any person by whom or on whose behalf

compensation is claimed or who has an interest in the property in respect of which compensation is payable is subject to any disability or incapacity, the Court may appoint a guardian *ad litem* to protect the interests of that person.

Rules for assessment of compensation.

67. (1) Subject to this Act, the following rules shall apply to the determination of compensation for the acquisition of property:

(a)  the value of the property shall, subject as hereinafter provided, be taken to be the amount which the property in its condition at the time of acquisition, if sold in the open market by a willing seller, might have been expected to have realised at the date of publication in the *Gazette* of the Order made under section 63 of this Act;

(b)  where the property is acquired consequent upon the revocation of the licence of the public utility provider, or on the cessation of telecommunications operations by such provider, the market value of the property shall be reduced by such amount as may be considered reasonable in all the circumstances;

Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 245 of 485

(c)  in assessing compensation, the Court shall employ the generally accepted methods of valuation of the kind of property that has been acquired, taking particularly into account the comparable sales of such property in Belize;

(d)  the special suitability or adaptability of the property for any purpose shall not be taken into account if that purpose is a purpose to which the property could be applied only in pursuance of statutory powers or other permit, licence or authority not already granted or revoked, or for which there is no market apart from the special needs of a particular purchaser or the requirements of any Government Department or a public statutory body;

(e)  account shall be taken of any pending litigation against the public utility provider and of any pending or potential claims against such provider;

(f)  all compensation assessed under this Act shall be expressed and payable in the lawful currency of Belize.

(2) In assessing compensation, no allowance shall be made on account of:-

    *(i)*    the acquisition being compulsory or the degree of urgency or necessity which had led to the acquisition;

    *(ii)*    any disinclination on the part of the person interested to part with the property acquired;

    *(iii)*    any damage sustained by the person interested which, if caused by a private person, would not render such person liable to an action or claim:

    *(iv)*    any increase in the value of the property acquired likely to accrue from the use to which the property acquired will be put;

    *(v)*    any outlay or improvement of, or other dealings with, such property, which have been made, commenced or effected within twelve months immediately before the publication of the Order under section 63, with the intention of enhancing the compensation to be awarded therefor in the event of such property being acquired for public purposes;

Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 247 of 485

> *(vi)* any accommodation or other agreements or settlement deeds (by whatever name called), containing provisions contrary to law.

Interest.

68. (1) The Court, in awarding compensation, may add interest thereto and shall be guided by the rate paid by commercial banks in Belize on fixed deposits at the date of acquisition; so, however, that reasonable compensation shall be paid to the claimant having regard to all the circumstances.

(2) The interest under subsection (1) above may be added for the whole or any part of the period between the date of acquisition of the property and the date of the payment of the compensation awarded by the Court.

Costs in proceedings in the Supreme Court.

69. (1) Subject to this section, the amount of costs to be awarded in proceedings in the Supreme Court and all questions relating thereto shall be determined by the Court.

(2) Where an unconditional offer in writing of any sum as compensation to any claimant has been made by or on behalf of the Financial Secretary with the prior approval of the Minister of Finance and the sum awarded as compensation does not exceed the sum offered, the Court shall, unless for special reasons it considers otherwise, order the claimant to bear his own costs and to pay the costs of the Financial Secretary so far as the costs of the Financial Secretary were incurred after the offer was made.

Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 248 of 485

(3)  Where the claimant has failed to put forward a proper claim in sufficient time to enable the Financial Secretary to make a proper offer, the foregoing provisions of this section shall apply as if an unconditional offer had been made by or on behalf of the Financial Secretary at the time when, in the opinion of the Court, a proper claim should have been put forward and the claimant had been awarded a sum not exceeding the amount of such offer.

(4)  Where a claimant has indicated in writing to accept any sum as compensation and has put forward a proper claim in sufficient time to enable the Financial Secretary to make a formal offer and the sum awarded is equal to or exceeds that sum, the Court shall, unless for special reasons it considers otherwise, order the Financial Secretary to bear his own costs and to pay the costs of the claimant so far as the costs of the claimant were incurred after he had indicated in writing to accept such sum as compensation.

(5)  Where the Court orders the claimant to pay the costs or any part of the costs of the Financial Secretary, the Financial Secretary may deduct the amount so payable by the claimant from the amount of compensation payable to him.

(6)  For the purpose of this section, costs includes fees, charges and expenses.

70. Unless the Court considers that injustice may otherwise be done, no claim for compensation in respect of compulsory

Limitation of time for making claims.

(3) Where the claimant has failed to put forward a proper claim in sufficient time to enable the Financial Secretary to make a proper offer, the foregoing provisions of this section shall apply as if an unconditional offer had been made by or on behalf of the Financial Secretary at the time when, in the opinion of the Court, a proper claim should have been put forward and the claimant had been awarded a sum not exceeding the amount of such offer.

(4) Where a claimant has indicated in writing to accept any sum as compensation and has put forward a proper claim in sufficient time to enable the Financial Secretary to make a formal offer and the sum awarded is equal to or exceeds that sum, the Court shall, unless for special reasons it considers otherwise, order the Financial Secretary to bear his own costs and to pay the costs of the claimant so far as the costs of the claimant were incurred after he had indicated in writing to accept such sum as compensation.

(5) Where the Court orders the claimant to pay the costs or any part of the costs of the Financial Secretary, the Financial Secretary may deduct the amount so payable by the claimant from the amount of compensation payable to him.

(6) For the purpose of this section, costs includes fees, charges and expenses.

70. Unless the Court considers that injustice may otherwise be done, no claim for compensation in respect of compulsory

Limitation of time for making claims.

acquisition of property under this Act shall be admitted or entertained by the Government unless it is made in writing to the Financial Secretary within twelve months after the publication in the *Gazette* of the notice of acquisition pursuant to section 64 of this Act.

Payment of compensation etc.

71. All amounts which have been awarded by way of compensation under this Act, including interest and costs to be paid by the Financial Secretary, and all other costs, charges and expenses which shall be incurred under the authority of this Act, shall be paid out of moneys voted for the purpose by the National Assembly and all such compensation shall be paid within a reasonable time:

Provided that the Financial Secretary shall be entitled to deduct from any compensation which may have been awarded such sums as are due to the Government as arrears of any taxes, duties and charges, and all other sums whatsoever, which are owed to the Government by the person entitled to compensation.

Rules of Court.

72. The Chief Justice may, with the approval of the Attorney General, make rules for regulating the practice and procedure to be adopted in proceedings in the Supreme Court under this Act, but until such rules

SI 75/2005.

are made, the Supreme Court (Civil Procedure) Rules, 2005 will continue to apply.

Appeals.

73. Either party may appeal to the Court of Appeal against the determination of the Supreme Court under this Act, and every

such appeal shall be made within the time
and in the manner laid down by the Court
of Appeal Act and the rules made thereunder.    CAP. 90.

74. Subject to the Belize Constitution, where    This part to
there is a conflict between the provisions    prevail.
of this Part of this Act (or any Orders made    CAP. 4.
thereunder) and any other law, rule or
regulation, or the articles of association or
other corporate documents of a public utility
provider or its subsidiaries, this Part and any
Orders made thereunder shall prevail."

*Printed in Belize by the Government Printer*
*#1 Power Lane, Belmopan.*

**BELIZE:**

## STATUTORY INSTRUMENT

### No. 104 of 2009

*ORDER made by the Minister responsible for telecommunications in exercise of the powers conferred upon him by section 63 of the Belize Telecommunications Act (No. 16 of 2002), as amended by the Belize Telecommunications (Amendment) Act (No. 9 of 2009), and all other powers thereunto him enabling, and with the approval of the Minister of Finance.*

*(Gazetted 25th August, 2009.)*

WHEREAS, section 63 of the Belize Telecommunications Act, as amended, provides, inter alia, that where the Minister (responsible for telecommunications) considers that control over telecommunications should be acquired for a public purpose, he may, with the approval of the Minister of Finance, by Order published in the Gazette, acquire for and on behalf of the Government, all such property as he may from time to time consider necessary to take possession of and to assume control over telecommunications;

AND WHEREAS, after a careful consideration of all the facts and circumstances, I consider that control over telecommunications should be acquired for a public purpose, namely, the stabilisation and improvement of the telecommunications industry and the provision of reliable telecommunications services to the public at affordable prices in a harmonious and non-contentious environment;

NOW, THEREFORE, in pursuance of the above objectives, it is hereby ordered as follows:

Short title.

1. This Order may be cited as the

## BELIZE TELECOMMUNICATIONS (ASSUMPTION OF CONTROL OVER BELIZE TELEMEDIA LIMITED) ORDER, 2009.

Acquisition of property.

Schedule

2. The property specified in the Schedule to this Order is hereby acquired for and on behalf of the Government of Belize for the public purpose aforesaid.

Commencement.

3. This Order shall take effect on the date of its publication in the *Gazette*.

Interim Boards of Directors.

4. (1) Upon the commencement of this Order, the existing Boards of Directors of Belize Telemedia Limited (hereinafter referred to as "Telemedia") and of all of its subsidiaries shall cease to function and the Minister shall forthwith appoint interim Boards of Directors of Telemedia and its subsidiaries by notice published in the *Gazette*, who shall manage and regulate the affairs of their respective companies until such time as new Boards of Directors can be appointed in accordance with the Articles of Association and the reconstituted capital structure of Telemedia and its subsidiaries.

(2) Every person (including a director) who in any manner impedes or obstructs the interim Boards of Directors appointed under subparagraph (1) above from taking over the management and control of Telemedia and its subsidiaries shall be guilty of an offence and shall be liable on summary conviction to a fine not exceeding five thousand dollars for each day the offence continues, or to imprisonment for a term not exceeding two years, or to both such fine and term of imprisonment.

Secretary to deliver corporate documents.

5. (1) Upon the commencement of this Order, the existing Company Secretary of Telemedia shall forthwith deliver all books, records and other documents belonging to

Telemedia and its subsidiaries to the Chairman of the interim Board of Directors appointed by the Minister under paragraph 4 of this Order.

(2) Every person who contravenes or fails to comply with subparagraph (1) above shall be guilty of an offence and shall be liable on summary conviction to a fine not exceeding five thousand dollars for each day the offence continues, or to imprisonment for a term not exceeding two years, or to both such fine and term of imprisonment.

6. In the event it is determined by a competent court that the vesting of assets of the former Belize Telecommunications Limited in Belize Telemedia Limited pursuant to the Telecommunications Undertaking (Belize Telecommunications Limited Operations) Vesting Act was unconstitutional or otherwise unlawful, this Order shall apply *mutatis mutandis* to Telemedia's predecessor, Belize Telecommunications Limited, or any other Company which the court determines should be vested with Telemedia's assets and liabilities.

Application of this Order to other companies.

Act No. 10/ 2007

**MADE** by the Minister responsible for Telecommunications this 25th day of August, 2009.

(MELVIN HULSE)
*Minister responsible for Telecommunications*

**APPROVED** by the Minister of Finance this 25th day of August, 2009.

(DEAN O. BARROW)
*Minister of Finance*

*4*          ***Belize Telecommunications***          *[No. 104*

**SCHEDULE**          [Paragraph 2]

**PART 1**

**A - SHARES IN BELIZE TELEMEDIA LIMITED**

The following shares in Belize Telemedia Limited ("Telemedia") held by the persons shown in the statutory return for 2008 filed by Telemedia in the Belize Companies and Corporate Affairs Registry on or about the 5th January 2009, or held by any transferees of the said shares in the event of any transfers taking place since the said date of filing:

| Name of Shareholder | Address | No. of Shares acquired |
|---|---|---|
| 1. BB (or BCB) Holdings Limited | P. O. Box 1764, Belize City | 1,234,859 |
| 2. BTL International Inc. | P. O. Box 71, Tortola, BVI | 895,552 |
| 3. BTL Investments Limited | BTL, St. Thomas Street Belize City | 750,000 |
| 4. ECOM Limited | P. O. Box 1764, 212 North Front St., Belize City | 15,178,488 |
| 5. Mercury Communications Limited | P. O. Box 1764, 212 North Front St., Belize City | 4,786,230 |
| 6. New Horizons Inc. | 212 North Front St. Belize City | 20,581 |

**No. 104]**　　　　　*Belize Telecommunications*　　　　　　　5

| | | |
|---|---|---|
| 7. Sunshine Holding Limited | P. O. Box 1258,<br>212 North Front St.,<br>Belize City | 11,092,844 |
| 8. Thiermon Limited | 212 North Front St.,<br>Belize City | 12,886,959 |
| **Total number of Shares acquired** | | 46,845,513 |

## B – SHARES IN BTL DIGICELL LIMITED

| Name of Shareholder | Address | No. of Shares<br>acquired |
|---|---|---|
| Rocky Reef Ventures Limited | 212 North Front St.<br>Belize City | 1 |

## C – SHARES IN BUSINESS ENTERPRISE SYSTEMS LIMITED

| Name of Shareholder | Address | No. of Shares<br>acquired |
|---|---|---|
| Rocky Reef Ventures Limited | 212 North Front St.<br>Belize City | 1 |

## D – SHARES IN TELEMEDIA (FREE ZONE) LIMITED

| Name of Shareholder | Address | No. of Shares<br>acquired |
|---|---|---|
| Rocky Reef Ventures Limited | 212 North Front St.<br>Belize City | 1 |

6        *Belize Telecommunications*        *[No. 104*

## E – SHARES IN SUNSHINE HOLDINGS LIMITED

| Name of Shareholder | Address | No. of Shares acquired |
|---|---|---|
| Dean Boyce | 212 North Front St. Belize City | 1 |
| Trustees of the Belize Telecommunications Ltd Employees Trust | 212 North Front St. Belize City | 1 |

## F – SHARES IN TELEMEDIA INVESTMENTS LIMITED

| Name of Shareholder | Address | No. of Shares acquired |
|---|---|---|
| Rocky Reef Ventures Limited | 212 North Front St. Belize City | 1 |

Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 259 of 485

## PART II

## OTHER PROPERTY ACQUIRED

All proprietary and other interest held by **The Belize Bank (Turks and Caicos) Limited** in Belize Telemedia Limited and its subsidiaries under a Mortgage Debenture dated the 31st December, 2007 (including any amendments thereto) executed between Belize Telemedia Limited as the Mortgagor and The Belize Bank (Turks and Caicos) Limited as the Mortgagee, and registered in the Companies and Corporate Affairs Registry, Belmopan, on or about the 8th February 2008.

# Courtenay Declaration Exhibit G



**[Click here to print](#)**

**Government Passes Law to Takeover Telemedia**
**Mon, August 24, 2009**



**There was a Special Sitting of the House of Representatives today but the term "special" doesn't do it justice – it was historic, epochal, seismic. The Prime Minister introduced and the House passed the Belize Telecommunications Act of 2009 which allows government to acquire Belize Telemedia Limited. It is the most dramatic, consequential and bold piece of legislations ever taken to the legislature – and it changes everything. Government did it to resolve what had become an intractable and costly series of legal battles with Ashcroft affiliated interests which own BTL. The central basis for those battles was the Accommodation Agreement secretly signed by the Musa Administration in 2006. The Prime Minister gave a detailed rationale.**

**Hon. Dean Barrow, Prime Minister**
*"Let me once say that the long title is quite clear and what the government is doing by way of introducing this measure is preparing to take control of the company formerly known as Belize Telecommunications Limited and currently going by the name of Telemedia. I must also say immediately Mr. Speaker that government intends to take the bill through all its stages today. The Senate will then meet tomorrow and we expect that the Bill will be signed into law by Tuesday or Wednesday morning at the latest. At that time, the new government appointed board of directors will assume operational control over Telemedia and the re-Belizeanation of the company will be complete.*

*The infamous secret Accommodation Agreement in which the PUP government guaranteed the Ashcroft group a minimum rate of return of 15%. According to that agreement and under that guarantee, Ashcroft could in any year declare that BTL had not made that 15%, entirely a matter for him, declare under a formula that did not give the government any opportunity to seriously dispute what he was saying, Ashcroft could declare that BTL had not made that minimum 15%, declare how much the supposed short fall was and simply not pay his taxes until the so-called shortfall had been recovered. That Mr. Speaker s exactly what happened in 2007 so that thereafter Ashcroft's Telemedia ended up paying no business tax, no Customs duties, no impress of any kind. In addition the Accommodation Agreement stipulated that the Public Utilities Commission, which is there to regulate all utility services providers, that Accommodation Agreement stipulated that the PUC, could not regulate Telemedia's rates, just leaving the consumers at the complete mercy of the company.*

*The UDP Cabinet voted in the name of the Belizean people to resist this treasonerous Accommodation Agreement. Belizean law and Belizean dignity would be upheld, Belizean pride*

*and Belizean patriotism and Belizean patrimony vindicated. And of course resisted we have.*

*Now no one can doubt the justice of our stance but as we always knew it would, it has been costly. Michael Ashcroft had Telemedia invoke a arbitration in London, arbitration which the PUP administration and in particular the then Prime Minister and the then Attorney General had provided for in that Accommodation Agreement, Michael Ashcroft had Telemedia invoke arbitration in London to enforce the Accommodation Agreement and as we all know, he obtained a judgement of $38.5 million and an LCIA mandated requirement that this government now begin to honour this Accommodation Agreement. Well Mr. Speaker, I have said that as God is my witness I will never pay that award.*

*But it doesn't stop there, in April of 2009 Telemedia informed the government of further claims they will make to the London Court of International Arbitration and that the size of the new award they hope to get, and I am quoting now, could pale the current award of $38 million into insignificance, end of quotation. Mr. Speaker, Members, fellow Belizeans, this is intolerable. I and the United Democratic Party government in the name of the people will put up with it no longer. That an agreement, so patently illegal, so patently immoral, so patently anti-Belize should continue to torture us, to bleed us, to subject us to this death by a thousand cuts cannot for one second more be countenance.*

*This is our House, this is our country. Here we are masters. Here we are sovereign. And with the full weight of that sovereignty, we must now put an end to this disrespect, to this chance taking, to this new age slavery. There will thus be no more Telemedia awards against us, no more Telemedia court battles, no more debilitating waste of government's energy and resources, and there will be no more suffering of this one man's campaign to subjugate an entire nation to his will. After long and sufficient consideration and in the exercise of that national power that is ours by constitution and inalienable right, this government will now acquire Telemedia.*

*This is no ideology, this is not triumphalism, this is a country in particular circumstances reaching the end of its patience and doing a singular necessary righteous thing to protect its national interest. It is not part of any pattern, part of no new philosophy, it is plain and simple, a special measure for a special case.*

*No one need feel any sympathy for Lord Ashcroft. This is not an ad hominem move. It is to deal with a structural problem. Indeed, apart from his compensation, Lord Ashcroft's interests will remain profit making participants in Belize's telecommunications sector because those interests own Speednet and Speednet will be left free to fly.*

*This I repeat then is only about Telemedia and no more and no less than a case of the Belizean national interests trumping any other consideration. Thank you Mr. Speaker, I look forward to the debate."*

**As we said, it is historic. The Government of Belize has never - to our knowledge acquired a private company by an act of parliament – particularly one of the most profitable, essential and ubiquitous companies in the country. It is a bold manoeuvre, but beyond the broad stokes there are the details, the practical considerations that will operationalise such an acquisition. The Prime Minister also listed those today.**

**Hon. Dean Barrow,**
*"That the Bill makes every provision for fair and proper compensation to be paid to the owners of the shares that we will acquire. This is not, I repeat, some cowboy action but something done in the full plenitude of and compliance with our constitution. As well, we are only acquiring the 94 percent or so of Telemedia that is controlled by the Ashcroft interests. The shareholding owned by Belizeans will be left intact. The actual acquisition will be done by an order made by the Minister*

*of Telecommunications who will in that same order appoint a new Board of Directors.*

*As soon as practicable after, an extraordinary general meeting will be held and new Articles of Association adopted. The new Articles will essentially be the articles of the successful BTL that was launched in 1988. In other words the safeguards to protect Belizean shareholders will be re-established including protection of the special share and the limitations on the amount of single ownership.*

*As well and perhaps most important, the Articles will guarantee that dividends will be paid annually to the shareholders at the rate of 40% of the company's yearly profits. I also want to say that the new Board of Directors will be chaired in an executive capacity by Mr. Nestor Vasquez and it will have as one of its members the Rt. Hon. Manuel Esquivel.*

*Telemedia's current employees will of course all keep their jobs. Indeed we expect a greatly improved industrial relations climate and the quick resolution of any current outstanding worker grievances. I think particularly of the arbitration case of the dismissed workers, a case that the current owners of Telemedia have utterly frustrated. I am positive therefore that Telemedia's staff like all other right thinking Belizeans will completely support the government's move and cooperate to make the transition as seamless as possible.*

*For consumers, we expect services to continue uninterrupted. We do not believe that the present operators of the company will try any kind of sabotage. If they do, we will have to use already existing provisions of the law to move and take control even before the passage of this bill."*

**The timeline is as follows, the Senate meets in its own special sitting tomorrow to consider the act, approval is expected to be forthcoming and thereafter, either on Tuesday evening or Wednesday morning, the governor General is expected to sign it into law. The Minister of Public Utilities will then sign an order activating the new board of directors, which should go into BTL on Wednesday. And while that's the plan – it is expected that BTL's Ashcroft-controlled ownership may throw a series of legal obstacles to undermine that plan.**

**Close this window**

# Courtenay Declaration
# Exhibit H

Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 265 of 485

Case 1:09-cv-02117-RJL   Document 16-35   Filed 03/29/10   Page 19 of 43
Belize Prime Minister's verbatim introduction of bill to take over Belize Telemedia Ltd. ... Page 1 of 4

# Belizean

Thoughts on the intersection of life, politics and development in Belize.

## Belize Prime Minister's verbatim introduction of bill to take over Belize Telemedia Ltd.

By The Founder on August 24, 2009 8:27 PM | Permalink | Comments (0)



Belmopan - 24 August, 2009 Mr. Speaker, I rise to introduce the Bill for an Act to amend the Belize Telecommunications Act to provide for assumption of control over telecommunications by the Government in the public interest; and to provide for matters connected therewith or incidental thereto.

Let me at once say that the long title is quite clear and what the government is doing by way of introducing this measure, is preparing to take control of the company formerly known as Belize Telecommunications Limited, and currently going by the name of Telemedia.

I must also say immediately, Mr. Speaker, that government intends to take the Bill through all its stages today. The Senate will then meet tomorrow, and we expect that the Bill will be signed into law by tomorrow evening or Wednesday morning at the latest. At that time the new, Government-appointed Board of Directors will assume operational control over Telemedia, and the re-Belizeanization of the company will be complete.

Now I confess, Mr. Speaker, that the Opposition, indeed all members of the House, are only seeing the Bill for the first time this morning. And yet we intend to pass it today. Members will thus have to read and digest quickly between the introduction and the resumption after committee meets, in order to debate the measure. The lack of notice is regretted, but could not, in the circumstances, be helped. The current owners of Telemedia, as they have repeatedly demonstrated, will stop at nothing to frustrate the business of governance in this country; and will act with every resource at their command to thwart the interest and legitimate aspirations of the Belizean people. While the minimum requirements of our democracy means that there will still be a two day window of opportunity for those that would stymie us, government had to do what was necessary to narrow that opening as much as possible. I say again to all members that I would have wished that we did not have to proceed in this fashion. But the exigencies of the circumstances, the larger demands of Belize's national interests, left us no choice.

The questions will of course be asked: why this move, and why now? In answering these questions I need to rehearse for the house and the nation a fair amount of background. Mr. Speaker, Belize Telecommunications Limited was incorporated in 1987 during the first UDP administration. At that time the purpose was to Belizeanize telecommunications, replacing the control of the foreign entity Cable and Wireless with a national company. It was always the UDP government's intention that the new BTL would be majority owned by the citizens of Belize, not by the government. That first privatization worked wonderfully well and has remained one of the proudest accomplishments of the 84 - 89 UDP administration. We made sure then to insert particular safeguards into the company's Articles of Association to protect the national interest in BTL. And history has recorded what a fabulous success story that whole enterprise was. In the years immediately after 1987 BTL returned record profits to the many Belizeans that invested in the company. A 20% return on investment was the order of the day, and there were years when BTL paid a dividend yield of as much as 30%.

All remained well until February 1992 when the predatory designs of one man were facilitated by the greed and hunger for cash of the then PUP administration. At that time the PUP began to sell shares in BTL to Michael Ashcroft at a rate and in a manner that was counterintuitive and counter nationalistic. Under the UDP Articles of Association there was a 25% cap on the shares that could be sold to any one person or entity. This was so that no single individual could dominate the company and in order to make the ownership as widely Belizean as possible. In violation of this Article, the PUP presided over an ever increasing transfer of shares to Ashcroft. This process was interrupted by the 93-98 UDP return to power, but restarted as soon as the PUP became the government again. It culminated in March 2004 with the infamous sting operation perpetrated by then Prime Minister Said Musa, which leveraged almost 94% of BTL shares into the control of Lord Ashcroft. Since then the PUP double dealing in which they screwed Glenn Godfrey for Ashcroft, then Ashcroft for Prosser, then Prosser for Ashcroft again, has produced litigation after litigation. Between 2005 and 2006 alone, there were at least 6 BTL cases in Belize, England, the US and Canada. In the end Ashcroft prevailed and cemented his total control.

But, he was not satisfied. Between 1998 and 2005 BTL's profits were 20 cents for every dollar invested. Nevertheless, and perhaps as payback for the PUP support, however fleeting, of Jeffrey Prosser, Ashcroft wanted more. And he got it from the PUP in 2006 after he had regained supreme control of BTL. The game by way of the infamous secret Accommodation Agreement, in which the PUP government guaranteed the Ashcroft group a minimum rate of return of 15%. According to that Agreement and under that guarantee, Ashcroft could in any year declare that BTL had not made that 15%; declare how much the shortfall was; and simply not pay his taxes until the so-call shortfall had been recovered. This is exactly what happened in 2007, so that thereafter Ashcroft's Telemedia ended up paying no business tax, no customs duties, no imprest of any kind. In addition, the Accommodation Agreement stipulated that the PUC could not regulate Telemedia's

Search

Search

### About this Entry

This page contains a single entry by The Founder published on August 24, 2009 8:27 PM.

Belize Government Moves to Expropriate leading telco B.T.I. was the previous entry in this blog.

Belize Chamber of Commerce and Industry Concerned over Belize Telemedia Takeover is the next entry in this blog.

Find recent content on the main index or look in the archives to find all content.

### Categories

### Monthly Archives

February 2010 (8)
January 2010 (2)
December 2009 (3)
November 2009 (3)
October 2009 (9)
September 2009 (4)
August 2009 (7)
July 2009 (2)
May 2009 (1)
April 2009 (5)
March 2009 (4)
February 2009 (1)
December 2008 (4)
October 2008 (4)
September 2008 (1)
August 2008 (2)
July 2008 (1)

### Pages

Subscribe to this blog's feed

POWERED BY
MT 4
MOVABLE TYPE®



rates, leaving the consumers at their mercy. But it still did not stop there. All other existing Telecoms licenses ( excepting Speednet's - about which more later) had to be revoked. Voice Over Internet Protocol, which we all know gives consumers the cheapest option, is outlawed. Telemedia is able to refuse interconnection to any and everyone, including internet service providers. And the PUC cannot, for any cause and no matter what the complaint, in any way touch or alter Telemedia's license. Finally, the Accommodation Agreement binds each government department, agency, or associated body, to use only Telemedia's services at onerous pre-arranged rates until 2015, and thereafter for successive 3 year renewal periods.

Now, Mr. Speaker, this is where the new government of the United Democratic Party came in. As soon as we discovered this Accommodation Agreement and the fact that it had been secretly signed and secretly implemented by the PUP, we came to the Belizean public and denounced it. Lord Michael Ashcroft is an extremely powerful man. His net worth may well be equal to Belize's entire GDP. He is nobody to cross and the new government could well have chosen the path of least resistance; to cower in the face of the certain wrath of this potentate; to continue in the PUP style with business as usual; to betray, in other words, all that we had campaigned for, all that we had promised, and all that is basic and decent and straight forward if there is to be any ounce of trust left in public office. But betrayal of the people is not in my nature, and not, I am surpassingly proud to say, in the nature of the United Democratic Party.

And so we took counsel among ourselves and to a man the UDP cabinet voted, in the name of the Belizean people, to resist this treasonous Accommodation Agreement at all costs. Belizean Law and Belizean dignity would be upheld; Belizean pride and Belizean patriotism and Belizean patrimony vindicated.

And, of course, resisted we have. Now no one can doubt the justice of our stand. But, as we always knew, it has been costly. Michael Ashcroft had Telemedia invoked arbitration in London to enforce the Accommodation Agreement. And he obtained a judgment of 38.5 million dollars and a court - mandated requirement that government now begin to honor the Accommodation agreement.

Well, I have said that as God is my witness I will never pay that award. But it doesn't stop there. In April of 2009 Telemedia informed the government of further claims they will make to the London Court of International Arbitration, and that the size of a new award "could pale the current award of 38 million into insignificance".

Mr. Speaker, Members, fellow Belizeans: this is intolerable. I, and the United Democratic Party Government, in the name of the people will put up with it no longer. That an agreement so patently illegal, so patently immoral, so patently anti-Belize, should continue to torture us, to bleed us, to subject us to this death by a thousand cuts, cannot for one second more be countenanced. This is our House, this is our country. Here we are masters, here we are sovereign. And with the full weight of that sovereignty we must now put an end to this disrespect, to this chance taking, to this new age slavery. There will thus be no more Telemedia awards against us; no more Telemedia court battles; no more debilitating waste of government's energies and resources; and there will be no more suffering of this one man's campaign to subjugate an entire nation to his will. After long and sufficient consideration, therefore, and in the exercise of that national power that is ours by Constitution and inalienable right, this government will now acquire Telemedia.

Think on it Mr. Speaker. Telecommunications uses the airwaves as its medium. But these airwaves constitute a God-given natural resource of Belize, just like our sun, our sea, our rivers, our forests. These things together help to make up the patrimony of the Belizean people, and the exploitation of that patrimony must always be consistent with the interests of Belizeans. When those that come to partner with us demonstrate beyond all doubt that they will upend equitability, upend reasonableness, that they will, infamy upon infamy, beat us about our heads with our own inheritance, the very blood coursing through our Belizean veins obliges us to act.

Just as fundamental, though perhaps a little more prosaic, telecommunications - information and communications technology - is a critical part of the development apparatus of any modern society. Indeed, as has been officially recognized by our regional integration movement CARICOM, it is an indispensable tool in that restructuring of developing countries' economies that, in the face of the global crisis, must begin to take place now. Accordingly, unregulated monopoly control and abuse of the sector cannot be permitted. Yet, that is precisely what the Accommodation Agreement mandates. This is especially so in view of the fact that even the very limited mobile phone so-called competitor to Telemedia, is owned by Telemedia. That is right and I have the documents to prove it. 77.38% of Speednet is owned by three companies - Cailerbar Limited. Riddermark Ventures Limited, and Heaver Holdings Limited. These three companies are headquartered at the Belize City Cork Street premises of Michael Ashcroft, and controlled by two of the now notorious Trusts owned by Michael Ashcroft.

And so Mr. Speaker let no one be in any doubt as to why we are doing what we are doing today. Let no one confuse or misunderstand our purpose. This is not ideology, this is not triumphalism. This is a country in particular circumstances reaching the end of its patience and doing a singular, necessary, righteous thing to protect its national interest. It is not part of any pattern, part of no new philosophy. It is plain and simple a special measure for a



Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 267 of 485

Case 1:09-cv-02170-BJL   Document 16-35   Filed 03/29/10   Page 21 of 43
Belize Prime Minister's verbatim introduction of bill to take over Belize Telemedia Ltd. ...   Page 3 of 4

special case. We make no apologies for it, but we also do not seek to elevate it. As must be clear from the developments in even the global bastions of super capitalism and private property, this is what countries do to protect themselves. It is an article of faith and a cardinal rule of statecraft that a nation will act in any way necessary to preserve its national interest. That national interest, in these circumstances, now absolutely demands our present course of action.

So there you have it, Mr. Speaker, the government's brief from the heart. In the days to come, the dissection and the deconstruction, both at home and abroad, will of course take place. But no matter which way you look at it, ours is a straightforward case and a compelling case. We will move ahead not unaware of the difficulties that will be thrown up, but with a confidence that is both supreme and serene because we know we are right.

Before I conclude, just let me spend a little time telling you what will happen as we proceed. First of all, you will see that the Bill makes every provision for fair and proper compensation to be paid to the owners of the shares we will acquire. This is not, I repeat, some cowboy action but something done in the full plenitude of, and compliance with, our Constitution. As well, we are only acquiring the 94% or so of Telemedia that is controlled by the Ashcroft interests. The shareholding owned by Belizeans will be left intact. The actual acquisition will be done by way of an order made by the Minister of Tele communications, who will in that same order appoint a new Board of Directors. As soon as practicable after, an extraordinary general meeting will be held and new Articles of Association adopted. The new Articles will essentially be the Articles of the successful BTL that was launched in 1988. In other words, the safeguards to protect Belizean shareholders will be re-established, including protection of the special share and the limitation on the amount of single ownership. As well, and perhaps most importantly, the articles will guarantee that dividends will be paid to shareholders at the rate of 40% of the yearly profits.

Of course, a prospectus will as early as possible be published. On this basis, Belizeans will be invited to purchase the shares now being acquired in Telemedia by the Government. In other words, there is no intention for government to hold on to those shares. This acquisition is, rather, to give all Belizeans a chance to invest once again in a company that has proven to be a money maker.

I also want to say that the new Board of Directors will be chaired by Mr. Nestor Vasquez and will have the Right Honorable Manuel Esquivel as a member. Telemedia's current employees will, of course, all keep their jobs. Indeed, we expect a greatly improved industrial relations climate and the quick resolution of outstanding worker grievances. I think particularly of the arbitration case of the dismissed workers, a case the current ownership of Telemedia has utterly frustrated. I am positive, therefore, that Telemedia's staff, like all other right-thinking Belizeans, will completely support the Government's move and cooperate to make the transition as seamless as possible. For consumers, we expect services to continue uninterrupted. We do not believe the present operators of the company will try any kind of sabotage. If they do, we will have to use already existing provisions of the law to move in and take control even before the passage of this Bill.

Mr. Speaker, I close by saying that no one need feel any sympathy for Lord Ashcroft. This is not an ad hominem move; it is to deal with a structural problem. Indeed, apart from his compensation, Lord Ashcroft's interests will remain profit-making participants in Belize's Telecommunications sector, because those interests own Speednet, the other telecoms provider. This, I repeat then, is only about Telemedia; and no more and no less than a case of the Belizean national interest trumping any other consideration.

Thank you, Mr. Speaker, and I look forward to the debate.

The above is the full text of the Prime Minister's introduction of a law to take over ownership of Belize Telemedia Ltd.

Tags: Belize

## Leave a comment

Name

Email Address

URL

☐ Remember personal info?

Comments (You may use HTML tags for style)

# Courtenay Declaration Exhibit I

## IN THE SUPREME COURT OF BELIZE, A.D. 2009

**CLAIM NO. 1042 of 2009**

|  |  |  |
|---|---|---|
| **ATTORNEY GENERAL** | - | **CLAIMANT** |

**AND**

| | | | |
|---|---|---|---|
| **JOSE ALPUCHE** | - | **1ˢᵗ DEFENDANT** | |
| **KEITH ARNOLD** | - | **2ⁿᵈ DEFENDANT** | |
| **LORD ASHCROFT, KCMG** | - | **3ʳᵈ DEFENDANT** | |
| **DEAN BOYCE** | - | **4ᵗʰ DEFENDANT** | **as Trustees of the Hayward Charitable Belize Trust** |
| **ALLAN FORREST** | - | **5ᵗʰ DEFENDANT** | |
| **PETER GAZE** | - | **6ᵗʰ DEFENDANT** | |
| **PHILIP OSBORNE** | - | **7ᵗʰ DEFENDANT** | |
| **EDIBERTO TESUCUM** | - | **8ᵗʰ DEFENDANT** | |
| **PHILIP ZUNIGA** | - | **9ᵗʰ DEFENDANT** | |
| **DUNKELD INTERNATIONAL INVESTMENT LTD** | - | **10ᵗʰ DEFENDANT** | |

## PENAL NOTICE

1.  This Order prohibits you from doing the acts set out in this Order. You should read it carefully. You are advised to consult an attorney as soon as possible. You have a right to ask the Court to vary or discharge this Order.

2.  If you disobey this Order you may be found guilty of contempt of Court.

1

3.     A respondent who is an individual who is ordered not to do something must not do it himself or in any other way.  He must not do it through others on his behalf or on his instructions or with his encouragement.

4.     A respondent which is a corporation and which is ordered not to do something must not do it itself or by its directors, officers, employees or agents or in any other way.

## ORDER

Before the Honourable Mr. Justice Samuel Lungole Awich

The 29th day of December, 2009.

UPON HEARING Lois Young S.C. of Counsel for the Claimant (Applicant);

AND UPON READING the affidavit of Gian C. Gandhi dated 22 December 2009 filed in support of the application;

AND UPON THE Claimant (Applicant), through his Counsel, undertaking to pay any damages, which the Defendants (Respondents) may sustain which the Court considers the Claimant should pay,

**IT IS ORDERED THAT:**

1.     The 1st to the 9th Defendants, as Trustees of the Hayward Charitable Belize Trust, and the 10th Defendant, Dunkeld International Investment Ltd., whether by themselves or by their officers, servants, agents, subsidiaries, assignees, or other persons and bodies under their control, are hereby restrained until further order from taking any or any further

3.     A respondent who is an individual who is ordered not to do something must not do it himself or in any other way.  He must not do it through others on his behalf or on his instructions or with his encouragement.

4.     A respondent which is a corporation and which is ordered not to do something must not do it itself or by its directors, officers, employees or agents or in any other way.

## ORDER

Before the Honourable Mr. Justice Samuel Lungole Awich

The 29th day of December, 2009.

UPON HEARING Lois Young S.C. of Counsel for the Claimant (Applicant);

AND UPON READING the affidavit of Gian C. Gandhi dated 22 December 2009 filed in support of the application;

AND UPON THE Claimant (Applicant), through his Counsel, undertaking to pay any damages, which the Defendants (Respondents) may sustain which the Court considers the Claimant should pay,

**IT IS ORDERED THAT:**

1.     The 1st to the 9th Defendants, as Trustees of the Hayward Charitable Belize Trust, and the 10th Defendant, Dunkeld International Investment Ltd., whether by themselves or by their officers, servants, agents, subsidiaries, assignees, or other persons and bodies under their control, are hereby restrained until further order from taking any or any further

steps in the continuation or prosecution of the arbitration proceedings commenced by the 10th Defendant, Dunkeld International Investment Ltd., by Notice of Arbitration dated 4 December, 2009, under the Arbitration Rules of the United Nations Commission on International Trade Law 1977 and the 1982 Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Belize for the Promotion and Protection of Investments, arising out of or relating to the acquisition of certain property by the Government of Belize under the Belize Telecommunications (Assumption of Control Over Belize Telemedia Limited) Order, 2009 (S.I. No. 104 of 2009), as amended by the Belize Telecommunications (Assumption of Control Over Belize Telemedia Limited) (Amendment) Order, 2009 (S.I. No. 130 of 2009).

2.    Permission is granted to the Claimant to serve the Claim Form, the Application and supporting affidavit and this Order, and all other associated documents on the 2nd Defendant, Keith Arnold, outside the jurisdiction at No. 6779 Columbia Avenue, Lake Worth, Fl. 33467, USA, or elsewhere, pursuant to Rule 7.3(2) (c) (ii) and Rule 7.10(1) (b).

3.    Permission is also granted to the Claimant to serve the Claim Form, the Application and supporting affidavit and this Order and all other associated documents on the 10th Defendant, Dunkeld International Investment Ltd., outside the jurisdiction, at Box 97, No. 1 Caribbean Place, Leeward Highway, Providenciales, Turks and Caicos Islands or elsewhere, pursuant to Rule 7.3(2) (c) (ii) and Rule 7.10(1) (d).

4.    The 2nd Defendant and the 10th Defendant shall each, after service on it of the Claim Form, respond to it by filing and serving:

3

(a)  an acknowledge of service within 21 days after service on it;

(b)  an affidavit in response to the application herein, within 21 days after service on it.

5.  Service of the Claim Form, the application and supporting affidavit and this Order and all other associated documents shall be forthwith carried out on the 1st Defendant and the 3rd through 9th Defendants.

6.  The 1st Defendant and the 3rd through 9th Defendants shall each, after service on him, respond by filing an acknowledgment of service and affidavit in response within 14 days of service.

7.  This Order is returnable on Tuesday the 26th day of January 2010 at 9:00 a.m.

8.  The costs of this application shall be costs in the cause.

9.  The Defendants (Respondents) shall have liberty to apply on 72 hours' written notice to the Claimant's attorneys for a variation or discharge of this Order.

Dated 2☐ December, 2009

BY ORDER

REGISTRAR

The court office is at Supreme Court Registry, Regent Street, Belize City, Belize, Telephone No. 227-7377, Fax No. 227-0181.  The Office is open between 8:00 a.m. and 5:00 p.m. Monday to Thursday, and 8:00 a.m. to 4:30 p.m. Friday, except on public and bank holidays.

4

# Courtenay Declaration Exhibit J

# IN THE SUPREME COURT OF BELIZE, A.D. 2009

**CLAIM NO. 1042 of 2009**

| | | |
|---|---|---|
| **ATTORNEY GENERAL** | - | **CLAIMANT** |

**AND**

| | | | |
|---|---|---|---|
| **JOSE ALPUCHE** | - | **1st DEFENDANT** | |
| **KEITH ARNOLD** | - | **2nd DEFENDANT** | |
| **LORD ASHCROFT, KCMG** | - | **3rd DEFENDANT** | |
| **DEAN BOYCE** | - | **4th DEFENDANT** | **as Trustees of the Hayward Charitable Belize Trust** |
| **ALLAN FORREST** | - | **5th DEFENDANT** | |
| **PETER GAZE** | - | **6th DEFENDANT** | |
| **PHILIP OSBORNE** | - | **7th DEFENDANT** | |
| **EDIBERTO TESUCUM** | - | **8th DEFENDANT** | |
| **PHILIP ZUNIGA** | - | **9th DEFENDANT** | |
| **DUNKELD INTERNATIONAL INVESTMENT LTD** | - | **10th DEFENDANT** | |

## PENAL NOTICE

1.  This Order prohibits you from doing the acts set out in this Order.   You should read it carefully.   You are advised to consult an attorney as soon as possible.   You have a right to ask the Court to vary or discharge this Order.



11-2-2010
10:15AM

1

2.     If you disobey this Order you may be found guilty of contempt of Court.

3.     A respondent who is an individual who is ordered not to do something must not do it himself or in any other way.  He must not do it through others on his behalf or on his instructions or with his encouragement.

4.     A respondent which is a corporation and which is ordered not to do something must not do it itself or by its directors, officers, employees or agents or in any other way.

## ORDER

Before the Honourable Mr. Justice Samuel Lungole Awich

The 5th day of February, 2010.

UPON HEARING Lois Young of Counsel for the Claimant (Applicant) and Eamon Courtenay, S.C. of Counsel for the 1st, 2nd, 3rd, 4th, 7th, 8th and 9th Defendants (Respondents);

AND UPON READING the first affidavit of Gian C. Gandhi dated 22nd December 2009 filed in support of the application; and the first affidavit of Jose Alpuche dated the 8th January 2010 filed in support of the application to discharge the without notice injunction granted on the 29th December 2009;

AND UPON THE Claimant (Applicant), through his Counsel, undertaking to pay any damages, which the Defendants (Respondents) may sustain which the Court considers the Claimant should pay,

**IT IS ORDERED THAT:**

1.  Since the seven respondents: Jose Alpuche, Keith Arnold, Lord Ashcroft, Dean Boyce, Philip Osborne, Ediberto Tesucum, and Philip Zuniga presented and argued their application dated 8.1.2010, for an order to set aside the interim injunction order made on an application without notice on 29.12.2009, their application dated 8.1.2010, is formally dismissed.

2.  The application dated 22.1.2010, of the Attorney General for the continuation of the interim injunction order made on 29.12.2009, is granted, but modified in that instead of continuation of the order, a new interim injunction order is made to last until the determination of this claim (No. 1042 of 2009) of the Attorney General, or until further order.  The draft order filed is amended to spell out the terms of the injunction granted.

3.  The Terms of the injunction granted are the following:
    Jose Alpuche, Keith Arnold, Lord Ashcroft, KCMG, Dean Boyce, Allan Forrest, Peter Gaze, Philip Osborne, Ediberto Tesucum, Philip Zuniga, as Trustees and or advisers of the Hayward Charitable Belize Trust, or in any other capacity, and the 10th Defendant, Dunkeld International Investment Ltd., whether by themselves or by their officers, servants, agents, subsidiaries, assignees, or other persons and bodies under their control, are hereby restrained until the determination of this claim (No. 1042 of 2009) of the Attorney General or until further order, from taking any or any further steps in the continuation or prosecution of the arbitration proceedings commenced by the 10th Defendant, Dunkeld International Investment Ltd., by Notice of Arbitration dated 4 December, 2009, under the Arbitration Rules of the United Nations Commission on International Trade Law 1977, and the 1982 Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Belize, for the Promotion and Protection of Investments, arising out of or relating to the

acquisition of certain property by the Government of Belize under the Belize Telecommunications (Assumption of Control Over Belize Telemedia Limited) Order, 2009 (S.I. No. 104 of 2009), as amended by the Belize Telecommunications (Assumption of Control Over Belize Telemedia Limited) (Amendment) Order, 2009 (S.I. No. 130 of 2009).

4.    Since Allan Forrest, Peter Gaze and Dunkeld International Investment Ltd. did not attend the hearing of the applications, it is open to them to apply for an order to set aside these orders in respect to themselves.

5.    The costs of this application shall be costs in the cause.

Dated the    10th day    February    , 2010.

BY ORDER

REGISTRAR

4

# Courtenay Declaration
# Exhibit K

Claim No 2010 - 513

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**AND IN THE MATTER OF AN ARBITRATION APPLICATION**



**BEFORE THE HONOURABLE MR JUSTICE HAMBLEN**

BETWEEN:

### THE BRITISH CARIBBEAN BANK LIMITED

**Applicant/Claimant**

and

### THE ATTORNEY-GENERAL OF BELIZE
### ON BEHALF OF THE GOVERNMENT OF BELIZE

**Respondent/Defendant**



~~DRAFT~~ **ORDER**

### ORDER FOR AN INTERIM ANTI-SUIT INJUNCTION

**PENAL NOTICE**

(1) This Order prohibits you from doing the acts set out in this Order. You should read it all carefully. You are advised to consult a Solicitor as soon as possible. You have a right to ask the Court to vary or discharge this Order.

(2) If you disobey this Order you may be found guilty of Contempt of Court. Any other person who knows of this Order and does anything which helps or permits the Respondent to breach the terms of this Order may also be held to be in Contempt of Court

An application was made on 4 May 2010 by the Solicitor-Advocate for the Claimant to the Honourable Mr Justice Hamblen. The Judge heard the application and read the Witness Statement of Mr Matthew Peter Gearing listed in Schedule 1 and accepted the undertakings in Schedule 2 of this Order.

**IT IS ORDERED** that

**The Injunction**

(1) Until further order of the Court or 14 days following the first procedural hearing of the arbitral tribunal in the anticipated arbitration referred to below, the Defendant acting by itself or by its officers, employees or agents or in any other way, is restrained from commencing, pursuing, progressing or taking any steps before the Courts of Belize or elsewhere to enjoin or restrain the Claimant and/or the Tribunal from commencing or taking any steps in an anticipated arbitration against the Defendant under the "*Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Belize for the Promotion and Protection of Investments*" (as subsequently extended to the Turks and Caicos Islands by Exchange of Notes between the UK and Belize which came into force on 10 December 1985) arising out of and/or in relation to:

(i) An overdraft facility granted by the Claimant to Sunshine Holdings Limited by way of a letter dated 19 May 2006;

(ii) A Syndicated Loan Facility dated 19 September 2005 between the Claimant and Sunshine Holdings Limited;

(iii) A security agreement dated 19 September 2005 between the Claimant and Sunshine Holdings Limited;

(iv) A Term Loan Facility dated 6 July 2007 granted by the Claimant to Belize Telemedia Limited; and/or

(v) A Mortgage Debenture dated 31 December 2007 between the Claimant and Belize Telemedia Limited.

**Costs of the application**

(2) Costs reserved to the Judge hearing any return application. If no return application is made within the time specified below in (3), then express liberty to the Claimant to apply in writing for an order for the costs of this application.

**Variation or discharge of this Order**

(3) The Defendant has liberty to apply to the Court to discharge and/or vary this Order at any time but if it wishes to do so it must first inform the Claimant's Solicitors in writing at least 48 hours beforehand. The Claimant's Solicitors are Allen & Overy LLP, One Bishops Square, London E1 6AD (Ref: JAEG/MPG/AAMW 0093963-0000001). The contact telephone number is +44(0)20 3088 0000.

**Permission to Serve out of the Jurisdiction and by an alternative method**

(4) The Claimant has permission to issue and serve the Application Notice, this Order and such further documents as may be required to be served in these proceedings either by way of court order or in accordance with provisions of the CPR from time to time together with a copy of a Claim Form in this action (the "Documents") out of the jurisdiction on the Defendant at The Government of Belize, New Administration Building, Belmopan, Belize, Central America or elsewhere where the Defendant may be found in Belize.

(5) The Claimant has permission to issue and serve an Arbitration Claim Form on the Defendant through the Foreign and Commonwealth Office in accordance with CPR 6.44 and section 12 of the State Immunity Act 1978.

(6) The Defendant has two months and 37 days after service on it of the Arbitration Claim Form to respond to the Arbitration Claim Form by filing and serving:

(a) an acknowledgment of service; and
(b) either an admission; or
(c) a defence.

(7) The Claimant has permission to serve the Documents by an alternative method, namely by express courier.

All communications to the Court about this Order should be sent to the Commercial Court Clerk, the Listing Office, Room E201, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number. The telephone number +44 20 7947 6826. The offices are open 10am and 4.30pm Monday to Friday.

**Dated this 4th of May 2010**

## SCHEDULE 1

## WITNESS STATEMENTS

The Judge read the Witness Statement of Mr Matthew Gearing dated 4 May 2010 before making this Order.

## SCHEDULE 2

**Undertakings given to the Court by the Claimant and BCB Holdings Limited**

(1)     If the Court finds that this Order has caused loss to the Defendant or any other party served with or notified of this Order and decides that the Defendant or other party should be compensated for that loss, the Claimant will comply with any Order that the Court may make to that effect.

**Undertakings given to the Court by the Claimant**

(2)     The Claimant undertakes to issue the draft Arbitration claim form and the draft Application Notice (substantially in the form of the drafts attached to this order) as soon as is reasonably practicable.

(3)     The Claimant undertakes to serve on the Defendant the Arbitration claim form, this Order, the Witness Statement of Mr Matthew Gearing, the Skeleton Argument and a Note of the Hearing at which this Order was granted at The Government of Belize, New Administration Building, Belmopan, Belize, Central America by express courier, as soon as is reasonably practicable.

(4)     The Claimant undertakes to serve the Notice of Arbitration (substantially in the form exhibited to the Witness Statement of Mr Matthew Gearing) at The Government of Belize, New Administration Building, Belmopan, Belize, Central America by express courier, as soon as is reasonably practicable.

# Courtenay Declaration

# Exhibit L

## IN THE SUPREME COURT OF BELIZE A.D. 2010

CLAIM NO. ____ of 2010

BETWEEN:

THE ATTORNEY GENERAL                    CLAIMANT

−AND-

BRITISH CARIBBEAN BANK LIMITED    DEFENDANT

---

### FIXED DATE CLAIM FORM

IN THE SUPREME COURT OF BELIZE, A.D. 2010

CLAIM NO. __5ᵈᵗ__ of 2010

ATTORNEY GENERAL              -        CLAIMANT

AND

BRITISH CARIBBEAN BANK LIMITED -      DEFENDANT

FIXED DATE CLAIM FORM
[Rule 8.1(5)]

———

The Claimant,       Attorney General, representing the Government of Belize, of
                    Attorney General's Ministry, Belmopan, Belize

Claims against

The Defendant       British Caribbean Bank Limited of Governor's Road,
                    Leeward, Providenciales, Turks and Caicos Islands

the following reliefs:

1.    A declaration that the Supreme Court of Belize is the proper forum for
      the determination of all claims to compensation and other matters arising
      out of or relating to the acquisition of certain property by the Government
      of Belize, including the property of the Defendant herein, under the
      Belize Telecommunications (Assumption of Control Over Belize
      Telemedia Limited) Order, 2009 (S. I. No. 104 of 2009), as amended by
      the Belize Telecommunications (Assumption of Control Over Belize

1

Telemedia Limited) (Amendment) Order, 2009 (S.I. No. 130 of 2009) (hereinafter collectively referred to as the **"Acquisition Orders"**).

2.   A declaration that the 1982 Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Belize for the promotion and protection of investments (hereinafter referred to as **"the Treaty"**), not having been brought into domestic law by enabling legislation, is not a part of the law of Belize and cannot be relied upon by the Defendant or any other person.

3.   A declaration that there is no agreement between the Claimant and the Defendant to refer any disputes arising out of or relating to the Acquisition Orders to international arbitration.

4.   A declaration that, in any case, the Defendant, being under the control of a citizen of Belize, has no *locus* to invoke the Treaty, even if it were to be assumed (without admitting) that the Treaty applied.

5.   A declaration that the action of the Defendant in commencing arbitration proceedings against the Government of Belize, by Notice of Arbitration dated 4 May 2010 and continuing with such proceedings, is oppressive, vexatious, inequitable and an abuse of the arbitral process within the meaning of section 106A(8) (i) of the Supreme Court of Judicature Act (CAP. 91), as amended by the Supreme Court of Judicature (Amendment) Act 2010 (No. 18 of 2010), or otherwise.

6.   An order restraining the Defendant, whether by itself or by its servants, agents, subsidiaries, assignees, or other persons and bodies under its control, from taking any or any further steps in the continuation or

2

prosecution of the arbitration proceedings commenced by the Defendant by Notice of Arbitration dated 4 May, 2010, in respect of or relating to the acquisition of certain property by the Government of Belize under the Acquisition Orders, or commencing or continuing any other arbitral proceedings arising out of or relating to the same facts.

7       Further or other relief.

8.      Costs.

Filed by Magalie Perdomo, Crown Counsel, Attorney General's Ministry, for the Claimant herein, whose address for service is c/o Supreme Court Library, Belize City, Belize.

Dated /6   August 2010                   Magalie Perdomo

**Certificate of Truth**

I, Bernard Q. A. Pitts, Attorney General, hereby certify that the facts stated herein are true and accurate to the best of my knowledge and belief.

Dated: /6   August 2010                   Bernard Q. A. Pitts

3

IN THE SUPREME COURT OF BELIZE, A.D. 2010

CLAIM NO. _____ of 2010

ATTORNEY GENERAL                    -        CLAIMANT

AND

BRITISH CARIBBEAN BANK LIMITED      -        DEFENDANT

_____ ··· _____

This Claim Form and the application for interim injunction are supported by the affidavit of Joseph Waight sworn to on _____ August, 2010 and filed on _____ August 2010, and the affidavit of Bernard Q. A. Pitts sworn to on _____ August 2010 and filed on _____ August 2010.

Dated: _____ August 2010

Magalie Perdomo
Crown Counsel for the Claimant

4

## NOTICE TO THE DEFENDANT

The first hearing of this claim will take place at [Hon. Justice Legall]     on Wednes day the 13 day of October , 2010   , at 9:00 a.m. / p.m.

If you do not attend at that hearing, judgment may be entered against you in accordance with the claim.

If you do not attend, the judge may –

   (a)    deal with the claim, or
   (b)    give directions for the preparation of the case for a further hearing.

A statement of claim or an affidavit giving full details of the claimant's claim should be served on you with this claim form.  If not and there is no order permitting the claimant not to serve the statement of claim or affidavit you should contact the court office immediately.

You should complete the form of acknowledgment of service served on you with this claim form and deliver or send it to the court office (address below) so that they receive it within 14/28 days of service of this claim form on you.  The form of acknowledgment of service may be completed by you or a legal practitioner acting for you.

You should consider obtaining legal advice with regard to this claim. See the notes on the back of this form or on the next page.

This claim form has no validity if it is not served within 6 months of the date below unless it is accompanied by an order extending that time.

Dated:    16     day of August, 2009    2010

5

The court office is at the Treasury Lane, Belize City, telephone number 227-7377, FAX 227-0181.   The office is open between 8:00 a.m. and 12:00 p.m. and from 1:00 p.m. to 5:00 p.m. except on public and bank holidays.

The Claimant's address for service is (set out clearly below).

> Law Librarian
> Supreme Court Library
> Belize City
> BELIZE

## NOTES FOR DEFENDANTS (FIXED DATE CLAIM)

The claimant is seeking an order from the court as set out in the claim form on the basis of the facts or evidence set out in the statement of claim or affidavit served with it. The claimant will not be entitled to enter judgment against you without a hearing.

You may:

### A.    *Admit the claim*

If so, you should complete and return the form of acknowledgment of service to the court office within 14/28 days stating this. You may attend the first hearing if you wish to do so.

### B.    *Dispute the claim*

If so, you should complete and return the form of acknowledgment of service as under A.   You should also file at the court office and serve on the claimant's legal practitioner (or the claimant if the claimant has no legal practitioner):

(a)  a defence if the claim form was accompanied by the claimant's statement of claim,

OR

(b)  an affidavit in answer if the claim form is accompanied by an affidavit sworn by or on behalf of the claimant

within 28/42 days of the day on which the claim form was served on you. Your defence or affidavit must set out briefly ALL the facts on which you will rely to dispute the claim made against you.

7

You should also attend the first hearing.  If you do not the judge may deal with the claim in your absence.

### C.    *Make a claim against the claimant*

If so, you should complete and return the form of acknowledgment of service as under A. You must file a statement of claim (a counterclaim) setting out full details of what you claim against the claimant and the facts on which you will rely. This must be done within 28/42 days of the date on which the claim form was served on you. The statement of claim should set out ALL the facts on which you rely in disputing any part of the claimant's claim against you.

**You should also attend the first hearing. If you do not the judge may deal with the claim in your absence.**

——————·····————————

**FORM 4A**

**Acknowledgement of Service of Fixed Date Claim Form**

**[Rule 9.2(1)]**

CLAIM NO. ⟍⟋ OF 2010

BETWEEN:

      **ATTORNEY GENERAL**         -      **CLAIMANT**

      **AND**

      **BRITISH CARIBBEAN BANK LIMITED**    -    **DEFENDANT**

———  ·  ———

## ACKNOWLEDGEMENT OF SERVICE OF FIXED DATE CLAIM FORM

WARNING:   This form should be completed and returned to the court at the address below within 14/28 days of service of this claim form on you.

However, the claimant will not be entitled to have judgment entered against you except at the first or subsequent hearing of the claim.

| | | |
|---|---|---|
| 1. | Have you received the claim form with the above number? .............................................. | YES/NO |
| 2. | If so, when did you receive it? ...................... | dd/mm/yy |
| 3. | Did you also receive the claimant's statement of Claim or affidavit in support? ...................... | YES/NO |
| 4. | If so, on what date did you receive then ........... | dd/mm/yy |
| 5. | Are your names properly stated on the claim form? If not, what are your full names?.............. | |

9

6.      Do you intend to defend the claim? ...............     YES/NO

If so, you must file a defence within 28/42 days of the service of the claim form on you.

7.      Do you admit the whole claim? ...................     YES/NO

8.      Do you admit any part of the claim? .............     YES/NO

9.      If so, what do you admit? ..........................

10.     What is your own address? .......................

11.     What is your address for service? ...............

If you are acting in person you must give an address within ____ miles of the court office to which documents may be sent either from other parties or from the court.  You should also give your telephone number and FAX number, if any.

Date ...............................................

Signed ............................................

[Defendant in person] [Defendant's Legal Practitioner]

10

The court office is at Treasury Lane, Belize City, telephone number 227-7377, FAX 227-0181.  The office is open between 8:00 a.m. and 12:00 p.m. and from 1:00 p.m. to 5:00 p.m. except on public and bank holidays.

———————  ...  ———————

# Courtenay Declaration Exhibit M

## IN THE SUPREME COURT OF BELIZE, A.D.  2010

**CLAIM NO.  588 of 2010**

| | |
|---|---|
| **ATTORNEY GENERAL** | **CLAIMANT** |
| **AND** | |
| **BRITISH CARIBBEAN BANK** | **DEFENDANT** |

<u>Hearings</u>
 <u>2010</u>
6th  September
13th October
12th November
7th  December


Ms.  Lois Young SC and Ms.  Magali Perdomo for the Claimant.
Lord Peter Henry Goldsmith QC and Mrs.  Ashanti Arthurs-Martin for the Defendant.



LEGALL    J.


### JUDGMENT


### <u>The Treaty or Agreement</u>

1.    On  the  30th  April  1982  an  agreement  was  made  between  the Government  of  the  United  Kingdom  of  Great  Britain  and  Northern

Ireland, and the Government of Belize, for the promotion and protection of investments in the country of each contracting party.

2.    The agreement or treaty was signed at Belmopan, Belize, by Neil Marten, the then Secretary of State for Foreign Affairs for Great Britain; and by George Price, the then Prime Minister of Belize. Article 12 of the Agreement states that the agreement comes into force upon signature of the parties.   The agreement, in the first instance, remains in force for ten years; and thereafter, according to Article 13, it shall continue in force until the expiration of twelve months from the date on which either contracting party gives written notice of termination to the other contracting party.  No such notice of termination has ever been given.

3.    The general purpose of the agreement was to create favourable conditions for greater investment by nationals and companies of one state in the territory of the other State, recognizing that the encouragement and reciprocal protection under international agreements of such investments, would be conducive to the stimulation of individual business initiative and would increase prosperity in both states.

4.    Article 11 of the agreement authorizes the contracting parties to extend the agreement to such territories, as may be agreed between them, by virtue of, what the agreement calls, an Exchange of Notes. A document entitled Exchange of Notes was signed on 28th November, 1985 by Jim Crosby, the then Secretary of State for

Foreign Affaires, on behalf of the U.K.; and by Dean O. Barrow, the present Prime Minister of Belize, but who was then the Minister of Foreign Affairs, on behalf of Belize. The Exchange of Notes extended the terms of the Agreement of 30th April 1982 to the Turks and Caicos Islands. The significance of the extension of the agreement is that the provisions of the agreement were made applicable to nationals of, and companies registered in, the Turks and Caicos Islands. The defendant bank is a company registered in the Turks and Caicos Islands and carries on business there.

5.   The agreement contains several other provisions relevant to these proceedings. Article 1 of the agreement defines investment to include every kind of asset, including shares, stocks and debentures of companies, or interest in the property of such companies. Article 2 makes provisions for the promotion and protection of investments. Concerning the nationalization of investments of companies by either contracting party to the agreement, article 5 states as follows:

> "(1)  Investments of nationals or companies of either Contracting Party shall not be nationalized, expropriated or subjected to measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party except for a public purpose related to the internal needs of that Party and against just and equitable compensation. Such compensation shall amount to the fair market value of the investment expropriated before the expropriation or impending

expropriation became public knowledge, shall include interest at the rate prescribed by law until the date of payment, shall be made without undue delay effectively realizable and be freely transferable. The national or company affected shall have a right, under the law of the Contracting Party making the expropriation, to prompt review, by a judicial or other independent authority of that Party, of his or its case and of the valuation of his or its investment in accordance with the principles set out in this paragraph.

(2)   Where a Contracting Party expropriates the assets of a company which is incorporated or constituted under the law in force in any part of its own territory, and in which nationals or companies of the other Contracting Party own shares, it shall ensure that the provisions of paragraph (1) of this Article are applied to the extent necessary to guarantee the compensation provided for in that paragraph in respect of their investment to such nationals or companies of the other Contracting Party who are owners of those shares."

6.     Article 8 deals with the settlement of disputes between an investor and the host State, and it states as follows:

"(1)   Disputes between a national or company of one Contracting Party and the other Contracting Party concerning an obligation of the latter under this Agreement in relation to an investment of the former

4

which have not been amicably settled shall after a period of three months from written notification of a claim be submitted to international arbitration of either party to the dispute so wishes.

(2) Where the dispute is referred to international arbitration, the investor and the Contracting Party concerned in the dispute may agree to refer the dispute either to –

(a)  the International Centre for the Settlement of Investment Disputes (having regard to the provisions, where applicable, of the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington D.C. on 18 March 1965 and the Additional Facility for the Administration of Conciliation Arbitration and Fact-Finding Proceedings); or

(b) the Court of Arbitration of the International Chamber of Commerce; or

an international arbitrator or ad hoc arbitration appointed by a special agreement or established under the Arbitration Rules of the United Nations Commission on International Trade Law.

If after a period of three months from written notification of the claim there is no agreement to an alternative procedure, the parties to the dispute shall be bound to submit it to arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law as then in force.

The parties to the dispute may agree in writing to modify these Rules."

**Compulsory Acquisition of Bank's Property**

7.  The defendant bank made several loans to Belize Telemedia (BTL), a telecommunications company registered and operating in Belize. One such loan to BTL in the amount of US$22,500.000 was made by the defendant bank on 6th July, 2007; and the purpose claimed was to acquire telecommunication assets and equipment for BTL.  BTL entered into several other loan agreements and mortgage debentures and put up as security its assets for such loans.

8.  On 25th August 2009, the House of Representative and the Senate of Belize enacted the Belize Telecommunications (Amendment) Act 2009, No.  9 of 2009, section 63 of which states that where the Minister responsible for telecommunication considers that control over telecommunications should be acquired for a public purpose, the Minister may, with the approval of the Minister of Finance, by order published in the gazette, acquire all such property as he may consider necessary to take possession of and to assume control over telecommunications.  The  Minister  responsible  for Telecommunications, acting under section 63(1) of the Act, made two Statutory Instruments, or Orders, No.  104 of 2009 entitled Belize Telecommunication (Assumption of Control over Belize Telemedia Ltd.) Order 2009, dated 25th August, 2009; and No.  130 of 2009, which amended Order No.   104 of 2009; entitled the Belize Telecommunications (Assumption of Control over Belize Telemedia

6

Ltd.) Order 2009 dated 4th December, 2009.  The effect of these acquisition orders is that they compulsorily acquired all proprietary and other rights and interests of the defendant bank in BTL, held as security for the loans under the mortgage debentures and loan agreements entered into by the bank and BTL.

9.  The defendant bank challenged the constitutionality of the acquisition legislation in the Supreme Court in Claim No.  874 of 2009, stating that the acquisition legislation was contrary to section 3,6,16 and 17 of the Constitution, and, among other things, that the acquisition was not for a public purpose.  The Supreme Court held, in a written decision dated 30th July, 2010, that the acquisition legislation was not unconstitutional; and that the acquisition was for a public purpose.  In paragraph 139 of the decision, the court said that it was a matter of grave concern for the court that negotiations were not in progress for the payment of compensation to the defendant bank; and the court ordered the Financial Secretary to, without delay, comply with section 65(1) of the Act for the payment of reasonable compensation to the defendant within a reasonable time.

**Claims for Compensation**

10.  By letter dated 27th August, 2009, notice was sent out by the Financial Secretary inviting interested parties to submit claims for compensation.  By letter dated 15th October, 2009, the defendant bank made a claim for reasonable compensation for all its proprietary rights and interests compulsorily acquired by the acquisition legislation.  To date, compensation has not been paid to the defendant bank, nor has

there been concluded negotiations as to the amount payable to the defendant bank for properties and rights and interests compulsorily acquired. The government has raised questions about the validity of the loan agreements and mortgage debentures between BTL and the defendant bank, indicating, it was submitted, an intention by the government not to pay compensation to the defendant bank. This issue will be considered below.

11. The defendant bank decided to act under the Article 8 of the agreement or treaty, and commenced arbitration proceeding by notice of arbitration dated on 10th May, 2010 which was served on the claimant. The arbitral tribunal has been established and consists of Dr. Albert Jan Van den Berg, Mr. John Beechey and Dr. Rodrigo Oreamuno. The tribunal by letter dated 26th July 2010, wrote to the claimant stating that the tribunal would hold a preparatory conference on 26th August, 2010. The conference was held, but though attended by the defendant, was not attended by the claimant. Moreover, a directive to the claimant to indicate to the tribunal by 3rd November, 2010 whether it would provide a statement of defence was not complied with by the claimant.

12. The defendant seeks the following reliefs from the arbitration tribunal as stated in the notice of arbitration dated 4th May, 2010:

> "(a) a declaration that the Government has violated Articles 2, 3 and 5 of the Treaty, as well as its obligations under general international law;

8

(b)   an order that the Government make full reparation to BCB for the injury or loss to its investment arising out of the Government's violation of the Treaty, and applicable rules of international law, such full reparation being in the form of damages or compensation paid to BCB in an amount to be determined, including interest thereon;

(c)   an order that the Government pay the costs of these arbitration proceedings including the costs of the Tribunal, as well as the legal and other expenses incurred by BCB including but not limited to the fees of their legal counsel, experts and consultants as well as BCB's own employees on a full indemnity basis, plus interest thereon at a reasonable commercial rate to be determined by the Tribunal; and

(d)   any alternative or other relief the Tribunal may deem appropriate in the circumstances."

13.   Judith Gill Q.C., solicitor for the defendant in the tribunal proceedings, outlined in the above notice of arbitration, the general arguments in support of the reliefs claimed. In relation to the relief under Article 2, the general argument is as follows:

"The Government undertook to encourage and create favourable conditions for BCB's investment, to accord to BCB's investment "fair and equitable treatment" and "full

protection and security", not to impair BCB's investment by unreasonable or discriminatory measure and to observe any obligation entered into with regard to BCB's investment. In breach of Article 2 of the Treaty, the government has in several respects failed to ensure that BCB's investments were treated in accordance with these requirements. The Government's conduct has been grossly unjust and discriminatory."

14.    It was also stated in the Notice that the obligation of the government under the Agreement was to ensure full security and protection of the bank's investment, and "this obligation was violated by the various actions of the government, most notably by the government's nationalization of Telemedia and its shareholder Sunshine." The same argument based on discrimination is put forward in support of the relief claimed under Article 3 of the Agreement. The relief claimed under Article 5 is for compensation for the compulsory acquisition of the proprietary rights, interests and assets of the bank, or as it is put in the Notice, compensation for "investment expropriated." Article 5 states, inter alia, that investments are not to be nationalized, "except for a public purpose."

15.    As can be seen from the decision of the Supreme Court in action 874 of 2009, the basic arguments in the Notice, namely that the government in nationalizing the assets of the bank acted unreasonably, discriminatory, unfair, unjust, in abuse of sovereign power, carried out not for a public purpose, and the right to compensation, were

arguments advanced by the bank in the said constitutional action; and the Supreme Court held that the action by the government in nationalizing the banks assets were not discriminatory, unreasonable, arbitrary or an abuse of power and was for a public purpose. It seems that the arguments for the bank before the tribunal would, considering the notice, involve to some extent a repetition of arguments raised in the said action, on which a decision has already been given by the court.

## The Claim

16. On 16th August, 2010 the claimant therefore brought a claim against the defendant for the following declarations and injunctions:

> "1. A declaration that the Supreme Court of Belize is the proper forum for the determination of all claims to compensation and other matters arising out of or relating to the acquisition of certain property by the Government of Belize, including the property of the Defendant herein, under the Belize Telecommunications (Assumption of Control Over Belize Telemedia Limited) order, 2009 (S.I. No. 104 of 2009), as amended by the Belize Telecommunications (Assumption of Control Over Belize Telemedia Limited) (Amendment) Order, 2009 (S.I. No. 130 of 2009) (hereinafter collectively referred to as the "Acquisition Orders").
>
> 2. A declaration that the 1982 Agreement between the Government of the United Kingdom of Great Britain and Northern

Ireland and the Government of Belize for the promotion and protection of investments (hereinafter referred to as "the Treaty"), not having been brought into domestic law by enabling legislation, is not a part of the law of Belize and cannot be relied upon by the Defendant or any other person.

3.  A declaration that there is no agreement between the Claimant and the Defendant to refer any disputes arising out of or relating to the Acquisition Orders to international arbitration.

4.  A declaration that, in any case, the Defendant, being under the control of a citizen of Belize, has no locus to invoke the Treaty, even if it were to be assumed (without admitting) that the Treaty applied.

5.  A declaration that the action of the Defendant in commencing arbitration proceedings against the Government of Belize, by Notice of Arbitration dated 4 May 2010 and continuing with such proceedings, is oppressive, vexatious, inequitable and an abuse of the arbitral process within the meaning of section 106A(8) (i) of the Supreme Court of Judicature Ace (CAP. 91), as amended by the Supreme Court of Judicature (Amendment) Act 2010 (no. 18 of 2010), or otherwise.

6.  An order restraining the Defendant, whether by itself or by its servants, agents, subsidiaries, assignees, or other persons and bodies under its control,

from taking any or any further steps in the continuation or prosecution of the arbitration proceedings commenced by the Defendant by Notice of Arbitration dated 4 May, 2010, in respect of or relating to the acquisition of certain property by the Government of Belize under the Acquisition Orders, or commencing or continuing any other arbitral proceedings arising out of or relating to the same facts."

17.  The substantive claims in the above action are not yet ripe for hearing. The matter before me for hearing at this interlocutory stage of the proceedings, are not the substantive claims above, but is an application dated 16th August, 2010 for an interim injunction.  The interim injunction is drafted as follows:

"1.    An interim injunction restraining the Defendant, British Caribbean Bank Limited, whether by itself or by its officers, servants, agents, subsidiaries, assignees, or other persons and bodies under its control, from taking any or any further steps in the continuation or prosecution of the arbitration proceedings commenced by the Defendant by Notice of Arbitration dated 4 May, 2010, under the Arbitration Rules of the United Nations Commission on International Trade Law 1977 and the 1982 Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Belize for the Promotion and Protection of Investments, arising out of or relating to the acquisition of certain property

by the Government of Belize under the
Belize Telecommunications (Assumption of
Control Over Belize Telemedia Limited)
Order, 2009 (S.I. No. 104 of 2009), as
amended by the Belize Telecommunications
(Assumption of Control Over Belize
Telemedia Limited) (Amendment) Order,
2009 (S.I. No. 130 of 2009), or
commencing or continuing any other arbitral
proceedings arising out of or relating to the
same facts."

## Jurisdiction

18.   Before I consider the application for the injunction, I must divert a
little and consider an exparte injunction which was issued on 4th May,
2010 by His Lordship Mr. Justice Hamblen in the High Court of
Justice in the United Kingdom restraining the Attorney General of
Belize on behalf of the Government of Belize.   The injunction
generally is in these terms:

"The Injunction (1) Until further order of
the Court or 14 days following the first
procedural hearing of the arbitral tribunal in
the anticipated arbitration referred to below,
the Defendant acting by itself or by its
officers, employees or agents or in any other
way, is restrained from commencing,
pursuing, progressing or taking any steps
before the Courts of Belize or elsewhere to
enjoin or restrain the Claimant and/or the
Tribunal from commencing or taking any
steps in an anticipated arbitration against the
Defendant under the "Agreement between
the Government of the Untied Kingdom of

14

Great Britain and Northern Ireland and the
Government of Belize for the Promotion and
Protection of Investments."

19.   This injunction was subsequently continued on 3rd September 2010 by
an English Judge, His Lordship Mr.  Justice Blair.  The question is
whether the court in the U.K. has jurisdiction to issue an injunction
against the government of an independent Belize.  There is nothing in
the Constitution of Belize which gives the English Court that
jurisdiction.  The English State Immunity Act 1978, relied on by the
defendant, does not state that the English courts have jurisdiction to
legislate for Belize; and even if it did so state, it would be legally
meaningless because of the absence of jurisdiction of the English
Parliament to make statutes applicable to an independent Belize.  I
know of no law that would allow one State to pass statutes
enforceable in another independent country without that country's
permission.  Moreover, section 9 of the State Immunity Act 1978
(UK) states:

> "(1)   Where a State has agreed in writing to
> submit a dispute which has arisen, or
> may rise, to arbitration, the State is
> not immune as respects proceedings
> in the courts of the United Kingdom
> which relate to the arbitration.
>
> (2)   This section has effect subject to any
> contrary provision in the arbitration
> agreement and does not apply to any
> arbitration agreement between States."

20.   The Attorney General on behalf of the Government of Belize is not legally bound by the injunction issued by His Lordship, Mr. Justice Hamblem.  But in the spirit of international comity, independent states and governments, though not so bound, sometimes comply with such orders or injunctions.  But governments of independent States are not legally bound by such orders or injunctions, and can legally disregard them, unless restrained by their own courts, laws or Constitutions.

### Serious questions to be tried

21.   Let us now return to consider the application for the injunction.  The interlocutory injunction is a remedy that is both temporary and discretionary.  It is not a part of the function of the court, at this interlocutory stage, to resolve conflicts of evidence on affidavits as to facts, especially without the benefit of oral testimony or cross-examination; nor to decide difficult questions of law which call for detailed arguments and mature considerations.  These are matters to be dealt with by the judge at the trial of the claim.  At this interlocutory stage, the court no doubt must be satisfied that the claim is not frivolous or vexatious, that there is a serious question to the tried:  see Lord Diplock in *American Cyanamid Co.  v.  Ethicon Ltd. 1975 1 A.E.R.  504 at p 509.*  In this application for an interim injunction before me, there were detailed written arguments by both sides, for which the court expresses its gratitude.  Though it is for the trial judge to make a decision on the claims, at this interlocutory stage, due to the detailed legal arguments, the court would be lacking in its duty, in my view, if it did not examine those arguments advanced at

this stage, and venture some thoughts or views, without making a decision on the claims.

22.     The question whether the court has statutory jurisdiction to issue an injunction against a party restraining it from continuing proceedings with respect to an arbitration abroad is relevant to the application for the injunction.     Section 106A(8)(i)(ii) of the Supreme Court Judicature Act, chapter 91 (the Act) states:

> "Without prejudice to the generality of the foregoing provisions, the Court shall have jurisdiction –
>
> (i)     to issue an injunction against a party or arbitrators (or both) restraining them from commencing or continuing any arbitral proceedings (whether sited in Belize or abroad), or an injunction against a party restraining it from commencing or continuing any proceedings for enforcement of an arbitral award (whether in Belize or abroad), where it is shown (in either case) that such proceedings are or would be oppressive, vexatious, inequitable or would constitute an abuse of the legal or arbitral process;
>
> (ii)     to void and vacate an award made by an arbitral tribunal (whether in Belize or abroad), in disregard of or contrary to any such injunction."

(2)  Section 106 A(8)(2) of the Act states that every person whether in Belize or elsewhere who disobeys an injunction shall be guilty of criminal contempt of court; and section 106A(8)(3) prescribes fines or imprisonment or both for persons found guilty of criminal contempt.

### (i)  Treaty – Domestic Law

23.  We may now return to the arguments as to whether there are serious questions to be tried.  It is urged by the claimant that the agreement or treaty is not part of the laws of Belize because it has not been incorporated or enacted into domestic law by the Legislature of Belize; and therefore no agreement to arbitrate legally exists.  The claimant mainly relies on two decisions to support this submission. One from Pakistan:  *Societe Generale de Surveillance SA (SGS) v. Pakistan, CA No.  459 and 460 of 2002* (Supreme Court of Pakistan), and *AG and Others v.  Joseph and Boyce (2006), 69 W.I.R.  104 (Caribbean Court of Justice)*.

24.  In *SGS v.  Pakistan*, there was a contract made on 29th September, 1994 between SGS and the government of Pakistan, under which SGS agreed to inspect all consignment of goods imported into Pakistan on which customs duties and other government dues, as prescribed under the relevant customs and other statutes, were to be assessed by SGS. In other words, under the contract the assessment of customs duties and other dues for goods entering Pakistan, which is normally the function of the government, was given to a contractor – SGS, a foreign company registered in Switzerland.  The contract was for a substantial amount of money; and was, as expected, controversial.

After the dismissal of Benazir Bhutto's Government on corruption charges in November 1996, the contract was terminated by the new Government of Pakistan on 12th December 1996; and such termination was accepted by SGS on the condition that its legal rights contained in Clause 11.1 of the contract be maintained, which stated as follows:

> "Arbitration. Any dispute, controversy, or claim arising out of, or relating to this Agreement, or breach, termination or invalidity thereof, shall as far as it is possible, be settled amicably. Failing such amicable settlement, any such dispute shall be settled by arbitration, in accordance with the Arbitration Act of the Territory as presently in force. The place of arbitration shall be Islamabad, Pakistan and the language to be used in the arbitration proceedings shall be the English language."

25. The government of Pakistan filed an application in court under section 20 of the Arbitration Act (Pakistan) for the appointment of an arbitrator under the contract, but this application was resisted by SGS, because SGS did not feel it would, with that appointment, get a fair hearing in Pakistan. SGS then made an application dated 4th January, 2002 to the Pakistan court, under section 41 of the Arbitration Act (Pakistan), seeking a stay of the application filed by the government, on the ground that SGS had instituted arbitration proceedings to the

International Centre for Settlement of Investments Disputes (ICSID), and that the application before the Pakistan court should be stayed.

26.   The court dismissed the application for a stay; and ordered the parties to file a panel of proposed arbitrators.  SGS appealed the dismissal, but the Appeal Court dismissed the appeal and also an application by the government.  A further appeal was made to the Supreme Court of Pakistan by the Government of Pakistan, and in the appeal the Government applied to restrain S.G.S. from participating in the ICSID arbitration.  The ICSID arbitration was available to SGS because Pakistan had signed and ratified the ICSID Convention in 1966 and also a Bilateral Investment Treaty (BIT) between Switzerland and Pakistan was signed by Pakistan on 11th July 1995.  BIT contained provisions for ICSID arbitration where there was a dispute between a Swiss Investor – SGS – and Pakistan relating to investments.

27.   The Supreme Court of Pakistan ruled that SGS was restrained from taking any step, action or measure to pursue or participate or to continue to pursue or participate in the ICSID arbitration.  The basis for the ruling of the Supreme Court was that since neither the provisions of the BIT of July 1995 between Pakistan and Switzerland, nor the ICSID Convention was incorporated through legislation into the laws of Pakistan, therefore they did not have the effect of altering existing laws; and as such, rights arising from them, called treaty rights, cannot be enforced through the courts in Pakistan, because in such a situation, the court was not vested with the power to do so.

28.    The Supreme Court in coming to that ruling seems to have been influenced by the fact that the local arbitration proceedings under clause. 11.1 above had commenced earlier in time to the ICSID arbitration, and could not be reversed; and therefore the court prevented any of the parties from seeking to participate in the ICSID arbitration.   In other words, since the local arbitration was already seized of the matter, it could not be asked to take its hands off the matter.   The parties had agreed and intended that the local arbitration was the forum to settle their contractual disputes at Islamabad Pakistan, and the parties were bound by what they agreed to.   The BIT and the ICSID Convention could not be deemed to vary or supercede Clause 11 (1) of the local arbitration agreed by the parties.

29.    But as shown above, the Supreme Court of Pakistan did say, following the English case of *Maclaine Watson & Co.   Ltd.   v. Department of Trade and Industry 1989 3 A.E.R.   532* that a treaty was a contract or agreement between governments of two or more sovereign states and that "except to the extent that a treaty becomes incorporated into the laws of the Untied Kingdom, there is no power to enforce treaty rights and obligations at the behest of a sovereign government or at the behest of a private individual."

30.    There are certain distinguishing features in this case before me and the *SGS v.   Pakistan* case.   In this case before me there is no direct application by the defendant bank to specifically enforce any provisions of the agreement.   The defendant in these proceedings are not specifically claiming any remedies or rights against the claimant.

21

In the SGS v. Pakistan, SGS had filed an application for a stay which was heard and dismissed and filed an appeal against that dismissal. The application and the appeal by SGS were in effect to enforce or cause the ICSID arbitration to proceed; and this it seems, was the basis for the above quotations from the judgment of the Supreme Court that "that treaty rights cannot be enforced" through the Pakistan court because the treaty was not incorporated in local law. In this case before me the defendant did file an application for a stay, but it has not yet been heard.

31.     The second distinguishing feature is that in this case there is no local arbitration commenced by the defendant.  It must be recalled, as shown above, that the fact that the local arbitration in Pakistan had commenced earlier in time, and could not be reversed, and that the parties were bound by their agreement to arbitrate in Pakistan, were matters which influenced the Pakistan Supreme Court in arriving in its decision and making the above pronouncements.  But as we shall discuss below, in this case before me, there is a local claim for compensation filed earlier in time to the application before the tribunal.

32.     The second case cited by the claimant to support the submission that local law must incorporate the treaty is *AG v. Joseph* above.  In this case, four men were charged for the offence of murder, and at their trial, the prosecution offered the men the opportunity to plead guilty to the lesser count of manslaughter.  Two of them accepted and were sentenced to terms of imprisonment.  The other two – Jeffery Joseph

and Lennox Boyce – opted to go to trial for the offence charged.  At their trial, they were convicted for murder and sentenced to death.  Their appeals to the Court of appeal and the Privy Council were dismissed.  The condemned men then filed an application to the Inter American Commission on Human Rights seeking declarations that their rights under the American Convention of Human Rights, which was ratified by Barbados, but not incorporated into the laws of Barbados, had been violated.

33.   The Barbados Privy Council (BPC), a body established by the Constitution of Barbados, which has the power to advise the Governor General on the exercise of the prerogative of mercy, met and advised against the commutation of the death sentence.  The condemned men then filed a motion in the Barbados High Court for declarations that their rights to life, and their rights not to be subject to inhuman and degrading treatment were being violated; and seeking a commutation of the sentence to death.  The execution of the men were stayed pending the determination of the motion.

34.   The Inter American Court, acting pursuant to the condemned men's application under the Convention, also requested Barbados to not carry out the execution of the men until the outcome of their application under the Convention.  The crucial issue before the Barbados High Court in relation to the motion was whether the BPC was obliged to wait the outcome of the proceedings filed by the condemned men under the American Convention of Human Rights before advising the Governor General in relation to the exercise by

him of the prerogative of mercy.   The High Court dismissed the condemned men's motion; and held that the BPC was not required to wait on the conclusion of the proceedings before the American Commission of Human Rights, before advising the Governor General on the prerogative of mercy.  On appeal to the Court of appeal, it was held that the executive, as the treaty making organ of the Government, could not ignore treaties which gave rights to citizens, and to which the Executive had bound the State.  On appeal to the Caribbean Court of Justice, it was held, in relation to this point, as follows:

> "Nevertheless, the ratification of the American Convention on Human Rights by Barbados (albeit not incorporated into national law), coupled with positive statements by representatives of the executive arm of Government evincing an intention or desire on the part of the executive to abide by the Convention, and the practice of the Government in giving condemned persons an opportunity to have petitions to international human rights bodies processed before proceeding to the execution of their sentences, had given the respondents a legitimate expectation that the State would not execute them without allowing a reasonable time within which the proceedings under the Convention could be completed; in the alternative (per Wit J), States were bound to give effect to treaties which they had ratified in good faith, even if the treaties were not formally incorporated into, national law, and such obligation precluded the State from pre-empting the outcome of human rights petitions to international bodies by executive action."

35.   The CCJ further held that the BPC ought not to have decided to advise the Governor General to proceed with the execution of the men before allowing a reasonable time for the completion of the processing of the condemned men's petition before the Inter American Commission. But the CCJ also said that "international treaties form no part of domestic law, unless they have been specifically incorporated by the legislature.  In order to be binding in municipal law, the terms of the treaty must be enacted by the local parliament. ….. Municipal Courts therefore will not interpret or enforce the terms of an unincorporated treaty":  see paragraph 55 of the judgment.

36.   The condemned men had applied to interpret and enforce the terms of the Convention in the High Court of Barbados.  In this case before me a distinguishing feature is, that the defendant bank has not applied to specifically enforce any term or the terms of the agreement; but is defending the application for an injunction brought against it; and it cannot, in my view, be reasonably submitted that in doing so the defendant is indirectly enforcing any term of the treaty.  But it is abundantly clear that the views expressed by the CCJ in *Joseph* above, and the views in the SGS show that there are serious questions to be tried in this case.

(ii)  **The *Alpuche* case**

37.   Moreover, on the question whether the agreement is in force in Belize, the Belize Court of Appeal in *Jose Alpuche and Another v. AG No. 8 of 2010* said, in relation to the agreement as follows: "The treaty ….. is an agreement for the promotion and protection of investments

made between the government of the United Kingdom and GOB dated 30th April 1982 and which remains in force": see Morrison JA at paragraph 9 of the judgment, which the other members of the court, Sosa JA and Alleyne JA concurred. The Court of Appeal expressed the above views in relation to the said agreement which is the subject in this application. The Court of Appeal also has suggested that the "treaty is governed by international law."

38.    One of the issues before the court in *Alpuche* was whether to restrain a foreign arbitration proceedings which were brought pursuant to a treaty, on the basis that those proceedings were vexatious, oppressive or abusive – an issue which is fundamental to the application before me. The Court of Appeal, however, did not think it necessary for purposes of the decision, to make a finding on this issue. But it certainly may be argued, as was argued by the defendant, that the treaty referred to by their Lordships in *Alpuche,* case is the same treaty before this court; and therefore, their pronouncements on that treaty, that it remains in force, are binding on the Supreme Court.

39.    The claimant submitted that the existence, or the validity of the treaty or agreement was not an issue, neither directly or indirectly, before the Court of Appeal; and the Court of Appeal was not called upon to examine the treaty in order to deal with the appeal. Therefore what the Court of Appeal said above was not binding. In relation to this argument, evidence of the transcript of the hearing in the Court of Appeal may be relevant at the trial, since the claimant in written submissions said that the defendant knew and acknowledged that the

treaty was not an issue before the Court of Appeal. This is further evidence that there are serious questions to be tried.

40. It is also said that Belize is bound by the agreement on the basis of Public international law, being an "agreement governed by international law "according to the Court of Appeal. In *Ecuador v. Occidental Exploration Production Company 2007 EWCA Civ 656* SIR Anthony Clark MR says that it is common ground that a similar treaty or agreement "is governed by public international law." and that BIT confers or creates direct rights on international law ...." The above is more evidence that there are serious questions to be tried in this case.

41. But the defendant argues that there is no serious question to be tried. The agreement is signed by the government and is binding in international law, states the defendant, and there is no need for implementing legislation to enable the treaty to have effect in Belize. In other words, there is no need for domestic legislation to give effect to the agreement in Belize law. If the treaty needed domestic legislation to give it force in Belize, this would have been stated in the treaty itself. Moreover, states the defendant, the fundamental principle of " pact sunt servanda," that is, every treaty in force is binding on the parties to it and must be performed in good faith," applies in this case. There is, states the defendant, a general principle which states that the state would be prohibited from reneging on an arbitration agreement. The defendant relies on *Ecuador v.*

*Occidental Exploration and Production Company 2007 EWCA Cr 656.*

42.   The further argument of the defendant, if I understand it correctly, seems to be that there is separate from the treaty signed by the parties, an agreement to arbitrate, which is derived from the treaty. This agreement to arbitrate came about because of an offer by the government to arbitrate disputes between the government and an investor; and there was an acceptance of the offer which resulted in a separate agreement to arbitrate, separate from the treaty or agreement as a whole. The treaty, says the defendant, contains an offer "but once the offer is accepted by a notice of dispute, which was done in this case, an agreement to arbitrate is created between the government and the investor, in this case the defendant. The agreement to arbitrate is separate from the treaty and is not a treaty. Therefore, there is no need for domestic legislation to bring the agreement to arbitrate into force. The agreement to arbitrate is a binding contract between the parties thereto.

43.   In support of this argument the defendant relies on *Ecuador v. Occidental* in which Lord Justice Mauce said:

> .... Further .... The agreement to arbitrate which results by following the Treaty route is not itself a treaty. It is an agreement between a private investor on the one side and the relevant state on the other."

28

44. But His Lordship immediately proceeded to ask the following question and gave the following answer:

> "The question may then arise: under what law is that agreement to arbitrate to be regarded as subject ....? .... We would be minded to accept that, under English Private International law principles, the agreement to arbitrate, may itself be subject to international law, as it may be subject to foreign law. Although it is a consensual agreement, it is closely connected with the international Treaty which contemplated its making and which contains the provisions defining the scope of the arbitrators jurisdiction. Further the protection of investors at which the whole scheme is aimed is likely to be better served if the agreement to arbitrate is subject to international law, <u>rather than to the law of the state against which an investor is arbitrating</u>." (emphasis mine)

45. Earlier in his judgment, Lord Mauce said in relation to treaties that "as a matter of the constitutional law of the United Kingdom, the Royal Prerogative, whilst it embraces the making of treaties does not extend to altering the law or conferring rights upon individuals or depriving individuals of rights which they enjoy in domestic law without the intervention of Parliament. Quite simply, a treaty is not part of English law unless and until it has been incorporated in the law by legislation."

(ii) **Competence de la Competence**

46.    The defendant further argued that the court should not intervene to stop an arbitration, even where, as here, there is a challenge to the jurisdiction of the tribunal, because of the internationally recognized doctrine of Competence – Competence, referred to in different phraseologies as Kompetenz – Kompetenz or Competence de la Competence, which simply means that an arbitral tribunal has jurisdiction to decide its own jurisdiction – the power of an arbitral tribunal to decide disputes concerning its own jurisdiction. Therefore, says the defendant, the argument of the claimant, that the arbitration agreement is not binding because it was not incorporated into local law, risks interfering with the tribunal's assessment of its own jurisdiction or raises arguments concerning the jurisdiction of the tribunal, which the tribunal is to decide under the doctrine of Competence – Competence.   But the defendant accepted that exceptions to this doctrine are made only in extreme cases, but this, according to the defendant, is not such a case.

47.    It is not for me at this interlocutory stage for an injunction to decide these serious questions raised above.  But based on the authorities mentioned above, especially the decision and views expressed by the CCJ in **Joseph** and the views of the Court of Appeal in the *Alpuche* case; and the competence – competence doctrine, there is certainly compelling reasons for holding that the treaty and the agreement to arbitrate are binding on the government, not only as a matter of municipal law, but also on the principles of Public International law. But this is a matter for the trial judge to decide, not for me at this

interlocutory stage. What I do find at this interlocutory stage is that there are, as shown above, serious questions to be tried.

### Damages

48. Having found that there are serious questions to be tried, the next question is whether damages would be an adequate remedy, because if damages would, and the defendant would be in a financial position to pay them, no injunction should normally be granted, however strong the plaintiff case at this stage may appear to be. On the other hand, if damages recoverable, under the claimant's undertaking as to damages, would be an adequate remedy to the defendant and the plaintiff would be in a financial position to pay them, there would be no reason upon this ground to refuse an interlocutory injunction.

49. The court at the interlocutory stage should assess whether granting or withholding an injunction is more likely to produce a just result. So that if damages would be an adequate remedy for the plaintiff, and the defendant would be able to pay them, there are no grounds for interference with the defendant freedom of action by the granting of an injunction. Likewise, if there is a serious issue to be tried and the plaintiff could be prejudiced by the acts or omissions of the defendant pending trial, and the cross-undertaking in damages would provide the defendant with an adequate remedy if it turns out that his freedom of action should not have been restrained, then an injunction should ordinarily be granted: see Lord Hoffman in *National Commercial Bank v. Olint Corp 2009 Uk PC 16 at para 16*.

50.  If the injunction is refused, and the claimant participates in the arbitration and prevails, costs would be awarded to the claimant. But there is no evidence before me as to the approximate extent of such costs payable to the claimant; and would the costs be adequate damages for the claimant. There is evidence that the cost of the arbitration is prohibitive; but this is not very helpful. On the other hand, if the injunction is granted and the defendant is restrained from participating in the arbitration, where is the evidence of the approximate amount of damages the defendant would be entitled to, for any loss or damage which it suffered because of the injunction, if it turned out that the defendant was wrongly restrained? Because of these considerations, I have doubt as to the adequacy of damages "It is," says Lord Diplock, "where there is doubt as to adequacy of the respective remedies in damages available to either party or to both, that the question of balance of convenience arises": see *American Cyanamid v. Ethicon Ltd. 1975 AC at 408.*

## Balance of Convenience

51.  The most difficult part for me on this application for the injunction is to decide where the balance of convenience lies – where the balance of justice lies. I have to consider the prejudice which the claimant may suffer if no injunction is granted, or the prejudice the defendant may suffer if it is granted. I must remember the underlying principle is that the court should take whichever course seems likely to cause the least prejudice to one party or the other. In considering where the balance of justice lies, consideration ought to be given to the views of

Lord Diplock in *American Cyanamid* above, quoted with approval by the Privy Council in *Olint Corporation Ltd.* above, as follows:

> "It would be unwise to attempt even to list all the various matters which may need to be taken into consideration in deciding where the balance lies. Let alone to suggest the relative weight to be attached to them": see page 408 of *American Cyanamid* and para 17 of *Olint Corporation*."

Lord Hoffmann in *Olint* above proceeded to state that, among matters which the court may take into account, are:

> "The prejudice which the plaintiff may suffer if no injunction is granted or the defendant may suffer if it is; the likelihood of such prejudice actually occurring; the extent to which it may be compensated by an award of damages or enforcement of the cross-undertaking; the likelihood of either party being able to satisfy such an award and the likelihood that the injunction will turn out to have been wrongly granted or withheld, that is to say, the court's opinion of the relative strength of the parties cases."

52.   The court is required to examine what, on the particular facts and circumstances of the case, the consequences of granting or withholding of the injunction are likely to be. If it appears that granting of the injunction is likely to cause irremediable prejudice to

the defendant, a court may be reluctant to grant it unless satisfied that the chances that it will turn out to have been wrongly granted are low.

53.   There are many matters to be considered on this question of balance of justice or convenience.  If the defendant prevails at the tribunal, could the tribunal enforce its order of compensation against the claimant?  If the claimant refuses to obey any order the tribunal makes, does the tribunal have enforcement powers against the claimant?  In the absence of such enforcement powers of the tribunal, it seems that the defendant would have to confine itself to the local claims made by it for compensation.  It may therefore result in the hearing of the claims for compensation simultaneously bearing in mind the court order in 874/2009, or a second time, which could result in financial consequences involved in prosecuting and defending the claims.

54.   Again, if the injunction is refused, the defendant will proceed to pursue claims for compensation before the tribunal; and at the same time the local claim would be continuing under the order of the court made in Claim 874 of 2009, and again there would be contemporaneous hearings.  Assuming the defendant obtains an order for compensation from the tribunal as a result of its claims there, the defendant, in that case, could still continue with the local claims for compensation against the government under the undertaking?  The defendant gave an undertaking, which, as shown above is ambiguous. The undertaking is that generally the claimant would not proceed locally, except where it fails before the tribunal or if the government

fails to satisfy an award by the tribunal in 90 days.  Once again the double litigation on this question of compensation is a clear possibility, involving costs, inconvenience, stress and time, to both sides.

### (i) Oppressive or vexatious

55.   Another issue to consider on this question of a balance of justice is whether the proceedings before the tribunal is oppressive or vexatious. The court, according to section 106A(8)(i) above, has jurisdiction to grant an injunction restraining a party from commencing or continuing arbitral proceedings, whether in Belize or abroad, where it is shown that such proceedings are or would be oppressive, vexatious, inequitable or would constitute an abuse of the legal  or arbitral process.  Even in cases where the arbitral agreement is binding on the parties and is enforceable, the courts under the said section has the jurisdiction to grant an injunction on either of the grounds stated in the section.  The question arises:  what circumstances would, in law, be classified as oppressive or vexatious?

56.   In *Societe Aerospaliate v.  Lee Kui Jak 1987 AC 871* a very wealthy businessman was a passenger in a helicopter manufactured by *Societe Aerospaliate*, when it crashed in Brunei, killing all passengers on board, including the businessman.  The government of Brunei ordered an inquiry into the crash, which was held; and a report on the accident was submitted to the government stating the cause of the crash. Proceedings were started by the widow and administrators of the late businessman in Brunei, France and Texas.

57.   In the Texas proceedings, *Societe Aerospaliate* was one of the defendants, against whom allegations were made of negligent design and manufacture of the helicopter under the Texas Wrongful Death Statute, on the basis that SA was doing business in Texas.  SA made several attempts to have the proceedings in Texas dismissed on the ground of forum non conveniens, but failed in doing so.  SA then applied for an injunction from a Brunei Court to restrain the proceedings in the Texas Court.  The Brunei Court refused the injunction, and SA appealed to the Court of Appeal who dismissed the appeal.  On an appeal to the Privy Council, it is said that the jurisdiction to restrain a party from pursuing legal proceedings in a foreign jurisdiction is to be exercised when the ends of justice required it; where the order is directed not against the foreign court, but against the parties; when the order will be an effective remedy; and that the jurisdiction to make the order must be exercised with caution.  Their Lordships then proceeded to give some guidance to judges at first instance, who may have to exercise the jurisdiction to make such orders.  Lord Goff of Chieveley guides as follows:

> "Another important category of case in which injunctions may be granted is where the plaintiff has commenced proceedings against the defendant in respect of the same subject matter both in this country and overseas, and the defendant has asked the English court to compel the plaintiff to elect in which country he shall alone proceed. In such cases, there is authority that the court will only restrain the plaintiff from pursuing the foreign proceedings if the pursuit of such

> proceedings is regarded as vexatious or oppressive: see *McHenry v. Lewis (1882) 22 Ch.D. 397 and Peruvian Guano Co. v. Bockwoldt (1883) 23 Ch.D. 225.*"

58.   In *Castanho v. Brown Root 1981 AC 557* Lord Scarman quoting Lord Diplock in *McShannon v. Rochway Class Ltd. 1978 AC 793* said that to justify a grant of an injunction against a foreign court, it must be shown that "(a) that the English court is a forum to whose jurisdiction they are amenable in which justice can be done at substantially less inconvenience or expense, and (b) the injunction must not deprive the plaintiff of a legitimate personal or juridical advantage which would be available to him if he involved the American jurisdiction ...... The mere fact that the courts in Brunei provide the natural forum for the action is, .... not enough of itself to justify the grant of an injunction. An injunction will only be granted to prevent injustice and in the context of a case such as the present, that means that the Texas proceedings must be shown in the circumstances to be vexatious or oppressive.".

59.   The court acts to prevent injustice; and as Bowen LJ said in *Peruvian Guanolo v. Buckwolt 23 Ch.D 225, at page 233*, the courts will interfere when a party is acting under colour of asking for justice "in a way which necessarily involves injustice to others." In *Albon v. NAZA Motors 2008 1 AER 351* one of the reasons for holding that co-existing proceedings were oppressive was that it involved "needless expense." In one case it was said that an applicant for an

injunction or a stay must satisfy the oppressive or vexatious criteria": in short that it would be unjust : see *Carter Holt Harvey Ltd. v. Genesis Power Ltd Civ – 2001 – 404 – 1974*. In *Carter* the court says that it is possible to envisage a case where there is a substantial degree of overlap of factual or legal issues that it would be inappropriate for both court and arbitral proceedings to proceed simultaneously. This suggests to me that if in the different proceedings there is a duplication of factual or legal issues, it may be unjust or oppressive to allow both proceedings to proceed at the said time.

60.   In *Union of India v.  Dabhol Power Co. 5th May  2004* there was an application in India to stay arbitral proceedings between the plaintiff and defendant pending at London, until an appeal was disposed of by the Supreme Court of India.  The contention was that the court in India had inherent powers to restrain the defendant from further proceeding with arbitral proceedings if it was shown that the proceedings were oppressive or vexatious in nature and would be an abuse of the process.  The court held that the arbitral proceedings in London were oppressive, and restricted the defendant from proceeding further with it, until a decision was made on the case in the court in India.  In other words, the court did not make a permanent injunction, staying the proceedings indefinitely, but an injunction only until the court in India decided the matter.  What is noteworthy about this case is the attempt by the court to give an indication as to what may be included in the word oppression.  Since the matter pending before the Indian Court, "would go to the root of the matter" pending

before the London arbitral proceedings, for this reason the arbitral proceedings are oppressive.  Chopra J proceeded to say:

> "In case no ad interim injunction is granted the plaintiff would suffer irreparable loss/injury in as much as not only that it will have to participate in the arbitral proceedings at London but may also suffer an Award in spite of the pendency of a crucial issue before Supreme Court. <u>Balance of convenience also is more in favour of the temporary deferment of the arbitral proceedings rather than permitting these to go ahead which may ultimately turn out to be an exercise in futility at an exorbitant cost for the plaintiff.</u>" (emphasis mine)

61.   The defendant's argument in this application before me is that the application for the injunction should be rejected because the claimant seeks to avoid the agreement to arbitrate to which it has signed and bound by the law of Belize and International law.  But as shown above, the court may still restrain the arbitration, if it is oppressive, vexatious, or an abuse, as section 106A8(i) of the Act states, or unconscionable.  But the defendant submitted that "even where it can be said that the continuation of an injunction would be vexatious, oppressive or unconscionable, it should not be granted."  The defendant relies in support of this submission on several authorities namely:  *Electum SA v.  Virendi Universal SA 2007 EWHC 571, Siskiha v.  Distos 1979 AC 210; South Carolina Insurance Co.  v.*

*The Assurance Maat Shappij 1987 AC 24; and Channel Tower Group Ltd. Balfour Really Construction Ltd.* I do not wish to appear to detract from the industry and scholarship of counsel if I do not discuss these cases, but in my view, I am not dealing in this application before me with the continuation of an injunction; and section 106 A (8)(i) of the Act states that the court has jurisdiction to grant an injunction where arbitral proceedings are oppressive or vexatious.

(ii) **Caution**

62.   Both parties accepted that the jurisdiction to grant the injunction "must be exercised with caution;" and according to the defendant, the caution should be "increased or even redoubled in the case of an anti arbitration injunction;" using the words of Longmore LJ in *Al Bon* above. It was also submitted that it was "only with extreme hesitation that the court will interfere with the process of an arbitration and that the power of the court is to ensure that the arbitration process is not "stopped dead in its track or its outcome rendered nugatory by one side or the other before the outcome of the process itself": see Conteh CJ in *AG v. Carlisle Holdings Limited No. 15 of 2005* Supreme Court of Belize (unreported.)

63.   The defendant further submitted that in International law, the reasons for enforcing the arbitration process are stronger. But the court also has to consider the dictates of the legislature in section 106A(8)(i) of the Act. Even though it has been submitted that there is a constitutional challenge to this section, I cannot see how I could

legally ignore the section because there is a pending constitutional challenge in another court. But the authorities correctly and clearly show that since an order granting an injunction against foreign arbitral proceedings affects those proceedings, the jurisdiction to grant the injunction must be exercised with caution. This is uncontroversial: see *Cohen v. Rothfield 1919 1 KB 410, at page 413; Castano v. Brown L Root (UK) Ltd. 1981 AC 557 at page 573 and Societe Aerospatiale v. Lee Kui Jak above at 892.*

### (iii) **Different Fora**

64.  It is further urged by the defendant that it is not vexatious or oppressive to follow the agreement which is in full force and effect, made by two sovereign states; and it is not vexatious or oppressive for the defendant, to exercise agreed rights under the agreement or treaty which is binding on the claimant, both as a matter of municipal law and International law. It is not oppressive or vexatious, says the defendant, to have claims in different fora and reliance was placed on *Ronald S. Lander v. The Czech Republic; McHenry v. Lewis 1882 CH 397; and Merrill Lynch v. Raffa. 2001 CP Reports 44.*

65.  *Lander* is a decision given by an arbitration tribunal in London. The Czek and Slovak Republic in October 1991 adopted an Act dealing with radio and television broadcasting. A Czeck company named CET21 applied for a radio and television licence under the Act. CET21 had discussions with a German company, CEDC, with which the claimant, Mr. Lauder, had indirect voting control. The licence was issued to CET21 by the relevant government department, which

stated that CEDC was a direct party to the application for the licence, which meant that CEDC was a contractual partner of CET21. A dispute arose in relation to the licence which went to arbitration and the Czech Supreme Court. One party to the dispute challenged the arbitration tribunal's jurisdiction on several grounds, including firstly that the claimant had already submitted the same dispute to the courts of the Czeck Republic and other arbitral tribunals; and, secondly, that the claimant may not concurrently pursue the same remedies in different fora. In relation to the first point, article V1(3)(a) of the relevant treaty stated that a national or company to a dispute may institute arbitral proceedings "provided:

> (i) the dispute has not been submitted by the national or company for resolution in accordance with any applicable previously agreed dispute settlement procedures; and
>
> (ii) the national or company concerned has not brought the dispute before the courts of justice or administrative tribunals or agencies of competent jurisdiction of the party that is a party to the dispute."

66.  The purpose of the above article was to avoid a situation where the same dispute was brought by the same company or national against the same party to the treaty for resolution before other courts or tribunals. The tribunal held that since proceedings were not brought before any other tribunal or court, Article V1(3)(a) did not preclude it from having

jurisdiction in the present proceedings.  Secondly in relation to same remedies in different fora, or the lis alibi pendens argument, the tribunal said that the lis alibi pendens argument "to be of no use, since all the other court and arbitration proceedings involve different parties, and different causes of action.  Therefore no possibility exists that any other court or arbitral tribunal can render a decision similar to or inconsistent with the award which will be issued by this arbitral tribunal" see page 87.  But the tribunal did say that there was no abuse of process "in the multiplicity of proceedings initiated by Mr.  Lander and the entities he controls."  The tribunal continued:

> "Even assuming that the doctrine of abuse of process could find application here, the arbitral tribunal is the only forum with jurisdiction to hear Mr.  Launder claim based on the treaty …. The present proceedings are the only place where the parties rights under the treaty can be protected": see page 87.

It was on the basis of the above, that the tribunal held that it was not precluded from having jurisdiction in the proceedings before it.

67.    In *McHenry v.  Lewis* above there were three actions brought, two in the courts in England and one in America.  One of the actions in England was wider than the other actions, in alleged breaches, but not on reliefs claimed.  The action in the US was brought against the same defendants who were defendants in the actions in England.  But some

defendants in the US action, were not parties to the actions in England; and in this way the American action was different from the England actions. The US action was brought because a motion was made in the plaintiff's actions in England for an injunction which failed because the American Railroad Company and the directors of that company were not parties to it. Soon after the failure, the action in America was instituted making them parties.

68. The court considered that there were parties to the litigation who could not be made liable in England and who could be made liable in America. It was mainly for this reason that the court held that there was strong ground that the actions were bona fide and in good faith and refused to interfere to stay the English actions. The court did say that "the vexation, if any, consists in bringing several proceedings to try the same question or series of questions": see page 42. And Romer LJ asserted that it would be most unwise to lay down any definition of what is vexatious or oppressive." He would rather rest on the "general principle that the court can and will interfere whenever there is vexation and oppression to prevent the administration of justice being perverted for an unjust end.

69. McHenry demonstrates that the court has the power to stay proceedings, but it must be done with extreme caution. It was said that stopping in the middle of a suit or arbitration a plaintiff from going on when he believes he has a right of action as against a defendant, is a jurisdiction which has to be exercised with very considerable caution.

70. In *Merrill Lynch v. Raffa* above the defendant made an application to the court in England that the action against him be stayed on the grounds that there were in existence similar proceedings brought by the claimant against him in Egypt, and that he was unable to instruct his English lawyers. The facts are briefly that the claimant alleged that the defendant, a former employee of the claimant, had extracted about £50 million pounds from the account of one of their clients.

71. The claimant had commenced proceedings in England. The defendant was arrested in Egypt. The claimant then made a court request against the defendant in Egypt under the Egyptian criminal system. The defendant sought the stay of the English proceedings. The court refused to grant the stay holding, as Raymond Jack J said: "The court reviewed the law governing cases where a claimant commences proceedings in two jurisdictions. It would normally be considered vexatious for a claimant to do so, and put the defendant to the multiplication of costs, time and stress, ….. it amounts to a harassment of the defendant to make him fight the same battle twice, but in some circumstances a claimant might have sufficient justification to bring the two sets of proceedings. ….." The court found in the case before it the justification to be, that on the facts, the Egyptian Criminal proceedings would still continue until the defendant was convicted.

(iv) **Local cases**

72   The defendant further relied on the *AG v. Belize Bank Ltd. No. 228* of 2008 to show that the Supreme Court had in that case, stayed

proceedings with the effect that an arbitration would proceed.  The stay was granted based largely on the learned Chief Justice's interpretation of section 26(1) of Arbitration Act, Chapter 125 of the Laws of Belize.  The court did however recognize its inherent power to stay an action on the ground that it was frivolous, vexatious, oppressive or an abuse of the court, and that the Rules of Court have provision to stay the whole or part of any proceedings.  But the Learned Chief Justice says that: "I do not understand the application as being pressed on the court on this ground":  see para 27 of the judgment.

73.    By "the application" I believe the Chief Justice meant the application for the stay of proceedings.  It seems therefore that the grounds for the application for the stay were not, on the understanding of the court, on the basis that the action was oppressive, vexatious or an abuse of the process of the court; and therefore was not the reason for its decision; for the court thought that it was "hardly conceivable that the Government of Belize's case can be described as frivolous, vexatious, oppressive or an abuse of the process of the court," based on the facts of the case.

74.    In *AG of Belize v.  Carlisle Holdings No.  15 of 2005* the court had to decide whether it had jurisdiction to grant relief to Carlisle Holdings to ensure that nothing happened to certain shares in B.T.L until the final determination of arbitration proceedings between it and the government, and the court held it had such jurisdiction.  The second issue was whether the interim relief sought by Carlisle Holdings Ltd.

can lie against the Attorney General as representing the Government of Belize.   The court followed the classic pronouncement of Lord Templeton in *Re FM 1994 1 AC377* as follows:

> "The judiciary enforce the law against individuals, against institutions and against the executive. The judges cannot enforce the law against the Crown as monarch because the Crown as monarch can do no wrong but judges enforce the law against the Crown as executive and against the individuals who from time to time represent the Crown.   A litigant complaining of a breach of the law by the executive can sue the Crown as executive bringing his action against the Minister who is responsible for the department of State involved ... To enforce the law the courts have power to grant remedies including injunctions against a minister in his official capacity ... the argument that there is no power to enforce the law by injunction or contempt proceedings against a minister in his official capacity would, if upheld, establish the proposition that the executive obey the law as a matter of grace and not as a matter of necessity, a proposition which would reverse the result of the Civil War."

75.    The court therefore granted the reliefs claimed against the Attorney General restraining the sale of BTL shares until the hearing and determination of the arbitration proceedings in London.

76.    In ***BCB Holdings Ltd. Belize Bank v.  AG No.  52 of 2009*** Awich J says that where parties have agreed to submit a dispute to arbitration, "the arbitration tribunal <u>must be allowed the first opportunity to decide questions such as jurisdiction and the lawfulness of the agreement</u>" (emphasis mine).  This statement has now to be read in light of section 106A(8)(i) of the Act, which was not in force at the time the statement was made; and certainly it would depend on the facts and circumstances of each particular case, whether the local courts or the tribunals should have the first opportunity to decide the lawfulness of the agreement.

77.    In ***Belize Telemedia v.   AG No.   317 of 2008***, the applicant Belize Telemedia was served with summonses in Belize for the payment of business taxes.   It therefore applied to the court to restrain the AG from issuing a judgment summons against the applicant for taxes and customs duties.  An English court presided over by Steel J had on 16th May, 2008 issued a similar injunction against the AG of Belize and the Commissioner of Income Tax, from issuing any such judgment summons against the claimant BTL.  Recognizing that the court has jurisdiction to grant an injunction to restrain an action in local courts, in favour of foreign arbitral proceedings, the court said the discretion to grant such a restraining order must be exercise with care and caution.

78.     The court gave several impressive reasons for declining to grant the restraining order and did refuse the application.   Though agreeing with the principle that it is for the arbitration tribunal to determine its own competence, the court declined the application for the injunction. One of the reasons was that the court was "at a loss to understand how a foreign court can enjoin a foreign government from the process of collecting taxes in its own domain."   The parties had an arbitral agreement which the court found did not include the payment of taxes and duties.  This case does not deal with the jurisdiction to grant an injunction against proceedings which may be oppressive or vexatious nor was there in existence at the time section 106A(8)(i) of the Act.

79.     Some of the above authorities give some guidance as to what matters were held by the court to amount to oppressive or vexatious conduct. In considering what matters fall within the definition of oppressive or vexatious conduct in the context of section 106 A(8)(i) of the Act, it seems to me, on the basis of the authorities, that the court should have regard to, among other matters, the issue of injustice, the issue of needless expense, time, and stress and harassment; the overlap of factual and legal issues; and the question whether the matter before the local court goes as to the root of the matter before the tribunal.

80.     **The Undertaking**

The defendant has given a written undertaking to suspend   the local claim whilst the arbitration is proceeding.  But that undertaking is given on the condition that the defendant reserved the right to the claim in Belize in certain situations, such as if the defendant fails

before the tribunal, or the government fails to pay.  The undertaking is drafted as in this way:

### "Undertaking by the Defendant

The Government of Belize (the "GOB"), the Defendant, British Caribbean Bank Limited ("BCB"), undertakes that if this Honourable Court declines to grant the injunction sought in the above proceedings by the GOB, then, subject to paragraph 2 below, it will:

(i)     suspend the pursuit of its statutory claim for compensation in Belize whilst BCB's arbitration against the GOB commenced by a Notice of Arbitration dated 4 May 2010 (the "Investment treaty Arbitration") is proceeding; and

(ii)    abide by the decision of the Tribunal in the Investment Treaty Arbitration as to the merits and quantum of that claim (subject to any rights to challenge an award of the tribunal).

There are only two circumstances where BCB would reserve its right to resume its statutory claim (which it is entitled to bring) in Belize:

(a)     if the Tribunal rejects BCB's Investment Treaty Arbitration claim on jurisdictional grounds (which BCB does not think is a likely outcome but which, given that the GOB is raising the jurisdictional issue, will allow for that contingency) and therefore refuses to

> give a decision as to the merits or quantum of that claim; or
>
> (b) an award is given in BCB's favour by the Tribunal, but the GOB fails to satisfy that award within 90 days of its issue. In that event, BCB should be able to pursue any remedy to recover payment to which it is entitled including the statutory claim.".

This is an undertaking by the defendant. Neither the claimant nor the Government gave an undertaking. But the undertaking above as drafted is ambiguous. It seems to be an undertaking by the Government or the defendant or by both. Moreover, under the undertaking, it is possible, that there may be proceedings for compensation in the tribunal as well as the local claims for compensation. So that even under the undertaking, it is possible that the claim for compensation before the tribunal may have to be considered again, on the claim for compensation in Belize. In addition, the undertaking cannot suspend the process of the local claim, because of the Court Order in 874 of 2009. The court order states as follows:

> "The financial Secretary is ordered to comply with section 65(1) of the Belize Telecommunications Act as amended."

That section states that the Financial Secretary shall without delay enter into negotiations with the claimant for the payment of reasonable compensation within a reasonable time.

**Unlawful Mortgage?**

81. There is also an argument, referred to above, advanced by the claimant that the loan of US$22,500,000 lent to BTL under mortgages and loan agreements are unlawful and void. It was said that BTL used the loan to purchase shares in itself, and that this was unlawful as being contrary to section 48 of the Companies Act Chapter 256 of the Laws of Belize. Therefore the loan itself is unlawful and void. The loan was said to be for the purpose of purchasing equipment but was subsequently used, a great portion of it, to purchase shares in BTL itself, as the court in Action 874 of 2009 held.

82. This position taken by the claimant has created a belief in the defendant that the claimant may not have an intention of paying compensation, because of the belief that the loan is unlawful and void. The defendant has therefore submitted that it cannot be vexatious or oppressive for the tribunal hearings to proceed, because the government does not intend to pay compensation because of the belief that the loan, is unlawful and void, and does not have to be repaid. It cannot therefore be just or convenient, says the defendant, to injunct the proceedings before the tribunal for compensation. It is, says the defendant, based on the above argument, that the tribunal may be the only remaining process to get compensation.

83.  Whether the loan is lawful or unlawful is not before me for decision at this interlocutory stage; and I do not make a decision on that point. What I can say, at this interlocutory stage, is that it is difficult for me to find a legal basis to sustain the view that if A, by a written loan contract, receives loans from B, but A uses the loans for some alleged illegal purpose, A is not bound by the loan contract; and does not have to repay the loan.  Mr. Vasquez, the Chairman of BTL, who said he got legal advice on this matter, without naming the advisor, was brave enough to write, in a letter to the Financial Secretary dated 30th July, 2010, as follows:

> "I must inform you that the Board of Belize Telemedia Limited considers that the company has never had a legal liability to the Belize Bank Turks Caicos Island Ltd (now British Caribbean Bank Ltd. ...."

84.  Seldom have I seen such a views expressed in writing with respect to such a loan received on a mortgage.  I do not see a court, on the facts available to me at this stage, acceding to such a submission; and, in my view, there are grave doubts about the merits of the submission. But it is not for me at this interlocutory stage, without the benefit of full arguments on the point, to decide it.  It is for the decision of the trial judge on the substantive hearing of the case.

**Just or convenient**

85.  If both local and international proceedings are allowed to go on, there are the expense, the stress, the inconvenience and the time involved

by both parties.  What is more likely to produce a just or convenient result at this interlocutory stage – granting or refusing the injunction?

86.  If the injunction is refused and the tribunal is allowed to proceed, while the Financial Secretary at the same time proceeds with the local claim for compensation filed by the defendant, as the Financial Secretary is ordered to do by the court, there would be simultaneous hearings, both local and international, on the issue of compensation. Suppose the parties reach an agreement in that local claims process, the tribunal hearing would have been useless.  Now assume the reverse situation, the defendant, on the granting of the injunction proceeds in the local claims process, and it successfully prevails there, the tribunal process would also be not necessary.  What on the facts, is the just or convenient thing to do?  If both processes for compensation are allowed to continue simultaneously, because this could occur bearing in mind the order of the court in 874/2009, both sides would suffer more expense, time, stress, inconvenience, harassment.  If one process is allowed at a time, it could result in less expense, time, stress, inconvenience.  The Financial Secretary had sworn to an affidavit and said that the cost of International arbitration was generally prohibitive and that the arbitration proceedings "will overburden the Government of Belize financially."  No doubt it would also be prohibitive and highly expensive and will overburden the defendant too.

87.  Would it not be just or convenient to allow one process at a time, one which the Financial Secretary was ordered to undertake without delay

by the court, and which is earlier in time to the arbitral proceedings? If this process earlier in time so ordered by the court does not resolve the issue of compensation between the parties, resort may then be taken of the arbitral process if the defendant so desires. Would it not be just or convenient to allow one process at a time instead of two processes contemporaneously? Would the balance of convenience come down on the side of allowing the process earlier in time to continue rather than both processes at the same time? As I see it, I think it would. We saw above in the *SGS v. Pakistan* where the court opted to allow the proceedings that were earlier in time to proceed; and we also saw above in the *Union of India* case, where the court refused an injunction to stay proceedings indefinitely, but granted an injunction until the local litigation in India was completed. I do not think that a permanent injunction staying the arbitral proceedings indefinitely, as applied for by the claimant, is the just or convenient thing to do. I think an injunction to stay the arbitral proceedings until the local claims for compensation and any subsequent local proceedings, have been heard and determined, would be the just or convenient thing to do. It would be vexatious or oppressive to allow both proceedings for compensation to go on simultaneously.

### Conclusion

88.  It seems at this interlocutory stage that there is force in the argument that the treaty and agreement to arbitrate are binding on the government; but this is for the trial judge to decide, not for me at this interlocutory stage. At this interlocutory stage, I find that there are

serious questions to be tried, and there are doubts whether damages would be an adequate remedy.

89.   The argument that the loan of US$22,500,000 to BTL is unlawful and void, and that BTL never had a legal liability to the defendant for that loan is, as I see it at this interlocutory stage, without full arguments on the issue, devoid of legal force or merit.  But this is for the trial judge to decide, not for me at this interlocutory stage.

90.   The court has, at this interlocutory stage, to do what is just or convenient.   It is not just or convenient to grant a permanent injunction to prevent the defendant indefinitely from continuing arbitral proceedings or commencing other arbitral proceedings, as applied for by the claimant.   But it seems to me to be just or convenient to grant an injunction to stay the foreign arbitral proceedings not indefinitely, but only until the local claim for compensation by the defendant, and any subsequent proceedings in the local courts in relation to that claim, are heard and determined. After such hearing and determination, the defendant is entitled, if needed, to continue or to commence proceedings in the arbitral tribunal, as the defendant thinks fit under the treaty or agreement.  In other words, I think it is just or convenient, and the balance of convenience requires, that one process for compensation be undertaken at a time, and since the local claim is earlier in time, and ordered by the court, I think that process ought to continue.

91.     The defendant did give a written undertaking, but it is ambiguous, and there is doubt whether the defendant could properly suspend the local claim for compensation, in the light of the order of the court made in Claim 874 of 2009, that the Financial Secretary comply without delay with section 65(1) of the Belize Telecommunications Act for the payment to the defendant of reasonable compensation within a reasonable time.  The undertaking as drafted cannot suspend a process that the court in effect had ordered, which order has been perfected.  It would be oppressive or vexatious on the facts of this case to have both processes for compensation taking place at the same time.

92.     I therefore make the following orders:

(1)     An injunction is granted to the claimant restraining the defendant, whether by itself or by its officers, servants, or agents, subsidiaries, assignees or other persons or bodies under its control, from taking any or any further steps in the continuation or prosecution of the arbitration proceedings, commenced by the defendant by notice of arbitration  dated 5th May, 2010 under the Arbitration Rules of the United Nations Commission on International Trade law 1977 and pursuant to the treaty or agreement made on 30th April, 1982 between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Belize and extended to the Turks and Caicos Islands, until the hearing and determination of the local claims for compensation made on 15th October, 2009 by the defendant, and until any subsequent

proceedings in the local courts in relation to the said local claims are heard and determined.

(2)     After the completion of hearing and determination of the local claims, and any subsequent proceedings, mentioned at (1) above for compensation, the defendant may, if it thinks fit, continue or commence arbitration proceedings under the above mentioned treaty or agreement for such compensation or other remedies as it thinks fit.

(3)     Each party to bear its own costs.

Oswell Legall
JUDGE OF THE SUPREME COURT
7th December, 2010

# Courtenay Declaration Exhibit N

Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 358 of 485



**No. 18 of 2010**

I assent,

**(SIR COLVILLE N. YOUNG)**
*Governor -General*

31st March, 2010

AN ACT to amend the Supreme Court of Judicature Act,
Chapter 91 of the Laws of Belize, Revised Edition
2000 - 2003, to strengthen the provisions relating to
contempt of court; and to provide for matters connected
therewith or incidental thereto.

*(Gazetted 1st April , 2010.)*

*BE IT ENACTED, by and with the advice and consent of
the House of Representatives and the Senate of Belize
and by the authority of the same, as follows:-*

1.  This Act may be cited as the                 Short title.

**SUPREME COURT OF JUDICATURE
(AMENDMENT) ACT, 2010,**

CAP. 91.
Act No. 8/01
11/03
9/08.

and shall be read and construed as one with the Supreme Court of Judicature Act, which, as amended, is hereinafter referred to as the principal Act.

Amendment
of section
70.

2.   Section 70 of the principal Act is hereby amended in subsection (2) thereof as follows:-

> *(i)*    by adding the word "or" at the end of paragraph *(c)*;
>
> *(ii)*   by adding the following as new paragraph *(d)* immediately after paragraph *(c)*:
>
> > "*(d)* in which a person is alleged to have committed contempt of court."

Addition of
section
106A.

3. The principal Act is hereby amended by the addition of the following as new section 106A immediately after section 106 in Part IX [Contempt of Court]:

"Criminal
Contempt
of Court.

106A.    (1) Notwithstanding any other law or rule of practice to the contrary but without prejudice to the power of Court to punish for contempt in accordance with Part 53 of the Supreme Court (Civil Procedure) Rules 2005 by way of committal and seizure of assets, every person, whether in Belize or elsewhere, who disobeys or fails to comply with an injunction, or an order in the nature of an injunction, issued by the Court (whether such injunction was issued before or after the commencement of this Act), shall be guilty of an offence and shall be punished in accordance with the Summary Procedure of the Court, and in every such case, any rule of court relating to the unlimited jurisdiction of the Court shall apply.

S.I. 75/05.

(2) A complaint for an offence under subsection (1) above may be laid by the Attorney General or

the aggrieved party or a police officer not below the rank of Inspector.

(3) A person guilty of an offence under subsection (1) above shall be punished on conviction-

> *(i)* in the case of a natural person, with a fine which shall not be less than fifty thousand dollars but which may extend to two hundred and fifty thousand dollars, or with imprisonment for a term which shall not be less than five years but which may extend to ten years, or with both such fine and term of imprisonment, and, in the case of a continuing offence, with an additional fine of one hundred thousand dollars **for each day the offence continues;**

> *(ii)* in the case of a legal person or other entity (whether corporate or unincorporate), with a fine which shall not be less than one hundred thousand dollars but which may extend to five hundred thousand dollars, and in the case of a continuing offence, with an additional fine of three hundred thousand dollars **for each day the offence continues.**

(4) Every person, whether in Belize or elsewhere, who-

> *(a)* directly or indirectly, instigates, commands, counsels, procures, solicits, advises or in any manner whatsoever aids, facilitates, or encourages the commission of an offence under subsection (1) above; or

> *(b)* knowing that an injunction has been issued by

the Court, does any act the effect of which would be to disregard such injunction, whether such injunction was issued before or after the commencement of this Act,

shall be guilty of abetting the said offence and shall be punished in like manner as if he had committed that offence, and the penalties prescribed in subsection (3) above shall accordingly apply.

(5) Where an offence under this section is committed by a body of persons, whether corporate or unincorporate, every person who, at the time of the commission of the offence, acted in an official capacity for or on behalf of such body of persons, whether as shareholder, partner, director, manager, advisor, secretary or other similar officer, or was purporting to act in any such capacity, shall be guilty of that offence and punished accordingly, unless he adduces evidence to show that the offence was committed without his knowledge, consent or connivance.

(6) Notwithstanding anything to the contrary contained in any other law, the offences created by this section shall be investigated, tried, judged and punished by the Court regardless of whether the offences occurred in Belize or in any other territorial jurisdiction, or whether or not the offender was present in Belize or elsewhere, but without prejudice to extradition, where applicable, in accordance with the law.

(7) For the avoidance of doubt, it is hereby declared that this section shall have effect regardless of whether the injunction referred to in this section was issued before or after the commencement of this Act.

(8) Without prejudice to the generality of the foregoing provisions, the Court shall have jurisdiction -

    *(i)*    to issue an injunction against a party or arbitrators (or both) restraining them from commencing or continuing any arbitral proceedings (whether sited in Belize or abroad), or an injunction against a party restraining it from commencing or continuing any proceedings for enforcement of an arbitral award (whether in Belize or abroad), where it is shown (in either case) that such proceedings are or would be oppressive, vexatious, inequitable or would constitute an abuse of the legal or arbitral process;

    *(ii)*    to void and vacate an award made by an arbitral tribunal (whether in Belize or abroad), in disregard of or contrary to any such injunction.

(9) In addition to the modes of service prescribed in the Supreme Court (Civil Procedure) Rules 2005, notice of an injunction issued by the Court, or of an application for such injunction, or of any order associated therewith (whether such injunction or order was issued before or after the commencement of this Act), may be served by registered post, fax, courier service or a notice in the Belize Gazette (as may be appropriate in the circumstances of each case), regardless of whether the person against whom the injunction or order was issued, or against whom the application for such injunction or order was made, be present or resident within or outside Belize, and for this purpose, no leave of the Court for serving the injunction, notice or order, as the case may be, outside Belize shall be required notwithstanding anything to the contrary contained in any other law or rule of practice.

S.I. 75/05

(10) Where an offence created by this section was committed outside Belize, the information and complaint for such offence shall be laid in the Central District of the Supreme Court.

(11) A person charged with an offence under this section may be tried in his absence if the Court is satisfied that such person was given at least 21 days' notice of the charge and the date, time and place of the trial and that he had a reasonable opportunity of appearing before the Court but had failed to do so.

(12) The notice referred to in subsection (11) above may be served personally, or by registered post, or by a notice in the Belize Gazette, as may be appropriate in the circumstances of each case.

S.I. 75/05.

(13) No person shall be liable to be prosecuted for an offence under this section if he has already been punished for the same offence under Part 53 of the Supreme Court (Civil Procedure) Rules, 2005, or *vice versa.*

CAP. 1.

(14) In this Act, the word "person" shall have the meaning ascribed to it in section 3 of the Interpretation Act.

(15) Subject to the foregoing provisions of this section, the Attorney General may, if he considers necessary, make rules for giving better effect to the provisions of this section, and all such rules shall be subject to negative resolution."

*Printed in Belize by the Government Printer*



**No. 26 of 2010**


I assent,


(SIR COLVILLE N. YOUNG)
*Governor-General*


22nd October, 2010.


**AN ACT to amend the Supreme Court of Judicature Act, Chapter 91 of the Laws of Belize, Revised Edition 2000-2003, to clarify the law as to the ingredients of the offence of criminal contempt of court; to make provision for mitigation of penalties in the case of natural persons in certain extenuating circumstances; to specify the Rules Governing Trial on Criminal Information and Complaint; and to provide for matters connected therewith or incidental thereto.**


*(Gazetted 23rd October, 2010.)*


***BE IT ENACTED, by and with the advice and consent of the House of Representatives and the Senate of Belize and by the authority of the same, as follows:–***


1.    This Act may be cited as the                    Short title.

  **SUPREME COURT OF JUDICATURE (AMENDMENT) (NO. 2) ACT, 2010,**

CAP. 91.
Act 8/01
11/03
9/08
18/10.

and shall be read and construed as one with the Supreme Court of Judicature Act, which, as amended, is hereinafter referred to as the principal Act.

Amendment of section 70.

No. 18/2010

2.     Section 70 of the principal Act is hereby amended in subsection (2) thereof by deleting paragraph *(d)* [added by Act No. 18 of 2010].

Amendment of section 106A.

3.     Section 106A of the principal Act is hereby amended as follows:–

   *(i)*   in subsection (1)–

      *(a)*   by inserting the word "knowingly" immediately before the word "disobeys" occurring therein; and

      *(b)*   by deleting the words "shall be punished in accordance with the Summary Procedure of the Court" and substituting therefor the words **"shall be tried summarily in the Supreme Court by a judge sitting alone without a jury, on a criminal information and complaint laid under subsection (2);**

   *(ii)*   in **subsection (3),** by adding the following *Proviso* at the end of paragraph *(i)* thereof:

      "Provided that where a natural person who is convicted of an offence under this section shows that the extenuating circumstances (as described in subsection 3a below) exist in his case, a court may, in lieu of imposing the penalties specified above, impose a fine of not less than five thousand dollars and not more than ten thousand dollars, and in

default of payment of such fine, a term of imprisonment of not less than one year and not more than two years.";

*(iii)* by adding the following new subsection immediately after subsection (3):

"(3a) For the purpose of the *Proviso* to paragraph *(i)* of subsection (3) above, the expression "extenuating circumstances" means where–

    *(a)* the convicted person has previously been a law abiding person and has no criminal record; and

    *(b)* the offence was committed through sheer ignorance of the consequences of his conduct; and

    *(c)* the imposition of full penalties prescribed in subsection (3) above would cause grave hardship to him and his family.";

*(iv)* by adding the following new subsection (16) after subsection (15)-

Appendix I.

(16) Subject to the provisions of this section and any rules made by the Attorney General under subsection (15), the rules contained in Appendix I hereto shall apply to a trial on criminal information and complaint laid under this section.

## APPENDIX I   [Section 106A (16)]

### Rules Governing Trial on Criminal Information and Complaint under Section 106A

— ••• —

**Short title**

1.   These Rules may be cited as the

## CRIMINAL INFORMATION AND COMPLAINT RULES.

**Form of criminal Information and complaint.**

2. (1) A criminal information and complaint may be in the following form:

"The Queen v AB

In the Supreme Court of Belize (Criminal Jurisdiction) _____ District.

Criminal Information and Complaint filed by _____ this ____ day of _____.

AB is charged with the following crime:

Statement of crime
X X

Particulars of Crime
XX

_____
Name and Signature of the Complainant

Sworn to the day
and year above-mentioned

Before me

_____
Commissioner of the Supreme Court.

(2) Figures and abbreviations may be used in a criminal information and complaint for expressing anything which is commonly expressed thereby.

(3) A criminal information and complaint shall be sworn to before a Commissioner of the Supreme Court.

(4) A criminal information and complaint shall not be open to objection by reason only of any failure to comply with this rule.

3. (1) Every criminal information and complaint shall contain and be sufficient if it contains a statement of the specific crime or crimes with which the accused person is charged, together with such particulars as may be necessary for giving reasonable information as to the nature of the charge.

*Presentation and sufficiency of criminal information.*

(2) Notwithstanding any rule of law or practice to the contrary, a criminal information shall not be open to objection in respect of its contents if it is framed in accordance with these rules.

4. (1) The statement of crime shall describe the crime shortly in ordinary language, avoiding as far as possible the use of technical terms, and without necessarily stating all the essential elements of the crime, and shall contain a reference to the section of the Act under which the charge is laid.

*Contents of criminal information and complaint.*

(2) After the statement of the crime, particulars of it shall be set out in ordinary language, in which the use of technical terms shall not be necessary.

5. (1) Subject to subrule (2), any number of counts for the same crime may be joined in the same information and complaint and shall be sufficiently distinguished.

*Joinder of counts and proceedings thereon.*

(2) Where there are more counts than one in a criminal information and complaint, each count may be treated as a separate information and complaint.

(3) If the court thinks it conducive to the ends of justice to do so, it may direct that the accused person be tried upon anyone or more of the counts separately.

(4) Where an information and complaint contains more than one count, the counts shall be numbered consecutively.

**Joinder of two or more accused persons in one criminal information and complaint.**

6. (1) Subject to subrule (2), any number of persons may be charged in one criminal information and complaint and tried together for a crime which they are alleged to have jointly committed, or in which they, or any of them, are alleged to have participated by abetment or otherwise.

(2) The court may, on application either on behalf of any of the accused persons or of the prosecutor, at any time, order that any of such persons shall be tried separately from all or any of the others.

**Description of persons.**

7. The description or designation in a criminal information and complaint of the accused person or of any other person to whom reference is made therein, shall be such as is reasonably sufficient to identify him, without necessarily stating his correct name, or his abode, style, degree or occupation, and if, owing to the name of the person not being known, or for any other reason, it is impracticable to give that description or designation, such description or designation shall be given as is reasonably practicable in the circumstances.

**Description of document.**

8. Where it is necessary to refer to any document or instrument in a criminal information and complaint, it shall be sufficient to describe it by any name or designation by which it is usually known, or by the purport thereof, without setting out any copy thereof.

Case 1:14-cv-01123-CKK   Document 1-1   Filed 07/01/14   Page 371 of 485

9. Subject to any other provisions of these rules, it shall be sufficient to describe any place, time, thing, matter, act or omission whatever, to which it is necessary to refer in any criminal information and complaint, in ordinary language in such a manner as to indicate with reasonable clearness that place, time, thing, matter, act or omission.

General rule as to description.

10. (1) Every criminal information and complaint shall be filed in the Supreme Court Registry at least twenty-one (21) days before the date of trial of the accused person charged in such criminal information and complaint.

Filing of criminal information and complaint.

(2) The Registrar shall, at least fourteen (14) days before the day of trial, deliver or cause to be delivered to the accused person, or if the accused person is in custody, to the keeper of the prison, a certified copy of the criminal information and complaint.

(3) For the purpose of subrule (2) above ——

    *(a)* the delivery to the keeper of the prison of the certified copy may be made by transmitting it in a registered letter by post properly addressed to him;

    *(b)* if the accused person be out of Belize, the copy may be served by registered post, fax, courier service or a notice in the Belize Gazette (as may be appropriate in the circumstances of each case);

    *(c)* the receipt purporting to be given by an officer of the Post Office for the registered letter, or an employee of the courier service for the package sent by courier, shall be deemed

> *prima facia* evidence of the posting or delivery on the day stated therein;

**(d)**   a certificate signed by the Registrar, that a certified copy of a criminal infonnation and complaint was duly sent in the manner aforesaid shall be deemed *prima facia* evidence that the copy reached the accused person charged in the criminal infonnation and complaint.

**Trial Judge to give directions.**

11. Where a criminal information and complaint is filed in the Supreme Court Registry, the trial Judge shall, subject to section 106A of this Act and these Rules, give directions as to ——

**(a)**   the date of arraignment of the accused person;

**(b)**   the date and conduct of trial;

**(c)**   the disclosure of prosecution evidence to the accused person;

**(d)**   the reception of evidence, whether by witness statements or by *viva voce* testimony; and

**(e)**   any other matter pertaining to such trial.

**Power of the trial Judge.**

12. Subject to the provisions of section 106A of this Act and these Rules, on a trial on criminal information and complaint, the trial Judge shall have like powers as to the attendance of the accused person and the witnesses, remanding an accused person in custody or admitting him

to bail, adjournment of the trial from time to time, and all other matters, as if it were a trial on indictment.

13. These Rules may from time to time be amended by the Attorney General by rules made under section 106A (15) of this Act.

Amendment of Rules.

# Courtenay Declaration

# Exhibit O

04/27/2010 04:53 FAX 2126106408          ALLEN & OVERY LLP          ☒001

Case 1:09-cv-02170-RJL   Document 45-13   Filed 07/01/14   Page 375 of 485
Case 1:09-cv-02170-RJL   Document 45-13   Filed 02/15/13   Page 1 of 17

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              2487
CONNECTION TEL        02300169659011501223 0214
CONNECTION ID
ST. TIME              04/27 04:47
USAGE T               05'57
PGS. SENT              16
RESULT               OK
```

# ALLEN & OVERY

## FAX MESSAGE

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

| | |
|---|---|
| Pages | 16  (including this page) |
| From | Benno Kimmelman |

Tel              1-212-610-6300
Fax             1-212 610 6399
benno.kimmelman@allenovery.com

| | |
|---|---|
| To | Eamon H. Courtenay SC |
|    | Courtenay Coye LLP |
|    | Belize City, Belize |
|    | Tel: 011-501-223-1475 |
|    | Fax: 011-501-223-0214 |
| Date | April 27, 2010 |
| Subject | *Belize Social Development Limited v. The Government of Belize,* |
|         | <u>Case No. 09-cv-2170 (United States District Court, District of Columbia)</u> |

Please see the attached.

Best Regards,

Benno Kimmelman

# ALLEN & OVERY

## FAX MESSAGE

Allen & Overy LLP
1221 Avenue of the Americas
New York  NY  10020

| | |
|---|---|
| Pages | 16  (including this page) |

Tel        1-212-610-6300
Fax       1-212 610 6399
benno.kimmelman@allenovery.com

| | |
|---|---|
| From | Benno Kimmelman |
| To | Eamon H. Courtenay SC<br>Courtenay Coye LLP<br>Belize City, Belize<br>Tel: 011-501-223-1475<br>Fax: 011-501-223-0214 |
| Date | April 27, 2010 |
| Subject | *Belize Social Development Limited v. The Government of Belize*,<br><u>Case No. 09-cv-2170 (United States District Court, District of Columbia)</u> |

Please see the attached.


Best Regards,

Benno Kimmelman

If all pages are not received, please call the sender.  This fax is confidential and may also be privileged.  If you are not the intended recipient, please notify us immediately.  You should not copy this fax or use it for any purpose, nor disclose its content to any other person.

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is regulated by the Law Society of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practice in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AO and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Amsterdam, Antwerp, Bangkok, Beijing, Bratislava, Brussels, Budapest, Dubai, Frankfurt, Hamburg, Hong Kong, London, Luxembourg, Madrid, Milan, Moscow, New York, Paris, Prague, Rome, Shanghai, Singapore, Tokyo and Warsaw.

# ALLEN & OVERY

April 27, 2010

**BY FACSIMILE**

Eamon H. Courtenay, S.C.
Senior Partner
Courtenay Coye LLP
15 A Street
PO Box 234
Belize City, BELIZE

**Allen & Overy LLP**
1221 Avenue of the Americas
New York  NY  10020

Tel          212 610 6322
Fax         212 610 6399
benno.kimmelman@allenovery.com

> **Re:**   *Belize Social Development Limited v. The Government of Belize,*
>            **Case No. 09-cv-2170 (United States District Court, District of Columbia)**

Dear Mr. Courtenay:

I am writing to ask whether you or another lawyer from Courtenay Coye LLP would be willing to assist us by providing a declaration in response to the Declaration of Michael C. Young, S.C. (a copy of which is attached hereto) submitted in the above-referenced proceeding that is pending in Washington, DC (USA), captioned Belize Social Development Limited v. The Government of Belize, Case No. 09-CV-02170-RJL, in which Belize Social Development Limited seeks to confirm the monetary portion of an arbitration award against the Government of Belize.

I look forward to hearing from you.

Very truly yours,

Louis B. Kimmelman

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practice in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Bratislava, Brussels, Bucharest (associated office), Budapest, Doha, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, London, Luxembourg, Madrid, Milan, Moscow, Munich, New York, Paris, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo and Warsaw.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BELIZE SOCIAL DEVELOPMENT LIMITED<br>Craigmuir Chambers, P.O. Box 71<br>Road Town, Tortola, British Virgin Islands, | ) ) ) ) | |
| Petitioner, | ) ) | Civil Action No. 1:09-CV-02170-RJL |
| v. | ) ) | |
| THE GOVERNMENT OF BELIZE<br>Attorney General, Attorney General's Ministry<br>New Administration Building, Belmopan, Belize<br>Central America, | ) ) ) ) ) | |
| Respondent. | ) | |

## DECLARATION OF MICHAEL C. YOUNG, S.C.

I, **MICHAEL C. YOUNG, S.C.** of **YOUNGS LAW FIRM**, #28 Regent Street, Belize City, Belize, hereby declare as follows:

1.   I am an attorney-at-law, duly admitted to practice law and practicing law in Belize, and legal counsel of record for the Government of Belize ("GOB") in the case of Attorney General [of Belize] v. Belize Telemedia Limited, Claim No. 3N of 2009, currently pending before the Supreme Court of Belize ("Belize Action").

2.   I have personal knowledge of certain of the facts stated herein and in relation to other stated facts they are true to the best of my information and belief.  Insofar as the statements herein relate to legal principles or positions, they represent opinions which I hold to the best of my knowledge and belief.

3.   The Belize Action was initiated by the GOB, which is the party-in-interest, against Belize Telemedia Limited ("BTL") and Belize Social Development Limited ("BSDL").

By Section 42 (5) of the Constitution of Belize, "Legal proceedings for or against the State shall be taken, in the case of civil proceedings, in the name of the Attorney General and, in the case of criminal proceedings, in the name of the Crown."

4.    The records attached as exhibits to this declaration are true and correct copies of records filed by the parties in the Belize Action, which were filed either by the Attorney General's Ministry, or by Youngs Law Firm  (to the extent that they are documents filed by the GOB) or obtained (to the extent that they are documents filed by BTL) in my capacity as legal counsel for the GOB.

5.    Attached hereto as Exhibit 1 is a true and correct copy of the Fixed Date Claim Form (or, complaint) filed by the GOB in the Belize Action on April 6, 2009.

6.    The GOB initiated the Belize Action seeking a judicial declaration that the arbitration award dated March 18, 2009 and rendered by the London Court of International Arbitration ("LCIA") in LCIA Arbitration No. 81079 between BTL and the GOB ("Arbitration Award") is contrary to the Belize Constitution, Belize law and Belize public policy and, therefore, is unenforceable. This Arbitration Award also is the subject of the instant enforcement action before the United States District Court for the District of Columbia ("D.C. Action").  In addition, the GOB seeks a judicial declaration that the Arbitration Award also is unenforceable because the underlying agreements (between the GOB and BTL), which were the basis of the Arbitration Award, also are contrary to the Belize Constitution, Belize law and Belize public policy.  See Exhibit 1 hereto at pages 2-5 (Fixed Date Claim).

7.    When it initiated the Belize Action, the GOB filed an Application for an interim injunction prohibiting BTL and BSDL from enforcing the Arbitration Award in any judicial proceeding in Belize, the United Kingdom or any other state or territory until after the Belize

Supreme Court adjudicates the Belize Action.   A true and correct copy of said Notice of

Application, filed on or about April 6, 2009, is attached hereto as Exhibit 2.

8.      Together with the Application, the GOB filed the Affidavit of Mr. Gian C.

Gandhi, Director General of the International Financial Services Commission of Belize and also

Legal Counsel to the Ministry of Finance, Government of Belize, dated April 6, 2009 ("4/6/09

Gandhi Aff."), a true and correct copy of which is attached hereto as Exhibit 3.

9.      On April 7, 2009 a Second Affidavit of Mr. Gandhi ("4/7/09 Gandhi Aff.") was

filed attaching submitting a copy of the Arbitration Award.   A true and correct copy of the 4/7/09

Gandhi Affidavit is attached hereto as Exhibit 4.

10.     As set forth in the April 6, 2009 Affidavit of Mr. Gandhi, this dispute arises from

a series of four agreements entitled: (1) Government Telecommunications Accommodations

Agreement (dated September 19, 2005); (2) Amendment to the Accommodation Agreement

(dated November 21, 2005); (3) Settlement Deed in relation to the Government

Telecommunications Accommodation Agreement (dated December 15, 2006); and (4)

Settlement Deed in relation to the Government Telecommunications Accommodation Agreement

(dated January 7, 2008).   (4/6/09 Gandhi Aff. ¶ 11.)   Copies of the four agreements are attached

to the 4/6/09 Gandhi Aff. and designated as exhibits "GCG5," "GCG6," "GCG7" and "GCG8,"

and are collectively referred to herein as the "Accommodation Agreements."

11.     It is the official position of the GOB that the Accommodation Agreements were

improperly executed and entered into in secret by the prior Prime Minister, the Honorable Said

Musa, and representatives of BTL.   As is discussed below, the prior Prime Minister, without

authority to do so, purported to give BTL favorable tax treatments, duty  exemptions and a

virtual monopoly over certain aspects of telecommunications in Belize, encroaching into the

constitutional authority of the Belize Legislature and statutory authority of the Belize Public

Utilities Commission, among other things.  Only after the General Election of February 2008,

when the new administration of the Honorable Prime Minister Dean Barrow took control of the

government, determined to eradicate past preferential treatments and abuses, did the nature of the

Accommodation Agreements become known to the public.  Public policy require that public

contracts be negotiated in a spirit of transparency and public accountability, be properly

authorized and approved, and not be contrary to the Constitution and laws of Belize, but these

requirements were not followed with respect to the Accommodation Agreements.

12.    Further, as Mr. Gandhi explains, the original Accommodation Agreement

contained secrecy provisions which were incorporated by reference into the three subsequent

Accommodation Agreements, in order to keep them out of the reach of public knowledge.

Secrecy provisions in public agreements have been outlawed and invalidated by the Belize

Freedom of Information (Amendment) Act, 2008.

13.    The secret Accommodation Agreements, as well as the subject Arbitration Award,

violate various provisions of the Belize Constitution and laws of Belize, as well as Belize public

policy, as is contended by the GOB in the Belize Action and is summarized below.

14.    First, enforcement of the Arbitration Award, including its award of monetary

damages, would be contrary to the Constitution and laws of Belize, including but not limited to

section 114 of the Belize Constitution; section 3 of the Belize Finance and Audit (Reform) Act,

2005 (No. 12 of 2005); and sections 106, 109 and 110 of the Belize Income and Business Tax

Act (CAP. 55).  The irreparable fallacy of the Arbitration Award is that it has held that the Prime

Minister can enter into an agreement with a private party that allows that private party to avoid

its tax liabilities, among other things.  It is well-settled that taxes are set by the Legislature and a

tax payer must pay the rates set by the legislature. Former Prime Minister Musa had no authority to enter into an agreement that would exempt TBL from its tax liabilities under Belize law. Indeed, under the Belize Constitution (as reiterated in the Finance and Audit Reform Act), taxes must be collected by the Government and paid into the Consolidated Fund. The levy of tax and obligation to pay under the Income and Business Tax Act (including the sections cited above) are compulsory and do not provide for set offs or deductions, despite the misguided conclusion of the Arbitration Award. Similarly, the Arbitration Award improperly sets aside or purports to nullify assessment notices, judgment summonses and magistrates court proceedings in Belize, and going forward any and all future notices, summonses and magistrates court proceedings, also in contravention of the laws of Belize including the Income and Business Tax Act, which at sections 65 et seq. provides for the process of enforcement and collection of tax. The Arbitration Award is contrary to rules of international law and comity – that a tribunal will not adjudicate the tax and revenue laws of another country. Those matters must be adjudicated in the local courts -- in this case in Belize.

15.     Second, enforcement of the Arbitration Award also would be improper, because the Accommodation Agreements between the GOB and BTL, upon which the Arbitration Award are based, violate the Belize Constitution, Belize law and Belize public policy including, among other things, as follows:

(a)     As discussed above, the entirety of the Accommodation Agreements are null and void, ab initio, because the Prime Minister had no authority to enter into an agreement that would exempt TBL from its tax liabilities under Belize law. BTL is obligated to pay the taxes and duties set by the Legislature without offset.

(b)     The application of the "Agreed Rate" of business tax payable by BTL is contrary to the Belize Income and Business Tax Act. Section 107 prescribes the rates of tax. The tax that are set by the Legislature. The Executive Branch of government cannot change the rate prescribed under the Act. Otherwise, the Prime Minister or Minister of Finance could effectively re-write the tax code from the privacy of his office by entering into agreements with corporations and individuals, like the subject secret agreement between BTL and the GOB purport to do.

(c)     The exemption of BTL from custom duties is contrary to the Belize Customs and Excise Duties Act. By section 3 of the Act, the Legislature provides for the raising, levying and collection of duties on imported goods at rates set out in a Schedule to the Act. Again, the rates cannot be changed by the Executive except where such power is given under the Act or another Act (in other words, the Executive cannot grant an exemption except when empowered by statute), and there is no such grant of power applicable to the instant matter.

(d)     The unilateral entitlement of BTL to use the frequencies 2.496 Ghz to 2.69 Ghz is contrary to the Belize Telecommunications Act of 2002 ("BTA"). The BTA at section 3(j) states that it together with the Public Utilities Commission ("PUC") Act "ensure the efficient use of radio frequency," at section 3 states that the PUC "shall regulate the telecommunications section in accordance with this Act," and at section 6(j) provides that the PUC is to manage and administer the use of the radio frequency spectrum, and thus the Executive does not have the power to grant unilateral entitlements as those purportedly granted to BTL.

(e)     The requirement that only the "Individual License Holders, Telemedia [TBL] and Speednet be granted or permitted to hold any permit in Belize to legally carry on, conduct or provide telecommunications services in Belize involving or allowing the provisions of VoIP services in Belize, and that customers of VoIP services can only use such services under written

6

permission of the relevant License Holder, TBL or Speednet, are contrary to the BTA and the Public Utilities Commission Act. The BTA provides that it is the PUC that has the power to receive and process applications for licenses, as set forth in sections 6(2)p and 15(6). Further, at section 42(4) there is a prohibition against licensees entering into any agreement which has the effect of significantly lessening competition in the market for the supply of telecommunications services. Further, under the PUC Act, the PUC is an autonomous body, and thus the Executive cannot encroach on said powers of the PUC.

(f)     The "setting off" of various sums (including setting off the "short fall" difference between the actual return in profit to BTL and the return purportedly guaranteed by the government in the Accommodation Agreements, and the setting off of sums allegedly due to the GOB under a loan note against business taxes due) against the tax liability of BTL under the Accommodation Agreements also violates the Constitution and laws of Belize for the various reasons discussed above, including that the GOB must collect the taxes at the rates set by the Legislature without set offs or offsets.

16.     The Arbitration Award not only purports to award monetary damages but also contains "declarations" which actually would serve as improper prospective injunctions, and purports to make findings, including regarding the applicability or non-applicability of Belize tax laws to BTL, that would have serious impacts and ongoing consequences on Belize, the GOB and the people of Belize, including:

(a)     Incapacity on the part of GOB to impose on BTL the tax rate mandated by law passed by the Legislature.

(b)     Incapacity on the part of the GOB to collect full revenue as contemplated by the Constitution provided for by the Legislature.

(c)　　　An enforced preferential tax status for BTL and/or its assignee through an agreement with the executive and not by authority of statute or regulation with the resultant negative revenue impact.

(d)　　　Incapacity on the part of the GOB to impose on BTL the customs duties mandated by law passed by the Legislature.

(e)　　　Incapacity on the part of the PUC to manage and regulate the assignment of frequencies as mandated by law passed by the Legislature.

(f)　　　Incapacity on the part of the PUC to exercise the power granted by the Legislature to receive and process applications for licences for the provision of telecommunication services.

(g)　　　Incapacity on the part of the PUC and the GOB to promote competition in the supply of telecommunications which would benefit consumers and promote development of the industry, and

(h)　　　Incapacity on the part of the PUC to regulate rates which has a direct impact on consumers, businesses and the economy.

Accordingly, enforcement of the Arbitration Award also would violate the public policy of Belize.

17.　　　Notwithstanding the illegality of the Accommodation Agreements under Belize law, BTL improperly submitted for determination by private arbitrators in a foreign country (the United Kingdom) the issue whether the Accommodation Agreements are legal and whether the GOB must honor these secret agreements.  As discussed above, these private arbitrators also were asked to pass judgment on tax matters relative to Belize tax laws, including whether BTL could be relieved from its tax liabilities by agreement, although the issue of interpretation of local tax laws can properly be brought only before the courts of Belize.  Despite the foregoing,

after unilaterally obtaining the Arbitration Award, BTL issued a press release proclaiming that: "The LCIA has made it clear that the Accommodation Agreement is lawful and a valid and binding agreement. The LCIA has also found no evidence of corruption or that the Accommodation Agreement was a secret agreement." 4/6/09 Gandhi Aff. CGC4.

18.    The official position of the GOB is that no arbitrator or foreign court may determine the legality or adjudicate the enforceability of the Accommodation Agreements to which the GOB is a party or interpret the effect, if any, of the Accommodation Agreements on BTL's obligations and liabilities under local revenue, tax and duty laws other than the courts of Belize. It was for this reason that, shortly after being informed of the LCIA's decision, the GOB initiated its aforementioned action in Belize.

19.    On April 7, 2009, the Belize Supreme Court heard the GOB's interim injunction application ex parte (Exhibit 2), and granted an interim injunction in an Order which provided in pertinent part:

> The First Defendant, BELIZE TELEMEDIA LIMITED, and the Second Defendant, BELIZE SOCIAL DEVELOPMENT LIMITED [Collectively "the Respondents"], their successors, assigns and subsidiaries, whether by themselves, their officers, servants, affiliates, agents or howsoever, shall be and are hereby restrained until further order from enforcing or causing to be enforced the 'Final Award' issued on the 18th March 2009 by the Arbitration Tribunal constituted by the London Court of International Arbitration (LCIA) to hear claims in Arbitration number 81079 (or 81709) between Belize Telemedia Limited (the First Defendant herein) and the Attorney General of Belize (the Claimant herein), whether in Belize or any other jurisdiction outside Belize, or from commencing or continuing any other legal or arbitral proceedings in any country or jurisdiction whether in or outside of Belize, relating to or arising out of the said Final Award.

20.    A true and correct copy of said Order, dated April 7, 2009, granting said interim injunction is attached hereto as Exhibit 5.

21.     Both BTL and BSDL were thereafter served with copies of the April 7, 2009 Order and related documents by delivery at No. 212 their known addresses in Belize. True and correct affidavits of service on both entities are attached hereto as Exhibit 6 and Exhibit 7 respectively.

22.     The April 7, 2009 Order set a return date of May 5, 2009. By that date, BTL and BSDL were obligated to present their arguments if they contended that the interim injunction should be dissolved and a preliminary injunction should not be entered.

23.     BTL thereafter appeared in, and is defended, the Belize Action. BTL appeared in the Belize Action represented by Belize attorney Eamon Courtenay S.C.

24.     On or about April 28, 2009, BTL filed a Notice of Application accompanied by a declaration of Dean C. Boyce, then-Chairman of the Executive Committee of the Board of Directors of BTL. A true and correct copy of the Notice of Application and accompanying documents is attached hereto as Exhibit 8. The Notice of Application sought to consolidate with the Belize action two other related judicial proceedings pending in Belize which, like the Belize action, challenged the lawfulness of the Accommodation Agreements. Id.

25.     On or about May 20, 2009, BTL filed an Amended Notice of Application accompanied by a declaration of Ediberto Tesucum, a then-member of the Board of Directors of BTL. A true and correct copy of the Amended Notice of Application is attached hereto as Exhibit 9. The Amended Notice of Application requested (a) a declaration that the Arbitration Award is valid and binding on the GOB, and (b) requesting that the proceedings be stayed. Id.

26.     On July 3, 2009, the BTL submitted a Skeleton (summary) Argument, a true correct copy of which is attached hereto as Exhibit 10.

27.     On July 8, 2009, the GOB submitted a Skeleton (summary) Argument on behalf of the Claimant, a true and correct copy of which is attached hereto as Exhibit 11.

28.     On July 9, 2009, the Belize Supreme Court held a hearing in the Belize Action. Mr. Courtenay S.C. and Mr. Nigel Plemming, Q.C, appeared at the hearing as counsel for BTL. Mr. Michael Young, S.C. appeared at the hearing as counsel for the GOB. The parties presented their arguments to the Belize Supreme Court, and the Supreme Court took the matter under submission.

29.     Thereafter, on July 20, 2009, the Belize Supreme Court issued an Order and Decision granting, in part, the Application of the GOB for an interim injunction until the conclusion of the Belize Action. Attached hereto as Exhibit 12 is a true and correct copy of the Order of, and attached hereto as Exhibit 13 is a true and correct copy of said Decision of, the Belize Supreme Court.

30.     The Order (Exhibit 12) extended the ex parte restraining order until conclusion of the Belize action provides, in relevant part:

> 1.    Belize Telemedia Limited and Belize Social Development Limited or their successors, assigns or subsidiaries, are hereby restrained by themselves, their agents or representatives howsoever, from enforcing, or commencing or continuing in the United Kingdom or any other jurisdiction, proceedings for enforcing the award of the London Court of International Arbitration (LCIA), made on the 18th of March 2009; in Arbitration Number 81079, or from commencing or continuing in the United Kingdom or in any other jurisdiction, any proceedings relating to the enforcement of said award.
>
> 2. The Injunction Order above shall continue until the conclusion of the Claim herein or until further Order.

31.     On the morning of 18th March 2010 Rowdane Morris, who is employed as a process server for Youngs Law Firm, went to No. 212 North Front Street, Belize City Belize in accordance with instructions from Youngs Law Firm to serve on BSDL a copy of the Injunction

Order issued on the 20th of July 2009 and perfected on the 25th of November 2009 [referred to above]. Upon arriving at the said address Mr. Morris inquired on whether that was the registered address for BSDL and was told "no". He was told further that BSDL was an overseas company and does not have a registered office in Belize. This statement is included by way of duty to the Court and does not constitute any admission or agreement on the part of the Government of Belize with any position taken or advocated by BSDL or attorneys on its behalf.

32. The Belize Supreme Court's Decision (Exhibit 13) supporting its Order holds, in part:

> From the above, it is obvious that serious questions arise in the several contentions of illegality of the agreement, raised by the Attorney General. That in turn raises a serious question as to whether enforcement of the award will not be contrary to the Constitution, the other statutory laws and public policy. **Section 20 of Arbitration Act**, requires that for an award to be enforced, "*the arbitration agreement must be valid under the law by which it was governed*", and the enforcement, "*must not be contrary to public policy or the law of Belize*".

33. With respect to the question of whether an injunction should be issued, the Supreme Court held in the Decision, as follows:

> The application, the subject of this decision, is for an order to preserve the *status quo* until trial of the claim of the Attorney General, in which he claims relief against enforcement of the foreign arbitration award made on 18.3.2009, by the LCIA. The *status quo* at the moment is that no enforcement proceedings have been commenced in courts in Belize or in courts in England or elsewhere, although an application has been filed for an order of this court for a declaration that the "award is valid and binding..."
>
> I have decided that serious issues of illegality and of public policy, have been raised in the claim to resist enforcement. I must proceed to consider whether in the circumstances of the claim, including the fact that the restraining order is sought in respect of

proceedings outside Belize as well, it is appropriate to exercise discretion in favour of granting an interim restraining order.

It is my view that, in the interest of justice, the *status quo* should obtain until the determination of the claim of the Attorney General.

34.    It should be noted that  one basis for restraining both BTL and BSDL arose from BTL's own argument, as expressly noted in the Decision:

> There is a further reason in favour of granting an order restraining both respondents from enforcing the award or commencing or continuing claims related to the award in the UK and in any other jurisdiction.  According to an application dated 28.4.2009, filed the same day by BTL, there are already three claims: No. 317 of 2009, No. 275 of 2009 and No. 279 of 2009, in the Supreme Court of Belize, in which both the Attorney General and BTL are parties with others.  BTL has asked that the claims be consolidated with this claim.  It said that the same ground of illegality concerning the same and similar agreements are in issue.
>
> In my view, it would be oppressive and vexatious to have enforcement of an award in which the same ground was considered proceed with outside Belize, while the proceedings in Belize were still pending.

35.    The instant confirmation action would improperly require this Court to enforce an Arbitration Award that improperly purports to adjudicate tax liabilities of BLT under Belize law.

36.    As counsel for the GOB, and on its behalf, I respectfully submit to this District Court that the Order and Decision of the Belize Supreme Court are well reasoned and valid under Belize law, and respectfully request that this District Court dismiss the instant confirmation

action, or at least stay this confirmation action until after the final adjudication of the Belize Action, in deference to the Belize Supreme Court.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED IN BELIZE CITY, BELIZE

ON: 26ᵗʰ MARCH 2010

MICHAEL C. YOUNG
of YOUNGS LAW FIRM
#28 Regent Street, Belize City, Belize

14

# Courtenay Declaration Exhibit P



# COURTENAY COYE LLP
### A T T O R N E Y S   A T   L A W

EAMON H. COURTENAY SC
CHRISTOPHER COYE
DENISE A.T. COURTENAY SC

ASHANTI ARTHURS MARTIN

May 14, 2010

**BY FAX**: 1-212-610-6399

Louis B. Kimmelman
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020 USA

Dear Mr. Kimmelman,

> **Re:** **Belize Social Development Limited v. The Government of Belize,
> Case No. 09-cv-2170 (United States District Court, District of
> Columbia)**

I am writing in response to your letter dated April 27, 2010 requesting assistance with
respect to the above-referenced proceeding that is pending in Washington, DC against the
Government of Belize.

Unfortunately, based on legal advice that I have received from counsel in Belize regarding
Act No. 18 of 2010, Supreme Court of Judicature (Amendment) Act, 2010, I am not in a
position to provide a witness declaration in the above-referenced proceeding.

Yours truly,

COURTENAY COYE LLP
Eamon H. Courtenay SC

---

15 A Street
P.O. Box 234
Belize City, Belize
Tel: +(501) 223-1476/1478/0279
Fax: +(501) 223-0214
Email: advice@courtenaycoye.com

http://www.courtenaycoye.com

Main Street
Placencia Village
Stann Creek, District
Tel: +(501) 674-1478/523-3282

# Courtenay Declaration
# Exhibit Q

ADVANCE COPY                                    [2014] CCJ 2 (AJ)


### IN THE CARIBBEAN COURT OF JUSTICE
**Appellate Jurisdiction**


### ON APPEAL FROM THE COURT OF APPEAL OF BELIZE


**CCJ Appeal No. CV8 of 2012**
**BZ Appeal Nos. 7, 9 and 10 of 2011**


**BETWEEN**

|  |  |
|---|---|
| **THE ATTORNEY GENERAL OF BELIZE** | **Appellant** |

**AND**

|  |  |
|---|---|
| **PHILIP ZUNIGA** | |
| **DEAN BOYCE** | |
| **KEITH ARNOLD** | |
| **MICHAEL ASHCROFT** | **Respondents** |
| **JOSE ALPUCHE** | |
| **PHILIP OSBORNE** | |
| **EDIBERTO TESUCUM** | |

**AND**

|  |  |
|---|---|
| **BCB HOLDINGS LIMITED** | |
| **THE BELIZE BANK LIMITED** | |
| **PHILIP JOHNSON** | |
| **KEN ROBINSON** | |
| **THANET FINANCIAL SERVICES LIMITED** | **Interested Parties/** |
| **THE SWAN AT WESTGATE LTD** | **Respondents** |
| **JACDAW INVESTMENTS LIMITED** | |
| **SHAUN BREEZE** | |
| **DAVID HAMMOND** | |
| **JOHN LAMBIE** | |
| **PAUL BIFFEN** | |

| **Before The Honourables** | **Mr Justice Nelson** |
|---|---|
| | **Mr Justice Saunders** |
| | **Mr Justice Wit** |
| | **Mr Justice Hayton** |
| | **Mr Justice Anderson** |

<u>Appearances</u>

**Mr Denys Barrow SC and Ms Iliana Swift for the Appellant**

**Mr Edward Fitzgerald QC and Ms Priscilla Banner for the Respondents**

**Mr Edward Fitzgerald QC holds for Lord Goldsmith QC and Mr Godfrey Smith SC for the Interested Parties/Respondents**

**JUDGMENT**
**of**
**The Honourable Justices Nelson, Saunders and Hayton,**
**Delivered by**
**The Honourable Mr Justice Adrian Saunders**
**on the 24th day of January 2014**
**and**
**JUDGMENT**
**of The Honourable Justices Wit and Anderson**

**JUDGMENT OF THE HONOURABLE JUSTICES NELSON, SAUNDERS AND HAYTON**

**The nature of the proceedings**

[1]     This appeal and the respective cross-appeals concern the constitutionality of two Amendment Acts passed by the Parliament of Belize. Throughout this judgment we refer to this legislation as "the Acts" or sometimes "the Act" or "the legislation". The first of the two Amendment Acts was enacted in April 2010, the other in October, 2010. Each of them amended the Supreme Court of Judicature Act[1] ("the principal Act"). The first Amendment Act[2] added a new section, 106(A), to the principal Act. The Long Title of this first Act states its purpose as "An Act to amend the Supreme Court of Judicature Act … to strengthen the

---

[1] Cap 91, Laws of Belize, Revised Edition 2000 - 2003
[2] Supreme Court of Judicature (Amendment) Act, No. 18 of 2010

provisions relating to contempt of court; and to provide for matters connected therewith or incidental thereto". The second Amended Act[3] amended both the principal Act as well as the first Amendment Act. Its Long Title identifies it as "An Act to … clarify the law as to the ingredients of the offence of criminal contempt of court; to make provision for mitigation of penalties in the case of natural persons in certain extenuating circumstances; to specify the rules Governing Trial on Criminal Information and Complaint; and to provide for matters connected therewith…".   Throughout this judgment, unless otherwise indicated, we shall treat with and examine the Acts as if they were consolidated into the principal Act.

[2]     The new section 106(A) contains 16 sub-sections. In substance, these sub-sections: create the offence of knowingly disobeying or failing to comply with an injunction (in particular an anti-arbitration injunction); prescribe severe penalties for persons convicted of this offence, including mandatory minimum penalties; and provide for a range of ancillary matters.

[3]     No sooner were they enacted than the Acts were challenged by the two groups of litigants who are the respondents to the main appeal in these proceedings. Purely for ease of reference, we refer to these groups respectively as the Zuniga group and the BCB Holdings group and we lump both groups together as "the challengers". At the time their challenge was mounted members of these groups feared that the legislation posed considerable, serious and immediate risks to their respective interests and accordingly, they instituted these proceedings against the Attorney General. With the passage of time and, in particular, given the judgment of this Court in a related suit,[4] these fears have substantially diminished. The legal issues raised by the appeal are still, however, of significant constitutional

---

[3]  Supreme Court of Judicature (Amendment) No 2  Act, No. 19 of 2010

[4]  *British Caribbean Bank Ltd v The Attorney General of Belize* [2013] CCJ 4 (AJ), (2013) 82 WIR 63.

importance and the challengers retain their anxieties about the constitutional validity of the Acts.

[4]     Having heard the challenge to the first Act (the second Amendment Act was not yet passed when the challenge to the first was initially mounted), Muria J found that, save for sub-sections 8, 9 and 12, the remaining  sub-sections of section 106(A) were valid. The challengers appealed this finding. For his part, the Attorney General cross-appealed the finding that sub-sections 8, 9 and 12 were invalid. The Court of Appeal considered each of the 16 sub-sections and Mendes JA delivered a careful, painstaking judgment with which the other members of that court agreed. The Court of Appeal held that sub-sections 3 and 5 violated the Constitution; that the impact of this violation automatically rendered also invalid sub-sections 1, 2, 4, 6, 7, 10, 11, 12, 13 and 16 (all of which were, in their own right, otherwise found constitutionally unimpeachable) and that therefore, of the 16 sub-sections, all were ultimately to be struck down save sub-sections 8, 9 and 15. The Attorney General has appealed this judgment to this Court. Likewise, the Zuniga group and the BCB Holdings group have each cross-appealed the opinion of the court below that sub-sections 8, 9 and 15 are constitutionally valid.

**The background**

[5]     The judgment of the Court of Appeal set out in very helpful detail the factual background giving rise to the passage of the Amendment Acts and the bringing of the proceedings. In doing so, that court also found and commented upon certain material facts. Since there is no challenge to the manner in which the Court of Appeal performed this exercise, it is unnecessary for this Court to approach the task of providing the background in as full or lengthy a manner as did Mendes JA. It is sufficient to indicate the following.

[6]     The present Government of Belize has had a series of continuing disputes with members of both the Zuniga and the BCB Holdings groups. These disputes relate

back to an "Accommodation Agreement" entered into in 2005 between Belize Telemedia Limited ("Telemedia") and the former Government. It is unnecessary for the purpose of this appeal to enter into the details of this Accommodation Agreement. It suffices merely to note that under the agreement the then Government granted certain financial concessions, assurances and inducements to Telemedia.

[7]     Upon assuming office in 2008, the present Prime Minister disavowed the Accommodation Agreement. He flatly stated that his Government would not be bound by its terms. His conception of, and vigorous opposition to, the Agreement is well captured in his resolve, uttered in Parliament, "That an agreement so patently illegal, so patently immoral, so patently anti-Belize, should continue to torture us, to bleed us, to subject us to death by a thousand cuts cannot for one second more be countenanced".

[8]     The Accommodation Agreement contained an arbitration clause. When the Government repudiated the Agreement, Telemedia invoked this clause. The London Court of International Arbitration ultimately, on 18th March 2009, awarded damages against the Government in the sum of BZ$38.5 million for breach of the Agreement. Telemedia assigned this award to the Belize Social Development Limited (BSDL). The Prime Minister is recorded as having vowed in the House of Representatives "as God is my witness I will never pay that award". The Government obtained an injunction from a High Court Judge of Belize restraining Telemedia and BSDL from enforcing the award. Despite the existence of the injunction, BSDL commenced proceedings in the United States to enforce the award.

[9]     Throughout the series of events relating to the fall-out from the Accommodation Agreement, the Prime Minister consistently cast matters in terms of a battle between his government and Lord Michael Ashcroft, a member of the Zuniga

group. There is evidence to suggest that, at one time, the Prime Minister believed that Lord Ashcroft owned the bulk of the shares in Telemedia. The Government's next move was to pass legislation acquiring 94% of the shares in Telemedia. In fact, although Mr Zuniga and other members of the Zuniga group, including Lord Ashcroft, were indeed at the time directors or officers of Telemedia or persons with *some* interest in Telemedia, 71% of the shares were owned by Dunkeld International Investment Limited ("Dunkeld"), a Turks & Caicos Island company wholly owned by Hayward Charitable Belize Trust ("the Hayward Trust").

[10]    The process of acquiring the Telemedia shares has been far from smooth. The tremendous legal disputes are still on-going. In the first instance, the constitutionality of the acquisition was challenged by Dean Boyce (another member of the Zuniga group) and by British Caribbean Bank Limited ("BCBL"), a Turks and Caicos Islands registered institution and a wholly owned subsidiary of BCB Holdings Ltd. The courts of Belize declared the acquisition to be unconstitutional but the Government subsequently enacted fresh legislation for the re-acquisition of the shares. The constitutionality of the re-acquisition is still wending its way through the courts.

[11]    There exists a bilateral investment treaty between the Government of the United Kingdom and the Government of Belize prohibiting the nationalisation or expropriation of investments except for specified purposes and upon payment of just and equitable compensation. Dunkeld responded to the acquisition of its shares by invoking the arbitration clause contained in this bilateral investment treaty. BCBL also notified the Government of its intention to commence arbitration proceedings.

[12]    The Prime Minister made further public statements indicating that "he [the reference was to Lord Ashcroft] must realize I don't care how much money he has, I don't care how powerful he thinks he is, he cannot and will not defeat the sovereign united nation…" Taking the view that the members of the Zuniga group

were Trustees of the Hayward Trust (although in fact, they were mere advisors to the Trust); that the Belize courts were the proper forum for determining all matters in relation to the acquisition of Telemedia and compensation for expropriated shareholders; and that arbitral proceedings relating to the acquisition, commenced contemporaneously with the earlier mentioned domestic proceedings, were oppressive and unconscionable, the Government filed a suit against Dunkeld and the Zuniga group claiming a permanent injunction to prevent them from taking further steps in the arbitration processes they had instituted. The Government also applied for and obtained in December 2009 an interim injunction preventing these parties from proceeding further with arbitration. In February 2010 the Belize trial court continued this interim injunction until the hearing and determination of the suit filed by the Government.

[13]   Dunkeld ignored the order restraining it from proceeding to arbitration. Mendes JA notes that Dunkeld "proceeded with its arbitration and enforcement action in another jurisdiction, even though there is no detailed evidence of exactly what Dunkeld did or when and where".[5] Dunkeld's disobedience of the injunction was, from all indications, a precipitating factor in the promotion and passage of the first Amendment Act which was assented to on 31st March 2010 and came into effect on 1st April 2010.

[14]   In the wake of the passage of that Act the members of the Zuniga group resigned as advisors of the Hayward Trust with effect from 29th March 2010. They apparently feared that they could be charged under the Act and resigned in light of the injunction that had been granted against Dunkeld, their lack of control over the actions of Dunkeld and bearing in mind the stiff sanctions introduced by the first Amendment Act against even advisors to a party disobeying a court injunction. The Zuniga group launched their challenge to the constitutionality of the Amendment Act in April 2010 and, within a few weeks, the BCB Holdings

---

[5] See para 20 of the Judgment of the Court of Appeal.

group applied to be joined to the suit as Interested Parties. Later, in June 2010, finding that the members of the Zuniga group actually exercised no control over Dunkeld, the Court of Appeal discharged the injunction that had earlier been obtained against them.

[15]   The above background merely gives the briefest context in which to consider the impugned legislation and the challenge to it. We proceed now to consider each of the 16 sub-sections of section 106(A) highlighting at times, only so much of their content as is necessary to understand better the bases of the challenge and the decisions of the courts below and of this Court. But before we do so it is just as well to say a brief word about the principal Act since the Acts should also be considered in light of that Act.

**The principal Act and the provisions of the Amendment Acts**

[16]   The principal Act is a pre-Independence statute dating back, at least, to 1958. It is the statute that details the contours of such of the vast jurisdiction of the Supreme Court as can conceivably and coherently be captured in print. It provides, among other matters, for the manner in which that jurisdiction is to be exercised.

[17]   The first of the two Amendment Acts contained three sections. Section 1 expressed the Short Title, namely, "Supreme Court of Judicature (Amendment) Act, 2010" and declared that the Act was to be read and construed as one with the Supreme Court of Judicature Act. Section 2 contained an addition to section 70 of the principal Act but this was later removed by the second Amendment Act. Section 3 added the new section 106(A) to the principal Act.

[18]   Following the passage of the second Amendment Act the new section 106(A) now contains 16 sub-sections. The new section falls under Part IX of the principal Act which deals with contempt of court. Part IX has five sections ranging from sections 102 to 106 (inclusive). Leaving aside section 105 for the moment, these

sections of the principal Act (i) prescribe a punishment not exceeding imprisonment for a term of three months or a fine of two hundred and fifty dollars for criminal contempt committed in the face of the court or calculated to interfere with the administration of justice in pending proceedings; (ii) describe what acts are targeted under this offence; (iii) provide for appeals to the Court of Appeal; and (iv) indicate that all fines levied are to be paid into the Consolidated Revenue fund.

[19]  In the context of this appeal section 105 of the principal Act is of some importance. That section gives the Supreme Court "the same powers as regards punishments for all contempts, whether criminal or otherwise, as are possessed by the High Court of Justice in England, and the practice and procedure shall be as nearly as possible the same as the practice and procedure in that Court in like case". In the appeal before us the issue arose during oral argument whether the reference there to English practice is ambulatory, i.e. always speaking, or whether it is frozen as at the time of the passage of the principal Act. The relevance of the issue is to be able to determine the penalty for contempt under section 105. Counsel on all sides accepted that the maximum punishment that may be imposed for contempt in the United Kingdom today is imprisonment for a term of two years and that this has been the case for many years. Accordingly, counsel agreed and we are prepared also to accept that this is the maximum term that could be awarded for criminal contempt under section 105 of the principal Act. Disobedience of a court order or injunction can, of course, be a civil contempt and section 106A(1)  was thus stated to be "without prejudice to the power of the Court to punish for contempt in accordance with Part 53 of the Supreme Court (Civil Procedure) Rules 2005" that supplements section 105.

*The 16 sub-sections of section 106(A)*

[20]  Sub-section 1 of the new section 106(A) criminalises, whether in Belize or elsewhere, knowingly (the word "knowingly" was inserted by the Second Amendment Act) disobeying or failing to comply with an injunction "issued by

the Court". The second Amendment Act makes it clear that this new offence is to be tried summarily by a judge sitting alone without a jury on a criminal information and complaint under sub-section 2.

[21] Sub-section 2 states that a criminal complaint for an offence under sub-section 1 may be laid by the Attorney General or the aggrieved party or a police officer not below the rank of inspector.

[22] Sub-section 3 prescribes the punishment for a person found guilty of an offence under sub-section 1 (or under sub-sections 4 and 5 as indicated below). In the case of a natural person the penalty is a fine which shall not be less than $50,000.00 but which may extend to $250,000.00, or imprisonment for a term which shall not be less than five years but which may extend to ten years, or both such fine and term of imprisonment. If the offence is continuing, the convicted person faces an additional fine of $100,000.00 for each day the offence continues. In the case of a legal person or other entity (whether corporate or unincorporated) the prescribed penalty is a fine which shall not be less than $100,000.00 but which may extend to $500,000.00. In the case of a legal person, if the offence is continuing the convicted entity faces an additional fine of $300,000.00 for each day the offence continues. Sub-section 3 contains a proviso (introduced by the second Amendment Act) that relieves a natural person from the previously specified penalties if the convicted person could establish extenuating circumstances. Those circumstances are listed as a clean criminal record, ignorance by the defendant of the consequences of his/her action and grave hardship if the full penalty were imposed. In that event, the penalty is reduced to a mandatory minimum fine of $5,000.00 and a maximum of $10,000.00 and, in default of payment of such fine, a term of imprisonment of not less than one year and not more than two years.

[23] Sub-section 4 is aimed at a person who, whether in Belize or elsewhere, "directly or indirectly, instigates, commands, counsels, procures, solicits, advises or in any manner whatsoever aids, facilitates, or encourages the commission" of a sub-

section 1 offence. The section also targets a person who, knowing that an injunction has been issued by the court, does any act the effect of which would be to disregard such injunction. It matters not that the injunction was issued before or after the commencement of the Act. The penalties set out in sub-section 3 are made applicable to a person convicted under sub-section 4.

[24]   Sub-section 5 purports to spread the net even wider to criminalise other persons. The challengers say that this sub-section improperly reverses the burden of proof. The Court of Appeal declared the sub-section to be unconstitutional on that ground and this is the subject of detailed analysis later in this judgment. At [66] below sub-section 5 is set out in full.

[25]   Sub-section 6 gives extra-territorial effect to the new offences created. It provides that notwithstanding anything to the contrary contained in any other law, the offences shall be adjudicated regardless of whether they occurred in Belize or elsewhere, or whether the offender was or was not present in Belize.

[26]   Sub-section 7 makes it plain that the new section 106(A) covers injunctions issued both before and after the commencement of the Act.

[27]   Sub-section 8(i) gives the court jurisdiction to issue an injunction against a party or arbitrators (or both) restraining them from commencing or continuing arbitral proceedings or, in the case of a party, from embarking upon proceedings for the enforcement of an arbitral award, whether in Belize or elsewhere, where it is shown "that such proceedings would be oppressive, vexatious, inequitable or would constitute an abuse of the legal or arbitral process". Sub-section 8(ii) gives the court jurisdiction "to void and vacate an award made by an arbitral tribunal (whether in Belize or abroad), in disregard of or contrary to any such injunction".

[28]   Sub-section 9 has to do with the modes of service of notice of, or an application for, an injunction. In addition to the modes prescribed in the *Supreme Court (Civil*

*Procedure) Rules 2005 ("CPR")*, sub-section 9 permits service by registered post, fax, courier service or a notice in the Belize Gazette (as may be appropriate in the circumstances of each case) regardless of whether the defendant is present or resident within or outside Belize, "and for this purpose, no leave of the Court for serving the injunction, notice or order, as the case may be, outside Belize shall be required notwithstanding anything to the contrary contained in any other law or rule of practice".

[29]   Sub-section 10 states that where an offence created by the section is committed outside Belize, the information and complaint for such offence is to be laid in the Central District of the Supreme Court.

[30]   Sub-section 11 provides for trial *in absentia* if the court is satisfied that the defendant was given at least 21 days' notice of the charge and the date, time and place of the trial and that he had a reasonable opportunity of appearing before the Court but had failed to do so. Sub-section 12 states that the notice referred to in sub-section 11 could be served personally, or by registered post, or by a notice in the Belize Gazette, as may be appropriate in the circumstances of each case.

[31]   Sub-section 13 states that a defendant could not be prosecuted under section 106(A) if he had already been punished for the same offence under Part 53 of the CPR, or *vice versa*. Part 53 deals with the power of the Civil court to commit a person to prison or to make an order seizing assets for failure to comply with an order requiring that person to perform an act or an undertaking to refrain from doing an act.

[32]   Sub-section 14 indicates that the word "person" in the Act is to have the same meaning ascribed to it in section 3 of the Interpretation Act. In the latter Act "person" means a natural person or a legal person and includes any public body and any body of persons, corporate or unincorporated. The definition applies

notwithstanding that the word "person" occurs in a provision creating or relating to an offence or for the recovery of any fine or compensation.

[33]   Sub-section 15 empowers the Attorney General to make rules for giving better effect to the provisions of the section and sub-section 16, added by the second Amendment Act, establishes the rules which are to apply until the Attorney General exercises that power. These rules are set out in an Appendix and they address such matters as the content of every criminal information and complaint, issues of joinder of counts and the powers of trial judges and directions they may give.

**The grounds on which the legislation is challenged**

[34]   The challengers question the legislation's constitutional validity on a variety of grounds. Several of these grounds attack the legislation as a whole. Some are aimed at specific aspects. In enumerating the list of grounds below, we make no distinction between the two. Some of the grounds succeeded before the Court of Appeal (whose ruling the Government seeks now to reverse), while others were rejected by the Court of Appeal and accordingly form the subject of a cross-appeal in these proceedings. The challengers claim that:

   A)   The legislation breaches the separation of powers principle because it was introduced specifically in order to target the members of the Zuniga group in their recourse to international arbitration and to deter them from pursuing that remedy (**the *ad hominem* point**);

   B)   The legislation was enacted for an improper purpose and is therefore in breach of the section 68 constitutional imperative that the National Assembly make laws "for the peace, order and good government of Belize" (**the section 68 and improper purpose point**);

   C)   The legislation further contravenes the separation of powers principle because it introduces a special regime for the prosecution and harsh

punishment of a breach of an anti-arbitration injunction and this regime can be initiated at the complete discretion of the Executive, in the person of the Attorney General, as an alternative to the normal jurisdiction of the courts to deal with contempt (**the discretion of the Attorney General point**).

D) The mandatory minimum sentences prescribed in sub-section 3 are draconian and for this reason they contravene both the separation of powers principle and section 7 of the Constitution which proscribes inhuman and degrading punishment. This point (**the mandatory minimum sentence point**) is addressed in a separate and discrete manner but it is fair to state that the existence of the mandatory minimum sentences is also an important plank in the submissions advanced in support of many of the other points and in particular the discretion of the Attorney General point;

E) The constitutional right to the protection of the law set out or inherent in section 6 of the Constitution is infringed by the combined effect of such matters as the reversal of the burden of proof and the procedural provisions governing service, notice and trial in absentia (**the protection of the law point**); and

F)  Sub-section 8 constitutes a breach of the right to property guaranteed by sections 3(d) and 17(1) of the Constitution (**the right to property point**).

**Some general observations**

[35]   Before embarking on a consideration of these points it is useful briefly to make a few general observations. Firstly, sections 1 and 2 of the Constitution describe Belize as "a sovereign democratic State" and the Constitution as "the supreme law". As a consequence of its supremacy no law may be made that is inconsistent with the Constitution. To assess the validity of a law, however, the Court does not simply lay the Constitution side by side with the impugned legislation to

determine whether the latter squares with the former.[6] The words written in the Constitution do not exhaust the full meaning and breadth of that instrument. Such a perfunctory approach to judicial review would do a serious dis-service to the solemn mandate assigned the court to uphold and promote constitutional supremacy. The court's judicial review responsibility must necessarily include discovering and applying fundamental norms and principles that characterise the Constitution.

[36]   Secondly, as will be explored later in greater detail, the Constitution itself makes it clear that inconsistent laws are to be invalidated by the court "to the extent of the inconsistency". This means that, provided it is possible and feasible to save a law that may contain one or more inconsistent provisions, a scalpel, rather than a machete, is to be used by the court to sever that which is inconsistent. Thirdly, the two Acts in question here are essentially penal in nature. Penal statutes should be clear, certain, coherent and fair in the consequences they pose for those who risk falling foul of them. Failing this, the *rule of law*, yet another fundamental, albeit at times, implicit feature of the Constitution, is placed in jeopardy.

### The *ad hominem* point

[37]   Before the trial judge, the Government led evidence to suggest that the Act was not directed at any particular entity but was passed against the backdrop of "widespread and contemptuous disregard of injunctions". Not only was this latter claim unsupported but, before the Court of Appeal, the Government shifted its position and sought to justify the legislation on the basis of Dunkeld's anticipated breach of the injunction issued against that company. Indeed, the Dunkeld and BSDL situations provided the only evidence adduced of the alleged tendency in the society towards a disregard of injunctions. The challengers insist that the legislation was indeed aimed at Dunkeld and Lord Ashcroft.

---

[6] See on the contrary *United States v Butler (1935) 297 U.S. 1 at 62-63*

[38]     The gist of the challengers' submission is that a) the legislation was "*ad hominem*"; b) it introduced draconian, mandatory and disproportionate punishments against Lord Ashcroft, Dunkeld and its officers and this was coupled with special rules relating, it was said,  to the reversal of the burden of proof, notice to accused, extraterritorial application and trial *in absentia*; c) the pre-existing law and procedure for contempt was sufficient to deal with any disregard for injunctions but there was never any resort to them; and d) the Attorney General, an official of the Executive arm of government, was given the special power to invoke the new procedure. The challengers claimed that, under the principles developed by the Privy Council in *Liyanage v R*[7], the legislation should be struck down as a contravention of the separation of powers doctrine.

[39]     *Liyanage* was a case from Ceylon, as Sri Lanka was then called. The case was decided by the Privy Council in 1962. It arose against the backdrop of a foiled coup staged by army officers. While the men were in prison awaiting trial, Parliament enacted legislation to cover their peculiar situation. The legislation legalised their detention *ex post facto* and otherwise operated retrospectively to encompass the acts of which they were accused. The new laws were specifically tailored to meet the circumstances of these acts and were made to lapse after the trial of the men. The legislation included the creation of new offences, the alteration of the law of evidence so as to apply to statements made by the men and the creation of severe mandatory minimum sentences to be applied if (in all the circumstances it is almost more appropriate to say "when") the men were found guilty by the court. The Privy Council struck down the legislation and, in the process, established helpful principles to which one could have regard in determining when legislative interference amounted to an impermissible breach of the separation of powers doctrine.

---

[7] [1967] 1 AC 259

[40]     A word or two about this doctrine is appropriate here. It may be said that in the post-independence Anglophone Caribbean the doctrine of the separation of powers derives its force from the fact that the fundamental law upon which the legal order rests, i.e. the Constitution, disperses the power of the sovereign State among various branches, insulates the judicial branch from interference by the political branches and enshrines the paramount principle of constitutional supremacy.[8] The Constitution having conferred particular functions on the judicial branch, constitutional supremacy requires that, among other things, in the exercise of these functions, the judiciary is not undermined by action taken by another branch of the State. Specifically, in the context of the point being discussed here, the judiciary must possess the ability, independence and freedom to interpret and apply substantive legal principles so as to guarantee to litigants in a particular case a just outcome that itself is protected from executive or legislative interference. Application of the separation of powers doctrine upholds the Constitution, advances the rule of law and promotes the description of Belize as "a sovereign democratic State".[9]

[41]     *Liyanage* is a particularly notorious example of a breach of the separation of powers doctrine. The instant case is at an entirely different point in the spectrum. Legislation prompted by the acts of a particular individual or group, accompanied by the introduction of steep mandatory penalties and providing for rules to be made by the Attorney General, might raise a red flag, especially where the Government has or may have an interest at stake. But even if present, these *indicia* by themselves alone do not necessarily establish that the separation of powers doctrine is compromised. To offend the doctrine it must be shown that the legislature is undermining the decisional authority or independence of the judicial branch by compromising judicial discretion. The court's ability to address legal principles in a pending case, i.e. *its adjudicative process*, must be negatively

---

[8] See *Boyce & Joseph v The A.G of Barbados (2006) 69 WIR 104; [2006] CCJ 3 (AJ)*, per Wit J at [19]
[9] For a helpful discussion on the Separation of Powers See Gerangelos, THE SEPARATION OF POWERS AND LEGISLATIVE INTERFERENCE IN THE JUDICIAL PROCESS, Hart Publishing, 2009

impacted so that it can truly be said that the legislature, in order to guarantee a particular outcome, is prescribing or directing or constraining the court in its application or interpretation of those principles. The litigant must be protected from a situation where he/she has to contend in court with both the opposing side and the interference of the legislature seeking, in the midst of proceedings, to direct the judge as to the outcome of the contest. When a claim is made, in a case of this kind, that the doctrine is engaged, the task of the court is to examine and assess the various indications pointing towards or away from impermissible interference and to consider the impugned legislation as a whole to discover its true purpose. Ultimately, the court makes a judgment as to whether the Act in question is an exercise of legislative power or an interference with judicial power under the guise of exercising legislative power.

[42]     In his written submissions to the court, Mr Fitzgerald QC, on behalf of the Zuniga group, focused heavily on the alleged *ad hominem* character of the legislation, the mandatory penalties imposed and the "power invested in the Attorney General to apply the new regime selectively to special targets". This last factor is the subject of separate treatment at [51] – [56] below but it is sufficient to state that its linkage here to the *ad hominem* point does little to alter the court's assessment of the challenge based on the point under discussion. Counsel claimed that in all the circumstances the legislature is effectively instructing or directing the courts on how to deal with any case brought before them under the special regime. In any event, submits counsel, the *Liyanage* principle goes beyond dictating to the judiciary the decision it must reach in a specific case.

[43]     There is absolutely no doubt that the legislation here is not *ad hominem* in relation to any precise proceedings. It does not direct the court on how it should deal with the challengers (or any member(s) of the two groups) in any particular proceeding. As Mendes JA pointed out, although it might be correct to characterize the Act as having been passed with the appellants and the interested parties in mind, it "is not expressed to apply to specific individuals, or to specific

arbitrations, or to be applicable to any pending criminal or other proceedings. It is expressed in terms of general application".[10] Mendes JA also observed, quite properly, that apart from mandating the sentence to be imposed on anyone found guilty of a sub-section 1 offence (a matter which shall separately be considered), there is no direction to the judiciary as to how it should exercise the discretion bestowed upon it.[11]

[44]   Subject to the Constitution, Parliament is at liberty to exercise its legislative power so as to abrogate or alter rights and liabilities which would otherwise be subject to judicial determination. On the other hand, it seems to us that the true principle to be extracted from *Liyanage* is that Parliament may not interfere with the judicial process itself in the sense of compromising judicial discretion by prescribing or directing the outcome in specific and pending proceedings. This is evident also from the manner in which the *Liyanage* principle is applied in later Australian cases.[12] In our view the principle was properly applied by Mendes JA who concluded[13] that the challenged Act:

> "…constitutes an ordinary exercise of legislative power. It is the business of the legislature to identify conduct to which penal sanctions are to attach and to determine the severity of such punishment. It is also the business of the legislature to vest new powers in the judiciary and to create new rights and obligations. As Mason CJ, Dawson J and McHugh J said in their joint judgment in *Leeth v. Commonwealth (1972) 174 CLR 455*, para 30, 'a law of general application which seeks in some respect to govern the exercise of a jurisdiction which it confers does not trespass upon the judicial function'…"

[45]   Mr Fitzgerald suggested that caution should be exercised in relying on Australian cases as a different constitutional regime exists there where the respective powers

---

[10] See Judgment of the Court of Appeal at [64]
[11] See Judgment of the Court of Appeal at [66]
[12] See *R v Humby; Ex p Rooney (1973) 129 CLR 231*; *Australia Building Construction Employees' & Builders Labourers' Federation v Commonwealth (1986) 161 CLR 88; Building Construction Employees' & Builders Labourers' Federation of New South Wales v Minister for Industrial Relations (1986) 7 NSWLR 372; Nicholas v R (1998) 193 CLR 173*
[13] at [67] of the judgment of the Court of Appeal

of the legislature and the judiciary are differently defined, and where Parliament remains sovereign. We do not consider this difference material in relation to this point. Given the structure of Australia's Constitution, the Australian High Court has regarded as constitutionally entrenched the separation of judicial power from executive and legislative power[14] and there is no reason why this Court ought not to have regard to the judgments of Australia's highest court that extract and apply the *Liyanage* principles. In all the circumstances the cross-appeal on this point fails. The Court of Appeal was right to reject the challenge to the legislation on this ground.

**The section 68 and improper purpose point**

[46]     There are two limbs to the challengers' position on this point. One limb focused on sub-section 8 of the new section 106(A). As is outlined at [8] and [27] above, sub-section 8 specifically targets anti-arbitration injunctions. The challengers submitted that the Act (and this sub-section specifically) was introduced to thwart their undoubted right to seek and pursue both international arbitration claims and proceedings to enforce arbitral awards that may be granted in their favour; and the enactment was passed at a time when it was common knowledge that they were actively pursuing arbitration claims against the State. It was said that in this respect the Act violated the rule of law and the due process principle recognised by the Privy Council in *Thomas v Baptiste*.[15]

[47]     It is unnecessary to spend a great amount of time on this limb of the submission. Much of the wind was taken out of its sails by the intimations contained in the judgment of this Court in *British Caribbean Bank Ltd v The Attorney General of Belize*.[16]  These proceedings were pending at the time we delivered that judgment and we were aware then that an interpretation of sub-section 8 was an issue in this

---

[14] See *R v. Kirby; Ex parte Boilermakers' Society of Australia* (1956) 94 CLR 254 at 275-6 and 297
[15] [2000] 2 AC 1; (1998) 54 WIR 387
[16] [2013] CCJ 1 (AJ)

appeal. We were nevertheless prepared then[17] to accept the Court of Appeal's view that, to the extent that sub-section 8 empowered the court to restrain a party from proceeding with foreign arbitration proceedings on the ground that such proceedings would be oppressive, vexatious, inequitable, or would constitute an abuse of the legal or arbitral process, the sub-section merely codified pre-existing law which had never been regarded as being in conflict with the Constitution. This Court ruled that it was only in exceptional cases that an anti-arbitration injunction would be granted.[18] The ruling effectively allayed much of the anxiety of the challengers that the Act could operate to undermine or frustrate their on-going and/or anticipated international arbitration proceedings.  We have heard nothing in these proceedings to lead us to differ from the Court of Appeal's view of sub-section 8. As to the remainder of sub-section 8, while we see nothing *unconstitutional* in it, it is immediately difficult to envisage a circumstance in which a court in Belize would be justified in issuing an injunction against *arbitrators* to restrain them from commencing or continuing arbitral proceedings in light of the well-known principle of *Kompetenz-Kompetenz*.[19]

[48]    The more significant limb of the improper purpose point relates to the submissions made in relation to section 68 of the Constitution which section grants the National Assembly the power to pass laws for the "peace, order and good government" of Belize. The challengers submit that, in light of the principle of constitutional supremacy, this power to legislate is subject to review by the Court on ordinary public law principles. Mr Fitzgerald referred to *Bowen v The Attorney General*[20] where Chief Justice Conteh stated that the grant of law-making power to the legislature is not unlimited and is subject to "a continuing audit [by the court] to ensure conformity in its exercise with the Constitution".

---

[17] See [2013] CCJ 1 (AJ) op-cit at [32]
[18] 2013] CCJ 1 (AJ) [30] – [41]
[19] See *West Tankers Inc v Allianz SpA (formerly RAS Riunione Adriatica di Sicurtà SpA) and another* [2009] AC 1138 and also *Ust-Kamenogorsk Hydropower Plant JSC v AES Ust-Kamenogorsk Hydropower Plant LLP* [2013] UKSC 35
[20] Belize High Court Claim No. 445 of 2008, decided 13th February 2009

[49]     It is trite law that the court is entitled to determine whether laws enacted by Parliament are in conformity with the Constitution and to strike them down to the extent of their inconsistency. If the Chief Justice's words are interpreted to mean that, absent some breach of the Constitution (outside of a perceived breach of section 68 itself) the Court is at liberty to declare a law void merely because, in its wisdom, the court does not consider the law to fall within the compass of what conduces to the "peace, order and good government" of Belize, then respectfully, we must disagree. We prefer the approach taken by Mendes JA who noted that "it is not possible to eke out an implied principle that the judiciary may second guess the elected representatives on the question of what purpose it is appropriate for legislation to serve. Such a power would put the judiciary in competition with the legislature for the determination of what policies ought to be pursued in the best interests of Belize".[21]

[50]     In the realm of policy, the National Assembly is not only best equipped, but it also has a specific remit to assess and legislate what it considers suitable for Belizean society. The expression "peace, order and good government" is not to be, and has never been seen as, words of limitation on parliament's law making power.[22] On the contrary, the words are to be regarded as a compendious expression denoting the full power of Parliament freely to engage in law-making subject only to the Constitution. Without more, it is not for the court to question the wisdom or appropriateness of an Act of Parliament to determine whether the Act is inimical to the peace, order and good government of Belize. This Court would not go so far, however, as to endorse the blanket suggestion that a court may never be concerned with the propriety or expediency of an impugned law. It may be appropriate and even necessary to be so concerned where, for example, the purpose of the law is a relevant issue in determining a breach of the separation of powers doctrine (as we have seen above at [37]) – [45]), or a violation of a

---

[21] See [49] of the judgment of the Court of Appeal
[22] See *Ibralebbe v R [1964] AC 900* at 923; *Regina (Bancoult) v Sect of State for Foreign & Commonwealth Affairs (No 2) [2009]* 1 AC 453 at 485-511

fundamental right. Outside of such contexts, it is not for this Court to say that section 68 has been breached because, for example, the Acts in question were not passed to meet a legitimate and real concern about adherence and obedience to court injunctions. If the National Assembly considers it fit to enact new legislation along the lines of section 106(A) criminalising and stiffening the penalties for breaches of injunctions, then, subject to the Constitution, it is so entitled.

## The discretion of the Attorney General point

[51]   The challengers submit that the power invested in the Attorney General, in sub-section 2 of 106(A), to lay a complaint under the new provisions introduced by the Act is unconstitutional.  The submission rests on three premises. It is said that, firstly, section 105 of the principal Act and section 269 of the Criminal Code each criminalises contempt of court and or the breach of court orders; secondly, while the maximum penalty for transgressing section 269 is three months, and under section 105, two years[23], the mandatory minimum penalty for a breach of sub-section 1 (which latter breach Mendes JA categorised as being less serious than a breach of section 269) is the harsh punishment as set out at [22] above; and thirdly, where it appears that there has been a contempt of court, in lieu of permitting either section 105 or section 269 to run its course, the Attorney General can now choose whether to proceed under section 106(A) so as to ensure that the accused faces a steep mandatory minimum punishment if convicted. It is therefore contended that the Attorney General, an official of the Executive, is empowered by Parliament, in effect, to select the sentence of the offender. If the transgressor is Joe Blow, the Executive may, on a whim, lay a complaint that renders Joe triable for an offence contrary to sub-section 1, thereby requiring him to face a stiff penalty. But if the transgressor is Jenny Bloggs, the Attorney General may allow her to be charged with a section 269 or section 105 offence

---

[23] See [19] above

where the maximum penalty is considerably less. Guided by the authority of *Ali v R*,[24] the Court of Appeal held that to invest this power in the Attorney General was a violation of the separation of powers.

[52]   There is undoubtedly some overlap between the offence described in section 105 and the offence described in section 106(A). We do not consider, however, that section 269 of the Criminal Code should similarly be regarded as overlapping with section 106(A). Section 269 relates to "*any order … made or issued by any court or magistrate*". The section must be read with section 3(2) of the Summary Jurisdiction (Procedure) Act, Cap. 99 which provides:

> "*Every offence created by any Act or other law with respect to which it is directed that the offender shall be liable on conviction summarily or on summary conviction … to any punishment or penalty, shall be a summary conviction offence within the meaning of this section.*"

[53]   In section 2 of the Summary Jurisdiction (Procedure) Act, "court" means "a summary jurisdiction court established under the Inferior Courts Act." On the other hand, "court" in the principal Act, and consequently in the two Amendment Acts, is defined in section 2 as "the Supreme Court" Disobedience to a court in section 106A can therefore only refer to disobedience to an order of a judge of the Supreme Court.  Disobedience to an order of a magistrate can only be dealt with under section 269 of the Criminal Code.   Accordingly, there is no overlap between section 269 and section 106A of the Amendment Acts.

[54]   All court orders, whether emanating from a Magistrate's Court or the Supreme Court, are serious commands that must be obeyed. But it is reasonable to assume that in enacting section 106(A) Parliament considered itself justified in increasing the penalties beyond those which could be imposed by pre-existing legislation,

---

[24] [1992] 2 AC 93

whether s 105 of the principal Act or s 269 of the Criminal Code. In particular, in relation to the latter, it is common knowledge that for the same or similar offence, trial by a judge usually carries a greater maximum penalty than the sentence that can be imposed by a magistrate. Secondly, given the higher status of the Supreme Court, it would not be unreasonable also for Parliament to have considered that disobedience to the orders of the Supreme Court justifies penalties that attract more serious punishment than those imposed for disobeying the orders of a magistrate.

[55]   In any event, it must be borne in mind that section 106(A) extends the power to lay a criminal information not only to the Attorney-General, but also to an aggrieved party and the police.   It is quite a leap to suggest that the exercise of this power amounts to the selection of a penalty. As Appendix I to the second Amendment Act makes clear, a person who lays or files a criminal information and complaint in the High Court bypasses the preliminary inquiry process and begins a proceeding between the Crown and the named defendant.  The Director of Public Prosecutions is required by his office to conduct the case for the Crown. The Director is obliged to make an independent decision as to whether and how to proceed.   In our view, it is difficult to see how the right to lay a criminal information, with which the DPP may or may not proceed, amounts to the selection of a choice of penalty by the Attorney-General, the citizen or police officer laying the information. In all the circumstances we respectfully disagree with the Court of Appeal's treatment of this point.

**The mandatory minimum sentence point**

[56]   As previously noted, the severity of the sentences found in sub-section 3, and, in particular, the mandatory minimum penalties, were factors that were used to strengthen the core of the challengers' objections to the Acts on grounds additional to those that fall under this point. In the course of discussing those other grounds above this court has, quite deliberately, characterised the sentences

(which are set out at [22] above) as "steep", "stiff", "harsh". We have done so bearing in mind that the mandatory minimum sentences can be meted out to *anyone* found guilty of knowingly breaching an injunction.

[57]   One of the unusual circumstances of the inquiry under this point is that this is not a case where the party challenging the validity of the penalty has already been tried and is now arguing the unconstitutionality of a particular sentence that has been handed down. The court is not here dealing with the application of particular punishment to a specific offender. In a case like that a court is well positioned to consider all the relevant factors that contribute to an assessment of proportionality. The court could, for example, weigh the sentence imposed against the facts of the specific case, taking account of the gravity of the offence, the manner in which it was committed, the degree of participation and motivation of the accused and all the personal characteristics and antecedents of the particular offender before the court.

[58]   Here, there is no accused person. This is a case of a pre-emptive challenge to the mandatory minimum penalty prescribed by a new law even before there has been a conviction under this law. It follows that to determine this challenge the court must look at the penalty regime in the round and make a generalised value judgment as to its validity. The court must assess whether the mandatory minimum punishment set out in the law would be grossly disproportionate in its application to likely offenders. As the assessment is hypothetical, Mr Barrow suggests that the court should not now invalidate the penalty regime but wait for an actual case to arise before we could realistically consider whether these penalties are indeed grossly disproportionate. We disagree. The Constitution fully entitles a litigant with appropriate standing not to await the full brunt upon him of a measure whose unconstitutionality is looming on the horizon. At least, in so far as the unconstitutionality relates to a breach of the citizen's fundamental rights.

Instead, the litigant is authorised to challenge the measure even before its impact is actually felt.[25] Further, we do not consider that it would be appropriate to leave on the statute books penal provisions that challenge the Constitution and which leave the citizen and the State in a state of uncertainty as to their future application. As pointed out by Chief Justice McLachlin, such an approach "deprives Parliament of certainty as to the constitutionality of the law in question and thus of the opportunity to remedy it."[26] We are persuaded that, on the face of the penalty regime set out in sub-section 3, the argument that the mandatory minimum penalties should be invalidated is made out.

[59]    The nature and subject matter of injunctions issued by a judge of the Supreme Court vary widely. So, too, do the consequences resulting from their breach. Moreover, there are numerous ways in which a person can be said to have knowingly violated such an injunction. The breach may represent a contumelious defiance of the court in order, perhaps, to perpetrate some other even more dangerous crime or perhaps in order to reap handsome financial reward. In such a case moreover, the offender might be someone quite notorious for flouting the law. On the other hand, one can easily envisage many reasonable hypothetical cases which would commonly arise in which the mandatory minimum penalties would obviously be grossly disproportionate. The injunction may arise out of civil proceedings, perhaps involving a minor domestic squabble between spouses or between neighbours who have a boundary dispute, and the particular offender, though unable to come within the statutorily defined extenuating circumstances, is clearly deserving of punishment that in no way rises to the level of the minimum penalty that the court is compelled by sub-section 3 to impose.

[60]    The court rejects the notion that a favourable comparison can be made between the penalty regime laid out in sub-section 3 and the factual situation in *R v Glotz*[27]

---

[25] See s 20 of the Belize Constitution
[26] See McClachlin J in Ferguson v R [2008] SCC 6, [2008] 1 SCR 96 at [73]
[27] [1991] 3 SCR 485

where a mandatory seven day term of imprisonment, imposed on a defendant who was driving while prohibited, was held by a majority of the Supreme Court of Canada not to be contrary to the guarantee against cruel and unusual punishment in section 12 of the *Canadian Charter of Rights and Freedoms*. Since sub-section 3 carries a mandatory minimum fine of $50,000.00 or alternatively a five-year mandatory minimum term of imprisonment, a better comparison in Canadian jurisprudence might be *R v Smith (Edward Dewey)*.[28] In that case the Supreme Court held to be incompatible with section 12 of the Charter the provision in a statute imposing a minimum sentence of seven years' imprisonment on conviction of importing narcotics into Canada. The provision was severed from the statute.

[61]    It is a vital precept of just penal laws that the punishment should fit the crime.[29] The courts, which have their own responsibility to protect human rights and uphold the rule of law will always examine mandatory or mandatory minimum penalties with a wary eye. If by objective standards the mandatory penalty is grossly disproportionate in reasonable hypothetical circumstances, it opens itself to being held inhumane and degrading because it compels the imposition of a harsh sentence even as it deprives the court of an opportunity to exercise the quintessentially judicial function of tailoring the punishment to fit the crime. As stated by Holmes JA in *State v Gibson*,[30] a mandatory penalty "unduly puts all the emphasis on the punitive and deterrent factors of sentence, and precludes the traditional consideration of subjective factors relating to the convicted person." This is precisely one of the circumstances that justifies a court to regard a severe mandatory penalty as being grossly disproportionate and hence inhumane. A variety of expressions has been utilised to define "grossly disproportionate" in this context. It is said to refer to a sentence that is beyond being merely excessive. In *Smith v R*,[31] where the seven year mandatory minimum sentence was

---

[28] [1987] 1 SCR 1045
[29] Per Saunders JA (Ag.) in the combined cases of *Hughes v R and Spence v R* (2001) 60 WIR 156 at [216]
[30] 1974 (4) SA 478 (A) at 482A
[31] See *Smith*, supra

invalidated, Wilson J characterised such a sentence as one where "no one, not the offender and not the public, could possibly have thought that that particular accused's offence would attract such a penalty. It was unexpected and unanticipated in its severity …"

[62]    Ultimately, it is for judges, with their experience in sentencing, to assess whether a severe mandatory sentence is so disproportionate that it should be characterised as inhumane or degrading punishment. In this case the mandatory minimum fines of $50,000 plus a daily rate of $100,000 are well beyond the ability of the average Belizean to pay and so are grossly disproportionate. Equally, the imposition of a mandatory minimum fine of $50,000.00 or a sentence of imprisonment for at least a stretch of five years on anyone convicted of any of the offences in question (save those whose sentences fall within mitigating criteria fashioned not by the court but by Parliament) is grossly disproportionate. It bears no reasonable relation to the scale of penalties imposed by the Belize Criminal Code for far more serious offences and for that reason it is also arbitrary. In our view, the mandatory minimum sentences here should indeed be characterised as being grossly disproportionate, inhumane and therefore unconstitutional for contravening section 7 of the Constitution. Later in this judgment we shall consider the consequences of this finding.

**The protection of the law point**

[63]    Section 6 of the Constitution guarantees to everyone the right to equal protection of the law. The constitutional protection afforded by this right goes well beyond the detailed provisions found in the section itself.  In *The A.G. of Barbados v Joseph & Boyce*[32] de la Bastide P and Saunders J observed that, "the right to the protection of the law is so broad and pervasive that it would be well-nigh impossible to encapsulate in a section of a constitution all the ways in which it

---

[32] See *Boyce*, supra at [60]

may be invoked or can be infringed." In the same case, Wit J went further and drew attention to the inextricable link between the protection of the law and the rule of law, with the latter embracing concepts such as the principles of natural justice and "adequate safeguards against irrationality, unreasonableness, fundamental unfairness or arbitrary exercise of power." [33] Notwithstanding the principle that an ambiguity in a criminal statute must be resolved in favour of the accused, at [36] above we have noted, and we reiterate here, that penal statutes should be clear, certain, coherent and fair in the consequences they pose for those who risk falling foul of them.

[64]   The submission of the challengers under this point is that several features of the Act impinge on their right to the protection of the law. The most egregious of these features concerns the allegation of a reverse burden of proof in sub-section 5 and it is to this that we now turn.

*The reverse burden of proof*

[65]   Section 6(3)(a) of the Constitution establishes the presumption of innocence. Every person charged with a criminal offence is presumed to be innocent until he is proved or has pleaded guilty. It is, however, permissible for a law to impose on an accused person the burden of proving particular facts.[34]  The Court of Appeal upheld the challengers' submission that sub-section 5 contravenes section 6(3)(a). The Attorney General disputes this finding and submits on appeal that the sub-section merely requires the accused to establish particular facts and it is accordingly not invalid.

[66]   To consider this submission it is appropriate to set out sub-section 5 in full. It reads:

> "Where an offence under this section is committed by a body of persons, whether corporate or unincorporated, every person who, at the time of the

---

[33] See [20] of the judgment of Wit J
[34] See section 6(10)(a) of the Constitution

commission of the offence, acted in an official capacity for or on behalf of such body of persons, whether as shareholder, partner, director, manager, advisor, secretary or other similar officer, or was purporting to act in any such capacity, shall be guilty of that offence and punished accordingly, unless he adduces evidence to show that the offence was committed without his knowledge, consent or connivance"

[67]    Reading the text one's attention is immediately drawn to a number of matters. Firstly, the extensive degree to which the web of guilt is spread. Shareholders, advisors, secretaries; all are ensnared if they "acted in an official capacity" (more on that phrase later) at the time the offence was committed. Secondly, there is the alleged reverse burden itself. After the prosecution has proved the commission of an offence by a body of persons (say, XYZ Company Ltd), the accused is presumed to be guilty of the same crime as the company unless he adduces evidence to show that the offence was committed by the company without his knowledge, consent or connivance. If the accused is tried *after* the conviction of XYZ Company Ltd, then at his trial the entire case for the prosecution might take only a few minutes. A presumption of guilt against the accused is established if the prosecution merely adduce in evidence a) a certificate of the conviction recorded against XYZ Company Ltd for committing a sub-section 1 offence; b) a true copy of the relevant register or employment record of the company establishing that the accused is a shareholder or secretary etc. and c) evidence that the accused "acted in an official capacity" ("or was purporting" so to act) at the time the company committed the offence.

[68]    Thirdly, it is unclear what exactly is meant by the phrase *acted (or purporting to act) in an official capacity for or on behalf of [XYZ Company Ltd] at the time of the commission of the offence*. Is it that the shareholder, partner, director etc must have acted in some official capacity *in the company's commission of the offence*? In other words, is the requirement satisfied if, by sheer coincidence, the accused happened at the time to have been holding or acting in an official capacity but took no step, in that capacity, in relation to the company's commission of the offence? Or must the capacity in which the person acted actually be linked to the

commission of the offence? The section is not very clear on this but if it were the latter interpretation (the more sensible and logical one) and the accused acted in her official capacity, whether directly or indirectly, to aid or abet disobedience to the injunction, then the accused would already be caught by sub-section 4 (See [23] above) and sub- section 5 would then be entirely redundant. If, on the contrary, sub-section 5 is to add some new factor to sub-section 4 then *acting in an official capacity at the time of the commission of the offence* must presumably mean that the person who so acted, albeit having knowledge of the intention by the company to disobey the injunction, may be caught although she falls outside the wide net cast by sub-section 4. Suppose, for example, a shareholder is on vacation. She was aware of the injunction before she left on holiday. While on vacation she learns that the company intends to disobey the injunction. She does nothing and carries on with her holiday. If the Court of Appeal was right to construe "knowledge, consent or connivance" in a conjunctive manner, then according to sub-section 5 the secretary's guilt is clear because her prior knowledge that the company intended to disobey an injunction would be enough to preclude her from taking advantage of the exculpatory aspect of the sub-section. Mendes JA put it this way:

> 148   "…an accused may adduce evidence to show, and may satisfy the court on a balance of probabilities, that he did not consent to or connive at the commission of the offence, but may yet be incapable of rebutting the presumption of guilt because he knew that the offence was being committed. Indeed, it would appear that the accused would be unable to discharge the burden even if he made efforts to prevent the commission of the offence, but was unable to persuade other officials to desist.

> 149   In the result, the possibility is created that a person whose only "offence" was holding an official position on behalf of a company at the time it knowingly disobeyed an injunction, is in jeopardy of being held criminally responsible for the company's criminal conduct."

[69]   Counsel for the Attorney General argued that in analyzing what the accused was required by the sub-section to show, the Court of Appeal i) failed to distinguish

between a legal and evidential burden; ii) misconstrued the sub-section as imposing a legal burden whereas, in fact, it did no more than cast an evidential burden on the accused; iii) erroneously equated the words "unless he adduces evidence to show" with "unless he proves" and iv) misinterpreted the phrase "knowledge, consent or connivance" to read those words conjunctively so that, according to the Court of Appeal, knowledge without consent or connivance was sufficient to satisfy guilt if the other elements of the offence were established.  In support of these arguments, counsel cited *Vasquez v R, O'Neil v R,*[35] *Jayasena v R,*[36] *Sheldrake v DPP,*[37] *Westminster City Council v Croyalgrange Ltd*[38] and *Huckerby v Elliot.*[39]

[70]     If indeed the Court of Appeal was right to read the expression "knowledge, consent or connivance" conjunctively, with the result that, in the example given above, either way the secretary is caught by sub-section 5, then not even counsel for the Attorney General is prepared to defend the sub-section. The idea that mere knowledge, in a case like this, could be sufficient to found guilt is preposterous. But if counsel is right, as we believe to be the case, that the sub-section should be read to mean that a shareholder has to show that the offence was committed without her knowledge *and* consent or alternatively, without her knowledge *and* connivance, then, to the extent that some sense can be made of the sub-section, it is difficult to conceive of a circumstance where she would escape being swept up in the provisions of sub-section 4(a) or 4(b). On one view, therefore, the sub-section obviously offends the rule of law and on another, quite apart from anything else, it is otiose.

[71]     We agree with the conclusion reached by the court below that the sub-section contravenes the principle of the presumption of innocence. The analysis must

---

[35] [1994] 1 WLR 1304; 45 WIR 103
[36] [1970] 1 All ER 219 at 221
[37] [2005] 1 AC 264 at 289
[38] [1986] 2 All ER 353
[39] [1970] 1 All ER 189

begin with the fundamental duty of the prosecution in a criminal case. The basic principle is that the prosecution must prove every essential ingredient of a criminal offence.[40]  It is this principle that is reflected in section 6(3)(a) of the Constitution; a provision that must be construed generously in favour of the individual.[41]  The burden on the prosecution does not extend to every conceivable fact in issue. Section 6(3)(a) is not infringed by a law requiring a defendant to establish a particular matter of fact or law. Section 6(10)(a) of the Constitution actually permits the State to impose on an accused "the burden of proving particular facts". But the imposition must be reasonable and proportionate. A balance must be struck between the importance of what is at stake and the rights of the defence.[42] Since section 6(10)(a) is a derogation from a right that is to be generously construed, the derogation must be construed strictly.[43]

[72]   Counsel spent some time seeking to distinguish between a legal (or persuasive) burden and an evidential burden. In order to determine whether the accused here has been saddled with one or the other, it is unproductive to engage in the semantic differences between the expressions "adducing evidence *to show*" and "having *to prove*" (on a balance of probabilities) a particular element of the offence. The substance and effect, and not necessarily the form, of the words used are paramount. If an accused is required to establish on a balance of probabilities the absence of an important element of the offence in order to avoid conviction the presumption of innocence is unjustifiably violated because a conviction is possible in spite of a reasonable doubt as to guilt.[44] As Lord Bingham noted in *Sheldrake v DPP*[45] it is "repugnant to ordinary notions of fairness for a prosecutor to accuse a defendant of crime and for the defendant to be then required to

---

[40] See *Vasquez , supra* at 1313D to 1314H
[41] See *Minister of Home Affairs v Fisher* per Lord Wilberforce [1980] AC 319 and also *A-G of the Gambia v Momodou Jobe* [1984] AC 689 at 700
[42] See *Sheldrake, supra*  per Lord Bingham at [23] - [27]
[43] See *Vasquez , supra* at 1313D
[44] See Dickson CJ in *R v Whyte (1988) 51 DLR (4th) 481 at* 493; Lord Nicholls in *R v Johnstone*  [2003] 1 WLR 1736 at [50]See *Sheldrake, supra*  per Lord Bingham at [23] - [27]
[45] See *Sheldrake, supra* [2005] 1 AC 264, 292 at [9]

disprove the accusation on pain of conviction and punishment if he fails to do so. The closer a legislative provision approaches to that situation, the more objectionable it is likely to be."

[73]   In resolving the tension between section 6(3)(a) and 6(10)(a) the overriding concern is to promote the rule of law by ensuring a trial that is fair.[46]  Ordinarily, in cases of contempt of court the prosecution has the burden of proving conscious, deliberate disobedience of a court order. But here, the sub-section is framed in a manner so as to relieve the prosecution of the onus of proving *mens rea* which is the vital element of the offence targeted by sub-section 5.   Usually, section 6(10)(a) comes into play with reference to "offences arising under enactments which prohibit the doing of an act save in specified circumstances or by persons of specified classes or with specified qualifications or with the licence or permission of specified authorities".[47] Here, the accused does not have to show some positive exculpatory act on his part but rather is put in the unenviable position of having to establish a negative, namely that he did not consent to or connive at the disobedience to the injunction. If the sub-section is to be construed in a manner that widens the blanket of guilt beyond those captured by sub-section 4, it comes perilously close to legislating guilt by association. We agree with the Court of Appeal that the sub-section contravenes section 6(3)(a) of the Constitution and is therefore invalid.

*Trial in absentia*

[74]   Section 6(3) of the Constitution permits trial *in absentia* if the relevant law permitting it provides for "adequate notice of the charge and the date, time and place of the trial and to a reasonable opportunity of appearing before the court." As we have seen above at [30], sub-section 11 of section 106(A) does provide for trial *in absentia*. The sub-section stipulates a 21 day notice period and it requires

---

[46] See s.6(2) of the Constitution and also *Sheldrake, supra*  at 297 [20]
[47] *Vasquez, supra* at 1313D where Lord Jauncey quotes  Lawton LJ in *R v Edwards* [1974] 2 All ER 1085 at 1095, [1975] QB 27 at 39–40

the court, before embarking upon any such trial, first to satisfy itself that the accused had a reasonable opportunity of appearing before the Court but had failed to do so.

[75]   The challengers interpret the Constitution as requiring the satisfaction of each of "two related but distinct" criteria, namely, a reasonable notice period *and* the court's satisfaction as to the reasonableness of the opportunity provided the accused to appear. The challengers claim that the Court of Appeal wrongly conflated both requirements; that sub-section 11 failed the first requirement in providing only for 21 days' notice; and that as a result, the sub-section should be struck down.

[76]   The Court of Appeal rightly rejected this attempt to construe the Constitution in this tabulated manner. Mendes JA, at [164], in effect stated that the controlling provision in both the Constitution and the sub-section is the discretion vested in the court to assess whether the accused did have a reasonable opportunity to appear. Even if 21 days' notice has been given, trial *in absentia* cannot proceed unless the court is satisfied that the accused has had a reasonable opportunity of appearing. The 21 days' notice is a minimum period which the court is empowered to extend if, in all the circumstances, it proves to be unreasonably short. The first rule set out in Appendix 1 also makes this clear. It speaks about criminal complaints being filed "*at least 21 days* before the date of trial of the accused person".

*Service of Proceedings*

[77]   Sub-sections 9 and 12 of the Act deal with service of proceedings. The sub-sections are commented upon earlier at [28] and [30] respectively. The trial judge had agreed with the challengers that both sub-sections contravened section 6 of the Constitution especially as they relate to trials *in absentia*. The Court of Appeal's judgment at [157] neatly summarized what was contended before and found by the trial judge:

157.   The trial judge found that the requirements for service under section 106A(9) were wholly inadequate in that no time is specified within which service is to be effected, there is no requirement of personal service on a person located within Belize, no procedure to effect service out of [the] jurisdiction and no grounds have been given for effecting service on a person abroad by fax, courier service or notice in the Belize Gazette. In the circumstances, he held that subsection 9 contravenes the right to a fair hearing and the right of access to [the] court under section 6 of the Constitution. He held further that section 106A(12) infringed section 6 because it allowed a trial of an offence under section 106A(1) to proceed in the absence of the accused upon a notice of the trial published in the Gazette. He considered this to be inadequate notice particularly in relation to persons who may live abroad or in rural Belize. Accordingly, he struck down both subsections 9 and 12

[78]   The Court of Appeal reversed the trial judge's finding. As Mendes JA noted,[48] the methods of service by registered post and fax merely mirror corresponding methods of service already provided for in the CPR, about which there is no complaint. With regard to service by notice in the Gazette, this method of service, as with the others, is qualified by the phrase "as may be appropriate in the circumstances of each case", a phrase to which the trial judge gave no or insufficient consideration. Sub-section 9 does permit service outside the jurisdiction without the need to obtain the leave of the court so to do. But this is balanced off by the fact that the court retains its discretion to satisfy itself that proof of adequate service has been established before one may embark upon an application for an injunction or any proceedings to enforce an injunction already granted. We agree with Mendes JA who stated:

161.   … there is no provision deeming service to have been properly effected by the particular method of service which the claimant selects. Indeed, by providing for a choice of four methods [i.e. by registered post, fax, courier service or a notice in the Belize Gazette], "as may be appropriate in the circumstances of the case", subsection 9 anticipates the exercise by the presiding judge of his

---

[48] See [157] – [167] of the Court of Appeal judgment

powers of superintendence over the method of service used to ensure that the defendant is indeed informed of the court proceedings or orders which might affect his interests.

[79]   For the reasons given by the Court of Appeal we hold that there is no merit in the submission that sub-sections 9 and 12 contravene section 6(3) of the Constitution.

**The right to property point**

[80]   Sub-section 8(i), it will be recalled, confers on the court jurisdiction to issue an anti-arbitration injunction. Sub-section 8(ii) confers jurisdiction to void and vacate arbitral awards made in disregard of such injunctions. The challengers had asserted before the court below that both sub-sections are unconstitutional because they interfere with the right to property guaranteed by sections 3(d) and 17(1) of the Constitution. They claimed that the powers given to the courts went beyond pre-existing judicial power and that, whether because of that fact or because the respects in which they exceed that power actually contravene the Constitution, they were invalid. The challengers appear to accept that the pre-existing position is not inconsistent with the Constitution.

[81]   The submissions made on this point cover to some degree the arguments made on the first limb of the section 68 and improper purpose point discussed above at [47]. Here too, our agreement with the Court of Appeal's construction of the jurisdiction conferred on the court by sub-section 8[49] as not going beyond the existing law, substantially, if not completely, undercuts the premise upon which the argument on this point was made. As the Government concedes, in practice it would now be exceptional for a court to issue an anti-arbitration injunction. The BCB Holdings group still claims, however, that there are two respects in which sub-section 8 went beyond the existing law and in each respect, it is said, the added power conferred upon the court renders the sub-section unconstitutional.

---

[49] See [47] above

[82]    The first respect concerns the jurisdiction, conferred on the court by sub-section 8(i), to restrain arbitrations that constitute "an abuse of the legal or arbitral process". The Court of Appeal agreed that this was a novel power[50] and this view was endorsed by this Court in *British Caribbean Bank Limited v The Attorney General*.[51] The BCB Holdings Group submits that the contractual right to arbitrate constitutes property that is capable of and requires constitutional protection. Whatever criteria exist to allow injunctions to restrain arbitrations, they should not be extended to situations which involve an abuse of the arbitral process itself. It should be for the arbitral tribunal itself to control the arbitral process.

[83]    The second respect concerns sub-section 8(ii). The challengers say that similarly, the jurisdiction conferred there (to void and vacate arbitral awards made in disregard of such injunctions) goes further than the pre-existing law. Arbitral awards should be set aside only by a competent authority of the country in which, or, under the law of which, the award was made.[52] The challengers submit that in seeking to give the courts of Belize the power to vacate not only Belizean awards, but awards of tribunals seated in other countries, sub-section 8(ii) creates an unjustifiable interference with the right to property

[84]    These submissions did not find favour with the Court of Appeal. Nor do they find favour with this Court. They would be better made and assessed in the context of a concrete instance of the exercise of the powers conferred since it is difficult to envisage a circumstance in which a court will be so insensitive to the nature and scope of the jurisdiction of an arbitral tribunal and the comity that must characterise the relationship between the courts and such tribunals that the power

---

[50] See [121] of the judgment of the Court of Appeal
[51] [2013] CCJ 4 (AJ) at [32]
[52] See Article V.1(e) of the New York Convention on the Recognition and Enforcement of foreign Arbitral Awards 1958 to which Belize is not a party

conferred might be exercised in a manner that renders its exercise unconstitutional. Empowering the court to exercise a power does not oblige the court to wield that power or to wield it in an indiscriminate fashion. There is nothing inherently unconstitutional in the court being given a power to restrain an abuse of the legal or arbitral process or to vacate awards. We agree entirely with Mendes JA who stated that:

> 126.  It seems fairly plain to me that prohibiting the pursuit of arbitration proceedings which bear the descriptions set out in section 106A (8) as they have been understood at common law pursues the legitimate aim of promoting fairness between parties to an agreement to arbitrate. The right of access to justice, so important to the maintenance of the rule of law, cannot be exercised in such a way as to abuse the process of the court. This is a principle which is fundamental to our system of justice. Likewise, the right to arbitrate cannot be fairly pursued if the arbitration process is itself abused. Arbitration proceedings which cause oppression, vexation or inequity, as these terms have been understood at common law, are similarly not in the public interest. Further, I can think of no fairer way to deal with arbitration proceedings which fit these descriptions then by vesting in the Supreme Court the power, in its discretion, to grant injunctive relief.

[85]   As to the power to void and vacate awards, the challengers concede that the exercise of this power is entirely unobjectionable so far as concerns *Belizean* awards. We fully expect that the court would be astute to take into account, before resorting to the impugned powers conferred, all the matters raised above that point towards the need for judicial restraint in favour of permitting the arbitral tribunal itself to control the arbitral process.

### The consequence of the findings of this Court

[86]   Like the Court of Appeal, this Court has found that the mandatory minimum penalties prescribed in sub-section 3 and all of sub-section 5 (the reverse burden sub-section) are invalid. The question now is what consequence ensues from this finding. In relation to the mandatory penalty regime, the Court of Appeal

considered the cases of *Aubeeluck v The State*,[53]  *R v Ferguson*,[54] and *State v Vries*[55] and was impressed with the reasoning of the Supreme Court of Canada in *Ferguson*. The court devoted much attention to arguments on whether to leave sub-section 3 on the statute books for an actual case to arise before making an assessment of the unconstitutionality of a specific complainant's sentence or whether it might be possible to disapply the mandatory penalties on a case by case basis or to formulate an implied term which would capture those situations where the mandatory penalty might be appropriate. The court stated that since sub-section 3 was a post-independence (as distinct from "an existing") law, the judiciary had no power of modification and no power to read in or read out words in order to save the sub-section from invalidity. The court acknowledged that it should be ready to read in an implied term so as to avoid conflict with the Constitution but it felt that there was danger in reading in an implied exception since that could produce a provision that Parliament never intended.[56] The court strove but found itself "unable to formulate any implied term which would capture those situations where the mandatory penalty imposed by section 106A(3) would pass constitutional muster". In light of this, the court felt itself bound to declare, not merely the offensive mandatory penalties, but ***all*** of sub-section 3 were invalid. The court then found that sub-section 3 was so integral to the scheme of the Act that given its invalidity, automatically sub-sections 1 - 7, 10 - 13 and 16 must also be declared invalid. With great respect, on this issue we differ from the Court of Appeal.

[87]    The cases of *Vries*, *Aubeeluck* and *Ferguson* all concern an offender who was challenging a mandatory sentence imposed upon him. The issue of whether to grant a constitutional exemption or to disapply the law given the particular circumstance of the offender had in those cases a resonance that is not shared in

---

[53] [2011] 1 LRC 627; [2010] UKPC 13
[54] [2008] 1 SCR. 96
[55] [1997] 4 LRC 1
[56] See *de Freitas v Ministry of Agriculture* [1999] AC 69, 79

these proceedings where one is faced with the situation which we described above at [58]. Yet, the discussion in the judgment of the Court of Appeal proceeded along the same footing as in *Vries*, *Aubeeluck* and *Ferguson* i.e. the utility of granting a constitutional exemption from the impact of a provision that was unconstitutional. In relation to sub-section 3, the court below proceeded from a consideration of the inappropriateness of the principle of constitutional exemptions to the striking down of practically the entire Act. It is our view that in doing so, the court gave insufficient consideration to the question whether the offensive mandatory minimum penalties could conveniently have been expunged from sub-section 3 and, if they could, whether what would remain after severance (save and except of course the unconstitutional sub-section 5 which also had to be severed) would still leave a coherent and constitutionally valid statute that fulfilled the objectives of Parliament. It is this issue that we must now consider.

*Severance*

[88]   In mandating that a law inconsistent with the Constitution is void *to the extent of its inconsistency*, the Constitution sanctions the principle of severance and encourages its exercise where possible. When faced with a statute that contains material that is repugnant to the Constitution the court strives to remove the repugnancy in order, if possible, to preserve that which is not. As long as the constitutional defect can be remedied without striking down the entire law, the court is obliged to engage in severance. In some cases it is not difficult to do this. But in other cases it is necessary to invalidate an entire Act so that, if it wishes, Parliament can have another go at the legislation. The court will do this because, broadly speaking, what remains after judicial surgery is incoherent or so impairs the legislative object that the constitutionally valid part cannot be said to reflect what Parliament originally intended.

[89]   The doctrine of severance is not free from controversy, but it is an important judicial tool regularly employed by courts as part of their responsibility simultaneously to uphold constitutional supremacy and maintain the separation of

powers. The classic statement on severability is regarded to be that given by Viscount Simon in *Attorney-General for Alberta v. Attorney-General for Canada*[57] when he stated that:

> "The real question is whether what remains is so inextricably bound up with the part declared invalid that what remains cannot independently survive or, as it has sometimes been put, whether on a fair review of the whole matter it can be assumed that the legislature would have enacted what survives without enacting the part that is *ultra vires* at all."

[90]   In performing the exercise of severance the court has no remit to usurp the functions of Parliament. Assuming severance is appropriate, the aim of the court is to sever in such a manner that, without re-drafting the legislation, what is left represents a sensible, practical and comprehensive scheme for meeting the fundamental purpose of the Act which it can be assumed that Parliament would have intended.[58] The court is entitled to assess whether the legislature would have preferred what is left after severance takes place to having no statute at all.[59] If it can safely be assessed that what is left would not have been legislated, then severance would not be appropriate. As Demerieux notes, severance involves speculation about parliamentary intent.[60] The court seeks to give effect, if possible, to the legitimate will of the legislature, by interfering as little as possible with the laws adopted by Parliament.[61] Striking down an Act frustrates the intent of the elected representatives and therefore, a court should refrain from invalidating more of the statute than is necessary.[62]

---

[57] [1947] A.C. 503, 518
[58] See Lord Diplock in *Hinds v R* [1977] AC 195 at 229
[59] See O'Connor J in *Ayotte v Planned Parenthood of Northern New England (2006) 546 US 320* at 321
[60] Margaret Demerieux, FUNDAMENTAL RIGHTS IN COMMONWEALTH CARIBBEAN CONSTITUTIONS, 1992 at 491
[61] See *Schachter v Canada* [1992] 2 SCR 679 at [27]
[62] *Regan v Time, Inc (1984)* 468 U.S. 641 at 652

[91]     In *Schachter v Canada,*[63] the Supreme Court of Canada indicated that severance will be warranted where a) the legislative objective is obvious and severance or the reading in of words would further that objective or constitute a lesser interference with that objective than would striking down; b) the choice of means used by the legislature to further that objective is not so unequivocal that severance/reading in would constitute an unacceptable intrusion into the legislative domain; and c) severance or reading in would not involve an intrusion into legislative budgetary decisions so substantial as to change the nature of the legislative scheme in question.[64]

[92]     The argument for the total invalidation of a law that is only partially unconstitutional is invariably premised on the notion that the court cannot be sure that Parliament would have passed the constitutionally valid remainder in any event and that the court should not re-word a statute.[65] The consummate ease with which this argument can always be made should warn judges of the need closely to scrutinise it. Unsurprisingly, the challengers have said exactly this to us; that severance is inappropriate here because we do not know what Parliament would have done. The challengers also claim that the mandatory minimum penalties are not severable because they are "*the raison d'être*" for the introduction of the Acts and are inextricably bound up with its purpose.

[93]     It is axiomatic that after a court has severed the unconstitutional portion of an impugned law, that which remains will never be precisely what Parliament had intended originally to enact. Further, a court can never *know* the intent of each legislator who voted to enact a statute. No court can ever be perfectly sure about parliamentary intent. If courts took it upon themselves to sever only after they possessed such certitude, then severance will never actually take place.

---

[63] *Schachter, supra* at [29]
[64] *Schachter, supra* at [26]-]31], [87]
[65] See for example counsel's submissions in *Hinds, supra* at page 208-209

[94]     To determine whether it would be appropriate to sever the mandatory minimum penalties from sub-section 3 an objective assessment must be made of the history and purpose of the Act. The challengers have contended that the Act was aimed at them but in fact, despite the rhetoric and acrimony of the Prime Minister, nothing in the Act actually suggests this. We agree entirely with Mendes JA that on its face, the Act constitutes an ordinary exercise of legislative power of general application and "was not expressed to apply to specific individuals, or to specific arbitrations, or to be applicable to any pending criminal or other proceedings."[66] Indeed, it is interesting to note that while the challengers claim that the Act is unconstitutional because it specifically targets them, on the other hand, they assert simultaneously that the Act is unconstitutional because the average Belizean who falls within its reach will be unable to pay the mandatory fines imposed. The reality is that the legislation was aimed at *any person* (whether the challengers or anyone else) who engaged in the conduct that was criminalised by it and, although the actions of Dunkeld and BSDL may have prompted the legislation, it would be an injustice to these bodies and also to Lord Ashcroft for anyone to presume that they possessed some special propensity to breach injunctions.

[95]     Although not decisive, the Long Title of an Act is a tool for discovering and determining the purpose of the legislation. The Long Titles here have already been referred to and set out in the first paragraph of this judgment. The purpose of the first Act, as revealed in its Long Title, is to strengthen the provisions relating to contempt of court and to provide for all ancillary and incidental matters. The Long Title of the second Act[67] states that its purpose is to clarify the law as to the ingredients of the offence of criminal contempt of court; to make provision for mitigation of penalties in the case of natural persons in certain extenuating circumstances; to specify the rules Governing Trial on Criminal Information and Complaint, and to provide for matters connected therewith.

---

[66] *Ibid* at para. 64
[67]  Supreme Court of Judicature (Amendment) Act, No. 18 of 2010

[96]     An appraisal of the various sub-sections of the Acts confirms that the respective Long Titles faithfully describe and accurately summarise the content of the constitutionally valid parts of the legislation. The strengthening of the provisions relating to contempt was accomplished by a variety of devices. Quite apart from the unconstitutional reverse burden sub-section and the introduction of the mandatory minimum penalties, Parliament also prescribed maximum penalties which considerably exceeded those that previously existed. In an appropriate case, it will now be open to a court, in its discretion, to punish an offender even more sternly than was envisaged by the mandatory minimum penalties. The strengthening of the provisions relating to contempt was also accomplished by mandating that trials be held summarily in the Supreme Court by a judge sitting alone without a jury; by widening the net, and establishing a detailed description, of those who could be charged for aiding and abetting the failure to comply with an injunction; by providing for the extraterritoriality of the Act's reach and by establishing the possibility of trial *in absentia*. In light of all these matters, we do not share the view that the mandatory minimum penalties should be isolated and regarded as "*the raison d'être*" for the introduction of the Acts.

[97]     It is also necessary to consider the relationship between the invalid and the valid parts of the legislation. Are the two so inextricably bound up that they cannot conveniently be separated one from the other? In our view that is certainly not the case. It is possible and convenient to read down or to remove from the remainder of sub-section 3, the unconstitutional mandatory minimum penalties. That remainder prescribes enhanced maximum penalties and is in keeping with Parliament's comprehensive scheme for prosecuting and punishing the breach of an injunction in a manner not presently captured by the pre-existing law. Neither the scheme nor the purpose of the legislation will be affected here by the absence of the mandatory minimum penalties. The constitutionally valid sub-sections of the Act are in no way inextricably bound up with, or reliant for their efficacy upon the reverse burden section and/or the mandatory minimum sentences. When faced

with an invalid mandatory sentence, in lieu of invalidating the entire sentencing regime and then the whole underlying law, courts everywhere would read down the mandatory sentence or simply remove it in order to leave standing any maximum penalty prescribed by the legislature. So, for example, in many Caribbean states, the courts have read down the mandatory death penalty so as to render the same a discretionary sentence.[68]  In *Aubeeluck*,[69] Lord Clarke referred to the Mauritius cases of *Philibert v State*,[70] where a mandatory minimum sentence of 45 years' penal servitude was held unconstitutional and read down so as to provide for a maximum sentence of 45 years, and *Joosub v State*[71] where a similar approach was taken to the mandatory sentence of 30 years' penal servitude imposed upon a person convicted of unlawful possession of heroin as a trafficker.

[98]    It seems to us that in light of all of this, the real question to be answered is this – Which course of action would represent a lesser intrusion on the role of Parliament? The extinguishment of the entire fruit of the parliamentary exercise (most of which reflected a valid exercise of parliamentary power) or excision of the invalid mandatory penalties and sub-section 5? For us, the answer to the question is self-evident and in this respect we must respectfully differ from the Court of Appeal, which would have left in place a mangled Act, and our colleagues who have opted to strike down the entire legislation. The court below came to the view that the mandatory penalty regime was "*the raison d'être*" of the Acts by surmising that if Parliament merely wanted heavier punishment Parliament would have simply increased the penalties of the existing section 105 which also criminalised the breach of an injunction. It is true that Parliament could have done this, but it is also true that, as we have seen, the various sub-sections of section 106(A) did much more than merely impose mandatory minimum punishment. That punishment properly reflects only one aspect of the

---

[68] See for example *Spence v R* and *Hughes v R*, St Criminal Appeals Nos. 20 of 1998 and 14 of 1997 respectively, 2nd April 2001; affirmed in *Reyes v R* (2002) 60 WIR 42
[69] *Aubeeluck, supra* at [28]-[29]
[70] 2007 SCJ 274
[71] 2008 SCJ 318

statute. It is comparatively easy for bodies outside of Parliament to second guess the legislature; to assert that they would have gone about, in a different way, a measure that Parliament sought to accomplish. The point, though, is that Parliament was not disentitled from enacting section 106(A) in the way it did, save that of course Parliament was not entitled to violate the Constitution.

[99]   A better example of a provision which, although not in itself constitutionally invalid, must be invalidated because it is so inextricably bound up with an invalid part that it cannot independently survive is provided by the Act itself. Clearly, the proviso to sub-section 3 and also sub-section 3(a)[72] are directly hinged on the existence of the mandatory minimum penalties. It can safely be assumed that Parliament would ***not*** have enacted these provisions without enacting the unconstitutional mandatory penalties. Accordingly, these provisions must also be invalidated.

[100]  In our view therefore, the legislation is constitutionally valid save for i) the mandatory minimum penalty regime contained in sub-section 3; ii) the  proviso to section 3 and also sub-section 3(a), and iii) sub-section 5 in its entirety. It follows that the Court should sever these provisions from section 106(A). We accordingly dismiss the appeal of the Attorney General and the cross appeals of both the Zuniga and BCB Holdings groups. For the avoidance of doubt, sub-section 3 shall be read in the following manner with the original words of the statute, which by this judgment have been invalidated, struck through and the words read in placed in bold lettering:

> *(3) A person guilty of an offence under subsection (1) above shall be punished on*
> *conviction –*
>
>> *(i)     in the case of a natural person, with a fine which ~~shall not be less~~*
>> *~~than fifty thousand dollars but which~~ may extend to two hundred*
>> *and fifty thousand dollars, or with imprisonment for a term which*

---

[72] Both the Proviso and sub-section 3(a) are set out below at [102] with the words struck through

*shall not be less than five years but which may extend to ten years, or with both such fine and term of imprisonment, and, in the case of a continuing offence, with an additional fine which may extend to of one hundred thousand dollars for each day the offence continues;*

(ii)     *in the case of a legal person or other entity (whether corporate or unincorporated), with a fine which shall not be less than one hundred thousand dollars but which may extend to five hundred thousand dollars, and in the case of a continuing offence, with an additional fine which may extend to of three hundred thousand dollars for each day the offence continues.*

*Provided that where a natural person who is convicted of an offence under this section shows that the extenuating circumstances (as described in subsection 3a below) exist in his case, a court may, in lieu of imposing the penalties specified above, impose a fine of not less than five thousand dollars and not more than ten thousand dollars, and in default of payment of such fine, a term of imprisonment of not less than one year and not more than two years.*

*(3a)   For the purpose of the Proviso to paragraph (i) of subsection (3) above, the expression "extenuating circumstances: means where –*
*(a) the convicted person has previously been a law abiding person and has no criminal record; and*
*(b) the offence was committed through sheer ignorance of the consequences of his conduct; and*
*(c) the imposition of full penalties prescribed in subsection (3) above would cause grave hardship to him and his family."*

## Costs

[101]   We were not specifically addressed on the issue of costs but we take into account that no one challenged the costs order made by the Court of Appeal. That order awarded the Zuniga group and the BCB Holdings group respectively 75% of their costs both in the Court of Appeal and in the trial court, certified fit for three counsel (including a Queen's Counsel and a Senior Counsel). The order further awarded the Attorney General 75% of his costs of the cross-appeal, certified as fit for three counsel (including two Senior Counsel) with all costs to be taxed, if not sooner agreed. That order was made to stand unless an application was made for a contrary order within 7 days of the delivery of the judgment.  It does not appear

that there was any application made for a contrary order. That order, about which this Court expressly makes no comment, must therefore stand.

[102]   In respect of the costs before this Court we order the Attorney General to pay 75% of the costs of the challengers on the main appeal certified fit for three counsel including a Queen's Counsel and a Senior Counsel. We order further that the Zuniga group and the BCB Holding group each pay to the Attorney General 100% of the costs incurred in defending their respective cross-appeals certified fit for three counsel (including two Senior Counsel). All costs are to be taxed, if not sooner agreed.

_____

**The Hon Mr Justice R Nelson**

_____                _____
 **The Hon Mr Justice A Saunders**                 **The Hon Mr Justice Hayton**

**JUDGMENT OF THE HONOURABLE JUSTICES WIT AND ANDERSON**

[103]   Section 106A (3) of the Supreme Court of Judicature (Amendment) Act 2010 (the "Amendment Act")[73] provides for mandatory minimum penalties for the offence created by Section 106A (1) of knowingly disobeying or failing to comply with an

---

[73] The Amendment Act was itself amended by the Supreme Court of Judicature (Amendment) (No 2) Act 2010; in this opinion the term "Amendment Act" includes both amendments.

injunction or an order in the nature of an injunction issued by the courts of Belize. The court below found that these mandatory minimum penalties were grossly disproportionate. Section 106A (3) was therefore held to have violated section 7 of the Belize Constitution which prohibits inhuman or degrading punishment or other treatment. As Section 106A (3) was found to be an "important" part of the legislative scheme enacted by Section 106A the court held that Section 106A (1) and all other provisions "connected with it" were invalid as well.  The court therefore declared that Section 106A (1) – (7), (10)-(13) and (16) were null and void and of no effect. Section 106A (5) which provides for the reversal of the burden of proof, was also found to be unconstitutional in itself in that it infringed the right to be presumed innocent enshrined in Section 6(3)(a) of the Constitution.

[104] This Court agrees that Subsections (3) and (5) are inconsistent with the Constitution for the reasons given by the Court of Appeal. The majority, however, are of the further view that the offending provisions can be severed because what remains is a sensible, practical and comprehensive scheme for meeting the fundamental purpose of the Amendment Act. We do not agree that severance is appropriate in the circumstances of this case and would declare the entire Amendment Act null and void for reasons which can be stated in relatively short compass.

[105] Part IX of the Supreme Court of Judicature Act punishes contempt of Court. Section 105 gives the Supreme Court of Belize "the same powers as regards punishments for all contempts, whether criminal or otherwise, as are possessed by the High Court of Justice in England" and further provides that "the practice and procedure shall be as nearly as possible the same as the practice and procedure in that Court in like case". Section 106A (1) of the Amendment Act creates the offence of knowing disobedience of a court order but this offence necessarily overlaps with the offences contemplated by Section 105. While not every contempt of court involves knowing disobedience to a court order, it is necessarily always the case that knowing disobedience to a court order is a contempt of court and punishable as such. In other words, even without the

introduction of Section 106A (1), knowingly disobeying or failing to comply with an injunction or an order in the nature of an injunction issued by a court in Belize would be punishable under Section 105. Section 106A (13) and (14) of the Amendment Act ensures that a person punished for contempt under Part 53 of the Supreme Court (Civil Procedure) Rules 2005 by way of committal and seizure of assets is not subject to double jeopardy by way of prosecution under Section 106A(1).

[106]   What was new and novel about Section 106A was therefore not the offence of knowing disobedience to a court order or the provisions ancillary to the creation of that offence but rather the penalty regime including most spectacularly the mandatory minimum penalties. That the provisions of the Amendment Act, of which the draconic  penalty regime was undoubtedly the legislative centrepiece, all formed part of a single scheme whose sole *raison d'être* was to erect on top of the existing legislation (Section 105) a formidable line of defence against what was  apparently perceived as an impending and ruthless attack on Belize's financial integrity and sovereignty, is evident from the background to the litigation and more specifically the attendant speeches in Parliament summarized in the judgment of this Court and more amply set out in the judgment of the Court of Appeal. Parliamentary pronouncements form part of the legislative history of the statute and may be used in the determination of the parliamentary intention in enacting the legislation (*Pepper (Inspector of Taxes) v Hart*[74]) in a similar way to which the long title is a useful indicator of parliamentary intent.

[107]   Section 106A (3) does indeed impose grossly disproportionate penalties for disobedience of a court order. In the case of a natural person the mandatory minimum fine is fifty thousand dollars which may extend to two hundred and fifty thousand dollars or imprisonment for not less than five years or both such fine and

---

[74] [1992] UKHL 3

imprisonment.  A continuing offence attracts an additional fine of one hundred thousand dollars for each day the offence continues. Where a natural person shows specified extenuating circumstances the court may impose a fine of not less than five thousand dollars and not more than ten thousand dollars and in default of payment a term of imprisonment of not less than one year and not more than two years.  In the case of a legal person the monetary penalty shall not be less than one hundred thousand dollars but may extend to five hundred thousand dollars and in the case of a continuing offence an additional fine of three hundred thousand dollars for each day the offence continues. It is note-worthy that by way of contrast with the penalties provided by the Amendment Act, the most egregious and wilful disobedience of court orders in England routinely attract a custodial sentence of 12 months at most: *R v Phelps*[75]; *R v Adewunmi;*[76] *R v Montgomery*[77].

[108]  The mandatory penalties imposed by the Amendment Act being wholly disproportionate are consequentially inconsistent with the Belize Constitution. It is now widely accepted that the prohibition in Section 7 of the Constitution against subjection to "torture or to inhuman or degrading punishment or other such treatment" is to be read as outlawing wholly disproportionate penalties. A penalty that is wholly disproportionate to the seriousness of the offence is necessarily one which imposes inhuman or degrading punishment: *Aubeeluck v State*[78].  In delivering the judgment of the Privy Council in the case of *Reyes v R*[79] Lord Bingham of Cornhill made clear that Section 7 of the Belize Constitution prohibited the State from imposing a punishment that is grossly disproportionate to what would have been appropriate.

[109]  The majority are of the view that the penalty regime stipulated by Section 106A (3) can be salvaged by severing the mandatory minimum penalties on the ground

---

[75] [2010] 2 Cr. App. R. (S) 1
[76] [2008] Cr. App. R (S) 52
[77] (1995) 16 Cr. App. R (S) 274
[78] [2010] UKPC 3, [2011] 1 LRC 627
[79] [2002] UKPC 11, [2002] All ER (D) 149

that what remains will still leave intact Parliament's comprehensive scheme laid out in Section 106(A) for prosecuting and punishing the breach of an injunction. We consider that there are several problems with this approach. Firstly, the judicial surgery to be performed on Section 106A (3) would appear to go beyond what is permissible and to intrude upon the legislative function. The severance proposed by the majority involves the re-fashioning of a discrete legislative provision by both deletion and addition. Thus the proposed severance results in the deletion of most of the penalty provision; in strict mathematical terms close to two-thirds of the wording is surgically removed. But not only is a significant majority of the provision excised, new words are added. Where Parliament stipulated that the court must impose a certain financial penalty, the majority would change the wording by adding additional words to make the provision mean a fine "which may extend to" the mandated financial penalty. This clearly runs counter to the parliamentary intention and is therefore fundamentally different from the approach undertaken in *Hinds v The Queen*[80] of relocating the sentencing power from the executive to the judiciary.

[110]   The rewriting of the provision by deleting as well as by adding new wording that runs counter to the parliamentary intention does not appear to be in line with the traditional doctrine of severance which by definition is confined to excising impugned provisions. A carte blanche power to rewrite legislation is more akin to the competence given to the court under Section 134 (1) of the Constitution to modify, adapt, qualify and make exceptions to existing law. That limited and special power is widely recognized as having given the courts a quasi-legislative function. The problem is, however, that Section 106A (3) is not an existing law to which Section 134 (1) is applicable. If courts can freely modify statutory provisions by recourse to the doctrine of severance in the manner proposed by the majority then the line between the judicial and legislative function may well become blurred and the separation of powers may be strained if not threatened. It

---

[80] [1976] 1 All ER 353

is true, of course, that a law passed after the commencement of the Belize Constitution that is determined to be inconsistent with the provisions of the Constitution must be declared to be null and void and of no effect *to the extent of the inconsistency*, which means that the Constitution itself provides for *pro tanto* voidness[81] and even requires severance. In our view, however, severance should never be used as a repair tool for saving an unconstitutional law that has problematic aspects and which, being now largely divorced from the reasons for which it was apparently made, is in a sense largely academic and theoretical. In any event, the 'inconsistency' referenced in the Constitution extends not only to discrete provisions containing the impugned provisions but also to other provisions in the law which while not in themselves inconsistent are inextricably interwoven with those found to be inconsistent.

[111] We are not convinced that cases cited by the majority in which mandatory minimum sentences were converted into maximum sentences are apposite. Those cases may be explained on the basis that had the sentencing regime been struck down *simpliciter*, no penalty would have been available to punish the offence; a situation that would have undoubtedly been anathema to Parliament's intent. The reading down of the death penalty for murder so as to render the penalty a discretionary one (*Reyes v R*[82]) was obviously to have been preferred to leaving the offence of murder without a penalty. The reading down of the mandatory minimum custodial sentences as the maximum sentences in *Philibert v State*[83] and *Joosub v State*[84] may be explained on the basis of similar principles. The present case may also be distinguished from those involving merely appeals against sentence as opposed to constitutional challenges to the nature of the penalty regime: (See e.g., *R v Ferguson*[85]).

---

[81] Margaret DeMerieux, op, cit. at p. 492

[82] [2002] UKPC 11, [2002] All ER (D) 149
[83] (2007) SCJ 274)
[84] (2008) SCJ 318)
[85] [2008] 1 S.C.R. 96

[112]  Another difficulty with the severance proposed is that what remains of the penalty regime is not only the mere statement of maximum penalties marooned from the legislative intent and context of the enactment of the Amendment Act.   The maximum penalties are themselves of astounding severity. Were those maximum penalties ever to be imposed we consider it likely that they would be struck down for being grossly disproportionate. From a constitutional perspective, Parliament may not legislate nor may the courts impose a sentence that does not bear a proper penological relationship with the offence committed. To take an illustrative example, it would not appear to be constitutionally possible for disobedience to a court injunction to be visited by imposition of the death penalty. It is accepted practice that a person in contempt may be imprisoned until he purges that contempt, normally in the form of an apology to the court. Theoretically this could mean, for example, imprisonment for even more than 10 years. But in such cases the prisoner himself holds the key to his release and such a case must therefore be distinguished from the power to impose a sentence of imprisonment for ten years. We see no point in leaving on the statute books a sentence the imposition of which in all likelihood will never pass constitutional muster.

[113]  But the most fundamental problem with the approach adopted by the majority concerns principles intrinsic to the notion of severance. The classical statement of the test for severance is derived from *Attorney-General for Alberta v. Attorney-General for Canada*: "The real question is whether what remains is so inextricably bound up with the part declared invalid that what remains cannot independently survive or, as it has sometimes been put, whether on a fair review of the whole matter it can be assumed that the legislature would have enacted what survives without enacting the part that is ultra vires at all."[86] This has been confirmed in a series of cases of the highest authority. Thus, a similar test was adopted in *Maher v Attorney General:* "But if what remains is so inextricably bound up with the part

---

[86] [1947] A.C. 503, at p. 518

held invalid that the remainder cannot survive independently, or if the remainder would not represent the legislative intent, the remaining part will not be severed and given constitutional validity."[87]

[114]   The formulation of the test for severance in this way masks a fundamental ambiguity. It equates the coherence of the interconnectedness of the provisions in the statue with the question of the parliamentary intention when these may not be synonymous. It is possible that what remains after severance can grammatically and conceptually stand on its own but at the same time not be what Parliament intended or would have enacted. To apply the tool of severance could then result in a law being left on the statute books that Parliament would not have enacted.

[115]   In our view the correct test for severance is not merely or even primarily whether what remains comprises a clear coherent and comprehensive legislative regime but rather is a matter of parliamentary intent. The question is whether it can be reasonably assumed that Parliament would, at the time of the passage of the statute, have enacted what remains, had it known that, and why, the inconsistent provisions would have been struck down. It may be assumed that Parliament would only pass coherent enactments but a coherent law need not satisfy the parliamentary intention on how to regulate a particular problem. In the absence of clear indications of parliamentary intent, the question reduces itself into whether what remains after the impugned provisions are struck represents a fundamentally different type of legislation than that passed by Parliament: *Hinds v The Queen*[88]; *Trinidad Island-Wide Cane Farmers' Association Inc. & Attorney General v Prakash Seereeram.*[89] If the legislative provisions which remain are of a fundamentally different kind then it cannot be said with any confidence that Parliament would have enacted it on its own, and it should, accordingly, be struck in its entirety because to leave what remains on the statute books in these

---

[87] [1973] IR 140, at 147
[88] [1976] 1 All ER 353 at 373-374
[89] (1975) 27 WIR 329 at 343, 372-373

circumstances would be to intrude upon the legislative function. It is only if the judicial conscience is clear that Parliament would have enacted the remainder of the legislation independently of that declared unconstitutional that severance is permissible.

[116] This approach accords with the dictum of the Supreme Court of Canada in *R v Ferguson*[90] asserting that:

> "If it is not clear that Parliament would have passed the scheme with the modifications being considered by the court — or if it is probable that Parliament would *not* have passed the scheme with these modifications — then for the court to make these modifications would represent an inappropriate intrusion into the legislative sphere. In such cases, the least intrusive remedy is to strike down the constitutionally defective legislation."

[117] An apt illustration of the guiding principles is provided by *Independent Jamaica Council for Human Rights (1998) Ltd v Marshall-Burnett*[91] where the Jamaican Parliament had legislated by three separate statutes to abolish the right of appeal to the Privy Council and replace it with a right of appeal to the Caribbean Court of Justice. Having arrived at the interesting conclusion that the specific statute providing for appeals to the CCJ was unconstitutional, the Privy Council found it necessary to strike down the three statutes because they were "connected" and formed an "interdependent scheme". Severance was not appropriate because it was not the intention of Parliament to revoke the right of appeal to Privy Council without putting anything in its place. There was no investigation of whether what remained constituted a coherent legislative scheme. Nor did the court engage in any speculation of whether, presented with the impugned statute, Parliament may have been content to keep the legislation providing solely for the abolition of

---

[90] Ibid.
[91] [2005] 2 AC 356, [2005] 2 lrc 840

appeals to the Privy Council with a view to subsequently legislating for appeals to the CCJ. The relevant parliamentary intention was that which existed at the time of passage of the package of legislation.

[118]   The present appeal provides an opportunity for application of the test for severance in circumstances where severance of constitutionally inconsistent provisions involves speculation as to parliamentary intention. This Court must ask itself whether on a fair review of the whole matter it can be safely assumed that at the time the Amendment Act was passed, the legislature would have enacted what survives without enacting the part that is *ultra vires*. All relevant indicia of parliamentary intention must be taken into account including the legislative history, the long title (and any perambulatory provisions) of the statute. Having consulted these sources, if the Court is reasonably certain that Parliament would have enacted the section that remains independently of what was struck down for inconsistency then severance is appropriate. But if the parliamentary intention is unclear or it is reasonably clear that Parliament would not have enacted the remainder of the statute by itself then the court is obliged to strike down the whole Act.

[119]   In this case we consider that it is less intrusive to strike down the Amendment Act than to leave its neutered remains on the statute books. Even if the exercise of severance had been restricted to expunging the impugned mandatory minimum penalties, the mere fact that what remains of Section 106A (3) after the excision, or that what remains of Section 106A after the excision of sections 106A (3) and (5), comprise a coherent legislative scheme cannot be decisive and to initiate an enquiry primarily along these lines is to ask the wrong question. Whether the provisions in a statute constitute a coherent legislative scheme is primarily a matter for Parliament. It is for Parliament to decide the nature and content of the laws of the State. The courts are mainly concerned with the interpretation and application of those laws.

[120]   On any reasonable view of the legislative history of the Amendment Act, the mandatory minimum penalties prescribed in Section 106A (3) was the centrepiece of that legislation. Those minimum penalties marked the radical departure from the existing law in Section 105 of the Supreme Court of Judicature Act and they cannot be excised from Section 106A (3) without grossly distorting the penalty regime contemplated by Parliament and thereby fundamentally altering the nature of the legislation. In the present case this has been compounded by the necessity for inserting wording that is patently different from what Parliament enacted and intended. Far from being unclear, the result of the "severance" proposed is a clear repudiation of the parliamentary intention and involves the modification, adaptation and qualification of the statute as passed by Parliament. Section 106A (3) cannot be excised without denuding the Amendment Act of its apparent reason for existence.

[121]   There is no doubt that the acrimony between the government and the Lord Ashcroft-led groups was the critical driving force for the deliberation and passage of the Amendment Act. We agree that the generalized wording employed by the legislation means that the legislation can in no way be characterized as an *ad hominen* attack by the government against its adversaries under the principles developed by the Privy Council in *Liyanage v R*[92]. Had the provisions of the Amendment Act otherwise passed constitutional muster, the motif for the passage of the legislation would have remained entirely inconsequential. But in circumstances where critically important provisions are by universal judicial consent deemed unconstitutional, the issue of parliamentary intention becomes relevant to the question of severance, and it becomes permissible to revisit and to take into account the rationale for the passage of the legislation. We consider that the background to the passage of the Amendment Act makes it less likely that Parliament would have passed the legislation without the impugned provisions.

---

[92] [1967] 1 AC 259

[122]   We do not agree with the Court of Appeal's approach of striking down the bulk of the law and leaving intact sub-sections (8) – (9) and (14) – (15). Subsection (8) legislates the power of the court to issue anti-arbitration injunctions the breach of which exposes the offender to the impugned penalty regime, but the Court of Appeal found and this Court confirmed in *British Caribbean Bank Limited v Attorney General of Belize*[93] that this provision largely repeats the common law. It must be doubtful that Parliament would have enacted this provision by itself without application of the penalty regime. Subsection (9) provides the modes for service of an injunction issued by the court and obviously cannot stand on its own. Subsection (14) is entirely ancillary to the impugned subsection (13); and subsection (15) merely empowers the Attorney General to make rules for giving better effect to the provisions of Section 106A.  We do not think that, given the choice, Parliament would have wanted to enact such a hobbled, almost meaningless piece of legislation as represented by subsections (8) – (9) and (14) – (15).

[123]   In the premises we agree with the judgment of the Court save that we would dispose of the case by striking the entire Amendment Act and leaving a clear slate upon which Parliament would be free in its sovereign right to enact constitutionally consistent legislation governing disobedience to orders issued by the courts.

**The Orders of the Court**

[124]    The Court accordingly orders that:

1.   Both the appeal of the Attorney General and the cross-appeals of the Zuniga and BCB Holdings groups respectively be dismissed;

2.   Section 106(A)(3) of the Supreme Court of Judicature Act as contained in the Supreme Court of Judicature (Amendment) Act, 2010 as amended by the

---

[93] [2013] CCJ 4 (AJ) at para. 31, (2013) 82 WIR 63.

Supreme Court of Judicature (Amendment) (No. 2) Act, 2010 is inconsistent with the Constitution of Belize to the extent that it provides for mandatory minimum sentences;

3. By majority decision, the said mandatory minimum sentences be severed from section 106(A)(3);

4. By majority decision, the proviso to section 106(A)(3) and sub-section (3a) be severed from section 106(A)(3);

5. Section 106(A)(5) of the Supreme Court of Judicature Act as contained in the Supreme Court of Judicature (Amendment) Act, 2010 is inconsistent with the Constitution of Belize and the same be invalidated in its entirety;

6. The Attorney General shall pay to the Zuniga group and the BCB Holdings group 75% of the costs of the State's unsuccessful appeal and the Zuniga group and the BCB Holdings group shall each pay to the Attorney General 100% of the State's costs incurred in responding to their respective unsuccessful cross-appeals.

_____                   _____
**The Hon Mr Justice D. Hayton**                      **The Hon Mr Justice W Anderson**

# Courtenay Declaration Exhibit R

[2013] CCJ 4 (AJ)

# IN THE CARIBBEAN COURT OF JUSTICE
## Appellate Jurisdiction

## ON APPEAL FROM THE COURT OF APPEAL OF BELIZE

**CCJ Appeal No. CV 001 of 2013**
**BZ Civil Appeal No. 6 of 2011**

**BETWEEN**

      **BRITISH CARIBBEAN BANK LIMITED**        **APPELLANT**

**AND**

      **THE ATTORNEY GENERAL OF BELIZE**        **RESPONDENT**

**Before the Honourables:**      Mr Justice D Byron
                               Mr Justice A Saunders
                               Mme. Justice D Bernard
                               Mr Justice J Wit
                               Mr Justice W Anderson

**Appearances:**

Mr Eamon H Courtney, SC, and Mrs Ashanti Arthurs Martin for the Appellants

Mr Michael C E Young, SC, and Ms Magalie Perdomo for the Respondent

## JUDGMENT
### Of
**The President Mr Justice Dennis Byron and Justices Saunders,
Bernard, Wit and Anderson**

### Delivered by
**The Rt. Hon. Mr Justice Dennis Byron and The Hon. Mr. Justice Anderson
on the 25th day of June 2013**

**Introduction**

[1]    This case raises an important question of law. What are the principles governing the jurisdiction to issue an injunction restraining international arbitration proceedings commenced in accordance with an arbitration clause agreed to by the parties to the court proceedings? This question arises against the following background.

**Background**

[2]    British Caribbean Bank Limited ("BCB") appeals to this Court against the interlocutory order made by the Court of Appeal restraining it from continuing certain foreign arbitration proceedings. The arbitration proceedings were instituted to resolve disputes arising from the compulsory acquisition by the Government of Belize ("GOB") of loan and mortgage debenture facilities having a face value of US$24 million owed to BCB from Belize Telemedia Limited ("Telemedia").

[3]    Recourse by BCB to arbitration was based upon a Bilateral Investment Treaty ("BIT")[1]  concluded on 30th April 1982, between the governments of Belize and the United Kingdom. The Agreement contained a provision for the resolution of disputes arising from any breach of the BIT by international arbitration and it applied to nationals and companies of either contracting party. By Exchange of Letters the Agreement was extended to the Turks and Caicos Islands. BCB is a large financial institution registered in the Turks and Caicos Islands.

[4]    The compulsory acquisition of BCB's property took place in the context where the Government of Belize, from 2009, has been taking steps to nationalize the Telecommunications industry in that country. Telemedia was in sole control of

---

[1] United Kingdom of Great Britain and Northern Ireland and Belize. Agreement for the Promotion and Protection of Investments, signed at Belmopan, 30 April 1982, (No. 21315). United Nations Treaty Series 1294 (1982), pp. 199 – 205

the telecommunications industry and was the primary target of GOB's take over efforts.  GOB acquired the rights of BCB under the various loan and mortgage facilities with Telemedia by Orders[2] made pursuant to the *Belize Telecommunications (Amendment) Act 2009*[3] *("2009 Acquisition Legislation")*. The payment of principal and interest on the loan facilities discontinued and no compensation has since been paid to BCB.

[5]    On 24th June 2011, the Court of Appeal in *AG v BCB*[4] struck down the 2009 Acquisition Legislation as being unconstitutional and declared it null and void. Within a couple of weeks, GOB passed the *Belize Telecommunications (Amendment) Act 2011*[5] ("2011 Acquisition Legislation") and made subsidiary Orders[6] to reacquire the same properties including the BCB loan and mortgage facilities. It also passed the *Belize Constitution (Eighth Amendment) Act 2011*[7] ("Constitutional Amendment Legislation") to further legitimize the acquisition.

[6]    BCB filed proceedings challenging the constitutionality of the legislation and claiming ancillary relief.  On 11th June 2012, a trial judge held that several sections of the 2011 Acquisition Legislation contravened the Constitution and were void, but upheld portions of the Constitutional Amendment Legislation which provide for the government to hold majority ownership of public utilities. At present an appeal against that judgment is pending before the Court of Appeal. BCB also submitted claims by way of letter to the Financial Secretary for compensation for the acquired property as was required by the acquisition legislation.  These claims specified that they were made without prejudice to

---

[2] *Belize Telecommunications (Assumption of Control Over Belize Telecommunications Limited) Order* No. 104 of 2008 and  *Amendment Order* No. 130 of 2009
[3] *Belize Telecommunications (Amendment) Act 2009*, No. 9 of 2009
[4] *British Caribbean Bank Limited v. the Attorney General of Belize and the Minister of Public Utilities* Civil Appeal No. 30 of 2010
[5] *Belize Telecommunications (Amendment) Act 2011* No. 8 of 2011
[6] *Belize Telecommunications (Assumption of Control Over Belize Telemedia Limited) Amendment Order* No. 70 of 2011 ("2011 Order").
[7] *Belize Constitution (Eighth Amendment) Act 2011* Act No. 11 of 2011

Arbitration proceedings pursuant to the BIT.  These claims have not been processed.

[7]     In addition to seeking redress in accordance with the law of Belize, on 5th May 2010, BCB initiated international arbitration proceedings to seek redress under the BIT.  Although GOB has not been participating in the process, the arbitration has reached the stage where a panel has been appointed and a preparatory meeting held in Washington DC on 26th August 2010.

[8]     In the meantime, GOB decided that it would not compensate BCB for the loan and mortgage facilities it had acquired on the ground that they had been made for an unlawful purpose, namely, the acquisition of shares in Telemedia.  On 4th June 2011, it commenced proceedings in the domestic courts with Telemedia as a co-plaintiff for related declaratory orders.  These proceedings have been stayed upon the application of BCB, with the consent of GOB, until the constitutional proceedings reach finality.

[9]     It was against this background that, on 16th August 2010, GOB initiated these proceedings aimed at stopping the arbitral proceedings permanently.  It also, on the same day, applied for the interlocutory injunction that resulted in the orders now being appealed.

**The Court Proceedings**

[10]    The Attorney-General claimed various declarations and orders relating to the arbitration proceedings initiated by BCB on 5th May 2010 including an order to restrain BCB from continuing with the arbitration. On the very same day, the Attorney General made another application by notice, this time for an "interim" injunction restraining BCB, "from taking any or any further steps in the continuation or prosecution of the arbitration proceedings."  The application for the interim or interlocutory injunction has now consumed almost three years. This

delay may have been quite unnecessary.   In effect the same relief was sought in relation to both the interlocutory and substantive matter. Moreover, both proceedings would have been supported by the same evidentiary and other materials.  In the circumstances, an effective procedure available to the trial judge would have been to direct the prosecution of the fixed date claim form, with a short adjournment and upon appropriate undertakings by BCB if considered necessary.

[11]   Be that as it may, the trial judge addressed only the application for interim relief. Having applied *American Cyanamid Co v Ethicon*[8] he concluded that there were serious issues to be tried to determine whether the BIT was in force in Belize and whether it created any binding obligations on the GOB either at municipal or international law.  He doubted that, in the event he wrongly refused to grant the injunction, damages would be an adequate remedy for the GOB.  The Judge decided that, in the circumstances, the balance of convenience lay with the GOB because it would be vexatious or oppressive to allow the arbitration to proceed simultaneously with the proceedings before the domestic courts relating to the constitutionality of the acquisition and the legality of the loan facility.  Since, in his view, resolution of the disputes through the domestic courts was preferable, he restrained the parties from continuing with the arbitral proceedings until the completion of the related domestic cases.

[12]   A majority in the Court of Appeal upheld the grant of the interim injunction but arrived at their decision by another route. They considered that the trial judge exercised his discretion on wrong principles and erred in not limiting the interlocutory injunction to the date of trial of the merits of the substantive application for a (permanent) injunction.  They decided to reconsider the matter and exercised their own discretion. They concluded that the BIT was in force and created binding obligations but that the right to go to international arbitration was qualified by the context of the BIT.  In the opinion of the majority, the right to

---

[8] [1975] AC 396.

arbitrate needed to ripen by the completion of the proceedings in the domestic court. Applying the "three-pronged" test for the award of interim injunctions as laid down in *American Cyanamid Co v Ethicon Limited*[9] and developed in *National Commercial Bank Jamaica Limited v Olint Corporation Limited*,[10] they held that the injunction should remain in place because there was "a serious issue to be tried" as to whether the multiplicity of claims in the courts of Belize rendered the arbitration vexatious and oppressive. Apart from the expense of the international arbitration proceedings there might be inconsistent awards and, in any event, the domestic proceedings could provide relief that may make the arbitration unnecessary.  They ordered that the parties be restrained from continuing with the arbitration proceedings until the hearing and determination of the substantive claim or further order.  The dissenting judgment emphasized that the 1982 Agreement had conferred on the Appellant, "an indefeasible" and "an unqualified" right to initiate international arbitration proceedings and that by granting the injunction the court was facilitating the breach of those international obligations.

## **The Issues**

[13]   The dispute became narrower before our court as a number of issues, which were carefully considered and clarified at the Court of Appeal, were no longer contested. The issues that remain outstanding are three-fold:

(a) Whether the BIT provided BCB with an unqualified or indefeasible right to proceed to international arbitration;

(b) Whether, if there was a power to restrain the arbitral process, the Court should make a determination of the merits of the claim for a permanent

---

[9] [1975] AC 396
[10] [2009] 1 WLR 1405

injunction or should limit its enquiry and determine only whether there was a serious issue to be tried; and,

(c) Whether, if the court addressed the merits, there was any or any sufficient basis, for the grant of the injunction to restrain the arbitration.

## Did the BIT provide an unqualified or indefeasible right to arbitrate?

[14]    BCB contended that the BIT provided it with an unqualified or indefeasible right to have any disputes under the BIT resolved by an international arbitral process and that consequently it could not be open to the Court to make any order restraining the continuation of the arbitral proceedings. We cannot agree. The exercise by one individual of his or her rights often infringes on the rights of other individuals or the society as a whole and the courts are and must remain the final arbiter of the relative distribution of those rights.

[15]    The grant of the right in the 1982 BIT to arbitrate is not a unique but is, rather, a common feature of such agreements.  The first bilateral investment treaty was concluded between Germany and Pakistan more than half a century ago for the Promotion and Protection of Investments. There are at least some 3000 analogous investment protection treaties concluded by states worldwide[11] with the purpose of creating a stable international legal framework to facilitate and protect foreign investments by providing rights and guaranteeing substantive standards for treatment that are to be accorded an investor by a host State and by providing for recourse to international arbitration in the event of dispute. Such investment protection treaties are now widely recognized by States in the modern world as a mechanism for promoting economic relations and for increasing investment and prosperity.  It seems fair to say that such investment treaties form an important feature of the modern economic jurisprudence and that they constitute an important developmental option for capital-importing developing countries such

---

[11] UNCTAD (2007 – June 2008) 11A Monitor, No. 2 (2008)

as those in the Caribbean. The bilateral investment treaty was developed to remedy the vulnerability of the foreign investor and ameliorate the conditions of their investments and the success of the treaty regime depends upon the acceptance and fulfillment by the host state of the legal obligations imposed by the treaty.

[16]   The BIT in this case was made between Belize and the UK.  In brief, it states that its objectives are to promote and protect investment of the nationals or companies of the other in their respective territories.  It contains promises not to subject the nationals and companies of the other to less favourable treatment than their own nationals or nationals of a third state.  It agreed on a regime for dealing with losses occurring in war and armed conflict and the like causes.  Article 5, which is particularly relevant to the dispute between the parties to this appeal, contained promises not to take action having the effect of expropriation of investments of nationals or companies of either contracting party except for a public purpose related to the internal needs of that party and against just and equitable compensation.  Such compensation shall amount to the fair market value before the expropriation became public knowledge and shall include interest at the rate prescribed by law until the date of payment. The compensation shall be made without undue delay, be effectively realizable and be freely transferable. The national or company affected shall have a right, under the law of the contracting party making the expropriation, to prompt review by a judicial or other independent authority of that party of his, her or its case and of the evaluation of the investment. The other articles made provisions for the unrestricted right to repatriate investments.  Article 8, important to this case as well, provides for the settlement of disputes between an investor and a Host State by international arbitration. Article 8(1) prescribes:

> "Disputes between a national or company of one Contracting Party and the other Contracting Party concerning an obligation of the latter under this Agreement in relation to an investment of the former which have not be amicably settled shall after a period of three months from written

> notification of a claim be submitted to international arbitration if either party to the dispute so wishes."

[17]   Other articles provide for the resolution of disputes concerning the interpretation of this agreement, in effect oust the jurisdiction of the domestic courts by agreeing to submit such disputes to the selected international arbitral tribunal. There are provisions for subrogation and for extending the agreement to other territories by exchange of notes.  It was specifically agreed that the agreement would come into force on signature.  It was also agreed that the agreement would continue for 10 years and thereafter for one year after notice of termination given by either contracting party.

[18]   In the early stages of this litigation GOB had contended that the BIT was not binding on Belize because it had not been incorporated into domestic law.  These submissions were not made before us, the matter having been authoritatively settled by the Court of Appeal.  It is now common ground that the BIT became binding under international law when it was signed in 1982 and remains in force.  The Court of Appeal of Belize in the case of *Jose Alpuche & Anor. v. AG*[12] has already ruled that this BIT is binding on the State.

[19]   Belize has still not passed any legislation to incorporate the 1982 BIT into domestic law.  The legal effect of treaties that are not incorporated into domestic law has already been examined in the decision of this Court in *Boyce and Joseph*.[13] The orthodox view that an unincorporated treaty does not form part of the law of Belize and creates no rights or obligations which are enforceable domestically was critiqued. It is sufficient to note that the notion that an unincorporated treaty is incapable of conferring any rights on private entities in the municipal system has been rejected. At a minimum they could yield legitimate expectations cognizable under domestic law.

---

[12] *Alpuche et al. v. Attorney General*  BZ 2010 CA 16
[13] *Attorney General v. Joseph*, [2006] CCJ 1 (AJ)

[20]     There is relevant jurisprudence on the specific juridical effects in domestic law of an arbitration provision in a bilateral investment treaty. In *Republic of Ecuador v Occidental Exploration and Production Co.*[14] the court held that an investment treaty, similar to that between the United Kingdom and Belize, had resulted in an agreement between the investor and the host state to arbitrate. This agreement to arbitrate was not itself a treaty but flowed from the treaty provisions. It may be said that in important ways the constitution of the agreement to arbitrate from the terms of the investment treaty is not unlike making a contract from an advertisement containing certain terms to get a reward. Such an advertisement constitutes a binding unilateral offer that can be accepted by anyone who performs its terms: *Carlill v Carbolic Smoke Ball Co.*[15]   Thus the relevant question is *not* whether the 1982 *Treaty* became part of Belizean law but rather whether the *right* to initiate arbitration (which may have been generated out of the treaty) is cognizable in the courts of Belize. This way of framing the issue admits of the possibility that provisions in the bilateral investment treaty could have given rise to the formation of a *contract* along the lines of reasoning adopted in *Carlill v Carbolic Smoke Ball Co.*  and that it is this contractual right to arbitrate and not the treaty (albeit the terms of the contract are found in the treaty) of which the courts take notice.

[21]     Thus BCB, the investor, is not a party to the treaty but Article 8 makes a free standing offer which is accepted on submission of the dispute to arbitration and becomes a binding contract between the investor and the State party. The provision is clear and unambiguous.  It evidences the intention of the State parties to provide private investors with the right to have the specified disputes settled by international arbitration.  The plain wording of the article also demonstrates that there are no preconditions to the right to submit the dispute to international arbitration. This right encompasses any dispute between a national or company of one Contracting Party and the other Contracting Party concerning an obligation of

---

[14] [2006] QB 432, especially at  paragraph 33 per Mance LJ.
[15] [1891-94] All ER Rep 127

the latter under this agreement. In this case the disputes include allegations of breaches of the obligations relating to expropriation of property.  The right is one of direct access that is not contingent on any one or thing.  Once there is a dispute that is not amicably settled, a national or company of one contracting party after giving three months' notice is entitled to submit the dispute to international arbitration.   The right to proceed is clearly independent; no permission or authorization is required from anyone or any state party.  There is no language in the agreement from which one could infer that there is a requirement that the parties must first exhaust domestic remedies.  It is reasonable that there should be none because the effectiveness of this type of dispute settlement would be undermined if the investor was required to exhaust remedies in domestic courts before proceeding to international arbitration: see *Mytilineos Holdings SA v the State of Union Serbia & Montenegro and Republic of Serbia)*[16] and *Compania de Aguas del Aconquija SA and Vivendi Universal (formerly Compagnie General des Eaux) v Argentine Republic.*[17] An important objective of international arbitration is to avoid possible pitfalls of domestic litigation.

[22]   The right to commence the arbitral proceedings that BCB seeks to exercise arises from a legally binding agreement by the state of Belize to submit to arbitration. It is unconditional, apart from the procedural requirement of three months' notice, in the sense that the BIT does not require the fulfillment of any precondition or the exhaustion of any domestic remedies.   It gives rise to an autonomous procedure through which BCB may vindicate rights under international law which are distinct and separate from rights vested as a matter of domestic law. The Court of Appeal was therefore in error when it stated that:

> "… since under Article 8 of the Treaty only disputes which are not amicably settled can be referred to arbitration, the dispute between the appellant and the Government of Belize would not be ripe for arbitration

---

[16] *Mytilineos Holdings SA v the State of Union Serbia & Montenegro and Republic of Serbia* (UNICTRAL, Partial award on jurisdiction 8 September 2006)
[17] *Compania de Aguas del Aconquija SA and Vivendi Universal (formerly Compagnie General des Eaux) v Argentine Republic* ICSID case no ARB/97/3  decision on annulment 3 July 2002

until it is determined whether any assets belonging to the appellant have been lawfully expropriated."

[23]     This is an error which affected the outcome of the case. The courts of Belize do have and retain the jurisdiction to restrain international or foreign arbitral proceedings which are oppressive, vexatious, inequitable, or would constitute an abuse of the legal process. This is a point to which we will return. In this sense there is no unqualified or indefeasible right to arbitrate. Equally, however, there is no requirement to exhaust local remedies before exercising the right to arbitration. Under the doctrine of *kompetenz-kompetenz*, the arbitrators are competent to determine their jurisdiction although the effective exercise of that jurisdiction remains subject to the inherent competence of the court to decide, in relation to an injunction to restrain international arbitration, whether a particular dispute falls within the scope of the arbitration agreement. In the case before us it is clear that the expropriation of Appellant's property fell within the scope of the 1982 Investment Treaty. Article 5 deals specifically with expropriation of investments. The very purpose of the arbitration contract created or generated by the arbitration clause in the investment treaty was to provide for the protection of the investments of foreign investors, among other things, by providing them with a right to pursue disputes about their investments through international and neutral arbitration as an alternative to submitting themselves to the national courts. The standards by which expropriations of investment are to be judged are the standards set out in the investment protection agreement and international law principles and not necessarily those set out in the domestic system of the host State. An expropriation that is perfectly lawful under the national law could nonetheless trigger a successful investment claim under the investment treaty. Any condition to strive for an amicable settlement before initiation of arbitration cannot include an obligation to litigate the constitutionality of the expropriation. There is therefore no requirement that domestic remedies be exhausted before arbitration can be engaged. Whether the arbitrators choose to stay the arbitral proceedings properly brought before them whilst related domestic proceedings are

in train is entirely a matter for them under the doctrine *kompetenz-kompetenz* and the circumstance that arbitrators may do so cannot form an appropriate basis for the domestic court to restrain the arbitration.

## **Should the Court determine the merits of the application for the injunction or only the question of whether there is a serious issue to be tried?**

### **(a) Interlocutory injunctions in international arbitration**

[24]   The jurisdiction to grant an interlocutory injunction is governed by section 27 (1) of the Belize *Supreme Court of Judicature Act*,[18] which is similar to section 45 (1) of the United Kingdom Supreme Court of Judicature (Consolidation) Act 1925 (an Act replaced by subsequent UK legislation). The Court may grant an injunction by an interlocutory order "in all cases where it appears to the Court to be just and convenient to do so."  It is on this statutory provision that the case law was based. *American Cyanamid Co v Ethicon* laid down guidelines that require an applicant for an interlocutory injunction to fulfill three conditions before the court will grant his application, namely, he must show that (1) there is a serious question to be tried, (2) he will suffer irreparable injury, for which damages would not be an adequate remedy,  if refused the interlocutory relief, and (3) the balance of inconvenience resulting from granting or denying the interlocutory relief lies with him rather than with the respondent.

[25]   It was not long before it was understood that it would not be just and convenient to apply that rule inflexibly in all cases. This was clearly expressed by Lord Kerr in *Cambridge Nutrition Ltd v British Broadcasting Corp.*[19]  He said that:

> "It is important to bear in mind that the *American Cyanamid* case contains no principle of universal application. The only such principle is the statutory power of the court to grant injunctions when it is just and convenient to do so. … The American Cyanamid case provides an

---

[18] Cap 91
[19] [1990] 3 All E.R. 523

> authoritative and most helpful approach to cases where the function of the
> court in relation to the grant or refusal of interlocutory injunctions is to
> hold the balance as justly as possible in situations where the substantial
> issues between the parties can only be resolved by a trial."[20]

[26]    There were a number of cases "in which the grant or refusal of an injunction at
that stage would, in effect, dispose of the action finally in favour of whichever
party was successful in the application, because there would be nothing left on
which it was in the unsuccessful party's interest to proceed to trial."[21]
Circumstances could also exist where there is no material dispute over the facts,
and where even at the interlocutory hearing there is already a complete factual
record.  In these cases the *American Cyanamid* reasons for refusing to venture
into the merits of the case, are absent. It is thus now accepted that *American
Cyanamid* does not apply to all domestic applications for interlocutory injunctions
to preserve rights pending trial.[22]

[27]    In this case, there are no factual issues in dispute, and during oral argument,
counsel for the respondent actually stated that there is no further material which
could be presented to the trial court on the full hearing of the matter.  The case
turns on the legal consequence of the existence of the specified proceedings
before the domestic court, and the extent to which it would be vexatious or
oppressive to hear the arbitration simultaneously with or before the hearing of
those proceedings.

[28]    For these reasons alone, the application of the "three-pronged test" laid down in
*American Cyanamid* necessarily resulted in error. In the circumstances of this
case, where all the relevant materials were before it without any complex issues of
facts to be resolved, the court below ought to have decided whether it was just and
convenient to uphold the injunction. The Court of Appeal having decided the

---

[20] [1990] 3 All E.R. 523 (C.A.) at 534 - 535
[21] *N.W.L. Ltd. v. Woods* [1979] 3 All ER 614 at 625 (H.L.).
[22] See e.g., *N.W.L. Ltd v Woods [1979] 3 All ER 614 (HL); RJR – MacDonald Inc. Canada (A.G.) [1994] 1
S.C.R. 311; Miller v Cruikshank (1986) 44 W.I.R. 319;* Jean-Philippe Groleau, "Interlocutory Injunctions:
Revisiting the Three-Pronged Test", (2008) 53 McGill LJ 269.

matter on a wrong principle, this Court cannot now limit itself to a review of that decision but must consider afresh the material before it and make a finding on the merits while observing the underlying statutory power to impose the injunction if it is just and convenient to do so: see *Hadmor Productions Limited v Hamilton and Others*.[23]

## (b)  Was there sufficient basis for granting the injunction restraining the arbitration?

[29]    The Government of Belize contends that the continuation of the arbitral proceedings should be restrained.  It has submitted that it is vexatious or oppressive to pursue those proceedings simultaneously with the domestic proceedings regarding the constitutionality of the acquisition legislation and compensation and the validity of the loan and mortgage facility.  It claims that the multiplicity of proceedings, including the risk of conflicting or overlapping orders renders the process vexatious and oppressive.

[30]    The power to issue an anti-arbitration injunction is contained in the *Supreme Court of Judicature (Amendment) Act 2010* ("the Amendment Act") which amended the *Supreme Court of Judicature Act* by introducing a new section 106A.  The Amendment Act entered into force on 1st April 2010.  Section 106A (8) vests in the Supreme Court power to issue an anti-arbitration injunction and to nullify arbitral awards made in breach of such injunction.  The precise wording of the provision is as follows

> (8) "Without prejudice to the generality of the foregoing provisions, the Court shall have jurisdiction
> (i) to issue an injunction against a party or arbitrators (or both) restraining them from commencing or continuing any arbitral proceedings (whether sited in Belize or abroad), or an injunction against a part restraining it form commencing or continuing any proceedings for enforcement of an arbitral award (whether in Belize or abroad), where it is

---

[23] [1985] 1 AC 191

> shown (in either case) that such proceedings are or would
> be oppressive, vexatious, inequitable or would constitute an
> abuse of the legal or arbitral process;
> (ii) to void and vacate an award made by an arbitral
> tribunal (whether in Belize or abroad) in disregard of or
> contrary to any such injunction."

[31]    Section 106A (8) has had a chequered career. On 22nd December 2010, the
Supreme Court of Belize declared that section 106A (8) was unconstitutional.  On
8th August 2012, the Court of Appeal (by majority) upheld the interim injunction,
that court being careful to base its reasoning, not on the statutory provision which
remained inoperative under the judicial declaration of unconstitutionality, but
rather on common law and equity. Following that judgment, however, the
constitutionality of section 106A (8) was restored by a unanimous Court of
Appeal in *Zuniga et al v Attorney General of Belize and others* on 8th August
2012.  The provision is, therefore, the current law of Belize but it should be noted
an appeal from the decision in *Zuniga* is currently under review before this Court.

[32]    The instant case is exclusively concerned with a limited aspect of the power in
section 106A (8), namely, the power to restrain a party from proceeding with a
foreign arbitration proceedings on the ground that such proceedings would be
oppressive, vexatious, inequitable, or would constitute an abuse of the legal or
arbitral process.  The concepts of "oppression", "vexation", "inequity" and "abuse
of process" have been known to the common law and equity for centuries, being
the primary theories used by the court to regulate its process pursuant to its the
inherent jurisdiction.  In giving its unanimous judgment in *Zuniga* the Court of
Appeal ruled that  with the exception of the power to restrain an arbitration on the
ground that its continuation would be an abuse of the arbitral process,  the section
did not make significant changes in the common law that had been applicable
prior to its passage.  It concluded that the concept of inequity had been embraced
within the framework of vexation and oppression.  Moreover, the extreme caution
which the Supreme Court has traditionally exercised in granting such injunctions
is not displaced by section 106A (8) either.  This is in recognition in part of the

fact that the parties have voluntarily chosen to settle their disputes by arbitration and that the arbitrator is competent to determine matters concerning his or her own jurisdiction. We accept this as the current statement of the law of Belize on this matter subject to the outcome of the appeal to be heard by us.

[33]   The concepts of vexation and oppression are derived from the old common law cases of *McHenry v Lewis*,[24] *Peruvian Guano co v Bockwoldt*,[25] and *Hyman v Helm*[26] and are elucidated by two examples from Jessel MR in the *Peruvian* case; namely, one of pure vexation where the proceedings are so absurd that they cannot succeed, and the other where there is no intention to harass or annoy but the litigant seeks some fanciful advantage by suing in two courts at the same time under the same jurisdiction.  But it would not be vexatious to bring an action in each country where there are substantial reasons of benefit to the plaintiff.  There is no presumption that a multiplicity of proceedings is vexatious, or that proceedings are vexatious merely because they are brought in an inconvenient place.

[34]   Proceedings may be restrained not only because they are vexatious in the sense of being frivolous or useless but also because they are oppressive.  An example of oppression occurs where a litigant may be encouraged to pursue proceedings in a forum, having no connection with the subject matter of the dispute, by inducements of enhanced remedies including punitive damages. In normal circumstances, the widely recognized principle of *forum non conveniens* will apply but the court will restrain proceedings where a party acting under the colour of seeking justice acts in a way which necessarily creates injustice to others: see *Castanho v Brown & Root*[27] and *Spiliado Maritime Corporation v Consulex Ltd*.[28]

[35]   Moreover since the courts are concerned with the ends of justice, account must be taken not only of the injustice to the defendant if the plaintiff is allowed to pursue

---

[24] McHenry v. Lewis. [1881 N. 2327.] - (1882) 22 Ch.D. 397
[25] *Peruvian Guano Co v Bockwoldt and others* - [1881-85] All ER Rep 715
[26] *Hyman v. Helm.* [1882 H. 4284.] - (1883) 24 Ch.D. 531
[27] *Castanho v Brown and Root (UK) Ltd* [1981] AC 557, [1981] 1 All ER 143
[28] *Spiliado Maritime Corporation v Consulex Ltd* . [1986] 3 All ER 843

the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. So the courts will not grant an injunction if by doing so they will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him. This problem can be overcome by appropriate undertakings or granting appropriate terms for the order.

[36]   Lord Goff's opinion in *Societe National Industrielle Aerospatiale v Lee Kui Jak*[29] is now generally accepted as clarifying the law in England with regard to the granting of orders restraining the continuation of proceedings in a foreign jurisdiction while there are domestic proceedings pending. The jurisdiction is to be exercised when the ends of justice require it. The order is not made against the foreign court but against the parties proceeding or threatening to proceed. An injunction will only be issued against a party who is amenable to the jurisdiction of the court; and that since such an order indirectly affects the foreign court, the jurisdiction must be exercised with caution. There is another line of cases starting with *British Airways v Laker,*[30] not argued before us, but nonetheless relevant because it sheds light on the concepts of inequity, unconscionable conduct and abuse of process. The case law was examined and the principles explained by Lord Hobhouse in *Turner v Grovit.*[31]   In brief, his speech reaffirmed the principles set out in the speech of Lord Goff in *Lee Kui Jak*. He went on to explain them in the context of the equitable origins of jurisdiction to grant injunctions. In that sense, the power to make the order is dependent upon there being wrongful conduct of the party to be restrained which the applicant has a legitimate interest in seeking to prevent. Lord Hobhouse suggested that the concept of unconscionable conduct embraced other tests like vexation and oppression and abuse of process, although his speech carries the implication of an additional element of wrongful conduct of the person to be restrained.

---

[29] [1987] AC 871
[30] *British Airways v Laker* (1985) AC 58
[31] *Turner v Grovit and others* [2001] UKHL 65

[37]    The Court exercises heightened vigilance when asked to restrain international arbitration because the parties have contracted to arbitrate their dispute. The acceptance of international arbitration has a long and respected genealogy. In the 19th Century Lord Watson declared that the law has, "from the earliest of times, permitted private parties to exclude the merits of any dispute between them from consideration of the Court by simply naming their arbiter": *Hamlyn & Co. v Talisker Distillery*.[32] In numerous cases an injunction to restrain foreign arbitral or judicial proceedings was refused and instead the English action was stayed in order to force the parties to abide by their agreement to litigate in the foreign arbitration or the foreign court. The fact that there had been the instigation of domestic proceedings was never a reason to allow a party to renege on the bargain to litigate abroad. Even in the ordinary case of concurrent proceedings (i.e., where the parties had not expressly agreed to the foreign trial) the concurrency of local and foreign actions did not necessarily make the foreign action vexatious or oppressive.[33]

[38]    The approach to modern arbitration agreements contained in investment treaties is for the court to support, so far as possible, the bargain for international arbitration.[34] Belizean cases have affirmed that it is "only with extreme hesitation" that the court will interfere with the process of arbitration.[35]

[39]    What then are the specific principles governing the circumstances when the court will, in exceptional circumstances grant an injunction restraining international or foreign arbitration? The nature of the exceptional circumstances was considered in the case of *Elektrim S.A. v Vivendi Universal S.A.*.[36]  The court held that there

---

[32] [1894] AC 202 at 214
[33] *McHenry v Lewis* (1882) 22 Ch.D 397; *Peruvian Guano Co. Bockwold* (1883) 23 Ch.D 225; *Cohen v Rotherfield* [1918] 1 KB 410
[34] *Channel Group v. Balfour Beatty Ltd.* [1993] A.C. 334, at 341 per Lord Brown-Wilkinson; *Occidental Exploration and Production Co. v The Republic of Ecuador* [2005] EWCA Civ. 1116, at paragraph 32 per Mance LJ; *Carter Holt Harvey Limited v Genesis Power Limited and Rolls Royce New Zealand Limited* (Civ-2001-404-1974, Judgment delivered on 22 February 2006 per Randerson J.
[35] *The Attorney General of Belize v Carlisle Holdings Limited* (Claim No. 15 of 2005) (Conteh CJ); see also (*Belize Telemedia Limited v Attorney General of Belize* (Claim No. 317 of 2008) (Conteh CJ)
[36] *Elektrim SA v Vivendi Universal SA and others* [2007] EWHC 571 (Comm)

were only two bases on which an injunction to restrain an international arbitration could be granted:

> "First, if the proceedings are an infringement of a legal or equitable right of a party; secondly where those proceedings are vexatious, oppressive unconscionable. The first analysis is usually applied to cases where the parties have contractually agreed to submit disputes to a particular court or arbitration and one party has started proceedings in breach of that agreement. The second analysis applies where there is not such agreement but the court concluded that the ends of justice require an injunction to restrain foreign proceedings that are vexatious or oppressive."

A party is, therefore at liberty to challenge the validity of the arbitration contract or the agreement of which the arbitration contract is an integral and non-severable part.  But once the validity of the arbitration bargain has been established the court will only grant an injunction to restrain the arbitration if it is positively shown that the arbitration proceedings would be oppressive, vexatious, inequitable, or an abuse of process.  The burden is on the party seeking the injunction and he must discharge that burden to a higher level than that required to restrain foreign proceedings which do not involve a contract to litigate in the foreign court.

[40]   In applying these principles to the instant case, the factual basis for the finding of vexation or oppression was that there were a multiplicity of proceedings and that those in the domestic courts should be completed first.   The case law has elucidated that there is no presumption that the pursuit of multiple proceedings is vexatious or oppressive or an abuse of process in itself, nor is there vexation or oppression if there is an advantage to the party seeking the arbitral proceeding: *Lee Kui Jak*.  This was further clarified in the case of *Elektrim* where Aikens J said:

> ".... can Elektrim demonstrate that continuation of the LCIA. Arbitration now that the ICC arbitration has started is oppressive or vexatious? The only basis on which it can seriously do so is by asserting that it should not

have to face two arbitrations at once. However, it is clear that the two arbitrations concern different subject matters. The LCIA arbitration is dealing with disputes concerning the TIA. The ICC arbitration is dealing with disputes concerning the Settlement Agreement. Neither arbitration could deal with the subject matter of the disputes that is being dealt with by the other.  Both arbitrations were started pursuant to contracts."[37]

[41]    The principles that are to be applied to the case before us are the following. The provisions in section 106A (8) (i) of the Supreme Court of Judicature Act of Belize, as they currently stand, are applicable. In a case where the substantive remedy is the grant of the injunction the principles in making an order for an interim injunction are much the same as those governing the making of the final order and the primary power is to make the order where it is just and convenient to do so.  In a case where there is no significant dispute on the facts and the record before the court is materially complete the court should in the interests of doing justice consider the merits, at least in a preliminary manner, to determine whether there are any violations of the rights of the claimant and not limit itself to determining whether there is a serious issue as to whether there could be such a violation.   In particular, the jurisdiction to grant an anti-arbitration injunction must be exercised with caution and only granted if the arbitral proceedings are vexatious or oppressive.  Proceedings could be vexatious where they are absurd or the litigant seeks some fanciful advantage by suing in two courts at the same time but they would not be so held where there are substantial reasons of benefit to the plaintiff to bring the two sets of proceedings. There is no presumption that a multiplicity of proceedings, or that merely bringing the proceeding in an inconvenient place, is vexatious. In normal circumstances the widely recognized principle of forum *non conveniens* will apply but in anti-arbitration injunctions cases the mere fact that the court is the natural forum for the case is not sufficient for it to grant the injunction.  The equitable basis of the jurisdiction makes it a remedy based on the wrongful conduct of the person to be restrained. In cases of restraining international arbitration proceedings, the court must re-double the caution it normally exercises in restraining foreign proceedings because of the

---

[37] *Elektrim SA v Vivendi Universal SA and others* [2007] EWHC 571 (Comm) at [65]

importance of recognizing and enforcing the agreement of parties to the mechanism for dispute resolution and the accepted principle of international law that the arbitral tribunal should not be subjected to the control of the domestic courts before it makes an award. There is a role in the undertaking for damages in supporting the refusal of an injunction.

[42]   The factual matrix on which the GOB case was built was that it was vexatious or oppressive to continue with the arbitration before related domestic proceedings were completed. The anti-arbitration injunction was said to be required to avoid the inconvenience and expense of having to participate in the foreign arbitration proceedings when aspects of the dispute could be resolved which may impact on the arbitral proceedings, minimizing the risk of inconsistent awards which could prejudice GOB by risking double compensation. Domestic litigation could also make the arbitration unnecessary. The proceedings are *Suite 874 of 2009*; *Suit 360 of 2011 AG and Telemedia v BCB;*[38] *Claim 597 of 2011 BCB v AG;*[39] and the claim for compensation under the 2011 acquisition legislation.

[43]   In *Claim 874 of 2009* the Appellants had sought declarations that the 2009 legislation compulsorily acquiring their property was unconstitutional null and void, and the award of punitive damages.  The Appellant was unsuccessful in the High Court but prevailed in the decision of the Court of Appeal handed down on 24th June 2010, where the Act was condemned as unconstitutional, null and void. Apart from costs the Court of Appeal awarded no consequential relief no doubt believing that the Government would respect all the consequences of the legislation being declared void.  That was not to be. BCB appealed, ultimately to this Court, for relief consequential upon the decision of the Court of Appeal.  A majority in this Court declared a "stay of the appeals pending the outcome of the challenge in the normal manner to the 2011 legislation."  In the circumstances,

---

[38] *The Attorney General* of Belize *and Belize Telemedia* v. *The British Caribbean Bank,* Claim No.  360 of 2011

[39] *The British Caribbean Bank v. The Attorney General* of Belize and *The Minister of Public Utilities* Claim No. 597 of 2011

this action by the Appellant cannot in any good conscience be said to constitute vexatious or oppressive conduct so as to justify the restraint of their right to go to international arbitration.  Neither could it in conscience be said that recourse to arbitration was abusive in light of the circumstances attending this action undertaken in Belize.

[44]   *Suit 360 of 2011 AG* and *Telemedia v BCB* is the case in which GOB applied to have the loan and mortgage facilities declared invalid on the ground that it was used for an unlawful purpose. It contends that there is a risk that the loan may be declared illegal by the domestic court after the arbitral tribunal has made an award for compensation.  This would prejudice the GOB because it could have to pay compensation for property which it did not get.  A declaration of invalidity would entitle Telemedia to refuse to repay the loan for which GOB may have had to pay compensation to BCB.  *Suit 597 of 2011*[40] is a challenge to the 2011 Acquisition Legislation, 2011 Order, and Constitutional Amendment Legislation for failing to meet the requirements of the Belize constitution.  GOB contends that it could be prejudiced if the arbitral tribunal awards compensation for the expropriation of the property and in the constitutional proceedings the expropriation is declared to be unlawful and the court orders the return of the property conferring double benefit on BCB.  The fourth and final proceeding that was alleged in this context was the claim for compensation under the 2011 Acquisition Legislation by letter to the financial secretary. This is not, however, a proceeding before the courts. The law required BCB to file a claim for compensation within specified time limits.  This claim could be no more than ancillary to the constitutional claim.  It was filed without prejudice to the arbitral proceedings.

[45]   In the case before us there are many advantages to BCB to pursue the arbitral proceedings because the relief it seeks for breach of the BIT is qualitatively different from the relief it could obtain from the domestic courts.  The fact that it

---

[40] *The British Caribbean Bank v. The Attorney General* of Belize and *The Minister of Public Utilities Claim No. 597 of 2011*

may be inconvenient or expensive for GOB to litigate before the arbitral tribunal is not an issue that could justify a finding of vexation or oppression.

[46]    The subject matter of the claims before the arbitration is qualitatively different from the claims regarding the constitutionality of the acquisition legislation and the validity of the loan and mortgage facilities. The arbitral claims are for compensation for breach of BCB's rights under the BIT in international law.  It is common ground that the arbitral tribunal does not have jurisdiction to make any declarations under the Constitution. The cause of action before the tribunal is breach of the BIT, not breach of the Constitution or existing legislation.  Similar principles apply to the validity of the loan and mortgage facilities, although in this case, the validity of the loan itself must be a matter within the ambit of the arbitration to which the parties had freely entered as BCB must be able to establish that it owned the property allegedly expropriated.

[47]    There can be no doubt that there is benefit to BCB in going to arbitration.  The rights that it alleges were violated exceed the rights it might have under the Constitution.  The entire scheme of the BIT is contractual and it is clear that Belize consented to the international arbitration as the method of dispute resolution under the BIT.  The likelihood that either the court or the tribunal would make an order that would afford BCB double relief or impose a double jeopardy on the GOB is remote. It would be contrary to elementary judicial principles that would be applied by both the arbitral tribunal and the domestic court.

[48]    In *suit 360 of 2010*, there is no allegation of a wrongful act by BCB.  It was GOB who made the acquisition order and then brought this action in August 2010 after the arbitration was commenced in May 2010. There was no contention that the claims as to the validity of the loan could not be taken before the arbitral tribunal which was already operational at the time the suit was launched.  As we have already discussed, there is no obligation for matters to be resolved by the

domestic court before the commencement of the arbitral proceedings.   It is beyond dispute that BCB had undertaken a step it was entitled to take.

[49]   GOB contended that there was abuse of process and inequity because BCB applied for and obtained with the consent of the GOB a stay of those proceedings until the conclusion of the constitutional case tying up those proceedings while intending to proceed with the arbitration.   However, it was common ground that the GOB would have no standing in the constitutional action if the acquisition was invalid, so it was logical for that action to be determined before the hearing of the arbitration otherwise the parties would have to advocate that same issue in both proceedings.   On a purely factual basis, therefore, there seems to be no conduct of BCB in relation to this action which could support a conclusion of vexatious or oppressive conduct.

**The Undertaking**

[50]   BCB has offered that if the injunction issued by the Court of Appeal is discharged, it would suspend proceedings under the statutory claim and ensure that there will be no double recovery.   It reserved the right to proceed, however, if the arbitrators declined jurisdiction or in the event that it received any award that was not paid within 90 days.

[51]   The giving of undertakings of this kind is scarcely foreign in international commercial disputes. Neither does it reflect adversely upon the sovereignty of domestic judicial decision-making if it is borne in mind that the undertaking is meant to facilitate trial of the dispute in accordance with agreement of the parties. As early as the turn of the Twentieth Century an undertaking was accepted by an English court as part of the measures that facilitated a stay of English proceedings in favour of enforcing the agreement by the parties to litigate their dispute in a German Court: *Kirchner & Co. v Gruban.*[41]   An undertaking was accepted in

---

[41] [1909] 1 Ch. 413 at 423

*Jarvis and Sons Limited v Blue Circle Dartford Estates Limited*[42] to reduce the risk that concurrent proceedings in England and in the foreign arbitration could result in the party that was resisting arbitration being mulcted in damages twice over.  In light of that undertaking the court held that risks posed by the concurrent proceedings were now so low that the arbitration could not be characterized as oppressive.  It is significant in the case before us that a majority in the Court of Appeal accepted that the undertaking by the Appellant nullified any vexation or oppression that might otherwise be caused by the simultaneous pursuit of the arbitration and the local claim for compensation, although Mendes JA qualified his acceptance in an important regard which we must now address.

[52]    When the matter was being considered, the Court of Appeal accepted that the undertaking nullified any vexation or oppression in respect of the statutory claim for compensation.  But it also  concluded that the undertaking would not  avoid: a) the paradox of arbitrating over the quantum of compensation when one would not yet know whether the property will or will not be returned to BCB; and b) the risk of inconsistent decisions as to the validity of the loan. The consideration of these issues resulted from the erroneous approach of the Court of Appeal limiting its determination to whether there was an arguable case of oppression or vexation. These considerations would not have any significance in rejecting the offer of the undertaking had the court considered whether the case for vexation or oppression had been made out. The undertaking against receiving double damages is merely an additional protection to GOB.  In the circumstances, the Court of Appeal erred in not concluding that the undertaking properly worded would further minimize the risk of double recovery and any prejudice that may result from that circumstance.

[53]    Under the doctrine of *kompetenz-kompetenz* the arbitrators are competent to determine their jurisdiction although the effective exercise of that jurisdiction remains subject to the inherent competence of the court to decide, in relation to an

---

[42] [2007] EWHC 1262 (at paras. 27-29, 44

injunction to restrain international arbitration, whether a particular dispute falls within the scope the arbitration agreement.

[54]   Admittedly, the ostensibly odd situation could arise whereby litigation in the domestic courts produces results that are incongruous with the results of arbitration. In the present dispute, for example, it may be that if concurrent proceedings were to run their course, the arbitral tribunal could award compensation for the expropriation of the Appellant's property whilst the Belizean courts subsequently nullified the legislation under which property was expropriated and order the return of the property to the Appellant as its rightful owner. Quite apart from any undertaking given it would appear that the doctrine of estoppel and/or unjust enrichment would operate to prevent double dipping. For this reason it is not now necessary to extract the undertakings discussed in the Court of Appeal. The Appellant will be stuck with the remedy first received, or, if the equity of the situation so required, be put to his election.

## Costs

[55]   The Court of Appeal made an order nisi that the Respondent should have 80% of his costs, certified fit for three counsel, including two Senior Counsel. That order was later made absolute. Before this Court the parties have made written submissions on costs. BCB has argued that having pointed out several errors of the Court of Appeal, it should have its costs before this Court and also before the Court of Appeal.  GOB has submitted that the costs order was the exercise of a careful discretion made after investigation and submissions and should not be disturbed. We have noted that BCB did not address one of the determinative features of the appeal that is the applicable threshold for the court to award the injunction in any detail, if at all. Had this been a plank of their armoury it may have prevented the Court of Appeal from slipping into error on this decisive area of the case.  In these circumstances, justice will be done if the order of the Court

of Appeal on costs is set aside and no order as to costs is made to replace it.  GOB must pay the costs of appeal before this Court.

**Disposition**

[56]   For the reasons given above, the orders of the Court of Appeal are set aside.  The interlocutory injunction is discharged with costs.

_____
**The Rt Hon Sir Dennis Byron (President)**


_____          _____
**The Hon Mr Justice A Saunders**              **The Hon Mme. Justice D. Bernard**


_____          _____
**The Hon Mr Justice J Wit**                       **The Hon Mr Justice W Anderson**