**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BCB HOLDINGS LIMITED and | ) |
| THE BELIZE BANK LIMITED, | ) |
| | ) |
| Petitioners/Plaintiffs, | ) Case No. |
| | ) |
| v. | ) |
| | ) |
| THE GOVERNMENT OF BELIZE, | ) |
| | ) |
| Respondent/Defendant. | ) |
| | ) |

## DECLARATION OF LOUIS B. KIMMELMAN

LOUIS B. KIMMELMAN declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.  I am a partner of the law firm Sidley Austin LLP, counsel of record for Petitioners BCB Holdings Limited ("BCB Holdings") and The Belize Bank Limited ("BBL") (collectively, "Petitioners") in this proceeding.

2.  I submit this declaration in support of Petitioners' Petition to Confirm a Foreign Arbitration Award pursuant to Section 207 of the Federal Arbitration Act, 9 U.S.C. § 207, and Article III of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958.

3.  I am fully familiar with the facts set forth herein.

4.  On August 20, 2009, an arbitral tribunal of three arbitrators in London, England, rendered a unanimous final award (the "Award") in the arbitration commenced by Petitioners against the Government of Belize (the "GOB") before the London Court of International Arbitration (the "LCIA").  A true and correct copy of a certified copy of the Award is attached hereto as Exhibit A.

**The Settlement Deed**

     5.     As set forth in the Award, BCB Holdings (then known as Carlisle Holdings Limited) and the GOB entered into a Settlement Deed on March 22, 2005, which was subsequently amended on June 21, 2006 (collectively, the "Settlement Deed"). A true and correct copy of the Settlement Deed is attached hereto as Exhibit B. The Settlement Deed resolved an existing dispute between BCB Holdings and the GOB.

     6.     Pursuant to Clause 8 of the Settlement Deed, BBL has the power to enforce the Settlement Deed. Clause 8.1 states:

> "8.1    The [GOB] expressly acknowledge[s] that any member of the Carlisle Group which is not a party to this deed (in particular but not limited to The Belize Bank Limited) shall be entitled to enforce the terms of this deed (in particular clause 4) against any party to this deed in accordance with the Contract (Rights of Third Parties) Act 1999."

Exhibit B (Settlement Deed), Clause 8.1.

     7.     In the Settlement Deed, the GOB agreed to arbitrate all disputes with Petitioners pursuant to the arbitration rules of the LCIA in London, England. Exhibit B (Settlement Deed), Clause 11. A true and correct copy of the agreement to arbitrate between the GOB and Petitioners is set forth in Clauses 11.2-11.4 of the Settlement Deed and states:

> "11.2  Any dispute arising out of or in connection with this deed including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this clause. The number of arbitrators shall be 3 (one appointed by each Party and the third appointed jointly by the two Parties' arbitrators).
>
> 11.3    The arbitral proceedings shall be conducted in the English language.

11.4    The seat or legal place of the arbitral proceedings shall be London, England."

Exhibit B (Settlement Deed), Clauses 11.2 – 11.4.

8.      The GOB explicitly waived its immunity from suit with respect to its obligations under the Settlement Deed.  Clause 11.5 of the Settlement Deed states:

"The Government irrevocably and unconditionally:

(a)    agrees that if Carlisle [now called BCB Holdings] brings proceedings against it or its assets in relation to this deed no immunity from such legal proceedings (which will be deemed to include without limitation, suit, attachment prior to judgment, other attachment, the obtaining of judgment, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

(b)    waives any such right of immunity which it or its assets now has or may in the future acquire; and

(c)    consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with such proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any award, order or judgment which may be made or given in arbitration proceedings or related enforcement proceedings."

The GOB has therefore waived sovereign immunity as to this proceeding to confirm an arbitration award rendered with respect to the GOB's obligations under the Settlement Deed.

## The Arbitration

9.      The dispute addressed in the Award arose principally out of Clauses 4.1 and 4.2 of the Settlement Deed.  Pursuant to those clauses, the GOB warranted that (i) BBL could offset overpayment of business tax against future business tax payments rather than deducting such overpayments as an expense against revenues; and that (ii) the Petitioners would be indemnified against all costs, expenses, losses and damages incurred by them arising out of or

in connection with any breach of the warranties given with respect to this tax treatment (the "Indemnity Clause").  *See* Exhibit A (Award) ¶¶ 26-52.

10.     Following a general election in February 2008, there was a change in political control in the GOB.  In August 2008, the Belize Commissioner of Income Tax (the "Commissioner") rejected tax returns that had been filed by BBL under the previous government in accordance with the tax treatment provided for in the Settlement Deed.  The Commissioner expressly rejected the tax treatment outlined in the Settlement Deed and would not accept the returns as filed.

11.     Petitioners considered this rejection to be a repudiation of the Settlement Deed. In accordance with the arbitration clause in the Settlement Deed, Petitioners commenced arbitration against the GOB before the LCIA on October 16, 2008.  Petitioners sought: (i) a declaration that the Settlement Deed was terminated as a result of the GOB's repudiatory breach, (ii) damages for such breach, and (iii) an award of costs, expenses, losses and damages resulting from the breach in accordance with the Indemnity Clause in the Settlement Deed.  *Id.* ¶¶ 93-144.

12.     The GOB did not submit a response or participate in the arbitration at any time.

13.     The arbitral tribunal was duly constituted with Mr. Michael J. Lee nominated by Petitioners (and appointed by the LCIA) and Mr. Salim Moollan appointed by the LCIA, given the GOB's failure to nominate an arbitrator.  The co-arbitrators agreed to select Mr. Carl F. Salans as the third and presiding arbitrator, and he was appointed by the LCIA.

**The Award**

14.     The arbitration hearing took place on June 18, 2009.

15.     The Award was issued by the LCIA on August 20, 2009.  The arbitral tribunal concluded that in the Settlement Deed the GOB had promised to provide certain

treatment with respect to the payment of business and income taxes by BCB Holdings Group. *Id.* ¶ 97. The arbitral tribunal concluded that "[i]n refusing to accept [Petitioners'] tax returns based on this treatment, Respondent [GOB] breached its contractual warranty and clearly evinced its intention not to honour the agreement. This amounted to a repudiatory breach on the [GOB's] part, which entitled [Petitioners] to consider that the Settlement Deeded as Amended was discharged and to terminate it, which they lawfully did by their letter of 15 October 2008." *Id.* The arbitral tribunal rendered a damages award in favor of Petitioners for breach of contract and ordered the GOB to pay Petitioners BZ$40,843,272.34, plus interest and costs. *See id.* ¶¶ 118, 145-150.

**The Award Enforcement Proceedings in Belize**

16.     Immediately after receiving the Award, on August 21, 2009, Petitioners commenced proceedings to enforce the Award against the GOB in Belize. The GOB opposed enforcement on various grounds, including that enforcement of the Award would be contrary to the law and public policy of Belize.

17.     On December 22, 2010, the Supreme Court of Belize enforced the Award. The Supreme Court of Belize concluded that the tax matters referred to in the Settlement Deed were arbitrable. The court rejected the GOB's public policy argument as a political position taken by the new administration following a change of government.

18.     On January 5, 2011, the GOB appealed this decision. In addition to the arguments initially made by the GOB in opposing enforcement of the Award, the GOB further argued that Part IV of the Belize Arbitration Act Chapter, which provides for enforcement of arbitration awards in Belize under the New York Convention, was enacted *ultra vires* and thus does not apply in Belize.

19.     On August 8, 2012, the Belize Court of Appeals issued a decision finding that Part IV of the Belize Arbitration Act Chapter was *ultra vires* and therefore void.  As a result, the Belize Court of Appeals refused enforcement of the Award.

20.     Petitioners appealed this decision to the Caribbean Court of Justice (the "CCJ"), the highest court of appeal for Belize.  On July 26, 2013, the CCJ issued a final judgment regarding the enforceability of the Award.  A true and correct copy of the CCJ decision dated July 26, 2013, is attached hereto as Exhibit C.  The CCJ concluded that implementation of the provisions of the Settlement Deed, without legislative approval, was "repugnant to the established legal order of Belize."  Exhibit C ¶ 53.  While the CCJ criticized the GOB for "treat[ing] with indifference the arbitral process to which it had agreed," the court found that the underlying Settlement Deed was invalid because it had not been approved by Parliament.  *Id.* ¶ 55.  The CCJ refused enforcement of the Award.

**The Award Enforcement Proceedings in London, England**

21.     On February 26, 2013, Petitioners filed an application before the English High Court of Justice, Queen's Bench Division, Commercial Court (the "English High Court") to enforce the Award as an English court judgment pursuant to Section 66 of the English Arbitration Act 1996.

22.     On February 26, 2013, the English High Court issued both an Order and a Judgment with respect to the enforcement of the Award.  A true and correct copy of the Order of the English High Court dated February 26, 2013 is attached hereto as Exhibit D.

23.     The Order of the English High Court states that Petitioners "be at liberty to enforce the Final Award…." and that "the costs of this arbitration claim and of the judgment entered hereunder be paid" by the GOB.  Exhibit D.

24.     The Judgment of the English High Court declares and adjudges, *inter alia*, that Petitioners are entitled to damages in the amount of BZ$40,843,272.24, that Petitioners are entitled to reimbursement of the costs of the arbitration fixed by the LCIA, and that Petitioners "are also entitled to the legal, professional and other arbitration costs which they have incurred as a result of the Defendant's breach." A true and correct copy of the Judgment of the English High Court dated February 26, 2013 is attached hereto as Exhibit E.

**The Belize 2010 Criminal Statute**

25.     As described in the accompanying Declaration of Eamon H. Courtenay dated June 26, 2014 (the "Courtenay Declaration"), Belize enacted a new criminal law on March 31, 2010 that imposed mandatory criminal penalties on those who disobeyed or failed to comply with an injunction issued by the Supreme Court of Belize and also on any person who "directly or indirectly . . . counsels . . . advises or in any manner whatsoever aids, facilitates, or encourages" a violation of an injunction."  Courtenay Declaration ¶ 38.

26.     At that time, I was the partner of the law firm Allen & Overy LLP responsible for representing Belize Social Development Limited ("BSDL") in an arbitration award enforcement proceeding against the GOB in this Court.  That proceeding was filed on November 17, 2009 and was captioned *Belize Social Development Limited v. The Government of Belize*, Civil Action No. 09-2170 (RJL).  A true and correct copy of the docket sheet for that case is attached hereto as Exhibit F.

27.     On March 29, 2010, the GOB filed papers in opposition to BSDL's award enforcement proceeding, including a motion to stay the action.  Among those papers was a declaration of Michael C. Young, a Senior Counsel for the GOB in Belize.

28.     In order to respond to the declaration submitted by Mr. Young, I requested assistance from Mr. Eamon Courtenay, a Senior Counsel in Belize, who had represented parties

adverse to the GOB in Belize.  I wrote to Mr. Courtenay on April 27, 2010 requesting assistance, enclosing a copy of the declaration submitted by Mr. Young.  A copy of my letter to Mr. Courtenay is attached as Exhibit O to the Courtenay Declaration.

29.     On May 14, 2010, Mr. Courtenay responded to my request.  He stated that after seeking advice from counsel, he was unable to provide assistance because of the 2010 Criminal Statute.  A copy of Mr. Courtenay's response is attached as Exhibit P to the Courtenay Declaration.  As a result, BSDL would not be able to respond to the declaration filed by the GOB.

30.     Based on this response from Belize counsel and the breadth and scope of the 2010 Criminal Statute, BSDL filed a motion on May 25, 2010 to suspend the scheduling order and for a status conference in the pending case.  A true and correct copy of BSDL's May 25, 2010 Motion to Suspend is attached hereto as Exhibit G.   In that motion, BSDL informed the Court of the 2010 Criminal Statute (and attached a copy of the new law) and advised the Court that "[i]t appears that the new law purports to apply to BSDL's attorneys appearing before this Court in this proceeding."  Exhibit G, p. 3.  BSDL concluded:

> "As a result, it would appear that the filing of papers by counsel for BSDL on May 28, 2010 in accordance with the Court's Minute Order dated April 14, 2010 would be deemed by Respondent GoB to be a criminal offense.  Counsel for BSDL does not want to do anything that would be deemed a violation of any valid and enforceable law.  Accordingly, counsel for Petitioner respectfully requests that the Court suspend the Scheduling Order of April 14, 2010 and schedule a status conference with the parties."

*Id.*

31.     The GOB opposed this motion.  *See* Exhibit F docket entry 22.

32.     On June 21, 2010, the district court denied the motion in a minute order without any explanation.  *See* Exhibit F.

8

33. On June 24, 2010, BSDL filed a Motion to Clarify the June 21, 2010 Minute Order to Ensure a Fair Hearing. *See* Exhibit F, docket entry 26. The purpose of this motion was to ensure BSDL an opportunity for a full and fair hearing on the merits of the dispute.

34. The GOB opposed this motion. *See* Exhibit F, docket entry 27.

35. The district court also denied this motion in a minute order dated October 18, 2010. *See* Exhibit F. At the same time, the district court granted the relief requested by the GOB, an order staying BSDL's arbitration award enforcement proceeding in a minute order dated October 18, 2010. *See* Exhibit F.

36. BSDL appealed from the district court's stay order. The stay order was effectively vacated by the Court of Appeals when it granted a writ of mandamus on January 13, 2012. *Belize Social Development Ltd. v. Government of Belize*, 668 F.3d 724 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 274 (2012). The D.C. Circuit stated in its opinion with regard to the threat of criminal sanctions:

> "Instead of filing an opposition to the motion for a stay, BSDL filed a motion to suspend the scheduling order and for a status conference, advising the district court that its failure to respond was based not on agreement that a stay was warranted but on fear of criminal sanctions for violation of the anti-enforcement injunction issued by the Supreme Court of Belize."

*Belize Social Development Ltd.*, 668 F.3d at 733.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 27, 2014 in New York, New York.

Louis B. Kimmelman

# Kimmelman Declaration

# Exhibit A

# LONDON COURT OF INTERNATIONAL ARBITRATION

### Arbitration N° 81169

---

## FINAL AWARD

---

BCB Holdings Limited; and The Belize Bank Limited

Claimants

v.

The Attorney-General of Belize (on behalf of the Government of Belize)

Respondent

LONDON COURT OF INTERNATIONAL ARBITRATION
Certified true copy of original

*James Ansbury* LCIA Registrar

Place of Arbitration: London, The United Kingdom   Date _20 August 2009_

Date : 18 August 2009

# Table of contents

I.   The Parties and their Counsel .................................................................................3

II.  The Arbitral Tribunal ............................................................................................5

III. The Contracts and Arbitration Agreement.........................................................6

IV.  The Arbitral Procedure ........................................................................................12

V.   The Positions of the Parties on the Merits .......................................................21

    Claimants' Position.................................................................................................21
    Respondent's Position............................................................................................28

VI.  DISCUSSION .........................................................................................................31

    A.   Jurisdiction ..................................................................................................31
    B.   Arbitrability.................................................................................................34
    C.   Law Applicable to the Merits....................................................................38
    D.   Authority of the Government to Enter Into the Settlement Deed as
        Amended – Illegality ...................................................................................38
    E.   Repudiatory Breach of Contract / Entitlement to Terminate.................47
    F.   Damages .......................................................................................................48
    G.   Costs .............................................................................................................59
    H.   Interest .........................................................................................................66
    I.   Other Claims ...............................................................................................69

VII. AWARD ....................................................................................................................70

# FINAL AWARD

## I.    The Parties and their Counsel

1.    The Parties to the present arbitration are:

### Claimants

BCB Holdings Limited, a company registered in Belize whose registered office is 60 Market Square, Belize City, Belize, Central America (Tel: 501 227 0697; Fax: 501 227 0983).  At the outset of this arbitration, this company's name was BB Holdings Limited [hereafter, "**BB Holdings**"]; but on 26 May 2009 it changed its name to BCB Holdings Limited.[1]  [hereafter, "**BCB Holdings**"]

The Belize Bank Limited, a company registered in Belize whose registered office is also 60 Market Square, Belize City, Belize, Central America (Tel: 501 227 0697; Fax: 501 227 0983). [hereafter, "**BBL**"]

Together referred to as "**Claimants**".

### Respondent

The Government of Belize, represented by the Attorney-General whose address and other contact details are: The Attorney-General, New Administration Building,

---

[1] See Belize City Registrar of International Business Companies Certificate of Name Change submitted by Claimants in their letter of 3 August 2009.

Belmopan Cayo, Belize, Central America (Tel: 501 822 2154; Fax: 501 822 3390).
[hereafter, the **"Government of Belize"** or **"Respondent"**]

Claimants and Respondent together referred to as the **"Parties"**.

2.  Claimants are represented in this arbitration by the law firm, Allen & Overy LLP, One
Bishops Square, London E1 6AD, United Kingdom (Tel: 44 (0)20 3088 0000; Fax:
44 (0)20 3088 0088), for the attention of:

Judith Gill (*Judith.gill@allenovery.com*),

Matthew Gearing (*matthew.gearing@allenovery.com*),

Mona Vaswani (*mona.vaswani@allenovery.com*),

Angeline Welsh (*angeline.welsh@allenovery.com*) and

Andrew Waters (*andrew.waters@allenovery.com*).

3.  Respondent is represented, according to the contractual documents submitted to the
Arbitral Tribunal, by its Attorney-General [hereafter the **"Attorney-General"**] whose
address and contact details are cited in paragraph 1 above. Neither the Attorney-
General nor anyone else appeared in the arbitral proceedings on behalf of the
Government of Belize. Nevertheless, the Arbitral Tribunal and Claimants sent all
correspondence and other documents pertaining to the arbitration proceedings to the
Attorney-General by facsimile, e-mail, air courier service and/or registered airmail.

- 4 -

## II.   The Arbitral Tribunal

4.   The Arbitral Tribunal is composed of the following persons:

- Michael J. Lee, 20 Essex Street, London WC-2R 3AL, United Kingdom,

  Tel:   44 (0)20 7842 1200

  Fax:   44 (0)20 7842 1270

  E-mail: mlee@20essexst.com

  arbitrator nominated by Claimants and appointed by the London Court of International Arbitration [hereafter "**LCIA**"] pursuant to Articles 5.4 and 5.5 of the LCIA Arbitration Rules [hereafter "**LCIA Arbitration Rules**"]

- Salim Moollan, Essex Court Chambers, 24 Lincoln's Inn Fields, London WC-2A 3EG, United Kingdom

  Tel:   44 (0)20 7813 8000

  Fax:   44 (0)20 7813 8080

  E-mail: SMoollan@essexcourt.net

  arbitrator appointed by the LCIA pursuant to Article 5.4, 5.5 and 7.2 of the LCIA Arbitration Rules in the absence of a nomination by Respondent

- Carl F. Salans, 5 boulevard Malesherbes, 75008 Paris, France

  Tel:   33 (0)1 42 68 48 00

  Fax:   33 (0)1 42 68 45 15

  E-mail: csalans@salans.com

- 5 -

jointly nominated by Mr. Lee and Mr. Moollan and appointed by the LCIA pursuant to Articles 5.4, 5.5 and 7 of the LCIA Arbitration Rules, as third and presiding arbitrator [hereafter "**Chairman of the Tribunal**"].

### III. The Contracts and Arbitration Agreement

5.   BCB Holdings (then known as Carlisle Holdings Limited), the Government of Belize, the Minister of Finance of Belize (who signed for himself as well as on behalf of the Government of Belize) and the Attorney-General of Belize, (acting on behalf of the State of Belize), entered into a Settlement Deed on 22 March 2005 (Claimants' exhibit l[2]) that had as its purpose to settle a dispute among them, which had been submitted to LCIA arbitration, concerning a share purchase deed and an option deed.

6.   Clause 8 of the Settlement Deed gives to BBL, the Second Claimant in this arbitration, the power to enforce the Deed and refers expressly to the Contract (Rights of Third Parties) Act 1999.

7.   Clause 11 of the Settlement Deed provides as follows:

> *11.   GOVERNING LAW AND ARBITRATION*
>
> *11.1   This deed is governed by and shall be construed in accordance with English law.*
>
> *11.2   Any dispute arising out of or in connection with this deed including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by*

---

[2] Claimants' exhibits will hereafter be referred to as C-1, C-2, A-1, A-2, etc... and, unless otherwise indicated, will refer to the exhibits submitted with Claimants' Statement of Case dated 19 January 2009. Claimants also submitted documents with their Request for Arbitration dated 16 October 2008 and separately at the request or with the permission of the Arbitral Tribunal.

*arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this clause. The number of arbitrators shall be 3 (one appointed by each Party and the third appointed jointly by the two Parties' arbitrators).*

11.3   *The arbitral proceedings shall be conducted in the English language.*

11.4   *The seat or legal place of the arbitral proceedings shall be London, England.*

11.5   *Each of the Government Parties irrevocably and unconditionally:*

    (a)   *agrees that if Carlisle brings proceedings against it or its assets in relation to this deed no immunity from such legal proceedings (which will be deemed to include without limitation, suit, attachment prior to judgment, other attachment, the obtaining of judgment, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;*

    (b)   *waives any such right of immunity which it or its assets now has or may in the future acquire; and*

    (c)   *consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with such proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any award, order or judgment which may be made or given in arbitration proceedings or related enforcement proceedings.*

11.6   *For the avoidance of doubt, each of the Government Parties each (sic) irrevocably and unconditionally consents to:*

    (a)   *any relief being ordered against it whether by way of injunction or otherwise. This consent is given by each of the Government Parties with particular reference to, but without being limited by, Section 13(3) of the State Immunity Act 1978, or any other statutory re-enactment or modification thereof; and*

    (b)   *the service of any writ or other document required to be served on any or all of the Government Parties in*

> *relation to legal proceedings, whether for instituting proceedings or otherwise, being effected in accordance with the notice provisions of clause 7. This consent is given by each of the Government Parties with particular reference to, but without being limited by, Section 12(6) of the State Immunity Act 1978 or any other statutory re-enactment or modification thereof.*

8.   On 21 June 2006, BB Holdings and the Government of Belize entered into an Amendment to Settlement Deed [hereafter the "**Amendment Deed**"]. The original Settlement Deed as amended by the Amendment Deed is referred to hereafter as the "**Settlement Deed as Amended**".

9.   The Amendment Deed provides in its Clause 3.2 that, except as specifically amended by it, the provisions of the original Settlement Deed remain in full force and effect. Clause 2.2 states that with one exception, all references in the Settlement Deed to "Carlisle" shall be replaced with "BB Holdings" as the company had changed its name. The arbitration agreement contained in Clause 11 of the original Settlement Deed was not amended by the Amendment Deed and, consequently, remains in full force and effect. Indeed there is as an appendix to the Amendment Deed (C-2), a document entitled Settlement Deed as Amended on June 21, 2006, containing the original arbitration clause and signed by BB Holdings and the Minister of Finance and the Attorney-General of Belize on 21 June 2006.

10.  The dispute in the present arbitration arises principally out of Clauses 4.1 and 4.2 of the Settlement Deed as Amended which read as follows:

> *4.1   In consideration of BB Holdings agreeing not to pursue its Claims arising out of or in connection with the Share Purchase Deed and the Option Deed (as set out in*

paragraphs 2 and 3 above), the Government Parties each jointly and severally confirm and warrant that:

(a) following the Set-Off, each member of the BB Holdings Group will have satisfied in full all and any liabilities, assessments and claims of whatsoever nature and howsoever arising in respect of Business Tax and / or Income Tax in respect of all periods up to and including 31 March 2005 and without prejudice to the generality of the foregoing, following the Set-Off each PIC[3] Group company within the BB Holdings Group, including in particular but not limited to The Belize Bank Limited, has satisfied in full all and any such liabilities assessments or claims;

(b) all filings in relation to any form of taxation required to be made on behalf of BB Holdings or any member of the BB Holdings Group in Belize are, including in particular but not limited to The Belize Bank Limited, complete and up to date;

(c) to the extent that the BB Holdings PIC Group, The Belize Bank Limited, or any other PIC Group Company within the BB Holdings Group are liable to pay any Business Tax and/or Income Tax in respect of any period beginning on or after 1 April 2005, the calculation of and the raising of any assessments or claims in respect of such Business Tax and/or Income Tax shall be calculated solely and exclusively on the basis that;

   (i) Business Tax shall be paid on a quarterly basis at the rate prescribed under the Business and Income Taxes Act (Chapter 55 of the Laws of Belize) from time to time, which in the case of PIC Group Companies which are banks is currently a charge of 8%;

   (ii) Income Tax shall be assessed on the amount of chargeable income and at a rate of twenty cents per dollar less than the rate of 25%. Chargeable income shall be assessed in accordance with the provisions applicable to Public Investment Companies and PIC Group Companies in the Income and Business Tax Act (Chapter 55 of the Laws of Belize) and International Business Companies Act (Chapter 270 of the Laws of Belize). BB

---

[3] See paragraphs 42 *et seq.* for the definition of a PIC Group company.

*Holdings, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group shall file a group income tax return at the end of each financial year, on behalf of the companies in the BB Holdings PIC Group, completed on the basis of the assessment provided for in this clause;*

(iii)   *Business Tax is a withholding tax and an advance payment for final Income Tax and any amount paid in Business Tax which is in excess of the amount due in Income Tax will constitute an overpayment of Income Tax and shall be offset on a quarterly basis against Business Tax due and payable in subsequent financial years;*

(iv)   *the total amount of Business Tax paid in any financial year for the purposes of the procedure in clause 4.1 shall be the aggregate of:*

    (a)   *the amount of Business Tax actually paid by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group in a financial year; and*

    (b)   *the amount of Business Tax which is paid by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group by way of offset of any overpayment of Income Tax against Business Tax on a quarterly basis in any financial year.*

(v)   *the provisions applicable to Public Investment Companies and PIC Group Companies contained in the International Business Companies Act (including the provisions which allow fiscal continuity of Public Investment Companies and of PIC Group Companies) and the Income and Business Tax Act (Chapter 55 of the Laws of Belize) (including Section 15 (Allowance of trade losses) and Section 115 (Carry forward of losses) of the Income and Business Tax Act) shall apply; and*

       *(vi)*   *no other Business Tax and/or Income Tax shall be payable by the BCB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group.*

   *(d)*  *the Demand for Payment shall be withdrawn and the parties agree that:*

       *(i)*   *the BB Holdings PIC Group shall waive its entitlement to carry forward all prior losses for the period up to 31 March 2006; and*

       *(ii)*   *The Belize Bank Limited shall pay the further sum of BZ$4,288,037.34 in Business Tax for the financial year ended 31 March 2006 (being the amount of Business Tax payable by The Belize Bank Limited on the basis of the current charge for PIC Group Companies which are banks of 8%, totalling BZ$5,104,806.35, less BZ$816,769.01, being the amount of Business Tax already paid by The Belize Bank Limited during the financial year) and, for the avoidance of doubt, no further Business Tax shall be paid by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group for the financial year ended 31 March 2006; and*

       *(iii)*  *no penalty or arrears interest or other interest whatsoever shall be payable by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group company within the BB Holdings Group in respect of Business Tax for the financial year ended 31 March, 2006.*

   *(e)*  *BB Holdings, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group shall file a group income tax return for the financial year ended 31 March, 2006 on behalf of the companies in the BB Holdings PIC Group, assessed on the basis set out in clause 4.1 (c) (ii) and the procedure set out in clause 4.1 shall be followed thereafter by the parties.*

*4.2*   *The Government Parties agree to indemnify and to keep indemnified BB Holdings and any member of the BB Holdings Group against all costs, expenses, losses and*

*damages howsoever incurred by BB Holdings and any member of the BB Holdings Group arising out of or in connection with any breach of the warranties contained in clause 4.1 of this deed.*

## IV.   The Arbitral Procedure

11.   On 16 October 2008, Claimants filed a Request for Arbitration pursuant to Article 1 of the LCIA Arbitration Rules requesting that all disputes arising out of or in connection with the Settlement Deed as Amended be referred to arbitration pursuant to the provisions of Clause 11 of the original Settlement Deed and Article 1 of the LCIA Arbitration Rules.   Claimants informed the Arbitral Tribunal by letter dated 27 April 2009 that the Request was communicated to Respondent by facsimile and air courier on 16 and 17 October 2008 respectively. According to the facsimile cover sheet, the Request was received by the Attorney-General's office on 16 October.   Claimants' counsel believes that the hard copy sent by air courier was received by Respondent a few days later.

12.   According to the LCIA Arbitration Rules, Article 2, within 30 days of service of the Request on the Respondent *"the Respondent shall send to the Registrar a written response to the Request..."*.   Respondent did not at any time submit a response to the Request for Arbitration.

13.   By facsimile of 2 December 2008, the LCIA notified the Parties that the Arbitral Tribunal had been constituted.

- 12 -

14.   The Arbitral Tribunal, in a letter dated 9 December 2008, instructed the Parties to proceed in accordance with Article 15 of the LCIA Arbitration Rules as follows:

> *"Within 30 days of receipt of written notification from the LCIA Registrar of the formation of the arbitral tribunal, the claimant shall send to the Registrar a Statement of Case (article 15.2). Within 30 days of receipt of the statement of case or written notice from Claimant that it elects to treat the Request for Arbitration as its Statement of Case, the Respondent shall send to the Registrar a Statement of Defence including any counterclaims (article 15.3). Within 30 days of receipt of the Statement of Defence, the Claimant shall send to the Registrar a Statement of Reply which, where there are any counterclaims, shall include a defence to counterclaim (article 15.4). If the Statement of Reply contains a defence to counterclaim, within 30 days of its receipt the Respondent shall send to the Registrar a Statement of Reply to counterclaim (article 15.5).*
>
> *As provided in article 15.6 of the Rules, all statements referred to above shall be accompanied by copies of all essential documents on which the party concerned relies and which have not previously been submitted by any party."*

15.   In that same letter, the Tribunal informed the Parties that it would like to appoint an administrative secretary, in the person of Ms. Anne Secomb, whose time would be billed at the hourly rate of £150. The Parties' agreement to such appointment was requested. Claimants agreed to the appointment by letter dated 16 December 2008. Respondent did not reply to the request, which, as indicated in a letter dated 16 December, the Arbitral Tribunal interpreted as meaning Respondent had no objection, unless Respondent informed it to the contrary – which it did not do. Ms. Secomb was, therefore, appointed as administrative secretary of the Arbitral Tribunal with the approval of the LCIA.

16. By letter dated 12 December 2008, Claimants applied to the Tribunal for urgent interim relief under Article 25.1 of the LCIA Arbitration Rules. The Government of Belize had taken steps to enforce certain tax assessments, which are the subject of the present arbitration, against BBL by issuing judgment summonses in respect of tax alleged to be owed in the assessments. Arguing that under the Settlement Deed as Amended the tax assessed was not due and was in breach of that agreement, Claimants requested the Arbitral Tribunal to grant interim injunctive relief to restrain the Government from taking any further steps to enforce the judgment summonses or taking any other steps (otherwise than in accordance with the Settlement Deed as Amended) to recover any further Business Tax or income tax allegedly payable.  On 15 December 2008, the Chairman of the Tribunal, in an effort to have Respondent participate in the Tribunal's consideration of Claimants' request in a conference call scheduled the following day, attempted to reach the Attorney-General of Belize by telephone but spoke instead to Crown Counsel in the Attorney-General's chambers who said she would try to contact the Attorney-General and have him call the Chairman of the Tribunal back. However, she subsequently sent an e-mail stating that she had been unable to reach the Attorney-General or another principal. The Tribunal also sent a fax to the Attorney-General inviting him to participate in the telephone conference but received no reply.

17. Consequently, on 15 December 2008, the Tribunal did hold a conference call with counsel for Claimants in which it heard Claimants' arguments in favour of an interim injunction.

18. Subsequent to the telephone conference, Claimants, by letter of the same date, 16 December 2008, requested the Arbitral Tribunal to refrain from issuing a decision on

1/014

their request for interim measures since the Government of Belize had agreed to adjourn for a period of one month the magistrate court's hearing on the tax assessment set for 16 December.

19.    On 18 January 2009, Claimants again requested the Arbitral Tribunal to issue a decision on their request to grant interim injunctive relief, following their communication of 13 January informing the Tribunal that the hearing before the magistrate court of Belize was scheduled to take place on 19 January 2009.

20.    The Arbitral Tribunal issued and communicated to the Parties an Interim Decision and Order[4] on 19 January 2009. In it, the Tribunal made the following interim orders:

> *UPON the Claimants' undertaking that if the Tribunal later finds that this order has caused loss to the Defendant, and decides that the Defendant should be compensated for that loss, the Claimants will comply with any order the Tribunal may make*
>
> *AND UPON the Claimants' undertaking that they will maintain within Belize sufficient assets to pay the tax assessments pending variation or discharge of the present Order whether as a result of an application by the Government of Belize under paragraph 2 below, or as result of the final determination of the claims in this arbitration, or for any other reason.*
>
> *IT IS ORDERED THAT:*
>
> *1. No Party shall take any action which could prejudice the outcome of this arbitration or which could adversely affect the efficacy or enforceability of any decisions rendered by the Arbitral Tribunal in accordance with the Arbitration Rules of the London Court of International Arbitration. In particular, the Arbitral Tribunal orders the Government of Belize to take no further steps to progress or enforce the judgment summonses or the tax assessments which are*

---

[4] This Interim Decision and Order was subsequently sometimes referred to as Procedural Order No.1.

> *the subject of a hearing before the Belize Magistrate's Court on 19 January 2009 against the Second Claimant or any other entities specified as subject to the tax calculation mechanism set out in clause 4 of the Settlement Deed as amended concerning assessments of Business Tax or Income Tax allegedly payable in respect of the period between 1 April 2006 and 30 September 2008.*
>
> 2. *The Defendant be at liberty to apply on 48 hours notice to the Tribunal and the Claimants to set aside or vary this order.*

21. By letter of the same date, 19 January, BBL, on behalf of BB Holdings and BBL, undertook vis-a-vis the Arbitral Tribunal as follows:

> *We refer to the Interim Decision and Order of the Tribunal dated 19th January 2009 [the **Order**] in the Arbitration.*
>
> *On behalf of the Belize Bank Limited and BB Holdings Limited, we undertake to the Tribunal as follows:*
>
> 1. *The Belize Bank Limited and BB Holdings Limited shall, between them, maintain within Belize sufficient assets to pay the tax assessments enforcement of which is sought by the Belize Commissioner of Income Tax in the Judgment Summonses issued by him on 10 December 2008 and served on The Belize Bank Limited, as set out in those Judgment Summonses; and*
>
> 2. *The undertaking set out in paragraph 1. above shall cease to apply upon the final determination of the claims in this arbitration or, if sooner, variation or discharge of the Order.*

22. Despite the Arbitral Tribunal's Decision and Order of 19 January 2009, the hearing before the magistrate court in Belize took place on 27 January 2009. At that very hearing, according to Claimants, the magistrate court ordered BBL to pay the amounts alleged to be due in the judgment summonses, i.e., BZ$5,715,776.45 on 3 February and BZ$5,715,776.45 on 12 February 2009. Claimants informed the Arbitral Tribunal by letter dated 24 February 2009 of the magistrate court's decision and of the fact that BBL

- 16 -

had paid the two instalments on 3 February[5] and 12 February 2009. Claimants also informed the Tribunal in that same letter that it had tried to enforce the Arbitral Tribunal's Interim Decision and Order of 19 January before a judge of the Belize Supreme Court, but on 11 February the judge refused Claimants' request for relief in support of the injunction.

23. Also on 19 January 2009, Claimants submitted their Statement of Case with exhibits, pursuant to Article 15.2 of the LCIA Arbitration Rules, which were received by Respondent on 23 January 2009[6]. According to Article 15.3 of the LCIA Arbitration Rules, Respondent was required to submit a Statement of Defence and any counterclaims within 30 days of receipt of the Statement of Case. Article 4.6 of the LCIA Arbitration Rules provides that time periods set out in the Rules start running on the day following receipt of the relevant communication. Because Claimants omitted certain enclosures to their Statement of Claim which were sent later by facsimile transmission and received by Respondent only on 29 January, the Arbitral Tribunal considered that it was only on 29 January that Respondent received the complete Statement of Claim and that, consequently the 30 days for filing a Statement of Defence began to run on 30 January 2009, expiring on 1 March 2009. That day being a Sunday, Article 4.6 of the LCIA Arbitration Rules also provides that if the last day of a period is a non-business day at the place of the addressee, the period is extended until the first business day which follows, in the present case, 2 March 2009. Therefore, Respondent's Statement of Defence was due by 2 March 2009. No Statement of Defence was received by the Arbitral Tribunal by that date or at any time thereafter. Article 15.8 of the LCIA Arbitration Rules states that "... *if the Respondent fails to submit a Statement of Defence*

---

[5] The receipts submitted by Claimants for these payments (C-26) appear to show all amounts having been paid on 12 February 2009.
[6] See DHL receipt enclosed in Allen & Overy's facsimile transmission of 19 February 2009.

> *... the Arbitral Tribunal may nevertheless proceed with the arbitration and make an award."*

24.   Pursuant to the provision in Article 15.8 of the LCIA Arbitration Rules cited at the end of the preceding paragraph of the present Award, the Arbitral Tribunal decided to proceed with the arbitration and issued Procedural Order No. 2 on 6 March 2009 setting forth directions for the further proceedings. Among other things, Procedural Order No. 2 established the procedure for the Parties to serve witness and expert evidence[7] and fixed 18 and 19 June 2009 as dates for a hearing in Paris[8].

25.   In a Procedural Order No. 3 of 23 March 2009, the Arbitral Tribunal requested Claimants to make written submissions by 29 May 2009 on (i) damages claimed, (ii) costs claimed in an amount incurred as of that date and (iii) interest. Respondent was given until 10 June 2009 to file a written reply to such submissions.

26.   Procedural Order No. 4 of 1 April 2009 modified certain dates, at Claimants' request, established in Procedural Order No. 2. Respondent made no comments regarding Claimants' request despite being asked to do so by the Arbitral Tribunal.

27.   On 14 April 2009, the Arbitral Tribunal issued Procedural Order No. 5 containing the procedural rules which would apply to the hearing scheduled for 18/19 June 2009.

---

[7] In a subsequent communication to the Parties on 9 March 2009, the Arbitral Tribunal clarified that the witness/expert evidence should be submitted in the form of written statements.

[8] Claimants, by letter of 27 February 2009, requested that Paris be the place where the hearing be held. Respondent made no comment on Claimants' request, despite being given an opportunity to do so by the Arbitral Tribunal by facsimile dated 2 March 2009. While the seat of the arbitration is London, Article 16.2 of the LCIA Arbitration Rules provides that the Tribunal may hold hearings at any convenient location in its discretion and if elsewhere than at the seat, the arbitration shall be considered as an arbitration conducted at the seat of the arbitration.

28. By letter dated 17 April 2009, Claimants communicated to the Arbitral Tribunal and to Respondent written witness statements by Michael Bernard Coye and Philip Thomas Osborne and an expert report of Peter James Clokey.

29. In an effort to better understand Respondent's position in the absence of its participation in the arbitration proceedings, on the same date, 17 April 2009, the Arbitral Tribunal sent a letter to the Parties requesting them to submit to the Tribunal documents which were relevant to the issues in the arbitration which Respondent filed in the judicial proceedings in Belize resulting in the judgment of 11 February 2009. Claimants submitted to the Tribunal, by letter of 29 April 2009, the Government's reply submissions dated 4 February 2009 to Claimants' application and a first affidavit of the Assistant Commissioner of Income Tax in support of the Government's reply.

30. Subsequently, on 23 April 2009, the Arbitral Tribunal sent to the Parties a list of questions which the Tribunal wished to discuss with them at the hearing on 18/19 June.

31. The Arbitral Tribunal issued Procedural Order No. 6 on 18 May 2009 modifying certain aspects of Procedural Orders Nos. 3 and 4.

32. Pursuant to Procedural Order No. 6, Claimants submitted, on 5 June 2009, a written opening statement (hereafter "**Opening Written Submissions**") for the hearing on 18/19 June, addressing the merits as well as containing a statement specifying damages claimed, costs claimed and interest claimed. Respondent, although invited to do so by the Procedural Order, made no submissions.

33.    A hearing was held on 18 June 2009 and completed in one day. Two witnesses presented by Claimants, Michael Bernard Coye and Philip Thomas Osborne and an expert, Peter James Clokey, were examined by Claimants' counsel and the Arbitral Tribunal; and Claimants' counsel made oral submissions to the Tribunal and responded to the Tribunal's questions. Two additional exhibits were admitted into evidence with the agreement of the Arbitral Tribunal and were sent by telecopy by Claimants' counsel to Respondent. A stenographic transcript of the hearing was made and distributed to the Parties, to members of the Arbitral Tribunal, the Tribunal's administrative secretary and to the LCIA. No representative of Respondent participated in the hearing.

34.    Following the hearing, Claimants submitted the quantification of its claims for damages and costs; and Mr. Clokey, Claimants' expert, submitted an alternative calculation of Claimants' damage claim based on the weighted average cost of capital as the discount rate as requested by the Tribunal at the hearing.   The Arbitral Tribunal asked Respondent whether it had any comments on these two submissions; but Respondent did not reply.

35.    The Arbitral Tribunal informed the Parties by letter dated 24 July 2009 that the proceedings were closed.   Nevertheless, the Arbitral Tribunal accepted into evidence Claimants' letter dated 3 August 2009 containing the Certificate of Name Change of BCB Holdings, after requesting Respondent's comments on the Claimants' submission and receiving none.

## V.   The Positions of the Parties on the Merits

Claimants' Position

36.   BBL, a commercial banking operation in Belize, and its parent company, BCB Holdings, have brought this arbitration, claiming that the Government of Belize has breached and repudiated the Settlement Agreement as Amended. The dispute concerns, in particular, the alleged failure of Respondent to honour the undertakings it made in Clause 4.1 of that agreement concerning the tax treatment to be accorded by the Government of Belize to Claimants.

37.   Clause 4.1 of the Settlement Agreement as Amended provides, *inter alia*, that a so-called "Business Tax", levied on gross receipts, shall be paid on a quarterly basis. Business Tax is a withholding tax and an advance payment for final income tax due (income tax being levied annually on profits), and any amount paid in Business Tax which is in excess of the amount due in income tax calculated at the end of the year constitutes an overpayment of income tax; and, according to subparagraph (iii) of Clause 4.1(c) of the agreement, during any period beginning on or after 1 April 2005 "shall be offset on a quarterly basis against Business Tax due and payable in subsequent financial years". The rate of Business Tax applicable to a company in a public investment company group (see paragraph 42 below) was, at the time the Settlement Deed was concluded, 8% and is now 12%.

38.   Claimants and their expert, Mr. Clokey (at paragraph 4.20(f) of his expert statement of 17 April 2009), explain that under the normal statutory regime in Belize, where a

greater amount of Business Tax has been paid in a financial year than the amount of income tax payable, the overpayment may be carried forward as an "expense" deductible for the purpose of future income tax.

39.   Claimants argue that Clause 4.1(c)(iii) of the Settlement Deed as Amended, in providing that BBL could offset overpayments of Business Tax against future Business Tax payments rather than deducting such overpayments as an expense against revenues, confers a significant benefit on it.  During the hearing, Claimants handed up an exhibit, C-49, which illustrates the benefit to them of the tax concessions provided for in the Settlement Deed as Amended.

40.   It is Claimants' position that the Government of Belize had the necessary legal authority to grant the tax warranty contained in Clause 4.1(c)(iii) of the Settlement Deed as Amended by virtue of the Crown's common law prerogative to enter into contracts in relation to public services (citing Bankers Case [1700] 90 E.R. 270 and New South Wales v. Bardolph [1934] 52 C.L.R. 455) in the absence of any constitutional or statutory restriction and provided the contract is entered into in the ordinary or necessary course of Government administration (Hearing Transcript - - hereafter "HT" - - pages 113-114).  Claimants also rely on Section 95 of the Income and Business Tax Act of Belize (hereafter "IBTA") for the Government's authority. Section 95 states:

> The Minister may remit the whole or any part of the income tax payable by any person if he is satisfied it would be just and equitable to do so.

The reference to the Minister is to the minister responsible for finance under Section 2 of the IBTA.

41.   According to Claimants, Section 95 of the IBTA, which is found in part I of the Act relating to income tax, must be read across to part III of the Act relating to Business Tax as a result of Section 111(5) of the IBTA which states that the provisions relating to assessments of tax contained in part I of the Act shall apply *mutatis mutandis* to assessments of tax under part III of the Act (HT pages 132-3). It should also be noted that Section 95 of the IBTA provides that remittances made pursuant thereto shall be published in the official gazette of Belize.

42.   Under the law of Belize, BCB Holdings is a "public investment company". A public investment company ("**PIC**") is a form of incorporation and operation provided for under Belize's International Business Companies Act ("**IBCA**") of 1990.[9] According to Claimants and to their witness, Mr. Osborne, PICs are companies subject to a number of requirements, including high capitalisation, quotation on relevant stock exchanges and employment of a certain number of Belizeans. As an incentive to establish PICs in Belize and thereby attract investment in the country, the IBCA provides that PICs are exempt from all Belize taxes and duties for 30 years.[10] BCB Holdings became a PIC in 1990 and is entitled to remain one until 31 March 2020.

43.   In addition, companies owned by more than 50% by a PIC also receive favourable tax treatment as specified in Section 124 of the IBCA. In particular Section 124 (2) of the IBCA provides that they shall pay income tax at a rate of twenty cents per dollar less than the rates prescribed in Section 21 of the IBTA (which prescribes a yearly rate of 25%). This was interpreted by all Parties as establishing an income tax rate of 5% for

---

[9] See the witness statement of Philip Thomas Osborne, paragraph 6.
[10] *Id.* and expert report of Peter James Clokey, paragraph 2.9.

such companies.[11]   BBL was and is owned by more than 50% by BCB Holdings and

therefore entitled to this reduced rate.  Mr. Osborne testified at the hearing that during

the period 2006 – 2008 there was, and there still is today, also a management company

in the PIC group owned more than 50% by BCB Holdings, which was and is a cost

center, whose costs were included in the overall PIC tax returns.[12]

44.   According to Mr. Osborne's witness statement (at paragraph 24), following the

signature of the Settlement Deed as Amended, the Belize Commissioner of Income Tax

sent a letter to BBL dated 10 July 2006 stating that any overpayments of Business Tax

would be applied as an expense against income tax for the following year, which was

inconsistent with Clause 4.1(c)(iii) of the Settlement Deed as Amended.  BBL wrote

back on 26 July contesting the Commissioner's letter and asking the Commissioner to

liase directly with the Minister of Finance in that respect (C-28).  According to Mr.

Osborne's witness statement (paragraph 26), the Commissioner, in a letter of

10 October 2006 to BBL (exhibit C-29), subsequently accepted BBL's position by

accepting BBL's payment of Business Tax for the financial year ended 31 March 2006

based on application of the offset provision of Clause 4.1(c)(iii) of the Settlement Deed

as Amended.

45.   Claimants state that following the signature of the Settlement Deed as Amended, BBL

submitted Business Tax returns in respect of all quarters ending 30 June 2006 through

30 September 2008 in which it showed the amount of Business Tax due for the relevant

quarter which had been set off against a previous overpayment and, therefore, in respect

of which no payment was made because, in effect, that payment had previously been

---

[11] See Belize Solicitor General's letter to BB Holdings dated 24 March 1999 (C-35).
[12] HT, page 12, lines 23 *et seq.*

made. Where the unused amount of the overpayment remaining was less than the amount of Business Tax due in a quarter, BBL made payment of Business Tax in an amount equal to the amount of Business Tax due less the remaining amount of overpayment[13]. According to Claimants, none of the tax returns thus filed had, until recently, ever been challenged by the Government of Belize.

46.   On 8 February 2008, according to Claimants, the government administration in Belize changed following a general election. By letter dated 29 August 2008, the Belize Commissioner of Income Tax sent BBL assessments of Business Tax in respect of the three month periods ending June 2006 through June 2008, rejecting two years of tax returns filed by BBL.

47.   Claimants assert that the amounts claimed as unpaid tax by the Belize Commissioner of Income Tax are exactly equal to the amounts set off by BBL in accordance with its interpretation of the Settlement Deed as Amended during the period from 1 June 2006 to 30 June 2008 plus interest and penalties.  The assessments, say Claimants, therefore fail to take into account the terms of Clause 4.1(c)(iii) of the Settlement Deed as Amended.

48.   When BBL disputed the assessments in a letter dated 9 September 2008 (C-8), the Commissioner confirmed the assessments by letter of 8 October 2008 and stated as follows:

> "*The Settlement Deed you refer to that was signed between B.B. Holdings and the Attorney-General and Minister of Finance of Belize does not supersede the Income and Business Tax Act of Belize*" (C-3)

---

[13] See Claimants' Statement of Case, page 17, paragraph 72.

The Commissioner states, in the same letter, that the previous returns filed by BBL over a period of two years and the tax paid by BBL on the basis of those returns were not accepted by the Government of Belize.

49.   It is the Claimants' position that the Commissioner's letter dated 29 August 2008 enclosing the Assessments and/or the Commissioner's letter dated 8 October 2008 amounted to a repudiatory breach of the Settlement Deed as Amended, in that they evidence a clear intention on behalf of the Government not to be bound by its terms.  By letter dated 15 October 2008 (C-4), Claimants wrote that they accepted the Belize Government's repudiatory breach of the Settlement Deed as Amended and reserved their rights as to the loss they had suffered due to such repudiatory breach.

50.   Further, on 15 October 2008, BBL filed a tax return for the period from 1 July to 30 September 2008 in accordance with the terms of the Settlement Deed as Amended, but in a covering letter stated that in light of its acceptance of the repudiatory breach, it would, from the date of this acceptance, pay Business Tax at the generally applicable statutory rate (C-9).  The Commissioner of Income Tax in a letter dated 6 January 2009 (C-10), rejected the tax return filed by BBL for the period 1 July through 30 September 2008.

51.   As a consequence of the foregoing, Claimants commenced the present arbitration and now seek the following relief[14]:

> (i)   a declaration that BBL was entitled, pursuant to the terms of the Settlement Deed as amended, to set off

---

[14] As set forth in the Claimants' Opening Written Submissions.

- 26 -

*Overpayments in previous financial years against its payments of Business Tax as set out in the Returns; and*

(ii) *a declaration that the Settlement Deed as amended has been terminated as a result of the Government Parties' repudiatory breach;*

(iii) *damages, for the above mentioned breaches of the Settlement Deed as amended, and*

(iv) *in accordance with Clause 4.2 of the Settlement Deed as amended and section 1 above, all costs, expenses, losses and damages it (sic) has incurred arising out of or in connection with the breach of the Settlement Deed as amended by the Government on an indemnity basis, including all costs of these proceedings (including fees paid to the LCIA and Arbitral Tribunal) and the reasonable legal fees incurred by the Claimants to Allen & Overy LLP and Courtenay Coye & Co in respect of these proceedings; and*

(v) *interest at a rate to be determined by the Tribunal on all sums found to be due and owing for a period to be determined pursuant to article 26.6 of the LCIA Rules and/or sections 49(3) and (4) of the Arbitration Act 1996 compounded monthly; and*

(vi) *costs; and*

(vii) *such other or further relief as this Arbitral Tribunal thinks just and/or appropriate.*

52.   At the hearing on 18 June 2009, counsel for Claimants emphasized that Claimants were not asking the Arbitral Tribunal to declare what level of tax is owed by Claimants to Respondent but instead are requesting the Arbitral Tribunal to award Claimants damages for breach by Respondent of the warranties it gave regarding taxation in the Settlement Deed as Amended (HT pages 158-161).

Respondent's Position

53.   Respondent has not appeared in this arbitration and has not submitted any written arguments or evidence. It did not file a response to the Request for Arbitration or a Statement of Defence or any counterclaims. It did not comment on Claimants' quantification of their damages or their costs or on their claims for interest. Nor did Respondent participate in the hearing on 18 June 2009, examine or cross-examine the witnesses and expert offered by Claimants or make any oral arguments, as it was invited to do by the Arbitral Tribunal. It is, therefore, difficult to discern what Respondent's contentions are and what its position is regarding the various arguments made by Claimants and on Claimants' requests for relief. The Arbitral Tribunal believes that it, nevertheless, has an obligation to take into account such elements it can find explaining Respondent's position.

54.   The only elements in the record which reflect Respondent's position are the Commissioner of Income Tax's letter dated 8 October 2008 quoted in paragraph 48 of the present Award, the submissions filed by the Government of Belize in the Supreme Court of Belize in opposition to Claimants' attempt to enforce the present Tribunal's Interim Decision and Order of 19 January 2009 granting interim injunctive relief and the Belize Supreme Court's decision of 11 February 2009, which does not necessarily reflect the government's position but refers to it, (hereafter "**Belize Court case**").

55.   It appears from the Commissioner of Income Tax's letter of 8 October 2008 that the Government of Belize argues that the Settlement Deed cannot supersede the statutory law of Belize as reflected in the IBTA. That position seems to have been adopted by

- 28 -

Mr. Justice Awich, the judge of the Supreme Court of Belize who heard the Belize Court case, in his judgment of 11 February 2009. He stated his preliminary opinion that the Minister of Finance and the Attorney-General could not legally enter into a contract by which they seemed to have fettered themselves and other officers from carrying out their duties in accordance with provisions of the IBTA. The judge also expressed serious doubt that the Minister and the Attorney-General had power to grant a general waiver of tax under the Settlement Deed (referring to Section 95 of the IBTA).[15]

56.   The Government of Belize, relying on an affidavit of the Assistant Commissioner of Income Tax, argued that the Settlement Deed as Amended is unlawful as being contrary to the IBTA and beyond the power of the relevant ministers to conclude. It argued that the word "remit" in Section 95 of the IBTA did not refer to future tax liabilities. It stated the proposition that a court will not enforce an agreement which is unlawful in the country of performance. Another argument which the Government of Belize made before the Belize Supreme Court and which was adopted by Mr. Justice Awich in his decision of 11 February 2009 is that an award made by an arbitral tribunal in one country concerning collection of tax or restraining collection of tax cannot be enforced in another country because tax matters are *"quintessentially territorial"*, citing the judgment of the Chief Justice of Belize in the Supreme Court's decision in the case of *Belize Telemedia Limited v. The Attorney-General of Belize* [Claim N° 317 of 2008] (see paragraph 17 of Respondent's reply to the application by BBL for an interim injunction of 4 February 2009). The government quoted further from the Chief Justice's opinion: *"I do not think it is the province of either the arbitral tribunal or the English Commercial Court as the supervising court of the parties' arbitral process, to*

---

[15] Paragraph 18 of the Supreme Court of Belize Decision dated 11 February 2009. For further discussion, see paragraph 85 of the present Award.

*pronounce upon such a fundamentally sovereign preserve as the taxation regime of a foreign sovereign state ".* Mr. Justice Awich also relied on the generally accepted principle of international law that the courts of one country will not enforce the revenue laws of another country, citing English case law for that principle.[16] Furthermore, Mr. Justice Awich states in his judgment that in the event that an arbitral award is made in favour of Claimants they will be able to enforce it in court in England whereas in the event an award is made in favor of Respondent, the Republic of Belize would not be able to enforce the award in court in England because the award will be for sums to be collected or retained as tax. That result, the judge said, was inequitable and unjust.

57.   The learned judge of the Belize Supreme Court also expressed his preliminary view that tax concessions such as are found in the Settlement Deed as Amended are usually granted by legislation. That way, he said, illegality is avoided and the tax concession cannot remain a confidential matter but rather is a public decision.

58.   Claimants informed the Arbitral Tribunal in their letter of 24 February 2009 that they intended to appeal Mr. Justice Awich's decision of 11 February 2009. (Claimants' letter of 24 February 2009). At the hearing, Claimants' counsel confirmed that an appeal had in fact been filed. (HT, page 33)

---

[16] *The Government of India v. Taylor and Another* (1955) A.C. 491 and In *re Visser Queen of Holland v. Drucker* (1928) Ch. 877 cited at paragraph 13 of the Supreme Court of Belize Decision dated 11 February 2009.

## VI.   DISCUSSION

59.   The Arbitral Tribunal will now proceed to an examination of Claimants' arguments and claims, taking into consideration issues which might have been raised if Respondent had participated in the present arbitration.

60.   Before examining the merits of Claimant's claims, the Arbitral Tribunal has considered whether there can be any question regarding its jurisdiction to decide the issues submitted to it by Claimants or regarding the arbitrability of these issues. Jurisdiction and arbitrability are matters which, under the Settlement Agreement as Amended, are subject to English law since this is the law chosen by the Parties to govern their substantive agreement (see Clause 11.1) as well as the law applicable at the seat of this arbitration, London (see Clause 11.4).[17]

### A.      Jurisdiction

61.   There is no doubt in the minds of the three arbitrators that the Arbitral Tribunal has jurisdiction to hear and decide Claimants' claims based upon the Settlement Deed as Amended.  That agreement was signed by BB Holdings (then, Carlisle Holdings and now BCB Holdings), the first Claimant in this arbitration, and on behalf of the Government of Belize and the State of Belize by the Attorney-General of Belize and the Minister of Finance of Belize (who was also the Prime Minister of Belize). Clause 11.2 of the agreement provides for arbitration under the LCIA Arbitration Rules to resolve any dispute arising out of or in connection with the Settlement Deed as Amended, including any question concerning its existence, validity or termination which cannot be

---

[17] Given this concordance of connecting factors, the Tribunal need not delve into the issue of whether the arbitration agreement is governed by the same law as that of the substantive agreement, or by that applicable at the seat of the arbitration.

1/031

resolved amicably.  It contains a Clause 8 which gives the right to BBL to enforce its terms, thereby in the understanding of the Arbitral Tribunal, giving the contractual right to BBL to be a claimant party to this arbitration.[18]  In addition it contains a waiver of sovereign immunity by Belize in Clause 11.5(a).

62.   Even if the Respondent challenges the validity of the Settlement Deed as Amended (a challenge which the Respondent has not made to this Arbitral Tribunal), the widely accepted doctrine of the separability of the arbitration clause contained in a contract would preserve the validity of the arbitration clause in the Settlement Deed as Amended and the jurisdiction of this Tribunal in this case[19].  The LCIA Arbitration Rules, in Article 23.1, set forth this doctrine:

> *The Arbitral Tribunal shall have the power to rule on its own jurisdiction, including any objection to the initial or continuing existence, validity or effectiveness of the Arbitration Agreement. For that purpose, an arbitration clause which forms or was intended to form part of another agreement shall be treated as an arbitration agreement independent of that other agreement. A decision by the Arbitral Tribunal that such other agreement is non-existent, invalid or ineffective shall not entail ipso jure the non-existence, invalidity or ineffectiveness of the arbitration clause.*

63.   Similarly, Section 7 of the English Arbitration Act of 1996 provides:

> *Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because the other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.*

---

[18] See *Nisshin v Cleaves* [2004] 1 Lloyd's Rep. 38.
[19] See, generally, re the separability doctrine, Redfern and Hunter, Law and Practice of International Commercial Arbitration, 3rd edition, Sections 3-31 *et.seq.*

It is noteworthy that Mr. Justice Awich, in his decision of 11 February 2009 accepted *"that where parties have agreed to submit disputes arising under an arbitration clause in a contract between them to arbitration, the arbitration tribunal must be allowed the first opportunity to decide questions such as its jurisdiction..."* (paragraph 15, page 11).

64.   It is also worth adding that international tribunals have repeatedly held that a Sovereign cannot be permitted to invoke its own laws to avoid treaty or contractual undertakings freely entered into to submit to arbitration[20]. The principle that a State may not rely on its own internal law as a justification for its failure to comply with its contractual undertaking to submit to arbitration is universally recognized.

65.   The Arbitral Tribunal also wishes to address the statement by Mr. Justice Awich in his decision of 11 February 2009 that if an arbitral award is made in favour of Claimants they will be able to enforce it in a court in England but that if the award is in favour of Respondent, it would not be able to enforce it in England -- which he thought was unfair. As Claimants point out in their Opening Written Submissions, Respondent has made no claim for relief in this arbitration which, if granted, would have to be enforced abroad. There is nothing in English law or practice that would prevent Respondent from enforcing an award by this Arbitral Tribunal in its favour rejecting Claimants' claims based on an interpretation by the Tribunal of the Parties' agreements, as can be seen in the quotations from Dicey at paragraph 68 of this Award. Further, of course, any award in favour of Respondent could be enforced in Belize.

---

[20] Fouchard Gaillard Goldman On International Commercial Arbitration, E. Gaillard and J. Savage (Ed), 1999, paragraph 550 and cited case law.

**B.**   **Arbitrability**

66.   Respondent has not, in this arbitration or in the Belize Court case referred to earlier, contested the capacity of the Government of Belize to enter into an arbitration agreement. Indeed, Claimants have cited several cases where the courts of Belize have upheld arbitration agreements concluded by the Government (see, for example, exhibits A-13 and A-30). Claimants assert in their Opening Written Submissions that there is no statutory provision in Belize which limits the capacity of the Government to enter into an arbitration agreement (see paragraph 7). Respondent has not contested this assertion.

67.   As to the arbitrability of the issues referred to it, the Arbitral Tribunal recognizes the general principle of international law that the courts of one country will not enforce the revenue laws of another country but does not believe that that principle is applicable to the facts of this case.

68.   The general principle, as accepted in the United Kingdom, English law being the governing contractual law, is set forth in Dicey, Morris & Collins on the Conflict of Laws (2006), 14th edition, at paragraph 5R-019, rule 3 (A-3):

> *"English courts have no jurisdiction to entertain an action: (1) for enforcement, either directly or indirectly, of penal, revenue or other public law of a foreign State, ..."*

Dicey continues at paragraph 5-020 of the above-cited work:

> *"There is a well-established and almost universal principle that the courts of one country will not enforce the penal and revenue laws of another country."*

At paragraphs 5-023 and 5-024 of this work, Dicey explains that:

> *"Direct enforcement occurs where a foreign State ... seeks to obtain money or property, or other relief, in reliance on the foreign rule in question. But indirect enforcement is also prohibited ..."*

> *"Where direct or indirect enforcement does <u>not</u> arise, a foreign law of a type falling within Rule 3(1) will be recognised if it is relevant to the issue and provided it is not contrary to public policy ... "* (emphasis added)

69. The Arbitral Tribunal accepts Dicey's statement of the law as conforming to its understanding of English law. It is clear that this law prohibits the enforcement of foreign tax laws but that it does not prevent a court or an arbitral tribunal from deciding foreign tax issues arising from contracts entered into by a foreign government with private parties, where the court or arbitral tribunal is not asked to enforce a foreign government's claim for tax payments. That is the case in the present arbitration. The Arbitral Tribunal is not being asked to enforce Belize revenue laws; rather it is being asked to determine the validity and interpretation of a contractual warranty made by Respondent promising Claimants favourable tax treatment for their operations in Belize. Claimants have cited a series of decisions of arbitral tribunals upholding their jurisdiction to determine tax-related matters arising out of the contracts and investment agreements within their remit[21], and this Tribunal similarly finds that it does have jurisdiction to entertain the tax - related matters raised in this arbitration.

70. To the knowledge of the Arbitral Tribunal, it is commonplace in international investment contracts and treaties as well as in other international agreements for a host country to promise to a foreign investor or contractor tax incentives as an inducement to

---

[21] *Alcoa Minerals of Jamaica, Inc. v. Government of Jamaica* (A-4); *Engineering Company (Italy) v. Engineering Company (Greece) and Producer (Greece)* (A-6); *TCSB Inc. v. Iran* (A-5); *Paushok and Others v. the Government of Mongolia* (A-7). See also Gaillard, "Tax Disputes Between States and Foreign Investors" in 217 New York Law Journal 1997.

make the investment or carry out an activity which is the subject of such agreement. Those agreements often provide for arbitration as a dispute settlement mechanism, and if it were the case that the arbitral tribunal was prohibited from deciding that a host country violated its contractual tax undertakings and ordering it to refrain from doing so or awarding damages if it has done so, one of the essential elements in the agreement without which no agreement might have been concluded would thus fall outside of the dispute resolution clause the parties had agreed to. Surely this cannot have been the intention of the parties when they enter into such agreements and, in the case of the Settlement Deed as Amended which is the subject of the present arbitration, the Arbitral Tribunal is aware of no evidence which suggests that such was the intention of its Parties. On the contrary, a reading of the Settlement Deed as Amended and particularly its arbitration clause shows clearly that the Parties intended any dispute regarding an alleged violation of the tax undertaking in the agreement to be decided by the Arbitral Tribunal.

71.    To the extent that the Commissioner of Income Tax of Belize's statement in his letter of 8 October 2008 that "the Settlement Deed does not supersede the Income and Business Tax Act of Belize" is intended to assert that the Settlement Deed as Amended violates Belize law and is, therefore, invalid and unenforceable, that assertion does not of itself affect the arbitrability of the present dispute. Arbitral tribunals are frequently called upon to decide the compatibility of a substantive contract with laws which a party contends to be mandatorily applicable, and to determine the validity and enforceability of that substantive contract. No argument has been put forward by the Respondent in this case as to why the alleged incompatibility of the substantive contract with Belize law, or any resulting invalidity or unenforceability of that substantive contract, would

- 36 -

have the effect of rendering this aspect of the case non-arbitrable, or would otherwise affect the parties' separate agreement to arbitrate. Further, for the reasons set forth in Section VI.D. of this Award, the Arbitral Tribunal is not deciding in this arbitration that the Settlement Deed as Amended has "superseded" the IBTA. Rather, the Arbitral Tribunal is deciding that the Settlement Deed as Amended contains promises by the Government of Belize that it would use such powers as it had as a matter of Belize law to ensure that Claimants would enjoy the benefits of the regime set forth in Clause 4.1(c) of the Settlement Deed as Amended, and that the Government of Belize did in fact have the necessary powers to ensure that Claimants would enjoy the benefits of the said regime. The above is true as well for the Supreme Court's decision of 11 February 2009, insofar as that decision casts doubt on the legality under the law of Belize of the provisions of Clause 4.1 of the Settlement Deed as Amended.

72.    The Chief Justice of the Supreme Court of Belize, in his decision in the case of *Belize Telemedia Limited and The Attorney-General* (Claim N° 317 of 2008), stated:

> *"I do not think it is the province of either the arbitral tribunal or the English Commercial Court… to pronounce upon such a fundamentally sovereign preserve as the taxation regime of a foreign sovereign state."*

The Arbitral Tribunal accepts this statement and emphasizes that it is <u>not</u>, in this Award, pronouncing upon the taxation regime of Belize. Instead, it is pronouncing upon a contractual warranty which the Government of Belize made to Claimants regarding the taxation regime which the Government of Belize, in the exercise of its sovereign power, would grant to Claimants - - spelled out in Clause 4 of the Settlement Deed as Amended.

C.      Law Applicable to the Merits

73.   Clause 11.1 of the Settlement Deed as Amended provides that the Deed is governed by and shall be construed in accordance with English law.

74.   Claimants have accepted that the law of Belize is the applicable law in respect of the capacity of the government of Belize to enter into the Settlement Deed as Amended (Opening Written Submissions, paragraph 60). The Arbitral Tribunal would, in this respect, distinguish between the actual authority of the government or any of its officers to enter into an agreement, which it agrees is governed by Belize law since it relates to the capacity of an entity or person to conclude an agreement which is generally accepted to be subject to the law of the place where that entity or person is domiciled, and the apparent authority of the entity or officer to enter into an agreement, which is a question governed by the law of the contract, here, English law.[22] This subject will be further developed in the discussion in Section VI.D. of the present Award.

D.      Authority of the Government to Enter Into the Settlement
        Deed as Amended – Illegality

75.   In view of the Commissioner of Income Tax's letter of 8 October 2008, in which he said that the Settlement Deed cannot supersede the statutory law of Belize as reflected in the IBTA, and the comments made by Mr. Justice Awich in his judgment of 11 February 2009, the Tribunal has considered in some detail the questions of whether the Prime Minister and the Attorney-General at the time the Deed was entered into had actual

---

[22] *Marubeni Hong Kong and South China Ltd. v. Government of Mongolia* (2004), paragraphs 105 to 110, (citing Dicey), [2004] 2 Lloyds Reports 198. (A-16)

authority, or, alternatively, apparent authority, to make the promises to the Claimants relating to the waiver of tax in the Settlement Deed as Amended and of the powers they had as to waiver of tax as a matter of Belize law. It may be helpful to set out the relevant part of Mr. Justice Awich's judgment on this issue, which is as follows:

> "*I do not express a firm and final view on the agreement from which the dispute has been submitted to arbitration. My preliminary view on the papers assembled is that, the Minister of Finance and the Attorney-General then, could not legally enter a contract by which they seemed to have fettered themselves and other officers from carrying out their duties in accordance with the provisions of the Income Tax Act – see R v Secretary of State for the Home Department ex parte Venables [1998] AC407. I also have serious doubt that the Minister and the Attorney-General had power to grant a general waiver of tax as under the Settlement Deed. It is doubtful that the power of the Minister under s: 95 of the Act to remit tax covers the tax concession granted in the Settlement Deed. Challenges based on these grounds could be raised after the conclusion of the arbitration. Usually challenges are brought in the court at the seat of the arbitration. In this case the parties are likely to be faced with the question whether the court in England will competently pass judgment in tax matters of a foreign country, Belize.*"

Actual Authority

76.    The Tribunal accepts that the question of whether the then Prime Minister and Attorney-General had actual authority to enter into the Settlement Deed as Amended is a matter to be determined in accordance with the law of Belize. The Tribunal notes that the Deed was signed by the Prime Minister of Belize at the time, the Hon Said Musa, in his capacity as Minister of Finance and on behalf of the Government of Belize. He was at the time the Minister responsible for financial matters, including taxes. The Prime Minister also signed the Deed on behalf of the Government of Belize. According to the website of the Belize Ministry of Finance (C-46), the Minister of Finance heads the Ministry of Finance in Belize, which includes the Department of Income Tax.

77.  The Settlement Deed as Amended was also signed on behalf of the State of Belize by the Attorney-General at the time, the principal legal adviser to the Government of Belize and the officer who was responsible for the administration of legal affairs in Belize, according to the Constitution of Belize. (A-9, Section 41(1)2)

78.  The Settlement Deed as Amended was accompanied by a letter addressed to the Chairman of BCB Holdings from the Hon Said Musa dated 21 June 2006. This letter *"irrevocably confirmed"* that all business and income tax obligations of BBL, among others, would be governed by the terms of the Settlement Deed as Amended and also *"irrevocably fixed"* the rate of income tax set out in the Deed in respect of BBL for as long as BCB Holdings remained a PIC *"notwithstanding anything contained in the Income Business Tax Act to the contrary"*. (C-16)

79.  The Tribunal notes that under Section 36(1) of the Constitution of Belize the executive authority of the country is vested in Her Majesty, i.e., the Crown. In exercising their executive authority Ministers of the Belize Government act on behalf of the Crown. Section 36(2) of the Constitution of Belize provides that *"subject to the provisions of this Constitution, the executive authority of Belize may be exercised on behalf of Her Majesty by the Governor General either directly or through officers subordinate to him."* The Prime Minister of Belize is appointed by the Governor General and is the Senior Minister in the Government. The appointment of the Hon Said Musa as Prime Minister and Minister of Finance was published in the Belize Gazette Extraordinary of 23 August 2004 (C-15) which expressly states that the Governor General assigned to the Prime Minister *"responsibility for the business of Government more fully enumerated*

- 40 -

*hereunder and directs that the Ministry shall be known as the Office of the Prime Minister and Ministry of Finance, Defence and the Public Service ".*

80.     In addition to the specific power assigned to him by virtue of the Constitution of Belize the Tribunal considers that the Crown (and therefore the Prime Minister) has, at common law, a wide prerogative to enter into contracts which is unfettered by restrictions as to subject matter or persons. See the Australian case of *New South Wales v Bardolph*[23] which reaffirmed that the Crown prerogative may be exercised by the Government in the absence of any constitutional or statutory restriction, provided that: (i) the contract is entered into in the ordinary or necessary course of Government administration; (ii) is authorised by the responsible Minister; and (iii) any payments by the Government are covered by, or referable to, an appropriate Parliamentary grant. In this case no payment by the Government is involved so the third limb does not apply.

81.     As to the first and second limbs, the Tribunal is satisfied that as both Prime Minister and Minister of Finance the Hon Said Musa had authority to enter into the Settlement Deed as Amended and to give the warranties set out in his letter to the Chairman of BCB Holdings dated 21 June 2006, and that the contract was one entered into in the ordinary or necessary course of the administration of the Government of Belize. The Tribunal takes account of the fact that the Settlement Deed as Amended does give the Government considerable financial benefits, including the Claimants' agreement not to reopen the previous arbitration proceedings or to bring claims against the Government for breach of the original Settlement Deed. It is not unusual for Governments to enter into settlement arrangements which involve concessions or reductions. Set off

---

[23] [1934] 52 CLR 455. The Tribunal notes that *Bardolph* has been followed by the St Lucian Court of Appeal in *The Attorney-General v Martinus Francois* Civil Appeal No 23 of 2003.

arrangements have been entered into by the United Kingdom Government[24] and the Tribunal notes that this has also been done by previous and present governments in Belize.[25]

82. Claimants have recognized in their Opening Written Submissions that the general power to contract of the Prime Minister and Minister of Finance only exists "in the absence of some controlling statutory provision", and have submitted that there are no such provisions in the present case. In a separate section of their Opening Written Submissions, however, the Claimants seek to rely on a specific statutory provision (Section 95 of the IBTA) as conferring upon the Government specific power to contract in this case. Having considered this issue, the Tribunal finds that the said specific power is, in fact, a "controlling statutory provision" within the meaning of the *Bardolph* test, which has taken away such general powers to contract as may have existed prior to enactment of the IBTA.

83. The question in relation to actual authority, therefore, turns on the proper interpretation of Section 95 of the IBTA. The Tribunal has accordingly carefully considered that statutory provision. Section 95 which is found in Part I of the IBTA, which relates to income tax, provides as follows:

> "*(1) The Minister* (i.e., the Minister responsible for finance) *may remit the whole or any part of the income tax payable by any person if he is satisfied that it would be just and equitable to do so.*
>
> *(2) Notices of such remission shall be published in the Gazette*".

---

[24] See, for example, in *re D. H. Curtis (Builders) Ltd* [1978] 2 WLR 28.
[25] See the examples referred to in the *Telemedia* Award (A-38).

84.   Part III of the IBTA specifically refers to Business Tax. Section 111(5) which is contained in Part III provides that *"the provisions relating to assessments, review, objections, appeals, collection and the recovery of income tax contained in Part I of this Act shall apply mutatis mutandis to assessments, reviews, objections, appeals, collections and the recovery of tax under this Part"*.

85.   In their written submissions to the Supreme Court of Belize dated 4 February 2009 the Government of Belize argued that there is no power to remit Business Tax under Section 95 as this section contained in Part I of the IBTA only applied to income tax. The Tribunal has, therefore, considered in some detail the construction of the relevant provisions of the Act and in particular whether Section 95 applies to the remittance of Business Tax. The Government's argument, as appears from their submissions, is that the only sections of Part I of the Act which apply to Business Tax, as opposed to income tax, are those relating to assessments (Sections 38-45), collection (Sections 53-61) and recovery (Sections 62-85). The Government submits that Sections 86-95 are contained in a stand-alone part of the Act headed "General" and do not come under Section 111(5). The Tribunal considers that it should adopt a purposive approach to the construction of the Act, as urged by the Claimants. If the Government's narrow interpretation of Section 111(5) were correct this would mean that not only would Section 95 of the Act not apply to Business Tax but neither would the preceding Sections 86-94. These are provisions dealing with the punishment for offences against the Act, including failure to make tax returns and the making of false statements and returns (Sections 86-88) and the impeding of the Commissioner or Chief Collector of Taxes and the fraudulent transfer of property (Sections 90-91) and would only apply to income tax and not Business Tax. On the Government's construction of Section 111(5)

- 43 -

a party could be prosecuted for offences in relation to income tax, but not in relation to Business Tax. In the Tribunal's view, this could not have been the intention of the Legislature.

86.   In their submissions the Government also argued that the use of the word "remit" in Section 95 means that tax has to be assessed before it can be remitted, and that it does not refer to future tax liability, as provided for in the Settlement Deed as Amended. [26] The Tribunal considers that the Government's interpretation of 'remit' is too restrictive. In the Tribunal's view the definition can include the cancellation or extinguishment of all or part of a financial obligation[27] whether past or future.

87.   Finally on this point the Tribunal notes that Section 95(2) of the IBTA requires notice of any remittance made by the Minister of Finance under Section 95(1) to be published in the Gazette. The Claimants have been unable to confirm whether this has been done in relation to the remittance of the Business Tax provided for under the Settlement Deed as Amended. The Tribunal notes, however, that there is no time limit stipulated for publishing the notice and, in any event, a failure to give the notice, which is an administrative formality, would not, in the Tribunal's view, affect the exercise of the power under Section 95(1) by the Minister of Finance.[28]

88.   For the above reasons the Tribunal finds that the Hon Said Musa, as Prime Minister and Minister of Finance, had actual authority under Section 95 of the IBTA to enter into the Settlement Deed as Amended.

---

[26] The Government relies on the definition of 'remit' in Black's Legal Dictionary.
[27] See the definition of 'remission' in Black's Legal Dictionary.
[28] See Statement of Case, paragraphs 122-127.

Apparent Authority

89.   Even if the Prime Minister and Attorney-General lacked the actual authority to enter
      into the Settlement Deed as Amended, the Claimants argue that they had apparent
      authority to do so. This is a matter which falls to be governed by English law, as the law
      of the contract. This is an issue which was fully considered by the Commercial Court in
      London in *Marubeni Hong Kong and South China Limited v Government of
      Mongolia*[29]. That case concerned an unconditional guarantee given by the Mongolian
      Government acting through the Ministry of Finance supported by a legal opinion given
      by the Deputy Minister of Justice. The authority of the Government to enter into the
      guarantee was disputed following a change of government. The Judge (Creswell J) held
      that the Government had actual authority to enter into the guarantee, but went on to set
      out the principles of English law as to apparent authority. He held that apparent
      authority will arise where (i) a person by words or conduct represents or permits to be
      represented that a person has authority to act on his behalf; (ii) the representation is
      express or implied; and (iii) it is either a direct representation by the principal of the
      agent's authority or a representation of a very general nature and arises from the
      principal putting the agent in a specific position carrying with it a usual authority. The
      Judge added that there were special considerations to take into account in the case of a
      contract with a Government (or Crown), namely (i) that no public officer, unless
      possessing some special power, can hold out on behalf of the Crown[30]; and (ii) where to
      bind the Government would be to fetter the Crown's freedom to do its public duty.

---

[29] [2004] 2 Lloyd's Reports. 198. (A-16)
[30] Attorney-General v Silver [1953] AC461

- 45 -

90.    In the *Marubeni* case the Judge held that the Minster of Justice and the Deputy Minister of Justice both had actual and apparent authority to issue opinion letters which amounted to a holding out of the Ministry of Finance to enter into the guarantee. The Arbitral Tribunal, applying *Marubeni* to the facts of the present case, finds that the Prime Minister and Minister of Finance of Belize had apparent authority binding the Government of Belize when executing the Settlement Deed as Amended and giving the tax undertakings set out therein. Furthermore the Attorney-General, by signing the Settlement Deed as Amended, impliedly represented that the Prime Minister had the authority to enter into the agreement on behalf of the Government of Belize.

91.    The Arbitral Tribunal is comforted in its view by the fact that the Settlement Deed as Amended was honoured by the Parties[31] for a period of two years after its conclusion.

92.    Finally, the Tribunal notes that in his judgment of 11 February 2009, in the proceedings which were brought by Claimants to enforce the injunction granted by this Tribunal on 19 January 2009, Mr. Justice Awich expressed what he termed as a preliminary view that the Settlement Deed as Amended was illegal, and that tax concessions were usually granted by legislation, to ensure legality. In relation to that issue, this Tribunal decides that the Prime Minister had actual, or alternatively apparent, authority to give on behalf of the Government of Belize the contractual undertakings contained in Clauses 4.1 and 4.2 of the Settlement Deed as Amended, and that the Government is contractually bound by those undertakings, such that any breach of them by the Government may give rise to a cause of action in damages. *As pointed out in paragraph 69 above, the Tribunal is not being asked to enforce the revenue laws of Belize but is being asked to*

---

[31] Including the Commissioner of Income Tax. (See paragraph 44 above.)

determine the validity and interpretation of a contractual warranty made on behalf of Respondent promising Claimants favourable tax treatment for their operation in Belize.

## E.   Repudiatory Breach of Contract / Entitlement to Terminate

93.   Claimants contend that the Government of Belize took actions which constitute a repudiatory breach of the Settlement Deed as Amended, entitling Claimants under English law to treat the agreement as discharged and to terminate it, which it did by letter dated 15 October 2008 (C-4).  The actions invoked by Claimants were the Belize Commissioner of Income Tax's letter of 29 August 2008 (C-19) enclosing tax assessments which, according to Claimants, were inconsistent with the terms of the Settlement Deed as Amended and the Commissioner's letter dated 8 October 2008 stating that the Settlement Deed does not supersede the IBTA and rejecting the tax returns filed by BBL over the past two years (C-3).

94.   Whether these actions by the Commissioner of Income Tax amounted to a repudiatory act entitling Claimants to consider the Settlement Deed as Amended as discharged are questions which, under the Deed, are governed by English law.  In the case of *Universal Cargo Carriers Corporation v. Citati* (1957) 2 Q.B. 401 at 436, Mr. Justice Devlin stated English law regarding repudiatory breach:

> *A renunciation can be made either by words or by conduct, provided it is clearly made. It is often put that the party renunciating must "evince an intention" not to go on with the contract. The intention can be evinced either by words or by conduct. The test of whether an intention is sufficiently evinced by conduct is whether the party renunciating has acted in such a way as to lead a reasonable person to the conclusion that he does not intend to fulfil his part of the contract.*

- 47 -

95.   As a matter of English law, a repudiatory breach of contract by one party entitles the other party to treat the contract as discharged and to terminate it[32] .

96.   It is the view of the Arbitral Tribunal that the Commissioner of Income Tax, acting on behalf of the Government of Belize, by his letters of 29 August 2008 and 8 October 2008, clearly evinced the Government's intention not to go on with an essential part of the contract, in the words of *Universal Cargo Carriers*.

97.   The Government had promised in Clause 4.1(c)(iii) of the Settlement Deed as Amended to provide certain treatment to the payment of Business Tax and income tax by the BCB Holdings group, which was, in the view of the Arbitral Tribunal, an essential element of the agreement. In refusing to accept Claimants' tax returns based on this treatment, Respondent breached its contractual warranty and clearly evinced its intention not to honour the agreement. This amounted to a repudiatory breach on the Government's part, which entitled Claimants to consider that the Settlement Deed as Amended was discharged and to terminate it, which they lawfully did by their letter of 15 October 2008 (C–4).

## F.   Damages

98.   As part of the relief they seek, Claimants have claimed damages for the breaches of the Settlement Deed as Amended.

99.   The principles of English law applicable to an award of damages following an accepted repudiatory breach of contract have recently been restated by the English House of

---

[32] Chitty on Contracts 30th Ed., Chapter 24-001 *et.seq.*

Lords in *The Golden Victory* [2007] UKHL 12, paragraphs 8-9. In short, Claimants are entitled to compensatory damages such as will put them in the same financial position as if the contract had been performed.

100. As explained in Section V of this Award, Claimants' position is that the Settlement Deed as Amended *conferred upon them a significant financial benefit in the form of substantial savings in Business Tax payable from 1 April 2006 until the expiry of Claimants' PIC status (see paragraph 42 above as to Claimants' PIC status) on 31 March 2020.*

101. In their Opening Written Submissions, Claimants have separated their claims between "historical losses" (being losses incurred by Claimants by reason of actual payments of tax already made to the Respondent for the three year period from 1 April 2006 to 31 March 2009) and "future losses" (being losses to be incurred by Claimants through the payment of additional tax for the 11 year period from 1 April 2009 to 31 March 2020).

102. These two alleged heads of loss are considered in turn below.

"Historical losses"

103. Claimants' claim in this respect – as set out in paragraphs 167 to 174 of their Opening *Written Submissions (see also paragraph 193)* – is as follows:

| Period | Amount claimed |
|---|---|
| 1 April 2006 to 30 June 2008 | BZ$11,431,552.90 |
| 1 July 2008 to 30 Sept 2008 | BZ$1,201,420.42 |
| 1 Oct 2008 to 31 Dec 2008 | BZ$1,087,397.12 |
| 1 Jan 2009 to 31 March 2009 | BZ$302,912.06 |

- 49 -

104. Each of these four sums claimed is comprised of three elements being (i) actual taxes paid by Claimants, which Claimants say they ought not to have had to pay pursuant to the terms of the Settlement Deed as Amended (ii) penalty and interest charged by the Respondent on the ground of late payment of those taxes and (iii) bailiff and court fees paid by Claimants as a result of enforcement summons issued by the Respondent to recover those taxes for the first three periods (being periods preceding or partly preceding Claimants' acceptance of the Respondent's repudiatory breach on 15 October 2008).

105. The Tribunal accepts the evidence of Claimants' witness (Mr. Coye) and of the expert called by Claimants (Mr. Clokey) that the differences between Claimants' calculations of taxes due in their returns and the Respondent's calculations of those taxes in its re-assessments and judgment summonses arise out of (and exclusively out of) the fact that Claimants' calculations have been made pursuant to the terms of the Settlement Deed as Amended, and that the Respondent's calculations have been made without taking any account of the said terms. In other words, subject to verification below of the amounts claimed by reference to the underlying evidence and to potential questions as to the recoverability of arrears interest/penalties and bailiff/court fees, those differences represent the loss caused to Claimants by the Respondent's failure to abide by the warranties and undertakings given by it in the Settlement Deed as Amended.

106. The evidence underlying Claimants' "historical loss" claim was identified by Counsel for Claimants at the Hearing (see HT page 173 line 15 to page 175 line 21) and is considered below.

107. For the period 1 April 2006 to 31 June 2008, the tax returns filed by Claimants were produced by Claimants as exhibit C-5. Respondent disputed those returns and raised assessments in a total sum of BZ$11,006,387.63 (comprising tax said to be due of BZ$9,013,369.03 + BZ$1,993,018.60 penalty and interest) on 29 August 2008 (C-7). Judgment summonses were issued for recovery of that sum (BZ$9,013,369.03) in tax together with total arrears interest of BZ$2,410,163.88 and BZ$12,015 (3 x BZ$4,005) of bailiff and court fees on 10 December 2008 (C-11). Claimants effected a total payment of BZ$11,423,532.74 comprising BZ$9,013,369.03 of tax and BZ$2,410,163.71 of arrears interest on or about 12 February 2009 (C-26)[33]. The Tribunal accepts that the bailiff and court fees set out in exhibit C-11 were not included in that payment (as is clear from the receipts at C-26) but were paid in addition to this amount as submitted by Claimants (see HT page 173 line 21 to page 174 line 8). It further appears from the total amount claimed by Claimants for that period that two, and not three, sets of Court fees were paid. The Tribunal accordingly concludes that the amounts paid by Claimants to Respondent over and above the maximum tax liability warranted in the Settlement Deed as Amended for that first period was **BZ $11,431,542.74**[34] made up as follows:

(i)     BZ$9,013,369.03 of tax;

(ii)    BZ$2,410,163.71 of arrears interest; and

(iii)   BZ$8,010 of bailiff and court fees.

---

[33]     This is the total amount which appears on the Respondent's revenue collector receipts at exhibit C-26. See also footnote 4 above.

[34]     There is a negligible difference of BZ$ 10.16 between this figure and that of BZ$ 11,431,552.90 claimed by Claimants at paragraphs 174, 184 and 193 of Claimants' Opening Written Submissions.

108. For the period 1 July 2008 to 30 September 2008, the tax returns filed by Claimants
were produced by Claimants as exhibit C-9. Respondent disputed those returns and
raised an assessment in a sum of BZ$1,771,600 first on 15 October 2008 (C-10) which
it corrected to BZ$1,167,824.96 (consisting of BZ$1,086,348.81 tax + BZ$81,476.15
interest) on 26 February 2009 following representations by Claimants regarding the
correct revenue basis for the period (C-23 and C-25). A judgment summons was issued
for recovery of that sum (BZ$1,086,348.81) in tax together with total arrears interest of
BZ$114,066.61 and BZ$1,005 of court fees on 24 April 2009 (C-44). Claimants
effected a total payment of BZ$1,200,415.42 comprising BZ$1,086,348.81 of tax and
BZ$114,066.61 of arrears interest on or about 8 May 2009 (see exhibit C-45). In
addition, Claimants paid bailiff and court fees in the sum of BZ$1,005 (as set out in the
judgment summons at exhibit C-44). The Tribunal accordingly concludes that the
amounts paid by Claimants to Respondent over and above the maximum tax liability
warranted in the Settlement Deed as Amended for that second period was
**BZ$1,201,420.42** made up as follows:

(i)     BZ$1,086,348.81 of tax;

(ii)    BZ$114,066.61 of arrears interest; and

(iii)   BZ$1,005 of bailiff and court fees.


109. The period 1 October 2008 to 31 December 2008 was what Claimants described as "a
split period" (HT page 174 line 25) with the first 15 days of the period being prior, and
the remainder of the period being ulterior, to Claimants' acceptance of Respondent's
repudiatory breach on 15 October 2008. Claimants accordingly filed a tax return split
between those two periods on 15 January 2009 (C-22). A sum of BZ$175,949.23
(consisting of BZ$165,040.03 tax, BZ$9,904.20 interest and BZ$1,005 bailiff and court

fees) was ultimately paid for the pre-acceptance period on or about 8 May 2009 following the issue of a judgment summons (C-45). As for the post-acceptance period (16 October to 31 December 2009), the sum of BZ$911,447.89 was paid on the day the tax return was filed (see C-46). It further appears from the "Schedule of Overpayment" included by Claimants with their tax return of 15 January 2009 (C-22) that there remained (after deduction of US$ 165,070.03 for the pre-acceptance period – 1 October to 15 October 2008) an "overpayment carried forward" of BZ$1,984,713.90 which, had the Settlement Deed as Amended remained in existence, could have been used to set off the tax liability of BZ$911,447.89 for the post-acceptance period. The Tribunal accordingly concludes that the amounts paid by Claimants to Respondent over and above the maximum tax liability warranted in the Settlement Deed as Amended for the third period (1 October to 31 December 2008) was **BZ$1,087,397.12** made up as follows:

(i)     BZ$1,076,487.92 of tax;

(ii)    BZ$9,904.20 of arrears interest; and

(iii)   BZ$1,005 of bailiff and court fees.

110.   As for the fourth and final period (1 January to 31 March 2009), the relevant return was filed on 15 April 2009 (C-47) and the relevant payment of BZ$302,912.06 was effected on the same day (C-48), as the whole of the period post-dated Claimants' acceptance of Respondent's repudiatory breach. It further appears from the "Schedule of Overpayment" included by Claimants with their tax return of 15 January 2009 (C-22) that there still remained (after deduction of the further BZ$911,447.89 of tax due for the post-acceptance period – 15 October to 31 December 2008) an "overpayment carried forward" of BZ$1,073,266.01 which, had the Settlement Deed as Amended remained in existence, could have been used to set off that tax liability of BZ$302,912.06. The

Tribunal accordingly concludes that the amounts paid by Claimants to Respondent over and above the maximum tax liability warranted in the Settlement Deed as Amended for the fourth period (1 January to 31 March 2009) was **BZ$302,912.06** made up exclusively of tax.

111.  The Tribunal has considered whether its award on damages on historical losses should include the elements of interest and bailiff and court fees over and above the actual tax recovered by Respondent. The Tribunal is of the view that these additional costs (interest, bailiff and court fees) would not have been incurred had Respondent respected the undertakings and warranties given by it in the Settlement Deed as Amended and that they were reasonably foreseeable losses (as Respondent could not expect Claimants to accept its breaches of contract without protest) covered by the broad language of Respondent's indemnity in the Settlement Deed as Amended. The Tribunal accordingly concludes that Respondent's repudiatory breach has caused Claimants historical losses for the three year period 1 April 2006 to 31 March 2009 in the sum of **BZ$14,023,272.34** made up as follows :

(i)     BZ$11,176,205.76 of tax;

(ii)    BZ$2,534,134.52 of arrears interest; and

(iii)   BZ$10,020 of bailiff and court fees.

"Future losses"

112.  In addition to recovery of these past "historical losses", Claimants seek the award of a sum of money to compensate them for the loss of the tax benefits of the Settlement Deed as Amended going forward, i.e., for the 11 year period from 1 April 2009 to 31

- 54 -

March 2020.   Claimants have adduced the evidence of Mr. Clokey, a partner of PricewaterhouseCoopers. Mr. Clokey has produced two reports in these arbitral proceedings. In his first report dated 17 April 2009, Mr. Clokey has attempted to forecast BBL's future financial performance for the period 2009-2020 on the basis *(inter alia)* of its historical financial performance (in particular the growth of its deposit base) and of the economic prospects of Belize (analysed in terms of GDP growth): see Sections V and VI of the report; HT page 47 line 21 to page 48 line 22.   Mr. Clokey then used that forecasted financial performance in order to forecast taxable income, and the extra tax burden imposed on Claimants (as a consolidated entity: see report paragraphs 7.2, 7.3, HT pages 67-68) for each year from 2009 to 2020 as a result of Respondent's repudiation of the Settlement Deed as Amended: see Section VII of the report. He then discussed which discount rate to use to obtain the net present value of the resulting cash flows, opined that "the appropriate discount rate is that for a liability *not an asset*" (*Section VIII of the report*), and concluded that "an appropriate range is between 7% and 9%" . On that basis, Mr. Clokey assessed Claimants' future losses to be in the range of BZ$62 m (at a discount rate of 9%) to BZ$69 m (at a discount rate of 7%).

113.  Mr. Clokey's second report was produced following the Tribunal's request that "[he] provide [the Tribunal] with a calculation of the weighted average cost of capital of the Belize Bank and to calculate damages using that rate as the discount rate ... and to state for [the Tribunal] the pros and cons, in his view, of the two" (see HT page 182). In that report, Mr. Clokey calculates that the weighted average cost of capital ("**WACC**") of the Belize Bank is "in the range of between 6.5% and 7.5%" (see paragraph 4.14 of the second report) and that the value of Claimant's claims for future losses assessed using

the WACC as a discount rate was accordingly within a slightly higher range of BZ$68 m (at a discount rate of 7.5%) to BZ$71 m (at a discount rate of 6.5%).

114. Mr. Clokey's calculations are based on what he has described as a trend of "steady growth at a steady growth rate" (see e.g., HT page 49 line 19). His evidence was that his model is *"a model that presumes a sort of serene future that goes along at typical rates. I know the future is going to bring good times and bad times, so what will actually happen will be some years much better than I predict and probably there will be some years that are worse than that which I predict"* (see HT page 50 lines 13-19). However, Mr. Clokey accepted in his oral evidence that the Belize economy as a whole "has suffered" as a result of the current economic downturn (see HT page 44). It is also clear from Mr. Clokey's evidence that Claimants have had some operational difficulties in the recent past, although Mr. Clokey sought to describe these as a "hiccup" (see HT page 60). The Tribunal has carefully considered Mr. Clokey's evidence, and is of the view that it cannot proceed on the basis of the growth assumptions contained in his first report. There is, in the Tribunal's view, a clear risk (at least) that during the next few years, given the current economic crisis and its unpredictable duration, *BBL's cash flows will be lower than historical levels* and, in the Tribunal's judgment, a real possibility that they will rise again over the longer term to reach back, and perhaps exceed, historical levels. On balance, the Tribunal is of the view that the best indication which it has of Claimants' losses going forward are the three years of losses which have already been incurred (from 1 April 2006 to 31 March 2009), and the Tribunal has accordingly decided to assess Claimants' future losses on the basis of a constant yearly cash flow based on a yearly average of the total loss realized over that three year period.

115. As noted in paragraph 111 above, that total loss was BZ$14,023,272.34 made up of BZ$11,176,205.76 tax, BZ$2,534,134.52 arrears interest, and BZ$10,020 bailiff and court fees. These last two amounts are irrelevant to an assessment of future loss as Claimants have now accepted Respondent's repudiation of the Settlement Deed as Amended and accordingly no longer have any valid reason to withhold tax payments in Belize and incur arrears interest and bailiff and court fees. The Tribunal will accordingly assess Claimants' future losses on the basis of a constant yearly loss of BZ$3.7 m per year for each year from 1 April 2009 – 31 March 2010 to 1 April 2019 – 31 March 2020.

116. As for the discount rate applicable to these cash flows, the Tribunal has decided to use the discount rate commonly used in international commercial and investment arbitration, i.e., the weighted average cost of capital of Claimants. In that respect, Claimants note Mr. Clokey's statements in his second report (i) that BBL's post-tax cost of debt is 5.28% (6% - 12% Business Tax, see paragraphs 4.9 - 4.10 and Appendix 2) and (ii) that the applicable cost of equity is 16% (see paragraph 4.8). With respect to the cost of debt, the Tribunal prefers Mr. Clokey's prior estimation of the cost of a liability to Claimants set out in Section VIII of his first report to the new calculations set out in paragraphs 4.9-4.10 of his second report, and it accordingly adopts a post tax cost of debt of 6.16% (7% - 12% Business Tax). As for BBL's cost of equity, the Tribunal accepts Mr. Clokey's calculations and adopts a cost of equity of 16%. As for the level of gearing, the Tribunal does not accept Mr. Clokey's position (contained in paragraph 4.13 of his second report) that "in assessing the WACC one should consider a 'market' level of gearing, not necessarily the actual level for the business being valued". Mr. Clokey has provided no basis for that position. In its request to Claimants at the hearing

on 18 June 2009 (see paragraph 34 above), the Tribunal asked Mr. Clokey to calculate the actual "weighted average cost of capital (WACC) of the Belize Bank", not a hypothetical WACC based on a "market level of gearing". It appears from Appendix 2 of Mr. Clokey's second report that the level of gearing of BCB Holdings is in fact 65.9%. While the Tribunal does note that Mr. Clokey would exclude that fact from his assessment on the basis that "BBHL ... has significant non-banking operations"), the Tribunal also notes that BCB Holdings is a party to these proceedings, that Claimants' losses are being sought and recovered on a consolidated basis (see paragraph 112 above), and that this level of gearing is not far removed from that of one of the comparators used by Mr. Clokey *viz*., that of Scotiabank Trinidad & Tobago Ltd, a bank operating in a similarly small neighbouring economy). On balance, the Tribunal has accordingly decided to use a discount rate equal to the WACC of BBL calculated on the basis of a 65% gearing level, i.e., a rate equal to $(.35 \times 16\%) + (.65 \times 6.16\%) = 9.6\%$. The Tribunal notes that this discount rate is only marginally higher than the 9% upper range of Mr. Clokey's estimates contained in his first report.

117. On the basis of a constant cash flow of BZ$3.7 m per year discounted annually at 9.6%, the Tribunal calculates the net present value of Claimants' future losses at **BZ$26.82 m** calculated as set out in Appendix 1.

118. The Tribunal accordingly assesses Claimants' total losses at BZ**$40,843,272.34** (being BZ$14,023,272.34 in respect of historical or past losses and BZ$26.82 m in respect of future losses). The Arbitral Tribunal orders Respondent to pay this amount to Claimants forthwith.

### G.    Costs

119. In their Opening Written Submissions, Claimants specified the costs they claim as follows:

- costs of responding to the Business Tax assessments issued by the Government in breach of the Settlement Deed as Amended, and the subsequent enforcement proceedings;

- costs of applying for an interim injunction from the Tribunal, which was successful;

- costs of the attempt to enforce that interim injunction in Belize, which was unsuccessful; and

- costs in relation to the present arbitration proceedings.

120. Article 28.2 of the LCIA Rules provides that the Arbitral Tribunal shall specify in the award the total amount of the costs of the arbitration as determined by the LCIA Court. It further provides that unless the Parties agree otherwise in writing, the Tribunal shall determine the proportions in which the Parties shall bear all or part of such arbitration costs. The Parties have not agreed otherwise.

121. Article 28.4 of the LCIA Rules gives the Arbitral Tribunal the power to order all or part of the legal or other costs incurred by a party to be paid by another party, unless the Parties have agreed otherwise in writing. The Parties have not agreed otherwise.

122. In Article 28.3 of the LCIA Rules, the principle is laid down that unless the Parties agree otherwise in writing the Arbitral Tribunal shall make its orders on both arbitration and legal costs reflecting the Parties' relative success and failure in the arbitration

1/059

unless it appears to the Tribunal that this approach is inappropriate. The Parties have not agreed otherwise.

123. Clause 4.2 of the Settlement Deed as Amended contains an indemnity in favour of the Claimants from the Government of Belize in respect of *"all costs, expenses, losses and damages howsoever incurred by BB Holdings and Claimants arising out of or in connection with any breach of warranties contained in clause 4.1 of the Deed"*.

124. On the basis of these provisions, Claimants have requested the Arbitral Tribunal to award to them all costs arising out of the Government of Belize's breaches of the Settlement Deed as Amended. In accordance with the language of Clause 4.2 of the Settlement Deed as Amended, the Arbitral Tribunal would narrow this request to all costs arising out of or in connection with any breach of the warranties contained in Clause 4.1 of the Settlement Deed as Amended.

125. On 8 July 2009, Claimants submitted a schedule of the costs they claim. Among other things, they requested that any award of costs made by the Arbitral Tribunal be made in Belize dollars. The rate of exchange which Claimants have used to convert their pounds sterling costs into Belize dollars is £1 = BZ$3.09[35]. Respondent has made no comments on Claimants' claims for costs, their quantification, the currency in which any award of costs should be made or the exchange rate to be applied although invited by the Arbitral Tribunal to do so. The Arbitral Tribunal sees no objection to converting pounds sterling amounts into Belize dollars and will do so[36], but not necessarily at the exchange rate

---

[35] This is the average interbank exchange rate effective through the period, 29 August 2008 to 3 July 2009.
[36] Section 48(4) of the English Arbitration Act 1996 expressly provides that the Tribunal has the power to *"order the payment of a sum of money, in any currency."*

proposed by Claimant, since it appears to the Tribunal that in certain cases the exchange rate prevailing on the date the cost was incurred is more appropriate.

126. The total amount of the costs of the arbitration (other than the legal or other costs incurred by the parties themselves), up to the date of this Award, have been determined by the LCIA Court, pursuant to Article 28.1 of the LCIA Rules to be as follows:

| | | |
|---|---|---:|
| Registration fee: | £ | 1,500.00 |
| LCIA's administrative charges: | £ | 14,267.26 |
| Tribunal's fees and expenses: | £ | 168,750.00 |
| Secretary to the Tribunal fees and expenses: | £ | 14,228.73 |
| Hearing room costs: | £ | 2,262.10 |
| Court reporting charges: | £ | 5,240.05 |
| Total costs of arbitration | £ | 206,248.14 |

The Claimants have lodged a registration fee and three deposits (£50,000: 15 December 2008; £140,000: 14 May 2009; £30,000: 30 July 2009), together amounting to £221,520.27, which includes interest accrued, of which £206,248.14 has been applied to the costs of the arbitration as above. These costs shall be borne in their entirety by Respondent since Claimants have prevailed in all aspects of this arbitration. Respondent is, consequently, ordered to pay to Claimants forthwith the equivalent in BZ$ of £206,248.14, at an exchange rate which is the average of the exchange rates prevailing on the three days that each of the deposits made by Claimants was lodged. The £15,272.13 held by the LCIA, being the residue of the funds deposited, is to be refunded by the LCIA to Claimants.

127. Claimants have quantified their total legal and professional costs (including disbursements), using the exchange rate of £1 = BZ$3.09 (which appears to the Arbitral Tribunal to be the appropriate rate, in effect at the time these costs were incurred – see footnote 35 above), at an amount of BZ$2,896,785.45. This amount includes the fees and expenses of Allen & Overy, of local Belize counsel, Courtenay Coye & Co., of PricewaterhouseCoopers (in connection with the preparation of Mr. Clokey's expert report) and of outside counsel, Graham Dunning Q.C. and Nigel Pleming Q.C.   A schedule of Claimants' legal costs, as set forth in their submission of 8 July 2009, is as follows:

| Date of invoice to client | Amount claimed in respect of invoice (in GBP) | Amount claimed in respect of invoice (in BZD) | Date paid |
|---|---|---|---|
| Time costs other than in relation to the application for interim relief before the Tribunal or attempts to enforce the interim award before the Belize Courts (includes all disbursements): | | | |
| 30 September 2008 | 18,792.97 | 58,070.28 | 16 October 2008 |
| 31 October 2008 | 38,766.94 | 119,789.84 | 13 January 2009 |
| 27 November 2008 | 27,160.22 | 83,925.08 | 7 January 2009 |
| 31 December 2008 | 33,564.52 | 103,714.37 | 2 February 2009 |
| 30 January 2009 | 89,629.70 | 276,955.77 | 16 April 2009 |
| 27 February 2009 | 47,771.02 | 147,612.45 | 16 April 2009 |
| 31 March 2009 | 74,534.92 | 230,312.90 | 26 May 2009 |
| 30 April 2009 | 90,279.42 | 278,963.41 | 12 June 2009 |
| 10 June 2009 | 32,451.06 | 100,273.78 | Not yet paid – no interest to accrue |
| Unbilled amount to 3 July 2009 (including disbursements) | 194,035.84 | 599,570.75 | Not yet invoiced/paid - no interest to accrue |

| Time costs in respect of the interim relief application before the Tribunal: | | | |
|---|---|---|---|
| 27 November 2008 | 5,613.3 | 17,345.10 | 7 January 2009 |
| 31 December 2008 | 19,230.30 | 59,421.63 | 2 February 2009 |
| 30 January 2009 | 7,825.05 | 24,179.40 | 16 April 2009 |
| 27 February 2009 | 281.25 | 869.06 | 16 April 2009 |

| Time costs in respect of attempts to enforce that interim award before the Belize Courts: | | | |
|---|---|---|---|
| 30 January 2009 | 17,415.00 | 53,812.35 | 16 April 2009 |
| 27 February 2009 | 15,821.10 | 48,887.20 | 16 April 2009 |

Courtenay Coye invoices:

| | Amount due from client in BZD | Date paid |
|---|---|---|
| Time costs referable to attempts to enforce the interim award | 25,000 | 3 March 2009 |
| Other time costs | 23,250 | 3 March 2009 |
| Disbursements | 12,788.56 | 3 March 2009 |

PricewaterhouseCoopers invoices:

| Date of invoice to client | Amount claimed in respect of invoice (in GBP) | Amount claimed in respect of invoice (in BZD) | Date paid |
|---|---|---|---|
| 12 March 2009 | 29,790 | 92,051.10 | 23 March 2009 |

| 15 April 2009 | 94,682.23 | 292,568.09 | 24 April 2009 |

128. Claimants have also made a claim for arbitration costs other than legal costs, i.e., the travel costs and expenses of Philip Osborne, Michael Coye and Philip Johnson (a representative of Claimants) for attending the hearing in Paris in an amount of BZ$63,950.24.

129. The Arbitral Tribunal has examined Claimants' costs submissions and finds them to be reasonable.  Respondent has not challenged them or raised any questions about their quantum.  While the legal costs are high, they are in line with fees charged by prestigious London law firms comparable to Allen & Overy.  In considering the issue of the award of costs, the Arbitral Tribunal has borne in mind the failure of Respondent to participate in the arbitral proceedings, which has made the work of counsel and of the Arbitral Tribunal more onerous than if Respondent had presented its case.  On the basis of the foregoing, the Arbitral Tribunal awards to Claimants their legal and other costs of the arbitration in an amount of BZ$2,960,735.69 and orders Respondent to reimburse these costs to Claimants forthwith.

130. Included in Claimants' claims for costs are legal and other costs incurred in the court proceedings in Belize, for example, those of Courtenay, Coye & Co.  The precise amount of Allen & Overy's fees related to the Belize Court case is unclear.  These costs were incurred in actions to enforce the Arbitral Tribunal's Interim Decision and Order of 19 January 2009 enjoining Respondent from enforcing its judgment summonses or tax assessments and to defend against Respondent's court actions against BBL to collect those taxes.  While in normal circumstances, the Arbitral Tribunal would consider that

- 64 -

the allocation of costs incurred in other court proceedings should be determined by the court concerned, the present circumstances appear to the Arbitral Tribunal to fall within the Parties' indemnity agreement in Clause 4.2 of the Settlement Deed as Amended by which Respondent agreed to indemnify Claimants against "*all costs, expenses... losses.... howsoever incurred.... arising out of or in connection with any breach of the warranties contained in Clause 4.1 of the deed*". That is extremely broad language, and the Arbitral Tribunal considers that it reflects the Parties' intention that costs such as those incurred by Claimants in the Belize Court case be covered by Respondent's indemnity undertaking. Therefore, it is not necessary for the Arbitral Tribunal to know the precise amount of Allen & Overy's fees in the Belize Court case which, from the work description submitted by Claimants on 8 July 2009, appear to be a miniscule proportion of their total fees.

131. Claimants have entirely prevailed in this arbitration. Consequently, in accordance with the indemnity provision in Clause 4.2 of the Settlement Deed as Amended quoted above, or, alternatively, on the basis of Article 28.4 of the LCIA Rules, the Arbitral Tribunal awards to Claimants the costs of this arbitration to the extent determined as follows:

    a.    Costs of the arbitration itself, as determined by the LCIA, 206,248.14 pounds sterling, converted into Belize dollars at the rate of exchange prevailing between the two currencies for each deposit made by Claimants to cover these costs on the date when Claimants made such deposit.

    b.    Legal and professional costs BZ$2,896,785.45.

    c.    Arbitration costs other than legal costs BZ$63,950.24.

### H.   Interest

132.  Claimants request an award of interest (a) in respect of "historical losses" as defined in paragraphs 103 *et seq.* above and (b) on the amount of "future losses" awarded per paragraphs 112 *et seq.*, until such time as the Award has been satisfied by the Government.

133.  Article 26.6 of the LCIA Rules gives the Arbitral Tribunal the power to award interest:

> *"The Arbitral Tribunal may order that simple or compound interest shall be paid by any party on any sum awarded at such rates as the Arbitral Tribunal determines to be appropriate..."*

134.  Sections 49 (3) and 49 (4) of the English Arbitration Act 1996 state that the rate of such interest should be that which the Arbitral Tribunal considers meets the justice of the case.

135.  Claimants argued in their Opening Written Submissions (paragraph 190, page 42) that the appropriate rate of interest is 8% per annum (compounded annually) because that rate was equivalent to the discount rate applied by their expert, Mr. Clokey, in his Report submitted to the Arbitral Tribunal in calculating the present value of future liabilities.  Claimants pointed out that 8% is also the rate applied to judgment debts in the High Court of England and Wales pursuant to section 17(1) of the Judgment Act, 1838 and the Judgment Debts (Rate of Interest) Order 1993 (SI 1993/5 64).  Claimants also argued that compound interest is most appropriate in the circumstances as most accurately reflecting the loss caused to Claimants by not having had the funds paid at their disposal.  Interest should run, Claimants say, on sums already paid in respect of Business Tax for which Claimants would not have been liable had the offset of

overpayments, rather than the Government's assessments, been applied, running from the date of such payment until the date of the Award. Following the Award, interest should run, according to Claimants, on the total amount awarded until payment by Respondent (Opening Written Submissions, paragraphs. 188-192).

136. Respondent made no comments regarding Claimants' claims for interest or the amounts claimed although invited to do so by the Arbitral Tribunal.

137. The Arbitral Tribunal considers that the appropriate rate of interest to be applied on an obligation to pay a sum of money is the market rate of the currency in which the obligation is denominated[37], i.e., in this case Belize dollars, rather than the market or legal rate of interest applicable to the currency of the place of arbitration or of the country whose law governs the contract. Since the Belize dollar is pegged to the U.S. dollar, the Arbitral Tribunal believes that an appropriate rate of interest to be applied in this case is the one year US LIBOR rate, which on the date of this Award is 1.38%, plus two points or 3.38%.

138. The Arbitral Tribunal accepts that interest should be compounded annually because it believes that compounded interest, as opposed to simple interest, most accurately reflects the loss of the use of money to the party concerned. This view is now widely held and applied in international arbitral awards, unless the law applicable to the matter prohibits an award of compound interest. There is no such prohibition in English law which is the law applicable both substantively and procedurally. (See Section 49 of the English Arbitration Act of 1996.)

---

[37] See James Otis Rodner, 15 ICC International Court of Arbitration Bulletin N° 1-Spring 2004.

139. There are two categories of damages which have been awarded to Claimants by the Arbitral Tribunal. The first category consists of "historical losses" incurred prior to 1 April 2009 equal to the amounts of Business Tax (including interest and penalties) paid by BBL which it would not have paid if Clause 4.1.c.(iii) of the Settlement Deed had been applied (hereafter, "**Overpayment(s)**"). The second category of damages consists of the Arbitral Tribunal's evaluation of the current value of "future losses" which Claimants will suffer as a result of Overpayments it will make for the period from 1 April 2009 until 31 March 2020.

On the first category of damages, the amount of which has been established by the present Award as BZ$14,023,272.34, interest shall be paid at the rate of 3.38% per annum compounded annually on any unpaid portion of the amount of each Overpayment made from the respective date of each Overpayment until repayment of that amount is made by Respondent to Claimants.

On the second category of damages, the amount of which is established by the present Award as BZ$26.82 million, interest at the rate of 3.38% per annum compounded annually shall be paid on any unpaid portion of that amount from the date of the Award to the date of payment by Respondent.

140. Claimants also request an award of interest on the legal and professional costs they have incurred related to this arbitration. The amount of such costs and date they were incurred or paid is set forth in paragraph 127 of this Award. The Arbitral Tribunal notes that of the total amount of legal costs £32,451.06 (BZ$100,273.78) has not yet been

- 68 -

paid as of 3 July 2009 and £194,035.84 (BZ$ 599,570.75) had not yet been invoiced as of 3 July 2009. Claimants claim no interest on these two amounts. Consequently, of the total amount of legal and professional costs claimed by Claimants, BZ$2,896,785.45, interest is claimed only on that portion billed and paid, which amount is BZ$2,196,940.92.

141. The Arbitral Tribunal accepts Claimants' right to interest on the legal and professional costs which they have paid. Consequently, it awards to Claimants interest at a rate of 3.38% per annum compounded annually on any such costs which they have paid as set forth in paragraph 127 above, from the date Claimants made payment until paid to them by Respondent.

142. No interest on deposits made by Claimants with the LCIA (£220,000) is awarded since those amounts earn interest while on deposit which interest is credited to Claimants by the LCIA.

## I.   **Other Claims**

143. As set forth in paragraph 51 of the present Award, Claimants' requests for relief include the following:

   - A declaration that BBL was entitled, pursuant to the terms of the Settlement Deed as Amended, to set off overpayments in previous financial years against its payments of Business Tax as set out in the Returns. This request is dismissed on the basis that the declaratory relief sought is not appropriate in this case as the Claimants will be fully compensated by the award of damages made, and as nothing submitted by the

Claimants justifies the granting of such relief separately or in addition to the said award of damages.

- A declaration that the Settlement Deed as Amended has been terminated as a result of the government parties' repudiatory breach. The Arbitral Tribunal hereby repeats the declaration it made to this effect in paragraph 97 of the present Award.

144. In light of the Arbitral Tribunal's treatment of these issues in the Discussion section of the present Award, particularly in Section VI.D., it appears to the Tribunal that no further examination of these requests is necessary.

## VII. AWARD

On the basis of the foregoing considerations the Arbitral Tribunal unanimously decides as follows:

145. The Settlement Deed as Amended has been terminated as a result of Respondent's repudiatory breach and Claimants' acceptance thereof.

146. Claimants are entitled to damages in the amount of BZ$40,843,272.34. Respondent is ordered to pay this amount to Claimants forthwith.

147. Claimants are entitled to reimbursement of the costs of the arbitration fixed by the LCIA at £206,248.14 and entirely paid out of three deposits made by Claimants. Respondent is ordered to pay to Claimants forthwith the equivalent of this amount in

BZ dollars, at an exchange rate which is the average of the exchange rates prevailing on the three days each of the deposits made by Claimants to cover these costs was lodged.

148.  Claimants are also entitled to the legal, professional and other arbitration costs which they have incurred as a result of Respondent's breach, which the Arbitral Tribunal quantifies as BZ$2,960,735.69.  Respondent is ordered to pay this amount to Claimants forthwith.

149.  Claimants are entitled to interest at an annual rate of 3.38%, compounded annually on any unpaid amount of the damages and costs awarded to them, i.e., with respect to historical losses, from the date when each element of such losses was incurred, with respect to future losses, from the date of this Award and with respect to costs, from the date when such costs were paid, until paid by Respondent to Claimants.

150.  Any other claims or requests for relief made by Claimants are dismissed.

Legal place / Seat of Arbitration: London, England

Date: 18 August 2009

_____
Michael J. Lee
*Arbitrator*

_____
Salim Moollan
*Arbitrator*

_____
Carl F. Salans
Chairman of the Tribunal

- 71 -

## LCIA Arbitration no. 81169

### Appendix 1 to Final Award

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Discount rate | - | $d = 1/1.096$ | $d^2$ | $d^3$ | $d^4$ | $d^5$ | $d^6$ | $d^7$ | $d^8$ | $d^9$ | $d^{10}$ | |
| Actualised loss (in millions of BZ$) | 3.7 | 3.38 | 3.08 | 2.81 | 2.56 | 2.34 | 2.13 | 1.94 | 1.78 | 1.62 | 1.48 | 26.82 |

- 72 -

# Kimmelman Declaration
# Exhibit B

# SETTLEMENT DEED

CARLISLE HOLDINGS LIMITED

AND

GOVERNMENT OF BELIZE

THE ATTORNEY-GENERAL ON BEHALF OF THE SOVEREIGN
DEMOCRATIC STATE OF BELIZE

THE MINISTER OF FINANCE OF BELIZE

22  MARCH 2005

THIS  DOCUMENT IS EXECUTED AS A DEED AND IS MADE ON MARCH 22, 2005.

BETWEEN:

(1)     **CARLISLE HOLDINGS LIMITED** an international business company incorporated under laws of Belize whose registered office is at 60 Market Square, PO Box 1764, Belize City, Belize, Central America ("**Carlisle**");

(2)     **THE GOVERNMENT OF BELIZE** whose office is at New Administration Building, Belmopan, Cayo, Belize, Central America;

(3)     **THE ATTORNEY-GENERAL ON BEHALF OF THE SOVEREIGN DEMOCRATIC STATE OF BELIZE** whose office is at New Administration Building, Belmopan, Cayo, Belize, Central America; and

(4)     **THE MINISTER OF FINANCE OF BELIZE** whose office is at New Administration Building, Belmopan, Cayo, Belize, Central America.

WHEREAS:

(A)     On 9 December 2003 Carlisle and the Government of Belize entered into a Share Purchase Deed.

(B)     On 17 February 2004 Carlisle and the Government of Belize entered into an Option Deed which made further provision to the matters contained in the Share Purchase Deed.

(C)     On 5 January 2005, Carlisle commenced LCIA arbitration proceedings against the Government of Belize, the Attorney-General on behalf of the sovereign democratic State of Belize and the Minister of Finance of Belize by serving on them a Request for Arbitration in accordance with Article 1 of the LCIA Rules in relation to disputes arising out of and in connection with the Option Deed and the Share Purchase Deed (the "**LCIA Arbitration Proceedings**").

(D)     The parties now wish to settle the LCIA Arbitration Proceedings on the terms set out below.

IT IS AGREED:

1.      **DEFINITIONS**

        In this deed:

1.1     **Bank** means a bank which is licensed to conduct business in Belize.

1.2     **Belize Court Proceedings** means the proceedings before the Supreme Court of Belize (Action no. 15) which were commenced by the Attorney-General of Belize against Carlisle on 14 January 2005 (Action no. 15).

1.3     **Business Day** means a day on which the banks are open for business in Belize.

1.4     **Business Tax** has the meaning set out in the Income and Business Tax Act of Belize.

1.5     **Carlisle Group** means Carlisle and all its subsidiary undertakings.

1.6     **Carlisle Owed Amount** means the amounts due from the Government Parties to Carlisle in respect of unpaid Deferred Consideration pursuant to clause 7 of the Share Purchase Deed including that

2

proportion of the dividends paid to shareholders of Belize Telecommunications Limited since 3 April 2004 which would have been payable to Carlisle and a yet unquantified sum linked to the value of the concessions afforded to Innovative Communications Corporation by the Government of Belize together with interest thereon.

1.7    **Claim** means each and any claim, counter-claim, cause or right of action or proceedings, whether at law or in equity, of whatsoever nature and howsoever arising, in any jurisdiction whatsoever, whether secured, proprietary, by way of tracing, priority or otherwise, whether by way of contribution or subrogation or otherwise, whether known or unknown to the parties, whether or not presently known to the law and whether arising before on or after the date of this deed.

1.8    **Final Assessment** means the amounts finally assessed by the Government Parties as being due or payable by any member of the Carlisle Group (including each PIC Group company within the Carlisle Group) in respect of Business Tax and / or Income Tax in respect of all periods up to and including 31 March 2005.

1.9    **Government Parties** means the Government of Belize, the Attorney-General on behalf of the sovereign democratic State of Belize and the Minister of Finance of Belize, including but not limited to agents, departments (including but not limited to the Income and Business Tax Department), employees, ministries, officers or servants.

1.10   **Income Tax** has the meaning set out in the Income and Business Tax Act of Belize.

1.11   **LCIA Arbitration Proceedings** means the arbitration proceedings no. 5619 commenced by Carlisle against the Government Parties pursuant to the arbitration rules of the LCIA by a Request for Arbitration dated 5 January 2005.

1.12   **Option Deed** means a deed dated 17 February 2004 between Carlisle and the Government of Belize.

1.13   **PIC Group** means any and all companies comprised in a PIC Group as defined in Section 124 of the International Business Companies Act of Belize (as amended).

1.14   **Set-Off** has the meaning set out in clause 3.13.

1.15   **Share Purchase Deed** means a deed dated 9 December 2003 between Carlisle and the Government of Belize.

1.16   Words denoting persons shall include bodies corporate and unincorporated associations of persons and any references to the singular shall include the plural and *vice versa*.

1.17   The headings in this deed are for convenience only and do not affect its interpretation.

2.    **SETTLEMENT**

2.1    This deed is in full and final settlement of:

        (a)    all and any Claims of Carlisle arising out of or in connection with the Share Purchase Deed and the Option Deed, whether made in the LCIA Arbitration Proceedings against the Government Parties or otherwise;

        (b)    all and any Claims of the Government Parties of whatsoever nature and whenever or howsoever arising out of or in connection with the Share Purchase Deed and the Option Deed, including but not limited to any claim by way of defence or counterclaim which the Government Parties could make against Carlisle whether in the LCIA Arbitration

3

Proceedings or otherwise howsoever arising, including any Claims which the Government Parties could make against Carlisle arising out of the various transactions between the Government Parties and Innovative Communications Corporation and any Claims for interest and costs; and

(c)     all and any Claims which the Government Parties have made against Carlisle in the Belize Court Proceedings.

## 3.     LEGAL PROCEEDINGS

3.1     The parties agree that, except as provided in clause 3.11, the LCIA Arbitration Proceedings shall be terminated and hereby consent to such termination, with no order as to costs.

3.2     The parties agree that the Order of the Tribunal in the LCIA Arbitration Proceedings for the continuation of interim and conservatory measures dated 7 February 2005 shall be discharged forthwith.

3.3     The parties agree that, within 7 days of the date of this deed, they will write to the Tribunal in the LCIA Arbitration Proceedings consenting to the Tribunal making a consent award in the form attached at Appendix 1.

3.4     Any further costs of the LCIA Arbitration Proceedings up to the date of this deed (other than legal or other costs incurred by the parties themselves) shall be borne equally between the parties, between Carlisle on the one hand and by the Government Parties on the other hand.

3.5     The parties shall not take any further steps in the Belize Court Proceedings (which were stayed by Orders of the Supreme Court of Belize by Conteh CJ, dated 24 January 2005 and 18 February 2005) and the parties agree that the Belize Court Proceedings shall be discontinued forthwith with no order as to costs.

3.6     The parties agree that the injunction granted by the Supreme Court of Belize, by Conteh CJ against the Government Parties on 18 February 2005 in the Belize Court Proceedings shall be discharged forthwith.

3.7     The parties will give instructions to their lawyers forthwith to discontinue the Belize Court Proceedings and discharge the injunction on the terms set out in clauses 3.5 and 3.6 above.

3.8     The Government Parties shall not take any steps by way of appeal from the judgment of Mr Justice Morison dated 31 January 2005 or otherwise in the proceedings between Carlisle and the Government Parties in the Commercial Court of the English High Court of Justice (Action 2005 Folio 28).

3.9     The Government Parties shall not bring any claim against Carlisle on any undertaking or cross undertaking given by Carlisle including, but not limited to:

(a)     the undertakings given by Carlisle in connection with the Order of Cooke J dated 17 January 2005 and as recorded in Schedule thereto;

(b)     the undertaking signed by Philip Osborne on behalf of Carlisle dated 31 January 2005 in connection with the Arbitration Proceedings; and

(c)     the undertaking given by Carlisle in relation to Action no. 15 before the Supreme Court of Belize, as recorded in the Order made by Conteh CJ on 18 February 2005.

4

3.10   The parties agree to waive and treat as discharged all existing and future orders for costs against each other in any existing legal proceedings to which they are both party, except for:

(a)   the Order of Mr Justice Morison dated 31 January 2005 that the Government Parties pay to Carlisle the sum of £45,000 (referred to at paragraph 2 thereof). Subject to clause 3.12 below, the parties agree that the sum of £45,000 is outstanding, due and payable and will remain outstanding, due and payable after the date of this deed;

(b)   as referred to in clause 3.11 below.

3.11   The parties agree that, notwithstanding the parties' agreement in clause 3.1 that the LCIA Arbitration Proceedings shall be terminated, the Tribunal shall issue a partial final award in the LCIA Arbitration Proceedings against the Government Parties by way of reimbursement of the sum of £20,000 which was paid by Carlisle to the LCIA in substitution of the Government Parties' share of the initial deposit in respect of the costs of the arbitration, as referred to in the Tribunal's Order dated 8 March 2005. Subject to clause 3.12 below, the parties agree that, notwithstanding the parties agreement in clause 3.1 or any other clause of this deed, the sum of £20,000 is outstanding, due and payable and will remain outstanding, due and payable after the date of this deed.

3.12   Carlisle agrees to accept the amount of US$123,500 from the Government Parties in full and final settlement of the amounts which are outstanding, due and payable to Carlisle and referred to in paragraphs 3.10 and 3.11 above, provided the amount of US$123,500 is received by Carlisle within 10 (ten) days of the date of this deed. If the amount of US$123,500 is not received by Carlisle within 10 (ten) days of the date of this deed then the parties agree that the amounts of £45,000 and £20,000 (including any interest thereon) referred to in paragraphs 3.10 and 3.11 above will remain outstanding, due and payable by the Government Parties to Carlisle.

3.13   The parties hereby agree that the Carlisle Owed Amount shall be set-off against the Final Assessment (the "Set-Off").

## 4.   CONSIDERATION

4.1   In consideration of Carlisle agreeing not to pursue its Claims arising out of or in connection with the Share Purchase Deed and the Option Deed (as set out in paragraphs 2 and 3 above), the Government Parties each jointly and severally confirm and warrant that:

(a)   following the Set-Off, each member of the Carlisle Group will have satisfied in full all and any liabilities, assessments and claims of whatsoever nature and howsoever arising in respect of Business Tax and / or Income Tax in respect of all periods up to and including 31 March 2005 and without prejudice to the generality of the foregoing, following the Set-Off each PIC Group company within the Carlisle Group, including in particular but not limited to The Belize Bank Limited, has satisfied in full all and any such liabilities assessments or claims;

(b)   all filings in relation to any form of taxation required to be made on behalf of Carlisle or any member of the Carlisle Group in Belize are, including in particular but not limited to The Belize Bank Limited, complete and up to date; and

(c)   the calculation of and the raising of any assessments or claims in respect of Business Tax and/or Income Tax for The Belize Bank Limited (or any other PIC Group company within the Carlisle Group which is or may become a Bank) in respect of any period beginning on or after 1 April 2005 will be calculated solely and exclusively on the basis: (i) of the Business Tax rate prescribed for PIC Group companies which are Banks from time to time, which is

5

currently a charge of 8%; (ii) of the Income Tax rate prescribed for a company comprised in a PIC Group by Section 124 of the International Business Companies Act (Chapter 270 of the Laws of Belize); (iii) that Business Tax is a withholding tax for final Income Tax; and (iv) of the provisions applicable to Public Investment Companies and PIC Group companies contained in the International Business Companies Act (including the provisions which allow fiscal continuity of Public Investment Companies and of PIC Group companies) and the Income and Business Tax Act (Chapter 55 of the Laws of Belize) (including Section 15 (Allowance of trade losses) and Section 115 (Carry forward of losses) of the Income and Business Tax Act). No other Business Tax and/or Income Tax shall be payable by The Belize Bank Limited (or any other PIC Group company within the Carlisle Group which is or becomes a Bank).

4.2     The Government Parties agree to indemnify and to keep indemnified Carlisle and any member of the Carlisle Group against all costs, expenses, losses and damages howsoever incurred by Carlisle and any member of the Carlisle Group arising out of or in connection with any breach of the warranties contained in clause 4.1 of this deed.

4.3     In consideration of Carlisle agreeing to settle and not to pursue its Claims arising out of or in connection with the Share Purchase Deed and the Option Deed (as set out in paragraphs 2 and 3 above), the Government Parties as a result also agree that completion of the sale by the Government of Belize to Innovative Communications Corporation of the shares in Belize Telecommunications Limited representing 52.46 per cent. of the issued share capital has not been "completed" for the purpose of clause 3.1 of the Option Deed.

## 5.     ENTIRE AGREEMENT

5.1     Each party confirms that this deed (and the documents referred to therein) sets out the entire agreement and understanding between the parties in relation to its subject matter.  Each of the parties acknowledges that, in entering into this deed, it has not relied on any oral or written representation, warranty, or other assurance (except as provided for or referred to in this deed) and waives all rights and remedies which might otherwise be available to it in respect thereof.

5.2     Nothing in this clause limits or excludes any liability for fraud.

## 6.     CONFIDENTIALITY

6.1     The parties agree that this deed and the matters to which it refers are confidential.

6.2     None of the parties shall make (or in the case of Carlisle permit any other member of the Carlisle Group to make) any announcement concerning this or any ancillary matter.

6.3     Nothing in this clause prevents any announcement being made or any confidential information being disclosed:

(a)     with the written approval of the other parties, which in the case of any announcement shall not be unreasonably withheld or delayed; or

(b)     to the extent required by law or any competent regulatory body or stock exchange.

6.4     Nothing in this clause prevents disclosure of confidential information by any party:

(a)     to the extent that the information is in or comes into the public domain other than as a result of a breach of any undertaking or duty of confidentiality by any person; or

6

   (b)     to that party's professional advisers, auditors or bankers, but before any disclosure to any such person the relevant party shall procure that he is made aware of the terms of this clause and shall use its best endeavours to procure that such person adheres to those terms as if he were bound by the provisions of this clause.

**7.    NOTICES**

7.1    Any notice or other formal communication given under this deed must be in writing (which includes fax, but not email) and may be delivered or sent by post or fax to the party to be served at its address as follows:

   (a)     to Carlisle at:

60 Market Square
PO Box 1764
Belize City
Belize
Central America

Fax: +501 2274443

marked for the attention of Philip Osborne

   (b)     to any of the Government Parties at:

New Administration Building
Belmopan Cayo
Belize
Central America

Fax: +501 822 3390 / 822 0102

marked for the attention of the Attorney-General

or at such other address or fax number as it may have notified to the other parties in accordance with this clause.  Any notice or other document sent by post shall be sent by registered post.

7.2    Any notice or other formal communication shall be deemed to have been given:

   (a)     if delivered, at the time of delivery; or

   (b)     if posted, at 10.00 a.m. on the fifth Business Day after it was put into the post; or

   (c)     if sent by fax, on the date of transmission, if transmitted before 3.00 p.m. on any Business Day, and in any other case on the Business Day following the date of transmission.

7.3    In proving service of a notice or other formal communication, it shall be sufficient to prove that delivery was made or that the envelope containing the communication was properly addressed and posted either by registered airmail or that the fax was properly addressed and transmitted, as the case may be.

**8.    CONTRACT (RIGHTS OF THIRD PARTIES) ACT 1999**

8.1    The Government Parties expressly acknowledge that any member of the Carlisle Group which is not a party to this deed (in particular but not limited to The Belize Bank Limited) shall be entitled to enforce the terms of this deed (in particular clause 4) against any party to this deed in accordance with the Contract (Rights of Third Parties) Act 1999.

<div align="center">7</div>

9.     **BREACH**

Each of the parties acknowledges, having regard to the nature of this settlement, that damages would not be an adequate remedy for any breach of this deed and that the remedies of injunction, specific performance and other equitable relief for any threatened or actual breach of this deed should lie to enforce any of the obligations herein.

10.    **REMEDIES AND WAIVERS**

No delay or omission on the part of any of the parties in exercising any right, power or remedy provided by the law of any jurisdiction or under this deed shall:

(a)     impair such right, power or remedy; or

(b)     operate as a waiver thereof.

11.    **GOVERNING LAW AND ARBITRATION**

11.1    This deed is governed by and shall be construed in accordance with English law.

11.2    Any dispute arising out of or in connection with this deed including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this clause.  The number of arbitrators shall be 3 (one appointed by each Party and the third appointed jointly by the two Parties' arbitrators).

11.3    The arbitral proceedings shall be conducted in the English language.

11.4    The seat or legal place of the arbitral proceedings shall be London, England.

11.5    Each of the Government Parties irrevocably and unconditionally:

(a)     agrees that if Carlisle brings proceedings against it or its assets in relation to this deed no immunity from such legal proceedings (which will be deemed to include without limitation, suit, attachment prior to judgment, other attachment, the obtaining of judgment, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

(b)     waives any such right of immunity which it or its assets now has or may in the future acquire; and

(c)     consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with such proceedings including, without limitation, the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any award, order or judgment which may be made or given in arbitration proceedings or related enforcement proceedings.

11.6    For the avoidance of doubt, each of the Government Parties each irrevocably and unconditionally consents to:

(a)     any relief being ordered against it whether by way of injunction or otherwise.  This consent is given by each of the Government Parties with particular reference to, but without being limited by, Section 13(3) of the State Immunity Act 1978, or any other statutory re-enactment or modification thereof; and

8

(b)    the service of any writ or other document required to be served on any or all of the Government Parties in relation to legal proceedings, whether for instituting proceedings or otherwise, being effected in accordance with the notice provisions of clause 7.  This consent is given by each of the Government Parties with particular reference to, but without being limited by, Section 12(6) of the State Immunity Act 1978 or any other statutory re-enactment or modification thereof.

## 12.    GENERAL

12.1    Each party shall bear its own costs in connection with the negotiation, execution and implementation of this deed.

12.2    This deed shall be binding on the parties, their successors and assigns and the name of a party appearing herein shall be deemed to include the names of any such successor or assign.

12.3    This deed may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same agreement and any parties may enter into this deed by executing a counterpart.

**IN WITNESS** whereof this deed has been executed on the date first above written.

**SIGNATORIES**

Signed as a deed by **CARLISLE**    )
**HOLDINGS LIMITED** acting by a    )
director and its secretary/two directors    )

Director

Secretary/Director    *Philip T. Osborn*

Signed, sealed and delivered by **GOVERNMENT**    )
**OF BELIZE** this 22nd day of March 2005 in the    )
presence of    )
    )
    )
    )

Minister of Finance
(On behalf of the Government of Belize)

*Yvette Halliday*
Justice of Peace

*Yvette M. Halliday*
*Justice of the Peace*
*32 Bougainville St.*
*Ladyville, Belize Dist.*

9

Signed, sealed and delivered by **ATTORNEY
GENERAL-GENERAL OF BELIZE** this 22nd
day of March 2005 in the presence of

)
)
)
)
)
)

Attorney-General of Belize

_Yvette M. Halliday
Justice of the Peace
33 Bougenvilla St.
Ladyville, Belize Dist._

/Justice of Peace

Signed, sealed and delivered by **MINISTER OF
FINANCE OF BELIZE** this 22nd day of March
2005 in the presence of

)
)
)

Minister of Finance of Belize

/Justice of Peace

_Yvette M. Halliday
Justice of the Peace
32 Bougenvilla St.
Ladyville, Belize Dist._

10

1/100



# SETTLEMENT DEED AS AMENDED ON
## JUNE 21, 2006

**BB HOLDINGS LIMITED**

AND

GOVERNMENT OF BELIZE

THE ATTORNEY-GENERAL ON BEHALF OF THE SOVEREIGN
DEMOCRATIC STATE OF BELIZE

THE MINISTER OF FINANCE OF BELIZE

1



THIS DOCUMENT IS EXECUTED AS A DEED AND IS MADE ON 22 MARCH 2005 AND
AMENDED ON JUNE 21, 2006.

BETWEEN:

(1)     BB HOLDINGS LIMITED an international business company incorporated under laws of Belize
        whose registered office is at 60 Market Square, PO Box 1764, Belize City, Belize, Central America
        ("BB Holdings");

(2)     THE GOVERNMENT OF BELIZE whose office is at New Administration Building, Belmopan,
        Cayo, Belize, Central America;

(3)     THE ATTORNEY-GENERAL ON BEHALF OF THE SOVEREIGN DEMOCRATIC STATE
        OF BELIZE whose office is at New Administration Building, Belmopan, Cayo, Belize, Central
        America; and

(4)     THE MINISTER OF FINANCE OF BELIZE whose office is at New Administration Building,
        Belmopan, Cayo, Belize, Central America.

WHEREAS:

(A)     On 9 December 2003 BB Holdings and the Government of Belize entered into a Share Purchase
        Deed.

(B)     On 17 February 2004 BB Holdings and the Government of Belize entered into an Option Deed
        which made further provision to the matters contained in the Share Purchase Deed.

(C)     On 5 January 2005, BB Holdings commenced LCIA arbitration proceedings against the Government
        of Belize, the Attorney-General on behalf of the sovereign democratic State of Belize and the
        Minister of Finance of Belize by serving on them a Request for Arbitration in accordance with
        Article 1 of the LCIA Rules in relation to disputes arising out of and in connection with the Option
        Deed and the Share Purchase Deed (the "LCIA Arbitration Proceedings").

(D)     The parties now wish to settle the LCIA Arbitration Proceedings on the terms set out below.

IT IS AGREED:

1.      DEFINITIONS

        In this deed:

1.1     Bank means a bank which is licensed to conduct business in Belize.

1.2     Belize Court Proceedings means the proceedings before the Supreme Court of Belize (Action no.
        15) which were commenced by the Attorney-General of Belize against BB Holdings on 14 January
        2005 (Action no. 15).

1.3     Business Day means a day on which the banks are open for business in Belize.

1.4     Business Tax has the meaning set out in the Income and Business Tax Act of Belize.

1.5     BB Holdings Group means BB Holdings and all its subsidiary undertakings.

2

1.6 **BB Holdings Owed Amount** means amount due from the Government Parties to BB Holdings in respect of unpaid Deferred Consideration pursuant to clause 7 of the Share Purchase Deed including that proportion of the dividends paid to shareholders of Belize Telecommunications Limited since 3 April 2004 which would have been payable to BB Holdings and a yet unquantified sum linked to the value of the concessions afforded to Innovative Communications Corporation by the Government of Belize together with interest thereon.

1.7 **Claim** means each and any claim, counter-claim, cause or right of action or proceedings, whether at law or in equity, of whatsoever nature and howsoever arising, in any jurisdiction whatsoever, whether secured, proprietary, by way of tracing, priority or otherwise, whether by way of contribution or subrogation or otherwise, whether known or unknown to the parties, whether or not presently known to the law and whether arising before on or after the date of this deed.

1.8 **Final Assessment** means the amounts finally assessed by the Government Parties as being due or payable by any member of the BB Holdings Group (including each PIC Group company within the BB Holdings Group) in respect of Business Tax and / or Income Tax in respect of all periods up to and including 31 March 2005.

1.9 **Government Parties** means the Government of Belize, the Attorney-General on behalf of the sovereign democratic State of Belize and the Minister of Finance of Belize, including but not limited to agents, departments (including but not limited to the Income and Business Tax Department), employees, ministries, officers or servants.

1.10 **Income Tax** has the meaning set out in the Income and Business Tax Act of Belize.

1.11 **LCIA Arbitration Proceedings** means the arbitration proceedings no. 5619 commenced by BB Holdings against the Government Parties pursuant to the arbitration rules of the LCIA by a Request for Arbitration dated 5 January 2005.

1.12 **Option Deed** means a deed dated 17 February 2004 between BB Holdings and the Government of Belize.

1.13 **PIC Group** means any and all companies comprised in a PIC Group as defined in Section 124 of the International Business Companies Act of Belize (as amended).

1.14 **Set-Off** has the meaning set out in clause 3.13.

1.15 **Share Purchase Deed** means a deed dated 9 December 2003 between BB Holdings and the Government of Belize.

1.16 Words denoting persons shall include bodies corporate and unincorporated associations of persons and any references to the singular shall include the plural and *vice versa*.

1.17 The headings in this deed are for convenience only and do not affect its interpretation.

2. **SETTLEMENT**

2.1 This deed is in full and final settlement of:

(a) all and any Claims of BB Holdings arising out of or in connection with the Share Purchase Deed and the Option Deed, whether made in the LCIA Arbitration Proceedings against the Government Parties or otherwise;

3



(b)    all and any Claims of the Government Parties of whatsoever nature and whenever or howsoever arising out of or in connection with the Share Purchase Deed and the Option Deed, including but not limited to any claim by way of defence or counterclaim which the Government Parties could make against BB Holdings whether in the LCIA Arbitration Proceedings or otherwise howsoever arising, including any Claims which the Government Parties could make against BB Holdings arising out of the various transactions between the Government Parties and Innovative Communications Corporation and any Claims for interest and costs; and

(c)    all and any Claims which the Government Parties have made against BB Holdings in the Belize Court Proceedings.

**3.    LEGAL PROCEEDINGS**

3.1    The parties agree that, except as provided in clause 3.11, the LCIA Arbitration Proceedings shall be terminated and hereby consent to such termination, with no order as to costs.

3.2    The parties agree that the Order of the Tribunal in the LCIA Arbitration Proceedings for the continuation of interim and conservatory measures dated 7 February 2005 shall be discharged forthwith.

3.3    The parties agree that, within 7 days of the date of this deed, they will write to the Tribunal in the LCIA Arbitration Proceedings consenting to the Tribunal making a consent award in the form attached at Appendix 1.

3.4    Any further costs of the LCIA Arbitration Proceedings up to the date of this deed (other than legal or other costs incurred by the parties themselves) shall be borne equally between the parties, between BB Holdings on the one hand and by the Government Parties on the other hand.

3.5    The parties shall not take any further steps in the Belize Court Proceedings (which were stayed by Orders of the Supreme Court of Belize by Conteh CJ, dated 24 January 2005 and 18 February 2005) and the parties agree that the Belize Court Proceedings shall be discontinued forthwith with no order as to costs.

3.6    The parties agree that the injunction granted by the Supreme Court of Belize, by Conteh CJ against the Government Parties on 18 February 2005 in the Belize Court Proceedings shall be discharged forthwith.

3.7    The parties will give instructions to their lawyers forthwith to discontinue the Belize Court Proceedings and discharge the injunction on the terms set out in clauses 3.5 and 3.6 above.

3.8    The Government Parties shall not take any steps by way of appeal from the judgment of Mr Justice Morison dated 31 January 2005 or otherwise in the proceedings between BB Holdings and the Government Parties in the Commercial Court of the English High Court of Justice (Action 2005 Folio 28).

3.9    The Government Parties shall not bring any claim against BB Holdings on any undertaking or cross undertaking given by BB Holdings including, but not limited to:

(a)    the undertakings given by BB Holdings in connection with the Order of Cooke J dated 17 January 2005 and as recorded in Schedule thereto;

(b)    the undertaking signed by Philip Osborne on behalf of BB Holdings dated 31 January 2005 in connection with the Arbitration Proceedings; and

4

(c)      the undertaking given by BB Holdings in relation to Action no. 15 before the Supreme Court of Belize, as recorded in the Order made by Conteh CJ on 18 February 2005.

3.10      The parties agree to waive and treat as discharged all existing and future orders for costs against each other in any existing legal proceedings to which they are both party, except for:

     (a)      the Order of Mr Justice Morison dated 31 January 2005 that the Government Parties pay to BB Holdings the sum of £45,000 (referred to at paragraph 2 thereof). Subject to clause 3.12 below, the parties agree that the sum of £45,000 is outstanding, due and payable and will remain outstanding, due and payable after the date of this deed;

     (b)      as referred to in clause 3.11 below.

3.11      The parties agree that, notwithstanding the parties' agreement in clause 3.1 that the LCIA Arbitration Proceedings shall be terminated, the Tribunal shall issue a partial final award in the LCIA Arbitration Proceedings against the Government Parties by way of reimbursement of the sum of £20,000 which was paid by BB Holdings to the LCIA in substitution of the Government Parties' share of the initial deposit in respect of the costs of the arbitration, as referred to in the Tribunal's Order dated 8 March 2005. Subject to clause 3.12 below, the parties agree that, notwithstanding the parties agreement in clause 3.1 or any other clause of this deed, the sum of £20,000 is outstanding, due and payable and will remain outstanding, due and payable after the date of this deed.

3.12      BB Holdings agrees to accept the amount of US$123,500 from the Government Parties in full and final settlement of the amounts which are outstanding, due and payable to BB Holdings and referred to in paragraphs 3.10 and 3.11 above, provided that the amount of US$123,500 is received by BB Holdings within 10 (ten) days of the date of this deed. If the amount of US$123,500 is not received by BB Holdings within 10 (ten) days of the date of this deed then the parties agree that the amounts of £45,000 and £20,000 (including any interest thereon) referred to in paragraphs 3.10 and 3.11 above will remain outstanding, due and payable by the Government Parties to BB Holdings.

3.13      The parties hereby agree that the BB Holdings Owed Amount shall be set-off against the Final Assessment (the "Set-Off").

**4.**      **CONSIDERATION**

4.1      In consideration of BB Holdings agreeing not to pursue its Claims arising out of or in connection with the Share Purchase Deed and the Option Deed (as set out in paragraphs 2 and 3 above), the Government Parties each jointly and severally confirm and warrant that:

     (a)      following the Set-Off, each member of the BB Holdings Group will have satisfied in full all and any liabilities, assessments and claims of whatsoever nature and howsoever arising in respect of Business Tax and / or Income Tax in respect of all periods up to and including 31 March 2005 and without prejudice to the generality of the foregoing, following the Set-Off each PIC Group company within the BB Holdings Group, including in particular but not limited to The Belize Bank Limited, has satisfied in full all and any such liabilities assessments or claims;

     (b)      all filings in relation to any form of taxation required to be made on behalf of BB Holdings or any member of the BB Holdings Group in Belize are, including in particular but not limited to The Belize Bank Limited, complete and up to date;

     (c)      to the extent that the BB Holdings PIC Group, The Belize Bank Limited, or any other PIC Group Company within the BB Holdings Group are liable to pay any Business Tax and/or

<div align="center">5</div>



Income Tax in respect of any period beginning on or after 1 April 2005, the calculation of and the raising of any assessments or claims in respect of such Business Tax and/or Income Tax shall be calculated solely and exclusively on the basis that:

(i)      Business Tax shall be paid on a quarterly basis at the rate prescribed under the Business and Income Taxes Act (Chapter 55 of the Laws of Belize) from time to time, which in the case of PIC Group Companies which are banks is currently a charge of 8%;

(ii)     Income Tax shall be assessed on the amount of chargeable income and at a rate of twenty cents per dollar less than the rate of 25%. Chargeable income shall be assessed in accordance with the provisions applicable to Public Investment Companies and PIC Group Companies in the Income and Business Tax Act (Chapter 55 of the Laws of Belize) and International Business Companies Act (Chapter 270 of the Laws of Belize). BB Holdings, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group shall file a group income tax return at the end of each financial year, on behalf of the companies in the BB Holdings PIC Group, completed on the basis of the assessment provided for in this clause;

(iii)    Business Tax is a withholding tax and an advance payment for final Income Tax and any amount paid in Business Tax which is in excess of the amount due in Income Tax will constitute an overpayment of Income Tax and shall be offset on a quarterly basis against Business Tax due and payable in subsequent financial years;

(iv)     the total amount of Business Tax paid in any financial year for the purposes of the procedure in clause 4.1 shall be the aggregate of:

(a)      the amount of Business Tax actually paid by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group in a financial year; and

(b)      the amount of Business Tax which is paid by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group by way of offset of any overpayment of Income Tax against Business Tax on a quarterly basis in any financial year.

(v)      the provisions applicable to Public Investment Companies and PIC Group Companies contained in the International Business Companies Act (including the provisions which allow fiscal continuity of Public Investment Companies and of PIC Group Companies) and the Income and Business Tax Act (Chapter 55 of the Laws of Belize) (including Section 15 (Allowance of trade losses) and Section 115 (Carry forward of losses) of the Income and Business Tax Act) shall apply; and

(vi)     no other Business Tax and/or Income Tax shall be payable by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group.

(d)      the Demand for Payment shall be withdrawn and the parties agree that:

(i)      the BB Holdings PIC Group shall waive its entitlement to carry forward all prior losses for the period up to 31 March 2006; and

8



(ii)    The Belize Bank Limited shall pay the further sum of BZ$4,288,037.34 in Business Tax for the financial year ended 31 March 2006 (being the amount of Business Tax payable by The Belize Bank Limited on the basis of the current charge for PIC Group Companies which are banks of 8%, totalling BZ$5,104,806.35, less BZ$816,769.01, being the amount of Business Tax already paid by The Belize Bank Limited during the financial year) and, for the avoidance of doubt, no further Business Tax shall be paid by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group for the financial year ended 31 March, 2006; and

(iii)    no penalty or arrears interest or other interest whatsoever shall be payable by the BB Holdings PIC Group, The Belize Bank Limited or any other PIC Group company within the BB Holdings Group in respect of Business Tax for the financial year ended 31 March, 2006.

(c)    BB Holdings, The Belize Bank Limited or any other PIC Group Company within the BB Holdings Group shall file a group income tax return for the financial year ended 31 March, 2006 on behalf of the companies in the BB Holdings PIC Group, assessed on the basis set out in clause 4.1 (c) (ii) and the procedure set out in clause 4.1 shall be followed thereafter by the parties.

4.2    The Government Parties agree to indemnify and to keep indemnified BB Holdings and any member of the BB Holdings Group against all costs, expenses, losses and damages howsoever incurred by BB Holdings and any member of the BB Holdings Group arising out of or in connection with any breach of the warranties contained in clause 4.1 of this deed.

4.3    In consideration of BB Holdings agreeing not to pursue its Claims arising out of or in connection with the Share Purchase Deed and the Option Deed (as set out in paragraphs 2 and 3 above), the Government Parties as a result also agree that completion of the sale by the Government of Belize to Innovative Communications Corporation of the shares in Belize Telecommunications Limited representing 52.46 per cent. of the issued share capital has not been "completed" for the purpose of clause 3.1 of the Option Deed.

**5.    ENTIRE AGREEMENT**

5.1    Each party confirms that this deed (and the documents referred to therein) sets out the entire agreement and understanding between the parties in relation to its subject matter. Each of the parties acknowledges that, in entering into this deed, it has not relied on any oral or written representation, warranty, or other assurance (except as provided for or referred to in this deed) and waives all rights and remedies which might otherwise be available to it in respect thereof.

5.2    Nothing in this clause limits or excludes any liability for fraud.

**6.    CONFIDENTIALITY**

6.1    The parties agree that this deed and the matters to which it refers are confidential.

6.2    None of the parties shall make (or in the case of BB Holdings permit any other member of the BB Holdings Group to make) any announcement concerning this or any ancillary matter.

6.3    Nothing in this clause prevents any announcement being made or any confidential information being disclosed:

7



(a)    with the written approval of the other parties, which in the case of any announcement shall not be unreasonably withheld or delayed; or

(b)    to the extent required by law or any competent regulatory body or stock exchange.

6.4    Nothing in this clause prevents disclosure of confidential information by any party:

(a)    to the extent that the information is in or comes into the public domain other than as a result of a breach of any undertaking or duty of confidentiality by any person; or

(b)    to that party's professional advisers, auditors or bankers, but before any disclosure to any such person the relevant party shall procure that he is made aware of the terms of this clause and shall use its best endeavours to procure that such person adheres to those terms as if he were bound by the provisions of this clause.

## 7.    NOTICES

7.1    Any notice or other formal communication given under this deed must be in writing (which includes fax, but not email) and may be delivered or sent by post or fax to the party to be served at its address as follows:

(a)    to BB Holdings at:            60 Market Square
                                     PO Box 1764
                                     Belize City
                                     Belize
                                     Central America

                                     Fax: +501 2274443

                                     marked for the attention of Philip Osborne

(b)    to any of the Government Parties at:   New Administration Building
                                     Belmopan Cayo
                                     Belize
                                     Central America

                                     Fax: +501 822 3390 / 822 0102

                                     marked for the attention of the Attorney-General

or at such other address or fax number as it may have notified to the other parties in accordance with this clause.  Any notice or other document sent by post shall be sent by registered post.

7.2    Any notice or other formal communication shall be deemed to have been given:

(a)    if delivered, at the time of delivery; or

(b)    if posted, at 10.00 a.m. on the fifth Business Day after it was put into the post; or

(c)    if sent by fax, on the date of transmission, if transmitted before 3.00 p.m. on any Business Day, and in any other case on the Business Day following the date of transmission.

7.3    In proving service of a notice or other formal communication, it shall be sufficient to prove that delivery was made or that the envelope containing the communication was properly addressed and

1/117



posted either by registered airmail or that the fax was properly addressed and transmitted, as the case may be.

**8.      CONTRACT (RIGHTS OF THIRD PARTIES) ACT 1999**

8.1    The Government Parties expressly acknowledge that any member of the BB Holdings Group which is not a party to this deed (in particular but not limited to The Belize Bank Limited) shall be entitled to enforce the terms of this deed (in particular clause 4) against any party to this deed in accordance with the Contract (Rights of Third Parties) Act 1999.

**9.      BREACH**

Each of the parties acknowledges, having regard to the nature of this settlement, that damages would not be an adequate remedy for any breach of this deed and that the remedies of injunction, specific performance and other equitable relief for any threatened or actual breach of this deed should lie to enforce any of the obligations herein.

**10.     REMEDIES AND WAIVERS**

No delay or omission on the part of any of the parties in exercising any right, power or remedy provided by the law of any jurisdiction or under this deed shall:

(a)      impair such right, power or remedy; or

(b)      operate as a waiver thereof.

**11.     GOVERNING LAW AND ARBITRATION**

11.1    This deed is governed by and shall be construed in accordance with English law.

11.2    Any dispute arising out of or in connection with this deed including any question regarding its existence, validity or termination, which cannot be resolved amicably between the parties shall be referred to and finally resolved by arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this clause. The number of arbitrators shall be 3 (one appointed by each Party and the third appointed jointly by the two Parties' arbitrators).

11.3    The arbitral proceedings shall be conducted in the English language.

11.4    The seat or legal place of the arbitral proceedings shall be London, England.

11.5    Each of the Government Parties irrevocably and unconditionally:

(a)      agrees that if BB Holdings brings proceedings against it or its assets in relation to this deed no immunity from such legal proceedings (which will be deemed to include without limitation, suit, attachment prior to judgment, other attachment, the obtaining of judgment, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

(b)      waives any such right of immunity which it or its assets now has or may in the future acquire; and

(c)      consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with such proceedings including, without limitation, the

9



making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any award, order or judgment which may be made or given in arbitration proceedings or related enforcement proceedings.

11.6    For the avoidance of doubt, each of the Government Parties each irrevocably and unconditionally consents to:

(a)    any relief being ordered against it whether by way of injunction or otherwise.  This consent is given by each of the Government Parties with particular reference to, but without being limited by, Section 13(3) of the State Immunity Act 1978, or any other statutory re-enactment or modification thereof; and

(b)    the service of any writ or other document required to be served on any or all of the Government Parties in relation to legal proceedings, whether for instituting proceedings or otherwise, being effected in accordance with the notice provisions of clause 7. This consent is given by each of the Government Parties with particular reference to, but without being limited by, Section 12(6) of the State Immunity Act 1978 or any other statutory re-enactment or modification thereof.

12.    **GENERAL**

12.1    Each party shall bear its own costs in connection with the negotiation, execution and implementation of this deed.

12.2    This deed shall be binding on the parties, their successors and assigns and the name of a party appearing herein shall be deemed to include the names of any such successor or assign.

12.3    This deed may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same agreement and any parties may enter into this deed by executing a counterpart.

IN WITNESS whereof this deed has been executed on the date first above written.

**SIGNATORIES**

Signed as a deed by **BB HOLDINGS**             )
**LIMITED** acting by a director and its         )
secretary/two directors this 21st day of         )
June, 2006

Director

Secretary/Director

10

Signed, sealed and delivered by **GOVERNMENT**
**OF BELIZE** this 21st day of June 2006 in the
presence of

)
)
)
)
)
)

_____
Minister of Finance
(On behalf of the Government of Belize)

_____
Justice of Peace

**GLENN F. LONGSWORTH**
Justice Of the Peace
6 St. Joseph St.
Belize City, Belize

Signed, sealed and delivered by **ATTORNEY**
**GENERAL-GENERAL OF BELIZE** this 21st
day of June 2006 in the presence of

)
)
)
)
)

_____
Attorney-General of Belize

_____
Justice of Peace

**GLENN F. LONGSWORTH**
Justice Of the Peace
6 St. Joseph St.
Belize City, Belize

Signed, sealed and delivered by **MINISTER OF**
**FINANCE OF BELIZE** this 21st day of June
2006 in the presence of

)
)
)
)
)



_____
Minister of Finance of Belize

_____
Justice of Peace

**GLENN F. LONGSWORTH**
Justice Of the Peace
6 St. Joseph St.
Belize City, Belize

11

1/120

# Kimmelman Declaration
# Exhibit C

[2013] CCJ 5 (AJ)

## IN THE CARIBBEAN COURT OF JUSTICE
### Appellate Jurisdiction

## ON APPEAL FROM THE COURT OF APPEAL OF BELIZE

CCJ Appeal No CV 7 of 2012
BZ Civil Appeal No 4 of 2011

BETWEEN

        BCB HOLDINGS LIMITED
        THE BELIZE BANK LIMITED           **APPELLANTS**

AND

        THE ATTORNEY GENERAL OF BELIZE        **RESPONDENT**

| | |
|---|---|
| **Before The Rt Honourable** | **Mr Justice Byron, President** |
| **And The Honourables** | **Mr Justice Saunders** |
| | **Mme Justice Bernard** |
| | **Mr Justice Wit** |
| | **Mr Justice Anderson** |

<u>**Appearances**</u>

Mr Edward Fitzgerald QC, Mr Eamon Courtenay SC and Mrs Ashanti Arthurs-Martin for the Appellants

Mr Michael Young QC, Ms Magalie Perdomo and Ms Iliana Swift for the Respondent

**JUDGMENT**
of
The President and Justices Saunders, Bernard, Wit and Anderson
Delivered by
The Honourable Mr Justice Adrian Saunders
and
The Honourable Mr Justice Winston Anderson
on the 26th day of July 2013

## JUDGMENT OF THE HONOURABLE MR JUSTICE SAUNDERS

[1]    The London Court of International Arbitration ("the Tribunal") determined that the State of Belize should pay damages for dishonouring certain promises it had made to two commercial companies, namely, BCB Holdings Limited and The Belize Bank Limited ("the Companies"). The promises were contained in a Settlement Deed as Amended ("the Deed") executed in March 2005. The Deed provided that the Companies should enjoy, from the 1st day of April, 2005, a tax regime specially crafted for them and at variance with the tax laws of Belize.

[2]    This unique regime was never legislated but it was honoured by the State for two years until it was repudiated in 2008 after a change of administration in Belize following a General Election. The Companies then commenced arbitration. The Tribunal found the State of Belize in breach and awarded damages against Belize in addition to arbitration costs and legal, professional and other fees ("the Award"). The Award totalled approximately $44 million and it carried interest at the rate of 3.38% compounded annually. The damages were calculated on the hypothesis that the Companies would have continued to benefit from the special tax regime at least until 2020; the year when, in keeping with the laws of Belize, BCB Holdings Limited"s status as a public investment company was due to expire.

[3]    The Companies are applying now to enforce the award. The State resists enforcement. The critical question is whether it is or is not contrary to public policy for the Court to enforce the same. For the reasons that follow it is our judgment that it would be contrary to public policy to recognise the Award and accordingly we decline to enforce it.

## A brief background

[4]    The Deed arose, at least in part, out of the stated intention of the Minister of Finance and the Companies to settle a pre-existing dispute between them. The prior dispute had to do with a share purchase deed and an option deed the parties had previously negotiated. That initial dispute had itself been submitted to the Tribunal for resolution by arbitration

because of certain claims made by the Companies against the State. The Deed recorded the Companies" agreement not to pursue further these existing claims. In return, the Minister agreed to grant the Companies the special tax regime to which reference was earlier made. The Deed expressed that its provisions were to be governed by English law and it contained an arbitration clause stipulating that either party could refer to the Tribunal for resolution of disputes that were not amicably settled.

[5]    The Deed was executed by the Prime Minister (the then Minister of Finance) and also by the Attorney General of Belize. The document was expressed to be "confidential". The parties agreed not to make any announcement concerning its contents or any ancillary matter. That did not, however, prevent any announcement being made or any confidential information being disclosed by a party -

> "a) with the written approval of the other parties, which in the case of any announcement shall not be unreasonably withheld or delayed; or
> b) to the extent required by law or any competent body or stock exchange."

[6]    For well over a year after its execution, the Commissioner of Income Tax was unaware of the Deed"s existence or its implications. On 10th July, 2006 the Commissioner wrote to the Companies seeking their compliance with the published tax laws of the land. The Companies responded by instructing the Commissioner to liaise directly with the Minister of Finance. Three months later the Commissioner wrote back to the Companies accepting the Companies" position and retracting what initially was his. For a period of two years, the Companies enjoyed the tax regime set out in the Deed.

[7]    In February, 2008, following a general election, a new administration was sworn into office in Belize. A few months later the Commissioner of Income Tax assessed the Companies for tax on the basis of Belize law in respect of the period the Companies had enjoyed the benefits under the Deed. The Commissioner rejected the tax returns filed by the Companies for the two previous years and required the Companies to comply with the law. The Commissioner informed the Companies that the Deed did not supersede the country"s revenue laws. This turn-around by the Government constituted a repudiation of

the promises made in the Deed and motivated the Companies once again to resort to arbitration.

**The Arbitral Award**

[8]    The Tribunal was duly constituted but the State did not participate in the arbitration. It did not appear. It did not make any submissions to the Tribunal. It did not enter a defence to, nor did it comment upon, the Companies‟ submissions. The Tribunal nonetheless rightly felt that it still had an obligation to take into account such matters as it considered might represent Belize‟s position on the issues in dispute. There was some material that enabled it so to do. Satellite proceedings had been tried in the Belize courts in which the State had participated and been legally represented. The Tribunal concluded that the submissions made in those proceedings and the judgments of the courts provided an indication of what arguments the State of Belize would have likely pursued before the Tribunal in relation to the matters in dispute.

[9]    The Tribunal considered that it had jurisdiction to entertain the dispute. It dismissed any notion that the dispute was not arbitrable whether because tax-related matters were involved or because of the alleged incompatibility of the promises made to the Companies with Belize law.  In making these findings the Tribunal emphasised that it was pronouncing not upon the taxation regime of Belize but instead upon the contractual warranties the Government, in the exercise of its sovereign power, had made to the Companies. The Tribunal noted that the Crown at common law had a wide prerogative power to enter into contracts and this power was unfettered by restrictions as to subject matter or persons. The Tribunal asserted that the only constraint on this wide prerogative power is that any such contract: (i) should be entered into in the ordinary or necessary course of Government administration; (ii) must be authorised by the responsible Minister, and that (iii) any payments by the Government to honour any such contract must be covered by, or referable to, an appropriate Parliamentary grant.

[10]    The Tribunal decided that the first of these three conditions was demonstrably established as the Deed gave the Government considerable financial benefits, including the Companies" agreement not to re-open the previous disputes between the parties.   The Tribunal reasoned that it was not unusual for governments to enter into settlement arrangements which involved concessions or reductions. As to the second condition, according to the Tribunal, the Prime Minister clearly had actual and ostensible authority both to make the contractual warranties that were made and to assure the Companies that they would indeed enjoy the promised benefits. The Tribunal stated that the third condition did not apply in this case. No specific reason was given for this finding but one can infer that it was because the Deed did not require the Government to make un-appropriated payments to anyone.

[11]    The Tribunal did not justify their decision only on the wide prerogative power of the Government. The Tribunal also held that section 95 of the *Income and Business Tax Act*[1] expressly authorised the Government, through the Minister of Finance, to make and guarantee the promises contained in the Deed. As section 95 is a short section we take the liberty of setting it out in full:

> "(i) The Minister may remit the whole or any part of the income tax payable by any person if he is satisfied that it would be just and equitable to do so.
>
> (ii) Notices of such remission shall be published in the Gazette".

In support of its findings that the Agreement was not illegal and the dispute was arbitrable the Tribunal cited several authorities.[2]

---

[1] *Income and Business Tax Act*, Cap 55 [Belize]

[2] These included but were not limited to *The Attorney General of New South Wales v Bardolph* [1934] 52 CLR. 455; *The Attorney General of Saint Lucia v Martinus Francois,* Civil Appeal No  37 of 2003; *In re D.H. Curtis (Builders) Ltd* [1978] 2 WLR 28; *Marubeni Hong Kong and South China Ltd v. Government of Mongolia* [2004] 2 Lloyd"s Rep. 198; *Attorney-General v.Silver* [1953] AC 461, Arbitral awards made in *Alcoa Minerals of Jamaica, Inc. v. Government of Jamaica, Engineering Company (Italy) v. Engineering Company (Greece) and Producer (Greece), TCSB Inc. v Iran and Paushok and Others v. the Government of Mongolia* and an Article by Emmanuel Gaillard on *Tax Disputes Between States and Foreign Investors* "Tax Disputes Between States and Foreign Investors" [1997] NYLJ 217

## The decisions of the Courts below

[12]   The Tribunal"s award cannot be enforced in Belize without an application first being made to the court to enforce it. The legislative basis for enforcement is the *Arbitration (Amendment) Ordinance* No 21 of 1980[3] ("the Act"). The application to enforce was made to a trial judge in Belize. On this occasion the State appeared and made several submissions strenuously resisting the application.

[13]   In essence, the State submitted to the judge that (a) the relevant provisions of the Act were in fact not part of the law of Belize; (b) the subject matter of the arbitration was non-arbitrable and (c) it would be contrary to public policy to enforce the Award. The judge rejected each of these arguments. The judge noted that section 28 of the Act enshrines the principle that an arbitral award, made pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention")[4] is, for all purposes, binding on those who are parties to the Convention. The judge held that this Award is a Convention Award. The judge therefore weighed this principle against the provisions of section 30 of the Act which enjoins the court not to refuse enforcement of a Convention award except upon very limited grounds which are specifically prescribed. Citing the case of *P T Asuransi Jasa Indonesia (Persero) v. Dexia Bank SA*[5], the judge explained that the courts in Belize ought to lean toward enforcement of Convention awards unless to allow enforcement would "shock the conscience" or "is clearly injurious to the public good or wholly offensive to the ordinary reasonable and fully informed member of the public". The judge concluded that the Deed was a lawful and legally binding commercial agreement and that to refuse enforcement would transgress established applicable legal principles and practices. He therefore ordered that the Companies be at liberty to enforce the Award in the same manner and to the same effect as a local judgment. The State appealed the judge"s decision to the Court of Appeal.

---

[3] Arbitration Act, Cap 125 [Belize]
[4] *Convention on the Recognition and Enforcement of Foreign Arbitral Awards* (adopted 10 June 1958, entered into force on 7 June 1959) 330 UNTS 3 (New York Convention)
[5] [2007] 1  SLR (Reissue) 597

[14]    It is a matter of great regret that the Court of Appeal determined the appeal on a consideration only of the State‟s submission (discussed more fully in the judgment delivered by Justice Anderson), that the Act was invalid and that for this reason enforcement of the Award should be refused. Two of the three judges upheld that submission. The third, Mendes JA, dissented. In his opinion the Act was valid and therefore the other submissions regarding enforceability were not at all moot.

[15]    No other issues were discussed in the judgment of the Court of Appeal. Mendes JA expressed his willingness to pronounce on the other issues in the case which, given his opinion that the Act was valid, would have arisen. Since his views on those other issues would have been otiose, given that the opinions of his colleagues had already determined the appeal, he considered ultimately that it was superfluous to express them in his judgment.

**<u>The issues</u>**

[16]    Three central issues arise from the appeal of the Companies to this Court:

1.  Is the Act valid? Was its passage an improper encroachment by the Belize colonial legislature upon the preserve of the Crown? Should the claim for enforcement be dismissed on this ground?

2.  If the first point is decided in favour of the Companies and the Act is valid and applicable, should this Court remit the case to the Court of Appeal so that it can first pronounce on the questions whether the Award should not be enforced because it is non-Arbitrable and/or because it is contrary to public policy?

3.  If the Act is not invalid and the case is not remitted, should the application to enforce the Award be refused either because it would be contrary to public policy to do so (the public policy point) or because it is in respect of a matter which was not capable of settlement by arbitration (the non-Arbitrability point)?

[17]    For the reasons set out by Justice Anderson, we are of the view that the Act is not invalid and the case should not be remitted. As our opinion on the public policy point is

dispositive of the appeal we consider it unnecessary to consider the non-Arbitrability point.

**The Public Policy Point**

*The submissions of the parties*

[18]   On this point, the State submits that it was never bound by the agreement that gave rise to the Deed because implementation of the same without parliamentary approval violates the country's fundamental law. While the Minister, in making agreements, could ordinarily be taken to have implicitly promised that he would secure any necessary legislative approval, the Award on its face discloses that no such approval was ever sought or obtained and there never was any intention to seek or obtain such approval. In these circumstances, counsel submits, the Court should not enforce the Award as it is repugnant to the Belize legal order.

[19]   The Companies, on the other hand, argue that the State benefited from the Agreement because the Deed amicably settled prior and pending claims of the Companies against the Government. The Tribunal has definitively ruled that the Agreement was not illegal and the Court should not now re-open the merits of what has already been determined. The State could and should have raised, before the Tribunal or before the English supervisory courts, any arguments it now wishes to raise on the legality of the Deed. The Award is final and, in keeping with the pro-enforcement bias courts should have towards Convention Awards, this Court should enforce it. The Companies support their submissions with reference to several authorities[6].

*The broad approach to the public policy exception*

[20]   Competing policies are invariably at play when a court is called upon to decide whether to enforce an arbitral Award. The court must balance divergent policies and interests and apply to them principles of proportionality.

---

[6] These included: *Soinco SACI and Another v Novokuznetsk Aluminium Plant and Others* [1998] 2 Lloyd's Rep. 337; *Westacre Investments Inc v Jugoimport-SPDR Holding Co. Ltd* [2000] 1 QB 288; and *Kersa Holding Company Luxembourg v Infancourtage, Famajuk Investment and Isny Kersa Holding Company Luxembourg v Infancourtage, Famajuk Investment and Isny* 24 November 1993, reported in Yearbook Commercial Arbitration, A.J. van den Berg ed., Vol. XXI, 1996, p.624

[21]   Almost two hundred years ago, Burrough J. in *Richardson v. Mellish*[7] famously noted that "public policy" is a very unruly horse. Once you get astride it, he warned, you never know where it will carry you. This admonition is especially prescient because the concept of public policy is fluid, open-textured, encompassing potentially a wide variety of acts. It is conditioned by time and place. Religion and morality, as well as the fundamental economic, social, political, legal or foreign affairs of the State in which enforcement is sought, may legitimately ground public policy concerns. Whether those concerns are of a substantive or procedural nature, if they are fundamental to the polity of the enforcing State, they may successfully be invoked.

[22]   Since the Award here in question is a foreign Award governed by English law, the question that naturally arises is, whose public policy is being interrogated? Is there some international public policy which must be used as a yardstick against which to measure those matters which it is said are contrary to public policy?

[23]   Public policy in this case must in the first instance be assessed with reference to the values, aspirations, mores, institutions and conception of cardinal principles of law of the people of Belize. It is in Belize that the Companies seek to enforce the Award and it is the courts of Belize that must make the assessment as to what, if anything, is offensive to public policy. It is also in Belize that the underlying obligations and promises were to be performed. Article V. 2(b) of the Convention provides that enforcement of an award may be refused, if enforcement would be contrary to "the public policy of *that country*"; that is, in this case, the State of Belize. But this does not mean that, although there is no universal standard of "public policy"[8], it would be appropriate for courts to adopt a parochial approach. As Cardozo J. reminds us in *Loucks v Standard Oil Co. of New York*[9], the courts are not free to refuse to enforce a foreign judgment at the pleasure of the judges or to suit the individual notion of expediency or fairness.

---

[7] (1824) 2 Bing 229, 252
[8] See: International Law Association"s Final Report on Public Policy 2002 at [21]
[9] 224 N.Y. 99

[24]    Where enforcement of a foreign or Convention award is being considered, courts should apply the public policy exception in a more restrictive manner than in instances where public policy is being considered in a purely domestic scenario. This is because, as a matter of international comity, the courts of one State should lean in favour of demonstrating faith in and respect for the judgments of foreign tribunals. In an increasingly globalised and mutually inter-dependent world, it is in the interest of the promotion of international trade and commerce that courts should eschew a uniquely nationalistic approach to the recognition of foreign awards.

[25]    The Court must be alive to the fact that public policy is often invoked by a losing party in order to re-open the merits of a case already determined by the arbitrators[10]. Courts must accordingly be vigilant not to be seen as frustrating enforcement of the Award or affording the losing party a second bite of the cherry. To encourage such conduct would cut straight across the benefits to be derived from the arbitral process and undermine the efficacy of the parties" agreement to pursue arbitration[11].

[26]    An expansive construction of the public policy defence would vitiate the Convention's attempt to remove pre-existing obstacles to enforcement and to accommodate considerations of reciprocity[12]. For all these and other reasons the Convention has a definite pro-enforcement bias and interpretation of what is contrary to public policy under the Belize statute should also reflect this bias. There is universal consensus that courts will decline to enforce foreign arbitral Awards only in exceptional circumstances. In particular, this restrictive approach is adopted in relation to Convention Awards therefore, only where enforcement would violate the forum state's most basic notions of morality and justice[13] would a court be justified in declining to enforce a foreign Award based on public policy grounds.  Enforcement would be refused, for example, if the Award is "at variance to an unacceptable degree with the legal order of the State in which

---

[10] See: *A v. R (Arbitration: Enforcement)* [2009] 3 HKLRD 389 at page 395 [24]
[11] *A v. R* [2009] 3 HKLRD 389 at page 395 [25]
[12] *Parsons & Whittemore Overseas Co. Inc v. Societe Generale De L'Industrie Du Papier (Rakta) and Bank of America* 508 F.2d 969(2d Cir. 1974)
[13] *Parsons & Whittemore Overseas Co. Inc v. Societe Generale De L'Industrie Du Papier (Rakta) and Bank of America* 508 F.2d 969 (2d Cir. 1974)

enforcement is sought inasmuch as it infringes a fundamental principle".[14] In such a case the infringement must constitute "a manifest breach of a rule of law regarded as essential in the legal order".[15] In this vein, the Indian Supreme Court has stated that it will decline to enforce an Award only if enforcement would be contrary to (i) the fundamental policy of Indian law; or (ii) the interests of India; or (iii) justice or morality.[16]

[27]   The International Law Association (the "ILA") has recommended the use of the phrase "international public policy" as an appropriate description of the restrictive scope of public policy that should be applied to Convention Awards.[17] The phrase is used in contra-distinction to "domestic public policy". Its content includes such matters as (i) fundamental principles, pertaining to justice or morality, that the State wishes to protect even when it is not directly concerned; and (ii) rules designed to serve the essential political, social or economic interests of the State.

[28]   We agree that to claim the public policy exception successfully the matters cited must lie at the heart of fundamental principles of justice or the rule of law and must represent an unacceptable violation of those principles. The threshold that must be attained by the State to establish the public policy exception is therefore a very high one.

*Public Policy and the underlying Agreement*

[29]   The rival submissions of the parties raise two important preliminary questions. Is it permissible for the Court now to examine the underlying Agreement reflected in the Deed? Should the Court re-examine the legality of the Deed even after the Tribunal has specifically addressed that issue and found the Deed to be valid?

[30]   In our view, the circumstances of this case lend themselves to a positive answer to both questions. There is no controversy as to the conduct of the parties in the making of the

---

[14] *Krombach v. Bamberski* [2001] 3 WLR 488 at [37]
[15] *Krombach v. Bamberski* [2001] 3 WLR 488 at [37]
[16] See: *Renusagar Power Company Ltd v. General Electric Company* (1994) AIR 860 at [66]
**[17]** See: ILA Final Report on Public Policy 2002, http://www.newyorkconvention.org/publications/full-text-publications/general/ila-report-on-public-policy-2002

Agreement. No one has any quarrel with the manner in which the Award sets out the basic terms of the Minister's Agreement with the Companies. The warranties and promises made to the Companies, the consideration given in exchange, these are all agreed.  There is no dispute that in 2008, when a new Minister of Finance assumed office, further implementation of the Agreement was halted. The reasons put forward to justify premature termination of the Agreement are also undisputed. In short, this is a case where all the relevant facts are uncontested matters of public record accepted by both sides. It is necessary only to decide whether, on the basis of these uncontroverted matters, enforcement of the Award will violate "some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal".[18]

[31]   It may be possible here to make that decision by confining oneself to the dispositive aspect of the Award, but given the circumstance that the factual background is agreed and since the court is performing, essentially, a balancing exercise between the competing public policies of finality and illegality, the nature and seriousness of the alleged illegality and the extent to which it can be seen that the same was addressed by the arbitral tribunal are factors we must take into account.[19] If there is illegality we must also consider the extent to which it impacts on the society at large and is offensive to primary principles of justice.

[32]   We respectfully disagree with the opinion of the trial judge that, because the Tribunal had considered and rejected the idea that the Deed was illegal, we are necessarily precluded from considering afresh that issue. We agree with Colman J who held in *Westacre* that any such estoppel must yield to the public policy against giving effect to transactions obviously offensive to the court[20].  In the context of the credible allegations of illegality put forward by the Government, in order to assess whether this transaction is truly offensive the court *must* examine the Agreement and the promises the Minister made to the Companies against the backdrop of fundamental principles and rules.

---

[18] See Cardozo J in *Loucks v Standard Oil Co. of New York* 224 N.Y. 99 at 111
[19] *Westacre Investments Inc v Jugoimport-SPDR Holding Co. Ltd* [1999] 3 All ER 864 at 885 H
[20] See *Westacre Investments Inc v Jugoimport-SPDR Holding Co. Ltd* [1998] 2 Lloyd's Rep. 111, 118

*The promises made by the Minister*

[33]   The promises made by the Minister were designed to affect, indeed to alter, the Companies" tax obligations under existing law. The Deed looked to past as well as future obligations. As to those of the past, whatever may have been the factual position in relation to the Companies" liabilities as at the date of its execution, the Deed determined that, for "all periods up to and including 31st March 2005", the Companies had "satisfied in full all and any such liabilities, assessments or claims". The Deed further assured the Companies that all their filings, in relation to any form of taxation required to be made on their behalf, were complete and up to date.

[34]   As to the future, the Deed recites at Clause 4.1(c) that

> "to the extent that [the Companies] are liable to pay any Business Tax and/or Income Tax in respect of any period beginning on or after 1st April 2005, the calculation of the raising of any assessments or claims in respect of such Business Tax and/or Income Tax shall be calculated solely and exclusively on the basis that … "

The Deed at this point goes on at some length to construct in careful detail a special tax regime reserved for the Companies; a regime that all parties readily acknowledge is at variance with the extant revenue laws of Belize and one which conferred significant benefits on the Companies. To cite just one example of this variation, section 21(3) of the Income and Business Tax Act states:

> "The excess of any business tax paid by any person other than an employed person during the basis year over the income tax due on the chargeable income of such person shall be carried forward as an expense to the next basis year."

On the other hand Clause 4.1(c)(iii) of the Deed states

> "Business tax is a withholding tax and an advance payment of final Income Tax and any amount paid in Business Tax which is in excess of the amount due in Income Tax will constitute an overpayment of Income Tax and shall be offset on a quarterly basis against Business Tax and payable in subsequent financial years."

[35]   The Award discloses that the Deed was buttressed by other assurances made to the Companies.  The Deed was accompanied by a letter dated 21st June 2006 addressed to the Chairman of the Companies in which the Minister of Finance "*irrevocably confirmed*" that all business and income tax obligations of the Companies would be governed by the terms of the Deed. The Minister also confirmed that the Deed had "*irrevocably fixed*" the rate of income tax payable by the Companies for as long as BCB Holdings remained a Public Investment Company *notwithstanding anything contained in the Income and Business Tax Act to the contrary*" (the italics are all those of the Tribunal in its published Award).

[36]   In sum, in exchange for settling the prior arbitral proceedings, the Deed purported to create and guarantee to the Companies a unique tax regime that was unalterable by Parliament. So, for the sake of argument, if BCB remained a Public Investment Company for the next 15 years, the State of Belize would be in breach of contract if its National Assembly, at any time during that period, without the Companies" concurrence, enacted any revenue measure applicable to the Companies that diverged from the Deed. The promises made by the Minister were thus intended to supplant and supersede all current and any future statutes enacted by the National Assembly.

[37]   The Tribunal addressed the issue of the legality of the Deed by asking itself whether the Minister had actual and/or ostensible authority to make these promises to the Companies. The Tribunal held that the Minister did have such authority. The Tribunal rested this conclusion on two premises, firstly, the extensive prerogative powers of the Executive to make agreements and secondly, section 95 of the Income and Business Tax Act[21]. The Tribunal noted that it is commonplace in international investment contracts for a host country to promise a foreign investor or contractor tax incentives as an inducement to make the investment or carry out an activity which is the subject of such agreements. The judge at first instance affirmed these conclusions of the Tribunal.

---

[21] See [11] above where the section is set out

[38]    We agree that the Minister does indeed possess wide prerogative powers to enter into agreements. The Executive may do so even when those agreements require legislative approval before they can become binding on the State. This was also the opinion of the Eastern Caribbean Court of Appeal in the Saint Lucian case of *The Attorney-General v. Francois*[22], an authority cited by the Tribunal. The judge"s focus, however, ought logically to have extended beyond the issue of whether it was lawful *to make* the promises. The making of a Government contract may be a matter quite distinct from its enforceability against the State as the *Francois* case also demonstrates.

[39]    It was necessary for the judge to consider whether the Award was contrary to public policy given the *implementation* of the underlying agreement *without parliamentary approval and without any intention on the part of the contracting parties to seek such approval*. This was an issue that was not at all considered by the Tribunal and the judge failed to advert to it. *Francois* concerned a guarantee entered into by the Saint Lucia Minister of Finance. No parliamentary approval had been given for the grant of the guarantee. The State was subsequently obliged to make good on the instrument. A citizen challenged its legality. The court held that nothing prevented the Minister from *giving* the guarantee, but the State only became *bound* by the same *after* Parliament had approved the funds necessary to discharge it. As Parliament had done so before the guarantee was honoured there was no basis for the citizen"s complaint.

*Executive prerogative and the Separation of Powers*

[40]    If it turns out that the Minister had no power to make or implement the promises he made, his lack of authority would be a potent factor in any assessment of the legality of the Agreement and the question whether enforcement of the Award is contrary to public policy. The Companies accept that the Minister"s authority to make the Agreement could only have been premised either on prerogative power or on section 95 of the Income and Business Tax Act[23]. As to the former, the Companies submit that the Deed was "a detailed commercial agreement" between two parties dealing with matters of "a

---

[22] Civil Appeal No 23 of 2003, Judgment of the Court of Appeal delivered 29th March 2004
[23] See [11] above where the section is set out in full

significant financial value"; that both sides must have sought legal advice with its drafting; and that it was entered into in order to settle prior arbitral proceedings in which claims amounting to "considerable sums of money" were being made against the State. None of these points is disputed although it must be emphasised that this Court has no material before it to indicate the reasonableness or strength of the claims the Companies allegedly had against the Government. The Court also has no evidence before it of an approximate figure that might reasonably represent the "considerable sums" mentioned by the Companies for which the State may have been liable if the prior dispute had been settled or arbitrated upon terms favourable to the Companies. These are, however, not matters of great significance. The crucial question is whether any of the points made above to justify the exercise of prerogative power, or all of them taken together, serves to render enforceable an agreement made by the Executive branch of government, without parliamentary approval, to except a taxpayer from obligations contained in current and future revenue statutes.

[41]   To negotiate an agreement with a company that can properly be described as a "detailed commercial" or "business" agreement or "settlement deed" does nothing to enhance the capacity of the Executive unilaterally to provide exceptions from the country"s revenue laws on the strength of Executive prerogative. The Government either has or lacks such capacity. It is trite that whatever legal advice the Minister procured does not bind a court and, interestingly, the State today actually has radically different advice from that which apparently informed the making of the Deed. The idea that the Minister who signed the Deed (or his Government) was attempting, in good faith, to settle a prior dispute is also quite beside the point. Neither a noble motive, as may have been the case, nor an executed Deed excuses or repairs an obvious excess of jurisdiction or serious breach of the fundamental principle of Separation of Powers.

[42]   The latter principle goes back to the writings of Montesquieu. So far as it relates to a strict division between the Executive and the Legislature, with the growing complexity of the machinery of government, the principle may have lost some of its lustre. In particular, in relatively small Parliaments like Belize"s, and where the Executive is largely drawn

from the legislature, the separation between these two bodies often appears blurred. But it is erroneous to assume that there is not an important division between the functions performed by each branch. The struggle to maintain this important distinction is as old as the epic battles waged between Chief Justice Coke and King James I who sought to use Royal proclamations to make law without Parliament"s approval.[24] The structure and content of the Belize Constitution reflects and reinforces the distinction. The Constitution carefully distributes among the branches the unique functions that each is authorised to exercise.[25] The rights and freedoms of the citizenry and democracy itself would be imperilled if courts permitted the Executive to assume unto itself essential law-making functions in the absence of constitutional or legislative authority so to do. It would be utterly disastrous if the Executive could do so, selectively, via confidential documents. In young States especially, keen observance by the courts of the separation of powers principle remains vital to maintaining the checks and balances that guarantee the rule of law and democratic governance. Caribbean courts, as part of their general function of judicial review, have a constitutional obligation to strike down administrative or executive action that exceeds jurisdiction or undermines the authority of the legislature.[26]

[43]   Section 68 of the Constitution empowers the National Assembly to make laws. The power to impose, alter, regulate or remit taxes and duties is a power constitutionally vested in the legislature. Only Parliament, or a body specifically delegated by Parliament, may lawfully grant exceptions to the obligation to obey the country"s revenue laws. Counsel for the Companies submitted that the Deed merely resolved "uncertainties and ambiguities" in the law, but the Executive Branch, whether for the purpose of "settling" claims made against it or otherwise, has no sovereign power to resolve such uncertainties and ambiguities. That is the function of the parliament and the courts. Governments in the region are authorised to make promises to public or private bodies that the latter may enjoy derogations from the revenue laws of the State, but whenever this occurs the

---

[24] See *Case of Proclamations* (1611) 12 Co. Rep. 74 which established the principle that the Executive has no general inherent power to alter the law of the land
[25] See in relation to the Constitution of Jamaica the judgment of Harrison JA in *Independent Jamaica Council for Human Rights and others v. The Attorney General*, Civil Appeals Nos 36-39 of 2004, at pages 11-13, judgment of the Court of Appeal delivered 12th July, 2004
[26] See for example: *J Astaphan & Co. (1970) Ltd v Comptroller of Customs of Dominica* (1996) 54 WIR 153 K

promises must be sanctioned by the legislature or a body specifically authorised by the Constitution or the legislature, before they can be implemented.

[44]   There is and must continue to be a healthy relationship among the arms of government. The State certainly cannot function effectively with its three mighty branches strictly compartmentalised and sealed off one from the other. Indeed, to facilitate the efficient operation of government, the Constitution permits some overlap in the functions carried out by each Branch.   But the judiciary has an obligation to uphold and promote the constitutional mandate that one Branch must not directly impinge upon the essential functions of the other. The principle that only Parliament should impose, alter, repeal, regulate or remit taxes is paramount. The National Assembly may in particular instances delegate aspects of its taxing powers but, absent such delegation, which in all cases must be strictly construed, the Executive branch is forbidden from engaging in such activity. To hold that pure prerogative power could entitle the Minister to implement the promises recorded in the Deed without the cover of parliamentary sanction is to disregard the Constitution and attempt to set back, over 300 years, the system of governance Belize has inherited and adopted.

[45]   There is a more fundamental reason why the Minister"s authority to make and implement the promises given in the Deed cannot be justified on the basis of prerogative power. This is because, as was noted by Lord Bridge in *Williams Construction v Blackman*[27], it is trite law that when the exercise of some governmental function is regulated by statute, the prerogative power under which the same function might previously have been exercised is superseded.   While the statute remains in force, the function can only be exercised in accordance with its provisions.   Since it is being put forward also that the Minister"s authority sprang from his powers under section 95 of the Income and Business Tax Act[28], prerogative power is ousted and it is to the statute that one must turn to discover whether (a) section 95 authorised the Minister to do what he did and (b), assuming such authorisation, the Minister acted within the scope of the authority given.

---

[27] (1994) 45 WIR 94 at 99
[28] See [11] above where the section is set out in full

*Section 95 of the Income and Business Tax Act*

[46]   The constitutionality of section 95 was challenged by counsel for the State. It is unnecessary now to rule on that challenge. Suffice it to say that, assuming its constitutional validity, the section must be interpreted in light of the Constitution. The Belize Constitution, like other Anglophone CARICOM Constitutions, places a specific and extremely high value on legislation dealing with taxation. Any Bill dealing with the imposition, repeal, remission, alteration or regulation of taxation is in the Constitution referred to as a "Money Bill"[29]. Money Bills are not enacted in the ordinary way. Sections 77, 78 and 79 of the Constitution contain special provisions with respect to the enactment of a Money Bill. In our view, given the extraordinary value the Constitution attaches to Money Bills, whenever the legislature delegates authority that touches on the powers contained in a Money Bill, the instrument containing the delegation should be construed strictly, narrowly, and the delegation should be accompanied by adequate safeguards to control arbitrary, capricious or illegal conduct. Further, if the power conferred is to be validly exercised, the accompanying safeguards must be scrupulously observed.

[47]   Section 95 cannot properly be interpreted as being capable of granting the Minister the power to do what the Deed here purported to do. In particular, we fail to see how, in one fell swoop, the Minister could possibly "remit" tax payable in respect of business activity to be conducted over an indefinite time in the future. The Tribunal expressed a different view on this issue. The Tribunal also likened remission of tax to the cancellation or extinguishment of all or part of a financial obligation whether past or future. In our opinion there is a substantial difference between the remitting tax payable and extinguishing an obligation to pay tax. If the Minister was authorised by section 95 to do the former he certainly had no power whatsoever to promise the latter.

[48]   Since the Minister is not the only official upon whom is conferred a power of remission, it is instructive to reason by analogy. Section 52(1)(d) of the Constitution confers on the Governor-General the power to "remit the whole or any part of any punishment imposed

---

[29]See s 80(1) of the Belize Constitution

on any person for any offence…" If the Tribunal"s views on remission are correct, then the Governor-General would be acting within the scope of the power if he/she remitted all the future sentences likely to be imposed upon a known recidivist. This would be an absurd interpretation of the Governor-General"s power.

[49]   In the exercise of the statutory power to remit, section 95 imposes upon the Minister the obligation to comply with two rather weak safeguards. Failure so to conform would impugn and automatically render void the exercise of the power.  Here, the Minister flouted *both* measures. Firstly, the Minister"s power under the section is constrained to the extent that the Minister needs to satisfy himself, on objective criteria, that it is just and equitable to remit tax payable. Fore-knowledge of the actual tax payable (which may be remitted in whole or part) constitutes a crucial, if not indispensable, factor informing the Minister"s exercise of discretion. Just as it would be perverse for the Governor-General (whose discretion is not ostensibly limited by what is "just and equitable") to remit punishment when no crime has as yet been committed, far less a sentence imposed, so too the Minister cannot properly satisfy himself of the justice or equity in remitting tax payable by a company where the business activity upon which the tax may or may not accrue has not yet commenced and there is no knowing whether the company would even be in business for the period the tax is supposedly "remitted". Apart from its absurdity, to construe the power to remit tax as capable of being exercised in respect of tax that may or may not become payable throughout the lifetime or existence of the taxpayer, evades section 95"s first safeguard and easily opens the door to the arbitrary and unlawful exercise of the power delegated.

[50]   Section 95 also required Notices of any remission to be published in the Gazette. Given the cloak of confidentiality that surrounded the making and implementation of the Deed, it is reasonable to conclude that there was never an intention on the part of the Minister to publish the required Notice. At any rate, the Minister had two years to fulfil this statutory obligation and no attempt was made to comply with it during that time. The trial judge accepted the Tribunal"s view that the requirement of publication is merely "an administrative formality" and that publication may lawfully be done at any time. In light

of the importance the Constitution attaches to the remission of tax, we disagree. Parliament in its wisdom has decreed publication in the gazette so that the Minister"s decisions on remission are open to public scrutiny. This might be a mild, after-the-fact legislative safeguard. But to strip it of all its content, to render it devoid of any force only emphasises the grave danger to public policy that flows from interpreting the first limb of section 95 in the manner in which the Companies suggest.

[51]   Finally, as the Constitution clearly suggests, there is a distinction between the imposition, repeal, remission, alteration or regulation of taxation.[30]   Even if one assumes that the Minister was entitled, by section 95, to remit tax in respect of future business activity; if one is prepared to assume further that the exercise of "remitting tax payable" includes excusing statutory obligations to   pay tax, the jurisdiction exercised by the Minister exceeded each of these dubious ways of exercising the power delegated.   The Deed purported to alter and regulate the manner in which the Companies should discharge their statutory tax obligations. The Deed impacted on a host of filing, administrative and other obligations imposed by Parliament"s revenue laws. In essence, the framers of the Deed conceptualised and designed a whole new *tax policy* for the benefit of the Companies. This policy was then embodied in the Deed, executed by the parties and implemented with the objective of overriding all current and any future statutes enacted by the National Assembly.

[52]   It is not the Court"s function in this case to assess the wisdom of this special tax policy. The Government does of course have the power to settle, and to settle in confidence if it so desires, and on terms it considers prudent, claims made against it. But transforming the policy conceived here, effectively into the status of a Money Bill, necessitated the intervention of the National Assembly so that legislation consistent with the imperatives of the Constitution could be enacted to give force to it.

---

[30] See s 80(1) of the Constitution

[53]    Prime Ministerial governance, a paucity of checks and balances to restrain an overweening Executive, these are malignant tumours that eat away at democracy. No court can afford to encourage the spread of such cancer.[31] In our judgment, implementation of the provisions of the Deed, without legislative approval and without the intention on the part of its makers to seek such approval, is indeed repugnant to the established legal order of Belize. In a purely domestic setting, we would have regarded as unconstitutional, void and completely contrary to public policy any attempt to implement this Agreement.

*Should the Award be enforced?*

[54]    As stated before, competing policies contend with each other when one must decide whether the public policy exception may successfully be invoked to render a foreign Award not enforceable. Even if a judge determines that there are features of an award that may seem inconsistent with public policy, it does not at all follow that the court *must* decline to enforce the Award. Reference has already been made to the pro-enforcement bias that informs the court′s approach and to the restrictive manner in which the public policy exception should be applied in the case of foreign awards.

[55]    There is also the fact here that the State treated with indifference the arbitral process to which it had agreed. This was far from exemplary conduct and it is a factor to which one should have regard. For this purpose no useful distinction can be made between the Administration in Belize which occupied the seat of government prior to 2008 and the one which held the reins immediately after the General Elections of that year. The latter was contractually bound by the warranties of the former, provided that the implementation of those warranties was not by law, impliedly or expressly, subject to parliamentary or judicial approval. The agreement to arbitrate was a free standing agreement separable from the remainder of the Deed and it is unfortunate that the Government approached its obligations *under that agreement* in the way it did.

---

[31] See in this regard [2013] UKPC 24 at [51] – [60]

[56]   We do not consider, however, that in each and every case, a failure to participate in the arbitral process should preclude a party from successfully arguing the public policy exception at the enforcement stage. The case law on this issue is far from coherent and it would not be right to lay down hard and fast rules. It seems to us that here also, a tension exists between various public interests. In resolving that tension the nature, quality and seriousness of the matters alleged to give rise to the public policy concerns must be weighed and placed alongside the court"s desire to promote finality and certainty with respect to arbitral awards.

[57]   There is actually nothing in the Act that suggests that a pre-condition for invoking the public policy exception is prior participation in the arbitral process. The Convention envisages that a court may *on its own motion* decline to enforce an Award on public policy grounds. This is hardly surprising. While it is public policy that arbitral awards, and in particular foreign awards, should be enforced, it is also public policy that awards which collide with foundational principles of justice ought *not* to be enforced. These two facets of public policy may sometimes appear to be, but are really not, mutually inconsistent. When a municipal court considers whether to decline to enforce an Award on public policy grounds, the court is not concerned with favouring or prejudicing *a party* to the arbitral proceedings. The Court is concerned with protecting the integrity of its executive function. In the process, the Court seeks simultaneously to guarantee public confidence in arbitral processes generally and to respect the institutional fabric of the country where the Award is to be enforced.

[58]   This is a case where, as we have noted, it is clear that the Minister had no power to guarantee fulfilment of the promises he gave. It is equally clear that the signatories to the Deed, including the Companies" representatives, had no intention to seek the requisite parliamentary approval. There was nothing in the Deed to suggest any such intention. Implementation of the promises made, far from being suspended pending possible legislative approval, took effect immediately upon execution of the Deed. But even if Parliament had ratified the promises made, not even Parliament could have bound itself to legislation that was "irrevocable".

[59]   The grounds for not enforcing this Award are compelling. The sovereignty of Parliament subject only to the supremacy of the Constitution is a core constitutional value[32]. So too is the principle of the Separation of Powers the observance of which one is entitled to take for granted[33]. To disregard these values is to attack the foundations upon which the rule of law and democracy are constructed throughout the Caribbean. It is said that public policy amounts to no less than those principles and standards that are so sacrosanct as to require courts to maintain and promote them at all costs and without exception.[34] The Committee on International Commercial Arbitration has endorsed "tax laws" as an example of an area that might fall within the scope of public policy, the breach of which might justify a State court refusing enforcement of an Award.[35] In our judgment, especially as the underlying agreement was to be performed in Belize, the balance here undoubtedly lies in favour of not enforcing this Award. This is a case where the Court actually has a duty to invoke the public policy exception.

[60]   We have considered whether, notwithstanding all of the above, we should still enforce the Award because if we did not, the State of Belize may be unjustly enriched. There are powerful factors that weigh against this view. As mentioned above at [47], we have no evidence of the strength of the Companies" claims relating to the prior dispute between the parties. There is therefore only a tenuous basis for presuming any unjust enrichment. Even assuming there could conceivably be *some* unjust enrichment, there is no way of assessing its likely quantum. It is also significant that the Companies are *not* foreign entities. They are Belizean companies cognizant of and constrained by the public policy of special tax rates, exemptions and concessions being granted by Parliament. The Companies themselves are currently the beneficiaries of tax concessions which were obtained, not from the Minister but through the National Assembly.

[61]   The public policy contravened in this case falls well within the definition of "international public policy" recommended by the ILA that might justify the non-

---

[32] See *Methodist Church v Symonette* [2000] 5 LRC 196 at 208; (2000) 59 WIR 1 at 13
[33] See *Moses Hinds v. The A.G. of Jamaica* [1976] 1 All ER 353 at 359
[34] See  Report, Committee on International Commercial Arbitration, International Law Association – London Conference (2000) pages 4-5
[35] See ILA Final Report on Public Policy 2002 at [30]

enforcement of a Convention Award. If this Court ordered the enforcement of this Award we would effectively be rewarding corporate citizens for participating in the violation of the fundamental law of Belize and punishing the State for refusing to acquiesce in the violation. No court can properly do this. Responsible bodies, including the Attorney General, have a right and duty to draw attention to and appropriately challenge attempts to undermine the Constitution.

## JUDGMENT OF THE HONOURABLE MR JUSTICE ANDERSON

[62]    An interesting question of general public importance raised by this case is the following: Did the enactment by the Parliament of Belize of the 1980 Arbitration Ordinance to give effect to the New York Convention before that treaty had been accepted by the Executive constitute a breach of the separation of powers doctrine thereby making the legislation unconstitutional?

## Constitutionality of the 1980 Arbitration Ordinance

[63]    In order to properly examine the constitutionality of the 1980 Arbitration Ordinance it is necessary to engage in a brief review of the historical background to the constitutional and legislative order in Belize. British Honduras was acquired by Great Britain by settlement becoming part of Her Majesty's dominions by 1817, at the latest. The British Honduras Constitution of 1870 vested power to make laws "for the peace, order and good governance of the … Colony" in the Governor "with the advice and consent of the … Legislative Council…" On 1st January 1964, the Colony achieved self-government through the British Honduras Letters Patent ("Letters Patent") and the enactment of the British Honduras Constitution Ordinance ("Constitution Ordinance"). These instruments, together with the common law relating to the Crown prerogative and executive power, delineated and delimited the boundaries of the three arms of governmental power in British Honduras: executive power was vested in the Monarch headed by Queen Elizabeth II; legislative authority vested in the colonial legislature; and judicial authority vested in the colonial judiciary.

[64]    British Honduras became Belize on 1st June 1973. For ease of reference the Court will henceforth refer to "Belize" regardless of the date of the relevant event. Belize became independent on 21st September 1981. By letter dated 29th September 1982, the Prime Minister informed the Secretary General of the United Nations that Belize would continue to apply provisionally and on the basis of reciprocity, the treaties extended to it by the United Kingdom.

[65]    On 10th October 1980, during the era of self-government, the Belize Legislature enacted the Arbitration (Amendment) Ordinance[36] ("the 1980 Ordinance") which came into effect on the same day. By the 1980 Ordinance the Legislature added Part III, sections 25 – 30 and a Fourth Schedule titled "*New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards*" to the Arbitration Ordinance of 1932. The 1980 Ordinance was expressed to be: "*An Ordinance to amend the Arbitration Ordinance Chapter 13 of the Laws to give effect to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.*" It provided for the staying of court proceedings in the absence of proof that the arbitration agreement was null and void and the enforcement in Belize of an arbitration award made in the territory of a country (other than Belize) which is a party to the New York Convention ("Convention Award"). The New York Convention had been ratified by the United Kingdom on 24th September 1975 and made applicable to Belize by Notice of Territorial Application (in the form of a Declaration by the United Kingdom) which was received by the Secretary General of the United Nations on 26th November 1980, some six weeks *after* the enactment of the 1980 Ordinance.

[66]    The Appellants contend that the LCIA Final Award of 29th August 2009 was made in the United Kingdom, a party to the New York Convention and is therefore a Convention Award that ought to be enforced in Belize in accordance with the provisions of the 1980 Arbitration Ordinance inserted into the Arbitration Act. This is opposed by the Respondent who argues that the Ordinance was *ultra vires* the powers of the Legislature and therefore unconstitutional at the time of its enactment. In response the Appellants

---

[36] No. 21 of 1980

say that even *if* the 1980 Arbitration Ordinance was defective at its passage, which they strenuously deny, it could nevertheless be characterized as "having effect" immediately before Independence Day and was therefore "saved" as existing law by Section 134 (1) of the Constitution. Finally, the Appellants argue that Belize is estopped from contending that the New York Convention is not applicable given the 29th September 1982 letter of the Prime Minister to the Secretary General of the United Nations.

**(a) Is *ultra vires* legislation saved as existing law?**

[67]   If the Appellants are correct that any defect in the passage of the 1980 Arbitration was cured by its being "saved" under the Independence Constitution then the issue would be resolved in their favour and this resolution would foreclose on the need to discuss whether the Ordinance was *ultra vires* the powers of the colonial legislature. For this reason it is convenient to consider this point first.

[68]   Section 134 of the Independence Constitution of 1981 made provision for the saving of "existing laws" and where necessary, for the Governor General and the courts to bring those laws into conformity with the 1981 Constitution. "Existing laws" meant any Act, Ordinance, rule, regulation, order or other instrument "having effect as part of the law of Belize immediately before Independence Day." The Appellants argue that even if the 1980 Ordinance was *ultra vires*, it was still capable of being saved on the basis that section 136 (6) does not require that an Ordinance be "valid" to qualify as an existing law but only that it be an Ordinance "having effect" immediately before Independence Day. Having been saved by section 134 the only basis on which the Ordinance could be declared unconstitutional was for want of compatibility with the 1981 Constitution, since the section gave the same effect to saved laws "as if they had been made in pursuance of this Constitution."

[68]   There is no merit in this argument. In order for a law to be saved as "existing" law that law must first exist. The purported enactment of a law by a legislature that has no power to enact that law does not result in the creation of law. Such a "law" does not exist and

never did; it is void *ab initio*: see *Murphy v R*.[37] There is therefore nothing to be saved. If the 1980 Ordinance was outside the legislative competence of the colonial Legislature then the Court agrees entirely with Pollard JA that the Ordinance could "not constitute ‚existing law" within the meaning of Section 134 (1) of the Belize Constitution and amenable to being saved at the time of independence of Belize".[38] The real question, therefore, is whether the enactment of the 1980 Ordinance was in fact outside of the legislative powers of the Legislature.

**(b)   Was the 1980 Ordinance ultra vires the powers of the legislature?**

[69]    The Respondent argues that by enacting the 1980 Ordinance the colonial legislature acted outside its legislative competence and encroached on the authority of the Executive thereby breaching the Separation of Powers doctrine and thus rendering the legislation unconstitutional. The competence of the colonial legislature derived from the Letters Patent and from the Constitutional Ordinance, section 16 of which provided: "Subject to the provisions of this Ordinance, the Legislature may make laws for the peace order and good government of the Territory." Under the Royal Prerogative executive power was vested in the Crown and exercised by the Governor of Belize. For centuries it has been accepted that executive powers in the Royal Prerogative included the power to make international treaties, although the legislative implementation of the treaty was a matter for the legislature: *Roberts v Minister of Foreign Affairs*;[39] and *Attorney General v Joseph and Boyce*.[40] Section 16 of the Letters Patent and Section 2 (4) of the Constitutional Ordinance confirmed that the Governor acting in his discretion was responsible for "external affairs".

[70]    The difficulty in this case arises from the fact that the 1980 Ordinance was expressly enacted "to give effect to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards" at a time when the Executive had not yet accepted the

---

[37] 1982 Ir. 241
[38] At paragraph 46 of the Judgment in the court below
[39] [2007] UKPC 56
[40] [2006] CCJ 3 (AJ)

Convention. Pollard JA, who delivered the majority judgment in the court below, held as follows:

> "Section 16 of the Constitutional Ordinance 1963 empowered the colonial legislature of Belize to make laws for the peace, order and good government of Belize. However, when the colonial legislature purported to pass an ordinance "to give effect to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards" the colonial legislature was clearly encroaching on the royal prerogative in respect of the matter relating to foreign affairs. The "enactment" of the Convention by the colonial legislature necessarily involved interference in foreign affairs which was exclusively the domain of the Crown.
> …
>
> On the evidence before this Court, the colonial legislative assembly of Belize presumed to apply in its domestic law, and I would venture to say without proper executive authority, express or implied, an international treaty, the New York Convention, which had not yet been extended by the Crown in the exercise of its exclusive prerogative powers to Belize…"

[71]    The Appellants argue that the 1980 Ordinance dealt with the internal affairs of Belize, that is, the recognition and enforcement of arbitration agreements and arbitral awards by the courts of Belize within the territory of Belize. It does not purport to regulate or govern external affairs or the external relationships between the State and other States. This line of reasoning found favour with Mendes JA who put the matter this way:

> "The establishment of obligations on the international plane is the domain of the executive. The enactment of laws for the peace and good government of the people of [Belize] was the responsibility of the [Belize] Legislature. It seems clear to me that these plenary powers include the power to provide for the enforcement of arbitration awards, no matter where made and no matter who the parties to the award might be. It was also within the competence of the legislature to place such limitations on the enforcement of such awards as it deem fit. In this particular instance, it chose to identify the awards which are enforceable by reference in part to whether the country in which the award was made was a party to the New York Convention. That too was clearly within its plenary powers. It does not seem to me to make one jot of difference that the terms in which the legislative will of the [Belize] Legislature was expressed was inspired or was intended to replicate or indeed was intended to give effect to an existing treaty by which [Belize] was not yet bound. Such a legislative act does not intrude into the domain of external affairs. It concerns entirely the development of the domestic law of [Belize]."

[72]   This Court finds the views expressed by Mendes JA utterly convincing and prefers them to those articulated by Pollard JA. The 1980 Ordinance in no way interfered with the exercise of the executive authority in foreign affairs. In legislating the 1980 Ordinance, the legislature was not engaged in the negotiation, signature or ratification of the New York Convention; matters which belonged to the prerogative powers of the Crown. Nothing in the 1980 Ordinance purported to make Belize a party to the New York Convention. The annexure of the Convention to the Ordinance appeared to have been for purposes of identifying the categories of foreign awards that would be recognized and enforced in Belize, not to undertake international law obligations on behalf of the State. By giving force to the obligations in a treaty at the domestic level the legislature does not usurp the executive"s functions. Belize could not, by virtue of the 1980 Ordinance, assert an international law right to compel other parties to the Convention to enforce awards made in favour of Belizean nationals; equally, an amendment to or repeal of the 1980 Arbitration Ordinance could not engage the international responsibility of Belize. There is a normative separation between international rights and obligations under the New York Convention and domestic legislative enactment of that Convention.

[73]   Further, the 1980 Ordinance was within the broad powers of the Belize legislature, "to make laws for the peace, order and good government of the Territory". These words are apt to connote the widest plenary law-making powers appropriate to a sovereign (*Ibralebbe v The Queen*[41] and *Regina (Bancoult) v Secretary of State for Foreign and Commonwealth Affairs (No. 2)*[42]. It is, indeed, unanimously agreed that this law-making power includes the power to legislate for the incorporation of international treaties. What the Respondent argues, and Pollard JA accepted, was that there was state practice in so-called "dualist" jurisdictions that established a requirement for the prior executive act of acceptance of the treaty by the Executive.

[74]   There is no such requirement. At best, state practice could amount to a customary rule of international law recognized as part of the common law but such a common law rule

---

[41] [1964] AC 900 at 923 (PC)
[42] [2009] 1 AC 453 at 486

could scarcely override the clear vesting by the Constitution of the widest plenary law-making powers in the Legislature. Furthermore, the emergence of customary law requires uniformity of state practice and state practice is by no means uniform on whether treaty acceptance must precede legislative incorporation. There are undoubtedly many instances in which the executive act of treaty acceptance has preceded legislative enactment of the treaty, although the authorities cited for the proposition that the timing of the 1980 Ordinance made it *ultra vires,* i.e., being enacted six weeks before executive acceptance of the New York Convention, do not establish that principle. *Attorney-General for Canada v Attorney General for Ontario*[43] held that the legislative enactment by the Dominion Parliament of the Versailles Treaty was *ultra vires* not because of a sequencing issue but, rather, because the domestic implementation of the relevant treaty obligations was within the exclusive competence of the legislatures of the provinces. The Dominion Parliament had therefore sought to usurp the jurisdiction of the Provincial Legislatures.

[75]   It is also the case that there are many occasions where legislative incorporation of a treaty has *preceded* executive acceptance of that treaty.[44] The Arbitration Act 1975 of England was enacted to give effect to the New York Convention before the United Kingdom had acceded to the Convention, although in *Channel Group v Balfour Beatty Ltd*[45] it was said that "strictly speaking" the legislation should have followed Executive acceptance of the Convention. The UK Act to implement the Warsaw Convention for the Unification of Certain Rules Relating to International Carriage by Air was passed before the Convention was ratified by the Executive.[46] In some instances the New York Convention has been given effect in domestic law even though the State is not a party to the Convention, as in the British Virgin Islands,[47] an important Caribbean jurisdiction for the settlement of transnational commercial disputes. Pre-acceptance enactment has also been

---

[43] [1937] AC 326 (PC)
[44] McNair, The Law of Treaties, (Oxford University Press, 8th Edition, 1961) at p. 86, footnote 3; *Salomon v Commissioner of Customs and Excise* [1967] 2 QB 116, at p. 143-D; *The Hollandia* [1982] 1 QB 872 (CA) and [1983] 1 AC 565 at p. 571 per Lord Diplock
[45] [1993] AC 334 at 354 (HL)
[46] Judgment in the court below, Pollard JA at paragraph 52
[47] The UK colony of the British Virgin Islands enacted its Arbitration Ordinance dated 6 September 1976 to give effect to the New York Convention in domestic law although the Convention has never been extended to the BVI by the British Government.

recommended by colonial legal advisors as well as modern academic writers.[48] The rationale appears to be that if domestic legislation is required to enable the State to give effect to its treaty obligation then the legislation should be in place before the treaty comes into force so as to avoid a breach of the international obligation at the point when the treaty enters into force. In an ideal world both the treaty and the incorporating legislation would enter into operation at the same time. But the sequencing of these events has never, prior to the decision below, been held to displace the constitutional competence in the legislature to enact incorporating legislation. We do not think that any such fettering of the legislative competence was intended by the Constitution.

[76]   We do not think that the majority in the court below gave sufficient weight to the Governor"s assent to the 1980 Ordinance. The colonial Constitution vested executive authority in the Crown and provided for its exercise by the Governor; the Governor acting in his discretion had responsibility for "external affairs". The Governor could interrupt the legislative passage (section 27 (1)) or refuse his assent or reserve the Bill for the signification of Her Majesty"s pleasure (section 28 (3)) if he felt the Bill infringed upon the prerogative powers or his special responsibilities. While not conclusive, it is reasonable to assume that by assenting to the Bill providing for the giving of effect to the New York Convention, the Governor must have considered that the legislation did not usurp the treaty making prerogative of Her Majesty or his special responsibilities. More crucially, the Bill was only fully enacted upon Assent of the Crown in the exercise of the Royal Prerogative. It is therefore difficult to see how a law which can only become so on the exercise of the Royal Prerogative could be inconsistent with the Royal Prerogative. It is not without significance that the Crown exercised its executive power to extend the Convention to Belize a mere six weeks after the enactment.

---

[48]See Diplomatic Telegram dated 31 December 1980 by the UK F&CO Advisers; UKFCO, Treaty Section, Information Management Department, "Treaties and MOUs, Guidance on Practice and Procedures," (2nd edition, May 2004), at p. 7; Joanna Harrington, "Scrutiny and approval: the Role for Westminster-style Parliaments in Treaty-making" in *International and Comparative Law Quarterly* (2006) Vol. 55 at p. 125).

[77]    For these reasons the Court concludes that the enactment of the 1980 Ordinance was *intra vires* the powers of the legislature and did not encroach into the domain of the Royal Prerogative in treaty-making. We therefore find the 1980 Ordinance to be constitutional and saved as "existing law" under the 1981 Independence Constitution.

### (c) Is Belize estopped from arguing that the New York Convention is not applicable?

[78]    The Appellants argue that the declaration made by the Prime Minister of Belize in the *Note Verbale* of 29th September 1982 was legally binding and estopped Belize from denying the applicability of the New York Convention. In the *Note Verbale*, the Prime Minister informed the Secretary General of the United Nations that the Government of Belize, "…. had decided to continue to apply provisionally and on the basis of reciprocity, all treaties to which the Government of the United Kingdom of Great Britain and Northern Ireland was a party, the application of which was extended either expressly or by necessary implication to the then dependent territory of Belize." The Prime Minister requested that his letter be circulated to all Member States of the United Nations. The Appellants contend that this declaration fulfilled the conditions for estoppel to arise in International Law, namely, (a) the meaning of the statement is clear and unambiguous; (b) the statement or representation is voluntary, unconditional, and authorised; and (c) there is reliance in good faith upon the representation of one party by the other party to his detriment (or to the advantage of the party making the representation).[49]

[79]    This issue of the binding nature of the declaration made by the Government of Belize raises very complex issues and not only those relating to estoppel in International Law. Diverse theories underpinning the law of treaties, state responsibility, state succession, and of unilateral declarations also come into play. Since this Court has already held that the 1980 Ordinance giving effect to the New York Convention was constitutional and

---

[49] These conditions are discussed by Professor Bowett, "Estoppel before International Tribunals and its Relation to Acquiescence", British Yearbook of International Law (1957) Vol. 33 at pp. 188-194.

saved as existing law at the time of independence, we consider it unnecessary and unwise in the circumstances to decide on the issue of estoppel.

## Why the case was not remitted to the Court of Appeal

[80]   There was no common ground between the parties as to the consequential disposal of the appeal in the event that this Court found the Arbitration Act to be constitutional, as we have. The Appellants submit that we should decide the issue of enforcement of the award without further ado while the Respondent seeks a remittal to the Court of Appeal. The remittal would enable the court below to decide the two other objections raised by the Respondent to enforcement, that is, that the subject matter of the dispute was not capable of settlement by arbitration, and enforcement would be contrary to public policy.

[81]   The issues of constitutionality, arbitrability, and public policy were the subject of comprehensive written submissions and were fully argued over a three-day period in October 2011, before the Court of Appeal.  At the request of the Court of Appeal made on 26th January 2012, the parties made further written submissions on the question of the constitutionality of the 1980 Ordinance. The judgment of the Court of Appeal was handed down on 8th August 2012, and dealt exclusively with the question of constitutionality. The judgment did not at all address the issues of arbitrability or public policy. This approach was lamented by Mendes JA who observed that ".... if there is an appeal and the decision of the majority is overturned, their Honours of the Caribbean Court of Justice are very likely to require the views of this court particularly on the question whether the enforcement of the award would be contrary to public policy."[50]

[82]   We deeply regret that the Court of Appeal declined to make their views on these matters available to us. This Court places considerable weight on the opinions expressed in the Court of Appeal; opinions which are pre-eminent in providing vital juridical material to inform and shape the views of this final Court especially on such innate questions as

---

[50] At paragraph [30] of the judgment in the court below

arbitrability and public policy: *Boyce v Attorney General and Minister of Public Utilities*.[51] The scheme of adjudication in the Constitution contemplates review by this Court of decisions of the Court of Appeal. But this Court does have explicitly in relation to any appeal, all the jurisdiction and powers possessed in relation to that case by the Court of Appeal.[52] The Court's overriding objective is "to deal with cases fairly and expeditiously so as to ensure a just result".[53] In every case the most important objective is for the Court to ensure a fair and just result. Subject to that requirement, the question which arises is whether the natural reluctance to decide the issues without the benefit of the views of the Court of Appeal should prevail over the judicial impulse to settle litigation with expedition and finality.

[83]   This question cannot be answered in the abstract but only by reference to the particular circumstances of the case at hand.   In this case the arbitral award was made on 20th August 2009 and finalized on 29th August 2009, almost four years ago. Each subsequent cycle of litigation before the courts of Belize occasions additional substantial costs and expense.   Under the terms of the award interest continues to accrue. The arguments on arbitrability and public policy were fully ventilated before the Supreme Court and in the judgment of the trial judge. That the Court of Appeal was aware of its responsibility to address the outstanding issues but chose not to do so argues against remitting the case: *Re James McDonald*.[54] Remitting the matter to the Court of Appeal could require a full rehearing before a new panel as Pollard JA is no longer a Judge of the Court of Appeal.

[84]   It is also significant that there are no relevant disputes of fact and that the issues to be decided do not derive from peculiar constitutional or legislative provisions in Belize. Whether an agreement that includes matters relating to the imposition and collection of taxes is properly submitted to international arbitration and whether enforcement of an award resulting from such arbitration would be contrary to public policy are

---

[51] [2012] CCJ 1
[52] Section 11 (6), Caribbean Court of Jurisdiction Act 2010
[53] Rule 1.3 of the Caribbean Court of Justice (Appellate Jurisdiction) Rules
[54] (1975) 13 JLR 12 especially at p 27 per Graham-Perkins, JA

quintessentially matters of judicial policy. Access to the views of the judges below remains important but the matters for decision are of broad significant public importance to the Caribbean polity as a whole. In these circumstances this Court must pay some attention to its determinative role in the further development of Caribbean jurisprudence through the judicial process.[55]

[85]   For these reasons the Court decides that the balance was tilted in favour of deciding the outstanding issues in dispute rather than remitting them to the Court of Appeal.

## Conclusion

[86]   For the reasons so eloquently articulated in the judgment of our brother Saunders JCCJ the Court orders that enforcement of the arbitral award should be declined under section 30 (3) of the Arbitration Act.

## Costs

[87]   The award of costs in this case is complicated by a number of factors. The Respondent has prevailed on the central issue that enforcement of the Convention Award would be contrary to the public policy of Belize. However, the Respondent had sought to have this Court defer decision on the public policy issue and instead to remit the matter to the Court of Appeal. The Appellants succeeded on the primary ground of appeal arising from the decision of the Court of Appeal, namely, that the Arbitration Act of 1980 was constitutional and saved as existing law under the Independence Constitution. A further factor that complicates the issue was the non-participation by the Respondent in arbitration proceedings despite numerous invitations and opportunities to do so. It is not beyond the realm of possibility that had the Respondent mounted vigorous and comprehensive arguments before the arbitral tribunal as it did before us the tribunal might have been persuaded to decline to adjudicate upon the matter thereby saving

---

[55] Cf. *Eco Swiss China Time Ltd v Benetton International NV*  [2000] 5 CMLR 816, 832

considerable expense. It is also the case that this Court has and must encourage the greatest respect for international commercial under the Arbitration Ordinance and by extension as well the New York Convention. In the circumstances we consider that the most appropriate award would be for each party to bear its own costs.

**<u>Disposition</u>**

[88]    The appeal is dismissed. There is no order as to costs.


_____/s/_____

The Right Hon Mr Justice Dennis Byron, President


_____/s/_____        _____/s/_____

The Hon Mr Justice A Saunders        The Hon Mme Justice D Bernard


_____/s/_____        _____/s/_____

The Hon Mr Justice J Wit        The Hon Mr Justice W Anderson

# Kimmelman Declaration
# Exhibit D

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**Before The Honourable** Mr Justice Burton

**IN AN ARBITRATION CLAIM**

**BETWEEN**

Claim No 2013 folio 269

(1)    **BCB Holdings Limited**

(2)    **The Belize Bank Limited**

**Claimants**

And

The Attorney General of Belize on behalf of the Government of Belize

**Defendant**

---

**ORDER**

---

**The Defendant has the right to make an application to set aside this Order within two months after the service of this Order. This Order will not be enforced until the end of that period or until any application made by the Defendant within that period has been finally disposed of.**

UPON a claim having been made by the Claimants by an arbitration claim form dated 26 February 2013;

AND UPON an application having been made by an application notice dated 26 February 2013;

AND UPON reading the witness statement (and its exhibits) of Angeline Marie Welsh dated 26 February 2013;

IT IS ORDERED THAT –

1.    pursuant to Section 66(1) of the Arbitration Act 1996, the Claimants be at liberty to enforce the award dated 20 August 2009 in the above Arbitration, rendered by an arbitral tribunal comprising Michael J. Lee, Salim Moollan, and Carl F. Salans duly appointed under the arbitration agreement in the Settlement Deed dated 22 March 2005 as amended by the Deed of Amendment dated 21 June 2006 (the "Award") in the same manner as a judgment or order to the same effect;

2.    pursuant to section 66(2) of the Arbitration Act 1996, judgment shall be entered against the Defendant in terms of the Award;

3.    the costs of this arbitration claim and of the judgment entered hereunder be paid by the Defendant to the Claimants and the subject of a detailed assessment if not agreed;

4.    the Claimants have permission to serve the arbitration claim form, the application notice and the witness statement of Angeline Marie Welsh (and its exhibits), all dated 26 February 2012, together with any subsequent documents as are or may be required, on the Defendant out of the jurisdiction through the Foreign and Commonwealth Office in accordance with CPR 6.44;

5.    the Claimants shall serve this Order on the Defendant out of the jurisdiction through the Foreign and Commonwealth Office in accordance with CPR 6.44, with the Court's permission not required (CPR 62.18(8));

6.    the period of time for service of the arbitration claim form, the application notice, the witness statement of Angeline Marie Welsh (and its exhibits), all dated 26 February 2013, this Order, and all related documents shall be extended from the one month set out in CPR 62.4(2) to six months, provided that the Claimants take all reasonable steps to effect service as soon as practicable; and

7.    the Award and the judgment entered hereunder should not be enforced until two months after service of this Order on the Defendant, unless the Defendant applies within that period to have this Order set aside, in which case, neither the Award nor the judgment shall be enforced until after any such application by the Defendant is finally disposed of.

Dated 26'ᵗʰ February 2013

Claim No.

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

_____

BETWEEN

(1) BCB HOLDINGS LIMITED
(2) THE BELIZE BANK LIMITED

**Claimant**

and

THE ATTORNEY GENERAL OF BELIZE
ON BEHALF OF THE GOVERNMENT OF BELIZE

**Defendant**

_____

**ORDER**

_____

Dated the      day of February, 2013

# ALLEN & OVERY

One Bishops Square
London E1 6AD

Tel: 0203 088 0000
Fax: 0203 088 0088

Ref: RJS/AAMW
Solicitors for the Claimant

# Kimmelman Declaration

# Exhibit E

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

Before The Honourable   Mr Justice Burton

Case No 2013 folio 26 9

**BETWEEN**

          (1)   **BCB Holdings Limited**

          (2)   **The Belize Bank Limited**

                                                    **Claimants**

                              **And**

The Attorney General of Belize on behalf of the Government of Belize

                                               **Defendant**

---

**JUDGMENT**

---

UPON The Honourable Mr(s) Justice ....Burton...... having by Order dated ....26ᵗʰ February..... 2013 (the **Order**) ordered that (i) the Claimants be at liberty to enforce the Final Award dated 20 August 2009 rendered by an arbitral tribunal, comprising Michael J. Lee, Salim Moollan and Carl F. Salans in arbitration number 81169 under the Rules of the London Court of International Arbitration (the **Final Award**); and (ii) that the costs of this arbitration claim, including the costs of entering judgment, be paid by the Defendant;

IT IS DECLARED AND ADJUDGED THAT (all capitalised terms used in this judgment bearing the same meaning as in the Final Award):

(1)    the Settlement Deed as Amended has been terminated as a result of the Defendant's repudiatory breach and the Claimants' acceptance thereof;

(2)    the Claimants are entitled to damages in the amount of BZ$40,843,272.34 and the Defendant is ordered to pay this amount forthwith;

(3)    the Claimants are entitled to reimbursement of the costs of the arbitration fixed by the LCIA at £206,248.14 and entirely paid out of three deposits made by the Claimants. The Defendant is ordered to pay to the Claimants forthwith the equivalent of this amount in BZ dollars, at an exchange rate which is the average of the exchange rates prevailing on the three days each of the deposits made by Claimants to cover these costs was lodged;

(4)    the Claimants are also entitled to the legal, professional and other arbitration costs which they have incurred as a result of the Defendant's breach, which the Arbitral Tribunal quantified as BZ$2,960,735.69. The Defendant is ordered to pay this amount to the Claimants forthwith;

(5)    the Claimants are entitled to interest at an annual rate of 3.38%, compounded annually on any unpaid amount of the damages and costs awarded to them, i.e., with respect to historical losses, from the date when each element of such losses was incurred, with respect to future losses, from the date of this Award and with respect to costs, from the date when such costs were paid, until paid by the Defendant to the Claimants; and

(6)    any other claims or requests for relief made by the Claimants are dismissed.

The 26ᵗʰ day of ............. 2013

# Kimmelman Declaration

# Exhibit F

APPEAL,CLOSED,STAYED,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:09–cv–02170–RJL

BELIZE SOCIAL DEVELOPMENT LIMITED v.
GOVERNMENT OF BELIZE
Assigned to: Judge Richard J. Leon
Case in other court:  10–07167
　　　　　　　　　　　14–07002
　　　　　　　　　　　14–07003
　　　　　　　　　　　14–07018
Cause: 09:0202 Award under Convention on Foreign Arbitral
Awards

Date Filed: 11/17/2009
Date Terminated: 01/16/2014
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Petitioner**

**BELIZE SOCIAL DEVELOPMENT
LIMITED**

represented by **Joseph S. Hall**
KELLOGG, HUBER, HANSEN, TODD,
EVANS &FIGEL, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036
(202) 326–7983
Fax: (202) 328–7999
Email: jhall@khhte.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Chris Todd**
KELLOGG, HUBER, HANSEN, TODD,
EVANS &FIGEL, PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036
(202) 326–7900
Fax: (202) 326–7999
Email: ctodd@khhte.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin Graham Koehler**
SIDLEY AUSTIN, LLP
1501 K Street, NW
Washington, DC 20005–1401
(202) 736–8359
Fax: (202) 736–8711
Email: kkoehler@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dana C. MacGrath**
SIDLEY AUSTIN, LLP
787 Seventh Avenue
New York, NY 10019
(212) 839–7319
Fax: (212) 839–5599
Email: dmacgrath@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Louis B. Kimmelman**
SIDLEY AUSTIN, LLP

787 Seventh Avenue
New York, NY 10019
(212) 839–5300
Fax: (212) 839–5599
Email: bkimmelman@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**GOVERNMENT OF BELIZE**  represented by  **Creighton R. Magid**
DORSEY &WHITNEY LLP
1801 K Street NW
Suite 750
Washington, DC 20006
(202) 442–3555
Fax: (202) 442–3199
Email: magid.chip@dorseylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jay Christopher Johnson**
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
(202) 344–4698
Fax: (202) 344–8300
Email: jcjohnson@venable.com
*TERMINATED: 01/31/2013*

**Juan C. Basombrio**
DORSEY &WHITNEY LLP
600 Anton Boulevard
Suite 2000
Costa Mesa, CA 92646
714–800–1400
Fax: 714–800–1499
Email: basombrio.juan@dorsey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy J. Koeppl**
DORSEY &WHITNEY, L.L.P.
1801 K Street, NW
Suite 750
Washington, DC 20006
(202) 442–3510
Email: koeppl.timothy@dorsey.com
*TERMINATED: 07/28/2010*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2009 | 1 | PETITION TO CONFIRM ARBITRATION AWARD against GOVERNMENT OF BELIZE ( Filing fee $ 350 receipt number 4616025534.) filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Louis B. Kimmelman, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Declaration Stephen J. Ruzika, # 17 Exhibit A, # 18 Exhibit B, # 19 Exhibit C, # 20 Exhibit D, # 21 Notice of Filing of Petition to Confirm Foreign Arbitration Award and to Enter Judgment, # 22 Civil Cover Sheet)(jf, ) (Entered: 11/18/2009) |

| 11/17/2009 | 2 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests NONE by BELIZE SOCIAL DEVELOPMENT LIMITED. (jf, ) (Entered: 11/18/2009) |
|---|---|---|
| 11/17/2009 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Dana C. MacGrath, :Firm– Allen &Overy LLP, :Address– 1221 Avenue of the Americas, New York, New York 10020. Phone No. – 212–610–6300. Fax No. – 212–610–6399 by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(jf, ) (Entered: 11/18/2009) |
| 11/17/2009 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Louis B. Kimmelman, :Firm– Allen &Overy LLP, :Address– 1221 Avenue of the Americas, New York, New York 10020. Phone No. – 212–610–6300. Fax No. – 212–610–6399 by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(jf, ) (Entered: 11/18/2009) |
| 11/17/2009 | 5 | REQUEST from Petitioner for the Clerk to effect service of one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 Notice of Suit) (jf, ) (Entered: 11/18/2009) |
| 11/20/2009 | 7 | CERTIFICATE OF CLERK of mailing one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state on Defendant, by registered mail, return receipt requested, to the head of the ministry of foreign affairs, pursuant to 28 U.S.C. 1608(a)(3). (Attachments: # 1 Receipt of Mailing) (jf, ) (Main Document 7 replaced on 11/30/2009) (jf, ). (Entered: 11/27/2009) |
| 11/23/2009 | | MINUTE ORDER granting 3 Motion of LOUIS B. KIMMELMAN for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 11/23/09. (lcrjl3) (Entered: 11/23/2009) |
| 11/23/2009 | | MINUTE ORDER granting 4 Motion of DANA C. MACGRATH for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 11/23/09. (lcrjl3) (Entered: 11/23/2009) |
| 11/25/2009 | 6 | STANDING ORDER. Signed by Judge Richard J. Leon on 11/25/09. (lcrjl3) (Entered: 11/25/2009) |
| 12/17/2009 | 8 | MOTION for Order to Resend by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Text of Proposed Order)(Hall, Joseph) (Entered: 12/17/2009) |
| 12/28/2009 | | MINUTE ORDER granting 8 Motion to Resend. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 12/28/09. (lcrjl3) (Entered: 12/28/2009) |
| 01/07/2010 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to GOVERNMENT OF BELIZE served on 12/2/2009, answer due 2/1/2010. (jf, ) (Entered: 01/07/2010) |
| 01/07/2010 | 10 | Summons Returned Unexecuted as to Attorney General for the GOVERNMENT OF BELIZE. (jf, ) . (Entered: 01/07/2010) |
| 01/22/2010 | 11 | NOTICE of Appearance by Timothy J. Koeppl on behalf of GOVERNMENT OF BELIZE (Koeppl, Timothy) (Entered: 01/22/2010) |
| 01/22/2010 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Juan C. Basombrio, :Firm– Dorsey &Whitney LLP, :Address– 38 Technology Drive, Suite 100, Irvine, California 92618–5310. Phone No. – 949–932–3650. Fax No. – 949–932–3601 by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 01/22/2010) |
| 01/22/2010 | 13 | Joint MOTION for Extension of Time to File Response/Reply to Petition by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 01/22/2010) |

| | | |
|---|---|---|
| 01/25/2010 | | MINUTE ORDER granting 12 Motion of JUAN C. BASOMBRIO for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 1/25/10. (lcrjl3) (Entered: 01/25/2010) |
| 03/29/2010 | 14 | NOTICE *of Rule 44.1 Intent to Rely on Foreign Law* by GOVERNMENT OF BELIZE (Koeppl, Timothy) (Entered: 03/29/2010) |
| 03/29/2010 | 15 | MOTION to Dismiss for Lack of Jurisdiction or Stay by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order, # 2 Declaration Claire L. Jones, # 3 Declaration Michael C. Young – Part A, # 4 Declaration Michael C. Young – Part B, # 5 Declaration Michael C. Young – Part C, # 6 Declaration Michael C. Young – Part D, # 7 Declaration Michael C. Young – Part E, # 8 Declaration Micaahel C. Young – Part F, # 9 Declaration Gian C. Ghandi – Part A, # 10 Declaration Gian C. Ghandi – Part B, # 11 Declaration Gian C. Ghandi – Part C, # 12 Declaration Gian C. Ghandi – Part D, # 13 Declaration Gian C. Ghandi – Part E, # 14 Declaration Gian C. Ghandi – Part F, # 15 Declaration Gian C. Ghandi – Part G, # 16 Declaration Gian C. Ghandi – Part H, # 17 Declaration Gian C. Ghandi – Part I, # 18 Declaration Gian C. Ghandi – Part J, # 19 Declaration Gian C. Ghandi – Part K, # 20 Declaration Gian C. Ghandi – Part L, # 21 Declaration Gian C. Ghandi – Part M, # 22 Declaration Gian C. Ghandi – Part N, # 23 Declaration Gian C. Ghandi – Part O, # 24 Declaration Gian C. Ghandi – Part P, # 25 Declaration Juan C. Basombrio – Part A, # 26 Declaration Juan C. Basombrio – Part B, # 27 Declaration Juan C. Basombrio – Part C, # 28 Declaration Juan C. Basombrio – Part D, # 29 Declaration Juan C. Basombrio – Part E, # 30 Declaration Juan C. Basombrio – Part F, # 31 Declaration Juan C. Basombrio – Part G, # 32 Declaration Juan C. Basombrio – Part H, # 33 Declaration Juan C. Basombrio – Part I, # 34 Declaration Juan C. Basombrio – Part J, # 35 Declaration Juan C. Basombrio – Part K, # 36 Declaration Juan C. Basombrio – Part L, # 37 Declaration Juan C. Basombrio – Part M, # 38 Declaration Juan C. Basombrio – Part N, # 39 Declaration Juan C. Basombrio – Part O, # 40 Declaration Juan C. Basombrio – Part P)(Koeppl, Timothy). Added MOTION to Stay on 3/30/2010 (znmw, ). (Entered: 03/29/2010) |
| 03/29/2010 | 16 | RESPONSE re 1 Petition to Confirm Arbitration Award,, *Preliminary Response to Petition* filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Text of Proposed Order Dismissing Petition, # 2 Declaration Claire L. Jones, # 3 Declaration Michael C. Young – Part A, # 4 Declaration Michael C. Young – Part B, # 5 Declaration Michael C. Young – Part C, # 6 Declaration Michael C. Young – Part D, # 7 Declaration Michael C. Young – Part E, # 8 Declaration Michael C. Young – Part F, # 9 Declaration Gian C. Ghandi – Part A, # 10 Declaration Gian C. Ghandi – Part B, # 11 Declaration Gian C. Ghandi – Part C, # 12 Declaration Gian C. Ghandi – Part D, # 13 Declaration Gian C. Ghandi – Part E, # 14 Declaration Gian C. Ghandi – Part F, # 15 Declaration Gian C. Ghandi – Part G, # 16 Declaration Gian C. Ghandi – Part H, # 17 Declaration Gian C. Ghandi – Part I, # 18 Declaration Gian C. Ghandi – Part J, # 19 Declaration Gian C. Ghandi – Part K, # 20 Declaration Gian C. Ghandi – Part L, # 21 Declaration Gian C. Ghandi – Part M, # 22 Declaration Gian C. Ghandi – Part N, # 23 Declaration Gian C. Ghandi – Part O, # 24 Declaration Gian C. Ghandi – Part P, # 25 Declaration Juan C. Basombrio – Part A, # 26 Declaration Juan C. Basombrio – Part B, # 27 Declaration Juan C. Basombrio – Part C, # 28 Declaration Juan C. Basombrio – Part D, # 29 Declaration Juan C. Basombrio – Part E, # 30 Declaration Juan C. Basombrio – Part F, # 31 Declaration Juan C. Basombrio – Part G, # 32 Declaration Juan C. Basombrio – Part H, # 33 Declaration Juan C. Basombrio – Part I, # 34 Declaration Juan C. Basombrio – Part J, # 35 Declaration Juan C. Basombrio – Part K, # 36 Declaration Juan C. Basombrio – Part L, # 37 Declaration Juan C. Basombrio – Part M, # 38 Declaration Juan C. Basombrio – Part N, # 39 Declaration Juan C. Basombrio – Part O, # 40 Declaration Juan C. Basombrio – Part P)(Koeppl, Timothy) (Entered: 03/29/2010) |
| 03/29/2010 | 17 | MOTION to Bifurcate by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order Granting Respondents Motion to Bifurcate)(Koeppl, Timothy) (Entered: 03/29/2010) |
| 04/12/2010 | | MINUTE ORDER GRANTING 13 Joint Motion for Extension of Time to Respond to Petition nunc pro tunc. Signed by Judge Richard J. Leon on 4/12/2010. (lcrjl3) (Entered: 04/12/2010) |

| 04/13/2010 | 18 | Joint MOTION for Extension of Time to *File Reply And/Or Opposition Papers With Respect To (1) Petition To Confirm Foreign Arbitration Award, (2) Motion To Stay/Dismiss Petition, And (3) Motion To Bifurcate* by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Text of Proposed Order)(Hall, Joseph) (Entered: 04/13/2010) |
|---|---|---|
| 04/14/2010 | | MINUTE ORDER granting 18 Joint Motion for Extension of Time to File Reply And/Or Opposition Papers. It is hereby ORDERED that the motion is GRANTED. Petitioner shall file by May 28, 2010, its: (a) Reply in support of the Petition to Confirm Foreign Arbitration Award and to Enter Judgment; (b) Opposition to Respondent's Motion to Stay Action or, in the Alternative, Dismiss Petition; and (c) Opposition to Respondent's Motion to Bifurcate. Respondent shall file by July 2, 2010, its: (a) Reply in support of the Motion to Stay Action or, in the Alternative, Dismiss Petition; and (b) Reply in support of the Motion to Bifurcate. Signed by Judge Richard J. Leon on 4/14/2010. (lcrjl3) (Entered: 04/14/2010) |
| 05/10/2010 | 19 | ERRATA *To Provide Corrected PDF Of Memorandum Of Points And Authorities In Support Of Petition To Confirm Arbitration Award And To Enter Judgment* by BELIZE SOCIAL DEVELOPMENT LIMITED 1 Petition to Confirm Arbitration Award,, filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Exhibit)(Hall, Joseph) (Entered: 05/10/2010) |
| 05/11/2010 | 20 | NOTICE of Appearance by Kenneth Christy Todd on behalf of BELIZE SOCIAL DEVELOPMENT LIMITED (Todd, Kenneth) (Entered: 05/11/2010) |
| 05/25/2010 | 21 | MOTION To Suspend The April 14, 2010 Scheduling Order And For A Status Conference by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Hall, Joseph) (Entered: 05/25/2010) |
| 05/26/2010 | 22 | Memorandum in opposition to re 21 MOTION To Suspend The April 14, 2010 Scheduling Order And For A Status Conference filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 05/26/2010) |
| 05/27/2010 | 23 | REPLY to opposition to motion re 21 MOTION To Suspend The April 14, 2010 Scheduling Order And For A Status Conference filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Hall, Joseph) (Entered: 05/27/2010) |
| 06/10/2010 | 24 | REPLY to opposition to motion re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by GOVERNMENT OF BELIZE. (Koeppl, Timothy) (Entered: 06/10/2010) |
| 06/14/2010 | 25 | SURREPLY to re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Hall, Joseph) (Entered: 06/14/2010) |
| 06/21/2010 | | MINUTE ORDER denying 21 Motion to Suspend the April 14, 2010 Scheduling Order and for a Status Conference. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 6/21/2010. (lcrjl3) (Entered: 06/21/2010) |
| 06/24/2010 | 26 | MOTION To Clarify The June 21, 2010 Minute Order To Ensure A Fair Hearing by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Hall, Joseph) (Entered: 06/24/2010) |
| 07/08/2010 | 27 | Memorandum in opposition to re 26 MOTION To Clarify The June 21, 2010 Minute Order To Ensure A Fair Hearing filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Text of Proposed Order)(Koeppl, Timothy) (Entered: 07/08/2010) |
| 07/16/2010 | 28 | REPLY to opposition to motion re 26 MOTION To Clarify The June 21, 2010 Minute Order To Ensure A Fair Hearing filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Hall, Joseph) (Entered: 07/16/2010) |
| 07/28/2010 | 29 | NOTICE of Appearance by Jay Christopher Johnson on behalf of GOVERNMENT OF BELIZE (Johnson, Jay) (Entered: 07/28/2010) |

| 07/28/2010 | 30 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GOVERNMENT OF BELIZE. Attorney Timothy J. Koeppl terminated. (Koeppl, Timothy) (Entered: 07/28/2010) |
|---|---|---|
| 10/18/2010 | | MINUTE ORDER granting 15 Motion to Stay or, in the Alternative, Dismiss Petition. It is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the proceedings in this case shall be STAYED pending resolution of the parties' case before the Belize Supreme Court. Signed by Judge Richard J. Leon on 10/18/2010. (lcrjl3) (Entered: 10/18/2010) |
| 10/18/2010 | | MINUTE ORDER denying 17 Motion to Bifurcate as moot. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/18/2010. (lcrjl3) (Entered: 10/18/2010) |
| 10/18/2010 | | MINUTE ORDER denying 26 Motion To Clarify the June 21, 2010 Minute Order to Ensure a Fair Hearing. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/18/2010. (lcrjl3) (Entered: 10/18/2010) |
| 11/16/2010 | 31 | NOTICE OF APPEAL as to Order on Motion for Miscellaneous Relief, Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Stay,, by BELIZE SOCIAL DEVELOPMENT LIMITED. Filing fee $ 455, receipt number 0090–2353925. Fee Status: Fee Paid. Parties have been notified. (Todd, Kenneth) (Entered: 11/16/2010) |
| 11/17/2010 | 32 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 31 Notice of Appeal,. (znmw, ) (Entered: 11/17/2010) |
| 12/03/2010 | | USCA Case Number 10–7167 for 31 Notice of Appeal, filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (jf, ) (Entered: 12/03/2010) |
| 08/16/2011 | 33 | NOTICE of Change of Address by Jay Christopher Johnson (Johnson, Jay) (Entered: 08/16/2011) |
| 07/20/2012 | | Set/Reset Hearings: Status Conference set for 9/24/2012 11:00 AM in Courtroom 18 before Judge Richard J. Leon. (kc ) (Entered: 07/20/2012) |
| 09/24/2012 | | Minute Entry for proceedings held before Judge Richard J. Leon. Status Conference held on 9/24/2012. Plaintiff's Pleadings due by 10/9/2012; Defendant's Response due by 10/23/2012; Plaintiff's Reply due by 11/2/2012. (Court Reporter Pat Kaneshireo–Miller.) (kc ) (Entered: 09/24/2012) |
| 10/09/2012 | 34 | SUPPLEMENTAL MEMORANDUM to re Status Conference, Set Deadlines,, *Petitioner's Memorandum Regarding the Resolution of this Case on Remand Following the Court of Appeals' Grant of Mandamus* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (MacGrath, Dana) (Entered: 10/09/2012) |
| 10/23/2012 | 35 | SUPPLEMENTAL MEMORANDUM to re Status Conference, Set Deadlines,, 34 Supplemental Memorandum, *Regarding Proposed Procedural Steps After Remand* filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Johnson, Jay) (Entered: 10/23/2012) |
| 11/02/2012 | 36 | REPLY re 34 Supplemental Memorandum, *Petitioner's Reply Memorandum Regarding the Resolution of This Case on Remand Following the Court of Appeals' Grant of Mandamus* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Text of Proposed Order)(Kimmelman, Louis) (Entered: 11/02/2012) |
| 12/13/2012 | 37 | ORDER, Ordered that oral argument on the Petition to Confirm Arbitration Award and to Enter Judgment 1 , and all of the related submissions by the parties including the papers filed by the parties relating to the Motion to Stay Action or, in the Alternative, Dismiss 15 , and the Response to Petition to Confirm Arbitration Award 16 , shall be held on the 25th day of February, 2013, at 11:00 AM. in Courtroom 18 of the United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. SO ORDERED. Signed by Judge Richard J. Leon on 12/11/2012. (see order) (kc ) (Entered: 12/13/2012) |

| 12/14/2012 | 38 | Unopposed MOTION for Extension of Time to *File Briefs* by GOVERNMENT OF BELIZE (Johnson, Jay) (Entered: 12/14/2012) |
|---|---|---|
| 12/19/2012 | | MINUTE ORDER granting 38 Motion to Modify Briefing Schedule. It is hereby ORDERED that Respondent Government of Belize shall file any further papers in support of its Motion to Stay Action or, in the Alternative, Dismiss and its Response to Petition to Confirm Arbitration Award filed in March 2010, to the extent Respondent deems necessary, by January 14, 2013; and it is further ORDERED that Petitioner BSDL shall file its opposition to the Motion to Stay Action or, in the Alternative, Dismiss and its reply to the Response to Confirm Arbitration Award by February 15, 2013. Signed by Judge Richard J. Leon on 12/19/2012. (lcrjl3) (Entered: 12/19/2012) |
| 12/19/2012 | | Set/Reset Deadlines: Government of Belize shall file any further papers in support of its Motion to Stay Action or, in the Alternative, Dismiss and its Response to Petition to Confirm Arbitration Award by 1/14/2013; BSDL shall file its opposition to the Motion to Stay Action or, in the Alternative, Dismiss and its reply in support of the Petition to Confirm Arbitration Award by 2/15/2013. (jth) (Entered: 12/19/2012) |
| 01/14/2013 | 39 | SUPPLEMENTAL MEMORANDUM to re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Declaration of Michael C. Young (Second), # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K)(Johnson, Jay) (Entered: 01/14/2013) |
| 01/14/2013 | 40 | MOTION for Discovery by GOVERNMENT OF BELIZE (Attachments: # 1 Text of Proposed Order)(Johnson, Jay) (Entered: 01/14/2013) |
| 01/31/2013 | 41 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GOVERNMENT OF BELIZE. Attorney Jay Christopher Johnson terminated. (Johnson, Jay) (Entered: 01/31/2013) |
| 01/31/2013 | 42 | NOTICE of Appearance by Creighton R. Magid on behalf of GOVERNMENT OF BELIZE (Magid, Creighton) (Entered: 01/31/2013) |
| 01/31/2013 | 43 | Memorandum in opposition to re 40 MOTION for Discovery *Petitioner's Opposition to Respondent's Motion for Discovery* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Kimmelman, Louis) (Entered: 01/31/2013) |
| 02/07/2013 | 44 | REPLY to opposition to motion re 40 MOTION for Discovery filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Declaration of Michael C. Young)(Magid, Creighton) (Entered: 02/07/2013) |
| 02/08/2013 | | MINUTE ORDER denying 40 Respondent Government of Belize's Motion for Leave to Conduct Limited Discovery. It is hereby ORDERED that respondent's motion is DENIED. Signed by Judge Richard J. Leon on 2/8/2013. (lcrjl3) (Entered: 02/08/2013) |
| 02/15/2013 | 45 | SUPPLEMENTAL MEMORANDUM to re 15 MOTION to Dismiss for Lack of Jurisdiction *or stay action* MOTION to Stay filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Louis B. Kimmelman in Opposition to Respondent's Motion, and in Support of the Petition, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Declaration of Eamon H. Courtenay, S.C., # 7 Exhibit A, # 8 Exhibit B, # 9 Exhibit C, # 10 Exhibit D, # 11 Exhibit E, # 12 Exhibit F, # 13 Exhibit G, # 14 Exhibit H, # 15 Exhibit I, # 16 Opinion of Marcus Smith QC on English Law, # 17 Exhibit A, # 18 Exhibit B, # 19 Exhibit C, # 20 Exhibit D, # 21 Exhibit E, # 22 Exhibit F, # 23 Exhibit G, # 24 Exhibit H, # 25 Exhibit I, # 26 Exhibit J, # 27 Exhibit K, # 28 Exhibit L, # 29 Exhibit M, # 30 Exhibit N, # 31 Exhibit O, # 32 Exhibit P, # 33 Exhibit Q, # 34 Rule 44.1 Notice of Intention to Rely Upon Foreign Law)(Kimmelman, Louis) (Entered: 02/15/2013) |
| 02/22/2013 | 46 | ERRATA *Notice of Errata Regarding the Declaration of Eamon H. Courtenay, S.C. and Petitioner's Memorandum in Opposition to Respondent's Motion to Stay or Dismiss and in Further Support of Petition to Confirm Foreign Arbitration Award and to Enter Judgment* by BELIZE SOCIAL DEVELOPMENT LIMITED |

| | | |
|---|---|---|
| | | 45 Supplemental Memorandum,,,, filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Kimmelman, Louis) (Entered: 02/22/2013) |
| 02/25/2013 | | Minute Entry for proceedings held before Judge Richard J. Leon.Oral Argument Hearing held on 2/25/2013. The Court takes matter under advisement. (Court Reporter Patty Gels.) (kc ) (Entered: 02/25/2013) |
| 09/30/2013 | 47 | MOTION for Leave to File *Additional Briefing* by GOVERNMENT OF BELIZE (Attachments: # 1 Declaration of Juan Basombrio, # 2 Exhibit 1, # 3 Text of Proposed Order)(Magid, Creighton) (Entered: 09/30/2013) |
| 10/02/2013 | 48 | ERRATA *to Declaration of Juan Basbombrio* by GOVERNMENT OF BELIZE 47 MOTION for Leave to File *Additional Briefing* filed by GOVERNMENT OF BELIZE. (Attachments: # 1 Declaration of Juan Basombrio, # 2 Exhibit 1)(Magid, Creighton) (Entered: 10/02/2013) |
| 10/15/2013 | 49 | RESPONSE re 47 MOTION for Leave to File *Additional Briefing* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Declaration Kimmelman Declaration, # 2 Exhibit A)(Kimmelman, Louis) (Entered: 10/15/2013) |
| 10/17/2013 | 50 | REPLY to opposition to motion re 47 MOTION for Leave to File *Additional Briefing* filed by GOVERNMENT OF BELIZE. (Magid, Creighton) (Entered: 10/17/2013) |
| 12/11/2013 | 51 | MEMORANDUM AND OPINION. Signed by Judge Richard J. Leon on 12/11/13. (tb, ) (Entered: 12/11/2013) |
| 12/11/2013 | 52 | ORDER: For the reasons set forth Memorandum Opinion entered this date: It is hereby ordered that 1 Petition to Confirm Arbitration Award and to Enter Judgment is GRANTED; it is further ordered that judgment shall be entered in favor of Petitioner and against Respondent for the monetary portion of the Final Award[3−1]. It is further ordered the parties shall within seven (7) days of this Order submit proposed judgment amounts with conversion and interested calculated in accordance with the Memorandum Opinion; it is further ordered that respondent's 15 Motion to Stay Action is DENIED; and it is further ordered that respondent's 47 Motion for Leave to Submit Additional Briefing is DENIED. SEE ORDER FOR FULL DETAILS. Signed by Judge Richard J. Leon on 12/11/13. (tb, ) (Entered: 12/11/2013) |
| 12/18/2013 | 53 | NOTICE *OF FILING OF PETITIONER'S PROPOSED JUDGMENT AMOUNTS* by BELIZE SOCIAL DEVELOPMENT LIMITED (Kimmelman, Louis) (Entered: 12/18/2013) |
| 12/19/2013 | 54 | MEMORANDUM re 52 Order on Motion for Leave to File,,, by GOVERNMENT OF BELIZE. (Magid, Creighton) (Entered: 12/19/2013) |
| 12/23/2013 | 55 | REPLY re 54 Memorandum *filed by Respondent Responding to the Court's December 11, 2013 Order* filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Kimmelman, Louis) (Entered: 12/23/2013) |
| 12/27/2013 | 56 | REPLY *TO BSDL 56 "REPLY" CONCERNING PROPOSED JUDGMENT AMOUNTS* filed by GOVERNMENT OF BELIZE. (Magid, Creighton) . (Entered: 12/27/2013) |
| 01/08/2014 | 57 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to Order on Motion to Bifurcate, 51 Memorandum &Opinion, Order on Motion for Discovery, 52 Order on Motion for Leave to File,,, by GOVERNMENT OF BELIZE. Filing fee $ 505, receipt number 0090−3585618. Fee Status: Fee Paid. Parties have been notified. (Magid, Creighton) (Entered: 01/08/2014) |
| 01/09/2014 | 58 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 57 Notice of Appeal to DC Circuit Court,. (znmw, ) (Entered: 01/09/2014) |
| 01/09/2014 | 59 | MEMORANDUM ORDER: Upon consideration of the petitioner's 53 Notice of Proposed Judgment Amounts and the response by the Respondent the next day. It is hereby ordered that the petitioner is awarded $22,484,961.94 in U.S. dollars. |

| | | |
|---|---|---|
| | | Signed by Judge Richard J. Leon on 01/08/14. (tb, ) (Entered: 01/09/2014) |
| 01/09/2014 | 60 | Supplemental Record on Appeal, consisting of a copy of the Memorandum Order filed 1/9/14 and docket sheet transmitted to US Court of Appeals re 57 Notice of Appeal to DC Circuit Court. USCA Case Number U.S.C.A. No. not assigned. (mlp) (Entered: 01/09/2014) |
| 01/13/2014 | 61 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 59 Order, by GOVERNMENT OF BELIZE. Filing fee $ 505, receipt number 0090–3590213. Fee Status: Fee Paid. Parties have been notified. (Magid, Creighton) (Entered: 01/13/2014) |
| 01/14/2014 | 62 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 61 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 01/14/2014) |
| 01/23/2014 | 63 | NOTICE of Filing of Transcript Order by GOVERNMENT OF BELIZE re 61 Notice of Appeal to DC Circuit Court (Magid, Creighton) (Entered: 01/23/2014) |
| 01/23/2014 | 64 | NOTICE Confirmation of Prior Transcript Filing by GOVERNMENT OF BELIZE re 61 Notice of Appeal to DC Circuit Court, 57 Notice of Appeal to DC Circuit Court, (Magid, Creighton) (Entered: 01/23/2014) |
| 01/24/2014 | | USCA Case Number 14–7002 for 57 Notice of Appeal to DC Circuit Court, filed by GOVERNMENT OF BELIZE. (jf, ) (Entered: 01/24/2014) |
| 01/24/2014 | | USCA Case Number 14–7003 for 61 Notice of Appeal to DC Circuit Court filed by GOVERNMENT OF BELIZE. (jf, ) (Entered: 01/24/2014) |
| 02/03/2014 | 65 | MOTION for Entry of Final Judgment in a Separate Document by BELIZE SOCIAL DEVELOPMENT LIMITED (Attachments: # 1 Exhibit Proposed Judgment)(Kimmelman, Louis) (Entered: 02/03/2014) |
| 02/04/2014 | 66 | CLERK'S JUDGMENT in favor of petitioner against respondent. SO ORDERED– Judge Richard J. Leon on 01/09/14. (tb, ) (Main Document 66 replaced on 2/4/2014) (tb, ). (Entered: 02/04/2014) |
| 02/04/2014 | 67 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 66 Clerk's Judgment by GOVERNMENT OF BELIZE. Filing fee $ 505, receipt number 0090–3612412. Fee Status: Fee Paid. Parties have been notified. (Magid, Creighton) (Entered: 02/04/2014) |
| 02/05/2014 | 68 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 67 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 02/05/2014) |
| 02/14/2014 | 69 | NOTICE of Appearance by Kristin Graham Koehler on behalf of All Plaintiffs (Koehler, Kristin) (Entered: 02/14/2014) |
| 02/21/2014 | | USCA Case Number 14–7018 for 67 Notice of Appeal to DC Circuit Court filed by GOVERNMENT OF BELIZE. (jf, ) (Entered: 02/21/2014) |
| 03/14/2014 | 70 | NOTICE of Confirmation of Prior Transcript Filing by GOVERNMENT OF BELIZE (Magid, Creighton) (Entered: 03/14/2014) |
| 03/28/2014 | 71 | TRANSCRIPT OF PROCEEDINGS before Judge Richard J. Leon held on 9/24/12; Page Numbers: 1–17. Date of Issuance:3/28/14. Court Reporter/Transcriber Patricia Kaneshiro–Miller, Telephone number 202–354–3243, Court Reporter Email Address : patfromhawaii@aol.com.<P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at |

| | | ww.dcd.uscourts.gov.<P></P> Redaction Request due 4/18/2014. Redacted Transcript Deadline set for 4/28/2014. Release of Transcript Restriction set for 6/26/2014.(Kaneshiro−Miller, Patricia) (Entered: 03/28/2014) |
|---|---|---|
| 04/03/2014 | 72 | Emergency MOTION to Stay by GOVERNMENT OF BELIZE (Attachments: # 1 Declaration of Creighton R. Magid, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration, # 4 Text of Proposed Order)(Magid, Creighton). Added MOTION for Emergency Relief on 4/4/2014 (znmw, ). (Entered: 04/03/2014) |
| 04/21/2014 | 73 | Memorandum in opposition to re 72 Emergency MOTION to Stay filed by BELIZE SOCIAL DEVELOPMENT LIMITED. (Attachments: # 1 Text of Proposed Order, # 2 Declaration Of Louis B. Kimmelman in Support of Petitioners Opposition to Respondents Motion to Stay., # 3 Exhibit A, # 4 Exhibit B)(Kimmelman, Louis) (Entered: 04/21/2014) |
| 04/28/2014 | 74 | REPLY to opposition to motion re 72 Emergency MOTION to Stay *and for Emergency Relief* filed by GOVERNMENT OF BELIZE. (Magid, Creighton) (Entered: 04/28/2014) |
| 04/29/2014 | | MINUTE ORDER denying 72 Respondent's Motion to Stay Proceedings Pending Appeal and for Emergency Relief. It is hereby ORDERED that Respondent's motion is DENIED. Signed by Judge Richard J. Leon on 4/29/2014. (lcrjl3) (Entered: 04/29/2014) |

# Kimmelman Declaration

# Exhibit G

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| BELIZE SOCIAL DEVELOPMENT LIMITED, | ) ) ) ) | |
| Petitioner, | ) | Case No. 1:09-CV-02170-RJL |
| v. | ) ) ) | |
| THE GOVERNMENT OF BELIZE, | ) ) | |
| Respondent. | ) ) ) | |

**MOTION TO SUSPEND THE APRIL 14, 2010
SCHEDULING ORDER AND FOR A STATUS CONFERENCE**

Pursuant to this Court's April 14, 2010 Minute Order, Petitioner Belize Social Development Limited ("BSDL") is required to submit papers to this Court by May 28, 2010 in connection with the pending proceeding, including the following: (a) Reply in support of the Petition to Confirm Foreign Arbitration Award and to Enter Judgment; (b) Opposition to Respondent's Motion to Stay Action or, in the Alternative, Dismiss Petition; and (c) Opposition to Respondent's Motion to Bifurcate. However, as explained below, counsel for Petitioner is unable to file those pleadings in accordance with the Scheduling Order. Counsel for Petitioner therefore requests that the April 28, 2010 Order be suspended and that the Court schedule a status conference with the parties.

In its Motion to Stay or Dismiss, Respondent Government of Belize ("GoB") states "[t]he Belize Supreme Court has issued an injunction prohibiting BSDL from enforcing the subject arbitration award" while a proceeding is pending in Belize. Respondent's Motion to Stay or Dismiss at 1 (Docket Entry 15). Respondent has stated in its papers that there is a Belize court order that states as follows:

> Belize Telemedia Limited and [BSDL] or their successors, assigns
> or subsidiaries, are thereby restrained by themselves, their agents or
> representatives howsoever, from enforcing, or commencing or
> continuing in the United Kingdom or any other jurisdiction,
> proceedings for enforcing the award of the London Court of
> International Arbitration (LCIA), made on the 18th of March 2009,
> in Arbitration Number 81079, or from commencing or continuing in
> the United Kingdom or in any other jurisdiction, any proceedings
> relating to the enforcement of said award.

*Id.* at 12.

On March 31, 2010, after the proceeding before this Court had been filed, Respondent

GoB enacted an amendment to the Belize Supreme Court of Judicature Act, Chapter 91 of the

Laws of Belize, "to strengthen the provisions relating to contempt of court; and to provide for

matters connected therewith or incidental thereto." A copy of this new Belize legislation is

attached as Exhibit A.

The new Belize legislation purports to make it a criminal offense, punishable by fines and

imprisonment, to "disobey[] or fail[] to comply with an injunction, or an order in the nature of an

injunction" issued by the Supreme Court of Belize (whether such injunction was issued before or

after the new Belize legislation). Exh. A. at 308 (Section 106A(1)). The new Belize legislation

makes such offenses punishable by fines and/or imprisonment "for a term which shall not be less

than five years but which may extend to ten years." *Id.* at 309 (Section 106A(3)). As the law

purports to apply whether such injunction was issued before or after the new Belize legislation,

the law presumably would apply to the purported injunction that Respondent has asserted was

issued against BSDL.

Furthermore, the new Belize legislation purports to make it a criminal offense if any

person, whether in Belize or elsewhere, directly or indirectly "***instigates, commands, counsels,

procures, solicits, advises or in any manner whatsoever aids, facilitates, or encourages***"

violation of an injunction or similar order issued by the Supreme Court of Belize. *Id.* (Section

106A(4)) (emphasis added).  The penalties for "abetting the said offence shall be punished in like manner" (fines and/or imprisonment).  *Id.* at 310 (Section 106A(4)).  It appears that the new law purports to apply to BSDL's attorneys appearing before this Court in this proceeding.

Offenses set forth in the new Belize legislation "shall be investigated, tried, judged and punished by the [Belize] Court" regardless of whether they occurred in Belize or in any other territorial jurisdiction, or whether or not the alleged offender was present in Belize or elsewhere. Additionally, offenses may be tried in the absence of the accused.  *Id.* (Section 106A(6)).

Counsel of record for the GoB has stated in the Joint Motion for Extension of Time ¶ 6 (Docket Entry 18) that the GoB "in no way consents to the continued prosecution of this Petition, does not waive its sovereign rights and obligations to fully enforce its laws, including but not limited to the Act referred to in paragraph 2 above [the Supreme Court of Judicature (Amendment) Act, 2010 that was enacted March 31, 2010]."  Joint Motion for Extension of Time at 2.

As a result, it would appear that the filing of papers by counsel for BSDL on May 28, 2010 in accordance with this Court's Minute Order dated April 14, 2010 would be deemed by Respondent GoB to be a criminal offense.  Counsel for BSDL does not want to do anything that would be deemed a violation of any valid and enforceable law.  Accordingly, counsel for Petitioner respectfully requests that the Court suspend the Scheduling Order of April 14, 2010 and schedule a status conference with the parties.

Dated:  May 25, 2010

Respectfully submitted,


  /s/ Joseph S. Hall
Joseph S. Hall (D.C. Bar No. 475057)
KELLOG, HUBER, HANSEN, TODD,
EVANS & FIGEL P.L.L.C.
1615 M Street, N.W., Suite 400
Washington D.C. 20036
Telephone:  (202) 326-7900
Fax:  (202) 326-7999
jhall@khhte.com

Louis B. Kimmelman (admitted pro hac vice)
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Fax: (212) 610-6399
benno.kimmelman@allenovery.com

Counsel for Petitioner
BELIZE SOCIAL DEVELOPMENT LIMITED

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 25, 2010, I caused to be filed electronically the foregoing Motion To Suspend the April 14, 2010 Scheduling Order and for a Status Conference with the Clerk of Court for the United States District Court for the District of Columbia using the CM/ECF system and accomplished service via the same.

/s/ Joseph S. Hall
Joseph S. Hall